**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

LTL MANAGEMENT LLC,

     Plaintiff,

   v.

DR. JACQUELINE MIRIAM MOLINE,

     Defendant.

Case 3:23-cv-02990-GC-DEA

Hon. Georgette Castner, U.S.D.J.

Return Date: July 3, 2023

***Document Electronically Filed***

<u>**ORAL ARGUMENT REQUESTED**</u>

---

**MEMORANDUM OF LAW IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR EXPEDITED DISCOVERY**

---

Kevin H. Marino
John D. Tortorella
Erez J. Davy
**MARINO, TORTORELLA & BOYLE, P.C.**
437 Southern Boulevard
Chatham, New Jersey 07928-1488
Tel: (973) 824-9300
Fax: (973) 824-8425
kmarino@khmarino.com
jtortorella@khmarino.com
edavy@khmarino.com

*Attorneys for Defendant*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND .......................................................................................................... 3

    A.   Dr. Moline, the Article, and the Obligation to Safeguard the Identities of the
          Article's Research Participants. ....................................................................... 6

    B.   J&J, LTL, and LTL's Campaign to Obtain the Spreadsheet to Discredit
          Dr. Moline and the Opinions Expressed in the Article. .............................. 8

LEGAL ARGUMENT ................................................................................................. 9

I.     LTL HAS FAILED TO DEMONSTRATE THAT IT IS ENTITLED TO
       PURSUE EXPEDITED DISCOVERY IN SUPPORT OF ITS MERITLESS
       CLAIMS. ............................................................................................................ 9

    A.   LTL Has Failed to Meet the *Notaro* Standard, which Governs this Motion. ............. 9

    B.   Even if the "Good Cause" Standard Applied, LTL has Failed to Meet It. ............... 13

CONCLUSION ........................................................................................................... 27

i

**<u>TABLE OF AUTHORITIES</u>**

<u>Cases</u>

*4Sight Supply Chain Grp., LLC v. Kent*,
    No. 2:19-cv-12476, 2019 U.S. Dist. LEXIS 246593 (D.N.J. June 16, 2019) .............. 13, 18, 20

*ALARIS Grp., Inc. v. Disability Mgmt. Network, Ltd.*,
    No. 12-cv-0446, 2012 U.S. Dist. LEXIS 200498 (D. Minn. May 30, 2012) ......................... 14

*Allen v. Currier*,
    No. 20-cv-1389, 2023 U.S. Dist. LEXIS 55895 (S.D. Cal. Mar. 30, 2023) ........................... 14

*Bader v. Johnson & Johnson*,
    86 Cal. App. 5th 1094 (Ct. App. 2022) ....................................................................................... 4

*Bell v. Am. Int'l Indus.*,
    No. 1:17-cv-0111, 2022 U.S. Dist. LEXIS 199180 (M.D.N.C. Sept. 13, 2022) .......... 11, 16, 18

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.*,
    627 F. Supp. 2d 384 (D.N.J. 2009) ........................................................................................... 17

*Chubb INA Holdings, Inc. v. Chang*,
    No. 16-cv-2354, 2016 U.S. Dist. LEXIS 82225 (D.N.J. June 24, 2016) ..................... 13, 19, 20

*Cobra Enters., LLC v. All Phase Servs.*,
    No. 20-cv-4750, 2020 U.S. Dist. LEXIS 96033 (D.N.J. June 1, 2020) ..................................... 12

*Crash Proof Ret. v. Price*,
    533 F. Supp. 3d 227 (E.D. Pa. 2021) ........................................................................................ 18

*Cusumano v. Microsoft Corp.*,
    162 F.3d 708 (1st Cir. 1988) ..................................................................................................... 23

*DeSantis v. Employees Passaic County Welfare Ass'n*,
    237 N.J. Super. 550 (App. Div. 1990) ...................................................................................... 17

*Dewey v. Volkswagen AG*,
    558 F. Supp. 2d 505 (D.N.J. 2008) ........................................................................................... 17

*Dill v. Yellin*,
    No. 22-cv-6116, 2023 U.S. Dist. LEXIS 38637 (D.N.J. Mar. 8, 2023) .................................... 12

*Dow Chemical Co. v. Allen*,
    672 F.2d 1262 (7th Cir. 1982) ................................................................................................... 22

*Driftless Area Land Conservancy v. Pub. Serv. Comm'n of Wis.*,
    No. 19-cv-1007, 2020 U.S. Dist. LEXIS 229001 (W.D. Wis. Dec. 7, 2020) ........................... 20

*Farnsworth v. Procter & Gamble Co.*,
    758 F.2d 1545 (11th Cir. 1985) ........................................................................................... 23, 26

*Fields v. Lilly*,
    2:13-cv-0035, 2015 U.S. Dist. LEXIS 191536 (M.D. Ala. Mar. 26, 2015) .............................. 23

*Gerling Int'l Ins. Co. v. Comm'r Gerling Int'l Ins. Co.*,
    839 F.2d 131 (3d Cir. 1988) ...................................................................................................... 19

*Gucci Am., Inc. v. Daffy's, Inc.*,
   No. 00-cv-4463, 2000 U.S. Dist. LEXIS 16714 (D.N.J. Nov. 14, 2000) .......................... 10, 12

*Harbortouch Payments, LLC v. Denali State Bank*,
   No. 14-cv-6049, 2015 U.S. Dist. LEXIS 64991 (D.N.J. May 19, 2015)................................ 13

*In re Fosamax Prods. Liab. Litig.*,
   MDL No. 1789, 2009 U.S. Dist. LEXIS 70246 (S.D.N.Y. Aug. 4, 2009) .............................. 23

*In re LTL Mgmt., LLC*,
   64 F.4th 84 (3d Cir. 2023) ......................................................................... 4, 8, 9, 22

*In re Novo Nordisk Sec. Litig.*,
   530 F. Supp. 3d 495 (D.N.J. 2021) ............................................................................. 19

*In re R. J. Reynolds Tobacco Co.*,
   136 Misc. 2d 282 (Sup. Ct., N.Y. Cty., 1987) ........................................................... 23

*In re Schaefer*,
   331 F.R.D. 603 (W.D. Pa. 2019) .............................................................................. 23

*In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*,
   MDL No. 2100, 2011 U.S. Dist. LEXIS 132056 (S.D. Ill. Nov. 15, 2011) ...................... 23, 25

*Ingenuity13 LLC v. Doe*,
   No. 2:12-cv-1969, 2012 U.S. Dist. LEXIS 113051 (E.D. Cal. Aug. 10, 2012) ...................... 21

*Klein v. Affiliated Grp., Inc.*,
   No. 18-cv-949, 2019 U.S. Dist. LEXIS 48019 (D. Minn. Mar. 22, 2019) .................. 23, 25, 26

*Kone Corp. v. Thyssenkrupp USA, Inc.*,
   No. 11-cv-0465, 2011 U.S. Dist. LEXIS 109518 (D. Del. Sept. 26, 2011)............................ 21

*Lucero-Gonzalez v. Kline*,
   No. 20-cv-0901, 2020 U.S. Dist. LEXIS 250690 (D. Az. Aug. 28, 2020) .............................. 21

*Malibu Media, LLC v. John Doe Subscriber Assigned IP Address 47.20.202.138*,
   No. 16-cv-0942, 2016 U.S. Dist. LEXIS 32445 (D.N.J. Mar. 14, 2016) ................................ 21

*Malibu Media, LLC v. John Does 1 through 32*,
   No. 1:12-cv-00886, 2012 U.S. Dist. LEXIS 107683 (E.D. Cal. Aug. 1, 2012) ...................... 21

*Mercy Catholic Med. Ctr. v. Thompson*,
   380 F.3d 142 (3d Cir. 2004) ...................................................................................... 19

*Merial LLC v. Fidopharm, Inc.*,
   No. 13-cv-1207, 2013 WL 4478477 (N.D. Ga. May 22, 2013) .............................................. 21

*Miller v. Hamm*,
   No. 22-cv-506, 2022 U.S. Dist. LEXIS 191524 (M.D. Ala. Oct. 20, 20222) ........................ 18

*Monsanto Co. v. Dragan*,
   No. 05-cv-786S, 2005 U.S. Dist. LEXIS 56872 (W.D.N.Y. Nov. 21, 2005)........................... 14

*Mullane v. Almon*,
   339 F.R.D. 659 (N.D. Fla. 2021) ............................................................................... 14

*Notaro v. Koch*,
  95 F.R.D. 403 (S.D.N.Y. 1982) .................................................................... passim

