

Deposition of:

# Jaqueline Moline , M.D., MSc, FACP, FACOEM

*February 26, 2020*

In the Matter of:

# Zimmerman, Linda Vs. Autozone Inc., Et Al.

Veritext Legal Solutions

800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Page 1

1        SUPERIOR COURT OF THE STATE OF CALIFORNIA

2              FOR THE COUNTY OF LOS ANGELES

3    Coordinated Proceeding        JCCP NO. 4674

     Special title (Rule 3.550)   Case No. BC720153

4

     LAOSD ASBESTOS CASES

5

     LINDA ZIMMERMAN,

6            Plaintiff,

7        vs.

8    AUTOZONE, INC., et al.,

             Defendants.

9

                        - - -

10

      Telephonic Deposition of JACQUELINE MOLINE, MD,

11                MSc, FACP, FACOEM,

12            Taken by Meghan B. Senter,

13            Before Jennifer D. Hamon,

              Certified Court Reporter,

14

              On Wednesday, February 26, 2020,

15    Beginning at 10:06 a.m. and ending at 1:42 p.m.

16                      - - -

17

18

19

20

21

22

23

24

25

Case 3:23-cv-02990-GC-DEA   Document 18-2   Filed 06/30/23   Page 4 of 71 PageID: 401
Jaqueline Moline , M.D., MSc, FACP, FACOEM          February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

**Page 2**

1 APPEARANCES OF COUNSEL
2 For the Plaintiff:
3    LEAH KAGAN
     (Via Telephone)
4    Simon Greenstone Panatier Bartlett PC
     Suite 540
5    3780 Kilroy Airport Way
     Long Beach, CA 90806
6    562.590.3400
     lkagan@sgpblaw.com
7
8 For the Defendant Chanel:
9    MEGHAN B. SENTER
     (Via Telephone)
10   MG+M
     One Canal Place, Suite 3000
11   365 Canal Street
     New Orleans, LA 70130
12   504.535.2879
     msenter@mgmlaw.com
13
14 For the Defendants Johnson & Johnson and
     Johnson & Johnson Consumer Inc.:
15
     JULIA ROMANO
16   (Via Telephone)
     King & Spalding
17   Suite 1600
     633 West Fifth Street
18   Los Angeles, CA 90071
     213.443.4365
19   jromano@kslaw.com
20
21
22
23
24
25 (Continued on next page)

**Page 3**

1 For the Defendants Ralphs Grocery Company and
   Thrifty Payless Inc. dba Rite Aid Pharmacy:
2
     GABRIELLE ANDERSON-THOMPSON
3    (Via Telephone)
     Barnes & Thornburg LLP
4    Suite 300
     2029 Cnetury Park East
5    Los Angeles, CA 90067
     310.284.3884
6    gathompson@btlaw.com
7
   For the Defendant Whittaker Clark & Daniels Inc.:
8
     REBECCA BELLOW
9    (Via Telephone)
     Berkes Crane Robinson & Seal
10   Suite 1500
     515 South Figueroa
11   Los Angeles, CA 90071
     213.955.1150
12   rbellow@bcrslaw.com
13
14 For the Defendants Revlon and Macy's:
15   PETER D. POLCHINSKI
     (Via Telephone)
16   Hawkins Parnell & Young LLP
     8th Floor
17   600 Lexington Avenue
     New York, NY 10022
18   212.897.9655
     ppolchinski@hpylaw.com
19
20
21
22
23
24
25

**Page 4**

1       INDEX TO PROCEEDINGS
2       EXAMINATION INDEX
3 JACQUELINE MOLINE, MD, MSC, FACP, FACOEM
4 Examination by Ms. Senter          5
   Examination by Ms. Romano          61
5 Examination by Mr. Polchinski          107
   Examination by Ms. Anderson-Thompson   130
6 Re-Examination by Ms. Senter       131
   Re-Examination by Ms. Romano       133
7 Examination by Ms. Kagan           135
8 Certificate Page           142
9
10      EXHIBIT INDEX
11 Exhibits
12 Exhibit 1 J&J Defendants' Notice of Deposition   6
   of Plaintiff's Expert Witness Dr.
13   Jacqueline Moline and Requests for
   Production of Documents
14
   Exhibit 2 Depositions and Testimony 2015-2019,   6
15   Revised 12/19/2019
16 Exhibit 3 Curriculum Vitae          6
17 Exhibit 4 Reference List - Linda Zimmerman       6
18 Exhibit 5 Handwritten notes          6
19 Exhibit 6 Wind Rose Plot          18
20
21 (Original Exhibits 1 through 6 have been attached
   to the original transcript.)
22
23
   (End of Index)
24
25

**Page 5**

1       February 26, 2020
2       10:06 a.m.
3       (Pursuant to OCGA 15-14-37 (a) and (b) a
4    written disclosure statement was submitted
5    by the court reporter to all counsel present
6    at the deposition and is attached hereto.)
7 JACQUELINE MOLINE, MD, MSc, FACP, FACOEM,
8    being first duly sworn, was examined and
9    testified as follows:
10 EXAMINATION
11 BY MS. SENTER:
12   Q    Good morning, Dr. Moline.  This is
13 Meghan Senter.  We met via telephone just a few
14 moments ago.  I think I'm going to be starting us
15 off today, and I want to cover just a little bit
16 of background.  All right?
17   A    Okay.
18   Q    I promise I'm going to try not to be
19 redundant.  I know you've done this a few times.
20 I'm not going to try and run you through
21 everything.  But it's fair for me to kind of
22 dispense with the usual admonitions?  You're
23 familiar with the process?
24   A    Yes.
25       - - -

Jaqueline Moline , M.D., MSc, FACP, FACOEM          February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

Page 6

1    (Whereupon documents were identified as
2    Exhibit 1, Exhibit 2, Exhibit 3, Exhibit 4,
3    and Exhibit 5.)
4    Q    At the outset, I'd like to just go
5  ahead and mark a number of exhibits I'd like to
6  discuss for the record.  The first is going to be
7  the Notice of Deposition.  We'll mark that as
8  Exhibit 1.
9        The second thing I'd like to mark is
10  your list of prior testimony.  We'll mark that as
11  Exhibit 2.  Your CV we'll go ahead and mark as
12  Exhibit 3.  And your reliance list we'll mark as
13  Exhibit 4.  And because we're going to be
14  discussing them later on, we'll go ahead and mark
15  your notes as Exhibit 5.
16        MS. KAGAN:  Counsel, I just want to
17  note for the record that we did submit objections
18  to the notice and that we did provide an updated
19  Madigan report that is not on the reliance list.
20        MS. SENTER:  Okay.  Thanks, Leah.
21        MS. KAGAN:  No problem.
22  BY MS. SENTER:
23    Q    Dr. Moline, when were you first
24  retained in this matter?
25    A    I'm not sure of the exact date.  It

Page 7

1  was some point in the -- in the fall.  It was --
2  hold on.  Around September-ish.
3    Q    Around September of 2019?
4    A    That's when I first became aware of
5  it, yes.  Correct.
6    Q    And how were you retained?  By letter?
7  By phone call?  Email?
8    A    I think that it would be by phone
9  call.  I honestly don't recall.  It definitely
10  was not by letter.
11    Q    Do you know when it was that you first
12  started reviewing materials specifically for this
13  case?
14    A    Well, I know it was before the
15  declaration was submitted in mid-October, so it
16  was at some point in October, I think early
17  October.  And then I went back and did some
18  refinement of my notes and was given things like
19  the -- looked at the sister's deposition somewhat
20  later.
21    Q    And I know we have your notes.  We
22  marked them as Exhibit 5.  Outside of the
23  materials listed in your notes, which are various
24  depositions and some medical records, what all
25  have you reviewed specific to this case in order

Page 8

1  to form your opinions?
2        MS. KAGAN:  I'm going to object.  If
3  you have reviewed her reference and reliance
4  list, it has specific documents identified in the
5  Zimmerman section.
6  BY MS. SENTER:
7    Q    Dr. Moline?
8    A    There have been a number of materials
9  that are related on the reliance list.  Some of
10  them are more general, and then some of them are
11  more specific, including testing of Jean Nate and
12  testing of some of the -- Dr. Longo's testing,
13  Dr. Gordon's report, looking at some Unarco
14  materials, looking at some Chanel testing, if I
15  didn't mention that.  And the rest are enumerated
16  on my report -- I mean on my reliance list.
17    Q    Okay.  So I know your reliance list in
18  this case is 43 pages long, so I'm just trying to
19  get a complete sense of what you reviewed
20  specifically in preparation for this case beyond
21  all 43 pages.
22        MS. KAGAN:  Counsel, there's a
23  specific Zimmerman section on the reliance list
24  that identifies specific case-specific documents
25  besides the things Dr. Moline has just enumerated

Page 9

1  for you.
2  BY MS. SENTER:
3    Q    That's beginning on page 25; is that
4  right, Doctor?
5    A    I don't know if I have that reliance
6  list in -- I didn't bring a copy of that with me
7  into the room today, so I can't tell you what
8  page it's on.
9    Q    That's fair.  What do you have with
10  you in the room today?
11    A    I have a copy of my notes.  I actually
12  have the testing binders of the testing results
13  from Dr. Compton, Dr. Longo and his declaration,
14  some Jean Nate testing, Mr. Martin's death
15  certificate, some Unarco documents, a copy of my
16  declaration, and -- yeah.  That's it.
17    Q    Okay.  Thank you.  About how many
18  hours have you spent in preparation for this
19  case?
20    A    About 15.
21    Q    Are you able to break down how you've
22  spent those 15 hours?
23    A    Reading and writing my notes.  So I
24  can't tell you -- I don't parse it out on -- I
25  don't know how I would do that.  I don't say for

Jaqueline Moline , M.D., MSc, FACP, FACOEM        February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

Page 10

1 hour 1 through hour 7.2, I reviewed the medical
2 records, and then from 7.2 to 16.9, I reviewed
3 the depositions. That's not how I work.
4     Q   With that many lawyers on the phone
5 today, do you wish you could --
6     A   I'm sure they do, but I don't bill in
7 ten-minute increments.
8     Q   Included in that 15 hours is there any
9 time spent in preparation for today's deposition?
10     A   I spent about half an hour in
11 preparation. I had a conversation with
12 Ms. Kagan, which was brief in part due to the
13 fact that Ms. Kagan couldn't speak. And that was
14 not included.
15     Q   Have you issued any invoices in this
16 case?
17     A   Not yet.
18     Q   What's your current rate?
19     A   It's $600 an hour.
20     Q   Do you anticipate, other than this
21 deposition, doing any additional work on this
22 matter prior to trial?
23     MS. KAGAN:  Counsel, I will note for
24 the record that we have not yet received the
25 final materials from Dr. Roggli as to digestion

Page 11

1 or anything else that he might use and the
2 evidence that he might offer. So to the extent
3 that those materials are received and provided to
4 Dr. Moline, she may review those.
5     MS. SENTER:  Understood.
6     THE WITNESS:  I don't anticipate doing
7 additional work unless something becomes
8 available for me to review or -- Ms. Zimmerman is
9 still alive, so if additional medical records
10 become available, I would review those prior to
11 trial. But I don't have those now.
12 BY MS. SENTER:
13     Q   When you were contacted and retained
14 in this matter, what were you asked to do? What
15 was your scope of work?
16     A   I was asked to review the documents
17 and identify whether I felt Ms. Zimmerman had an
18 asbestos-related disease and what exposures might
19 contribute.
20     Q   In line with that scope of work, what
21 opinions do you intend to offer at trial?
22     MS. KAGAN:  Overbroad.
23     THE WITNESS:  I mean, I'm asked
24 questions at trial, so this is a question that,
25 the way it's worded, is very challenging for me

Page 12

1 to answer. So could you refine that a bit?
2 BY MS. SENTER:
3     Q   You said that you were asked to review
4 the documents and to identify, first, whether or
5 not Ms. Zimmerman had an asbestos-related
6 disease; is that right?
7     A   Correct. So I would offer that she
8 does in fact have an asbestos-related disease.
9     Q   Do you have an opinion as to what type
10 of asbestos-related disease Ms. Zimmerman has?
11     A   I do.
12     Q   What is that?
13     A   She has malignant mesothelioma.
14     Q   And then the second portion of your
15 scope of work that was provided was to provide an
16 opinion as to the cause of that asbestos-related
17 disease; is that correct?
18     MS. KAGAN:  Mischaracterizes the scope
19 of the work, parts of it. The scope of
20 Dr. Moline's opinions are disclosed in the 2034
21 designation, in her notes, and reliance materials
22 and reference list.
23     THE WITNESS:  So I was asked if in
24 fact she -- I felt she did have an
25 asbestos-related disease. And just to be clear,

Page 13

1 I wasn't asked specifically in this case. This
2 is just an ongoing understanding I have with
3 Ms. Kagan and her firm to identify where she
4 might have had exposure to asbestos which I went
5 through and is incorporated in my notes.
6 BY MS. SENTER:
7     Q   So in your notes, you've identified on
8 multiple pages from your review of multiple
9 depositions, correct, where you believe that
10 Ms. Zimmerman may have had exposure to asbestos?
11     MS. KAGAN:  Mischaracterizes.
12     THE WITNESS:  My notes state what the
13 review of the deposition said from Ms. Zimmerman
14 and her family members' sworn testimony. So this
15 is a description of what transpired. It's not --
16 I believe it's what they said in the deposition
17 transcript.
18 BY MS. SENTER:
19     Q   What possible sources of exposure did
20 you identify through your review of the
21 materials?
22     A   She had exposure to cosmetic talc from
23 a number of different manufacturers. She had a
24 potential exposure from her stepfather. And
25 there was a potential exposure from her two sons

4 (Pages 10 - 13)

Jaqueline Moline , M.D., MSc, FACP, FACOEM       February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

Page 14

1 who worked at a gas station where friction
2 materials were used.
3      Q    Do you have a copy of your notes with
4 you? I believe you said you did. I just want to
5 be sure.
6      A    I do.
7      Q    Let's go ahead and look at those.
8 They've been marked as Exhibit 5. Aside from
9 what you've written on these papers, do you have
10 any handwritten notes or highlighting on the
11 actual depositions themselves?
12      A    No.
13      Q    If you could turn to page three, it
14 looks like -- I'm sorry -- page two, it looks
15 like you've noted from Ms. Zimmerman's deposition
16 that she considered Chanel to be a special treat?
17 You have that in quotations. Is that correct?
18      A    Yes.
19      Q    And then it looks like on page ten you
20 ran some calculations; is that right?
21      A    I wouldn't call them calculations. I
22 would call them -- well, I guess they are
23 calculations. It was just basically taking how
24 many times she said she used it by how many
25 years.

Page 15

1      Q    Okay. And then from that information
2 you have determined, based on your review of the
3 depositions, approximately how many containers of
4 each type of talcum powder products that she
5 would have used? Is that fair?
6      A    The container description comes
7 straight from her deposition. That's correct.
8      Q    So as we're going through this, I'm
9 looking at the comparison of the calculations
10 that you ran. And if you look at Chanel, it
11 looks like the Chanel entry has the fewest number
12 of containers. Is that fair?
13      A    Yes.
14      Q    And then I also note that you included
15 the Unarco. That was in relation to her
16 stepfather; is that right?
17      A    Correct.
18          MS. KAGAN: Foundation.
19 BY MS. SENTER:
20      Q    The Unarco calculation that you ran,
21 you came to the conclusion -- I think it says
22 that there were approximately 2,607 possible
23 interactions with Ms. Zimmerman's stepfather
24 after work; is that right?
25          MS. KAGAN: Mischaracterizes.

Page 16

1          THE WITNESS: That's correct.
2 BY MS. SENTER:
3      Q    I wanted to ask about some of the
4 other materials that we were provided. And I'm
5 not sure if you have them in front of you. I
6 know you reviewed some of the Unarco documents.
7 But in the materials provided to us, there was a
8 document called a wind rose document.
9      A    I'm sorry. A -- oh, a wind rose?
10 Yes.
11      Q    What is that?
12      A    That's a document -- hold on. Let me
13 get to it. It's wind directional plots based on
14 prevailing wind patterns that was accumulated by
15 the Illinois State Climatologic Office for
16 October 7th, 2004.
17      Q    Where did you get this document?
18      A    It was provided to me by Plaintiff's
19 counsel.
20      Q    Did you ask for it?
21      A    I didn't know such a thing existed,
22 but I asked about prevailing winds and location
23 of the plant to the family home.
24      Q    Have you ever relied on a document
25 like this before?

Page 17

1      A    You know, I'm sure I have at some
2 point. I've certainly looked at prevailing wind
3 patterns in some of my nonlitigation work, like
4 World Trade Center related work when the wind
5 patterns and the wind flows were mapped post
6 9-11.
7          So I don't know -- I don't think I've
8 ever seen one quite as pretty as this one, but I
9 have seen prevailing wind patterns before.
10      Q    It says on there that it's from
11 Station 14842. Do you see that?
12      A    Yes.
13      Q    Do you know where that station is?
14      A    It looks like it says the Greater
15 Peoria Airport in Peoria, Illinois.
16      Q    And I apologize. I'm not trying to
17 sound rude. But are you versed in climatology to
18 be able to read this plot?
19          MS. KAGAN: Objection. Argument.
20          THE WITNESS: I can read a plot. It's
21 basically describing the average wind speeds in
22 different colors and the direction of the wind.
23 That's my understanding of it. And that was the
24 only way I was looking at this.
25          I would not be qualified to develop

5 (Pages 14 - 17)

Jaqueline Moline , M.D., MSc, FACP, FACOEM          February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

Page 18

1 such a map, but I can look at a map and see where
2 the biggest spokes out of the radius are or of
3 the center are.
4 BY MS. SENTER:
5    Q    Do you know what the input parameters
6 were to create the plot?
7    A    I do not.  I assume that they are wind
8 speeds that were garnered in some fashion.
9    Q    Do you have any information about how
10 that wind speed was collected?
11    A    I do not.  I've been around enough to
12 know that there are windsocks that they collect
13 wind speed in, but I do not have any specific
14 information regarding how the data for this
15 particular plot was collected.
16        MS. SENTER:  Let's go ahead and mark
17 this as Exhibit 6 since we talked about it a bit.
18        (Whereupon a document was identified
19        as Exhibit 6.)
20 BY MS. SENTER:
21    Q    How did the wind rose document help to
22 form your opinions in this case?
23    A    Well, I'm often asked questions if
24 there happens to be an asbestos plant to ask
25 questions related to the relative distance and

Page 19

1 the wind patterns related to where the home is
2 and the plant.
3        And this particular wind rose showed
4 that the prevailing winds appeared to be in the
5 opposite direction from where the home was
6 relative to the Unarco plant.
7    Q    And just so we're clear, the wind rose
8 document, that talks about prevailing winds over
9 decades; right?
10    A    It is -- yes.
11    Q    Is it your understanding that that
12 would be an average of the speeds over decades?
13    A    Correct.
14    Q    But it doesn't take into account any
15 smaller time frame; is that right?
16        MS. KAGAN:  Vague as to "smaller time
17 frame."
18 BY MS. SENTER:
19    Q    For instance -- I can rephrase that.
20        If you were asking about a particular
21 year, that doesn't take a particular year into
22 account, does it?
23    A    Not to enumerate that particular year.
24 But all the data from that year would be included
25 and averaged into -- you wouldn't take out 1977

Page 20

1 and say -- based on how it's described here.
2        But it doesn't specifically say what
3 the wind pattern was in 1977.  It's just the data
4 from 1977 would have been included as a data
5 point to be averaged in with the other years.
6    Q    So based on your understanding of the
7 document, there could be certain years where the
8 prevailing wind pattern was not necessarily away
9 from the home, and that would be included in the
10 average?
11        MS. KAGAN:  Mischaracterizes.  Also
12 speculation.
13        THE WITNESS:  I mean, if that were the
14 case, then that would cause some skewing of the
15 average, and that would cause a blip in the
16 average that would be reflected in the plot.  I
17 mean, if there was a huge wind shift in one
18 particular year, I would expect that there would
19 be some skewing of the data.
20 BY MS. SENTER:
21    Q    So, for instance, if we're looking at
22 this document, I think what you're saying is you
23 see this biggest point that kind of extends out
24 and goes due south; is that right?
25        MS. KAGAN:  Mischaracterizes.

Page 21

1        THE WITNESS:  That the wind comes from
2 the -- I mean, it's -- correct.  It's coming from
3 the south, blowing from the south.
4 BY MS. SENTER:
5    Q    So the biggest spike is wind blowing
6 from the south?
7    A    Right.  It says that.  It says,
8 "Direction (blowing from)," in Orientation,
9 blowing from the south.
10    Q    But then also if you look, there are
11 other peaks that show wind blowing from the
12 northwest or west-northwest?
13    A    Well, I mean, there are other data
14 points.  There -- yes.  But they're not as --
15 they're not as high as the one from south to
16 north.
17    Q    So based on this plot, it does show
18 wind blowing from essentially every direction.
19 It's just that the largest data point was blowing
20 from the south.  Is that fair?
21        MS. KAGAN:  Mischaracterizes.
22        THE WITNESS:  It shows that wind
23 patterns have been at varying levels, but the
24 prevailing wind -- or the most frequent direction
25 of the wind is from the south to the north.

6 (Pages 18 - 21)

Jaqueline Moline , M.D., MSc, FACP, FACOEM        February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

Page 22

1  BY MS. SENTER:
2     Q    I also noted in the materials that
3  were produced to us there were multiple local
4  newspaper articles.  Did you review those?
5     A    Can you be more specific?
6     Q    Yes.  There were multiple articles
7  from the Pantagraph Sun?
8     A    And what's the content, please?
9     Q    Did you --
10    A    I mean, I don't have -- they were
11 sent -- some of them were sent to me
12 electronically in a list.  So are you talking
13 about the ones where Linda was in college and her
14 being active in college?
15    Q    I'm asking if you had reviewed them,
16 and the follow-up would be how they informed your
17 opinion.  Because they're just listed in the
18 reliance materials as Pantagraph newspaper
19 articles.
20    A    Oh, it was just showing that she was
21 really active.  She was spending a lot of time at
22 school, not at home.  I can probably venture a
23 guess that I am the only person on the phone who
24 has actually been to Illinois State University,
25 so I thought that was kind of cool because that's

Page 23

1  actually a place that I've spent many hours.
2           And she just had things like, you
3  know, her wedding announcement, honors she got.
4  But she was active in college.
5     Q    Beyond showing her activities,
6  college, her wedding announcement, do the
7  newspaper articles otherwise inform your opinions
8  in this case?
9     A    They corroborated her deposition
10 transcript and her sister's deposition transcript
11 that she did not spend a lot of time at home when
12 she was in college.  That's the extent to which
13 they really inform my opinion.
14    Q    So you're still relying on the
15 deposition testimony.  You just believe that the
16 newspaper articles kind of bolster that.  Is that
17 what I'm understanding?
18    A    I'm going to rely on the sworn
19 testimony.  The fact that there are documents
20 that were in the same time period that supplement
21 or that corroborate what she said is always
22 something that is helpful when someone is
23 recalling events that occurred, you know,
24 60 years before.
25    Q    If we could turn back to your notes

Page 24

1  for just a moment, you mentioned earlier when we
2  were talking about potential exposures the
3  potential exposures from Ms. Zimmerman's two sons
4  who worked at a gas station and did mechanic
5  work; is that right?
6     A    Correct.
7     Q    And I believe that starts on page
8  three with the deposition of Stephen Zimmerman?
9     A    Correct.
10    Q    I note in the margin -- and I
11 apologize.  I'm just really bad with handwriting,
12 my own included.  But the writing as to Bendix,
13 it says Bendix on the top.  It's an indented
14 section.
15    A    That's not the margin.  That's
16 actually within the body the way I take notes,
17 but, yes, it says Bendix.  It was -- I'm taking
18 these notes as I'm reading.  So he discussed the
19 brand Bendix as the brand he recalled seeing.
20    Q    What you've written under there,
21 "brake - cleaned," can you just read that section
22 under Bendix for me?
23    A    It says, "brakes - cleaned everything.
24 Scruffed up with sandpaper.  Delivered brakes
25 around 24 times.  Assisted mechanic with brakes

Page 25

1  around twice a month.  Clutch, gaskets, every
2  several months."  And the Q means every, and C
3  means with, just in medical shorthand.
4     Q    And then, additionally, to the left of
5  that, it says, "home - 20 car event/brakes."  Is
6  that right?
7     A    Right.
8     Q    Did you do similar calculations as you
9  did with the talcum powder products and the
10 Unarco exposure for potential brake exposures?
11    A    I did not.
12    Q    Was there a reason why?
13    A    In part because, during the time
14 period that they were working, it was unclear if
15 they were even using asbestos brakes because, at
16 that point in time, both nonasbestos and asbestos
17 brakes were available.  Neither Mr. Zimmerman or
18 Mr. Zimmerman knew what was actually being used.
19 They just knew they were brakes.  So I thought
20 that was too speculative and also was --
21           That was the main reason.  It was also
22 not -- the numbers would not have been as high
23 just in terms of the amount of time that they did
24 that.  But that was the main reason.  It was just
25 too speculative.  I wasn't even sure that they

7 (Pages 22 - 25)

Jaqueline Moline , M.D., MSc, FACP, FACOEM          February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

Page 26

1  were using asbestos products.
2      Q    Do you have an understanding of when
3  asbestos-free brakes were first placed on the
4  market?
5      A    Well, if you talk to the brake
6  manufacturers, they'll give varying dates that
7  some were available I believe in the '70s. I
8  think there was a move towards nonasbestos brakes
9  certainly in the mid-'80s.
10         And the Zimmerman boys were working at
11  the gas station starting -- I think the older one
12  started in 1986, so that would have been during
13  the transition period. So it's unclear what type
14  of brakes they actually worked with. He didn't
15  work with brakes per se. He might have helped
16  the mechanics on occasion, but he wasn't the
17  primary brake replacer.
18      Q    You noted that they cleaned everything
19  with compressed air and that they scuffed up the
20  brakes with sandpaper?
21      A    Correct.
22      Q    So assuming that some of the brakes
23  that they used were in fact asbestos-containing,
24  would you count this as a potential exposure for
25  Ms. Zimmerman?

Page 27

1      A    Well, that activity would have been an
2  exposure for the children. The exposure
3  Ms. Zimmerman would have had would have been from
4  laundering her children's clothes. So it is a
5  potential exposure.
6      Q    And would you also consider
7  Ms. Zimmerman's stepfather's work at Unarco a
8  potential exposure?
9      A    Yes.
10      Q    I want to ask just a little bit about
11  the specific work that you've done. I know that
12  we discussed your calculations on the number of
13  containers or exposures that you kind of
14  extrapolated out of the deposition testimony.
15         What I haven't seen on the calculation
16  page are any dose estimates. Have you done a
17  dose estimate for Ms. Zimmerman in this case?
18      A    No.
19      MS. KAGAN: Vague as to "dose
20  estimate."
21      THE WITNESS: The only calculations
22  I've done are on that page, and it was simply the
23  number of times she used the various products.
24  BY MS. SENTER:
25      Q    You've done dose estimates in past

Page 28

1  cases; correct?
2      A    Yes.
3      Q    Were you just simply not asked to do
4  one in this case?
5      A    I was not specifically asked to do one
6  in this case.
7      Q    And just to be clear, you said that
8  you're not planning on doing any additional work
9  before the trial aside from if there are
10  additional materials that come up that you need
11  to review. You're not planning on doing a dose
12  estimate for use at trial. Is that fair?
13      MS. KAGAN: Mischaracterizes.
14      THE WITNESS: That's correct.
15  BY MS. SENTER:
16      Q    I'm sorry. What was the answer?
17      A    I wasn't planning on doing a dose
18  estimate based on the numbers, correct.
19      Q    Thank you. I'm looking at your
20  case-specific materials that you reviewed and
21  rely on, and I note there's a number of testing
22  reports that you're relying on, including
23  Dr. Compton and Dr. Longo.
24         I just want to make sure. You haven't
25  reviewed any testing of any Chanel products

Page 29

1  specifically from Ms. Zimmerman; is that correct?
2      MS. KAGAN: You mean Ms. Zimmerman's
3  own containers?
4      MS. SENTER: Correct.
5      THE WITNESS: I don't recall that she
6  had any to be tested. I have not seen any
7  testing specific to Ms. Zimmerman with respect to
8  Chanel.
9  BY MS. SENTER:
10      Q    I've looked through some of your past
11  testimony to kind of eliminate some of my
12  questions, but I wanted to confirm as well: On
13  these tests that are bulk samples, you would need
14  somebody to convert the bulk sample results to a
15  fiber per cc value in order to determine whether
16  a specific product would result in
17  above-background exposure; is that right?
18      MS. KAGAN: Mischaracterizes.
19  Foundation. Argument.
20      THE WITNESS: A bulk sample by
21  definition is going to be upon a percentage by
22  weight or per gram, and it would need to be
23  converted to a volumetric exposure for fiber per
24  cc.
25              - - -

8 (Pages 26 - 29)

Jaqueline Moline , M.D., MSc, FACP, FACOEM          February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

Page 30

1  BY MS. SENTER:
2      Q    That was a yes?
3          MS. KAGAN:  Mischaracterizes.  Asked
4  and answered.
5          THE WITNESS:  I gave you a more
6  thorough -- you need a conversion because -- and
7  a bulk sample gives you one point of information.
8  Then you would need to have a sense of testing
9  for what becomes airborne.
10          We do know from the published
11  literature that a very small percentage by weight
12  can lead to millions or billions of fibers.  So
13  you would need to have some type of volumetric
14  measurement.  You can't just convert what's a
15  bulk sample to an air sample.
16  BY MS. SENTER:
17      Q    Just to be sure that you and I are on
18  the same page, if you had a result that showed
19  that a sample that was tested was 0.00016 percent
20  asbestos by weight, you wouldn't be able to tell
21  me just from that result whether or not that
22  would result in an above-background exposure?
23          MS. KAGAN:  Argument.  Foundation.
24          THE WITNESS:  I would need additional
25  information, and that -- so weight percent is not

Page 31

1  the accurate way of measuring what becomes
2  airborne, so I would not be able to do that.
3  That's not something that I have done.
4          But my understanding is it's been
5  described as an underestimation, if you just look
6  at the bulk sample percentage, to what becomes
7  airborne because the individual fibers weigh so
8  little that even a small percentage by weight can
9  translate into a very large percentage.
10          This has been described in the medical
11  literature by Rohl in the '70s or by Mattenklott
12  or the EPA.  I believe also the FDA recently made
13  a comment about that in their January statement.
14          So sorry to give such a long-winded
15  answer to that.  But bulk samples are not -- even
16  if it sounds like a very small percentage, are
17  not indicative of what can be a potential
18  airborne exposure.
19  BY MS. SENTER:
20      Q    And I understand your testimony that
21  you don't think it's indicative of what could
22  become airborne.  My question to you was more
23  limited.  It was just that, given those bulk
24  sample results, you could not look at the bulk
25  sample results and testify whether use of that

Page 32

1  product that was sampled would result in an
2  exposure above background.  Is that true?
3          MS. KAGAN:  Argument.
4          THE WITNESS:  If you're asking me for
5  a particular number, I don't know how you're able
6  to do that.  I mean, it's been well described by
7  some of the authors I mentioned, you know, Rohl
8  and Mattenklott, in terms of the percentage of
9  bulk samples leading to millions or billions of
10  fibers in the air.
11          I would not be able to give you an
12  actual quantification.  I would have to rely on
13  others to do that.
14  BY MS. SENTER:
15      Q    Dr. Moline, you're not a microscopist;
16  is that correct?
17      A    I am not a microscopist.
18      Q    And you're not a material scientist?
19      A    Correct.
20      Q    So in terms of methodology employed by
21  various experts, would you defer to experts in
22  those fields as to whether the methodology
23  employed was proper?
24          MS. KAGAN:  Vague as to "proper" and
25  vague as to "experts in those fields."