*Pacira Biosciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*,
  63 F.4th 240 (3d Cir. 2023) ...................................................... 5, 15, 16, 17

*Profil Institut Fur Stoffwechselforschung Gbmh v. Profil Inst. for Clinical Research*,
  No. 16-cv-2762, 2016 U.S. Dist. LEXIS 175238 (S.D. Ca. Dec. 16, 2016) ........... 14

*Robinson v. Moskus*,
  491 F. Supp. 3d 359 (C.D. Ill. 2020) ........................................................ 19

*Roman Chariot, LLC v. JMRL Sales & Serv.*,
  No. 06-cv-626, 2006 U.S. Dist. LEXIS 46620 (D.N.J. July 11, 2006) ................... 13

*Sambreel Holdings LLC v. Facebook, Inc.*,
  No. 12-cv-668, 2012 U.S. Dist. LEXIS 201217 (S.D. Ca. June 15, 2012) ............... 20

*Samuel, Son & Co. v. Beach*,
  No. 13-cv-0128, 2013 U.S. Dist. LEXIS 129486 (W.D. Pa. Sept. 11, 2013)........... 21

*Sawhorse Enters. v. Church & Dwight Co.*,
  No. 12-cv-6811, 2013 U.S. Dist. LEXIS 48155 (D.N.J. Apr. 3, 2013)............ 10, 12, 13, 20

*Shanus v. Auctions*,
  No. 2:11-cv-2839, 2013 U.S. Dist. LEXIS 12692 (D.N.J. Jan. 29, 2013)................. 5

*Strike 3 Holdings, LLC v. Doe*,
  No. 22-cv-1919, 2022 U.S. Dist. LEXIS 79903 (D.N.J. May 3, 2022).................... 21

*Sweezy v. New Hampshire*,
  354 U.S. 234 (1957)................................................................................ 23

*TQ Delta, LLC v. Samsung Elecs. Am., Inc.*,
  No. 21-cv-16580, 2021 U.S. Dist. LEXIS 243046 (D.N.J. Dec. 20, 2021)............... 19

*Webster v. Sun Co.*,
  790 F.2d 157 (D.C. Cir. 1986)................................................................... 17

*Windowizards, Inc. v. Castle, The Window People*,
  No. 00-cv-4680, 2005 U.S. Dist. LEXIS 54920 (E.D. Pa. Mar. 3, 2005) ............... 22

*Yip v. Pagano*,
  606 F. Supp. 1566 (D.N.J. 1985)................................................................ 17

## **Rules & Regulations**

45 C.F.R. § 160.103 ................................................................................... 24

45 C.F.R. § 164.502 ................................................................................... 24

45 C.F.R. § 164.514(b)(2)(i)(A)................................................................... 24

45 C.F.R. § 46.104(d)(4)(ii)......................................................................... 24

45 C.F.R. § 46.111(a)(7).............................................................................. 24

Fed. R. Civ. P. 12 ...................................................................................... 14

Fed. R. Civ. P. 26 ............................................................................................................ 9, 14

Fed. R. Civ. P. 34 ................................................................................................................. 18

Local Civil Rule 37.1 ........................................................................................................... 18

**Journals & Treatises**

6 Moore's Federal Practice - Civil § 26.121 (2023) .................................................... 14

Emily Haney-Caron, *et al.*, *Safe from Subpoena? The Importance of Certificates of Confidentiality to the Viability and Ethics of Research*, 48 AKRON L. REV. 349, 351 (2019) . 24

Eric Robinson, *No Confidence: Confidentiality, Ethics and the Law of Academic Privilege*, 21 COMM. L. & POL'Y 323 (Summer 2016) ...................................................... 24, 25

Restatement (Second) of Torts § 590A ........................................................................ 17

**Other Authorities**

Lisa Girion, *Special Report: J&J knew for decades that asbestos lurked in its Baby Powder*, REUTERS: HEALTHCARE & PHARMA (DEC. 14, 2018) ............................................. 3, 8

NIH, National Library of Medicine,
*Information bias in health research: definition, pitfalls, and adjustment methods*, *available* at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4862344/ .................................... 16

Roni Rabin & Tiffany Hsu, *Johnson & Johnson Feared Baby Powder's Possible Asbestos Link for Years*, N.Y. TIMES (DEC. 14, 2018) ................................................................. 3, 8

Roni Rabin & Tiffany Hsu, *Johnson & Johnson Recalls Baby Powder Over Asbestos Worry*, N.Y. TIMES (OCT. 18, 2019) .............................................................................. 4, 8

U.S. Department of Health and Human Services, Office for Human Research Protections, *available at* https://www.hhs.gov/ohrp/regulations-and-policy/regulations/45-cfr-46/index.html ............................................................................................................... 24

Defendant, Dr. Jacqueline Miriam Moline ("Dr. Moline"), respectfully submits this memorandum of law in opposition to LTL Management LLC's ("LTL") motion for expedited discovery of the confidential identities of participants in a medical study she conducted on the causes of idiopathic malignant mesothelioma.

## PRELIMINARY STATEMENT

LTL's motion is baseless and should be denied for two reasons.  First, LTL fails to satisfy or even cite the standard that applies to motions for expedited discovery that, like this one, seek substantive relief.  That standard, the *Notaro* test, requires the party seeking expedited discovery to demonstrate the threat of irreparable harm, a probability of success on the merits, a connection between the expedited discovery and the avoidance of irreparable harm, and evidence that the harm from denying expedited discovery outweighs the harm from granting it.

LTL does not meet any prong of that test:  (1) it faces no threat of irreparable harm if it does not secure the identities it seeks on an expedited basis; those names aren't going anywhere; (2) it is not likely to succeed on its claims against Dr. Moline; the Third Circuit recently held in *Pacira* that those claims are properly the subject of scientific debate, not litigation; (3) as there is no threat of irreparable harm if the identities are not promptly released, there is no connection between expedited discovery of those identities and the threat of irreparable harm; and (4) there is no harm from the denial of expedited discovery to outweigh the obvious irreparable harm to Dr. Moline, third parties, and the public at large from the chilling of scientific discourse expedited discovery would entail.

Second, LTL also fails to satisfy even the inapplicable good-cause standard it cites.  The cases on which it relies all involve expedited discovery that was necessary to prosecute those cases.  Here, there is no such need.  Moreover, Dr. Moline has not had the opportunity to seek dismissal

of claims that seek to impose liability on her for a scientific conclusion that is not actionable as a matter of law.  To permit LTL to obtain discovery of the sensitive and confidential identities of the participants in Dr. Moline's study before this Court determines the viability of LTL's claims would clearly contravene the Third Circuit's holding in *Pacira*.  This Court should not countenance such a result.

Additionally, the burden of production here—that is, the negative consequences that would flow from producing the identities—are considerable.  Dr. Moline and her employer, Northwell Health, Inc. ("Northwell"), are bound by federal health and privacy regulations, professional standards, and ethical obligations to maintain the study participants' anonymity.  The chilling effect on medical researchers would be profound.  LTL's argument that the production of a 5-page document bearing the patients' identities would not be burdensome misperceives the burden at issue.  The point is not that it would be physically difficult to produce a 5-page document, but that the concerns articulated above carry a burden far greater than one that attends a voluminous document production.

Moreover, the purpose for which LTL seeks the identities of the study participants—to prove its claims against Dr. Moline—is not a valid basis for expedited discovery.  A party that seeks expedited discovery must show an urgent and unusual need for early discovery, such as the pendency of a motion for a preliminary injunction.  Indeed, nearly all the cases on which LTL relies involve such circumstances.  LTL has not filed a motion for a preliminary injunction or, indeed, demonstrated any pressing need for the discovery it seeks, having known about Dr. Moline's article for years and having waited months after its bankruptcy filing was dismissed to file this motion.  LTL's supposed "need" for the document is no different than the "need" of any litigant to obtain discovery it believes will prove its claims.  What's worse, LTL does not "need"

the document in this case; its transparent purpose for seeking the study participants' identities (and, indeed, for filing the litigation) is to support its defense of other cosmetic-talc litigations.  That is not an appropriate basis to seek any discovery, much less expedited discovery.

Finally, given the significant confidentiality, privacy, and public-policy issues at stake, LTL's effort to obtain the identities in question could not fairly be resolved without significant motion practice and fact finding directed at these issues.  That motion practice would invariably involve Northwell, the entity that actually controls the document and whose concrete interests would be impacted if LTL were to move to compel its production.  The time and effort it would take to resolve these issues properly underscores that it is not the appropriate subject of expedited discovery.