Page 33

1          THE WITNESS:  I'm sorry.  I don't
2  understand what you mean by methodology.  The
3  methodology of what?
4  BY MS. SENTER:
5      Q    In terms of the testing that you're
6  relying on, the various bulk samples and testing
7  of specific products, if there's any question as
8  to the validity of the methodology used on those
9  samples, would you defer to the experts in
10  microscopy and material science as to whether or
11  not the methodology employed was valid or proper?
12          MS. KAGAN:  Vague as to "valid or
13  proper" and vague as to "those experts."
14          THE WITNESS:  I would not comment on
15  whether someone -- on the methodology apart from
16  saying whether they described it as something
17  that is standard and reported.  But I would not
18  comment on the specifics of how one went about
19  doing that and how it is described.
20  BY MS. SENTER:
21      Q    I think I saw from a past deposition
22  that when you are considering your background
23  levels you sometimes take into account the
24  geographic region in which an individual was
25  living.  Is that correct?

9 (Pages 30 - 33)

Jaqueline Moline , M.D., MSc, FACP, FACOEM          February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

Page 34

1       MS. KAGAN:  Vague.  Foundation.
2       THE WITNESS:  I'm not sure which
3   testimony you're referring to.  I think -- the
4   EPA's most recent background levels do not
5   differentiate based on region.  They just give a
6   general number.
7       I -- so I don't know how -- I don't
8   know what you're referring to so I can comment on
9   what you're specifically referring to.  In the
10  past, there have been differentiation between
11  rural and urban, but not with more recent
12  calculations.
13  BY MS. SENTER:
14      Q    What number do you use for background?
15      A    0.00001 fibers per cc.
16      Q    And is it fair for me to assume that
17  that's across the board you use that?
18      MS. KAGAN:  Vague as to "across the
19  board."
20      THE WITNESS:  If you're referring to
21  that's what the US description has been by the
22  EPA, yes.
23  BY MS. SENTER:
24      Q    So although in the past there's been
25  differentiation between urban and rural, you're

Page 35

1   not making that differentiation in your use of a
2   background number?
3       A    I'm using the more recent number which
4   does not differentiate.  In the past, I have
5   described the ATSDR which made some
6   differentiation between rural and urban.  And I
7   can tell you that Bloomington and Normal,
8   Illinois, are not urban.
9       Q    I've driven through.  I'm familiar.
10      In order for an exposure to be
11  considered significant in your estimation, do you
12  ascribe any certain amount above background that
13  it needs to be?
14      A    I haven't given an absolute number.  I
15  said it has to be an order of magnitude or more
16  above background.
17      Q    All right.  Dr. Moline, I'm going to
18  ask you some questions about your paper that you
19  recently authored, Mesothelioma Associated with
20  the use of Cosmetic Talc.  Okay?
21      We've been going for close to an hour.
22  We're going to switch topics.  So if you'd like
23  to take a break, that's fine.
24      A    Are you going to ask me specific pages
25  and lines?  Because I don't have it with me.  If

Page 36

1   you are, I can take a break and go get it.
2       Q    I don't plan to ask you about specific
3   pages and lines, no.
4       A    Okay.  Fine.  We can go for a little
5   bit more before a break.
6       Q    Okay.  Who were your coauthors on that
7   paper?
8       A    You're testing my memory here.
9   Kristin Bevilacqua, Maya Alexandri, and Ronald
10  Gordon.
11      Q    And how did each of those individuals
12  come to be one of the coauthors?
13      A    Maya Alexandri, despite having a law
14  degree, is a medical student who's spent time
15  working with me doing electives, so she got
16  involved in the paper that way.  Kristin
17  Bevilacqua was a former research coordinator and
18  expressed an interest in working with me on the
19  paper.
20      And Dr. Gordon is a colleague of mine
21  from my years at Mount Sinai who we had discussed
22  doing a joint paper where he had done fiber
23  analyses and I had done some more clinical
24  components of the paper.
25      Q    That kind of touched on the next area

Page 37

1   that I wanted to ask you about, which was the
2   role of each of the coauthors in putting together
3   the paper.  If you could tell me what Kristin
4   Bevilacqua --
5       A    Correct.
6       Q    What was Kristin's role in --
7       A    She assisted in formatting, helping
8   with the references.  She and I worked together
9   on the -- some of the introduction and
10  conclusion, particularly with respect to
11  references.  I wrote up the cases.  She helped
12  put the tables together -- or Table 1 together, I
13  believe.  She did the more administrative stuff
14  for the paper.
15      Q    Other than the formatting and
16  references, the work on the intro and conclusion,
17  putting together the table, is there anything
18  else that Kristin did?
19      A    It's challenging to discuss this in a
20  way because it was a collaborative process as we
21  worked on the various sections.  But, obviously,
22  she didn't do the testing or the testing protocol
23  or the descriptions.  We all worked on editing it
24  to make sure that the language made sense, and so
25  there was more sections than that.  And it was

10 (Pages 34 - 37)

Jaqueline Moline , M.D., MSc, FACP, FACOEM          February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

Page 38

1 a -- it was very much a collaborative process.
2     Q    I appreciate that.  And to the extent
3 that you can't parse it out, I understand.  I'm
4 just asking for what you can.
5     A    Yeah.  I mean, we were partners in
6 this, and she and I worked on the -- she's not a
7 clinician, so I worked on the more clinical
8 elements of it.  But we worked on the other
9 aspects together.
10     Q    How about Maya?  What was her role in
11 helping put together your paper?
12     A    Maya's role was to work on assisting
13 with some of the initial documents and trying to
14 make the -- some of the information from
15 Dr. Gordon fit in more with the clinical aspects
16 of the paper, and she spent more time working on
17 that section on making it into something that
18 would be more relevant to the journal's
19 readership.
20          So that was more her role also to do
21 editing or a reading through to make sure it was
22 all logical.  She assisted me when we were coming
23 up with the other -- figuring out how to come up
24 with the other tables.
25          Let me rephrase that.  It's not like

Page 39

1 we came up with the other tables.  It was how we
2 could best present the data in the tables.
3     Q    And Dr. Gordon, what was his role in
4 the drafting of this article?
5     A    So Dr. Gordon did the testing of the
6 tissue that was included.  He also provided
7 information regarding the controls and the
8 information related to the controls that he had
9 gathered in his laboratory, the methods how he
10 did the actual testing for asbestos.  So any of
11 the fiber testing he would have done as described
12 in the paper.
13          Obviously, we all worked on making
14 sure it was written in a way that seemed to flow.
15     Q    You mentioned a moment ago that Maya
16 assisted in making the documents or the
17 information received from Dr. Gordon fit in with
18 the clinical aspects.  What did you mean by that?
19     A    The way an electron microscopist might
20 write something is not the same way as a
21 clinician for a clinical journal might write
22 something, so -- and also how the data were
23 presented, it was basically to work on making it
24 so that it was a more cohesive paper.
25          Obviously, she did not touch the

Page 40

1 numbers because she had not done the
2 measurements, but it was more making it into a
3 unified theme.
4     Q    Do you have the initial data or
5 information that you received from Dr. Gordon in
6 the original form before it was somewhat -- I
7 don't want to say changed because I'm not trying
8 to misrepresent it -- but before it was tailored
9 to fit in with the clinical aspects?
10     A    Are you asking if I have the initial
11 part that he wrote up as a draft to include in
12 the paper?  Is that what you're asking me?
13     Q    Yes.  Did you retain that in its
14 original format?
15     A    I don't know if I still have it.  It
16 was basically work that's been rewritten.  I
17 don't know if I actually have that.
18     Q    Do you know how you received it?
19     A    I don't know if he sent it
20 electronically or if it was sent by hard copy.  I
21 don't remember.  This was about two-and-a-half
22 years ago that initially it was started.
23     Q    Which journal did you eventually
24 submit this article to?
25     A    It was submitted only to one journal,

Page 41

1 and that was the one it was published in.  Do you
2 need the name of that, or can you read that from
3 the bottom of the journal?
4     Q    I can read it.  I was just for clarity
5 of the record asking you the --
6     A    It's the Journal of Occupational and
7 Environmental Medicine.  The way your question
8 was worded is it could have been submitted
9 somewhere else and rejected, but it was not.
10     Q    I apologize.  I didn't mean to imply
11 that.  I was just asking which journal you
12 submitted to.  And that was the only journal you
13 submitted to, which you just named here; correct?
14     A    Correct.
15     Q    And it was published?
16     A    Correct.
17     Q    After you had submitted, did the -- it
18 was peer reviewed by a panel; correct?
19     A    It was peer reviewed and -- yes.  I
20 don't know who reviewed it.  But, yes, it was
21 peer reviewed.
22     Q    Did you receive any comments during
23 the peer review process of any revisions that
24 they would like for you to make?
25     A    Yes.

11 (Pages 38 - 41)

Jaqueline Moline , M.D., MSc, FACP, FACOEM          February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

Page 42

1    Q    Do you recall what the substance of
2 those comments were?
3    A    Some of it was they wanted us to take
4 out some of the initial -- what we had initially
5 submitted was -- there was some quotation in some
6 of the introduction to the conclusion.  They
7 asked that we add a line about whether there was
8 any genetic testing, which we did.
9         There was a -- some clarifications I
10 think on the tables.  There were some minor
11 changes.  It was nothing that was not --
12 obviously, it was nothing that prevented it from
13 being published.  It was a very constructive
14 review in terms of making it clearer to the
15 reader.
16   Q    Understood.  I assume that you made
17 those revisions; is that right?
18   A    When we were able to, yes.  I mean,
19 sometimes the reviewer will suggest things that
20 are not possible to do, and you note that it's
21 not possible to do it.  But in general, one tries
22 to be responsive to the reviewers' requests.
23   Q    Do you recall any specific request
24 made by the reviewers on this article that you
25 were unable to make?

Page 43

1    A    No.
2    Q    As we go forward, I am 99 percent sure
3 that I know your answers to these questions.  I
4 just have to ask them for the record.  You have a
5 key for the 33 cases that are included in your
6 paper that associates those 33 cases with
7 specific plaintiffs in talc litigation; is that
8 right?
9         MS. KAGAN:  Foundation, vague, and
10 argument as to "you have a fee."
11        THE WITNESS:  Are you asking me if I
12 have a way of associating who is who with what's
13 described in the paper?
14 BY MS. SENTER:
15   Q    Yes.
16   A    Yes.  I mean, I don't know if I would
17 call it a key, but yes.
18   Q    So the paper talks about 33 different
19 individuals, and those were all -- those
20 individuals were all plaintiffs in litigation;
21 correct?
22   A    Yes.
23   Q    And for each of those 33 individuals,
24 you have been hired or retained to provide an
25 opinion in association with their litigation;

Page 44

1 correct?
2    A    Correct.
3    Q    And because you were a retained expert
4 on each of those 33 cases associated with the
5 paper, you do have a way of identifying each of
6 the 33 individuals described within your
7 published paper; right?
8    A    I personally -- yes.  I have a way of
9 identifying who is patient 1 or who is patient
10 33.
11   Q    And for reasons that you can explain,
12 you will not provide the listing or any
13 information about which specific individual is
14 associated with any given case; correct?
15        MS. KAGAN:  I'm sorry.  Can you reask
16 the first part of the question?  For reasons she
17 can or cannot explain?
18        MS. SENTER:  Can.
19 BY MS. SENTER:
20   Q    For reasons that Dr. Moline can state
21 in response to my question, Dr. Moline will not
22 identify the specific individuals that are the
23 subject of your paper; correct?
24   A    I will not name names in this
25 deposition.  That is correct.

Page 45

1    Q    And what is the reason that you have
2 that you will not give the identities of the
3 individuals who were used in this paper?
4    A    I'm following -- the paper was
5 submitted for IRB approval, Institutional Review
6 Board approval.  I was -- it's to protect the
7 privacy of the individuals who we included in the
8 paper with their data in a way that it's not
9 identified in some fashion so that people can't
10 go knocking on their doors or sending them nasty
11 tweets.
12   Q    When you submitted for IRB approval,
13 was the approval granted conditionally upon the
14 individuals remaining anonymous?
15   A    We described that -- how we would be
16 describing the individuals, and we said that no
17 names would be included in the paper.  So to that
18 extent, yes.
19   Q    Would it have been possible to submit
20 the scope of this project for IRB approval
21 without the anonymity that you specified in
22 your --
23   A    I don't know.  I've never tried that.
24 It's never been my practice in any of the 70 or
25 80 papers that I've published to ever include

12 (Pages 42 - 45)

Jaqueline Moline , M.D., MSc, FACP, FACOEM    February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

Page 46

1 someone's name.  I would never -- I don't know if
2 IRB would approve it.  I've never even tried or
3 have heard of that.
4        And I honestly don't think I've seen a
5 paper, reading thousands of papers, that
6 specifically had someone's name in a scientific
7 journal article.
8    Q    To be clear, I'm not asking whether or
9 not you could write a paper specifically
10 identifying each individual.  I'm simply asking
11 whether or not maintaining the anonymity of
12 individuals who were involved in litigation
13 outside the context of the paper was required.
14    A    That was how we submitted it with the
15 understanding that we would be doing it, and
16 that's how it was approved.
17    Q    Now, the 33 cases that are included in
18 your paper, you had already reviewed those cases
19 in the context of litigation; correct?
20    A    Yes.
21        MS. KAGAN:  Asked and answered.
22 BY MS. SENTER:
23    Q    And Dr. Gordon submitted his tissue
24 digestion results in six cases; is that right?
25    A    Correct.

Page 47

1    Q    And those six cases were ones that you
2 had also been retained as an expert in
3 litigation?
4    A    Correct.
5    Q    Now, there's a note in the article
6 about the six cases with the tissue digestion.
7 There may have been additional digestion done by
8 another analyst; is that right?
9    A    There may have been other digestions
10 done by others.  And I honestly don't recall
11 because, as we were writing the paper, I realized
12 that it becomes repetitive in a sense to give
13 multiple case histories that are going to be
14 very, very similar.
15        So there was a note in there to say
16 that it wasn't -- these were six cases that one
17 person had done that I had also reviewed.  There
18 might have been other tissue testing done by
19 others in some of the other 27 cases that were
20 not included.  It wasn't to say that these were
21 the only cases that had tissue testing.
22        But, initially, when we started doing
23 the paper, he had these six that we had in
24 common, and that's what we went forward with.
25    Q    And within those six that Dr. Gordon

Page 48

1 had his tissue digestion, there also could have
2 been tissue digestion done by another retained
3 expert.  Is that fair?
4        MS. KAGAN:  Vague.
5        THE WITNESS:  I have no way of knowing
6 that.  I don't know.  There could have been.
7 BY MS. SENTER:
8    Q    And you didn't go back to those
9 specific cases, the six specific cases, to look
10 and see if there were additional tissue
11 digestions done by other experts; is that right?
12    A    I did not specifically do that as I
13 was writing a paper with Dr. Gordon's results.  I
14 was writing a paper with Dr. Gordon's results, so
15 I was going forward using those data points and
16 those tissue digestions that matched with the
17 cases I had also reviewed.
18    Q    So if another analyst or another
19 expert in one of those six cases had found
20 something different than Dr. Gordon, that's not
21 reflected in your article.  Is that fair?
22    A    That was not the focus, but it would
23 not have been reflected.  That's correct.
24    Q    So the other 27 cases, same thing?  If
25 there was tissue digestion done either by a

Page 49

1 plaintiff expert or a defense expert, those
2 results are not reflected in the paper; right?
3 That's why you included that disclaimer?
4    A    Right.  We didn't go into tissue
5 digestion for the other 27.  That's correct.
6    Q    And then my understanding is the 33 --
7 the number of 33 that you selected was kind of an
8 homage or a historical nod; correct?  That's why
9 you picked the number 33?
10    A    Correct.  In 1960, the connection
11 between mesothelioma and asbestos was based on
12 33.  And if you studied my CV well enough to know
13 what my college major was, you know that things
14 like this are important to me.
15    Q    I just wanted to be clear that it was
16 important to you for that reason and there wasn't
17 any particular statistical significance to
18 choosing 33 cases; is that right?
19    A    Well, there's no statistics in this
20 paper, so there's no -- so it was basically done
21 because of the historical reference to this big
22 ah-hah moment in the world of medicine saying
23 asbestos is associated with mesothelioma even
24 though it had been described before.
25        But this was really where everyone

13 (Pages 46 - 49)

Jaqueline Moline , M.D., MSc, FACP, FACOEM          February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

Page 50

1 started making the connection.  And I similarly
2 hoped that people in the medical community would
3 understand that this is a potential source of
4 asbestos exposure and have their similar ah-hah
5 moments going forward when they are evaluating
6 patients.
7      Q    And my understanding is that in
8 selecting those 33 cases, you specifically didn't
9 include any cases where there was a potential
10 alternative exposure; is that right?
11     A    To the best of my ability based on the
12 information I have, that is correct.
13     Q    So, for instance, if you were writing
14 that same paper now, you would not include
15 Ms. Zimmerman in the paper; right?
16     A    Right.  Ms. Zimmerman would not be the
17 type of person I would include because she has
18 potential alternative exposure, which is why I
19 have -- obviously, I have evaluated more than 33
20 individuals who had cosmetic talc exposure.  Some
21 of them have additional exposures as well.
22          But for the purposes of the paper, I
23 was trying to keep it, so to speak, clean and try
24 to identify folks for whom no other identifiable
25 source was apparent.

Page 51

1      Q    Now, I know that that analysis of
2 whether or not there were additional exposures
3 came primarily from the sworn testimony in the
4 case that -- the underlying case; correct?
5      A    You said case in the singular.  Did
6 you mean --
7      Q    Sorry.
8      A    I don't know what you're referring to
9 since there were 33 people described.
10     Q    Right.  So, for instance, I
11 hypothetically, since I know we're not discussing
12 the specific names of any individual, but for
13 individual number one that's included in your
14 paper, the analysis as to whether or not there
15 were alternative exposures would come from review
16 of the sworn testimony in the litigation that had
17 been filed by individual number one; correct?
18          MS. HAGAN:  Mischaracterizes.
19          THE WITNESS:  Any sworn testimony that
20 was available; any family member, coworker,
21 cohabitant depositions that were available.  In
22 some instances, I did actually also interview the
23 folks.  That wasn't delineated because it was --
24 didn't change materially the exposures.  But it
25 would have come for the most part from their

Page 52

1 deposition transcripts and the questions they
2 were asked.
3      Q    And so that would be information that
4 you had available at the time that you would have
5 written your report in any one of those
6 underlying cases; correct?
7          MS. KAGAN:  Mischaracterizes.
8 Foundation.
9          THE WITNESS:  In any one of the
10 underlying suits?  I would have been writing my
11 report based on information provided to me at the
12 time I was provided with the information,
13 correct.
14 BY MS. SENTER:
15     Q    And I guess I asked it inartfully.
16 But the information that is included in your
17 article is the same as the information you had
18 available to you at the time that you authored
19 your report in the underlying litigation;
20 correct?
21          MS. KAGAN:  Mischaracterizes as to
22 "report."  As you know, in California, you aren't
23 under report requirements.
24          THE WITNESS:  So it would have been
25 based on if a report was done and the data were

Page 53

1 compiled or based on notes that were done in
2 preparation for a particular case for litigation.
3 BY MS. SENTER:
4      Q    Did you ever do, in association with
5 drafting your paper, any additional investigation
6 specific to the authorship of the paper?
7      A    I have no idea what you're asking me.
8 I don't know what you mean specifically related
9 to authorship of the paper.
10     Q    Did you ever go back to look and see
11 whether there had been alternative exposure
12 testimony that you didn't have at the time you
13 came to your opinions in the underlying
14 litigation?
15          MS. KAGAN:  Vague.  Foundation.
16          THE WITNESS:  I don't recall that
17 occurring.  I do know that any time we had any
18 question about if there would be an alternate
19 exposure, we excluded them.  But I don't know at
20 what point that would have arisen.
21 BY MS. SENTER:
22     Q    You don't know at what point what
23 would have arisen?
24     A    If I had additional information that
25 led to the information that there might be

14 (Pages 50 - 53)

Jaqueline Moline , M.D., MSc, FACP, FACOEM          February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

Page 54

1 alternate exposures prior to submitting the
2 report, then I would have substituted another
3 individual who had no known alternate exposure.
4      I don't recall that happening. I know
5 that there were -- as we were preparing to submit
6 the paper, there were one or two folks that
7 realized there was a possibility, and we actually
8 took them out and substituted in someone else.
9      Q    With those one or two folks that you
10 realized there was a possibility, what suddenly
11 clued you in to that possibility of alternative
12 exposure?
13     A    I think it was going back in through
14 just reviewing the reports or the notes or the
15 records and seeing -- just to make sure that
16 there were no potential alternate exposures. I
17 don't recall that there had been any exposures
18 that had been raised in other settings that were
19 real that caused me to remove somebody from the
20 paper.
21     Q    For any of the 33 cases that you
22 included in your article, did you review any of
23 the expert -- the defense expert reports in those
24 cases?
25     A    In preparation for the manuscript, no.

Page 55

1 In general, I don't read defense expert reports.
2 I'm not provided them. I specifically did not
3 read defense expert reports in preparation of my
4 paper.
5      Q    Did you ever go back and ask for the
6 defense expert reports to see whether or not
7 there was additional information that you would
8 consider noteworthy before drafting your
9 manuscript?
10     A    I did not.
11     Q    You specified a moment ago real
12 exposure. Is that an assessment that you make as
13 to whether or not the exposure is real?
14     A    Well, I'm often asked hypothetical
15 exposures that would be if someone lived in a
16 city that had a plant that was five miles away
17 that has -- that has no evidence that an
18 individual has actual exposure but might live in
19 a town that has a plant five miles away that has
20 historically made asbestos products even though
21 they don't know what was actually done in the
22 plant and asked if that was a potential alternate
23 exposure when I had no information that that was
24 actually what I would call a real exposure.
25 That's what I was referring to.

Page 56

1      So often I'm confronted with questions
2 about whether I considered something that would
3 not be based on my medical training or
4 information that was available to show that there
5 was a potential exposure, that it was an actual
6 exposure an individual suffered.
7      Q    So it's based on your training and the
8 information that you had available to you when
9 you reached your opinion as to whether or not a
10 potential exposure is hypothetical or real?
11     A    The information in my paper was based
12 on the information I had at hand. What I was
13 discussing was being asked questions about
14 hypothetical exposures for which I had never been
15 provided with any documented evidence of exposure
16 or potential exposure and asked questions about
17 that.
18     So I'm trying to make a
19 differentiation between what I had in hand and
20 based on my training with somebody trying to
21 hypothesize that a potential exposure came
22 because of a particular scenario.
23     Q    I guess this is a little bit difficult
24 because we're trying to fit it all to a specific
25 schedule and not have concrete examples. But in

Page 57

1 terms of these 33 cases included in your paper,
2 do you recall whether there were any hypothetical
3 potential exposures that you deemed not real and
4 so not a reason to exclude that case from your
5 manuscript?
6      MS. KAGAN:  Overbroad.
7      THE WITNESS:  I have no recollection
8 of those particular scenarios for any of the
9 cases that I included in the paper. I was
10 speaking more broadly. But I have no specific
11 recollection.
12 BY MS. SENTER:
13     Q    Did you ever go back and review any
14 sort of trial testimony from any of the 33 cases
15 to see whether there were additional developments
16 regarding potential exposures?
17     A    You're assuming that --
18     MS. KAGAN:  Vague. Overbroad.
19     A    -- it actually went to trial. So
20 there may not be trial testimony in these
21 33 cases. I did not go back -- with that caveat
22 that I know I have not testified in all of those
23 33 cases or that they went to trial, I have not
24 gone back to read trial testimony.
25 BY MS. SENTER:

15 (Pages 54 - 57)

Jaqueline Moline , M.D., MSc, FACP, FACOEM       February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

Page 58

1    Q    Let's start there.  Did any of the
2  33 cases go to trial?
3    A    I'm not going to discuss that.
4    Q    If you're not going to tell me whether
5  or not they went to trial, I assume you're not
6  going to tell me whether or not you testified at
7  trial for any of those 33 cases.  Is that fair?
8    A    That is fair.  One can surmise if I
9  was asked to be an expert and a case went to
10  trial that I might have been asked to testify.
11  But I can't tell you which cases I testified in.
12  I don't recall which cases I testified in.  I
13  don't have the names, so I can't go through it
14  and -- as I sit here right now in this empty
15  conference room, nor would I tell you that anyway
16  because that would be too much information.
17    Q    So, hypothetically, since we're not
18  discussing a specific case, if at trial it came
19  out that there were other alternative exposures
20  which were unknown at the time of your report in
21  a case, you wouldn't include that information in
22  drafting your manuscript?
23    A    If there was additional information
24  that came out after my manuscript had been
25  submitted or drafted, I would not have included

Page 59

1  that in my manuscript.  That is correct.
2    Q    And I'm not talking about after your
3  manuscript had been drafted.  I'm talking about,
4  in a hypothetical scenario that one of the cases
5  included went to trial and you testified, if
6  there was subsequent testimony that showed an
7  alternative exposure, you didn't review that
8  testimony so you don't account for that
9  alternative exposure in whether or not that
10  person should have been included in your
11  manuscript; right?
12    MS. KAGAN:  I'm going to object
13  because it's vague, argument, calls for
14  speculation, incomplete hypothetical,
15  mischaracterizes.
16    THE WITNESS:  I didn't read any trial
17  testimony at any point in relation to this
18  article, so I didn't review any of that, and it
19  would not have been included in the manuscript.
20  BY MS. SENTER:
21    Q    I'm going to look over my notes, and
22  then I might have one or two other questions.
23  This would probably be a good time for a break if
24  you'd like to take one, Doctor.
25    A    That would be great.  Thank you.

Page 60

1    (Proceedings in recess, 11:29 a.m. to
2    11:35 a.m.)
3  BY MS. SENTER:
4    Q    Dr. Moline, I looked through my notes.
5  I think I have maybe one or two more questions
6  for you.  And, again, I think I know the answers
7  because you said you didn't review defense
8  reports.  But on your reliance list of all the
9  testing that you reviewed, I don't see any
10  product testing done by Alan Segrave.  Is that
11  correct?
12    A    Oh, I looked at the wrong list here.
13  I don't know if -- is there a date?  I don't see
14  any.  I don't recall anything specific to
15  Segrave.  I know that there have been some
16  questions about his testing, but I didn't put
17  anything specific on my reliance list related to
18  him.
19    Q    Have you ever reviewed any testing of
20  any Chanel product done by Alan Segrave?
21    A    Not that I recall.
22    Q    To the extent that Mr. Segrave's
23  testing differs, the results of his testing
24  differ from Dr. Compton's or Dr. Longo's, you
25  haven't reviewed that in the formation of your

Page 61

1  opinions; correct?
2    A    I don't recall seeing Dr. -- or
3  Mr. Segrave.  I don't think he's a doctor.  I
4  don't think he has a Ph.D.  I don't recall
5  reviewing Mr. Segrave specifically with respect
6  to Chanel.  That's correct.
7    MS. SENTER:  Thank you very much.  If
8  I have follow-ups, I'll jump in, but I'm going to
9  go ahead and let somebody else ask some questions
10  now.  Thank you for your time, Dr. Moline.
11    THE WITNESS:  You're welcome.
12  EXAMINATION
13  BY MS. ROMANO:
14    Q    Hey, Dr. Moline.  It's Julia Romano.
15    A    Hi.
16    Q    Hi.  Let me run through some questions
17  with you.  Then I'll hand you over to someone
18  else.
19    You're not one of Ms. Zimmerman's
20  treating doctors; right?
21    A    I am not.
22    Q    And you've not been involved in any of
23  her diagnosis, treatment, or care?
24    A    Correct.
25    Q    It's my understanding from your

16 (Pages 58 - 61)

Jaqueline Moline , M.D., MSc, FACP, FACOEM          February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

Page 62

1 previous testimony and from reviewing your notes
2 that you have not personally met with or spoken
3 to Ms. Zimmerman. Is that fair?
4     A   Correct.
5     Q   In other words, you have not taken an
6 exposure history from her directly, but, instead,
7 you're relying on her deposition?
8     A   Her deposition, her sister's
9 deposition, her son's deposition, and her other
10 son's deposition.
11    Q   Got it. Thank you. Have you ever
12 spoken with anyone in Ms. Zimmerman's family or
13 any of her doctors?
14    A   No.
15    Q   Is it still true that all of your
16 testimony in asbestos cases has been on behalf of
17 plaintiffs?
18    A   Yes.
19    Q   And is it still your opinion that talc
20 itself without asbestos is not a cause of
21 mesothelioma?
22    A   I don't have enough information that
23 would make me change that opinion at this time.
24    Q   And so you would agree if the
25 Johnson's baby powder that Ms. Zimmerman used did

Page 63

1 not contain asbestos then it did not cause or
2 contribute to her mesothelioma. Fair?
3     A   Correct.
4     Q   And, hypothetically, if Ms. Zimmerman
5 was exposed to asbestos from Johnson's baby
6 powder but that exposure was at or below
7 background level, then would you agree it did not
8 cause or contribute to her mesothelioma?
9         MS. KAGAN: Vague as to "background
10 level."
11        THE WITNESS: Correct.
12 BY MS. SENTER:
13    Q   Now, at the beginning of your
14 deposition, you said, I believe, that
15 Ms. Zimmerman had exposure to asbestos or -- had
16 exposure to asbestos from three sources or
17 potential sources: the various cosmetic talc
18 products she used, a potential exposure from her
19 stepdad's work, and then potential exposure from
20 her sons' work with automotive friction products;
21 is that right?
22    A   Correct.
23    Q   And I think with respect to the
24 potential exposure from her sons' automotive
25 friction work, you told us that you believe that

Page 64

1 was a potential exposure from laundering her
2 sons' clothes if they were in fact working with
3 asbestos-containing brake or friction products;
4 is that right?
5     A   Right. She wasn't doing brake
6 changes, and she wasn't assisting her --
7         Can someone mute or do something? I'm
8 pausing not for effect. All of a sudden, there's
9 a lot of feedback, and I don't know --
10    Q   I'm hearing it too.
11    A   It sounds like someone's having a
12 conversation in the background.
13        So with respect to the sons, she did
14 not -- they did not describe that she actually
15 assisted them, so it would have only come from
16 laundering their clothes.
17    Q   So in your opinion, if her sons were
18 working with asbestos-containing friction
19 materials, then Ms. Zimmerman would have been
20 exposed to asbestos from that work via laundering
21 their clothes?
22        MS. KAGAN: Incomplete hypothetical.
23        THE WITNESS: If he was exposed to
24 asbestos from the automotive work and -- then she
25 would have had a -- and it was on his clothes and

Page 65

1 she laundered the clothes, that's a potential
2 exposure.
3 BY MS. ROMANO:
4     Q   And if she was not exposed to asbestos
5 from laundering her sons' clothes, would you
6 consider that a substantial contributing factor
7 to the development of her mesothelioma?
8         MS. KAGAN: Incomplete hypothetical.
9         THE WITNESS: Yes.
10 BY MS. ROMANO:
11    Q   And with respect to her stepdad, you
12 also told us that that was another potential
13 source of exposure to Ms. Zimmerman; is that
14 right?
15    A   Correct.
16    Q   And that potential source of asbestos
17 exposure was because her stepfather worked at the
18 Union Asbestos and Rubber Company plant in
19 Bloomington; is that right?
20    A   Correct.
21    Q   And I know you talked about wind
22 patterns earlier, but I wasn't quite sure what
23 your opinion was in that regard. Do you believe
24 that Ms. Zimmerman had a potential exposure to
25 asbestos from -- well, strike that.

17 (Pages 62 - 65)

Jaqueline Moline , M.D., MSc, FACP, FACOEM        February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

Page 66

1        Do you believe or is it your opinion
2 that Ms. Zimmerman had a potential environmental
3 exposure to asbestos from living near the Unarco
4 plant in Bloomington?
5    A    I mean, based on my understanding of
6 the wind rose, it's unlikely.  They lived
7 about -- I think it was about a mile and a half
8 from the plant in the direction against the
9 prevailing winds, so it's unlikely.  But it is
10 theoretically possible.  And it depends on --
11    Q    Is it fair -- I'm sorry.  Go ahead.
12    A    I mean, it depends on whether there
13 was effluence from the plant.  Just because a
14 plant was there doesn't mean it was contaminating
15 the air.
16    Q    Would it be fair to say that that is a
17 potential exposure or one that you can't rule in
18 or rule out either way?
19        MS. KAGAN:  When you say "that," you
20 mean the environmental?
21        MS. ROMANO:  Yes, sorry, the
22 environmental exposure.
23        THE WITNESS:  The Unarco plant,
24 there's some misinformation about what -- whether
25 there was -- you know, there was -- Ms. Zimmerman

Page 67

1 or Ms. Fowler did not describe it snowing in July
2 like people who lived a block from other asbestos
3 plants have done where you would say, oh, yes,
4 that was a definite exposure.
5        There's no -- if they -- possible
6 exposure is something that I noted because it was
7 a plant that used asbestos and the stepfather
8 worked there.  But with respect to the
9 environmental exposure, I haven't seen any
10 testing that shows that they actually
11 contaminated the air and that it would get into
12 the Zimmerman/whatever Amos's last name was home
13 from the environment.
14 BY MS. ROMANO:
15    Q    With respect to the stepdad, setting
16 aside the environmental exposure, going back to
17 the fact that Ms. Zimmerman lived in the same
18 home as her stepdad, Amos Martin, who worked at
19 the Unarco plant, you said that was a potential
20 source of exposure to Ms. Zimmerman; right?
21    A    Correct.
22    Q    And that would be from her stepdad
23 bringing asbestos fibers home on his clothing, on
24 his person, and bringing them into the family
25 home.  Fair?