For these reasons, amplified below, the Court should deny LTL's motion for expedited discovery.

## **BACKGROUND**

Johnson & Johnson ("J&J") has repeatedly denied that its talc-based consumer products contained asbestos although it knew that they did for decades.  *See* Lisa Girion, *Special Report: J&J knew for decades that asbestos lurked in its Baby Powder*, REUTERS: HEALTHCARE & PHARMA (DEC. 14, 2018)[1]; Roni Rabin & Tiffany Hsu, *Johnson & Johnson Feared Baby Powder's Possible Asbestos Link for Years*, N.Y. TIMES (Dec. 14, 2018).[2]  J&J has repeated those denials despite recalling 33,000 bottles of baby powder in October 2019 after the Food and Drug Administration ("FDA") found that one of its bottles was contaminated with asbestos, and despite being found

---

[1]  *Available at* https://www.reuters.com/article/us-johnson-johnson-cancer-special-report/special-report-jj-knew-for-decades-that-asbestos-lurked-in-its-baby-powder-idUSKBN1OD1RQ

[2]   *Available at*  https://www.nytimes.com/2018/12/14/business/baby-powder-asbestos-johnson-johnson.html.

liable for selling its talc products and lying about the fact that they contained asbestos.  *See* Roni Rabin & Tiffany Hsu, *Johnson & Johnson Recalls Baby Powder Over Asbestos Worry*, N.Y. TIMES (OCT. 18, 2019)[3]; *see also, e.g.*, *Bader v. Johnson & Johnson*, 86 Cal. App. 5th 1094, 1099, 1103 (Ct. App. 2022) (affirming jury verdict finding J&J liable for negligence, products liability, and concealment on the theory that J&J and its co-defendants' "cosmetic talc products were contaminated with asbestos and that [plaintiff's] exposure thereto caused her mesothelioma"), *pet'n for review denied*, No. S278437, 2023 Cal. LEXIS 1887 (Apr. 12, 2023).

Rather than accept responsibility and make amends for the harm it has caused, J&J has steadfastly tried to limit its exposure to claims arising from its talc-based products by forming a new entity—LTL, the plaintiff in this litigation—and causing it to file for bankruptcy to force a global resolution of the thousands of personal-injury claims pending against J&J, a multinational powerhouse.  *See In re LTL Mgmt., LLC*, 64 F.4th 84, 93 (3d Cir. 2023).  In January 2023, the Third Circuit dismissed LTL's bankruptcy petition because it was not filed in good faith.  *See id.* Notwithstanding that ruling, LTL re-filed for bankruptcy on April 4, 2023; motions to dismiss that action as improvidently filed are pending.  *See In re LTL Management LLC*, 23-12825-MBK (Bankr. D.N.J.).

In addition to improperly using bankruptcy to avoid liability, J&J has used LTL in a relentless campaign to attack and silence the scientists whose medical research helped establish the links between talc-based products and mesothelioma.  Dr. Moline, a board-certified physician in internal and occupational medicine employed by Northwell, is one of those scientists.  In 2019, Dr. Moline published an article in the Journal of Occupational and Environmental Medicine

---

[3]   *Available   at*   https://www.nytimes.com/2019/10/18/business/johnson-johnson-baby-powder-recall.html.

("JOEM")[4] entitled *Mesothelioma Associated With the Use of Cosmetic Talc* (the "Article"), which concluded that asbestos-contaminated talcum powder can cause mesothelioma.  Dr. Moline based her conclusions on materials and methods clearly set forth in her study—that is, the medical records and sworn deposition testimony of 33 patients who suffered from mesothelioma, augmented in some instances by sworn testimony of family members and in-person interviews; and tissue analysis of 6 of the 33 patients.  Consistent with her legal, professional, and ethical obligations, as well as those of Northwell, Dr. Moline kept the identity of these patients confidential and has fought to preserve their anonymity ever since.

Notwithstanding Dr. Moline's disclosure of the basis for her conclusions, J&J, through LTL, sued her in an adversary proceeding in its since-vacated bankruptcy proceeding for injurious falsehood/product disparagement or trade libel,[5] fraud, and violating the Lanham Act.  There, as here, the transparent purpose of the lawsuit was to unmask the identities of the Article's subjects in the hopes of publicly smearing them to discredit the Article.  Indeed, within a few weeks after filing its adversary lawsuit, LTL moved for expedited discovery of a spreadsheet identifying the participants in Dr. Moline's study (the "Spreadsheet").  By obtaining the Spreadsheet, LTL apparently believed, along with other cosmetic-talc defendants who pursued the same strategy in

---

[4] The JOEM is a "leading scientific, peer-reviewed monthly publication in the specialty of occupational and environmental medicine" which "serves as an indispensable source to in-depth, clinically oriented research articles and technical reports that keep readers up-to-date on cutting-edge medical developments in the field."  American College of Occupational and Environmental Medicine, *Publications*, *available at* https://acoem.org/Publications/Journal-of-Occupational-and-Environmental-Medicine.

[5] *See, e.g.*, *Pacira Biosciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*, 63 F.4th 240, 244 n.7 (3d Cir. 2023) (noting that "[t]rade libel has also been referred to as 'product disparagement'"); *Shanus v. Auctions*, No. 2:11-cv-2839, 2013 U.S. Dist. LEXIS 12692, at *9 (D.N.J. Jan. 29, 2013) (using the terms "injurious falsehood," "product disparagement," and "trade libel" interchangeably).

other cases, that they could discredit Dr. Moline and any expert who relied on her work in a broad spectrum of cosmetic-talc litigations.

This lawsuit and motion for expedited discovery are a replay of this strategy. LTL asserts the same three causes of action against Dr. Moline—trade libel, fraud, and violation of the Lanham Act—as it did in its bankruptcy proceeding, and filed this motion for expedited discovery to obtain the Spreadsheet the day after service of the complaint. LTL argues that this is the unusual case where expedited discovery in contravention of the normal discovery schedule should be allowed because it "needs" the Spreadsheet to prove its claims. Not so.

### A.   Dr. Moline, the Article, and the Obligation to Safeguard the Identities of the Article's Research Participants.

Dr. Moline is a physician employed at Northwell who is board-certified in internal and occupational medicine. (Declaration of Kevin H. Marino ("Marino Decl.") Ex. 1, Moline Aff. ¶ 2.) Dr. Moline is also a professor of medicine at the Donald and Barbara Zucker School of Medicine at Hofstra/Northwell and a member of the editorial boards of several journals on industrial, occupational, and environmental medicine. (*Id.* ¶¶ 4-5.)

 In 2019, Dr. Moline and her co-authors published the Article that is the subject of this action. (*Id.* ¶ 7; *see also* Harvey Decl. Ex. 2.) The Article concluded that exposure to asbestos-contaminated talcum powders can cause mesothelioma and recommended that clinicians elicit a history of talcum powder usage in all patients presenting with mesothelioma. (Harvey Decl. Ex. 2, Article at 11.[6]) Dr. Moline based these conclusions on the "Materials and Methods" she disclosed in her article—namely, her study of the medical records and sworn deposition testimony of 33 patients who suffered from mesothelioma, augmented in some instances by sworn testimony

---

[6] All page references are to the paginations assigned in the JOEM.

of family members and in-person interviews; and tissue analysis of 6 of these 33 patients.  (*See id.* at 11-12.)  Dr. Moline further expressly noted the "limitations" of the study, including the risk that the subjects' testimony was influenced by the bias inherent in self-reporting their exposures.  (*See id.* at 16.)

Prior to drafting the Article, Dr. Moline sought and secured approval from Northwell's Human Research Protection Program—a program that supports, facilities, and promotes the ethical and safe conduct of research involving human subjects at Northwell—through Northwell's Institutional Review Board ("IRB").  (Marino Decl. Ex. 1, Moline Aff. ¶¶ 10-11.)  IRBs are intended to ensure the protection of research subjects' privacy and confidentiality rights, including—most fundamentally—their identities and protected health-care information.  (*Id.* ¶ 15.) In her application for approval of the study, Dr. Moline represented that (1) she took confidentiality seriously, and would take extensive measures to protect the participants' identities; (2) no patient identifiers would be included in research-related summaries; (3) all protected health information included in her review and the Article would be de-identified; and (4) the protected health information of the participants would be stored in Northwell's secure database.  (*Id.* ¶ 16.)