Page 68

1        MS. KAGAN:  Calls for speculation.
2        THE WITNESS:  Correct.
3 BY MS. ROMANO:
4    Q    And you said this was a potential
5 exposure.  What additional information would you
6 want to see or need to see in order to move it
7 from a potential exposure to a certain exposure
8 or probable exposure?
9    A    This is a case where we actually had
10 testimony describing that she avoided the house
11 as much as possible.  There was no testimony that
12 she ever hugged her stepfather, that she gave --
13 she didn't watch TV with the family, so it wasn't
14 like there was cuddling on the couch or
15 interactions that way.
16        She didn't do his laundry.  And, in
17 fact, his laundry was kept segregated from the
18 family laundry.
19        There was no carpet in the house.
20 There was hardwood floors, so it wasn't like the
21 fibers became embedded in the carpet and then
22 when Ms. Zimmerman's chore was vacuuming,
23 hypothetically, she was exposed that way.  It was
24 hardwood floors, and she didn't describe the task
25 of sweeping the floors.

Page 69

1        It sounded like he walked into the
2 basement and went directly into a shower.  There
3 was some pretty vivid exposure from Ms. Fowler as
4 to why he did that and -- before it came up into
5 the main living area for the family.
6        So it sounded like he got -- tried to
7 clean up as best he could after he came in from
8 work entering through the basement and then
9 showering and getting out of his work clothes
10 before he interacted with the family.
11    Q    Have you ever testified in a case
12 regarding an exposure to asbestos from this
13 Unarco Bloomington plant?
14    A    Not that I remember.
15    Q    You're certainly familiar with the
16 Union Rubber and Asbestos Company there?
17    A    As a name, sure.  I'm not familiar
18 with the plant facilities in any way, shape, or
19 form, but they're a notorious name.
20    Q    And they're a notorious name for
21 making asbestos-containing products, including
22 insulation; is that right?
23        MS. KAGAN:  Foundation.
24        THE WITNESS:  I mean, Selikoff began
25 studying Unarco workers I believe in New Jersey

18 (Pages 66 - 69)

Jaqueline Moline , M.D., MSc, FACP, FACOEM          February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

Page 70

1  in the 1950s. They made asbestos insulation
2  products, correct.
3  BY MS. ROMANO:
4      Q    And you understand that at least some
5  of those insulation products contained amosite
6  asbestos?
7      A    Yes.
8      Q    Is it also your understanding that
9  some of the insulation products that Unarco made
10 contained crocidolite asbestos?
11     A    That's my understanding. I believe
12 that was a much smaller percentage, but yes.
13     Q    And if Ms. Zimmerman was exposed to
14 asbestos from her stepdad, would you consider
15 that a substantial contributing factor to the
16 development of her disease?
17     A    Yes.
18     Q    In the materials we received prior to
19 your deposition there are a number of
20 Unarco-related documents, some union records,
21 some employment records, a historic plant view,
22 as well as a Unarco advertisement.
23         Do you know which materials I'm
24 referencing, Dr. Moline?
25     A    Yes.

Page 71

1      Q    Now, were those materials that -- I
2  guess, where did those materials come from? Were
3  they provided to you by Plaintiffs's lawyers?
4  Did you have them already from previous work?
5  Did you go out looking for them? How did you
6  come to obtain those?
7      A    I have no way of obtaining
8  Mr. Martin's employment records or his Unarco
9  contract. Those are not publicly available, to
10 the best of my knowledge, or I don't know how
11 they were obtained. They were given to me by
12 Plaintiff's counsel.
13         I did ask for -- whether there were
14 any maps or locations related to the plant and
15 the distance from the home that were provided to
16 me. So they were all provided by Plaintiff's
17 counsel. But they're publicly available, like a
18 Google map.
19     Q    It looks like you also received
20 Dr. Gordon's fiber burden digestion in this case
21 with respect to Ms. Zimmerman's tissue; is that
22 right?
23     A    Yes. I just received that yesterday.
24     Q    And have you had a chance to review
25 Dr. Gordon's report?

Page 72

1      A    Yes.
2      Q    And so you're aware that he found both
3  crocidolite and amosite fibers in Ms. Zimmerman's
4  tissue?
5          MS. KAGAN: Mischaracterizes.
6          THE WITNESS: That's not what --
7  that's not the sum total of what he found, but he
8  did find that. He also found that there was
9  anthophyllite, tremolite, talc, and aluminum
10 silicate, I believe.
11 BY MS. ROMANO:
12     Q    Correct. That was what I was looking
13 for. But you do agree or you understand that he
14 did find crocidolite and amosite fibers in her
15 tissue; right?
16         MS. KAGAN: Mischaracterizes.
17         THE WITNESS: In the tumor tissue,
18 correct. That was the predominant he found that
19 was in the tumor tissue, correct.
20 BY MS. ROMANO:
21     Q    And so we know, based on Dr. Gordon's
22 findings, that Ms. Zimmerman was exposed at some
23 point in her life to both crocidolite and
24 amosite. Fair?
25     A    Yes.

Page 73

1      Q    Do you have an opinion as to the
2  likely source of Ms. Zimmerman's exposure to
3  amosite or crocidolite?
4      A    I mean, it's possible it came from her
5  interactions with her stepfather or from -- but I
6  have no way of pinpointing it.
7      Q    Was there anything else in
8  Ms. Zimmerman's history as you were reading
9  through the various depositions in this case and
10 her medical records, was there any other source
11 of exposure that you saw that could have
12 accounted for the amosite and crocidolite
13 findings in her tissue?
14     A    You know, there have been some reports
15 of cummingtonite being found in some talc, which
16 is the noncommercial name for amosite. So apart
17 from that, that is a potential source of what
18 Gordon might have found as amosite. And I
19 believe that was from historical samples of
20 Johnson's baby powder where there was the
21 cummingtonite found.
22         But apart from the talc or the Unarco
23 work that her stepfather did, I did not see any
24 other sources.
25     Q    And you're not offering an opinion,

19 (Pages 70 - 73)

Jaqueline Moline , M.D., MSc, FACP, FACOEM        February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

Page 74

1 are you, that amosite asbestos is a contaminant
2 of cosmetic talc?
3      A    I'm just stating it was found in the
4 historical sample described as cummingtonite by
5 individuals in the past that have tested the
6 historical samples. I'm not opining. I would
7 leave that for the geologists, material
8 scientists to describe more. I can just state
9 what has been found.
10     Q    I know I'm going to test your memory,
11 but do you recall what document or test result
12 you're referring to with respect to the
13 cummingtonite findings?
14     A    I think it was in a testing document
15 from Mr. Matt Sanchez, who I believe listed
16 samples of the historical -- the archived
17 Johnson's baby powder, and that was what he
18 found.
19     Q    It sounds like a single finding of
20 cummingtonite by Dr. Sanchez; is that right?
21          MS. KAGAN: Mischaracterizes.
22          THE WITNESS: I don't know if it
23 was -- I think it was more than one finding. It
24 was in more than one sample. I don't have that
25 report in front of me, unfortunately, or those

Page 75

1 reports, so I -- you're testing my memory here.
2 I don't think it was a single sample.
3 BY MS. ROMANO:
4      Q    Okay. Fair enough. Have you seen any
5 documents, testing reports, et cetera, aside from
6 Dr. Sanchez's report that shows cummingtonite in
7 any Johnson & Johnson talc or talc product?
8      A    I don't recall seeing it, no.
9      Q    And have you seen any documents that
10 you believe show crocidolite asbestos being found
11 in any talc or -- J&J talc or finished product?
12     A    I haven't seen -- I don't recall
13 seeing any crocidolite in any J&J finished
14 product.
15     Q    And with respect to the cummingtonite
16 findings, again, you would defer to a testing
17 expert and a mineralogist with respect to that
18 finding and that mineral characterization. Is
19 that fair?
20          MS. KAGAN: Compound. Characterizes.
21          THE WITNESS: Yes, I would refer to a
22 geologist or a material scientist or somebody who
23 could characterize the fibers.
24 BY MS. ROMANO:
25     Q    And with respect to the tremolite,

Page 76

1 anthophyllite, and talc particles that Dr. Gordon
2 claimed to have found in Ms. Zimmerman's tissue,
3 it's fair to say that you cannot I guess connect
4 those particles to any specific product that
5 Ms. Zimmerman used. Is that fair?
6          MS. KAGAN: Mischaracterizes.
7 Argument.
8          THE WITNESS: So you can't use the
9 word claim in a pejorative sense for one
10 paragraph and not the other. So if you could
11 just rephrase the question because it's making it
12 sound like it was a definite finding when it was
13 one thing and it's a claim when it's another. So
14 if you could just rephrase the question, I'd
15 appreciate it.
16 BY MS. ROMANO:
17     Q    Sure. With respect to Dr. Gordon's
18 findings of anthophyllite, tremolite, and talc,
19 you have no way of connecting those specific
20 particles to any specific product that
21 Ms. Zimmerman may have used. Fair?
22          MS. KAGAN: Mischaracterizes.
23 Argument.
24          THE WITNESS: Are you asking can I
25 connect it to any peculiar manufacturer or seller

Page 77

1 of the product as opposed to just cosmetic talc?
2 Is that what your question is? I'm sorry. I
3 just want clarification.
4 BY MS. ROMANO:
5      Q    Sure. Let me break it down. You
6 would agree that there's no way to know where any
7 particular fiber or particle in an individual
8 tissue came from; right? They don't wear name
9 tags or date stamps. Fair?
10          MS. KAGAN: Overbroad.
11          THE WITNESS: They certainly don't
12 have date stamps, so it is not possible to say it
13 came from a container on January 6th, 1957,
14 versus January 7th, 1959. I do look at the
15 comments of what is found in the tissue and see
16 if it makes sense and if it is consistent with
17 what's been found in other folks for a particular
18 type of exposure.
19          But you can't pinpoint a particular
20 particle from a particular exposure on a
21 particular day.
22          I'm done.
23 BY MS. ROMANO:
24     Q    Thank you. Would it be fair to say
25 that you cannot say to a reasonable degree of

20 (Pages 74 - 77)

Jaqueline Moline , M.D., MSc, FACP, FACOEM          February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

Page 78

1 medical certainty that any of the particles
2 Dr. Gordon found in Ms. Zimmerman's tissue came
3 from Johnson's baby powder?
4        A    I can't say which manufacturer of
5 cosmetic talc. The findings of the fiber types
6 along with the talc and the silicates are all
7 consistent with talc exposure and what's been
8 reported in the literature for folks who are
9 exposed to cosmetic talc, so that would be the
10 extent to which I would be able to testify.
11        Q    It's fair that you also received
12 Dr. Roggli's pathology report in this case; is
13 that right?
14        A    I don't have it with me. It wasn't in
15 my binder. I think -- let me just check. I
16 don't have it in the binder I brought with me. I
17 think he -- the thing I remember is he had
18 asbestos bodies that he found and it was
19 consistent with cosmetic talc.
20        But, unfortunately, I don't have it.
21 I didn't -- I received it online, and I did not
22 print it out.
23        Q    That's fine. I was just going to ask
24 you what significance Dr. Roggli's report had to
25 you or if you had any opinions based on

Page 79

1 Dr. Roggli's report.
2        A    I mean, I think it's all consistent
3 with her exposures. He just -- I don't recall
4 that he ascribed it to a source. He just said he
5 found it. And I recall the asbestos bodies and
6 that the meso was -- my recollection is -- and,
7 again, this is from memory, but that the meso
8 was -- the mesothelioma Ms. Zimmerman had was
9 related to asbestos. He found asbestos bodies.
10        And that's what my takeaway was from
11 it. And it was an amphibole exposure. I don't
12 think he differentiated what type of fiber it
13 was. I don't recall that he broke that down.
14        Q    Fair enough. Other than Dr. Gordon's
15 report, Dr. Roggli's report, and Dr. Longo's
16 report related to the two Johnson's baby powder
17 bottles that were provided by Ms. Zimmerman, did
18 you review any other case-specific expert
19 reports?
20        MS. KAGAN: Julia, can you go back?
21 I'm sorry. I missed the first part of your
22 question.
23        MS. ROMANO: Sure.
24 BY MS. ROMANO:
25        Q    Other than Dr. Gordon's fiber burden

Page 80

1 digestion report, Dr. Roggli's pathology report,
2 and Dr. Longo's report related to the two bottles
3 of Johnson's baby powder that were provided by
4 Ms. Zimmerman, did you review any other
5 case-specific expert reports?
6        MS. KAGAN: Julia, I'm just going to
7 clarify that she has the other expert reports
8 that are on her reference and reliance list.
9 They're not specific to Ms. Zimmerman. Is that
10 what you mean?
11        MS. ROMANO: Right. That's exactly
12 what I mean. I don't mean Longo's report or
13 Dr. Compton's, you know, kind of general report
14 about Vermont talc or things like that. I'm
15 really just asking specifically about reports
16 that are specific to Ms. Zimmerman as opposed to
17 a more general report that might relate to one of
18 the Defendants in the case.
19        MS. KAGAN: Thank you for the
20 clarification.
21        THE WITNESS: That's right. I think I
22 have Longo's declaration that would have been
23 specific in this report, but apart from that,
24 that's correct.
25 BY MS. ROMANO:

Page 81

1        Q    Thank you. And I think you've told us
2 already that you've not calculated a cumulative
3 asbestos dose for Ms. Zimmerman and have no
4 intention of doing so; is that right?
5        A    Correct.
6        Q    I'm sure I've asked you questions
7 about latency before, so I'll try to keep it
8 short. In your opinion, what is the shortest
9 latency period for mesothelioma? Is it ten
10 years?
11        MS. KAGAN: Julia, could you clarify?
12 Are you asking from the first exposure or from
13 the last exposure?
14        MS. ROMANO: From -- well, I guess
15 I'll ask that of Dr. Moline.
16 BY MS. ROMANO:
17        Q    Dr. Moline, in terms of latency,
18 latency is often characterized as the time from
19 onset of exposure to time of diagnosis. Is that
20 fair?
21        A    Right. It's typically described as
22 when the first exposure occurred to when they
23 develop the disease.
24        Q    And in your opinion, what is the
25 shortest latency period for mesothelioma? Is it

21 (Pages 78 - 81)

Jaqueline Moline , M.D., MSc, FACP, FACOEM          February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

Page 82

1 ten years?

2    A    In general, that's about what the

3 minimum latency is.  There are about a handful of

4 cases that have a shorter latency that have been

5 reported in the literature, but in general, it's

6 about 10 or 11 years as the beginning latency,

7 and then it obviously increases with time.

8    Q    Of course.  And Ms. Zimmerman was

9 diagnosed with mesothelioma in June of 2018, I

10 believe?

11    A    Correct.

12    Q    Do you agree that any potential

13 asbestos exposure Ms. Zimmerman may have had the

14 ten years prior to her diagnosis would not

15 have -- would likely not have played a role in

16 the development of her mesothelioma?

17    A    No.  You know, I think it -- that has

18 not been well studied with respect to what --

19 when the minimum -- the amount of time from when

20 a -- the most recent exposure that would not have

21 any effect would be.  Certainly once the tumor

22 has started developing.  Then any additional

23 exposure would be noncontributory.

24        I don't think it's clear in the

25 literature, it hasn't been well studied, with

Page 83

1 respect to the last time an exposure can be

2 important.  It may be that more recent exposures

3 before the tumor developed are the -- and the

4 multi-hit hypothesis for carcinogens could be the

5 ones that push someone over the edge.

6        I don't know that there's a

7 hard-and-fast numerical value that one can truly

8 attribute for when the last period is.

9 Certainly, when the tumor starts to develop, and

10 that we're not fully clear on, then no exposure

11 after that would contribute.

12    Q    And in this case is there any way for

13 you to determine when Ms. Zimmerman's tumor

14 started to develop?

15    A    Unfortunately, no.  People can -- it

16 may start a couple years before.  It may start a

17 year before.  It may start three or four years

18 before.  But we have no way of knowing.

19    Q    You were asked some questions about

20 your most recent publication that you did with

21 Dr. Gordon and others.  Just a few brief

22 questions because I know we've already talked

23 about it at length and we've deposed you on it

24 before.

25    A    Just to clarify, it's actually not my

Page 84

1 most recent publication.  It's my most recent

2 publication dealing with asbestos.

3    Q    Thank you.  Your recent publication

4 that you authored with Dr. Gordon regarding

5 cosmetic talc and mesothelioma, it's my

6 understanding that you -- and I think you already

7 told us in this deposition -- that you will not

8 be divulging the identity of the plaintiffs or

9 the 33 subjects or cases in the paper; right?

10    A    Correct.

11    Q    And that's true even though they all

12 had public lawsuits related to their

13 mesothelioma?

14    A    Correct.

15    Q    And you talked a little bit about

16 the -- I can't remember if you brought up HIPAA

17 today, but I know you brought up the IRB.  If you

18 obtained the 33 plaintiffs' consent, could you

19 then divulge their identities, or would there be

20 something about the IRB process that would still

21 prohibit you from divulging their identities?

22    A    Well, if you exclusively obtain their

23 consent to divulge their identity -- I mean, that

24 was not how we presented our paperwork to the

25 IRB.  That would be a totally different scenario.

Page 85

1        I honestly have never seen a paper

2 where someone's name was included.  Sometimes

3 people will do that in books that they write.

4 But I haven't -- it's just not done.  I mean, you

5 know, we talked about Dr. Roggli earlier.  He

6 just published a paper on 300-something cases

7 from litigation.  He didn't divulge anyone's

8 name.  I mean, it's just not done.

9    Q    And I understand that with respect to

10 the publications.  I was wondering what your

11 position was on the idea of if you went and asked

12 those 33 plaintiffs for their consent whether

13 that would then allow you to divulge their

14 identities in a deposition, for example, not

15 necessarily as part of a publication or a --

16    A    I see.  So it's a different question.

17 Some of those people have passed on, so that's

18 not possible, and I would not feel comfortable

19 doing that.

20    Q    Have you communicated to those 33

21 plaintiffs or their lawyers that they were the

22 subject of the paper that you published?

23    A    I did not have any communication with

24 any lawyers in advance of the publication in

25 terms of including them, and that was part of the

22 (Pages 82 - 85)

Jaqueline Moline , M.D., MSc, FACP, FACOEM        February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

Page 86

1  HIPAA process or the IRB process and -- which was
2  to keep everything anonymous.
3          I did not have any conversations with
4  any lawyers.  In fact, they didn't even realize
5  that this paper was coming out from my end.
6      Q    What about after the paper was
7  published?
8      A    People commented on the paper.  They
9  did not specifically say, hey, you included one
10 of our individuals.
11         I've never had such a conversation,
12 nor would I encourage it.  What goes for the
13 goose goes for the gander.  I don't discuss it
14 with anyone in terms of the names.
15     Q    I see that you have the Fordyce
16 article listed on your reliance list.  Do you
17 know which article I'm talking about, Dr. Moline?
18     A    Are you talking about the Vermont talc
19 one?
20     Q    Yes.
21     A    Yes.  I have that on my list.
22     Q    And do you have any opinions or
23 criticisms of the paper?
24     A    You know, it's an overwhelmingly small
25 sample size.  I think the -- there has been a lot

Page 87

1  of back and forth in the published literature
2  about some of the issues related to their
3  comparison group and how the rates were
4  calculated.
5          I mostly took away from it that they
6  actually found a mesothelioma in a cohort of 400
7  people in addition to a discussion that the talc
8  ban that has been not particularly well described
9  by Lamb would also not consider the person with
10 the mesothelioma.
11         So there's the talc ban with
12 mesothelioma in addition to the Fordyce
13 mesothelioma that they found as part of the
14 cohort.
15         I have read some of the back and forth
16 about the rates.  I did not analyze the -- how
17 they were calculating the rates, which did seem a
18 little odd to me, but I had -- I think by the
19 time I read that I'd also read a lot of the
20 criticism, so I -- it wasn't in isolation that I
21 read it.
22     Q    I'm sorry.  Go ahead.
23     A    I was done.
24     Q    I didn't want to interrupt you.  When
25 you said the "back and forth," are your referring

Page 88

1  to the various letters to the editor that have
2  been published following the paper's publication?
3      A    Yes.
4      Q    Okay.  But you do understand that the
5  authors of the study concluded that there is no
6  increased risk of mesothelioma in that cohort; is
7  that right?
8      A    That's what the authors concluded.  I
9  don't know if I agree with that conclusion based
10 on the numbers of the small sample size.  I don't
11 know how they came with those numbers, and I
12 think those are some of the questions -- the
13 criticisms that were raised in some of those
14 letters to the editor.
15         That is Fordyce's conclusion.  I don't
16 know how they arrived at that conclusion given
17 the small sample size and the fact that they
18 found a mesothelioma.  But that is what they
19 found.  That is what they stated, not necessarily
20 what they found.  But that's what they stated.
21     Q    That was their conclusion?
22     A    That was their conclusion.  And
23 they're entitled to their opinion and their
24 conclusion, but that may not be what the facts
25 are.  But the paper will speak for itself, and

Page 89

1  the statistical analyses and whether they used
2  appropriate comparison groups I'm sure will be
3  fodder for many people in the future.
4      Q    Is it fair to say that you haven't
5  actually undertaken to go back and look at those
6  calculations yourself or to recalculate them?  Is
7  that fair?
8      A    I would defer to a statistician or an
9  epidemiologist on that.  I have not personally
10 done that.  I do recall when I was reading it
11 that the numbers and the conclusions didn't match
12 for me.  But I did not take the time to sit down
13 with a statistician to go over the numbers and
14 how they arrived at them.  That's a fairly large
15 undertaking that I don't have time for.
16     Q    Other than what we have discussed just
17 now, is there anything else about the Fordyce
18 paper that you intend to discuss or opine on at
19 trial?
20     A    Not that I can think of.  I mean, I
21 think that only that other statisticians have
22 commented on it if I'm asked about it, but I
23 think we talked about that already.
24     Q    Okay.  When you say "other
25 statisticians," are you referring to the letters

23 (Pages 86 - 89)

Jaqueline Moline , M.D., MSc, FACP, FACOEM          February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

Page 90

1 to the editor?
2    A    Right.  Dr. Madigan's a statistician.
3 He commented on it.  Finkelstein's an
4 epidemiologist.  He commented on it.  That kind
5 of thing.
6    Q    It's still true that you're not aware
7 of any public peer-reviewed epidemiology study
8 that has concluded there is an increased risk of
9 mesothelioma as a result of exposure to cosmetic
10 talc?
11       MS. KAGAN:  Are you asking about
12 cosmetic talc in the absence of asbestos?
13       MS. ROMANO:  Just cosmetic talc.
14       THE WITNESS:  I'm not aware of any
15 studies that have been done that are not -- that
16 is not like a series on end users of cosmetic
17 talc.
18 BY MS. ROMANO:
19    Q    But are you aware of any published
20 peer-reviewed epidemiology study that concluded
21 there is an increased risk of mesothelioma from
22 exposure to cosmetic talc?
23    A    There have been no studies that have
24 been done that have addressed that question, so
25 I'm unaware of any studies that have been done

Page 91

1 that have applied statistical tools to that in
2 the literature.
3    Q    Well, with respect to -- I understand
4 that with respect to I guess end users of
5 cosmetic talc.  Is it still true that you're not
6 aware of any published peer-reviewed epidemiology
7 study that has concluded that there is an
8 increased risk of mesothelioma to cosmetic talc
9 miners and millers?
10    A    Not by the authors who wrote the
11 papers.  I think there's been correspondence in
12 the medical literature about that.  There are
13 plenty of other epi studies that have looked at
14 the question of asbestos and mesothelioma that
15 have looked at that even at low doses, so -- but
16 not specifically related to cosmetic talc.
17    Q    The Johnson & Johnson internal company
18 documents, in previous cases, you've relied on
19 what I think we've called a testing binder that
20 contained -- I forget the number, but a large
21 number of documents that you rely on for your
22 opinion that there is asbestos in Johnson &
23 Johnson talc.
24       Do you know what binder I'm talking
25 about?

Page 92

1    A    I think you're talking about a table
2 with various testing.  But if I'm looking at it,
3 it has hundreds of different entries, yes.
4    Q    And you've also seen at trial the
5 large blue boards that sort of break out what
6 those documents are.  Are you with me?
7    A    I've seen demonstratives that are --
8 that blow up some of the summary tables from some
9 of the documents included, correct.
10    Q    Since your and my last case together,
11 which was the Crudge case in the fall of 2019,
12 have you added any additional documents to that
13 list or binder?
14    A    To be honest, I believe I have.  That
15 was -- the Crudge case I think was before the
16 article in -- or the testing done by the FDA
17 finding asbestos in the Johnson & Johnson powder.
18       The dates all blur in my head, but I
19 believe that there have been a number of
20 different -- certainly on my reliance list on
21 page 43 there's a number of documents that came
22 out afterwards.
23    Q    That's fair enough.  That's actually
24 where I was going.
25       Other than the group of documents

Page 93

1 related to the October 2019 findings and
2 Johnson & Johnson's voluntary recall, I'm
3 grouping those together in one category, are
4 there any other new documents related to -- or
5 any new internal company documents that you've
6 reviewed aside from -- and we'll set aside the
7 recall for a moment.
8    A    Not unless they were enumerated in the
9 Reuters article.  And it would have been a
10 document I hadn't seen.  But I think all of those
11 are on my reliance document.  It would be on the
12 reliance list generally.
13    Q    Now, with respect to the documents
14 that you've listed in the -- I'll call it the
15 recall section of your reliance list, were those
16 documents provided to you by plaintiff lawyers,
17 or did you obtain those?  How did you come to get
18 all the documents listed in that section?
19    A    I got a lot of them because it was all
20 over the news and it was something I was
21 interested in.  With respect to the FDA
22 documents, I had those.  The Reuters documents I
23 had.  FDA news release I had.
24       Comments about the testing, I had seen
25 some of those.  I think some of them became

24 (Pages 90 - 93)

Jaqueline Moline , M.D., MSc, FACP, FACOEM          February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

Page 94

1  available online.  So I -- it was in the public
2  interest, and it was all over the media, so they
3  were available that way.
4      Q    Do you plan to provide any testimony
5  or opinions regarding FDA's October 2019
6  announcement about AMA's findings of chrysotile
7  in one bottle of Johnson's baby powder?
8      A    I would assume I would be asked
9  questions about that and would ask if I'd heard
10 about it and was aware of it, yes.  But I don't
11 know what I'm going to be asked.
12     Q    Fair to say that the AMA findings
13 would be something that you would I guess
14 reference in terms of the finding of asbestos in
15 Johnson & Johnson talc, but when it comes to the
16 methodology used or the reliability of those
17 results, that's something that you would defer to
18 others on?
19     A    As to findings, I mean, it was -- I
20 would expect that I would opine on that this was
21 from a source, meaning the Chinese source, that
22 Ms. Zimmerman had been using for many years.  It
23 was consistent with the finding of Longo finding
24 chrysotile in her actual bottle from 2014.  And
25 then the FDA testing through AMA also found it in

Page 95

1  2019, so I would expect that there would be a
2  question related to that.
3          With respect to the actual methodology
4  on how the testing was done, I would defer to
5  others.
6      Q    And you are aware that AMA tested two
7  bottles of Johnson's baby powder and the other
8  bottle tested negative for asbestos; right?
9      A    That's my recollection, yes.
10     Q    I want to talk a little bit about
11 Dr. Longo's findings with respect to what I'll
12 call the Zimmerman bottles.  Is it your
13 understanding that with respect to Dr. Longo's
14 testing of the Zimmerman bottles, this was the
15 first time that Dr. Longo has ever claimed to
16 find chrysotile in Johnson's baby powder or a J&J
17 talc product?
18     A    I think that it was -- I mean, his
19 prior methodology specifically states he wasn't
20 measuring chrysotile, so I don't recall seeing
21 it.  I think he's using an additional method in
22 addition to the heavy liquid separation which is
23 going to be looking for the amphiboles that
24 separate out that will not find chrysotile
25 because chrysotile is too light, that now he's

Page 96

1  also in addition looking for chrysotile.
2          So I don't recall seeing him look for
3  chrysotile prior to the Zimmerman report.  I
4  don't know if he's done other reports or looked
5  for chrysotile in other cases since the FDA
6  report came out.
7      Q    And with respect to Dr. Longo's
8  testing, again, with respect to his methodology
9  and his results, whether they're reliable and
10 accurate, is something that you would defer to
11 others because that's not your field.  Fair?
12         MS. KAGAN:  Argument as to "reliable
13 and accurate."
14         THE WITNESS:  I can't speak to the
15 methodology.  I'm going to defer to others to
16 speak about methodology.
17 BY MS. ROMANO:
18     Q    And I think you and I have had this
19 conversation before that with respect to any of
20 the documents you rely on for your opinion that
21 there's asbestos in cosmetic talc and
22 specifically Johnson's baby powder, you're
23 essentially taking those conclusions at face
24 value because testing is not your area of
25 expertise.  Is that fair?