As a result of these and other representations about the research study, Northwell's IRB granted approval on March 23, 2018.  (*Id.* ¶ 17.) That grant was specifically predicated on Dr. Moline's research study containing adequate provisions to protect and maintain the confidentiality of the data and research participants examined in that study.  (*Id.* ¶ 19.)  Following the IRB's approval in March 2018, and throughout the Article's research and publication process, Dr. Moline protected the research subjects' privacy and confidentiality.  (*Id.* ¶ 21.)  Northwell has likewise consistently upheld its obligation to safeguard the identities of the participants in Dr. Moline's study under federal law, bedrock IRB standards of privacy and confidentiality covering research

subjects, and well-established standards and universally accepted norms in the medical research community.  (*See* Marino Decl. Ex. 2, Northwell 11/4/22 Br. at 1.)  Thus, it has consistently resisted efforts by consumer-talc defendants such as LTL to obtain the Spreadsheet. (*See id.* at 5-6.)

### B. J&J, LTL, and LTL's Campaign to Obtain the Spreadsheet to Discredit Dr. Moline and the Opinions Expressed in the Article.

J&J has reportedly known for years that its talc-based consumer products were contaminated with asbestos, but told the public the opposite. *See* Lisa Girion, *Special Report: J&J knew for decades that asbestos lurked in its Baby Powder*, REUTERS: HEALTHCARE & PHARMA (Dec. 14, 2018)[7]; Rabin & Hsu, *Johnson & Johnson Feared Baby Powder's Possible Asbestos Link for Years*.[8]  J&J maintained this public stance even after it recalled 33,000 bottles of baby powder in October 2019 when the FDA found that one of its bottles was contaminated with asbestos.  *See* Roni Rabin & Tiffany Hsu, *Johnson & Johnson Recalls Baby Powder Over Asbestos Worry*, N.Y. TIMES (Oct. 18, 2019).[9]

LTL is an entity J&J formed for the purpose of assigning J&J's liabilities for talc-related lawsuits and forcing a global settlement of these lawsuits by having LTL file for bankruptcy.  *See In re LTL*, 64 F.4th at 93, 94, 97.  On December 16, 2022, LTL filed an adversary proceeding in bankruptcy against Dr. Moline for trade libel, fraud, and violation of the Lanham Act based primarily on her publication of the Article.  *See In re LTL*, 21-30589-MBD (ECF No. 3502).  On

---

[7] *Available at* https://www.reuters.com/article/us-johnson-johnson-cancer-special-report/special-report-jj-knew-for-decades-that-asbestos-lurked-in-its-baby-powder-idUSKBN1OD1RQ

[8] *Available at* https://www.nytimes.com/2018/12/14/business/baby-powder-asbestos-johnson-johnson.html.

[9] *Available at* https://www.nytimes.com/2019/10/18/business/johnson-johnson-baby-powder-recall.html.

January 9, 2023, LTL moved for expedited discovery of the Spreadsheet in the adversary proceeding.

On January 30, 2023, before that motion could be fully briefed, the Third Circuit ordered that LTL's bankruptcy petition be vacated as not having been filed in good faith. *See In re LTL*, 64 F.4th at 93. Although LTL has since refiled for bankruptcy, *In re LTL Management LLC*, 23-12825-MBK (Bankr. D.N.J.)—motions to dismiss that filing are pending—it did not refile its adversary proceeding against Dr. Moline. Instead, on May 31, 2023, LTL filed suit against Dr. Moline in this Court. LTL asserts the same claims against Dr. Moline here as it did in the bankruptcy court—trade libel, fraud, and violation of the Lanham Act. The gravamen of the Complaint is that the conclusions Dr. Moline published in the Article are false and defamatory, and that Dr. Moline should therefore be held liable for publishing the Article and repeating its conclusions in various media and in testimony before Congress. *See, e.g.*, Cplt. ¶¶ 2-3.

On June 6, 2023, counsel for Dr. Moline accepted service of the Complaint. The next day, LTL filed this motion for expedited discovery, arguing that this Court should depart from the normal discovery schedule because it "needs" the Spreadsheet to prove its claims. This opposition follows.

## LEGAL ARGUMENT

I.   **LTL HAS FAILED TO DEMONSTRATE THAT IT IS ENTITLED TO PURSUE EXPEDITED DISCOVERY IN SUPPORT OF ITS MERITLESS CLAIMS.**

### A.   **LTL Has Failed to Meet the *Notaro* Standard, which Governs this Motion.**

Federal Rule of Civil Procedure 26(d)(1) forbids a party, absent a contrary stipulation, rule, or court order, from seeking discovery until the parties have conferred as required by Rule 26(f). When a party attempts to use expedited discovery as a means of obtaining substantive relief, such as information that would be used to further ulterior motives, courts require it to meet a standard

similar to that applied to obtain a preliminary injunction.  *See Notaro v. Koch*, 95 F.R.D. 403 (S.D.N.Y. 1982); *Gucci Am., Inc. v. Daffy's, Inc.*, No. 00-cv-4463, 2000 U.S. Dist. LEXIS 16714, at *17 (D.N.J. Nov. 14, 2000) (finding that a request for expedited discovery was akin to a request for a preliminary injunction because it had a substantive element, *i.e.*, identifying the suppliers of allegedly counterfeit handbags to enable Gucci to take action against them directly); *see also id.* at *19 (noting the "possibility that granting expedited discovery to [plaintiff] might well grant to plaintiff all the relief it truly seeks in this lawsuit, even though the allegations of the complaint were without basis."); *Sawhorse Enters. v. Church & Dwight Co.*, No. 12-cv-6811, 2013 U.S. Dist. LEXIS 48155, at *10-11 (D.N.J. Apr. 3, 2013) (explaining that the heightened standard was appropriate in *Gucci* because the information sought by plaintiff in that case would have "greatly harm[ed] [defendant's] interest and give [plaintiff] the information they desired as the ultimate goal of the litigation.").

In these circumstances, the party moving for expedited discovery must demonstrate that (1) it will suffer irreparable injury; (2) it has some probability of succeeding on the merits; (3) there is some connection between the expedited discovery sought and the avoidance of the irreparable injury; and (4) there is some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited relief is granted.  *See Gucci*, 2000 U.S. Dist. LEXIS 16714, at *19 (citing *Notaro*); *Sawhorse*, 2013 U.S. Dist. LEXIS 48155, at *10.  This standard is commonly referred to as the "*Notaro* standard" after the decision that first developed it.

The *Notaro* standard applies here because LTL, like the plaintiff in *Gucci*, wants to obtain the Spreadsheet so that it can take actions to defend itself in consumer-talc litigations without any further aid from this Court.  *Compare Gucci*, 2000 U.S. Dist. LEXIS 16714, at *17 ("Clearly, once

in possession of these parties' identities, Gucci will be able to act, at least in part, without the aid

of the Court.").  With the Spreadsheet in hand, LTL will be able to investigate or contact the cancer

victims who were the subjects of the Article or their relatives in order to challenge Dr. Moline's

methodological assumption that they had no known exposure to asbestos other than through

cosmetic-talc products.  *Compare id.* at *17 (noting that, once provided with the identities of the

defendant retail store's suppliers, Gucci would be able to contact the retail store's customers or

pressure its suppliers).  Indeed, LTL readily admits that obtaining the Spreadsheet is its end-goal

in this case so that it can determine whether the individuals Dr. Moline studied "had alternative

asbestos exposures."  (LTL Br. at 1; *see also id.* at 1-2 (representing that production of the

Spreadsheet would "facilitate the prompt resolution of this dispute" or "lead to the efficient

disposition of this case").)  Doing so, in LTL's view, would thereby enable it to discredit the Article

and assist it in defending numerous talcum-powder lawsuits.  (*See* Cplt. ¶ 231 (alleging that the

Article has been relied upon by multiple plaintiffs' firms, advocacy groups, expert witnesses, and

"considered by judges and juries throughout the country adjudicating cosmetic talc claims.").)

LTL's strategy is hardly unique.  It and other defendants in consumer-talc actions have

previously attempted to obtain the Spreadsheet in the belief that it would assist them in defending

these cases.  *See LTL Management LLC v. Moline*, No. 22-01393 (Bankr. D.N.J.) [ECF No. 9]

(seeking expedited discovery of the Spreadsheet for the same reasons expressed in this case);  *Bell

v. Am. Int'l Indus.*, No. 1:17-cv-0111, 2022 U.S. Dist. LEXIS 199180, at *14-15 (M.D.N.C. Sept.