Page 97

1          MS. KAGAN:  Argument.
2          THE WITNESS:  I mean, in the sense
3  that the findings that are -- I'm taking them --
4  I'm looking at them in the context of the
5  historical testing that's been done that found
6  chrysotile at the University of Minnesota that's
7  using methods from the Colorado School of Mines
8  to find the testing that's been done before.
9          It's been found in the historical
10 testing that the detection limits are such that
11 one would find it and not be classified as a
12 nondetect.  So it's looking at the described
13 methodology with respect to its sensitivity but
14 also looking in the historical context of what's
15 been done, what's been found.
16         In terms of how the methodology is
17 done, I guess that's not my area, but -- so I
18 hope that answers your question.  If not, I'm
19 happy to try again.
20 BY MS. ROMANO:
21     Q    No.  I think it does.  I think we can
22 agree that with respect to the testing documents
23 that you're relying on, you're essentially
24 relying on the conclusions of whoever authored
25 those documents rather than really taking a

25 (Pages 94 - 97)

Jaqueline Moline , M.D., MSc, FACP, FACOEM       February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

Page 98

1 critical look at the methodology because that's
2 somebody else's field?
3         MS. KAGAN:  Mischaracterizes.
4 Argument as to "critical look."
5         THE WITNESS:  The only -- I mean,
6 there are a couple things that I look at.  In
7 terms of how they actually go about doing a
8 columnar separation using various reagents, I'm
9 not paying attention to that because I can't --
10 wouldn't be able to opine whether that was using
11 a standard methodology or not.
12         What I am interested in is their
13 limits of detection and what they're able to
14 find, and that I do look at to see whether, when
15 they're referring to a nondetect, if it's a
16 nondetect or a true value of not finding anything
17 if that is enumerated within the document.
18         So it's sort of a two part.  Part of
19 it, I am not doing a critical review of how
20 someone is doing their laboratory work, but the
21 other is what do they say their limits are of
22 detection and what are they able to find and are
23 they using a sensitive enough method, for
24 example, if someone's using SEM versus TEM when
25 we know that TEM is more sensitive than SEM and

Page 99

1 you're not going to be able to differentiate
2 certain things if they're only using an SEM
3 versus a TEM or a phase contrast microscope.
4         So you don't find something on a phase
5 contrast microscope.  But does that mean that you
6 wouldn't see it if you used a TEM?  So that's the
7 degree that I would look at it.
8 BY MS. ROMANO:
9     Q    With respect to mineral
10 characterization with respect to -- if you're
11 looking at a particle under a microscope and
12 trying to determine what mineral it is, that's
13 something that you also are relying on whoever's
14 authoring the document rather than doing that
15 yourself; right?
16         MS. KAGAN:  Are you asking for a
17 determination of the chemical composition?
18         MS. ROMANO:  Right.
19 BY MS. ROMANO:
20     Q    The actual conclusion as to what any
21 of the documents are finding, you're relying on
22 those conclusions with respect to the
23 characterization of the mineral?
24     A    Correct.  I'm not doing mineral
25 characterization.  I'm not looking at peaks and

Page 100

1 things along those lines.
2     Q    Thank you.  Sorry.  That was not a
3 very well-worded question on my -- okay.  Let me
4 look at my notes.
5         Going back to your notes that were
6 produced to us, Dr. Moline, on the first page,
7 you have notes regarding Ms. Zimmerman's use of
8 Johnson's baby powder.  Do you have those in
9 front of you?
10     A    Yes.
11     Q    And it says, "Powder started 1954 -
12 J&J."  Then there's a parentheses, 54 to 2008.
13 Is that the number of bottles that you added up
14 for Johnson's baby powder based on
15 Ms. Zimmerman's testimony?
16         MS. KAGAN:  Mischaracterizes.
17         THE WITNESS:  I have 2018 on my notes.
18 BY MS. ROMANO:
19     Q    Oh, okay.  The 1 is not showing up on
20 what I can see.  Okay.  So that's just the date
21 range that she used Johnson's baby powder, 1954
22 to 2018?
23     A    Correct.
24     Q    And did you calculate how many bottles
25 of Johnson's baby powder Ms. Zimmerman would have

Page 101

1 used based on her testimony?
2     A    Yes.  And, also, I mean, it was
3 corroborated by her sister and then her kids.
4 And it was -- I did a whole sheet where I
5 calculated those numbers, and I thought I made it
6 clear.
7         MS. KAGAN:  Julia, I think it's the
8 last page in the notes.
9         MS. ROMANO:  I see that.  Thank you.
10 BY MS. ROMANO:
11     Q    So if we go to the last page or the
12 exposure page, what is the total -- is the
13 768 bottles?  Is that the total number of
14 bottles, Dr. Moline?
15     A    The calculations are based on the time
16 frame that she used it and how often she said she
17 used it.  For example, when she was younger, she
18 only used Johnson's baby powder.  She used that
19 once a day, and I calculated once a day even --
20 and it's a conservative value because she said
21 sometimes she used it more than once a day.  But
22 I just did once a day, and that would be 730
23 times.
24         With respect to the bottles, it was
25 based -- and, again, this is conservative because

26 (Pages 98 - 101)

Jaqueline Moline , M.D., MSc, FACP, FACOEM    February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

Page 102

1 she said she used one to two containers a month
2 and I only calculated as based on one container a
3 month for the 64 years. And then I said one
4 container per 64 years, and there are 12 months
5 in a year, and that's how I got the 768 bottles.
6         MS. ROMANO: Thank you for that.
7 Sorry. I'm scrolling through my notes trying to
8 cut down what I need to ask you. Give me one
9 moment, please.
10        I think now's a good time for a break.
11 We've been going an hour.
12        THE WITNESS: Sure. I can do a
13 stretch break.
14    (Proceedings in recess, 12:40 p.m. to
15    12:46 p.m.)
16 BY MS. ROMANO:
17    Q    Dr. Moline, are you ready to continue?
18    A    Yes.
19    Q    With respect to Dr. Longo's report
20 related to the two Zimmerman bottles, is there
21 anything else other than what we've already
22 discussed that you intend to discuss or opine on
23 at trial with respect to that report?
24    A    Not I can think of.
25    Q    And generally speaking with respect to

Page 103

1 the testimony that you intend to give at trial,
2 you obviously go through your background and
3 qualifications. Then you often discuss sort of
4 the historical context of asbestos and learning
5 that asbestos can cause disease.
6         And then you also I guess do that with
7 respect to talc and the evolution of knowledge
8 with respect to talc and asbestos. Then you talk
9 about obviously Ms. Zimmerman and what you
10 believe caused Ms. Zimmerman's mesothelioma. And
11 then you often talk about I guess the disease
12 progression in terms of what the future holds for
13 Ms. Zimmerman.
14        Is that a fair summary or description
15 of the testimony that you intend to give at trial
16 in this case?
17    A    I think -- yes. Obviously, I might be
18 asked other questions, but it will be asking
19 about what her medical course is. And I'm often
20 asked if the medical bills and the costs were
21 reasonable and necessary. But that's basically
22 in general what I've been asked at trial.
23    Q    Okay. And with respect to
24 Ms. Zimmerman's future medical treatment, have
25 you come up with an estimate in terms of how much

Page 104

1 her medical expenses might be in the future or
2 anything like that?
3    A    I have not per se. You know, it's so
4 hard to predict because it depends on her course
5 and what she might require and if there's
6 inpatient versus outpatient versus medication
7 costs and things like that.
8         So I haven't -- I would anticipate
9 that it would total -- you know, again, it
10 depends on what she elects to do at the end of
11 life. It could total easily more than six
12 figures, but it depends on her course and what
13 she decides to do.
14        I mean, it's going to be what she's
15 already incurred and then using that as a
16 starting point to say, yes, we know what she's
17 incurred getting these treatments. She's
18 continuing these treatments. They're going to
19 continue, that kind of thing.
20    Q    Have you calculated or added up her
21 past medical expenses? Is that something that
22 you've done in this case?
23    A    In a general sense that it's -- from
24 the various hospitals and the records that I saw,
25 it's about -- I think it was billed at around

Page 105

1 800 -- or I'm sorry -- $600,000. $600,000 has
2 been billed as to date.
3    Q    When you say "billed," do you mean
4 actually billed as opposed to what actually might
5 be paid out of that $600,000-ish? Is that right?
6    A    Right, because there's always a bill
7 that's -- there's negotiated rates. But the
8 initial bills have been around $600,000. I think
9 it's been -- because I think she has Medicare as
10 her primary, it -- the Medicare rates are
11 significantly less than what's billed. So it's
12 less.
13    Q    And with respect to Ms. Zimmerman's
14 clinical course, what are the most recent medical
15 records that you've reviewed in the case just in
16 terms of a date and general type of medical
17 record?
18    A    I have something from -- I think the
19 last I have was October 2019. Yeah, 2019,
20 October 2019.
21    Q    So you haven't seen any records
22 demonstrating what type of treatment, if any,
23 she's undergoing at this point in time. Is that
24 fair?
25    A    I don't know exactly what she's

27 (Pages 102 - 105)

Jaqueline Moline , M.D., MSc, FACP, FACOEM          February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

Page 106

1 getting now.  I know the last I saw she was on a
2 steroid paper for radiation pneumonitis.  I don't
3 have the medical records, which is something I
4 could ask to be provided, but they may become
5 available.
6      Q     And so at least as of today you're not
7 going to testify about Ms. Zimmerman's current
8 status.  Is that fair?
9      A     I can only talk about -- right.
10 That's correct.  I can't comment on what's
11 transpired since October because I haven't seen
12 the records.
13      Q     With respect to exposure calculations
14 from cosmetic talc, in the past I believe you've
15 relied on Dr. Gordon's 2014 article.  You've
16 relied on the Anderson paper that I guess was
17 a -- I don't know if rebuttal is the right word,
18 but a rebuttal to that Dr. Gordon paper.
19          You relied on Dr. Longo's exposure
20 data and then I believe also a 2007 paper by
21 Mattenklott.
22          Are there any other documents or
23 reports that you rely on for exposure
24 calculations other than the ones I just listed?
25      A     I mean, some of the timing would be

Page 107

1 like the timing that was represented as how long
2 it takes for -- to diaper a baby.  That was from
3 Dement and also some internal Johnson & Johnson
4 documents about how long it takes.
5          I mean, there have been other studies
6 that have been done like Compton and Fitzgerald,
7 but when I've done the calculations in the past,
8 I think that's been a fair way to characterize
9 how I've done that.
10      Q     Okay.  Thank you.
11      A     You're asking me questions related to
12 Johnson & Johnson; right?  Because there are
13 other --
14      Q     Yes.  I'm sorry.
15      A     Okay.
16      Q     Yes, specific to Johnson's baby
17 powder.
18      A     Okay.
19          MS. ROMANO:  I think those are all my
20 questions at this time, Dr. Moline.  I'm going to
21 go ahead and pass you on to someone else and
22 check my notes.  I may have one or two at the
23 end, but hopefully I'll be done.  I'll pass the
24 witness.
25 EXAMINATION

Page 108

1 BY MR. POLCHINSKI:
2      Q     Dr. Moline, I guess I will go next.
3 This is Pete Polchinski.  I represent Revlon.
4 I'm going to ask you some questions about Jean
5 Nate.  Dr. Moline, you have been involved in the
6 talc litigation for at least several years now.
7 Would that be fair to say?
8      A     Yes.
9      Q     With regard to cosmetic talc, and I'm
10 not talking about diapering a baby, I'm talking
11 about a person applying talcum powder, is there,
12 in your experience, a typical application time
13 period, in other words, how long it takes to
14 apply the powder?
15      A     I think that -- I don't know if any
16 woman or man would consider themselves typical
17 with their application.  I think some folks can
18 be very fastidious and slow, and then others may
19 be -- may apply it quickly.  So I don't know how
20 to answer.
21          I mean, everyone is different.  I've
22 seen numbers where people describe putting talc
23 on that have been corroborated by family members
24 that it took five minutes.  Others have described
25 it as being a minute or two.

Page 109

1      Q     So you found a range?
2      A     Again, I haven't tried to characterize
3 it because those people aren't doing a stop clock
4 to say how long does it take when I put on
5 cosmetic talc.  They're usually butt naked in a
6 bathroom without a timer on when they're doing
7 their application of powder, or they have their
8 undergarments on.
9          There have been varying descriptions.
10 I don't know if I would characterize it as a
11 range.  It all depends also on how they're
12 applying it, if they're pouring it into their
13 hands and applying it to their body or they're
14 using a powder puff and they find it a meditative
15 process, in which case it would take much longer.
16 So I think everyone applies powder somewhat
17 differently.
18      Q     So would you say that a five-minute
19 application would be on the high end of what you
20 have seen in the course of this litigation?
21      A     Again, it depends on how they're
22 applying it.  But five -- for the powder puff, I
23 think if they're using a powder puff, I think
24 that's about what people have described.  Again,
25 if they're putting -- using a powder puff on

28 (Pages 106 - 109)

Jaqueline Moline , M.D., MSc, FACP, FACOEM        February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

Page 110

1 their full body and it's something that they do
2 as part of their routine to help them set their
3 day, that would be about what they -- what's been
4 described.
5     Q    Now, have you also seen in the course
6 of this litigation that when asbestos or asbestos
7 fragments or cleavage fragments have been found
8 in talc, cosmetic talc, that it's been found in
9 trace -- what's called trace amounts?
10        MS. KAGAN: Objection. Argumentative
11 as to cleavage fragment. Vague.
12 Mischaracterizes.
13        THE WITNESS: I'm not quite sure what
14 you mean by trace amounts. They -- when they
15 describe the asbestos fibers that have been
16 found, they will often describe that they found X
17 number when they're doing a sample for grams. It
18 could be hundreds of thousands or millions of
19 fibers.
20        And then when they're doing air
21 measurements, it's levels that are orders of
22 magnitude above background.
23        If you're asking by weight, then it's
24 less than one percent by weight typically. But
25 that still represents millions and billions of

Page 111

1 fibers.
2        So a long-winded answer to in some
3 ways of it being described as trace meaning it's
4 less than one percent, yes, in a bulk sample.
5 BY MR. POLCHINSKI:
6     Q    And have you seen trace amounts of
7 1/1,000th?
8     A    In terms of a bulk weight --
9     Q    Yes.
10    A    -- bulk percentage? Yes.
11    Q    So if you were to compare that to an
12 asbestos-containing product that had 30 percent
13 asbestos, that would be 300 parts per 1,000;
14 correct?
15        MS. KAGAN: Argument.
16 Mischaracterizes.
17        THE WITNESS: Well, it depends on --
18 it's not necessarily -- it depends. If you're
19 talking about an asbestos product that's bound up
20 with cellulose and other things and 30 percent of
21 the product is asbestos, that's one thing.
22        If you're talking about a product
23 that's friable and is meant to become airborne
24 and aerosolize as talcum powders were, if you're
25 looking at .001 and 30, if your numbers are

Page 112

1 correct, that would be a comparison, yes.
2        But if it's -- I mean, if you're
3 asking me is one number more than the other, yes.
4 BY MR. POLCHINSKI:
5     Q    Doctor, in the course of your
6 involvement in asbestos litigation, you have
7 reviewed the report of Dr. Iwatsubo in the French
8 mesothelioma study?
9     A    Yes.
10    Q    That was from 1998?
11    A    I believe so.
12    Q    Dr. Iwatsubo in that report indicated
13 that 0.5 fibers per cc-years, anything less than
14 that was not significant in causing mesothelioma?
15        MS. KAGAN: Mischaracterizes.
16        THE WITNESS: I don't have the paper
17 in front of me, and I don't recall the specific
18 numbers from that particular paper. I do know
19 that there have been additional papers published
20 since then that have lower values of .1 fiber per
21 cc-year that have been associated with a fourfold
22 increase of mesothelioma.
23        I don't know if I talked about
24 Dr. Iwatsubo in my declaration. I think I did.
25 If you give me one second, I can refer to what I

Page 113

1 said in my declaration there, which is --
2 BY MR. POLCHINSKI:
3     Q    Sure.
4     A    Let me just grab it if that's what
5 you're referring to. But I don't have the actual
6 paper in the room with me. It said -- that was
7 his -- I think that was his lowest -- it's in the
8 footnote. I think that he gave a relative -- an
9 odds ratio of 4.2 for .5 to .99 fiber per
10 cc-years. I don't recall what he had for below
11 that.
12        But the Rodelsperger and the Lacourt
13 had values that were at a lower rate than he did.
14    Q    And Dr. Lacourt had a 0.1 fiber
15 cc-years quadrupling the nonoccupational risk of
16 developing mesothelioma?
17        MS. KAGAN: I'm sorry. Can you reask
18 that question?
19 BY MR. POLCHINSKI:
20    Q    Would you like me to repeat that?
21        MS. KAGAN: I didn't hear your
22 question. Can you please repeat the question?
23        MR. POLCHINSKI: Sure.
24 BY MR. POLCHINSKI:
25    Q    Dr. Lacourt had the value of 0.1 fiber

29 (Pages 110 - 113)

Jaqueline Moline , M.D., MSc, FACP, FACOEM          February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

Page 114

1  cc-years quadrupling the nonoccupational risk of
2  developing mesothelioma.  Do I have that correct?
3          MS. KAGAN:  Mischaracterizes.
4          THE WITNESS:  Lacourt, as I referenced
5  here, had an odds ratio of almost 24 for values
6  of greater than .1 fiber per cc-years.  In others
7  I think at a lower level it was fourfold
8  increase.
9  BY MR. POLCHINSKI:
10   Q    Now, is there an exposure level,
11  Doctor, that you rely on in calculating exposure
12  from a person applying cosmetic talc?
13          MS. KAGAN:  Vague.
14          THE WITNESS:  I'm sorry.  Can you --
15  I'm not quite -- I don't follow your question.
16  Could you rephrase it?
17  BY MR. POLCHINSKI:
18   Q    Sure.  Is there an exposure level in
19  fibers per cc that you have relied upon in
20  determining how much exposure exists when a
21  person is applying cosmetic talc?
22          MS. KAGAN:  Asked and answered by
23  Julia Romano five minutes ago.
24          MR. POLCHINSKI:  Well, we didn't have
25  a number.

Page 115

1          THE WITNESS:  I don't think I've ever
2  given a specific number with respect to that.
3  I've been asked whether I felt there was
4  exposures that were above background.  I've done
5  characterizations based on the published data
6  from where background is to where exposures are
7  related to cosmetic talc.  But it's a range.
8  Every exposure is going to be different.
9  BY MR. POLCHINSKI:
10   Q    Now, Dr. Moline, on page ten of your
11  notes, you had a calculation of the number of
12  applications with respect to the Jean Nate
13  product?
14   A    Correct.
15   Q    And that was 3,016 applications?
16   A    Correct.
17   Q    And if we were to use five minutes for
18  each application, that would give us
19  15,080 minutes of exposure lifetime.  Can you
20  rely on my math?
21   A    Yes.
22          MS. KAGAN:  Foundation.
23  BY MR. POLCHINSKI:
24   Q    Now, if we were to divide that 15,080
25  by 60 minutes, we would come up with 251 hours?

Page 116

1   A    Okay.
2   Q    All right?  Now, to add to that, what
3  we're talking about here, I'm going to submit to
4  you Dr. Longo did some examinations of Jean Nate
5  powder.  He looked at five tins, and in three of
6  those tins he found cleavage fragments.
7          MS. KAGAN:  Mischaracterizes.
8  Foundation.  Argument.
9  BY MR. POLCHINSKI:
10   Q    Are you with me so far?
11          MS. KAGAN:  Incomplete hypothetical.
12  Mischaracterizes.  If you're referring to a
13  specific document, you should tell her.  But
14  you're also not accurately describing the
15  document.  The hypothetical is incomplete.
16          MR. POLCHINSKI:  I'm not finished yet.
17          THE WITNESS:  I don't recall that he
18  only described cleavage fragments.
19  BY MR. POLCHINSKI:
20   Q    If we just say three out of five
21  tins -- let's just leave it at that -- three out
22  of five would be 60 percent of what he examined.
23  Would that be accurate?
24          MS. KAGAN:  Mischaracterizes.  He
25  found asbestos in four out of five.  I don't know

Page 117

1  why you're saying three out of five.
2          MR. POLCHINSKI:  That's what my
3  information said.
4          MS. KAGAN:  I don't know if you know
5  the difference between PLM and TEM, but he found
6  asbestos in one of the containers by PLM only and
7  then by TEM in three of them.  So you should read
8  his declaration, read the reports, and then ask
9  your questions.  Otherwise, you're asking a
10  hypothetical that's not based in fact and it
11  makes no sense.
12  BY MR. POLCHINSKI:
13   Q    If we go with my three out of five,
14  60 percent, Doctor, of 251 would be roughly
15  150 hours?
16          MS. KAGAN:  That's not accurate.
17  We're not going with your three out of five
18  because it's not based in fact.  You're asking a
19  hypothetical based on not the facts in this case.
20          MR. POLCHINSKI:  Counsel, would it
21  satisfy you if I did four out of five instead of
22  three out of five?
23          MS. KAGAN:  It would be factually
24  accurate to use four out of five as opposed to
25  three out of five, yes.

30 (Pages 114 - 117)

Jaqueline Moline , M.D., MSc, FACP, FACOEM          February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

Page 118

1 BY MR. POLCHINSKI:
2    Q    All right.  Well, let's do that then.
3 Let's take -- 250 hours times 80 percent is
4 200 hours.
5          MS. KAGAN:  Vague and
6 incomprehensible.
7 BY MR. POLCHINSKI:
8    Q    All right?
9    A    Okay.
10    Q    Now, if a person was exposed let's say
11 on a job to 0.1 fibers cc for 2,000 hours, a full
12 work year, at the end of that year, the person
13 would have had 0.1 fiber cc-years; correct?
14          MS. KAGAN:  Mischaracterizes.
15 Foundation.
16          THE WITNESS:  So I lost you there.  So
17 2,000 work hours in the year.
18 BY MR. POLCHINSKI:
19    Q    Right.
20    A    Ask the question again.
21    Q    If a person works in that environment,
22 0.1 fibers per cc, for a full year, 2,000 hours,
23 at the end of that year, that person will have
24 0.1 fiber cc-years.  Is that basically correct?
25    A    You're talking occupational standards

Page 119

1 now? Yes.
2    Q    Yes.
3    A    If someone has .1 fiber per cc for
4 2,000 hours, that's one fiber per cc-year for
5 their occupational time-weighted average.
6    Q    So if a person had 200 hours instead
7 of 2,000, that's one-tenth of a work year;
8 correct?
9          MS. KAGAN:  Mischaracterizes and
10 foundation as to the 200 hours.
11 Incomprehensible.  Incomplete hypothetical.
12          THE WITNESS:  Using your numbers, then
13 yes, that would be one-tenth of a work year.
14 BY MR. POLCHINSKI:
15    Q    Now, if a person had 200 hours at 0.1
16 fibers per cc, at the end of that period of time,
17 the 200 hours, their lifetime exposure from what
18 we're talking about would be 0.01 fiber cc-years.
19 Would that be accurate?
20          MS. KAGAN:  Mischaracterizes.
21 Foundation.  Incomplete hypothetical.
22          THE WITNESS:  I mean, your math is
23 correct, but you can't take the 80 percent value.
24 You have to take the fact that she had the full
25 250 hours of exposure.  I'm losing you somewhere

Page 120

1 along this.
2          But we're also discounting the fact
3 that you don't leave that -- a workplace is a
4 place you typically don't live in, and it's not
5 necessarily applicable.  It's been used as
6 estimates to try to give some sort of
7 quantification, but it's a little more
8 complicated than this.
9          But anyways, go ahead with whatever
10 you're doing.  I don't like doing math on the
11 fly, as anyone who's read my depositions has
12 known.
13 BY MR. POLCHINSKI:
14    Q    Especially over the phone.
15    A    Well, phone or -- I mean, I'm not
16 sitting with a calculator.  I like to do things
17 methodically.  If you look at page ten of my
18 notes, I was very methodical, and I actually
19 confirmed the numbers.
20          So we're not isolating out one product
21 versus another since they all contribute, and
22 that was in her cumulative exposure.  But anyway,
23 I'm happy to continue answering your questions.
24    Q    Just with respect to 200 hours, 0.1
25 would result in 0.01 fiber per cc-years.  Would

Page 121

1 that be accurate?
2          MS. KAGAN:  Mischaracterizes.
3 Foundation.  Incomplete hypothetical.
4          THE WITNESS:  Using the numbers that
5 you have stated, that's what the math would work
6 out to, yes.
7 BY MR. POLCHINSKI:
8    Q    And if a person were -- if that were
9 their lifetime exposure to a particular product,
10 that would be less exposure than both
11 Dr. Iwatsubo and Dr. Lacourt calculated as sort
12 of a threshold for substantial exposure.  Would
13 that be fair to say?
14    A    No.  They didn't describe that.  They
15 didn't have a threshold for substantial exposure.
16 Lacourt went lower and actually had values that
17 were below those numbers.  You can't do it in
18 simple isolation because there were additional
19 exposures.
20          All of these exposures would increase
21 the risk from the many years of the application
22 of a particular product, so it's not like you can
23 just say, well, the exposure was below this
24 number, there was no risk when the exposures are
25 above background.

31 (Pages 118 - 121)

Jaqueline Moline , M.D., MSc, FACP, FACOEM       February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

Page 122

1    Q    But you will admit, Doctor, that each
2  product has to be looked at individually?
3        MS. KAGAN:  Mischaracterizes.  Looked
4  at individually for what?
5        MR. POLCHINSKI:  Looked at for the --
6        MS. KAGAN:  Counsel, I don't know what
7  jurisdiction you think you're in.  I don't know
8  if you're licensed in California.  But Rutherford
9  does not require a dose calculation for each
10 individual exposure and it doubling their risk.
11       I think you're thinking of the
12 Borg-Warner case in Texas, and I think you're a
13 bit confused here.  So I'm not sure what you're
14 asking.
15       MR. POLCHINSKI:  I assure you I'm not
16 confused, Counsel, but I am asking questions of
17 the doctor.  And I'm drawing objections.  I
18 understand that.
19       MS. KAGAN:  You're asking questions
20 about taking an individual product into
21 consideration for exposure purposes which
22 Dr. Moline has already done for you twice.  But
23 now you're asking a different question which is
24 not in compliance with the law in California.
25       It is not required by Rutherford or --

Page 123

1  I am not sure what exactly you think you're
2  asking or what jurisdiction you practice in, but
3  it's clearly not California.
4  BY MR. POLCHINSKI:
5    Q    The question really goes to -- my
6  particular product is not -- my client is not
7  responsible for everyone else's exposures.  Would
8  that be fair to say?
9        MS. KAGAN:  Mischaracterizes.
10 Argument.  I don't know what you mean by
11 responsible.  You mean legally responsible?
12 Again, joint and several liability exists because
13 your client's product contributes to the disease
14 and you are jointly severable for that
15 contribution.
16       MR. POLCHINSKI:  No.  I'm just talking
17 about causation.
18       MS. KAGAN:  Right.  And she's already
19 testified that all these exposures contribute
20 that are above background.  I'm not sure, again,
21 what you're trying to parse out here, but it's
22 not the law in California.  You're just wasting
23 time.
24 BY MR. POLCHINSKI:
25    Q    Dr. Moline, you've indicated you're

Page 124

1  familiar with the Unarco plant in Bloomington,
2  Illinois?
3    A    Familiar I think would be -- I don't
4  know what you mean by familiar.  Am I aware that
5  there was a Unarco plant in Bloomington,
6  Illinois?  Yes.
7    Q    Have you received any photographs of
8  the Unarco plant, interior photographs of that
9  plant?
10   A    Not that I specifically recall.
11   Q    You indicated also that Dr. Selikoff
12 did some research into exposures at the Unarco
13 plant in New Jersey; correct?
14   A    My recollection is that Selikoff
15 evaluated folks who had worked at the Unarco
16 plant in New Jersey, not the Bloomington plant,
17 in the 1950s.  He didn't do exposure assessments
18 that I recall seeing, but I know that he was
19 describing the clinical findings from those
20 folks.
21   Q    Did you ever see a writing from
22 Dr. Selikoff that indicated that the interior of
23 the Unarco plant that he studied had roughly 50
24 fibers per cc?
25       MS. KAGAN:  Mischaracterizes.

Page 125

1  Foundation.
2        THE WITNESS:  I don't recall that
3  specific number from the New Jersey plant.  I
4  don't recall the publication.  I probably read
5  it, but I have no recollection of the specific
6  number.
7        And that would have -- and, also, I'm
8  not sure how the two plants compare and also what
9  Mr. Martin was actually doing in Bloomington.
10 Ms. Fowler testified that she recalled that he
11 worked with metal.  And when I looked at his
12 salary, he was making a rate that was associated
13 with the machinists' or other skilled trades'
14 rates because it was more than $2 an hour, which
15 was quite interesting.
16       And that made sense based on what
17 Ms. Fowler had described, that he worked with
18 metal, which is what machinists tend to do,
19 rather than working with the insulation itself.
20   Q    In your calculation on page ten of
21 your notes, you indicate 2,607 possible
22 interactions by the Plaintiff with her stepfather
23 regarding the Unarco exposure?
24   A    Right.  That was based on the fact
25 that she lived in the same house with him for ten

Jaqueline Moline , M.D., MSc, FACP, FACOEM          February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

Page 126

1 years.  And there are five workdays in a week, so
2 that's how I came up with that calculation.
3      Q     How many minutes per interaction did
4 you calculate?
5      A     I didn't.  And based on the testimony
6 from Ms. Zimmerman and Ms. Fowler, Ms. Zimmerman
7 tried to stay away from her stepfather as much as
8 possible and was not in the house.  It sounded
9 like there was -- she described it as very
10 minimal interaction.
11          And then she was away at college, and
12 then she would go from class to working.  I think
13 her sister described quite poignantly that she
14 would make her an egg or a grilled cheese
15 sandwich because she hadn't had anything to eat
16 by the time she came home at the end of the
17 evening.
18          Her sister would wake up and make her
19 a sandwich because she'd been out of the house
20 all day.  So she didn't have a lot of interaction
21 with the stepfather.
22      Q     How was it that you calculated the
23 2,607 interactions?
24      A     I said that she would interact with
25 him once a day for ten years, five days a week,

Page 127

1 five out of seven days a week, meaning it was
2 261 days in a year because he worked 261 days,
3 that's not assuming he took any vacations, and
4 were at the same house for ten years.
5      Q     From your review of this case, the
6 stepfather removed his work clothes in the
7 basement?
8      A     That's what Ms. Fowler described.
9      Q     So if the Plaintiff, Linda Zimmerman,
10 had occasion to go to the basement, be fair to
11 say that it was likely that there was asbestos in
12 the air in the basement?
13          MS. KAGAN:  Mischaracterizes.
14 Foundation.  Calls for speculation.
15          THE WITNESS:  I have no way of
16 knowing.  It depends on if she would be in there.
17 It's possible there could have been.  I don't
18 recall her describing going into the basement.  I
19 don't recall any testimony to that effect at all.
20 What I gleaned is she tried to stay away from her
21 stepfather as much as possible.
22 BY MR. POLCHINSKI:
23      Q     Is it your belief that some of the
24 asbestos from the father's clothes somehow
25 infiltrated the house beyond the basement?

Page 128

1          MS. KAGAN:  Argument as to "somehow
2 infiltrated the house."
3          THE WITNESS:  I don't know how
4 Mr. Martin's exposure managed to contaminate the
5 house.  There was also some description of them
6 riding in a car to go to church.  Perhaps it was
7 in the car on the rare occasion she was actually
8 in the car with him.  I have no way of knowing.
9 BY MR. POLCHINSKI:
10      Q     When Dr. Gordon found amosite and
11 crocidolite in Ms. Zimmerman's tumor, was that
12 the only asbestos types that he found in the
13 tumor?
14      A     Within the tumor tissue, those were
15 the only two types that he found, that's correct,
16 in the piece of the tumor he had, yes, not in the
17 lymph nodes.
18      Q     Based upon the facts that we have
19 before us with the three different types of
20 exposure that have been discussed here, is it
21 more likely than not in your opinion that the
22 amosite and crocidolite in the tumor tissue came
23 from the Unarco plant?
24          MS. KAGAN:  Mischaracterizes.
25 Argument.  Asked and answered by counsel for

Page 129

1 Chanel at the beginning of this deposition and by
2 Ms. Romano with respect to the amosite.
3          THE WITNESS:  I have no way of knowing
4 the source of any of these particular fibers.  As
5 I said before, the amosite, which is the
6 commercial term for cummingtonite, could have
7 come from cosmetic talc.  That's been described
8 before.  I have no way of knowing.
9          I do know that there was talc that was
10 found and that there was also
11 tremolite-anthophyllite in the lymph nodes
12 consistent with talc.
13 BY MR. POLCHINSKI:
14      Q     You've already indicated that it is
15 your belief that the Unarco plant used amosite
16 asbestos and to a lesser degree crocidolite
17 asbestos?
18          MS. KAGAN:  Asked and answered.
19          THE WITNESS:  Correct.
20 BY MR. POLCHINSKI:
21      Q     I didn't hear the answer.
22      A     Correct.
23          MS. KAGAN:  The question was asked and
24 answered.  I don't know why you're re-covering
25 questions that have already been asked by prior

33 (Pages 126 - 129)

Page 130

1 counsel.
2          MR. POLCHINSKI: Dr. Moline, that's
3 all I have for you this afternoon. Thank you
4 very much.
5          THE WITNESS: You're welcome.
6 EXAMINATION
7 BY MS. ANDERSON-THOMPSON:
8     Q    Good afternoon, Dr. Moline. This is
9 Gabrielle Anderson-Thompson. I just have a
10 couple questions for you.
11    A    Sure.
12    Q    You don't have any opinions regarding
13 a retailer's standard of care; correct?
14    A    Correct.
15    Q    And you don't have any expert opinions
16 specific to the retailer Ralphs Grocery Company.
17 True?
18    A    Correct.
19    Q    And you don't have any expert opinions
20 specific to the retailer Thrifty Payless Inc.
21 True?
22    A    Correct.
23          MS. ANDERSON-THOMPSON: Okay. I don't
24 have any other questions. Thank you.
25          THE WITNESS: You're welcome.