13, 2022) (addressing motion by defendant American International Industries ("AII") to unseal a

redacted version of the Spreadsheet on the ground that AII "'and other defendants continue to be

confronted with Moline's [a]rticle in litigation, and other plaintiffs' experts rely on it as support

for their opinions.'"); *Gref v. AII, et al.*, No. 20-cv-05589 (S.D.N.Y.) [ECF No. 279] (cross-moving

to enforce subpoena to Northwell seeking production of the Spreadsheet).

To make matters worse, LTL asks this Court to order Dr. Moline to produce the Spreadsheet before Dr. Moline can brief her forthcoming motion to dismiss, lodge objections to the Spreadsheet's production, or provide Northwell with an opportunity to be heard as to why the Spreadsheet should not be produced.  LTL is thus effectively asking this Court to grant it "all the relief it truly seeks in this lawsuit" before Dr. Moline has the opportunity to demonstrate that "the allegations of the complaint were without basis." *Gucci*, 2000 U.S. Dist. LEXIS 16714, at *19. And it makes this request despite knowing that, as shown below, producing the Spreadsheet will "greatly harm [Dr. Moline's] interest," *Sawhorse*, 2013 U.S. Dist. LEXIS 48155, at *11, as well as those of Northwell, the study's participants, and the public at large.

LTL does not even mention the *Notaro* standard, much less claim it meets that standard. As a threshold matter, LTL has thereby waived any argument that it meets this governing standard. *See Dill v. Yellin*, No. 22-cv-6116, 2023 U.S. Dist. LEXIS 38637, at *10 (D.N.J. Mar. 8, 2023) (holding that an argument not raised in an opening brief was waived); *Cobra Enters., LLC v. All Phase Servs.*, No. 20-cv-4750, 2020 U.S. Dist. LEXIS 96033, at *3 (D.N.J. June 1, 2020) ("As a matter of procedure, this Court will not accept arguments offered for the first time in the reply brief, as they were not properly asserted in the opening brief and Plaintiffs have not had the opportunity to respond to them.").

LTL's waiver is no surprise, as it plainly cannot satisfy the *Notaro* factors.  Indeed, as shown below, LTL has no probability of succeeding on the merits of its claims because all of them are facially deficient.  LTL also faces no prospect of irreparable injury.  Any reputational harm that could have been caused by publication of the Article—as opposed to the media articles cited above reporting that J&J had known for decades that its products were contaminated with asbestos,

or J&J's own recall of 33,000 bottles of baby powder due to the risk of asbestos exposure—has already occurred and would be compensable in damages.[10]  It necessarily follows that production of the Spreadsheet is not needed to remedy any prospect of irreparable harm.  Finally, for the reasons set forth below, the harm that Dr. Moline would suffer from production of the Spreadsheet—not to mention Northwell, the study's participants, and the public at large—is greater than the non-existent harm LTL would suffer if it were required to abide the Federal Rules of Civil Procedure and request the Spreadsheet in the normal course of discovery.

Thus, the Court should find that the *Notaro* standard applies here and that LTL has failed to meet it.  It should therefore deny LTL's motion on this basis alone.

### B.    Even if the "Good Cause" Standard Applied, LTL has Failed to Meet It.

Even if the good-cause standard applied here (and it does not), LTL has failed to meet it. To determine whether a movant has shown good cause for expedited discovery, courts consider (1) how far in advance of the formal start of discovery the request is made; (2) whether the discovery request is narrowly tailored; (3) the purpose of the requested early discovery; (4) whether the discovery burdens the defendants; and (5) whether the defendants are able to respond to the requests in an expedited manner.  *See 4Sight Supply Chain Grp., LLC v. Kent*, No. 2:19-cv-12476, 2019 U.S. Dist. LEXIS 246593, at *4-5 (D.N.J. June 16, 2019); *accord Chubb INA Holdings, Inc. v. Chang*, No. 16-cv-2354, 2016 U.S. Dist. LEXIS 82225, at *11 (D.N.J. June 24, 2016); *Sawhorse*, 2013 U.S. Dist. LEXIS 48155, at *15.  Courts apply these factors with the

---

[10] *See Harbortouch Payments, LLC v. Denali State Bank*, No. 14-cv-6049, 2015 U.S. Dist. LEXIS 64991, at *13 (D.N.J. May 19, 2015) ("The Third Circuit has consistently held that economic injury does not constitute irreparable harm necessary to support an award of injunctive relief."); *Roman Chariot, LLC v. JMRL Sales & Serv.*, No. 06-cv-626, 2006 U.S. Dist. LEXIS 46620, at *25 (D.N.J. July 11, 2006) ("[T]he loss of potential customers or profits is compensable by money damages. Such damages are not irreparable even though a precise measure of financial harm cannot be made.").

understanding that "[e]xpedited discovery is not the norm"; rather, "it should be granted only when unusual conditions exist that would likely prejudice the party seeking discovery if required to wait until the normal discovery period." 6 Moore's Federal Practice - Civil § 26.121 (2023).

A straightforward application of these factors shows that LTL has not carried its burden to demonstrate good cause for the expedited discovery it seeks. ***First***, LTL filed its motion the day after it served the Complaint, well before a Rule 26(f) conference was even requested, much less scheduled. In doing so, LTL has attempted to deprive Dr. Moline of the opportunity to demonstrate to the Court why ***no*** discovery is appropriate in this case because LTL's Complaint fails to state a claim on which relief can be granted. Allowing LTL to pursue such discovery would waste the parties' and the court's resources. *See Mullane v. Almon*, 339 F.R.D. 659, 668 (N.D. Fla. 2021) ("Requiring defendants to comply with an order for expedited discovery when the case may later be dismissed for failure to state a claim would wastefully force defendants to expend significant resources responding to discovery requests in a case where plaintiffs did not have a viable cause of action. Federal courts have an obligation to minimize needless expenditures of the parties' time, money, and effort." (cleaned up)).[11]

---

[11] *See also Allen v. Currier*, No. 20-cv-1389, 2023 U.S. Dist. LEXIS 55895, at *10 (S.D. Cal. Mar. 30, 2023) (rejecting request for expedited discovery made "far in advance of the typical discovery process" and before the plaintiff even demonstrated "that his [amended complaint] will survive Defendant's Motion to Dismiss"); *Profil Institut Fur Stoffwechselforschung Gbmh v. Profil Inst. for Clinical Research*, No. 16-cv-2762, 2016 U.S. Dist. LEXIS 175238, at *15-16 (S.D. Ca. Dec. 16, 2016) ("The Court's resolution of the pending motion to dismiss will significantly impact the scope and permissibility of any discovery. . . . Accordingly, the Court finds that the requested discovery is premature and that this factor also weighs against expedited discovery."); *ALARIS Grp., Inc. v. Disability Mgmt. Network, Ltd.*, No. 12-cv-0446, 2012 U.S. Dist. LEXIS 200498, at *7 (D. Minn. May 30, 2012) ("The Court finds that requiring the Defendant to participate in discovery when the Complaint may yet be dismissed pursuant to pending Rule 12 motions would waste the resources of both parties"); *Monsanto Co. v. Dragan*, No. 05-cv-786S, 2005 U.S. Dist. LEXIS 56872, at *15 (W.D.N.Y. Nov. 21, 2005) (finding it "especially" inappropriate to order expedited discovery "before defendant has had a chance to answer").

This sequencing is particularly problematic here, where the Complaint's facial deficiencies are readily apparent and any discovery would risk chilling academic and scientific freedom. The gravamen of the Complaint is that the Article's link between mesothelioma and cosmetic talc products is false and therefore constitutes trade libel. But as the Third Circuit held just weeks before LTL filed its complaint, a statement of pure opinion that is based on stated facts is not actionable in trade libel. *See Pacira*, 63 F.4th at 245 ("Statements of pure opinion, which are those 'based on stated facts or facts that are known to the parties or assumed by them to exist,' do not provide a basis for relief."). This holding has particular force in the context of academic and scholarly articles, as it makes clear that "mere disputes about the reliability of a scientific study's disclosed methodology cannot create an actionable falsehood for trade libel." *Id.* at 247. "To conclude otherwise would risk 'chilling' the natural development of scientific research and discourse." *Id.* at 248.