Page 131

1          MS. KAGAN: Anybody else?
2          MS. ROMANO: This is Julia. I have
3 maybe three more questions that I found that I
4 hadn't asked. But go ahead, Meghan.
5          MS. SENTER: It's the same for me. I
6 just had a couple follow-ups. I'll ask mine real
7 quick.
8 RE-EXAMINATION
9 BY MS. SENTER:
10    Q    Dr. Moline, when you were asked some
11 questions by Julia earlier, she asked some
12 questions specific to J&J, and I want to make
13 sure they just kind of apply across the board. I
14 think they do.
15          MS. KAGAN: Could you reask your
16 question? Sorry. I couldn't hear because I was
17 coughing.
18 BY MS. SENTER:
19    Q    I just wanted to confirm. Some of the
20 questions that were asked by Julia earlier were
21 specific to J&J, and I just want to make sure
22 that they apply across the board.
23          If the Chanel product used by
24 Ms. Zimmerman did not contain asbestos, you would
25 agree that it did not cause or contribute to her

Page 132

1 disease; correct?
2     A    Correct.
3     Q    And then do you recall giving a
4 deposition in the Ripley matter?
5     A    Believe it or not, I don't. I
6 remember the name because it allowed me to do
7 that at the time because it's corny and I
8 appreciate that humor. I recall that I was
9 deposed in the Ripley case. I don't remember
10 what I said.
11    Q    I noticed on your reliance list the
12 specific testing from Dr. Longo and Dr. Compton
13 as to Chanel No. 5. And you had all of those
14 tests at the time of the Ripley deposition. You
15 were asked about your opinions as to that
16 testing, and I just wanted to make sure that you
17 hadn't reached any new opinions based on that
18 testing since the Ripley deposition.
19          Does that make sense?
20    A    With respect to Dr. Longo's testing of
21 the Chanel, I don't recall having any -- I don't
22 have any new opinions related to that. I haven't
23 seen any additional testing.
24    Q    And do you have any new opinions about
25 Chanel based on Dr. Compton's testing which you

Page 133

1 also had at the time of the Ripley deposition?
2     A    Not that I'm aware of as I sit here
3 right now.
4          MS. SENTER: I thought we could
5 short-circuit that. The only the other things,
6 we can ask this off the record, Leah, I'll ask
7 afterwards.
8 RE-EXAMINATION
9 BY MS. ROMANO:
10    Q    Dr. Moline, just a few more questions.
11 You would agree that Ms. Zimmerman's stepfather's
12 work at Unarco is certainly a possible source of
13 the amosite and crocidolite found by Dr. Gordon
14 in Ms. Zimmerman's tissue. True?
15    A    Yes.
16    Q    You also reviewed Ms. Zimmerman's
17 medical records, obviously not the most recent,
18 but I think up until two thousand -- I think you
19 said her medical records up to October of 2019,
20 thereabouts?
21    A    Yeah. There was a pulmonology report
22 that I recall from October 8th.
23    Q    And in your review of Ms. Zimmerman's
24 medical records, did you see the notation noting
25 that her stepdad's work at an asbestos plant was

34 (Pages 130 - 133)

Jaqueline Moline , M.D., MSc, FACP, FACOEM          February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

Page 134

1 a possible source of asbestos exposure for
2 Ms. Zimmerman?  Did you see those statements?
3     A    Yes.
4         MS. KAGAN:  Foundation.
5 BY MS. ROMANO:
6     Q    Did you see any reference in
7 Ms. Zimmerman's medical records to cosmetic talc
8 or specifically Johnson's baby powder being a
9 possible source of asbestos exposure to
10 Ms. Zimmerman?
11    A    No.
12    Q    Did you see any reference in
13 Ms. Zimmerman's medical records to cosmetic talc
14 or specifically Johnson's baby powder as being a
15 possible cause of her mesothelioma?
16    A    Not within her medical records, no.
17    Q    Have we now discussed all the
18 testimony that you anticipate providing at trial
19 in this matter at least in a general sense?
20    A    With the exception of whether I would
21 comment on future medical and her additional
22 medical since October, yes.
23        MS. ROMANO:  Great.
24        MS. KAGAN:  Obviously, I'd tender
25 whatever we disclosed in our 2034 disclosure as

Page 135

1 well as what's on her reference and reliance
2 list, and the materials we produced prior to this
3 deposition would all be fair game and appropriate
4 for questioning at trial.
5         Anybody else have any questions?
6 EXAMINATION
7 BY MS. KAGAN:
8     Q    I have a couple of follow-up
9 questions.  First, Dr. Moline, I wanted to touch
10 upon the epidemiology questions that counsel for
11 Johnson & Johnson asked you.  She asked you
12 whether or not there have been epidemiologic
13 studies following the use of cosmetic talc
14 products that show an increased risk from use of
15 cosmetic talc.  Do you remember those questions?
16    A    Yes.
17    Q    Now, what is it in cosmetic talc that
18 in your opinion is causing mesothelioma?
19    A    Asbestos.
20    Q    Have there been epidemiological
21 studies of individuals who have been exposed to
22 asbestos?
23    A    Yes.
24        MS. SENTER:  I'm sorry.  Could I have
25 that question back?  You cut out, Leah.

Page 136

1         MS. KAGAN:  I asked if there have been
2 epidemiologic studies of individuals who have
3 been exposed to asbestos.
4         MS. SENTER:  Okay.  Sorry.
5         THE WITNESS:  Yes.
6 BY MS. KAGAN:
7     Q    And, Dr. Moline, do you need a
8 specific epidemiological study for every single
9 type of product that contains asbestos that
10 people would be exposed to in order to offer an
11 opinion that exposure to asbestos causes
12 mesothelioma?
13    A    No.
14    Q    Have there also been instances
15 documented in the peer-reviewed literature of
16 individuals with mesothelioma associated with --
17 who have had associations with use of cosmetic
18 talc or exposure to cosmetic talc?
19    A    Yes.
20    Q    And those references on your reference
21 and reliance list, you've testified about those
22 in trial before?
23    A    I have.  And, yes, they are on my
24 list.
25    Q    Dr. Moline, why didn't you calculate a

Page 137

1 specific numeric dose for Ms. Zimmerman's
2 lifetime exposure?
3     A    For her what exposure?
4     Q    For her lifetime exposure to asbestos.
5     A    You know, it's -- they're all
6 estimates.  She didn't have actual measurements
7 done when she was doing it.  We're not measuring
8 the full scope of when somebody applies powder
9 and then they have to clean it up, and I had no
10 way of being able to include that type of
11 exposure in a dose calculation.
12        I don't know what exactly she was
13 exposed to in the home where -- that she shared
14 with Mr. Martin or what contribution, if any, her
15 children's exposure made.  So I just -- I wasn't
16 able to -- I had no number to do it.
17        So it's always an estimate.  It's not
18 an actual exposure.  So there were too many
19 variables for me to feel confident in the number.
20 So that was the main reason.
21    Q    On your last page of your notes when
22 you quantified the number of exposures that
23 Ms. Zimmerman had to the various talcum powder
24 products and potentially from her stepfather from
25 Unarco, was this the most reliable quantification

35 (Pages 134 - 137)

Page 138

1 that you could have provided in this case?

2    A    Yes. And that's an underestimate in

3 many places because I don't address cleaning.

4 And then when she talked about that she would

5 shower sometimes more than once a day and apply

6 powder once a day, I would err on the side of one

7 rather than one and a half since it wasn't clear

8 how often she actually showered more than once a

9 day.

10        But this was the best I could do

11 understanding that it's probably undercounting

12 based on how she described it.

13    Q    Dr. Moline, is there any way you could

14 take out one of these exposures -- let's say you

15 could just remove Jean Nate from this exposure

16 profile from contributing to her total cumulative

17 dose based on the number of her exposures?

18        MR. POLCHINSKI: Objection. Form.

19        THE WITNESS: They're all going to

20 contribute. You can't just substitute -- take

21 one out and say that it had no relevance or it

22 wasn't a contributing factor. That's not

23 scientifically sound.

24 BY MS. KAGAN:

25    Q    Dr. Moline, counsel for Johnson &

Page 139

1 Johnson asked you about your review of the

2 medical records and whether or not you saw any

3 notations about Ms. Zimmerman's exposure to

4 asbestos from her use of cosmetic talc.

5        In your experience as a medical doctor

6 and in your review of medical records for

7 hundreds and hundreds of patients, how often do

8 physicians ask patients about their use of

9 hygiene products like cosmetic talc?

10        MS. ROMANO: Calls for speculation.

11 Overbroad. Go ahead.

12        THE WITNESS: Rarely, if ever.

13        MS. KAGAN: Thank you, Dr. Moline.

14 Those are all the questions I have.

15        THE COURT REPORTER: Dr. Moline, would

16 you like to waive signature?

17        THE WITNESS: Yes, please.

18        MS. KAGAN: Julia, can we do the usual

19 stips? Can you put it on the record before I

20 choke to death?

21        MS. ROMANO: You're testing my memory.

22 Meghan, do you have them in front of you? I

23 think it's that we can relieve the court reporter

24 of her duties.

25        (Whereupon off-the-record discussions

Page 140

1    ensued.)

2        MS. KAGAN: We can agree to relieve

3 the court reporter of her obligation to maintain

4 the original transcript under the Code.

5 Plaintiff will take custody of the original

6 transcript and make it available to anybody upon

7 reasonable request.

8        We also stipulate to using certified

9 copies for motion practice and trial. If the

10 original is lost, I propose we use certified

11 copies in general for motion practice and in

12 trial.

13        Then I also propose that we could use

14 an expedited rough if necessary for motion

15 practice in light of the expedited trial date.

16        MS. SENTER: So stipulated.

17    (Proceedings adjourned, 1:42 p.m.)

18    (Original transcript sent to Leah Kagan.)

19        The following reporter and firm

disclosures were presented at this proceeding for

20 review by counsel:

21        REPORTER DISCLOSURES

22    The following representations and

disclosures are made in compliance with Georgia

23 Law, more specifically:

    Article 10(B) of the Rules and Regulations of the

24    Board Of Court Reporting (disclosure forms)

    OCGA 9-11-28(c) (disqualification of reporter

25    for financial interest)

    OCGA 15-14-37(a) and (b) (prohibitions against

Page 141

1  contracts except on a case-by-case basis).
    - I am a certified reporter in the State of
2  Georgia.
    - I am a subcontractor for Veritext Legal
3  Solutions.
    - I have been assigned to make a complete and
4  accurate record of these proceedings.
    - I have no relationship of interest in the
5  matter on which I am about to report which
    would disqualify me from making a verbatim
6  record or maintaining my obligation of
    impartiality in compliance with the Code of
7  Professional Ethics.
    - I have no direct contract with any party in
8  this action and my compensation is determined
    solely by the terms of my subcontractor
9  agreement.
10    FIRM DISCLOSURES
11 - Veritext Legal Solutions was contacted to
    provide reporting services by the noticing or
12  taking attorney in this matter.
    - There is no agreement in place that is
13  prohibited by OCGA 15-14-37(a) and (b). Any
    case-specific discounts are automatically
14  applied to all parties, at such time as any
    party receives a discount.
15 - Transcripts: The transcript of this proceeding
    as produced will be a true, correct, and
16  complete record of the colloquies, questions,
    and answers as submitted by the certified court
17  reporter.
    - Exhibits: No changes will be made to the
18  exhibits as submitted by the reporter,
    attorneys, or witnesses.
19 - Password-Protected Access: Transcripts and
    exhibits relating to this proceeding will be
20  uploaded to a password-protected repository, to
    which all ordering parties will have access.
21
22
23
24
25

36 (Pages 138 - 141)

Jaqueline Moline , M.D., MSc, FACP, FACOEM          February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

Page 142

1                    CERTIFICATE
2  STATE OF GEORGIA:
3  COUNTY OF COBB:
4          I hereby certify that the foregoing
5  transcript was taken down, as stated in the
6  caption, and the colloquies, questions and
7  answers were reduced to typewriting under my
8  direction; that the transcript is a true and
9  correct record of the evidence given upon said
10 proceeding.
11         I further certify that I am not a
12 relative or employee or attorney of any party,
13 nor am I financially interested in the outcome of
14 this action.
15         I have no relationship of interest in
16 this matter which would disqualify me from
17 maintaining my obligation of impartiality in
18 compliance with the Code of Professional Ethics.
19         I have no direct contract with any party
20 in this action and my compensation is based
21 solely on the terms of my subcontractor
22 agreement.
23         Nothing in the arrangements made for
24 this proceeding impacts my absolute commitment to
25 serve all parties as an impartial officer of the

Page 143

1  court.
2          This the 2nd day of March, 2020.
3
4
5
6          _Jennifer D. Hamon_
7          Jennifer D. Hamon, CCR B-2287, RPR
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

37 (Pages 142 - 143)

Case 3:23-cv-02990-GC-DEA   Document 18-2   Filed 06/30/23   Page 40 of 71 PageID: 437
Jaqueline Moline , M.D., MSc, FACP, FACOEM        February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

[& - 8th]                                                                      Page 1

**&**

**&** 2:14,14,16 3:3,7
3:9,15 75:7 91:17
91:22 92:17 93:2
94:15 107:3,12
135:11 138:25

**0**

**0.00001** 34:15
**0.00016** 30:19
**0.01** 119:18 120:25
**0.1** 113:14,25
118:11,13,22,24
119:15 120:24
**0.5** 112:13
**001** 111:25

**1**

**1** 4:12,21 6:2,8
10:1 37:12 44:9
100:19 112:20
114:6 119:3
**1,000** 111:13
**1/1,000th** 111:7
**10** 82:6 140:23
**10022** 3:17
**107** 4:5
**10:06** 1:15 5:2
**11** 82:6
**11:29** 60:1
**11:35** 60:2
**12** 102:4
**12/19/2019** 4:15
**12:40** 102:14
**12:46** 102:15
**130** 4:5
**131** 4:6
**133** 4:6
**135** 4:7
**142** 4:8
**14842** 17:11

**15** 9:20,22 10:8
**15,080** 115:19,24
**15-14-37** 5:3
140:25 141:13
**150** 117:15
**1500** 3:10
**16.9** 10:2
**1600** 2:17
**18** 4:19
**1950s** 70:1 124:17
**1954** 100:11,21
**1957** 77:13
**1959** 77:14
**1960** 49:10
**1977** 19:25 20:3,4
**1986** 26:12
**1998** 112:10
**1:42** 1:15 140:17

**2**

**2** 4:14 6:2,11
125:14
**2,000** 118:11,17,22
119:4,7
**2,607** 15:22 125:21
126:23
**20** 25:5
**200** 118:4 119:6,10
119:15,17 120:24
**2004** 16:16
**2007** 106:20
**2008** 100:12
**2014** 94:24 106:15
**2015-2019** 4:14
**2018** 82:9 100:17
100:22
**2019** 7:3 92:11
93:1 94:5 95:1
105:19,19,20
133:19
**2020** 1:14 5:1
143:2

**2029** 3:4
**2034** 12:20 134:25
**212.897.9655** 3:17
**213.443.4365** 2:18
**213.955.1150** 3:11
**2287** 143:7
**24** 24:25 114:5
**24272** 143:6
**25** 9:3
**250** 118:3 119:25
**251** 115:25 117:14
**26** 1:14 5:1
**261** 127:2,2
**27** 47:19 48:24
49:5
**2nd** 143:2

**3**

**3** 4:16 6:2,12
**3,016** 115:15
**3.550** 1:3
**30** 111:12,20,25
**300** 3:4 85:6
111:13
**3000** 2:10
**310.284.3884** 3:5
**33** 43:5,6,18,23
44:4,6,10 46:17
49:6,7,9,12,18
50:8,19 51:9
54:21 57:1,14,21
57:23 58:2,7 84:9
84:18 85:12,20
**365** 2:11
**3780** 2:5

**4**

**4** 4:17 6:2,13
**4.2** 113:9
**400** 87:6
**43** 8:18,21 92:21

**4674** 1:3

**5**

**5** 4:4,18 6:3,15
7:22 14:8 113:9
132:13
**50** 124:23
**504.535.2879** 2:12
**515** 3:10
**54** 100:12
**540** 2:4
**562.590.3400** 2:6

**6**

**6** 4:12,14,16,17,18
4:19,21 18:17,19
**60** 23:24 115:25
116:22 117:14
**600** 3:16 10:19
**600,000** 105:1,1,5
105:8
**61** 4:4
**633** 2:17
**64** 102:3,4
**6th** 77:13

**7**

**7.2** 10:1,2
**70** 45:24
**70130** 2:11
**70s** 26:7 31:11
**730** 101:22
**768** 101:13 102:5
**7th** 16:16 77:14

**8**

**80** 45:25 118:3
119:23
**800** 105:1
**80s** 26:9
**8th** 3:16 133:22

Jaqueline Moline , M.D., MSc, FACP, FACOEM          February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

[9-11 - application]                                                                          Page 2

**9**

**9-11**  17:6
**9-11-28**  140:24
**90067**  3:5
**90071**  2:18 3:11
**90806**  2:5
**99**  43:2 113:9

**a**

**a.m.**  1:15 5:2 60:1
  60:2
**ability**  50:11
**able**  9:21 17:18
  30:20 31:2 32:5
  32:11 42:18 78:10
  98:10,13,22 99:1
  137:10,16
**absence**  90:12
**absolute**  35:14
  142:24
**access**  141:19,20
**account**  19:14,22
  33:23 59:8
**accounted**  73:12
**accumulated**
  16:14
**accurate**  31:1
  96:10,13 116:23
  117:16,24 119:19
  121:1 141:4
**accurately**  116:14
**action**  141:8
  142:14,20
**active**  22:14,21
  23:4
**activities**  23:5
**activity**  27:1
**actual**  14:11 32:12
  39:10 55:18 56:5
  94:24 95:3 99:20
  113:5 137:6,18

**add**  42:7 116:2
**added**  92:12
  100:13 104:20
**addition**  87:7,12
  95:22 96:1
**additional**  10:21
  11:7,9 28:8,10
  30:24 47:7 48:10
  50:21 51:2 53:5
  53:24 55:7 57:15
  58:23 68:5 82:22
  92:12 95:21
  112:19 121:18
  132:23 134:21
**additionally**  25:4
**address**  138:3
**addressed**  90:24
**adjourned**  140:17
**administrative**
  37:13
**admit**  122:1
**admonitions**  5:22
**advance**  85:24
**advertisement**
  70:22
**aerosolize**  111:24
**afternoon**  130:3,8
**ago**  5:14 39:15
  40:22 55:11
  114:23
**agree**  62:24 63:7
  72:13 77:6 82:12
  88:9 97:22 131:25
  133:11 140:2
**agreement**  141:9
  141:12 142:22
**ah**  49:22 50:4
**ahead**  6:5,11,14
  14:7 18:16 61:9
  66:11 87:22
  107:21 120:9

**131:4 139:11
**aid**  3:1
**air**  26:19 30:15
  32:10 66:15 67:11
  110:20 127:12
**airborne**  30:9 31:2
  31:7,18,22 111:23
**airport**  2:5 17:15
**al**  1:8
**alan**  60:10,20
**alexandri**  36:9,13
**alive**  11:9
**allow**  85:13
**allowed**  132:6
**alternate**  53:18
  54:1,3,16 55:22
**alternative**  50:10
  50:18 51:15 53:11
  54:11 58:19 59:7
  59:9
**aluminum**  72:9
**ama**  94:12,25 95:6
**ama's**  94:6
**amos**  67:18
**amos's**  67:12
**amosite**  70:5 72:3
  72:14,24 73:3,12
  73:16,18 74:1
  128:10,22 129:2,5
  129:15 133:13
**amount**  25:23
  35:12 82:19
**amounts**  110:9,14
  111:6
**amphibole**  79:11
**amphiboles**  95:23
**analyses**  36:23
  89:1
**analysis**  51:1,14
**analyst**  47:8 48:18

**analyze**  87:16
**anderson**  3:2 4:5
  106:16 130:7,9,23
**angeles**  1:2 2:18
  3:5,11
**announcement**
  23:3,6 94:6
**anonymity**  45:21
  46:11
**anonymous**  45:14
  86:2
**answer**  12:1 28:16
  31:15 108:20
  111:2 129:21
**answered**  30:4
  46:21 114:22
  128:25 129:18,24
**answering**  120:23
**answers**  43:3 60:6
  97:18 141:16
  142:7
**anthophyllite**  72:9
  76:1,18 129:11
**anticipate**  10:20
  11:6 104:8 134:18
**anybody**  131:1
  135:5 140:6
**anyone's**  85:7
**anyway**  58:15
  120:22
**anyways**  120:9
**apart**  33:15 73:16
  73:22 80:23
**apologize**  17:16
  24:11 41:10
**apparent**  50:25
**appearances**  2:1
**appeared**  19:4
**applicable**  120:5
**application**  108:12
  108:17 109:7,19

**[application - aware]**                                                      Page 3

115:18 121:21
**applications**
  115:12,15
**applied**  91:1
  141:14
**applies**  109:16
  137:8
**apply**  108:14,19
  131:13,22 138:5
**applying**  108:11
  109:12,13,22
  114:12,21
**appreciate**  38:2
  76:15 132:8
**appropriate**  89:2
  135:3
**approval**  45:5,6
  45:12,13,20
**approve**  46:2
**approved**  46:16
**approximately**
  15:3,22
**archived**  74:16
**area**  36:25 69:5
  96:24 97:17
**argument**  17:19
  29:19 30:23 32:3
  43:10 59:13 76:7
  76:23 96:12 97:1
  98:4 111:15 116:8
  123:10 128:1,25
**argumentative**
  110:10
**arisen**  53:20,23
**arrangements**
  142:23
**arrived**  88:16
  89:14
**article**  39:4 40:24
  42:24 46:7 47:5
  48:21 52:17 54:22

59:18 86:16,17
  92:16 93:9 106:15
  140:23
**articles**  22:4,6,19
  23:7,16
**asbestos**  1:4 11:18
  12:5,8,10,16,25
  13:4,10 18:24
  25:15,16 26:1,3,23
  30:20 39:10 49:11
  49:23 50:4 55:20
  62:16,20 63:1,5,15
  63:16 64:3,18,20
  64:24 65:4,16,18
  65:25 66:3 67:2,7
  67:23 69:12,16,21
  70:1,6,10,14 74:1
  75:10 78:18 79:5
  79:9,9 81:3 82:13
  84:2 90:12 91:14
  91:22 92:17 94:14
  95:8 96:21 103:4
  103:5,8 110:6,6,15
  111:12,13,19,21
  112:6 116:25
  117:6 127:11,24
  128:12 129:16,17
  131:24 133:25
  134:1,9 135:19,22
  136:3,9,11 137:4
  139:4
**ascribe**  35:12
**ascribed**  79:4
**aside**  14:8 28:9
  67:16 75:5 93:6,6
**asked**  11:14,16,23
  12:3,23 13:1
  16:22 18:23 28:3
  28:5 30:3 42:7
  46:21 52:2,15
  55:14,22 56:13,16

58:9,10 81:6
  83:19 85:11 89:22
  94:8,11 103:18,20
  103:22 114:22
  115:3 128:25
  129:18,23,25
  131:4,10,11,20
  132:15 135:11,11
  136:1 139:1
**asking**  19:20
  22:15 32:4 38:4
  40:10,12 41:5,11
  43:11 46:8,10
  53:7 76:24 80:15
  81:12 90:11 99:16
  103:18 107:11
  110:23 112:3
  117:9,18 122:14
  122:16,19,23
  123:2
**aspects**  38:9,15
  39:18 40:9
**assessment**  55:12
**assessments**
  124:17
**assigned**  141:3
**assisted**  24:25
  37:7 38:22 39:16
  64:15
**assisting**  38:12
  64:6
**associated**  35:19
  44:4,14 49:23
  112:21 125:12
  136:16
**associates**  43:6
**associating**  43:12
**association**  43:25
  53:4
**associations**
  136:17

**assume**  18:7 34:16
  42:16 58:5 94:8
**assuming**  26:22
  57:17 127:3
**assure**  122:15
**atsdr**  35:5
**attached**  4:21 5:6
**attention**  98:9
**attorney**  141:12
  142:12
**attorneys**  141:18
**attribute**  83:8
**authored**  35:19
  52:18 84:4 97:24
**authoring**  99:14
**authors**  32:7 88:5
  88:8 91:10
**authorship**  53:6,9
**automatically**
  141:13
**automotive**  63:20
  63:24 64:24
**autozone**  1:8
**available**  11:8,10
  25:17 26:7 51:20
  51:21 52:4,18
  56:4,8 71:9,17
  94:1,3 106:5
  140:6
**avenue**  3:16
**average**  17:21
  19:12 20:10,15,16
  119:5
**averaged**  19:25
  20:5
**avoided**  68:10
**aware**  7:4 72:2
  90:6,14,19 91:6
  94:10 95:6 124:4
  133:2

Case 3:23-cv-02990-GC-DEA   Document 18-2   Filed 06/30/23   Page 43 of 71 PageID: 440

Jaqueline Moline , M.D., MSc, FACP, FACOEM        February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

**[b - calculation]**                                                    Page 4

---

**b**

**b** 1:12 2:9 5:3
  140:23,25 141:13
  143:7
**baby** 62:25 63:5
  73:20 74:17 78:3
  79:16 80:3 94:7
  95:7,16 96:22
  100:8,14,21,25
  101:18 107:2,16
  108:10 134:8,14
**back** 7:17 23:25
  48:8 53:10 54:13
  55:5 57:13,21,24
  67:16 79:20 87:1
  87:15,25 89:5
  100:5 135:25
**background** 5:16
  29:17 30:22 32:2
  33:22 34:4,14
  35:2,12,16 63:7,9
  64:12 103:2
  110:22 115:4,6
  121:25 123:20
**bad** 24:11
**ban** 87:8,11
**barnes** 3:3
**bartlett** 2:4
**based** 15:2 16:13
  20:1,6 21:17
  28:18 34:5 49:11
  50:11 52:11,25
  53:1 56:3,7,11,20
  66:5 72:21 78:25
  88:9 100:14 101:1
  101:15,25 102:2
  115:5 117:10,18
  117:19 125:16,24
  126:5 128:18
  132:17,25 138:12
  138:17 142:20

**basement** 69:2,8
  127:7,10,12,18,25
**basically** 14:23
  17:21 39:23 40:16
  49:20 103:21
  118:24
**basis** 141:1
**bathroom** 109:6
**bc720153** 1:3
**bcrslaw.com** 3:12
**beach** 2:5
**began** 69:24
**beginning** 1:15 9:3
  63:13 82:6 129:1
**behalf** 62:16
**belief** 127:23
  129:15
**believe** 13:9,16
  14:4 23:15 24:7
  26:7 31:12 37:13
  63:14,25 65:23
  66:1 69:25 70:11
  72:10 73:19 74:15
  75:10 82:10 92:14
  92:19 103:10
  106:14,20 112:11
  132:5
**bellow** 3:8
**bendix** 24:12,13
  24:17,19,22
**berkes** 3:9
**best** 39:2 50:11
  69:7 71:10 138:10
**bevilacqua** 36:9
  36:17 37:4
**beyond** 8:20 23:5
  127:25
**big** 49:21
**biggest** 18:2 20:23
  21:5

**bill** 10:6 105:6
**billed** 104:25
  105:2,3,4,11
**billions** 30:12 32:9
  110:25
**bills** 103:20 105:8
**binder** 78:15,16
  91:19,24 92:13
**binders** 9:12
**bit** 5:15 12:1 18:17
  27:10 36:5 56:23
  84:15 95:10
  122:13
**blip** 20:15
**block** 67:2
**bloomington** 35:7
  65:19 66:4 69:13
  124:1,5,16 125:9
**blow** 92:8
**blowing** 21:3,5,8,9
  21:11,18,19
**blue** 92:5
**blur** 92:18
**board** 34:17,19
  45:6 131:13,22
  140:24
**boards** 92:5
**bodies** 78:18 79:5
  79:9
**body** 24:16 109:13
  110:1
**bolster** 23:16
**books** 85:3
**borg** 122:12
**bottle** 94:7,24 95:8
**bottles** 79:17 80:2
  95:7,12,14 100:13
  100:24 101:13,14
  101:24 102:5,20
**bottom** 41:3

**bound** 111:19
**boys** 26:10
**brake** 24:21 25:10
  26:5,17 64:3,5
**brakes** 24:23,24
  24:25 25:5,15,17
  25:19 26:3,8,14,15
  26:20,22
**brand** 24:19,19
**break** 9:21 35:23
  36:1,5 59:23 77:5
  92:5 102:10,13
**brief** 10:12 83:21
**bring** 9:6
**bringing** 67:23,24
**broadly** 57:10
**broke** 79:13
**brought** 78:16
  84:16,17
**btlaw.com** 3:6
**bulk** 29:13,14,20
  30:7,15 31:6,15,23
  31:24 32:9 33:6
  111:4,8,10
**burden** 71:20
  79:25
**butt** 109:5

---

**c**

**c** 25:2 140:24
**ca** 2:5,18 3:5,11
**calculate** 100:24
  126:4 136:25
**calculated** 81:2
  87:4 101:5,19
  102:2 104:20
  121:11 126:22
**calculating** 87:17
  114:11
**calculation** 15:20
  27:15 115:11
  122:9 125:20

Jaqueline Moline , M.D., MSc, FACP, FACOEM          February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

[calculation - clothes]

126:2 137:11
**calculations**  14:20
  14:21,23 15:9
  25:8 27:12,21
  34:12 89:6 101:15
  106:13,24 107:7
**calculator**  120:16
**california**  1:1
  52:22 122:8,24
  123:3,22
**call**  7:7,9 14:21,22
  43:17 55:24 93:14
  95:12
**called**  16:8 91:19
  110:9
**calls**  59:13 68:1
  127:14 139:10
**canal**  2:10,11
**caption**  142:6
**car**  25:5 128:6,7,8
**carcinogens**  83:4
**care**  61:23 130:13
**carpet**  68:19,21
**case**  1:3 7:13,25
  8:18,20,24 9:19
  10:16 13:1 18:22
  20:14 23:8 27:17
  28:4,6,20 44:14
  47:13 51:4,4,5
  53:2 57:4 58:9,18
  58:21 68:9 69:11
  71:20 73:9 78:12
  79:18 80:5,18
  83:12 92:10,11,15
  103:16 104:22
  105:15 109:15
  117:19 122:12
  127:5 132:9 138:1
  141:1,1,13
**cases**  1:4 28:1
  37:11 43:5,6 44:4

46:17,18,24 47:1,6
  47:16,19,21 48:9,9
  48:17,19,24 49:18
  50:8,9 52:6 54:21
  54:24 57:1,9,14,21
  57:23 58:2,7,11,12
  59:4 62:16 82:4
  84:9 85:6 91:18
  96:5
**category**  93:3
**causation**  123:17
**cause**  12:16 20:14
  20:15 62:20 63:1
  63:8 103:5 131:25
  134:15
**caused**  54:19
  103:10
**causes**  136:11
**causing**  112:14
  135:18
**caveat**  57:21
**cc**  29:15,24 34:15
  112:13,21 113:10
  113:15 114:1,6,19
  118:11,13,22,24
  119:3,4,16,18
  120:25 124:24
**ccr**  143:7
**cellulose**  111:20
**center**  17:4 18:3
**certain**  20:7 35:12
  68:7 99:2
**certainly**  17:2
  26:9 69:15 77:11
  82:21 83:9 92:20
  133:12
**certainty**  78:1
**certificate**  4:8
  9:15 142:1
**certified**  1:13
  140:8,10 141:1,16

**certify**  142:4,11
**cetera**  75:5
**challenging**  11:25
  37:19
**chance**  71:24
**chanel**  2:8 8:14
  14:16 15:10,11
  28:25 29:8 60:20
  61:6 129:1 131:23
  132:13,21,25
**change**  51:24
  62:23
**changed**  40:7
**changes**  42:11
  64:6 141:17
**characterization**
  75:18 99:10,23,25
**characterizations**
  115:5
**characterize**  75:23
  107:8 109:2,10
**characterized**
  81:18
**characterizes**
  75:20
**check**  78:15
  107:22
**cheese**  126:14
**chemical**  99:17
**children**  27:2
**children's**  27:4
  137:15
**chinese**  94:21
**choke**  139:20
**choosing**  49:18
**chore**  68:22
**chrysotile**  94:6,24
  95:16,20,24,25
  96:1,3,5 97:6
**church**  128:6