*Pacira*'s holding is squarely on point. Like the articles at issue in *Pacira*, Dr. Moline's article set forth a pure opinion—*i.e.*, that based on the evidence she reviewed, exposure to asbestos-contaminated talcum powders can cause mesothelioma, (*see* Harvey Decl. Ex. 2, Article at 11 ("Exposure to asbestos-contaminated talcum powders can cause mesothelioma"); *id.* at 15 ("Our findings strongly suggest that asbestos exposure through asbestos-contaminated cosmetic talc explains cases once deemed idiopathic or 'spontaneous'"))—that was based on her fully disclosed methodology. That methodology consisted of (i) reviewing the deposition transcripts of the 33 subjects, augmented in some instances by in-person interviews with the subjects and testimony from family members; (ii) reviewing the subjects' medical records; and (iii) conducting tissue analysis of 6 of the 33 individuals. (*See id.* at 11-12.) Beyond disclosing this methodology, Dr. Moline expressly disclosed its limitations, such as the risk that the studied subjects would give

15

inaccurate deposition testimony based on any bias inherent in "self-report[ing]."[12]  (*See id.* at 16 (noting the "limitations" of the data, including that "deposition testimony is by definition self-report").)  That LTL disagrees with Dr. Moline's methods—it alleges that Dr. Moline should have considered and reconciled all evidence that may have impeached the subjects' sworn deposition testimony—is a matter for scholarly debate, not a basis to bring a claim for trade libel.  *See Pacira*, 63 F.4th at 247-48.

LTL's gross mischaracterization of the court's decision in *Bell* only proves this point.  The *Bell* court did not find, as LTL contends, that Dr. Moline lied about the exposure of one of the study participants to sources of asbestos other than cosmetic talc products.  To the contrary, the court noted that Ms. Bell filed workers' compensation claims that appeared to contradict the statements in the deposition testimony that Dr. Moline reviewed.  *See* 2022 U.S. Dist. LEXIS 199180, at *3.  That workers' compensation claim was beyond the scope of the "Materials and Methods" that Dr. Moline reviewed for her study.  (*See* Harvey Decl. Ex. 2, Article at 11 (explaining that the author principally relied on each individual's "medical records and sworn testimony (deposition transcripts)").  While LTL apparently believes that Dr. Moline should have reviewed materials beyond those she listed, that is a classic dispute over methodology.  That debate can and should occur through the channel of academic critique and review, where Dr. Moline could explain why any statements made in the workers'-compensation case was less trustworthy than the sources she reviewed—a prospect the court in *Bell* expressly credited.  *See Bell*, 2022 U.S. Dist. LEXIS 199180, at *24 (acknowledging that "Dr. Moline and her colleagues may have a good answer as to why the workers' compensation claims do not undermine the article's credibility").

---

[12] *See* NIH, National Library of Medicine, *Information bias in health research: definition, pitfalls, and adjustment methods*, *available* at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4862344/ (describing the risk of self-reporting bias).

Importantly, whether Dr. Moline's article can sustain a claim for trade libel is a question of law that the Court will resolve at the pleading stage. *See Pacira*, 63 F.4th at 245 ("Whether a statement is a nonactionable opinion is a threshold question of law"); *id.* at 249 (holding that scientific opinions analogous to those expressed by Dr. Moline "constitute nonactionable opinions as a matter of law" and affirming the district court's dismissal of trade-libel claims based on those opinions at the pleading stage). No discovery is needed or appropriate to resolve it. To hold otherwise would subject scientists and academics to the precise risk of chilling that *Pacira*'s holding was meant to avoid.

Nor will LTL be able to evade *Pacira*'s holding by alleging, as it does in its Complaint, that Dr. Moline repeated the Article's conclusions in other media and in testimony before Congress. *See Pacira*, 63 F.4th at 249 n.19 (affirming dismissal of claims based on the allegation that the defendants "'repeat[ed] the false conclusions'" in their scientific articles); Restatement (Second) of Torts § 590A ("A witness is absolutely privileged to publish defamatory matter as part of a legislative proceeding in which he is testifying or in communications preliminary to the proceeding, if the matter has some relation to the proceeding."); *accord Yip v. Pagano*, 606 F. Supp. 1566, 1570 (D.N.J. 1985); *DeSantis v. Employees Passaic County Welfare Ass'n*, 237 N.J. Super. 550, 554 (App. Div. 1990); *Webster v. Sun Co.*, 790 F.2d 157, 161 (D.C. Cir. 1986). And LTL's remaining claims for fraud and violation of the Lanham Act will also falter at the pleading stage because LTL failed to plead reliance and the Article does not constitute commercial speech. *See, e.g.*, *Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 528 (D.N.J. 2008) (dismissing fraud claim at the pleading state for failing to plead reliance); *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 384, 456-57 (D.N.J. 2009) ("[T]here is an abundance of case law to support the proposition that a scientific article is protected noncommercial speech."); *Crash Proof*

*Ret. v. Price*, 533 F. Supp. 3d 227, 232 (E.D. Pa. 2021) (granting motion to dismiss Lanham Act claim by finding that the challenged article "does not qualify as commercial speech").

**Second**, although the expedited discovery request is narrow—calling for the production of a single document—the time and effort it will take to resolve it[13] will be considerable. As shown below, numerous courts have denied discovery requests that, if granted, would have adverse consequences for the researcher and other affected third parties, and that would have a chilling effect on socially desirable scientific and medical research. Indeed, with the exception of the ruling in *Bell*—which was limited to the disclosure of the name of one individual in the study who happened to be the plaintiff in that lawsuit—no court has ever ordered the full disclosure of the study participants' identities, despite repeated efforts by LTL and other cosmetic-talc defendants to obtain it. Dr. Moline would therefore oppose production of this document and would litigate LTL's effort to obtain it, as she has in other cases, including through any appeal.

This discovery dispute, moreover, would not be limited to the parties but would also involve third-party Northwell, which is yet another reason why LTL's motion should be denied. *See 4Sight*, 2019 U.S. Dist. LEXIS 246593, at *6 (finding that a request that encompassed a defendant's communications with and documents involving a non-party was an additional fact that

---

[13] J&J acts as though its motion for expedited discovery would eliminate its obligation to issue document requests, Dr. Moline's right to object to them, Northwell's right to intervene, the parties' need to confer in accordance with L.Civ.R. 37.1, and the Court's duty to resolve insuperable impasses. (*See* Proposed Order [ECF No. 7-5] (proposing that this Court order Dr. Moline to produce the Spreadsheet "within 5 days of this Order").) That is obviously not how discovery works. *See, e.g.*, Fed. R. Civ. P. 34(b)(2) (granting a responding party 30 days to serve written responses and objections to a discovery request, unless the time is shortened by stipulation or court order); L.Civ.R. 37.1(b) (requiring the parties to meet and confer before bringing a discovery motion). Even if J&J could demonstrate entitlement to expedited discovery (and it has not), Dr. Moline would have the right to lodge objections and litigate LTL's right to this document. *See Miller v. Hamm*, No. 22-cv-506, 2022 U.S. Dist. LEXIS 191524, at *14 (M.D. Ala. Oct. 20, 20222) (noting that the defendants were "free to make appropriate objections" in response to the expedited discovery requests served on them).

"weigh[ed] against granting expedited discovery."); *Chubb*, 2016 U.S. Dist. LEXIS 82225, at *15
("[S]everal courts have found that requests for expedited discovery from third parties were
overbroad").  As an initial matter, LTL's assumption that Dr. Moline—as opposed to Northwell—
would "control" the Spreadsheet and therefore be in a position to produce it is unfounded.  (LTL
Br. at 6 n.4.)  Control means the "'legal right to obtain the documents requested on demand.'"  *TQ
Delta, LLC v. Samsung Elecs. Am., Inc.*, No. 21-cv-16580, 2021 U.S. Dist. LEXIS 243046, at *10
(D.N.J. Dec. 20, 2021) (quoting *Gerling Int'l Ins. Co. v. Comm'r Gerling Int'l Ins. Co.*, 839 F.2d
131, 140 (3d Cir. 1988)); *accord Mercy Catholic Med. Ctr. v. Thompson*, 380 F.3d 142, 160 (3d
Cir. 2004); *In re Novo Nordisk Sec. Litig.*, 530 F. Supp. 3d 495, 502 (D.N.J. 2021).  LTL would
bear the burden on any discovery motion to prove that Dr. Moline has control over this document.
*See TQ Delta*, 2021 U.S. Dist. LEXIS 243046, at *10; *accord In re Novo Nordisk*, 530 F. Supp.
3d at 502.  LTL makes no attempt to show how it will be able to do so, which is not surprising
given that Northwell only authorized Dr. Moline to conduct her study based on her express
representation that she would protect the study participants' identity and that the subjects'
protected health information would be stored in Northwell's secure database.  (*See* Marino Decl.
Ex. 1, Moline Decl. ¶ 16.)  Northwell has also repeatedly made clear in its court filings that it
would oppose any effort by Dr. Moline to produce the Spreadsheet, (*see* Marino Decl. Ex. 2,
Northwell 11/4/22 Br.), therefore further belying any suggestion that she has the legal right to
obtain this document on demand.  LTL will thus be unable to show that Dr. Moline has "control"
over the document in these circumstances.  *See Robinson v. Moskus*, 491 F. Supp. 3d 359, 366
(C.D. Ill. 2020) (finding that an employee did not have "control" over documents where she had
no "legal right to obtain" them from her employer).  Finally, even if Dr. Moline were in a position
to produce the Spreadsheet, Northwell would have a right to intervene to protect its own interests