**circuit**  133:5
**city**  55:16
**claim**  76:9,13
**claimed**  76:2
  95:15
**clarification**  77:3
  80:20
**clarifications**  42:9
**clarify**  80:7 81:11
  83:25
**clarity**  41:4
**clark**  3:7
**class**  126:12
**classified**  97:11
**clean**  50:23 69:7
  137:9
**cleaned**  24:21,23
  26:18
**cleaning**  138:3
**clear**  12:25 19:7
  28:7 46:8 49:15
  82:24 83:10 101:6
  138:7
**clearer**  42:14
**clearly**  123:3
**cleavage**  110:7,11
  116:6,18
**client**  123:6
**client's**  123:13
**climatologic**  16:15
**climatology**  17:17
**clinical**  36:23 38:7
  38:15 39:18,21
  40:9 105:14
  124:19
**clinician**  38:7
  39:21
**clock**  109:3
**close**  35:21
**clothes**  27:4 64:2
  64:16,21,25 65:1,5

Jaqueline Moline , M.D., MSc, FACP, FACOEM       February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

**[clothes - contribution]**

Page 6

| | | | |
|---|---|---|---|
| 69:9 127:6,24 | **commented** 86:8 | **conclusion** 15:21 | **contain** 63:1 |
| **clothing** 67:23 | 89:22 90:3,4 | 37:10,16 42:6 | 131:24 |
| **clued** 54:11 | **comments** 41:22 | 88:9,15,16,21,22 | **contained** 70:5,10 |
| **clutch** 25:1 | 42:2 77:15 93:24 | 88:24 99:20 | 91:20 |
| **cnetury** 3:4 | **commercial** 129:6 | **conclusions** 89:11 | **container** 15:6 |
| **coauthors** 36:6,12 | **commitment** | 96:23 97:24 99:22 | 77:13 102:2,4 |
| 37:2 | 142:24 | **concrete** 56:25 | **containers** 15:3,12 |
| **cobb** 142:3 | **common** 47:24 | **conditionally** | 27:13 29:3 102:1 |
| **code** 140:4 141:6 | **communicated** | 45:13 | 117:6 |
| 142:18 | 85:20 | **conference** 58:15 | **containing** 26:23 |
| **cohabitant** 51:21 | **communication** | **confident** 137:19 | 64:3,18 69:21 |
| **cohesive** 39:24 | 85:23 | **confirm** 29:12 | 111:12 |
| **cohort** 87:6,14 | **community** 50:2 | 131:19 | **contains** 136:9 |
| 88:6 | **company** 3:1 | **confirmed** 120:19 | **contaminant** 74:1 |
| **collaborative** | 65:18 69:16 91:17 | **confronted** 56:1 | **contaminate** 128:4 |
| 37:20 38:1 | 93:5 130:16 | **confused** 122:13 | **contaminated** |
| **colleague** 36:20 | **compare** 111:11 | 122:16 | 67:11 |
| **collect** 18:12 | 125:8 | **connect** 76:3,25 | **contaminating** |
| **collected** 18:10,15 | **comparison** 15:9 | **connecting** 76:19 | 66:14 |
| **college** 22:13,14 | 87:3 89:2 112:1 | **connection** 49:10 | **content** 22:8 |
| 23:4,6,12 49:13 | **compensation** | 50:1 | **context** 46:13,19 |
| 126:11 | 141:8 142:20 | **consent** 84:18,23 | 97:4,14 103:4 |
| **colloquies** 141:16 | **compiled** 53:1 | 85:12 | **continue** 102:17 |
| 142:6 | **complete** 8:19 | **conservative** | 104:19 120:23 |
| **colorado** 97:7 | 141:3,16 | 101:20,25 | **continued** 2:25 |
| **colors** 17:22 | **compliance** | **consider** 27:6 55:8 | **continuing** 104:18 |
| **columnar** 98:8 | 122:24 140:22 | 65:6 70:14 87:9 | **contract** 71:9 |
| **come** 28:10 36:12 | 141:6 142:18 | 108:16 | 141:7 142:19 |
| 38:23 51:15,25 | **complicated** 120:8 | **consideration** | **contracts** 141:1 |
| 64:15 71:2,6 | **components** 36:24 | 122:21 | **contrast** 99:3,5 |
| 93:17 103:25 | **composition** 99:17 | **considered** 14:16 | **contribute** 11:19 |
| 115:25 129:7 | **compound** 75:20 | 35:11 56:2 | 63:2,8 83:11 |
| **comes** 15:6 21:1 | **compressed** 26:19 | **considering** 33:22 | 120:21 123:19 |
| 94:15 | **compton** 9:13 | **consistent** 77:16 | 131:25 138:20 |
| **comfortable** 85:18 | 28:23 107:6 | 78:7,19 79:2 | **contributes** |
| **coming** 21:2 38:22 | 132:12 | 94:23 129:12 | 123:13 |
| 86:5 | **compton's** 60:24 | **constructive** 42:13 | **contributing** 65:6 |
| **comment** 31:13 | 80:13 132:25 | **consumer** 2:14 | 70:15 138:16,22 |
| 33:14,18 34:8 | **concluded** 88:5,8 | **contacted** 11:13 | **contribution** |
| 106:10 134:21 | 90:8,20 91:7 | 141:11 | 123:15 137:14 |

Jaqueline Moline , M.D., MSc, FACP, FACOEM       February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

**controls**  39:7,8
**conversation**
　10:11 64:12 86:11
　96:19
**conversations**
　86:3
**conversion**  30:6
**convert**  29:14
　30:14
**converted**  29:23
**cool**  22:25
**coordinated**  1:3
**coordinator**  36:17
**copies**  140:9,11
**copy**  9:6,11,15
　14:3 40:20
**corny**  132:7
**correct**  7:5 12:7
　12:17 13:9 14:17
　15:7,17 16:1
　19:13 21:2 24:6,9
　26:21 28:1,14,18
　29:1,4 32:16,19
　33:25 37:5 41:13
　41:14,16,18 43:21
　44:1,2,14,23,25
　46:19,25 47:4
　48:23 49:5,8,10
　50:12 51:4,17
　52:6,13,20 59:1
　60:11 61:1,6,24
　62:4 63:3,11,22
　65:15,20 67:21
　68:2 70:2 72:12
　72:18,19 80:24
　81:5 82:11 84:10
　84:14 92:9 99:24
　100:23 106:10
　111:14 112:1
　114:2 115:14,16
　118:13,24 119:8

119:23 124:13
128:15 129:19,22
130:13,14,18,22
132:1,2 141:15
142:9
**correspondence**
　91:11
**corroborate**  23:21
**corroborated**  23:9
　101:3 108:23
**cosmetic**  13:22
　35:20 50:20 63:17
　74:2 77:1 78:5,9
　78:19 84:5 90:9
　90:12,13,16,22
　91:5,8,16 96:21
　106:14 108:9
　109:5 110:8
　114:12,21 115:7
　129:7 134:7,13
　135:13,15,17
　136:17,18 139:4,9
**costs**  103:20 104:7
**couch**  68:14
**coughing**  131:17
**counsel**  2:1 5:5
　6:16 8:22 10:23
　16:19 71:12,17
　117:20 122:6,16
　128:25 130:1
　135:10 138:25
　140:20
**count**  26:24
**county**  1:2 142:3
**couple**  83:16 98:6
　130:10 131:6
　135:8
**course**  82:8
　103:19 104:4,12
　105:14 109:20
　110:5 112:5

**court**  1:1,13 5:5
　139:15,23 140:3
　140:24 141:16
　143:1
**cover**  5:15
**covering**  129:24
**coworker**  51:20
**crane**  3:9
**create**  18:6
**critical**  98:1,4,19
**criticism**  87:20
**criticisms**  86:23
　88:13
**crocidolite**  70:10
　72:3,14,23 73:3,12
　75:10,13 128:11
　128:22 129:16
　133:13
**crudge**  92:11,15
**cuddling**  68:14
**cummingtonite**
　73:15,21 74:4,13
　74:20 75:6,15
　129:6
**cumulative**  81:2
　120:22 138:16
**current**  10:18
　106:7
**curriculum**  4:16
**custody**  140:5
**cut**  102:8 135:25
**cv**  6:11 49:12

**d**

**d**  1:13 3:14 143:7
**daniels**  3:7
**data**  18:14 19:24
　20:3,4,19 21:13,19
　39:2,22 40:4 45:8
　48:15 52:25
　106:20 115:5

**date**  6:25 60:13
　77:9,12 100:20
　105:2,16 140:15
**dates**  26:6 92:18
**day**  77:21 101:19
　101:19,21,22
　110:3 126:20,25
　138:5,6,9 143:2
**days**  126:25 127:1
　127:2,2
**dba**  3:1
**dealing**  84:2
**death**  9:14 139:20
**decades**  19:9,12
**decides**  104:13
**declaration**  7:15
　9:13,16 80:22
　112:24 113:1
　117:8
**deemed**  57:3
**defendant**  2:8 3:7
**defendants**  1:8
　2:14 3:1,13 4:12
　80:18
**defense**  49:1 54:23
　55:1,3,6 60:7
**defer**  32:21 33:9
　75:16 89:8 94:17
　95:4 96:10,15
**definite**  67:4 76:12
**definitely**  7:9
**definition**  29:21
**degree**  36:14
　77:25 99:7 129:16
**delineated**  51:23
**delivered**  24:24
**dement**  107:3
**demonstrating**
　105:22
**demonstratives**
　92:7

Jaqueline Moline , M.D., MSc, FACP, FACOEM        February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

[depends - documents]                                                          Page 8

depends   66:10,12
  104:4,10,12
  109:11,21 111:17
  111:18 127:16
deposed   83:23
  132:9
deposition   1:10
  4:12 5:6 6:7 7:19
  10:9,21 13:13,16
  14:15 15:7 23:9
  23:10,15 24:8
  27:14 33:21 44:25
  52:1 62:7,8,9,9,10
  63:14 70:19 84:7
  85:14 129:1 132:4
  132:14,18 133:1
  135:3
depositions   4:14
  7:24 10:3 13:9
  14:11 15:3 51:21
  73:9 120:11
describe   64:14
  67:1 68:24 74:8
  108:22 110:15,16
  121:14
described   20:1
  31:5,10 32:6
  33:16,19 35:5
  39:11 43:13 44:6
  45:15 49:24 51:9
  74:4 81:21 87:8
  97:12 108:24
  109:24 110:4
  111:3 116:18
  125:17 126:9,13
  127:8 129:7
  138:12
describing   17:21
  45:16 68:10
  116:14 124:19
  127:18

description   13:15
  15:6 34:21 103:14
  128:5
descriptions   37:23
  109:9
designation   12:21
despite   36:13
detection   97:10
  98:13,22
determination
  99:17
determine   29:15
  83:13 99:12
determined   15:2
  141:8
determining
  114:20
develop   17:25
  81:23 83:9,14
developed   83:3
developing   82:22
  113:16 114:2
development   65:7
  70:16 82:16
developments
  57:15
diagnosed   82:9
diagnosis   61:23
  81:19 82:14
diaper   107:2
diapering   108:10
differ   60:24
difference   117:5
different   13:23
  17:22 43:18 48:20
  84:25 85:16 92:3
  92:20 108:21
  115:8 122:23
  128:19
differentiate   34:5
  35:4 99:1

differentiated
  79:12
differentiation
  34:10,25 35:1,6
  56:19
differently   109:17
differs   60:23
difficult   56:23
digestion   10:25
  46:24 47:6,7 48:1
  48:2,25 49:5
  71:20 80:1
digestions   47:9
  48:11,16
direct   141:7
  142:19
direction   17:22
  19:5 21:8,18,24
  66:8 142:8
directional   16:13
directly   62:6 69:2
disclaimer   49:3
disclosed   12:20
  134:25
disclosure   5:4
  134:25 140:24
disclosures   140:19
  140:21,22 141:10
discount   141:14
discounting   120:2
discounts   141:13
discuss   6:6 37:19
  58:3 86:13 89:18
  102:22 103:3
discussed   24:18
  27:12 36:21 89:16
  102:22 128:20
  134:17
discussing   6:14
  51:11 56:13 58:18

discussion   87:7
discussions   139:25
disease   11:18 12:6
  12:8,10,17,25
  70:16 81:23 103:5
  103:11 123:13
  132:1
dispense   5:22
disqualification
  140:24
disqualify   141:5
  142:16
distance   18:25
  71:15
divide   115:24
divulge   84:19,23
  85:7,13
divulging   84:8,21
doctor   9:4 59:24
  61:3 112:5 114:11
  117:14 122:1,17
  139:5
doctors   61:20
  62:13
document   16:8,8
  16:12,17,24 18:18
  18:21 19:8 20:7
  20:22 74:11,14
  93:10,11 98:17
  99:14 116:13,15
documented   56:15
  136:15
documents   4:13
  6:1 8:4,24 9:15
  11:16 12:4 16:6
  23:19 38:13 39:16
  70:20 75:5,9
  91:18,21 92:6,9,12
  92:21,25 93:4,5,13
  93:16,18,22,22
  96:20 97:22,25

Case 3:23-cv-02990-GC-DEA    Document 18-2    Filed 06/30/23    Page 48 of 71 PageID: 445
Jaqueline Moline , M.D., MSc, FACP, FACOEM          February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

[documents - exhibit]                                                      Page 9

99:21 106:22
107:4
**doing** 10:21 11:6
28:8,11,17 33:19
36:15,22 46:15
47:22 64:5 81:4
85:19 98:7,19,20
99:14,24 109:3,6
110:17,20 120:10
120:10 125:9
137:7
**doors** 45:10
**dose** 27:16,17,19
27:25 28:11,17
81:3 122:9 137:1
137:11 138:17
**doses** 91:15
**doubling** 122:10
**dr** 4:12 5:12 6:23
8:7,12,13,25 9:13
9:13 10:25 11:4
12:20 28:23,23
32:15 35:17 36:20
38:15 39:3,5,17
40:5 44:20,21
46:23 47:25 48:13
48:14,20 60:4,24
60:24 61:2,10,14
70:24 71:20,25
72:21 74:20 75:6
76:1,17 78:2,12,24
79:1,14,15,15,25
80:1,2,13 81:15,17
83:21 84:4 85:5
86:17 90:2 95:11
95:13,15 96:7
100:6 101:14
102:17,19 106:15
106:18,19 107:20
108:2,5 112:7,12
112:24 113:14,25

115:10 116:4
121:11,11 122:22
123:25 124:11,22
128:10 130:2,8
131:10 132:12,12
132:20,25 133:10
133:13 135:9
136:7,25 138:13
138:25 139:13,15
**draft** 40:11
**drafted** 58:25 59:3
**drafting** 39:4 53:5
55:8 58:22
**drawing** 122:17
**driven** 35:9
**due** 10:12 20:24
**duly** 5:8
**duties** 139:24

## e

**earlier** 24:1 65:22
85:5 131:11,20
**early** 7:16
**easily** 104:11
**east** 3:4
**eat** 126:15
**edge** 83:5
**editing** 37:23
38:21
**editor** 88:1,14
90:1
**effect** 64:8 82:21
127:19
**effluence** 66:13
**egg** 126:14
**either** 48:25 66:18
**electives** 36:15
**electron** 39:19
**electronically**
22:12 40:20
**elects** 104:10

**elements** 38:8
**eliminate** 29:11
**else's** 98:2 123:7
**email** 7:7
**embedded** 68:21
**employed** 32:20
32:23 33:11
**employee** 142:12
**employment** 70:21
71:8
**empty** 58:14
**encourage** 86:12
**ensued** 140:1
**entering** 69:8
**entitled** 88:23
**entries** 92:3
**entry** 15:11
**enumerate** 19:23
**enumerated** 8:15
8:25 93:8 98:17
**environment**
67:13 118:21
**environmental**
41:7 66:2,20,22
67:9,16
**epa** 31:12 34:22
**epa's** 34:4
**epi** 91:13
**epidemiologic**
135:12 136:2
**epidemiological**
135:20 136:8
**epidemiologist**
89:9 90:4
**epidemiology** 90:7
90:20 91:6 135:10
**err** 138:6
**especially** 120:14
**essentially** 21:18
96:23 97:23

**estimate** 27:17,20
28:12,18 103:25
137:17
**estimates** 27:16,25
120:6 137:6
**estimation** 35:11
**et** 1:8 75:5
**ethics** 141:7
142:18
**evaluated** 50:19
124:15
**evaluating** 50:5
**evening** 126:17
**event** 25:5
**events** 23:23
**eventually** 40:23
**evidence** 11:2
55:17 56:15 142:9
**evolution** 103:7
**exact** 6:25
**exactly** 80:11
105:25 123:1
137:12
**examination** 4:2,4
4:4,5,5,6,6,7 5:10
61:12 107:25
130:6 131:8 133:8
135:6
**examinations**
116:4
**examined** 5:8
116:22
**example** 85:14
98:24 101:17
**examples** 56:25
**exception** 134:20
**exclude** 57:4
**excluded** 53:19
**exclusively** 84:22
**exhibit** 4:10,12,14
4:16,17,18,19 6:2

Case 3:23-cv-02990-GC-DEA   Document 18-2   Filed 06/30/23   Page 49 of 71 PageID: 446
Jaqueline Moline , M.D., MSc, FACP, FACOEM          February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

[exhibit - financially]                                                      Page 10

6:2,2,2,3,8,11,12
6:13,15 7:22 14:8
18:17,19
**exhibits** 4:11,21
6:5 141:17,18,19
**existed** 16:21
**exists** 114:20
123:12
**expect** 20:18 94:20
95:1
**expedited** 140:14
140:15
**expenses** 104:1,21
**experience** 108:12
139:5
**expert** 4:12 44:3
47:2 48:3,19 49:1
49:1 54:23,23
55:1,3,6 58:9
75:17 79:18 80:5
80:7 130:15,19
**expertise** 96:25
**experts** 32:21,21
32:25 33:9,13
48:11
**explain** 44:11,17
**exposed** 63:5
64:20,23 65:4
68:23 70:13 72:22
78:9 118:10
135:21 136:3,10
137:13
**exposure** 13:4,10
13:19,22,24,25
25:10 26:24 27:2
27:2,5,8 29:17,23
30:22 31:18 32:2
35:10 50:4,10,18
50:20 53:11,19
54:3,12 55:12,13
55:18,23,24 56:5,6

56:10,15,16,21
59:7,9 62:6 63:6
63:15,16,18,19,24
64:1 65:2,13,17,24
66:3,17,22 67:4,6
67:9,16,20 68:5,7
68:7,8 69:3,12
73:2,11 77:18,20
78:7 79:11 81:12
81:13,19,22 82:13
82:20,23 83:1,10
90:9,22 101:12
106:13,19,23
114:10,11,18,20
115:8,19 119:17
119:25 120:22
121:9,10,12,15,23
122:10,21 124:17
125:23 128:4,20
134:1,9 136:11,18
137:2,3,4,11,15,18
138:15 139:3
**exposures** 11:18
24:2,3 25:10
27:13 50:21 51:2
51:15,24 54:1,16
54:17 55:15 56:14
57:3,16 58:19
79:3 83:2 115:4,6
121:19,20,24
123:7,19 124:12
137:22 138:14,17
**expressed** 36:18
**extends** 20:23
**extent** 11:2 23:12
38:2 45:18 60:22
78:10
**extrapolated**
27:14

**f**
**face** 96:23
**facilities** 69:18
**facoem** 1:11 4:3
5:7
**facp** 1:11 4:3 5:7
**fact** 10:13 12:8,24
23:19 26:23 64:2
67:17 68:17 86:4
88:17 117:10,18
119:24 120:2
125:24
**factor** 65:6 70:15
138:22
**facts** 88:24 117:19
128:18
**factually** 117:23
**fair** 5:21 9:9 15:5
15:12 21:20 28:12
34:16 48:3,21
58:7,8 62:3 63:2
66:11,16 67:25
72:24 75:4,19
76:3,5,21 77:9,24
78:11 79:14 81:20
89:4,7 92:23
94:12 96:11,25
103:14 105:24
106:8 107:8 108:7
121:13 123:8
127:10 135:3
**fairly** 89:14
**fall** 7:1 92:11
**familiar** 5:23 35:9
69:15,17 124:1,3,4
**family** 13:14 16:23
51:20 62:12 67:24
68:13,18 69:5,10
108:23
**far** 116:10

**fashion** 18:8 45:9
**fast** 83:7
**fastidious** 108:18
**father's** 127:24
**fda** 31:12 92:16
93:21,23 94:25
96:5
**fda's** 94:5
**february** 1:14 5:1
**fee** 43:10
**feedback** 64:9
**feel** 85:18 137:19
**felt** 11:17 12:24
115:3
**fewest** 15:11
**fiber** 29:15,23
36:22 39:11 71:20
77:7 78:5 79:12
79:25 112:20
113:9,14,25 114:6
118:13,24 119:3,4
119:18 120:25
**fibers** 30:12 31:7
32:10 34:15 67:23
68:21 72:3,14
75:23 110:15,19
111:1 112:13
114:19 118:11,22
119:16 124:24
129:4
**field** 96:11 98:2
**fields** 32:22,25
**fifth** 2:17
**figueroa** 3:10
**figures** 104:12
**figuring** 38:23
**filed** 51:17
**final** 10:25
**financial** 140:25
**financially** 142:13

Jaqueline Moline , M.D., MSc, FACP, FACOEM       February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

**find**  72:8,14 95:16
  95:24 97:8,11
  98:14,22 99:4
  109:14
**finding**  74:19,23
  75:18 76:12 92:17
  94:14,23,23 98:16
  99:21
**findings**  72:22
  73:13 74:13 75:16
  76:18 78:5 93:1
  94:6,12,19 95:11
  97:3 124:19
**fine**  35:23 36:4
  78:23
**finished**  75:11,13
  116:16
**finkelstein's**  90:3
**firm**  13:3 140:19
  141:10
**first**  5:8 6:6,23 7:4
  7:11 12:4 26:3
  44:16 79:21 81:12
  81:22 95:15 100:6
  135:9
**fit**  38:15 39:17
  40:9 56:24
**fitzgerald**  107:6
**five**  55:16,19
  108:24 109:18,22
  114:23 115:17
  116:5,20,22,25
  117:1,13,17,21,22
  117:24,25 126:1
  126:25 127:1
**floor**  3:16
**floors**  68:20,24,25
**flow**  39:14
**flows**  17:5
**fly**  120:11

**focus**  48:22
**fodder**  89:3
**folks**  50:24 51:23
  54:6,9 77:17 78:8
  108:17 124:15,20
**follow**  22:16 61:8
  114:15 131:6
  135:8
**following**  45:4
  88:2 135:13
  140:19,22
**follows**  5:9
**footnote**  113:8
**fordyce**  86:15
  87:12 89:17
**fordyce's**  88:15
**foregoing**  142:4
**forget**  91:20
**form**  8:1 18:22
  40:6 69:19 138:18
**format**  40:14
**formation**  60:25
**formatting**  37:7
  37:15
**former**  36:17
**forms**  140:24
**forth**  87:1,15,25
**forward**  43:2
  47:24 48:15 50:5
**found**  48:19 72:2,7
  72:8,18 73:15,18
  73:21 74:3,9,18
  75:10 76:2 77:15
  77:17 78:2,18
  79:5,9 87:6,13
  88:18,19,20 94:25
  97:5,9,15 109:1
  110:7,8,16,16
  116:6,25 117:5
  128:10,12,15
  129:10 131:3

133:13
**foundation**  15:18
  29:19 30:23 34:1
  43:9 52:8 53:15
  69:23 115:22
  116:8 118:15
  119:10,21 121:3
  125:1 127:14
  134:4
**four**  83:17 116:25
  117:21,24
**fourfold**  112:21
  114:7
**fowler**  67:1 69:3
  125:10,17 126:6
  127:8
**fragment**  110:11
**fragments**  110:7,7
  116:6,18
**frame**  19:15,17
  101:16
**free**  26:3
**french**  112:7
**frequent**  21:24
**friable**  111:23
**friction**  14:1 63:20
  63:25 64:3,18
**front**  16:5 74:25
  100:9 112:17
  139:22
**full**  110:1 118:11
  118:22 119:24
  137:8
**fully**  83:10
**further**  142:11
**future**  89:3 103:12
  103:24 104:1
  134:21

**g**

**gabrielle**  3:2 130:9
**game**  135:3
**gander**  86:13
**garnered**  18:8
**gas**  14:1 24:4
  26:11
**gaskets**  25:1
**gathered**  39:9
**gathompson**  3:6
**general**  8:10 34:6
  42:21 55:1 80:13
  80:17 82:2,5
  103:22 104:23
  105:16 134:19
  140:11
**generally**  93:12
  102:25
**genetic**  42:8
**geographic**  33:24
**geologist**  75:22
**geologists**  74:7
**georgia**  140:22
  141:2 142:2
**getting**  69:9
  104:17 106:1
**give**  26:6 31:14
  32:11 34:5 45:2
  47:12 102:8 103:1
  103:15 112:25
  115:18 120:6
**given**  7:18 31:23
  35:14 44:14 71:11
  88:16 115:2 142:9
**gives**  30:7
**giving**  132:3
**gleaned**  127:20
**go**  6:4,11,14 14:7
  18:16 36:1,4 43:2
  45:10 48:8 49:4
  53:10 55:5 57:13

Jaqueline Moline , M.D., MSc, FACP, FACOEM         February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

57:21 58:2,13
61:9 66:11 71:5
79:20 87:22 89:5
89:13 98:7 101:11
103:2 107:21
108:2 117:13
120:9 126:12
127:10 128:6
131:4 139:11
**goes**  20:24 86:12
86:13 123:5
**going**  5:14,18,20
6:6,13 8:2 15:8
23:18 29:21 35:17
35:21,22,24 47:13
48:15 50:5 54:13
58:3,4,6 59:12,21
61:8 67:16 74:10
78:23 80:6 92:24
94:11 95:23 96:15
99:1 100:5 102:11
104:14,18 106:7
107:20 108:4
115:8 116:3
117:17 127:18
138:19
**good**  5:12 59:23
102:10 130:8
**google**  71:18
**goose**  86:13
**gordon**  36:10,20
38:15 39:3,5,17
40:5 46:23 47:25
48:20 73:18 76:1
78:2 83:21 84:4
106:18 128:10
133:13
**gordon's**  8:13
48:13,14 71:20,25
72:21 76:17 79:14
79:25 106:15

**grab**  113:4
**gram**  29:22
**grams**  110:17
**granted**  45:13
**great**  59:25 134:23
**greater**  17:14
114:6
**greenstone**  2:4
**grilled**  126:14
**grocery**  3:1
130:16
**group**  87:3 92:25
**grouping**  93:3
**groups**  89:2
**guess**  14:22 22:23
52:15 56:23 71:2
76:3 81:14 91:4
94:13 97:17 103:6
103:11 106:16
108:2

## h

**hagan**  51:18
**hah**  49:22 50:4
**half**  10:10 40:21
66:7 138:7
**hamon**  1:13 143:7
**hand**  56:12,19
61:17
**handful**  82:3
**hands**  109:13
**handwriting**
24:11
**handwritten**  4:18
14:10
**happening**  54:4
**happens**  18:24
**happy**  97:19
120:23
**hard**  40:20 83:7
104:4

**hardwood**  68:20
68:24
**hawkins**  3:15
**head**  92:18
**hear**  113:21
129:21 131:16
**heard**  46:3 94:9
**hearing**  64:10
**heavy**  95:22
**help**  18:21 110:2
**helped**  26:15
37:11
**helpful**  23:22
**helping**  37:7 38:11
**hereto**  5:6
**hey**  61:14 86:9
**hi**  61:15,16
**high**  21:15 25:22
109:19
**highlighting**  14:10
**hipaa**  84:16 86:1
**hired**  43:24
**historic**  70:21
**historical**  49:8,21
73:19 74:4,6,16
97:5,9,14 103:4
**historically**  55:20
**histories**  47:13
**history**  62:6 73:8
**hit**  83:4
**hold**  7:2 16:12
**holds**  103:12
**homage**  49:8
**home**  16:23 19:1,5
20:9 22:22 23:11
25:5 67:12,18,23
67:25 71:15
126:16 137:13
**honest**  92:14
**honestly**  7:9 46:4
47:10 85:1

**honors**  23:3
**hope**  97:18
**hoped**  50:2
**hopefully**  107:23
**hospitals**  104:24
**hour**  10:1,1,10,19
35:21 102:11
125:14
**hours**  9:18,22 10:8
23:1 115:25
117:15 118:3,4,11
118:17,22 119:4,6
119:10,15,17,25
120:24
**house**  68:10,19
125:25 126:8,19
127:4,25 128:2,5
**hpylaw.com**  3:18
**huge**  20:17
**hugged**  68:12
**humor**  132:8
**hundreds**  92:3
110:18 139:7,7
**hygiene**  139:9
**hypothesis**  83:4
**hypothesize**  56:21
**hypothetical**
55:14 56:10,14
57:2 59:4,14
64:22 65:8 116:11
116:15 117:10,19
119:11,21 121:3
**hypothetically**
51:11 58:17 63:4
68:23

## i

**idea**  53:7 85:11
**identifiable**  50:24
**identified**  6:1 8:4
13:7 18:18 45:9

Case 3:23-cv-02990-GC-DEA   Document 18-2   Filed 06/30/23   Page 52 of 71 PageID: 449

Jaqueline Moline , M.D., MSc, FACP, FACOEM       February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

[identifies - johnson]                                                      Page 13

**identifies**  8:24
**identify**  11:17
  12:4 13:3,20
  44:22 50:24
**identifying**  44:5,9
  46:10
**identities**  45:2
  84:19,21 85:14
**identity**  84:8,23
**illinois**  16:15
  17:15 22:24 35:8
  124:2,6
**impacts**  142:24
**impartial**  142:25
**impartiality**  141:6
  142:17
**imply**  41:10
**important**  49:14
  49:16 83:2
**inartfully**  52:15
**include**  40:11
  45:25 50:9,14,17
  58:21 137:10
**included**  10:8,14
  15:14 19:24 20:4
  20:9 24:12 39:6
  43:5 45:7,17
  46:17 47:20 49:3
  51:13 52:16 54:22
  57:1,9 58:25 59:5
  59:10,19 85:2
  86:9 92:9
**including**  8:11
  28:22 69:21 85:25
**incomplete**  59:14
  64:22 65:8 116:11
  116:15 119:11,21
  121:3
**incomprehensible**
  118:6 119:11

**incorporated**  13:5
**increase**  112:22
  114:8 121:20
**increased**  88:6
  90:8,21 91:8
  135:14
**increases**  82:7
**increments**  10:7
**incurred**  104:15
  104:17
**indented**  24:13
**index**  4:1,2,10,23
**indicate**  125:21
**indicated**  112:12
  123:25 124:11,22
  129:14
**indicative**  31:17
  31:21
**individual**  31:7
  33:24 44:13 46:10
  51:12,13,17 54:3
  55:18 56:6 77:7
  122:10,20
**individually**  122:2
  122:4
**individuals**  36:11
  43:19,20,23 44:6
  44:22 45:3,7,14,16
  46:12 50:20 74:5
  86:10 135:21
  136:2,16
**infiltrated**  127:25
  128:2
**inform**  23:7,13
**information**  15:1
  18:9,14 30:7,25
  38:14 39:7,8,17
  40:5 44:13 50:12
  52:3,11,12,16,17
  53:24,25 55:7,23
  56:4,8,11,12 58:16

58:21,23 62:22
  68:5 117:3
**informed**  22:16
**initial**  38:13 40:4
  40:10 42:4 105:8
**initially**  40:22
  42:4 47:22
**inpatient**  104:6
**input**  18:5
**instance**  19:19
  20:21 50:13 51:10
**instances**  51:22
  136:14
**institutional**  45:5
**insulation**  69:22
  70:1,5,9 125:19
**intend**  11:21 89:18
  102:22 103:1,15
**intention**  81:4
**interact**  126:24
**interacted**  69:10
**interaction**  126:3
  126:10,20
**interactions**  15:23
  68:15 73:5 125:22
  126:23
**interest**  36:18 94:2
  140:25 141:4
  142:15
**interested**  93:21
  98:12 142:13
**interesting**  125:15
**interior**  124:8,22
**internal**  91:17
  93:5 107:3
**interrupt**  87:24
**interview**  51:22
**intro**  37:16
**introduction**  37:9
  42:6

**investigation**  53:5
**invoices**  10:15
**involved**  36:16
  46:12 61:22 108:5
**involvement**  112:6
**irb**  45:5,12,20
  46:2 84:17,20,25
  86:1
**ish**  7:2 105:5
**isolating**  120:20
**isolation**  87:20
  121:18
**issued**  10:15
**issues**  87:2
**iwatsubo**  112:7,12
  112:24 121:11