in maintaining the anonymity of the study's human-research subjects.  *See Driftless Area Land Conservancy v. Pub. Serv. Comm'n of Wis.*, No. 19-cv-1007, 2020 U.S. Dist. LEXIS 229001, at *9 (W.D. Wis. Dec. 7, 2020) ("[N]umerous cases support limited, permissive intervention where a non-party seeks to intervene to protect confidential information that may be disclosed in discovery, or to modify protective orders to protect information that has been disclosed.").

***Third***, the purpose for which LTL seeks the Spreadsheet—to attempt to prove its claims against Dr. Moline—is not a valid basis for pursuing expedited discovery.  *See Chubb*, 2016 U.S. Dist. LEXIS 82225, at *15 (rejecting request for expedited discovery that "seem[ed] directed to the ultimate merits of the case.").[14]  If it were, any plaintiff could pursue expedited discovery simply by claiming that it "needs" a document (LTL Br. at 5) to prove its case.

It is noteworthy that LTL has not filed a motion for preliminary injunction or any motion demonstrating some urgent and unusual need for this document at this time.  That is a significant factor that cuts against expedited discovery.  *See Chubb*, 2016 U.S. Dist. LEXIS 82225, at *13-14 ("One significant factor weighing against a finding of good cause is that Chubb has not filed a motion for any preliminary relief"); *see also Sawhorse*, 2013 U.S. Dist. LEXIS 48155, at *15 ("This case does not involve a preliminary injunction.  Therefore, the need for expedited discovery is less urgent as it would not better enable the Court to rule on issues at a preliminary injunction hearing.").

Four of the cases LTL cites in support of its motion (*see* LTL Br. at 6-7) involved expedited

---

[14] *See also 4Sight*, 2019 U.S. Dist. LEXIS 246593, at *5 (finding request for expedited discovery inappropriate to the extent it was "directed to discovery on the merits generally."); *Sambreel Holdings LLC v. Facebook, Inc.*, No. 12-cv-668, 2012 U.S. Dist. LEXIS 201217, at *15 (S.D. Ca. June 15, 2012) (explaining that evidence sought to prove an issue "relevant in the case in chief" did not justify expedited discovery).

discovery for purposes of a pending or forthcoming motion for a preliminary injunction. *See Lucero-Gonzalez v. Kline*, No. 20-cv-0901, 2020 U.S. Dist. LEXIS 250690, at *21-22 (D. Az. Aug. 28, 2020) ("Plaintiffs' motion requests some limited and directed testing of Defendants' factual positions and to develop their own claims for preparing a second motion for preliminary injunction if and as appropriate."); *Samuel, Son & Co. v. Beach*, No. 13-cv-0128, 2013 U.S. Dist. LEXIS 129486, at *10 (W.D. Pa. Sept. 11, 2013) ("In its motion for expedited discovery, Frontier contends that a period of narrow and limited discovery is necessary to facilitate the preservation of evidence within Defendants' exclusive control and to prepare for an anticipated hearing on Frontier's preliminary injunction motion."); *Merial LLC v. Fidopharm, Inc.*, No. 13-cv-1207, 2013 WL 4478477 (N.D. Ga. May 22, 2013) ("Here, expedited discovery is sought in aid of a pending motion for preliminary injunction."); *Kone Corp. v. Thyssenkrupp USA, Inc.*, No. 11-cv-0465, 2011 U.S. Dist. LEXIS 109518, at *16 (D. Del. Sept. 26, 2011) (noting that plaintiff's request for expedited discovery "arises in the context of a pending preliminary injunction motion").

Four other cases LTL cites—*Strike 3 Holdings, LLC v. Doe*, No. 22-cv-1919, 2022 U.S. Dist. LEXIS 79903 (D.N.J. May 3, 2022); *Malibu Media, LLC v. John Doe Subscriber Assigned IP Address 47.20.202.138*, No. 16-cv-0942, 2016 U.S. Dist. LEXIS 32445 (D.N.J. Mar. 14, 2016); *Ingenuity13 LLC v. Doe*, No. 2:12-cv-1969, 2012 U.S. Dist. LEXIS 113051 (E.D. Cal. Aug. 10, 2012); and *Malibu Media, LLC v. John Does 1 through 32*, No. 1:12-cv-00886, 2012 U.S. Dist. LEXIS 107683 (E.D. Cal. Aug. 1, 2012)—make Dr. Moline's case yet more effectively: in all four cases, the plaintiffs had the IP addresses of the John Doe defendants who allegedly infringed their copyrights and sought from internet service providers expedited discovery of the names of the owners of those addresses, which they needed to prosecute their claims. The only other case on which LTL relies (besides *Bell*), *Windowizards, Inc. v. Castle, The Window People*, No. 00-cv-

4680, 2005 U.S. Dist. LEXIS 54920 (E.D. Pa. Mar. 3, 2005), also makes Dr. Moline's case. *Windowizards* applied the reasonableness test to grant a motion for expedited discovery needed to determine whether one party had breached the terms of a Consent Order in a settled case.  In so ruling, the *Windowizards* court expressly distinguished the case before it from one that applied the *Notaro* standard to "extraordinary discovery requests made extraordinarily early in the litigation process," *id.* at *1 n.1 (cleaned up)—the precise circumstances present here.

Against the backdrop of these cases, LTL's supposed "need" for expedited discovery rings hollow.  LTL does not need the Spreadsheet now to pursue its claims against Dr. Moline. LTL and other cosmetic-talc defendants have known about the Spreadsheet for years.  LTL previously attempted to obtain it in the adversary proceeding it brought against Dr. Moline as part of its bankruptcy case.  LTL's bankruptcy case was dismissed by the Third Circuit nearly five months ago.  *See In re LTL Mgmt., LLC*, 64 F.4th 84, 111 (3d Cir. 2023).  LTL has cited no emergent need to obtain this document now rather than through the ordinary course of litigation, and none exists.

***Fourth***, the discovery that LTL seeks would impose a significant burden on Dr. Moline. LTL interprets "burden" to mean difficulty in physically producing the Spreadsheet.  (LTL Br. at 7.)  Not so.  Numerous courts recognize that with respect to discovery, burden also consists of the negative consequences that would flow from production—both to the party producing the document and to other third parties that would be impacted by the production—as well as to the public at large.  This principle is particularly well established in the context of discovery requests that, if granted, would reveal information provided on the assurance or expectation of confidentiality and thereby have a chilling effect on academic or scientific research.  *See Dow Chemical Co. v. Allen*, 672 F.2d 1262, 1276 (7th Cir. 1982) (finding that the "burden of compliance" with a subpoena seeking data relating to research studies "could jeopardize both the

studies and [the researchers'] careers"); *Farnsworth v. Procter & Gamble Co.*, 758 F.2d 1545, 1546 (11th Cir. 1985) (affirming denial of subpoena for the identities of participants in a Center for Disease Control study where such disclosure would "inhibit future studies by causing the public to fear disclosure of personal information given to the Center"); *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*, MDL No. 2100, 2011 U.S. Dist. LEXIS 132056, at *8-9 (S.D. Ill. Nov. 15, 2011) (denying discovery of confidential peer-review materials because it would impose "a significant burden on the scientific and academic communities" by violating expectations of confidentiality, chill researchers' participation in the peer-review process, and ultimately "undermine efforts to improve public health and safety.").[15]

Here, the negative consequences that would flow from producing the Spreadsheet are considerable. The identities of the participants in Dr. Moline's study were provided to her on the