**j**

**j&j**  4:12 75:11,13
  95:16 100:12
  131:12,21
**jacqueline**  1:10
  4:3,13 5:7
**january**  31:13
  77:13,14
**jccp**  1:3
**jean**  8:11 9:14
  108:4 115:12
  116:4 138:15
**jennifer**  1:13
  143:7
**jersey**  69:25
  124:13,16 125:3
**job**  118:11
**johnson**  2:14,14
  2:14,14 75:7,7
  91:17,17,22,23
  92:17,17 93:2
  94:15,15 107:3,3
  107:12,12 135:11
  135:11 138:25
  139:1

Jaqueline Moline , M.D., MSc, FACP, FACOEM       February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

**johnson's** 62:25
63:5 73:20 74:17
78:3 79:16 80:3
93:2 94:7 95:7,16
96:22 100:8,14,21
100:25 101:18
107:16 134:8,14
**joint** 36:22 123:12
**jointly** 123:14
**journal** 39:21
40:23,25 41:3,6,11
41:12 46:7
**journal's** 38:18
**jromano** 2:19
**julia** 2:15 61:14
79:20 80:6 81:11
101:7 114:23
131:2,11,20
139:18
**july** 67:1
**jump** 61:8
**june** 82:9
**jurisdiction** 122:7
123:2

**k**

**kagan** 2:3 4:7 6:16
6:21 8:2,22 10:12
10:13,23 11:22
12:18 13:3,11
15:18,25 17:19
19:16 20:11,25
21:21 27:19 28:13
29:2,18 30:3,23
32:3,24 33:12
34:1,18 43:9
44:15 46:21 48:4
52:7,21 53:15
57:6,18 59:12
63:9 64:22 65:8
66:19 68:1 69:23
72:5,16 74:21

75:20 76:6,22
77:10 79:20 80:6
80:19 81:11 90:11
96:12 97:1 98:3
99:16 100:16
101:7 110:10
111:15 112:15
113:17,21 114:3
114:13,22 115:22
116:7,11,24 117:4
117:16,23 118:5
118:14 119:9,20
121:2 122:3,6,19
123:9,18 124:25
127:13 128:1,24
129:18,23 131:1
131:15 134:4,24
135:7 136:1,6
138:24 139:13,18
140:2,18
**keep** 50:23 81:7
86:2
**kept** 68:17
**key** 43:5,17
**kids** 101:3
**kilroy** 2:5
**kind** 5:21 20:23
22:25 23:16 27:13
29:11 36:25 49:7
80:13 90:4 104:19
131:13
**king** 2:16
**knew** 25:18,19
**knocking** 45:10
**know** 5:19 7:11,14
7:21 8:17 9:5,25
16:6,21 17:1,7,13
18:5,12 23:3,23
27:11 30:10 32:5
32:7 34:7,8 40:15
40:17,18,19 41:20

43:3,16 45:23
46:1 48:6 49:12
49:13 51:1,8,11
52:22 53:8,17,19
53:22 54:4 55:21
57:22 60:6,13,15
64:9 65:21 66:25
70:23 71:10 72:21
73:14 74:10,22
77:6 80:13 82:17
83:6,22 84:17
85:5 86:17,24
88:9,11,16 91:24
94:11 96:4 98:25
104:3,9,16 105:25
106:1,17 108:15
108:19 109:10
112:18,23 116:25
117:4,4 122:6,7
123:10 124:4,18
128:3 129:9,24
137:5,12
**knowing** 48:5
83:18 127:16
128:8 129:3,8
**knowledge** 71:10
103:7
**known** 54:3
120:12
**kristin** 36:9,16
37:3,18
**kristin's** 37:6
**kslaw.com** 2:19

**l**

**la** 2:11
**laboratory** 39:9
98:20
**lacourt** 113:12,14
113:25 114:4
121:11,16

**lamb** 87:9
**language** 37:24
**laosd** 1:4
**large** 31:9 89:14
91:20 92:5
**largest** 21:19
**latency** 81:7,9,17
81:18,25 82:3,4,6
**laundered** 65:1
**laundering** 27:4
64:1,16,20 65:5
**laundry** 68:16,17
68:18
**law** 36:13 122:24
123:22 140:23
**lawsuits** 84:12
**lawyers** 10:4 71:3
85:21,24 86:4
93:16
**lead** 30:12
**leading** 32:9
**leah** 2:3 6:20
133:6 135:25
140:18
**learning** 103:4
**leave** 74:7 116:21
120:3
**led** 53:25
**left** 25:4
**legal** 141:2,11
**legally** 123:11
**length** 83:23
**lesser** 129:16
**letter** 7:6,10
**letters** 88:1,14
89:25
**level** 63:7,10 114:7
114:10,18
**levels** 21:23 33:23
34:4 110:21

Jaqueline Moline , M.D., MSc, FACP, FACOEM          February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

**lexington**  3:16
**liability**  123:12
**licensed**  122:8
**life**  72:23 104:11
**lifetime**  115:19
  119:17 121:9
  137:2,4
**light**  95:25 140:15
**limited**  31:23
**limits**  97:10 98:13
  98:21
**linda**  1:5 4:17
  22:13 127:9
**line**  11:20 42:7
**lines**  35:25 36:3
  100:1
**liquid**  95:22
**list**  4:17 6:10,12
  6:19 8:4,9,16,17
  8:23 9:6 12:22
  22:12 60:8,12,17
  80:8 86:16,21
  92:13,20 93:12,15
  132:11 135:2
  136:21,24
**listed**  7:23 22:17
  74:15 86:16 93:14
  93:18 106:24
**listing**  44:12
**literature**  30:11
  31:11 78:8 82:5
  82:25 87:1 91:2
  91:12 136:15
**litigation**  43:7,20
  43:25 46:12,19
  47:3 51:16 52:19
  53:2,14 85:7
  108:6 109:20
  110:6 112:6
**little**  5:15 27:10
  31:8 36:4 56:23

84:15 87:18 95:10
  120:7
**live**  55:18 120:4
**lived**  55:15 66:6
  67:2,17 125:25
**living**  33:25 66:3
  69:5
**lkagan**  2:6
**llp**  3:3,15
**local**  22:3
**location**  16:22
**locations**  71:14
**logical**  38:22
**long**  2:5 8:18
  31:14 107:1,4
  108:13 109:4
  111:2
**longer**  109:15
**longo**  9:13 28:23
  94:23 95:15 116:4
  132:12
**longo's**  8:12 60:24
  79:15 80:2,12,22
  95:11,13 96:7
  102:19 106:19
  132:20
**look**  14:7 15:10
  18:1 21:10 31:5
  31:24 48:9 53:10
  59:21 77:14 89:5
  96:2 98:1,4,6,14
  99:7 100:4 120:17
**looked**  7:19 17:2
  29:10 60:4,12
  91:13,15 96:4
  116:5 122:2,3,5
  125:11
**looking**  8:13,14
  15:9 17:24 20:21
  28:19 71:5 72:12
  92:2 95:23 96:1

97:4,12,14 99:11
  99:25 111:25
**looks**  14:14,14,19
  15:11 17:14 71:19
**los**  1:2 2:18 3:5,11
**losing**  119:25
**lost**  118:16 140:10
**lot**  22:21 23:11
  64:9 86:25 87:19
  93:19 126:20
**low**  91:15
**lower**  112:20
  113:13 114:7
  121:16
**lowest**  113:7
**lymph**  128:17
  129:11

## m

**m**  2:10
**machinists**  125:13
  125:18
**macy's**  3:13
**madigan**  6:19
**madigan's**  90:2
**magnitude**  35:15
  110:22
**main**  25:21,24
  69:5 137:20
**maintain**  140:3
**maintaining**  46:11
  141:6 142:17
**major**  49:13
**making**  35:1 38:17
  39:13,16,23 40:2
  42:14 50:1 69:21
  76:11 125:12
  141:5
**malignant**  12:13
**man**  108:16
**managed**  128:4

**manufacturer**
  76:25 78:4
**manufacturers**
  13:23 26:6
**manuscript**  54:25
  55:9 57:5 58:22
  58:24 59:1,3,11,19
**map**  18:1,1 71:18
**mapped**  17:5
**maps**  71:14
**march**  143:2
**margin**  24:10,15
**mark**  6:5,7,9,10
  6:11,12,14 18:16
**marked**  7:22 14:8
**market**  26:4
**martin**  67:18
  125:9 137:14
**martin's**  9:14 71:8
  128:4
**match**  89:11
**matched**  48:16
**material**  32:18
  33:10 74:7 75:22
**materially**  51:24
**materials**  7:12,23
  8:8,14 10:25 11:3
  12:21 13:21 14:2
  16:4,7 22:2,18
  28:10,20 64:19
  70:18,23 71:1,2
  135:2
**math**  115:20
  119:22 120:10
  121:5
**matt**  74:15
**mattenklott**  31:11
  32:8 106:21
**matter**  6:24 10:22
  11:14 132:4
  134:19 141:5,12

Jaqueline Moline , M.D., MSc, FACP, FACOEM          February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

**[matter - mount]**                                                                 Page 16

142:16
**maya**   36:9,13
  38:10 39:15
**maya's**   38:12
**md**   1:10 4:3 5:7
**mean**   8:16 11:23
  20:13,17 21:2,13
  22:10 29:2 32:6
  33:2 38:5 39:18
  41:10 42:18 43:16
  51:6 53:8 66:5,12
  66:14,20 69:24
  73:4 79:2 80:10
  80:12,12 84:23
  85:4,8 89:20
  94:19 95:18 97:2
  98:5 99:5 101:2
  104:14 105:3
  106:25 107:5
  108:21 110:14
  112:2 119:22
  120:15 123:10,11
  124:4
**meaning**   94:21
  111:3 127:1
**means**   25:2,3
**meant**   111:23
**measurement**
  30:14
**measurements**
  40:2 110:21 137:6
**measuring**   31:1
  95:20 137:7
**mechanic**   24:4,25
**mechanics**   26:16
**media**   94:2
**medical**   7:24 10:1
  11:9 25:3 31:10
  36:14 50:2 56:3
  73:10 78:1 91:12
  103:19,20,24

104:1,21 105:14
105:16 106:3
133:17,19,24
134:7,13,16,21,22
139:2,5,6
**medicare**   105:9,10
**medication**   104:6
**medicine**   41:7
  49:22
**meditative**   109:14
**meghan**   1:12 2:9
  5:13 131:4 139:22
**member**   51:20
**members**   13:14
  108:23
**memory**   36:8
  74:10 75:1 79:7
  139:21
**mention**   8:15
**mentioned**   24:1
  32:7 39:15
**meso**   79:6,7
**mesothelioma**
  12:13 35:19 49:11
  49:23 62:21 63:2
  63:8 65:7 79:8
  81:9,25 82:9,16
  84:5,13 87:6,10,12
  87:13 88:6,18
  90:9,21 91:8,14
  103:10 112:8,14
  112:22 113:16
  114:2 134:15
  135:18 136:12,16
**met**   5:13 62:2
**metal**   125:11,18
**method**   95:21
  98:23
**methodical**   120:18
**methodically**
  120:17

**methodology**
  32:20,22 33:2,3,8
  33:11,15 94:16
  95:3,19 96:8,15,16
  97:13,16 98:1,11
**methods**   39:9 97:7
**mg**   2:10
**mgmlaw.com**   2:12
**microscope**   99:3,5
  99:11
**microscopist**
  32:15,17 39:19
**microscopy**   33:10
**mid**   7:15 26:9
**mile**   66:7
**miles**   55:16,19
**millers**   91:9
**millions**   30:12
  32:9 110:18,25
**mine**   36:20 131:6
**mineral**   75:18
  99:9,12,23,24
**mineralogist**
  75:17
**miners**   91:9
**mines**   97:7
**minimal**   126:10
**minimum**   82:3,19
**minnesota**   97:6
**minor**   42:10
**minute**   10:7
  108:25 109:18
**minutes**   108:24
  114:23 115:17,19
  115:25 126:3
**mischaracterizes**
  12:18 13:11 15:25
  20:11,25 21:21
  28:13 29:18 30:3
  51:18 52:7,21
  59:15 72:5,16

74:21 76:6,22
98:3 100:16
110:12 111:16
112:15 114:3
116:7,12,24
118:14 119:9,20
121:2 122:3 123:9
124:25 127:13
128:24
**misinformation**
  66:24
**misrepresent**   40:8
**missed**   79:21
**moline**   1:10 4:3,13
  5:7,12 6:23 8:7,25
  11:4 32:15 35:17
  44:20,21 60:4
  61:10,14 70:24
  81:15,17 86:17
  100:6 101:14
  102:17 107:20
  108:2,5 115:10
  122:22 123:25
  130:2,8 131:10
  133:10 135:9
  136:7,25 138:13
  138:25 139:13,15
**moline's**   12:20
**moment**   24:1
  39:15 49:22 55:11
  93:7 102:9
**moments**   5:14
  50:5
**month**   25:1 102:1
  102:3
**months**   25:2 102:4
**morning**   5:12
**motion**   140:9,11
  140:14
**mount**   36:21

Jaqueline Moline , M.D., MSc, FACP, FACOEM        February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

**[move - once]**                                                      Page 17

**move**  26:8 68:6
**msc**  1:11 4:3 5:7
**msenter**  2:12
**multi**  83:4
**multiple**  13:8,8
22:3,6 47:13
**mute**  64:7

**n**

**naked**  109:5
**name**  41:2 44:24
46:1,6 67:12
69:17,19,20 73:16
77:8 85:2,8 132:6
**named**  41:13
**names**  44:24 45:17
51:12 58:13 86:14
**nasty**  45:10
**nate**  8:11 9:14
108:5 115:12
116:4 138:15
**near**  66:3
**necessarily**  20:8
85:15 88:19
111:18 120:5
**necessary**  103:21
140:14
**need**  28:10 29:13
29:22 30:6,8,13,24
41:2 68:6 102:8
136:7
**needs**  35:13
**negative**  95:8
**negotiated**  105:7
**neither**  25:17
**never**  45:23,24
46:1,2 56:14 85:1
86:11
**new**  2:11 3:17
69:25 93:4,5
124:13,16 125:3
132:17,22,24

**news**  93:20,23
**newspaper**  22:4
22:18 23:7,16
**nod**  49:8
**nodes**  128:17
129:11
**nonasbestos**  25:16
26:8
**noncommercial**
73:16
**noncontributory**
82:23
**nondetect**  97:12
98:15,16
**nonlitigation**  17:3
**nonoccupational**
113:15 114:1
**normal**  35:7
**north**  21:16,25
**northwest**  21:12
21:12
**notation**  133:24
**notations**  139:3
**note**  6:17 10:23
15:14 24:10 28:21
42:20 47:5,15
**noted**  14:15 22:2
26:18 67:6
**notes**  4:18 6:15
7:18,21,23 9:11,23
12:21 13:5,7,12
14:3,10 23:25
24:16,18 53:1
54:14 59:21 60:4
62:1 100:4,5,7,17
101:8 102:7
107:22 115:11
120:18 125:21
137:21
**noteworthy**  55:8

**notice**  4:12 6:7,18
**noticed**  132:11
**noticing**  141:11
**noting**  133:24
**notorious**  69:19
69:20
**now's**  102:10
**number**  6:5 8:8
13:23 15:11 27:12
27:23 28:21 32:5
34:6,14 35:2,3,14
49:7,9 51:13,17
70:19 91:20,21
92:19,21 100:13
101:13 110:17
112:3 114:25
115:2,11 121:24
125:3,6 137:16,19
137:22 138:17
**numbers**  25:22
28:18 40:1 88:10
88:11 89:11,13
101:5 108:22
111:25 112:18
119:12 120:19
121:4,17
**numeric**  137:1
**numerical**  83:7
**ny**  3:17

**o**

**object**  8:2 59:12
**objection**  17:19
110:10 138:18
**objections**  6:17
122:17
**obligation**  140:3
141:6 142:17
**obtain**  71:6 84:22
93:17
**obtained**  71:11
84:18

**obtaining**  71:7
**obviously**  37:21
39:13,25 42:12
50:19 82:7 103:2
103:9,17 133:17
134:24
**occasion**  26:16
127:10 128:7
**occupational**  41:6
118:25 119:5
**occurred**  23:23
81:22
**occurring**  53:17
**ocga**  5:3 140:24,25
141:13
**october**  7:15,16,17
16:16 93:1 94:5
105:19,20 106:11
133:19,22 134:22
**odd**  87:18
**odds**  113:9 114:5
**offer**  11:2,21 12:7
136:10
**offering**  73:25
**office**  16:15
**officer**  142:25
**oh**  16:9 22:20
60:12 67:3 100:19
**okay**  5:17 6:20
8:17 9:17 15:1
35:20 36:4,6 75:4
88:4 89:24 100:3
100:19,20 103:23
107:10,15,18
116:1 118:9
130:23 136:4
**older**  26:11
**once**  82:21 101:19
101:19,21,22
126:25 138:5,6,8

**ones** 22:13 47:1 83:5 106:24
**ongoing** 13:2
**online** 78:21 94:1
**onset** 81:19
**opine** 89:18 94:20 98:10 102:22
**opining** 74:6
**opinion** 12:9,16 22:17 23:13 43:25 56:9 62:19,23 64:17 65:23 66:1 73:1,25 81:8,24 88:23 91:22 96:20 128:21 135:18 136:11
**opinions** 8:1 11:21 12:20 18:22 23:7 53:13 61:1 78:25 86:22 94:5 130:12 130:15,19 132:15 132:17,22,24
**opposed** 77:1 80:16 105:4 117:24
**opposite** 19:5
**order** 7:25 29:15 35:10,15 68:6 136:10
**ordering** 141:20
**orders** 110:21
**orientation** 21:8
**original** 4:21,21 40:6,14 140:4,5,10 140:18
**orleans** 2:11
**outcome** 142:13
**outpatient** 104:6
**outset** 6:4
**outside** 7:22 46:13

**overbroad** 11:22 57:6,18 77:10 139:11
**overwhelmingly** 86:24

## p

**p.m.** 1:15 102:14 102:15 140:17
**page** 2:25 4:8 9:3 9:8 14:13,14,19 24:7 27:16,22 30:18 92:21 100:6 101:8,11,12 115:10 120:17 125:20 137:21
**pages** 8:18,21 13:8 35:24 36:3
**paid** 105:5
**panatier** 2:4
**panel** 41:18
**pantagraph** 22:7 22:18
**paper** 35:18 36:7 36:16,19,22,24 37:3,14 38:11,16 39:12,24 40:12 43:6,13,18 44:5,7 44:23 45:3,4,8,17 46:5,9,13,18 47:11 47:23 48:13,14 49:2,20 50:14,15 50:22 51:14 53:5 53:6,9 54:6,20 55:4 56:11 57:1,9 84:9 85:1,6,22 86:5,6,8,23 88:25 89:18 106:2,16,18 106:20 112:16,18 113:6
**paper's** 88:2

**papers** 14:9 45:25 46:5 91:11 112:19
**paperwork** 84:24
**paragraph** 76:10
**parameters** 18:5
**parentheses** 100:12
**park** 3:4
**parnell** 3:15
**parse** 9:24 38:3 123:21
**part** 10:12 25:13 40:11 44:16 51:25 79:21 85:15,25 87:13 98:18,18 110:2
**particle** 77:7,20 99:11
**particles** 76:1,4,20 78:1
**particular** 18:15 19:3,20,21,23 20:18 32:5 49:17 53:2 56:22 57:8 77:7,17,19,20,21 112:18 121:9,22 123:6 129:4
**particularly** 37:10 87:8
**parties** 141:14,20 142:25
**partners** 38:5
**parts** 12:19 111:13
**party** 141:7,14 142:12,19
**pass** 107:21,23
**passed** 85:17
**password** 141:19 141:20
**pathology** 78:12 80:1

**patient** 44:9,9
**patients** 50:6 139:7,8
**pattern** 20:3,8
**patterns** 16:14 17:3,5,9 19:1 21:23 65:22
**pausing** 64:8
**paying** 98:9
**payless** 3:1 130:20
**pc** 2:4
**peaks** 21:11 99:25
**peculiar** 76:25
**peer** 41:18,19,21 41:23 90:7,20 91:6 136:15
**pejorative** 76:9
**people** 45:9 50:2 51:9 67:2 83:15 85:3,17 86:8 87:7 89:3 108:22 109:3 109:24 136:10
**peoria** 17:15,15
**percent** 30:19,25 43:2 110:24 111:4 111:12,20 116:22 117:14 118:3 119:23
**percentage** 29:21 30:11 31:6,8,9,16 32:8 70:12 111:10
**period** 23:20 25:14 26:13 81:9 81:25 83:8 108:13 119:16
**person** 22:23 47:17 50:17 59:10 67:24 87:9 108:11 114:12,21 118:10 118:12,21,23 119:6,15 121:8

Jaqueline Moline , M.D., MSc, FACP, FACOEM          February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

**personally** 44:8
62:2 89:9
**pete** 108:3
**peter** 3:14
**ph.d.** 61:4
**pharmacy** 3:1
**phase** 99:3,4
**phone** 7:7,8 10:4
22:23 120:14,15
**photographs**
124:7,8
**physicians** 139:8
**picked** 49:9
**piece** 128:16
**pinpoint** 77:19
**pinpointing** 73:6
**place** 2:10 23:1
120:4 141:12
**placed** 26:3
**places** 138:3
**plaintiff** 1:6 2:2
49:1 93:16 125:22
127:9 140:5
**plaintiff's** 4:12
16:18 71:12,16
**plaintiffs** 43:7,20
62:17 84:8,18
85:12,21
**plaintiffs's** 71:3
**plan** 36:2 94:4
**planning** 28:8,11
28:17
**plant** 16:23 18:24
19:2,6 55:16,19,22
65:18 66:4,8,13,14
66:23 67:7,19
69:13,18 70:21
71:14 124:1,5,8,9
124:13,16,16,23
125:3 128:23
129:15 133:25

**plants** 67:3 125:8
**played** 82:15
**please** 22:8 102:9
113:22 139:17
**plenty** 91:13
**plm** 117:5,6
**plot** 4:19 17:18,20
18:6,15 20:16
21:17
**plots** 16:13
**pneumonitis** 106:2
**poignantly** 126:13
**point** 7:1,16 17:2
20:5,23 21:19
25:16 30:7 53:20
53:22 59:17 72:23
104:16 105:23
**points** 21:14 48:15
**polchinski** 3:14
4:5 108:1,3 111:5
112:4 113:2,19,23
113:24 114:9,17
114:24 115:9,23
116:9,16,19 117:2
117:12,20 118:1,7
118:18 119:14
120:13 121:7
122:5,15 123:4,16
123:24 127:22
128:9 129:13,20
130:2 138:18
**portion** 12:14
**position** 85:11
**possibility** 54:7,10
54:11
**possible** 13:19
15:22 42:20,21
45:19 66:10 67:5
68:11 73:4 77:12
85:18 125:21
126:8 127:17,21

133:12 134:1,9,15
**post** 17:5
**potential** 13:24,25
24:2,3 25:10
26:24 27:5,8
31:17 50:3,9,18
54:16 55:22 56:5
56:10,16,21 57:3
57:16 63:17,18,19
63:24 64:1 65:1
65:12,16,24 66:2
66:17 67:19 68:4
68:7 73:17 82:12
**potentially** 137:24
**pouring** 109:12
**powder** 15:4 25:9
62:25 63:6 73:20
74:17 78:3 79:16
80:3 92:17 94:7
95:7,16 96:22
100:8,11,14,21,25
101:18 107:17
108:11,14 109:7
109:14,16,22,23
109:25 116:5
134:8,14 137:8,23
138:6
**powders** 111:24
**ppolchinski** 3:18
**practice** 45:24
123:2 140:9,11,15
**predict** 104:4
**predominant**
72:18
**preparation** 8:20
9:18 10:9,11 53:2
54:25 55:3
**preparing** 54:5
**present** 5:5 39:2
**presented** 39:23
84:24 140:19

**pretty** 17:8 69:3
**prevailing** 16:14
16:22 17:2,9 19:4
19:8 20:8 21:24
66:9
**prevented** 42:12
**previous** 62:1 71:4
91:18
**primarily** 51:3
**primary** 26:17
105:10
**print** 78:22
**prior** 6:10 10:22
11:10 54:1 70:18
82:14 95:19 96:3
129:25 135:2
**privacy** 45:7
**probable** 68:8
**probably** 22:22
59:23 125:4
138:11
**problem** 6:21
**proceeding** 1:3
140:19 141:15,19
142:10,24
**proceedings** 4:1
60:1 102:14
140:17 141:4
**process** 5:23 37:20
38:1 41:23 84:20
86:1,1 109:15
**produced** 22:3
100:6 135:2
141:15
**product** 29:16
32:1 60:10,20
75:7,11,14 76:4,20
77:1 95:17 111:12
111:19,21,22
115:13 120:20
121:9,22 122:2,20

Jaqueline Moline , M.D., MSc, FACP, FACOEM        February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

123:6,13 131:23
136:9
**production** 4:13
**products** 15:4
25:9 26:1 27:23
28:25 33:7 55:20
63:18,20 64:3
69:21 70:2,5,9
135:14 137:24
139:9
**professional** 141:7
142:18
**profile** 138:16
**progression**
103:12
**prohibit** 84:21
**prohibited** 141:13
**prohibitions**
140:25
**project** 45:20
**promise** 5:18
**proper** 32:23,24
33:11,13
**propose** 140:10,13
**protect** 45:6
**protected** 141:19
141:20
**protocol** 37:22
**provide** 6:18
12:15 43:24 44:12
94:4 141:11
**provided** 11:3
12:15 16:4,7,18
39:6 52:11,12
55:2 56:15 71:3
71:15,16 79:17
80:3 93:16 106:4
138:1
**providing** 134:18
**public** 84:12 90:7
94:1

**publication** 83:20
84:1,2,3 85:15,24
88:2 125:4
**publications** 85:10
**publicly** 71:9,17
**published** 30:10
41:1,15 42:13
44:7 45:25 85:6
85:22 86:7 87:1
88:2 90:19 91:6
112:19 115:5
**puff** 109:14,22,23
109:25
**pulmonology**
133:21
**purposes** 50:22
122:21
**pursuant** 5:3
**push** 83:5
**put** 37:12 38:11
60:16 109:4
139:19
**putting** 37:2,17
108:22 109:25

**q**

**quadrupling**
113:15 114:1
**qualifications**
103:3
**qualified** 17:25
**quantification**
32:12 120:7
137:25
**quantified** 137:22
**question** 11:24
31:22 33:7 41:7
44:16,21 53:18
76:11,14 77:2
79:22 85:16 90:24
91:14 95:2 97:18
100:3 113:18,22

113:22 114:15
118:20 122:23
123:5 129:23
131:16 135:25
**questioning** 135:4
**questions** 11:24
18:23,25 29:12
35:18 43:3 52:1
56:1,13,16 59:22
60:5,16 61:9,16
81:6 83:19,22
88:12 94:9 103:18
107:11,20 108:4
117:9 120:23
122:16,19 129:25
130:10,24 131:3
131:11,12,20
133:10 135:5,9,10
135:15 139:14
141:16 142:6
**quick** 131:7
**quickly** 108:19
**quite** 17:8 65:22
110:13 114:15
125:15 126:13
**quotation** 42:5
**quotations** 14:17

**r**

**radiation** 106:2
**radius** 18:2
**raised** 54:18 88:13
**ralphs** 3:1 130:16
**ran** 14:20 15:10,20
**range** 100:21
109:1,11 115:7
**rare** 128:7
**rarely** 139:12
**rate** 10:18 113:13
125:12
**rates** 87:3,16,17
105:7,10 125:14

**ratio** 113:9 114:5
**rbellow** 3:12
**reached** 56:9
132:17
**read** 17:18,20
24:21 41:2,4 55:1
55:3 57:24 59:16
87:15,19,19,21
117:7,8 120:11
125:4
**reader** 42:15
**readership** 38:19
**reading** 9:23
24:18 38:21 46:5
73:8 89:10
**ready** 102:17
**reagents** 98:8
**real** 54:19 55:11
55:13,24 56:10
57:3 131:6
**realize** 86:4
**realized** 47:11
54:7,10
**really** 22:21 23:13
24:11 49:25 80:15
97:25 123:5
**reask** 44:15
113:17 131:15
**reason** 25:12,21
25:24 45:1 49:16
57:4 137:20
**reasonable** 77:25
103:21 140:7
**reasons** 44:11,16
44:20
**rebecca** 3:8
**rebuttal** 106:17,18
**recalculate** 89:6
**recall** 7:9 29:5
42:1,23 47:10
53:16 54:4,17

Jaqueline Moline , M.D., MSc, FACP, FACOEM          February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

57:2 58:12 60:14
60:21 61:2,4
74:11 75:8,12
79:3,5,13 89:10
93:2,7,15 95:20
96:2 112:17
113:10 116:17
124:10,18 125:2,4
127:18,19 132:3,8
132:21 133:22
**recalled**  24:19
125:10
**recalling**  23:23
**receive**  41:22
**received**  10:24
11:3 39:17 40:5
40:18 70:18 71:19
71:23 78:11,21
124:7
**receives**  141:14
**recess**  60:1 102:14
**recollection**  57:7
57:11 79:6 95:9
124:14 125:5
**record**  6:6,17
10:24 41:5 43:4
105:17 133:6
139:19,25 141:4,6
141:16 142:9
**records**  7:24 10:2
11:9 54:15 70:20
70:21 71:8 73:10
104:24 105:15,21
106:3,12 133:17
133:19,24 134:7
134:13,16 139:2,6
**reduced**  142:7
**redundant**  5:19
**refer**  75:21 112:25
**reference**  4:17 8:3
12:22 49:21 80:8

94:14 134:6,12
135:1 136:20
**referenced**  114:4
**references**  37:8,11
37:16 136:20
**referencing**  70:24
**referring**  34:3,8,9
34:20 51:8 55:25
74:12 87:25 89:25
98:15 113:5
116:12
**refine**  12:1
**refinement**  7:18
**reflected**  20:16
48:21,23 49:2
**regard**  65:23
108:9
**regarding**  18:14
39:7 57:16 69:12
84:4 94:5 100:7
125:23 130:12
**region**  33:24 34:5
**regulations**  140:23
**rejected**  41:9
**relate**  80:17
**related**  8:9 11:18
12:5,8,10,16,25
17:4 18:25 19:1
39:8 53:8 60:17
70:20 71:14 79:9
79:16 80:2 84:12
87:2 91:16 93:1,4
95:2 102:20
107:11 115:7
132:22
**relating**  141:19
**relation**  15:15
59:17
**relationship**  141:4
142:15

**relative**  18:25 19:6
113:8 142:12
**release**  93:23
**relevance**  138:21
**relevant**  38:18
**reliability**  94:16
**reliable**  96:9,12
137:25
**reliance**  6:12,19
8:3,9,16,17,23 9:5
12:21 22:18 60:8
60:17 80:8 86:16
92:20 93:11,12,15
132:11 135:1
136:21
**relied**  16:24 91:18
106:15,16,19
114:19
**relieve**  139:23
140:2
**rely**  23:18 28:21
32:12 91:21 96:20
106:23 114:11
115:20
**relying**  23:14
28:22 33:6 62:7
97:23,24 99:13,21
**remaining**  45:14
**remember**  40:21
69:14 78:17 84:16
132:6,9 135:15
**remove**  54:19
138:15
**removed**  127:6
**repeat**  113:20,22
**repetitive**  47:12
**rephrase**  19:19
38:25 76:11,14
114:16
**replacer**  26:17

**report**  6:19 8:13
8:16 52:5,11,19,22
52:23,25 54:2
58:20 71:25 74:25
75:6 78:12,24
79:1,15,15,16 80:1
80:1,2,12,13,17,23
96:3,6 102:19,23
112:7,12 133:21
141:5
**reported**  33:17
78:8 82:5
**reporter**  1:13 5:5
139:15,23 140:3
140:19,21,24
141:1,17,18
**reporting**  140:24
141:11
**reports**  28:22
54:14,23 55:1,3,6
60:8 73:14 75:1,5
79:19 80:5,7,15
96:4 106:23 117:8
**repository**  141:20
**represent**  108:3
**representations**
140:22
**represented**  107:1
**represents**  110:25
**request**  42:23
140:7
**requests**  4:13
42:22
**require**  104:5
122:9
**required**  46:13
122:25
**requirements**
52:23
**research**  36:17
124:12