---

[15] *See also Cusumano v. Microsoft Corp.*, 162 F.3d 708, 716 (1st Cir. 1988) (holding that the propriety of a discovery request that seeks confidential information compiled by an academic researcher must be judged by weighing the "objector's interest in confidentiality and the potential injury to the free flow of information that disclosure portends"); *In re Schaefer*, 331 F.R.D. 603, 616 (W.D. Pa. 2019) (denying discovery where its disclosure could "chill further research into sensitive and consequential issues"); *Klein v. Affiliated Grp., Inc.*, No. 18-cv-949, 2019 U.S. Dist. LEXIS 48019, at *35 (D. Minn. Mar. 22, 2019) (denying motion to compel where disclosure would, among other things, cause patients to be concerned "about whether [defendants] and/or [a non-party hospital] handled their protected health information as required by HIPAA, resulting in unwarranted negative consequences for Defendants and [the non-party hospital]"); *Fields v. Lilly*, 2:13-cv-0035, 2015 U.S. Dist. LEXIS 191536, at *4 (M.D. Ala. Mar. 26, 2015) (denying request for unpublished manuscript based on the "burden that disclosure . . . would have on the scientific and academic community"); *In re Fosamax Prods. Liab. Litig.*, MDL No. 1789, 2009 U.S. Dist. LEXIS 70246, at *35 (S.D.N.Y. Aug. 4, 2009) ("Compelling testimony from a third party researcher risks chilling participation in beneficial public research. . . . There is a serious danger that permitting discovery in these situations 'inevitably tend[s] to check the ardor and fearlessness of scholars, qualities at once so fragile and so indispensable for fruitful academic labor.'" (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 262 (1957)); *In re R. J. Reynolds Tobacco Co.*, 136 Misc. 2d 282, 287-88 (Sup. Ct., N.Y. Cty., 1987) (quashing subpoenas for data relating to medical articles where they would "place an unreasonable burden upon the medical and scientific institutions involved and would unduly disrupt the ongoing research at both Mount Sinai and the American Cancer Society.").

expectation of confidentiality.  Indeed, "[a] general, fundamental tenet of much modern academic human-centered research . . . is a guarantee of confidentiality for respondents."  Eric Robinson, *No Confidence: Confidentiality, Ethics and the Law of Academic Privilege*, 21 COMM. L. & POL'Y 323, 327-28 (Summer 2016).  As a researcher of human subjects, Dr. Moline has an ethical obligation to protect the identities of her research subjects.  *See* Emily Haney-Caron, *et al.*, *Safe from Subpoena? The Importance of Certificates of Confidentiality to the Viability and Ethics of Research*, 48 AKRON L. REV. 349, 351 (2019).

Dr. Moline also has a legal obligation under the Common Rule[16] and the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") to protect her subjects' identity, even if her use of their private information or biospecimens was not the subject of express consent.  *See* 45 C.F.R. § 46.111(a)(7) (stating that, "[w]hen appropriate," there must be "adequate provisions to protect the privacy of subjects and to maintain the confidentiality of data."); *id.* § 46.104(d)(4)(ii) (providing that, when an investigator uses secondary research, the investigator must record the information, including information about biospecimens, "in such a manner that the identity of the human subjects cannot readily be ascertained directly or through identifiers linked to the subject"); *id.* § 164.502 (prohibiting the disclosure of "protected health information," except as expressly permitted by regulation); *id.* §§ 160.103, 164.514(b)(2)(i)(A) (defining "protected health information" as "individually identifiable health information," which includes names).

Production of the Spreadsheet would breach these confidentiality obligations and expectations, chilling valuable research like Dr. Moline's and thereby injuring the public.  The

---

[16] The "Common Rule" is a set of Department of Health and Human Services ("HHS") regulations designed to provide "a robust set of protections for research subjects."  *See* U.S. Department of Health and Human Services, Office for Human Research Protections, *available at* https://www.hhs.gov/ohrp/regulations-and-policy/regulations/45-cfr-46/index.html.

JOEM, like all journals that adhere to the ethical policies put forth by the Committee on Publication Ethics and the International Committee on Medical Journal Editors,[17] generally requires patient consent (or a recognized exception) and IRB approval.  IRB approval is predicated upon an investigator's compliance with the Common Rule and HIPAA.  Anonymity is foundational to those statutory and regulatory schemes.  If the ability of an investigator to preserve the anonymity of her subjects is called into question whenever an expert relies upon her research in litigation, neither IRBs nor learned journals will have confidence that their statutory, regulatory, and ethical requirements will be maintained.  As a result, important research will not be approved or published. The effect of all this will be to "undermine efforts to improve public health and safety"—a result that is "particularly troubling where, as here, medical research is in issue."  *In re Yasmin*, 2011 U.S. Dist. LEXIS 132056, at *9.

Beyond the harm to the public at large, both Dr. Moline and Northwell will likely face adverse consequences for breaching their confidentiality obligations.  Should Dr. Moline violate the regulations under which she conducted her research, there might well be an attempt to hold Northwell responsible for that breach.  *See* Robinson, 21 COMM. L. & POL'Y at 328 n.24 ("[i]f a researcher violates a subject's confidentiality, even under subpoena, the employing institution under whose aegis the research was conducted may be vicariously liable to the subject." (cleaned up)).  The sanction for non-compliance with the regulation is a loss of federal funding.  *Id.* Moreover, if there were a perception that Dr. Moline and Northwell failed to abide their confidentiality obligations, their ability to recruit participants in future studies would be impaired. *See Klein*, 2019 U.S. Dist. LEXIS 48019, at *35 (noting that disclosure that would cause patients to be concerned "about whether [defendants] and/or [a non-party hospital] handled their protected

---

[17] *See* https://journals.lww.com/joem/Pages/editoriallegalethicalpolicies.aspx.

health information as required by HIPAA" would "result[] in unwarranted negative consequences for Defendants and [the non-party hospital]"); *Farnsworth*, 758 F.2d at 1546 (finding that disclosure of the identity of participants in a CDC study would "inhibit future studies by causing the public to fear disclosure of personal information given to the Center").

But the harm that would flow from production of the Spreadsheet would not end there. The very fact that the identities of the Article's subjects would be disclosed would cause needless anxiety to the cancer victims who remain alive, their families, and the families of those who have passed away. *See Klein*, 2019 U.S. Dist. LEXIS 48019, at *35 (denying motion to compel where disclosure would, among other things, cause patients to be concerned "about whether [defendants] and/or [a non-party hospital] handled their protected health information as required by HIPAA"). LTL also readily admits that it wants to learn the identities of the Article's subjects so that it can show that, contrary to what they self-reported to Dr. Moline through their deposition testimony or interviews, they had exposure to other asbestos products.  (*See* LTL Br. at 3 (admitting that LTL seeks to "challenge the veracity" of the claims in Dr. Moline's article by identifying the 33 participants in her study); *id.* at 5 (acknowledging that LTL seeks to use the Spreadsheet to prove that the study participants "'admitted to . . . exposure to other sources of asbestos'").)  To do so, LTL would presumably seek to contact these victims and their families, and/or research any statement they made in court or regulatory filings regarding their potential exposure to asbestos. The prospect of such harassment is yet another burden that weighs against disclosing the Spreadsheet. *See Klein*, 2019 U.S. Dist. LEXIS 48019, at *35 (citing the "anxiety" that would be caused to non-party patients by receiving questions about their medical debt as an additional reason to deny the requested discovery).

***Finally***, for the reasons set forth above, Dr. Moline would be unable to respond to the

requests in an expedited manner.  Rather, as noted above, she would object to producing the Spreadsheet and demonstrate through motion practice—and appeal, if necessary—why LTL is not entitled to it.  That motion practice would almost certainly involve Northwell, the entity that actually controls the Spreadsheet and has a concrete interest that would justify its intervention in this case.  It makes no sense to engage in this protracted discovery fight now, particularly when the Court has not yet considered whether LTL states a claim on which relief can be granted.

Thus, LTL has not even established good cause for the expedited discovery it seeks, much less meet the more restrictive *Notaro* standard for such discovery.

## **CONCLUSION**

For the foregoing reasons, Dr. Moline respectfully requests that this Court deny LTL's motion for expedited discovery.

Chatham, New Jersey
Dated:  June 20, 2023

Respectfully submitted,

MARINO, TORTORELLA & BOYLE, P.C.

By: _____

Kevin H. Marino
437 Southern Boulevard
Chatham, New Jersey 07928-1488
(973) 824-9300
*Attorneys for Defendant Dr. Moline*