Jaqueline Moline , M.D., MSc, FACP, FACOEM        February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

**[respect - says]**                                                    Page 22

**respect**  29:7 37:10
61:5 63:23 64:13
65:11 67:8,15
71:21 74:12 75:15
75:17,25 76:17
82:18 83:1 85:9
91:3,4 93:13,21
95:3,11,13 96:7,8
96:19 97:13,22
99:9,10,22 101:24
102:19,23,25
103:7,8,23 105:13
106:13 115:2,12
120:24 129:2
132:20

**response**  44:21

**responsible**  123:7
123:11,11

**responsive**  42:22

**rest**  8:15

**result**  29:16 30:18
30:21,22 32:1
74:11 90:9 120:25

**results**  9:12 29:14
31:24,25 46:24
48:13,14 49:2
60:23 94:17 96:9

**retailer**  130:16,20

**retailer's**  130:13

**retain**  40:13

**retained**  6:24 7:6
11:13 43:24 44:3
47:2 48:2

**reuters**  93:9,22

**review**  11:4,8,10
11:16 12:3 13:8
13:13,20 15:2
22:4 28:11 41:23
42:14 45:5 51:15
54:22 57:13 59:7
59:18 60:7 71:24

79:18 80:4 98:19
127:5 133:23
139:1,6 140:20

**reviewed**  7:25 8:3
8:19 10:1,2 16:6
22:15 28:20,25
41:18,19,20,21
46:18 47:17 48:17
60:9,19,25 90:7,20
91:6 93:6 105:15
112:7 133:16
136:15

**reviewer**  42:19

**reviewers**  42:22
42:24

**reviewing**  7:12
54:14 61:5 62:1

**revised**  4:15

**revisions**  41:23
42:17

**revlon**  3:13 108:3

**rewritten**  40:16

**riding**  128:6

**right**  5:16 9:4 12:6
14:20 15:16,24
19:9,15 20:24
21:7 24:5 25:6,7
29:17 35:17 42:17
43:8 44:7 46:24
47:8 48:11 49:2,4
49:18 50:10,15,16
51:10 58:14 59:11
61:20 63:21 64:4
64:5 65:14,19
67:20 69:22 71:22
72:15 74:20 77:8
78:13 80:11,21
81:4,21 84:9 88:7
90:2 95:8 99:15
99:18 105:5,6
106:9,17 107:12

116:2 118:2,8,19
123:18 125:24
133:3

**ripley**  132:4,9,14
132:18 133:1

**risk**  88:6 90:8,21
91:8 113:15 114:1
121:21,24 122:10
135:14

**rite**  3:1

**robinson**  3:9

**rodelsperger**
113:12

**roggli**  10:25 85:5

**roggli's**  78:12,24
79:1,15 80:1

**rohl**  31:11 32:7

**role**  37:2,6 38:10
38:12,20 39:3
82:15

**romano**  2:15 4:4,6
61:13,14 65:3,10
66:21 67:14 68:3
70:3 72:11,20
75:3,24 76:16
77:4,23 79:23,24
80:11,25 81:14,16
90:13,18 96:17
97:20 99:8,18,19
100:18 101:9,10
102:6,16 107:19
114:23 129:2
131:2 133:9 134:5
134:23 139:10,21

**ronald**  36:9

**room**  9:7,10 58:15
113:6

**rose**  4:19 16:8,9
18:21 19:3,7 66:6

**rough**  140:14

**roughly**  117:14
124:23

**routine**  110:2

**rpr**  143:7

**rubber**  65:18
69:16

**rude**  17:17

**rule**  1:3 66:17,18

**rules**  140:23

**run**  5:20 61:16

**rural**  34:11,25
35:6

**rutherford**  122:8
122:25

**s**

**salary**  125:12

**sample**  29:14,20
30:7,15,15,19 31:6
31:24,25 74:4,24
75:2 86:25 88:10
88:17 110:17
111:4

**sampled**  32:1

**samples**  29:13
31:15 32:9 33:6,9
73:19 74:6,16

**sanchez**  74:15,20

**sanchez's**  75:6

**sandpaper**  24:24
26:20

**sandwich**  126:15
126:19

**satisfy**  117:21

**saw**  33:21 73:11
104:24 106:1
139:2

**saying**  20:22 33:16
49:22 117:1

**says**  15:21 17:10
17:14 21:7,7
24:13,17,23 25:5

Jaqueline Moline , M.D., MSc, FACP, FACOEM        February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

[says - solely]                                                                Page 23

100:11
**scenario** 56:22
  59:4 84:25
**scenarios** 57:8
**schedule** 56:25
**school** 22:22 97:7
**science** 33:10
**scientific** 46:6
**scientifically**
  138:23
**scientist** 32:18
  75:22
**scientists** 74:8
**scope** 11:15,20
  12:15,18,19 45:20
  137:8
**scrolling** 102:7
**scruffed** 24:24
**scuffed** 26:19
**se** 26:15 104:3
**seal** 3:9
**second** 6:9 12:14
  112:25
**section** 8:5,23
  24:14,21 38:17
  93:15,18
**sections** 37:21,25
**see** 17:11 18:1
  20:23 48:10 53:10
  55:6 57:15 60:9
  60:13 68:6,6
  73:23 77:15 85:16
  86:15 98:14 99:6
  100:20 101:9
  124:21 133:24
  134:2,6,12
**seeing** 24:19 54:15
  61:2 75:8,13
  95:20 96:2 124:18
**seen** 17:8,9 27:15
  29:6 46:4 67:9

75:4,9,12 85:1
92:4,7 93:10,24
105:21 106:11
108:22 109:20
110:5 111:6
132:23
**segrave** 60:10,15
  60:20 61:3,5
**segrave's** 60:22
**segregated** 68:17
**selected** 49:7
**selecting** 50:8
**selikoff** 69:24
  124:11,14,22
**seller** 76:25
**sem** 98:24,25 99:2
**sending** 45:10
**sense** 8:19 30:8
  37:24 47:12 76:9
  77:16 97:2 104:23
  117:11 125:16
  132:19 134:19
**sensitive** 98:23,25
**sensitivity** 97:13
**sent** 22:11,11
  40:19,20 140:18
**senter** 1:12 2:9 4:4
  4:6 5:11,13 6:20
  6:22 8:6 9:2 11:5
  11:12 12:2 13:6
  13:18 15:19 16:2
  18:4,16,20 19:18
  20:20 21:4 22:1
  27:24 28:15 29:4
  29:9 30:1,16
  31:19 32:14 33:4
  33:20 34:13,23
  43:14 44:18,19
  46:22 48:7 52:14
  53:3,21 57:12,25
  59:20 60:3 61:7

63:12 131:5,9,18
133:4 135:24
136:4 140:16
**separate** 95:24
**separation** 95:22
  98:8
**september** 7:2,3
**series** 90:16
**serve** 142:25
**services** 141:11
**set** 93:6 110:2
**setting** 67:15
**settings** 54:18
**seven** 127:1
**severable** 123:14
**sgpblaw.com** 2:6
**shape** 69:18
**shared** 137:13
**she'd** 126:19
**sheet** 101:4
**shift** 20:17
**short** 81:8 133:5
**shorter** 82:4
**shortest** 81:8,25
**shorthand** 25:3
**show** 21:11,17
  56:4 75:10 135:14
**showed** 19:3 30:18
  59:6
**shower** 69:2 138:5
**showered** 138:8
**showering** 69:9
**showing** 22:20
  23:5 100:19
**shows** 21:22 67:10
  75:6
**side** 138:6
**signature** 139:16
  143:6
**significance** 49:17
  78:24

**significant** 35:11
  112:14
**significantly**
  105:11
**silicate** 72:10
**silicates** 78:6
**similar** 25:8 47:14
  50:4
**similarly** 50:1
**simon** 2:4
**simple** 121:18
**simply** 27:22 28:3
  46:10
**sinai** 36:21
**single** 74:19 75:2
  136:8
**singular** 51:5
**sister** 101:3
  126:13,18
**sister's** 7:19 23:10
  62:8
**sit** 58:14 89:12
  133:2
**sitting** 120:16
**six** 46:24 47:1,6,16
  47:23,25 48:9,19
  104:11
**size** 86:25 88:10
  88:17
**skewing** 20:14,19
**skilled** 125:13
**slow** 108:18
**small** 30:11 31:8
  31:16 86:24 88:10
  88:17
**smaller** 19:15,16
  70:12
**snowing** 67:1
**solely** 141:8
  142:21

Jaqueline Moline , M.D., MSc, FACP, FACOEM       February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

**[solutions - subject]**                                                      Page 24

**solutions** 141:3,11
**somebody** 29:14
  54:19 56:20 61:9
  75:22 98:2 137:8
**someone's** 46:1,6
  64:11 85:2 98:24
**somewhat** 7:19
  40:6 109:16
**son's** 62:9,10
**sons** 13:25 24:3
  63:20,24 64:2,13
  64:17 65:5
**sorry** 14:14 16:9
  28:16 31:14 33:1
  44:15 51:7 66:11
  66:21 77:2 79:21
  87:22 100:2 102:7
  105:1 107:14
  113:17 114:14
  131:16 135:24
  136:4
**sort** 57:14 92:5
  98:18 103:3 120:6
  121:11
**sound** 17:17 76:12
  138:23
**sounded** 69:1,6
  126:8
**sounds** 31:16
  64:11 74:19
**source** 50:3,25
  65:13,16 67:20
  73:2,10,17 79:4
  94:21,21 129:4
  133:12 134:1,9
**sources** 13:19
  63:16,17 73:24
**south** 3:10 20:24
  21:3,3,6,9,15,20
  21:25

**spalding** 2:16
**speak** 10:13 50:23
  88:25 96:14,16
**speaking** 57:10
  102:25
**special** 1:3 14:16
**specific** 7:25 8:4
  8:11,23,24,24
  18:13 22:5 27:11
  28:20 29:7,16
  33:7 35:24 36:2
  42:23 43:7 44:13
  44:22 48:9,9
  51:12 53:6 56:24
  57:10 58:18 60:14
  60:17 76:4,19,20
  79:18 80:5,9,16,23
  107:16 112:17
  115:2 116:13
  125:3,5 130:16,20
  131:12,21 132:12
  136:8 137:1
  141:13
**specifically** 7:12
  8:20 13:1 20:2
  28:5 29:1 34:9
  46:6,9 48:12 50:8
  53:8 55:2 61:5
  80:15 86:9 91:16
  95:19 96:22
  124:10 134:8,14
  140:23
**specifics** 33:18
**specified** 45:21
  55:11
**speculation** 20:12
  59:14 68:1 127:14
  139:10
**speculative** 25:20
  25:25

**speed** 18:10,13
**speeds** 17:21 18:8
  19:12
**spend** 23:11
**spending** 22:21
**spent** 9:18,22 10:9
  10:10 23:1 36:14
  38:16
**spike** 21:5
**spoken** 62:2,12
**spokes** 18:2
**stamps** 77:9,12
**standard** 33:17
  98:11 130:13
**standards** 118:25
**start** 58:1 83:16,16
  83:17
**started** 7:12 26:12
  40:22 47:22 50:1
  82:22 83:14
  100:11
**starting** 5:14
  26:11 104:16
**starts** 24:7 83:9
**state** 1:1 13:12
  16:15 22:24 44:20
  74:8 141:1 142:2
**stated** 88:19,20
  121:5 142:5
**statement** 5:4
  31:13
**statements** 134:2
**states** 95:19
**stating** 74:3
**station** 14:1 17:11
  17:13 24:4 26:11
**statistical** 49:17
  89:1 91:1
**statistician** 89:8
  89:13 90:2

**statisticians** 89:21
  89:25
**statistics** 49:19
**status** 106:8
**stay** 126:7 127:20
**stepdad** 65:11
  67:15,18,22 70:14
**stepdad's** 63:19
  133:25
**stepfather** 13:24
  15:16,23 65:17
  67:7 68:12 73:5
  73:23 125:22
  126:7,21 127:6,21
  137:24
**stepfather's** 27:7
  133:11
**stephen** 24:8
**steroid** 106:2
**stips** 139:19
**stipulate** 140:8
**stipulated** 140:16
**stop** 109:3
**straight** 15:7
**street** 2:11,17
**stretch** 102:13
**strike** 65:25
**student** 36:14
**studied** 49:12
  82:18,25 124:23
**studies** 90:15,23
  90:25 91:13 107:5
  135:13,21 136:2
**study** 88:5 90:7,20
  91:7 112:8 136:8
**studying** 69:25
**stuff** 37:13
**subcontractor**
  141:2,8 142:21
**subject** 44:23
  85:22

Jaqueline Moline , M.D., MSc, FACP, FACOEM          February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

**subjects** 84:9
**submit** 6:17 40:24
  45:19 54:5 116:3
**submitted** 5:4
  7:15 40:25 41:8
  41:12,13,17 42:5
  45:5,12 46:14,23
  58:25 141:16,18
**submitting** 54:1
**subsequent** 59:6
**substance** 42:1
**substantial** 65:6
  70:15 121:12,15
**substitute** 138:20
**substituted** 54:2,8
**sudden** 64:8
**suddenly** 54:10
**suffered** 56:6
**suggest** 42:19
**suite** 2:4,10,17 3:4
  3:10
**suits** 52:10
**sum** 72:7
**summary** 92:8
  103:14
**sun** 22:7
**superior** 1:1
**supplement** 23:20
**sure** 6:25 10:6
  14:5 16:5 17:1
  25:25 28:24 30:17
  34:2 37:24 38:21
  39:14 43:2 54:15
  65:22 69:17 76:17
  77:5 79:23 81:6
  89:2 102:12
  110:13 113:3,23
  114:18 122:13
  123:1,20 125:8
  130:11 131:13,21
  132:16

**surmise** 58:8
**sweeping** 68:25
**switch** 35:22
**sworn** 5:8 13:14
  23:18 51:3,16,19

**t**

**table** 37:12,17
  92:1
**tables** 37:12 38:24
  39:1,2 42:10 92:8
**tags** 77:9
**tailored** 40:8
**take** 19:14,21,25
  24:16 33:23 35:23
  36:1 42:3 59:24
  89:12 109:4,15
  118:3 119:23,24
  138:14,20 140:5
**takeaway** 79:10
**taken** 1:12 62:5
  142:5
**takes** 107:2,4
  108:13
**talc** 13:22 35:20
  43:7 50:20 62:19
  63:17 72:9 73:15
  73:22 74:2 75:7,7
  75:11,11 76:1,18
  77:1 78:5,6,7,9,19
  80:14 84:5 86:18
  87:7,11 90:10,12
  90:13,17,22 91:5,8
  91:16,23 94:15
  95:17 96:21 103:7
  103:8 106:14
  108:6,9,22 109:5
  110:8,8 114:12,21
  115:7 129:7,9,12
  134:7,13 135:13
  135:15,17 136:18
  136:18 139:4,9

**talcum** 15:4 25:9
  108:11 111:24
  137:23
**talk** 26:5 95:10
  103:8,11 106:9
**talked** 18:17 65:21
  83:22 84:15 85:5
  89:23 112:23
  138:4
**talking** 22:12 24:2
  59:2,3 86:17,18
  91:24 92:1 108:10
  108:10 111:19,22
  116:3 118:25
  119:18 123:16
**talks** 19:8 43:18
**task** 68:24
**telephone** 2:3,9,16
  3:3,9,15 5:13
**telephonic** 1:10
**tell** 9:7,24 30:20
  35:7 37:3 58:4,6
  58:11,15 116:13
**tem** 98:24,25 99:3
  99:6 117:5,7
**ten** 10:7 14:19
  81:9 82:1,14
  115:10 120:17
  125:20,25 126:25
  127:4
**tend** 125:18
**tender** 134:24
**tenth** 119:7,13
**term** 129:6
**terms** 25:23 32:8
  32:20 33:5 42:14
  57:1 81:17 85:25
  86:14 94:14 97:16
  98:7 103:12,25
  105:16 111:8
  141:8 142:21

**test** 74:10,11
**tested** 29:6 30:19
  74:5 95:6,8
**testified** 5:9 57:22
  58:6,11,12 59:5
  69:11 123:19
  125:10 136:21
**testify** 31:25 58:10
  78:10 106:7
**testimony** 4:14
  6:10 13:14 23:15
  23:19 27:14 29:11
  31:20 34:3 51:3
  51:16,19 53:12
  57:14,20,24 59:6,8
  59:17 62:1,16
  68:10,11 94:4
  100:15 101:1
  103:1,15 126:5
  127:19 134:18
**testing** 8:11,12,12
  8:14 9:12,12,14
  28:21,25 29:7
  30:8 33:5,6 36:8
  37:22,22 39:5,10
  39:11 42:8 47:18
  47:21 60:9,10,16
  60:19,23,23 67:10
  74:14 75:1,5,16
  91:19 92:2,16
  93:24 94:25 95:4
  95:14 96:8,24
  97:5,8,10,22
  132:12,16,18,20
  132:23,25 139:21
**tests** 29:13 132:14
**texas** 122:12
**thank** 9:17 28:19
  59:25 61:7,10
  62:11 77:24 80:19
  81:1 84:3 100:2

Jaqueline Moline , M.D., MSc, FACP, FACOEM          February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

[thank - tv]                                                                                    Page 26

101:9 102:6
107:10 130:3,24
139:13
**thanks**  6:20
**theme**  40:3
**theoretically**
66:10
**thereabouts**
133:20
**thing**  6:9 16:21
48:24 76:13 78:17
90:5 104:19
111:21
**things**  7:18 8:25
23:2 42:19 49:13
80:14 98:6 99:2
100:1 104:7
111:20 120:16
133:5
**think**  5:14 7:8,16
15:21 17:7 20:22
26:8,11 31:21
33:21 34:3 42:10
46:4 54:13 60:5,6
61:3,4 63:23 66:7
74:14,23 75:2
78:15,17 79:2,12
80:21 81:1 82:17
82:24 84:6 86:25
87:18 88:12 89:20
89:21,23 91:11,19
92:1,15 93:10,25
95:18,21 96:18
97:21,21 101:7
102:10,24 103:17
104:25 105:8,9,18
107:8,19 108:15
108:17 109:16,23
109:23 112:24
113:7,8 114:7
115:1 122:7,11,12

123:1 124:3
126:12 131:14
133:18,18 139:23
**thinking**  122:11
**thompson**  3:2 4:5
130:7,9,23
**thornburg**  3:3
**thorough**  30:6
**thought**  22:25
25:19 101:5 133:4
**thousand**  133:18
**thousands**  46:5
110:18
**three**  14:13 24:8
63:16 83:17 116:5
116:20,21 117:1,7
117:13,17,22,25
128:19 131:3
**threshold**  121:12
121:15
**thrifty**  3:1 130:20
**time**  10:9 19:15,16
22:21 23:11,20
25:13,16,23 36:14
38:16 52:4,12,18
53:12,17 58:20
59:23 61:10 62:23
81:18,19 82:7,19
83:1 87:19 89:12
89:15 95:15
101:15 102:10
105:23 107:20
108:12 119:5,16
123:23 126:16
132:7,14 133:1
141:14
**timer**  109:6
**times**  5:19 14:24
24:25 27:23
101:23 118:3

**timing**  106:25
107:1
**tins**  116:5,6,21
**tissue**  39:6 46:23
47:6,18,21 48:1,2
48:10,16,25 49:4
71:21 72:4,15,17
72:19 73:13 76:2
77:8,15 78:2
128:14,22 133:14
**title**  1:3
**today**  5:15 9:7,10
10:5 84:17 106:6
**today's**  10:9
**told**  63:25 65:12
81:1 84:7
**tools**  91:1
**top**  24:13
**topics**  35:22
**total**  72:7 101:12
101:13 104:9,11
138:16
**totally**  84:25
**touch**  39:25 135:9
**touched**  36:25
**town**  55:19
**trace**  110:9,9,14
111:3,6
**trade**  17:4
**trades**  125:13
**training**  56:3,7,20
**transcript**  4:21
13:17 23:10,10
140:4,6,18 141:15
142:5,8
**transcripts**  52:1
141:15,19
**transition**  26:13
**translate**  31:9
**transpired**  13:15
106:11

**treat**  14:16
**treating**  61:20
**treatment**  61:23
103:24 105:22
**treatments**  104:17
104:18
**tremolite**  72:9
75:25 76:18
129:11
**trial**  10:22 11:11
11:21,24 28:9,12
57:14,19,20,23,24
58:2,5,7,10,18
59:5,16 89:19
92:4 102:23 103:1
103:15,22 134:18
135:4 136:22
140:9,12,15
**tried**  45:23 46:2
69:6 109:2 126:7
127:20
**tries**  42:21
**true**  32:2 62:15
84:11 90:6 91:5
98:16 130:17,21
133:14 141:15
142:8
**truly**  83:7
**try**  5:18,20 50:23
81:7 97:19 120:6
**trying**  8:18 17:16
38:13 40:7 50:23
56:18,20,24 99:12
102:7 123:21
**tumor**  72:17,19
82:21 83:3,9,13
128:11,13,14,16
128:22
**turn**  14:13 23:25
**tv**  68:13

Jaqueline Moline , M.D., MSc, FACP, FACOEM          February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

**tweets** 45:11
**twice** 25:1 122:22
**two** 13:25 14:14
  24:3 40:21 54:6,9
  59:22 60:5 79:16
  80:2 95:6 98:18
  102:1,20 107:22
  108:25 125:8
  128:15 133:18
**type** 12:9 15:4
  26:13 30:13 50:17
  77:18 79:12
  105:16,22 136:9
  137:10
**types** 78:5 128:12
  128:15,19
**typewriting** 142:7
**typical** 108:12,16
**typically** 81:21
  110:24 120:4

**u**

**unable** 42:25
**unarco** 8:13 9:15
  15:15,20 16:6
  19:6 25:10 27:7
  66:3,23 67:19
  69:13,25 70:9,20
  70:22 71:8 73:22
  124:1,5,8,12,15,23
  125:23 128:23
  129:15 133:12
  137:25
**unaware** 90:25
**unclear** 25:14
  26:13
**undercounting**
  138:11
**underestimate**
  138:2
**underestimation**
  31:5

**undergarments**
  109:8
**undergoing**
  105:23
**underlying** 51:4
  52:6,10,19 53:13
**understand** 31:20
  33:2 38:3 50:3
  70:4 72:13 85:9
  88:4 91:3 122:18
**understanding**
  13:2 17:23 19:11
  20:6 23:17 26:2
  31:4 46:15 49:6
  50:7 61:25 66:5
  70:8,11 84:6
  95:13 138:11
**understood** 11:5
  42:16
**undertaken** 89:5
**undertaking** 89:15
**unfortunately**
  74:25 78:20 83:15
**unified** 40:3
**union** 65:18 69:16
  70:20
**university** 22:24
  97:6
**unknown** 58:20
**updated** 6:18
**uploaded** 141:20
**ups** 61:8 131:6
**urban** 34:11,25
  35:6,8
**use** 11:1 28:12
  31:25 34:14,17
  35:1,20 76:8
  100:7 115:17
  117:24 135:13,14
  136:17 139:4,8
  140:10,13

**users** 90:16 91:4
**usual** 5:22 139:18
**usually** 109:5

**v**

**vacations** 127:3
**vacuuming** 68:22
**vague** 19:16 27:19
  32:24,25 33:12,13
  34:1,18 43:9 48:4
  53:15 57:18 59:13
  63:9 110:11
  114:13 118:5
**valid** 33:11,12
**validity** 33:8
**value** 29:15 83:7
  96:24 98:16
  101:20 113:25
  119:23
**values** 112:20
  113:13 114:5
  121:16
**variables** 137:19
**various** 7:23 27:23
  32:21 33:6 37:21
  63:17 73:9 88:1
  92:2 98:8 104:24
  137:23
**varying** 21:23
  26:6 109:9
**venture** 22:22
**verbatim** 141:5
**veritext** 141:2,11
**vermont** 80:14
  86:18
**versed** 17:17
**versus** 77:14 98:24
  99:3 104:6,6
  120:21
**view** 70:21
**vitae** 4:16

**vivid** 69:3
**volumetric** 29:23
  30:13
**voluntary** 93:2
**vs** 1:7

**w**

**waive** 139:16
**wake** 126:18
**walked** 69:1
**want** 5:15 6:16
  14:4 27:10 28:24
  40:7 68:6 77:3
  87:24 95:10
  131:12,21
**wanted** 16:3 29:12
  37:1 42:3 49:15
  131:19 132:16
  135:9
**warner** 122:12
**wasting** 123:22
**watch** 68:13
**way** 2:5 11:25
  17:24 24:16 31:1
  36:16 37:20 39:14
  39:19,20 41:7
  43:12 44:5,8 45:8
  48:5 66:18 68:15
  68:23 69:18 71:7
  73:6 76:19 77:6
  83:12,18 94:3
  107:8 127:15
  128:8 129:3,8
  137:10 138:13
**ways** 111:3
**we've** 35:21 83:22
  83:23 91:19
  102:11,21
**wear** 77:8
**wedding** 23:3,6
**wednesday** 1:14

Jaqueline Moline , M.D., MSc, FACP, FACOEM        February 26, 2020
Zimmerman, Linda Vs. Autozone Inc., Et Al.

**[week - zimmerman's]**                                        Page 28

| | | | |
|---|---|---|---|
| **week** 126:1,25 | 72:6,17 74:22 | **working** 25:14 | **yesterday** 71:23 |
| 127:1 | 75:21 76:8,24 | 26:10 36:15,18 | **york** 3:17 |
| **weigh** 31:7 | 77:11 80:21 90:14 | 38:16 64:2,18 | **young** 3:15 |
| **weight** 29:22 | 96:14 97:2 98:5 | 125:19 126:12 | **younger** 101:17 |
| 30:11,20,25 31:8 | 100:17 102:12 | **workplace** 120:3 | |
| 110:23,24 111:8 | 107:24 110:13 | **works** 118:21 | **z** |
| **weighted** 119:5 | 111:17 112:16 | **world** 17:4 49:22 | **zimmerman** 1:5 |
| **welcome** 61:11 | 114:4,14 115:1 | **write** 39:20,21 | 4:17 8:5,23 11:8 |
| 130:5,25 | 116:17 118:16 | 46:9 85:3 | 11:17 12:5,10 |
| **went** 7:17 13:4 | 119:12,22 121:4 | **writing** 9:23 24:12 | 13:10,13 24:8 |
| 33:18 47:24 57:19 | 125:2 127:15 | 47:11 48:13,14 | 25:17,18 26:10,25 |
| 57:23 58:5,9 59:5 | 128:3 129:3,19 | 50:13 52:10 | 27:3,17 29:1,7 |
| 69:2 85:11 121:16 | 130:5,25 136:5 | 124:21 | 50:15,16 62:3,25 |
| **west** 2:17 21:12 | 138:19 139:12,17 | **written** 5:4 14:9 | 63:4,15 64:19 |
| **whittaker** 3:7 | **witnesses** 141:18 | 24:20 39:14 52:5 | 65:13,24 66:2,25 |
| **whoever's** 99:13 | **woman** 108:16 | **wrong** 60:12 | 67:12,17,20 70:13 |
| **wind** 4:19 16:8,9 | **wondering** 85:10 | **wrote** 37:11 40:11 | 72:22 76:5,21 |
| 16:13,14 17:2,4,5 | **word** 76:9 106:17 | 91:10 | 79:8,17 80:4,9,16 |
| 17:9,21,22 18:7,10 | **worded** 11:25 41:8 | | 81:3 82:8,13 |
| 18:13,21 19:1,3,7 | 100:3 | **x** | 94:22 95:12,14 |
| 20:3,8,17 21:1,5 | **words** 62:5 108:13 | **x** 110:16 | 96:3 100:25 |
| 21:11,18,22,24,25 | **work** 10:3,21 11:7 | | 102:20 103:9,13 |
| 65:21 66:6 | 11:15,20 12:15,19 | **y** | 126:6,6 127:9 |
| **winded** 31:14 | 15:24 17:3,4 24:5 | **yeah** 9:16 38:5 | 131:24 134:2,10 |
| 111:2 | 26:15 27:7,11 | 105:19 133:21 | 137:23 |
| **winds** 16:22 19:4 | 28:8 37:16 38:12 | **year** 19:21,21,23 | **zimmerman's** |
| 19:8 66:9 | 39:23 40:16 63:19 | 19:24 20:18 83:17 | 14:15 15:23 24:3 |
| **windsocks** 18:12 | 63:20,25 64:20,24 | 102:5 112:21 | 27:7 29:2 61:19 |
| **wish** 10:5 | 69:8,9 71:4 73:23 | 118:12,12,17,22 | 62:12 68:22 71:21 |
| **witness** 4:12 11:6 | 98:20 118:12,17 | 118:23 119:4,7,13 | 72:3 73:2,8 76:2 |
| 11:23 12:23 13:12 | 119:7,13 121:5 | 127:2 | 78:2 83:13 100:7 |
| 16:1 17:20 20:13 | 127:6 133:12,25 | **years** 14:25 20:5,7 | 100:15 103:10,24 |
| 21:1,22 27:21 | **workdays** 126:1 | 23:24 36:21 40:22 | 105:13 106:7 |
| 28:14 29:5,20 | **worked** 14:1 24:4 | 81:10 82:1,6,14 | 128:11 133:11,14 |
| 30:5,24 32:4 33:1 | 26:14 37:8,21,23 | 83:16,17 94:22 | 133:16,23 134:7 |
| 33:14 34:2,20 | 38:6,7,8 39:13 | 102:3,4 108:6 | 134:13 137:1 |
| 43:11 48:5 51:19 | 65:17 67:8,18 | 112:13 113:10,15 | 139:3 |
| 52:9,24 53:16 | 124:15 125:11,17 | 114:1,6 118:13,24 | |
| 57:7 59:16 61:11 | 127:2 | 119:18 120:25 | |
| 63:11 64:23 65:9 | **workers** 69:25 | 121:21 126:1,25 | |
| 66:23 68:2 69:24 | | 127:4 | |

California Code of Civil Procedure

Article 5. Transcript or Recording

Section 2025.520

(a) If the deposition testimony is
stenographically recorded, the deposition officer
shall send written notice to the deponent and to
all parties attending the deposition when the
Original transcript of the testimony for each
session of the deposition is available for reading,
correcting, and signing, unless the deponent and
the attending parties agree on the record that the
reading, correcting, and signing of the transcript
of the testimony will be waived or that the
reading, correcting, and signing of a transcript of
the testimony will take place after the entire
deposition has been concluded or at some other
specific time.

(b) For 30 days following each notice under
subdivision (a), unless the attending parties and
the deponent agree on the record or otherwise in
writing to a longer or shorter time period, the
deponent may change the form or the substance of
the answer to a question, and may either approve
the transcript of the deposition by signing it, or

refuse to approve the transcript by not signing it.

(c) Alternatively, within this same period, the deponent may change the form or the substance of the answer to any question and may approve or refuse to approve the transcript by means of a letter to the deposition officer signed by the deponent which is mailed by certified or registered mail with return receipt requested. A copy of that letter shall be sent by first-class mail to all parties attending the deposition.

(d) For good cause shown, the court may shorten the 30-day period for making changes, approving, or refusing to approve the transcript.

(e) The deposition officer shall indicate on the original of the transcript, if the deponent has not already done so at the office of the deposition officer, any action taken by the deponent and indicate on the original of the transcript, the deponent's approval of, or failure or refusal to approve, the transcript. The deposition officer shall also notify in writing the parties attending the deposition of any changes which the deponent timely made in person.

(f) If the deponent fails or refuses to approve the transcript within the allotted period, the

deposition shall be given the same effect as though it had been approved, subject to any changes timely made by the deponent.

(g) Notwithstanding subdivision (f), on a seasonable motion to suppress the deposition, accompanied by a meet and confer declaration under Section 2016.040, the court may determine that the reasons given for the failure or refusal to approve the transcript require rejection of the deposition in whole or in part.

(h) The court shall impose a monetary sanction under Chapter 7 (commencing with Section 2023.010) against any party, person, or attorney who unsuccessfully makes or opposes a motion to suppress a deposition under this section, unless the court finds that the one subject to the sanction acted with substantial justification or that other circumstances make the imposition of the sanction unjust.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.