No. 16-CI-003503

JEFFERSON CIRCUIT COURT
DIVISION TEN (10)
JUDGE ANGELA MCCORMICK BISIG

CYNTHIA HAYES, as Executrix of the
Estate of DONNA ANN HAYES

PLAINTIFF

vs.

**ORDER REGARDING MOTIONS IN LIMINE,
FOR SUMMARY JUDGMENT,
AND FOR MISSING EVIDENCE INSTRUCTIONS**

COLGATE-PALMOLIVE COMPANY, *et al.*

DEFENDANTS

* * * * *

This matter is before the Court on a number of motions. The first is a Motion by

Defendant Cyprus Amax Minerals Company ("CAMC") for Summary Judgment filed on

October 30, 2018. Plaintiff Cynthia Hayes, as Executrix of the Estate of Donna Ann Hayes

("Cynthia"), filed a Response on January 7, 2019. CAMC filed a Reply on January 25, 2019.

The second is a Motion by Defendant Colgate-Palmolive Company ("Colgate") for Summary

Judgment filed on October 30, 2018. Cynthia filed a Response on January 7, 2019. Colgate

filed a Reply on January 28, 2019, as well as a Notice of Supplemental Authority on February

22, 2019. The third is a Motion by Defendant Johnson & Johnson for Summary Judgment filed

on October 30, 2018. Cynthia filed a Response on January 7, 2019. Johnson & Johnson filed a

Reply on January 21, 2019.

The fourth is a Motion by Cynthia for a Missing Evidence Instruction against Colgate.

The Motion was filed on December 7, 2018. Colgate filed a Response on January 11, 2019.

OO : 000001 of 000042

Cynthia filed a Reply on February 8, 2019. The fifth is a Motion by Cynthia for a Missing Evidence Instruction against Johnson & Johnson. The Motion was filed on December 7, 2018. Johnson & Johnson filed a Response on January 11, 2019. Cynthia filed a Reply on February 8, 2019. The remaining Motions are motions in limine filed by a number of parties to this action.

The Court heard oral argument on February 28 and March 1, 2019. Cynthia was represented by the Honorable Paul J. Kelley, the Honorable Paul J. Ivie, the Honorable J. Eric Kiser, and the Honorable J. Garrett Cambron. Colgate was represented by the Honorable Meredith M. Shaw, the Honorable Matthew W. Breetz, and the Honorable Nathan Guest. Johnson & Johnson was represented by the Honorable Matthew L. Bush, the Honorable Katie Kinsey, the Honorable Nina Trovato, the Honorable R. Scott Masterson, and the Honorable Richard T. Bernardo. CAMC was represented by the Honorable Todd P. Greer. The matter now stands submitted. The Court, having considered the written memoranda, oral argument, record in the case, and being otherwise sufficiently advised, rules as follows.

## BACKGROUND

In this asbestos case, Plaintiff Cynthia alleges that her decedent, Donna Ann Hayes ("Donna"), developed malignant mesothelioma as a result of her use of asbestos-containing cosmetic talcum powder products, including Defendant Johnson & Johnson's Shower-to-Shower product and Defendant Colgate's Cashmere Bouquet product. Cynthia maintains that these products were manufactured with asbestos-containing talc provided by Defendant CAMC and its predecessors-in-interest. CAMC, Colgate and Johnson & Johnson have moved for summary judgment in their favor. Cynthia has moved for missing evidence instructions against Colgate and Johnson & Johnson. Various parties have also filed a number of motions in limine ahead of the jury trial scheduled to begin in this matter on July 16, 2019.

2

## CAMC'S MOTION FOR SUMMARY JUDGMENT

1. *CAMC's Argument*

CAMC argues that it cannot be liable for Cynthia's claims. First, CAMC asserts it cannot have direct liability because it never mined, milled, sold or distributed talc. Second, CAMC also contends that as a matter of law it does not have successor-in-interest liability for Cynthia's claims. According to CAMC, the original importer, processer, and supplier of the talc at issue was an entity known as Charles Mathieu, Inc. ("Charles Mathieu"). CAMC asserts that in 1979, an entity known as Cyprus Mines purchased assets from subsidiaries of Charles Mathieu but expressly did not assume any of those companies' liabilities. CAMC contends that Cyprus Mines' talc assets and liabilities were later transferred to an entity known as Cyprus Talc in 1992 and ultimately ended up with Imerys Talc America, Inc.

CAMC maintains that it was formed in 1993 when two entities known as Cyprus Minerals and AMAX merged. CAMC contends that although Cyprus Mines became its subsidiary as a result of that merger, Cyprus Mines had divested its talc assets and liabilities before CAMC came into existence. CAMC also maintains that because it did not purchase Cyprus Mines, and because no fraud, merger, consolidation, or continuation of Cyprus Mines' business via CAMC occurred, CAMC cannot be responsible for Cyprus Mines' liabilities.

2. *Cynthia's Argument*

Cynthia argues that Charles Mathieu was the exclusive importer of Italian talc and operated through 1979. Cynthia contends that all talc used to manufacture Cashmere Bouquet through 1979 was provided exclusively by Charles Mathieu. According to Cynthia, Cyprus Mines took on Charles Mathieu's liabilities resulting from that conduct when Cyprus Mines purchased Charles Mathieu's assets in 1979 and simply continued Charles Mathieu's operations.

3

OO : 000003 of 000042

Cynthia maintains that CAMC then assumed Cyprus Mines' liabilities that had originated with Charles Mathieu, as well as Cyprus Mines' own liabilities arising from its provision of talc for Cashmere Bouquet from 1979 to 1992, when Cyprus Mines merged with AMAX in 1993 to create CAMC. Cynthia further asserts that CAMC also has its own liability because it sold talc from its Hamm underground mine to Johnson & Johnson from 1991 to 2003.

3.  *Summary Judgment Standard*

Civil Procedure Rule 56.03 authorizes summary judgment "if the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56.03. The Court must view the record "in a light most favorable to the party opposing the motion, and all doubts are to be resolved in his favor." Steelvest, Inc. v. Scansteel Serv. Ctr., Inc., 807 S.W.2d 476, 480 (Ky. 1991).

Summary judgment is proper when "it appears that it would be impossible for the respondent to produce evidence at the trial warranting a judgment in his favor and against the movant." Paintsville Hosp. Co. v. Rose, 683 S.W.2d 255, 256 (Ky. 1985) (quoting Roberson v. Lampton, 516 S.W.2d 838, 840 (Ky. 1974)). The term "impossible" is used in a practical sense and not in an absolute sense. Perkins v. Hausladen, 828 S.W.2d 652 (Ky. 1992).

When considering a motion for summary judgment, the "focus [of the court] should be on what is of record rather than what might be presented at trial." Welch v. Am. Publ'g Co. of Kentucky, 3 S.W.3d 724, 730 (Ky. 1999). "The party opposing summary judgment cannot rely on their own claims or arguments without significant evidence in order to prevent a summary judgment." Hallahan v. The Courier-Journal, 138 S.W.3d 699, 705 (Ky. App. 2004). The non-movant cannot defeat a properly supported summary judgment motion "without presenting at

4

least some affirmative evidence showing that there is a genuine issue of material fact for trial." Steelvest, 807 S.W.2d at 482.  Even if a trial court believes the party opposing the motion for summary judgment may not succeed at trial, "it should not render a summary judgment if there is any issue of material fact."  Id.  This is because it is the court's duty to examine the evidence, "not to decide any issue of fact, but to discover if a real issue exists."  Id.

   4.  *Direct Liability*

   The Court first finds that there is no evidence of record to support a finding of direct liability against CAMC.  CAMC presents affidavit testimony of its authorized representative Patrick Downey that CAMC never sold, milled, mined, or processed talc at any time.  Motion, Ex. C ¶ 2.  And while Cynthia disputes this by asserting that CAMC supplied talc to Johnson & Johnson from a mine known as the Hamm mine, the record does not support that contention.  Rather, the testimony relied upon by Cynthia establishes only that the Hamm mine was an approved source of talc for Johnson & Johnson's products, not that Johnson & Johnson in fact sourced talc from that mine.  Response, Ex. 13 at 1235:2-1238:13.  The witness relied upon by Cynthia also disagreed that talc had been provided to Johnson & Johnson from the mine.  Id. at 1237:16-1238:9.  Accordingly, because there is no evidence of record to support a finding that CAMC mined, milled, processed or sold any of the talc at issue, there is no basis upon which CAMC may be held directly liable for Cynthia's claims.

   5.  *Successor-in-Interest Liability*

   Nor does the Court find that the record presents a basis upon which CAMC could be held responsible for the liabilities of either Cyprus Mines or Charles Mathieu arising out of their provision of talc for manufacture of the products at issue.  As an initial matter, although Cynthia contends that CAMC became responsible for Cyprus Mines' liabilities—and thus also for

5

OO : 000005 of 000042

liabilities originating with Charles Mathieu—when CAMC merged with Cyprus Mines, the testimony she relies upon does not support the existence of any such merger.  Rather, the testimony states that CAMC was created by the "merger of Cyprus *Minerals* Company and a company called Amax."  Response, Ex. 7 at 1430:1-14 (emphasis added).  As such, there is no basis to find that CAMC may have assumed the liabilities of Cyprus Mines by virtue of a merger with that entity.

Moreover, the uncontroverted evidence of record indicates that CAMC is in fact the parent corporation of Cyprus Mines.  Motion, Ex. C ¶ 6.  A parent corporation such as CAMC bears no responsibility for the liabilities of its subsidiaries absent a showing that piercing of the corporate veil is warranted.  See Inter-Tel Techs., Inc. v. Linn Station Props., LLC, 360 S.W.3d 152, 170-71 (Ky. 2012) (finding parent and grandparent corporations responsible for liabilities of their wholly-owned subsidiary where the requirements for veil piercing were satisfied).  Here, Cynthia has made no showing that the corporate veil should be pierced to hold CAMC responsible for the liabilities of its subsidiary Cyprus Mines.

In addition, because CAMC is the parent of Cyprus Mines rather than a successor to that entity, the successor-in-interest doctrine does not provide a basis to find that CAMC assumed the liabilities of Cyprus Mines.  See Parker v. Henry A. Petter Supply Co., 165 S.W.3d 474, 478 (Ky. App. 2005) (noting that the successor-in-interest doctrine applies where there is a purchasing corporation and a selling corporation); Excel Energy, Inc. v. Cyprus Amax Coal Sales Corp., No. 3:98CV-713, 2008 WL 4127417, at *2 (W.D. Ky. Sept. 4, 2008) ("For successor liability, there must be only one surviving corporate entity.").  Finally, Cyprus Mines' liabilities were in any event assumed by an entity known as Cypress Talc on June 5, 1992, before CAMC came into existence.  Motion, Ex. C at Ex. A § 4.  Thus, there is no basis to find that

6

OO : 000006 of 000042

CAMC may be responsible for Cyprus Mines' liabilities, whether originating from Cyprus

Mines' own conduct or from its alleged assumption of the liabilities of Charles Mathieu.

Accordingly, because there is no genuine issue of material fact that CAMC does not have direct

or indirect liability for Cynthia's claim and because it would therefore be impossible for Cynthia

to prevail against CAMC at trial, CAMC's Motion for Summary Judgment is GRANTED.

## **COLGATE'S MOTION FOR SUMMARY JUDGMENT**

1.  *Colgate's Argument*

Colgate argues there is no basis to find that its product Cashmere Bouquet was

responsible for Donna's illness.  Colgate asserts its experts have opined that Cashmere Bouquet

never contained asbestos and that even use of talcum powder with trace amounts of asbestos

would not pose any danger.  Colgate contends that epidemiological studies further show a source

mine for the talc used in Cashmere Bouquet reported zero cases of mesothelioma among its

miners and millers, and that FDA testing did not find asbestos or a risk from cosmetic talcum

powder.  Colgate thus asserts the evidence of record demonstrates its product did not contain

asbestos and could not have caused Donna's disease.

Colgate further argues that even if Cynthia could show that some containers of Cashmere

Bouquet were contaminated with asbestos, she cannot show that the containers actually used by

Donna were tainted.  Colgate asserts that Donna's reliance on purported test results finding

asbestos in the source mines at issue likewise would show only that some containers of

Cashmere Bouquet contained asbestos, not that the containers used by Donna were

contaminated.  Colgate also asserts that the test results are questionable, and that the

overwhelming majority of its talc samples tested negative for asbestos.  Colgate further points to

testimony by plaintiffs' experts in other cases that the amount of asbestos in talc mines is

7

OO : 000007 of 000042

sporadic, occasional, and varied, and that not all Italian talc contained asbestos. Colgate contends that Cynthia's expert also testified there is no statistically sound method to determine whether asbestos was present in particular containers. Colgate thus contends the jury could only speculate that the Cashmere Bouquet used by Donna was tainted with asbestos.

Colgate further maintains that even if Cynthia could show Donna used Cashmere Bouquet contaminated by asbestos, Cynthia cannot show that any such contamination was a substantial factor in causing Donna's illness. Colgate asserts that Cynthia's experts concede no epidemiological studies have found an increased risk of mesothelioma from use of cosmetic talcum powder, and that studies in fact show no incidences of mesothelioma in miners and millers at the Italian talc mines. Colgate also points out that the FDA concluded in 1986 that cosmetic talc presented a lower risk of asbestos exposure than ambient background exposure. Colgate contends that Cynthia therefore has no evidence asbestos in cosmetic talcum powder can cause mesothelioma.

Colgate further argues that Cynthia also cannot prevail because her expert testified he cannot quantify the amount of asbestos to which Donna was exposed. Colgate maintains that Donna's potential exposure to asbestos as a result of her husband's work in an automobile repair shop further prevents her from showing that asbestos in Cashmere Bouquet caused her illness.

Finally, Colgate argues that at a minimum, it is entitled to summary judgment as to Cynthia's claim for punitive damages. Colgate asserts that as soon as it became aware of the potential dangers of asbestos contamination in the early 1970's, it developed and implemented a state of the art testing protocol to ensure that talc in Cashmere Bouquet was not contaminated. Colgate also contends the FDA has determined that cosmetic talcum powder is generally

OO : 000008 of 000042

recognized as safe. Colgate thus maintains that no reasonable jury could conclude Colgate exhibited wanton or reckless disregard for the lives of its customers.

2. *Cynthia's Argument*

Cynthia argues the evidence of record establishes that Donna used Cashmere Bouquet from the early 1960s until the 1990s, including a ten-year span when she used the product on a daily basis. Cynthia asserts that evidence of record also indicates that asbestos was present in the talc ore used to make Cashmere Bouquet as confirmed by historical and contemporary testing. According to Cynthia, expert testimony further demonstrates that significant amounts of asbestos were present in Cashmere Bouquet, that the same fiber types were found in Donna's lymph tissue, and that Donna's use of asbestos-containing talcum powder was a substantial factor in causing her illness. Cynthia contends this evidence presents a genuine issue of material fact as to whether Cashmere Bouquet contained asbestos and whether Donna's exposure to that product was a substantial factor in her development of mesothelioma.

Cynthia further argues that she is not required to present tests of the actual bottles used by Donna to prevail at trial. Rather, Cynthia maintains she only needs to show circumstantial evidence that Donna was exposed to Cashmere Bouquet and that Cashmere Bouquet was contaminated with asbestos. Cynthia contends she meets that standard with the opinions of her expert that the likelihood of asbestos exposure after using ten bottles of Cashmere Bouquet is 99.99% and that Donna's use of over 100 bottles of Cashmere Bouquet results in an essentially 100% statistical likelihood of exposure. According to Cynthia, this is particularly true given that talc and asbestos were located in Donna's lung and lymph tissue. Cynthia therefore maintains the evidence of record is sufficient to establish that Donna was exposed to asbestos in Cashmere Bouquet.

OO : 000009 of 000042

Cynthia further argues that she is also not required to demonstrate the level of asbestos to which Donna was exposed. According to Cynthia, Colgate itself had a zero-tolerance policy providing that no level of asbestos exposure was safe. Cynthia also points to her expert's opinion that anyone exposed to a carcinogen with no safe level of exposure is at risk of developing cancer, regardless of dose.

Finally, Cynthia also contends the evidence of record is sufficient to submit the issue of punitive damages to the jury. According to Cynthia, that evidence shows Colgate knew of the dangers of asbestos exposure and that its talc sources and Cashmere Bouquet contained asbestos. Cynthia maintains that Colgate nonetheless was consciously indifferent regarding that contamination, as evidenced by its failure to remove the product from shelves, substitute a safe non-talc alternative, share test results with the FDA, or warn consumers of the potential danger. Cynthia asserts that Colgate instead knowingly adopted an insufficient testing methodology.

### 3. *Presence of Asbestos in Cashmere Bouquet*

To prevail on an asbestos claim, the plaintiff must first show that the defendant's product contained asbestos. Here, Colgate asserts there is no evidence of record to support a finding that its product, Cashmere Bouquet, contained asbestos. Indeed, Colgate points to evidence that could support a reasonable conclusion that Cashmere Bouquet did not contain asbestos. For example, Colgate cites to studies from 1973, 1976, and 2012 reporting no asbestos in either Cashmere Bouquet or cosmetic-grade talc and talcum powder samples. See, e.g., Motion, Ex. 22 at HHS00000200-04 (indicating no reporting of tremolite or chrysotile for Cashmere Bouquet samples, *i.e.* samples 7, 81, and 165); id., Ex. 23 at HHS00000155-57 (indicating no reporting of tremolite or chrysotile for Cashmere Bouquet samples, *i.e.* samples 81 and 165).

OO : 000010 of 000042

Colgate further notes that studies also did not find asbestos in the mines in Italy, Montana, and North Carolina used to source talc for the manufacture of Cashmere Bouquet.  Id., Ex. 11 ¶¶ 25-26 (referencing studies that did not find asbestos in Italian mines, including testing of samples collected by Dr. Sanchez); id. ¶¶ 19-23 (noting studies finding no asbestos in Montana talc mines); id. at ¶ 27 (stating that expert is unaware of "any published literature indicating the presence of chrysotile or anthophyllite asbestos or tremolite asbestos in" Italian, Montana, or North Carolina talc).  Colgate also points to deposition testimony that none of its talc samples ever failed an asbestos test, as well as documents of its third-party testing laboratory indicating that the vast majority of samples tested negative for asbestos.  Id., Ex. 35 at 278:8-18 & Ex. 48.  Further supporting Colgate's position is its expert's opinion that Cashmere Bouquet did not contain asbestos, and epidemiological studies showing no cases of mesothelioma among miners and millers working in the Italian mines used to source talc for Cashmere Bouquet.  Id., Ex. 11 at ¶ 28 (stating "opinion that Cashmere Bouquet talcum powder *did not* contain asbestos") (emphasis in original); id., Exs. 36-39.

While this evidence could support a reasonable conclusion that Cashmere Bouquet did not contain asbestos, Cynthia points to evidence in the record that could support a reasonable conclusion that Cashmere Bouquet did contain asbestos.  For example, Cynthia presents evidence that Cashmere Bouquet tested positive for asbestos.  Response, Ex. 59 at 692:3-13, 697:3-24, Ex. 63 at 123:25-124:15, & Ex. 71.  Cynthia also notes a statement by the FDA in 1986 that "some cosmetic talc produced in the 1960s and early 1970s did contain asbestiform minerals."  Motion, Ex. 21 at FDA00003601.

Similarly, Cynthia answers Colgate's contention that the Italian mines did not contain asbestos with contradictory test results indicating that the mines did contain asbestos.  See, e.g.,

11

Response, Ex. 26, Ex. 28, Ex. 41 at CAMC-Herford-000119, 121, & Ex. 42 at 4 (indicating asbestos fiber content of up to .68% by weight in Italian talc).  She presents similar evidence regarding the presence of asbestos in Montana and North Carolina talc.  Id., Ex. 48 & Ex.55 at 25.  It is thus apparent that while Colgate's evidence suggests Cashmere Bouquet did not contain asbestos, Cynthia has presented contradictory evidence suggesting that asbestos was present in Cashmere Bouquet.  Accordingly, in construing the evidence in the light most favorable to Cynthia, the Court cannot find that it would be impossible for her to prove at trial that Cashmere Bouquet contained asbestos.  To the contrary, the record demonstrates a question of material fact as to the presence of asbestos in Cashmere Bouquet that must be resolved by the jury.

    4.  *Causation – Lack of Evidence Regarding Product Used by Donna*

    To prevail against Colgate at trial, Cynthia must also show that Cashmere Bouquet was a legal cause of Donna's mesothelioma, *i.e.* that Cashmere Bouquet was a "substantial factor in bringing about" Donna's illness.  Bailey v. North Am. Refractories Co., 95 S.W.3d 868, 871 (Ky. App. 2001).  However, Cynthia is not required to present direct evidence that Cashmere Bouquet caused Donna's mesothelioma.  Rather, she may also establish legal causation "'by a quantum of circumstantial evidence from which a jury may reasonably infer that the product was a legal cause of the harm.'"  Id. at 872-73.  "These inferences, however, must be reasonable, that is they must 'indicate the *probable*, as distinguished from a *possible* cause.'"  Id. at 873 (emphasis in original).

    The question of legal causation is generally one of fact for the jury, unless "the facts are undisputed and susceptible of but one inference."  Id. at 872.  Thus, the question for the Court on summary judgment is whether, when viewed in the light most favorable to the non-moving party and with all doubts resolved in her favor, "'the evidence as to the facts makes an issue upon

which the jury may reasonably differ as to whether the conduct of the defendant has been a substantial factor in causing the harm to the plaintiff.'" Pathways, Inc. v. Hammons, 113 S.W.3d 85, 92 (Ky. 2003).

Colgate argues that Cynthia cannot show Cashmere Bouquet was a legal cause of Donna's illness because Cynthia has no evidence the containers of product used by Donna actually contained asbestos. Colgate points to past tests of Cashmere Bouquet that did not reveal asbestos and the testimony of plaintiffs' experts in other cases that the presence of asbestos in talc mines can be variable, sporadic, and occasional. Reply, Ex. 61 at 53:20-24, Ex. 62 at 521:9-12, Ex. 63 at 140:13-23, & Ex. 64 at 135:8-136:16. Colgate also relies upon the testimony of Cynthia's expert Dr. Egilman that a lack of uniformity in the asbestos contamination of talc contributes to the difficulty in designing a statistically sound model to determine the presence of asbestos in particular containers of talcum powder. Motion, Ex. 46 at 701:8-15.

However, Cynthia presents affidavit testimony by Dr. Egilman indicating that because testing revealed asbestos in 50-60% of Colgate cosmetic talcum powder samples, the likelihood of being exposed to asbestos fibers after using ten bottles of Cashmere Bouquet is more than 99%. Response, Ex. 94 ¶ 66. Dr. Egilman calculated that based upon Donna's testimony, she used between 104 and 180 bottles of Cashmere Bouquet during her life. Response, Ex. 127. Dr. Egilman also states that in Donna's case, the likelihood of exposure to asbestos in Cashmere Bouquet is effectively 100% because talc and asbestos were found in Donna's lung and lymph tissue.[1] Response, Ex. 94 ¶ 66. Notably, Dr. Egilman also opines that the fibers found in

---

[1]     As discussed below, the Court will hold a *Daubert* hearing regarding the admissibility of the opinions of Dr. Poye, Dr. Dodson, and Dr. Taragin. See infra at 39-41. To the extent Dr. Egilman's exposure opinion may be based upon the tissue digestion analysis or other efforts of these experts, Colgate may move for exclusion of that opinion should the Court determine the experts' opinions are inadmissible following the *Daubert* hearing.

13

OO : 000013 of 000042

Donna's tissue were in fact a "finger print" of materials found in Cashmere Bouquet.  Id. at ¶ 62

("[T]he talc and asbestos found in Mrs. Hayes' lung and lymph tissue is a 'finger print' matching

the talc and asbestos found in . . . Colgate talcum powder products.").  Construed in the light

most favorable to Cynthia, this evidence is sufficient to raise a genuine issue of material fact as

to whether the containers of Cashmere Bouquet used by Donna contained asbestos.

     5.  *Causation – Lack of Evidence of Asbestos Levels in Cashmere Bouquet*

     Colgate also contends that Cynthia cannot demonstrate legal causation because she

cannot show a probability that the level of asbestos in Cashmere Bouquet, if any, was sufficient

to cause mesothelioma.  For example, Colgate points out that Cynthia's expert Dr. William

Longo testified he cannot provide a "quantifiable number" of the amount of asbestos present in

any bottle of Cashmere Bouquet.  Motion, Ex. 51 at 43:11-17.  Colgate also relies upon

testimony by Cynthia's expert Dr. Jacqueline Moline agreeing that "there are exposures to

asbestos that are so slight or trivial that [she] would not as a medical expert be prepared to assign

that exposure as a substantial contributing cause of the development of the disease."  Id., Ex. 53

at 76:14-20.  Colgate also submits affidavit testimony by its expert Jennifer Sahmel that even

assuming trace amounts of asbestos were present in Cashmere Bouquet, "any associated asbestos

exposure potential would be well within the corresponding cumulative lifetime background or

ambient levels of asbestos found in the air in the U.S."  Motion, Ex. 41 ¶ 25.  Similarly, Colgate

also points to a 1986 statement by the FDA that its scientists "concluded that the risk from a

worst-case estimate of exposure to asbestos from cosmetic talc would be less than the risk from

environmental background levels of exposure to asbestos (non-occupational exposure) over a

lifetime."  Motion, Ex. 21 at FDA00003602.

OO : 000014 of 000042

However, Cynthia again presents contradictory evidence.  For example, she points to her expert's opinion that the expected asbestos level in Cashmere Bouquet would have been well above background levels.  Response, Ex. 81 ¶¶ 46-47 (stating that exposure to asbestos in Cashmere Bouquet "would be substantially above background" and that Donna's exposure to Cashmere Bouquet in particular "caused her to be exposed to fibrous amphibole asbestos well above background or ambient levels.").

Moreover, Cynthia also points out that Colgate itself adopted a zero-tolerance policy regarding the presence of asbestos in its products because it assumed there was no safe level of exposure, as well as the opinion of her own expert that there is no safe level of exposure. Response, Ex. 82 at 341:25-342:2; id., Ex. 96 at 141:24-142:1 ("As a public health professional, I would not state that there is any safe level of exposure to asbestos."); id., Ex. 94 ¶ 63 ("It is important to recognize that once it is established that a substance (asbestos) is a carcinogen with no safe level of exposure, . . . anyone exposed to that substance is at risk of contracting cancer irrespective of the dose.").  Although Colgate presents case law from other jurisdictions rejecting the position that even minimal asbestos exposure can cause mesothelioma, Kentucky courts have declined to find that position untenable as a matter of law for purposes of summary judgment. See CertainTeed Corp. v. Dexter, 330 S.W.3d 64, 78 (Ky. 2010) (finding that trial court properly granted new trial where jury failed to apportion liability to "empty chair" defendants whose asbestos products were shown to be present in plaintiff's working environment, given expert's opinion that "*every single exposure* to asbestos would have been the legal cause of [plaintiff's] illness.") (emphasis in original); Landreth v. Brake Supply Co., No. 2015-CA-000006, 2017 WL 2392522, at *6 (Ky. App. June 2, 2017) ("For purposes of summary judgment, we disagree that a single exposure to a known carcinogen can never be sufficient to establish legal causation."); see

15

also Bailey, 95 S.W.3d at 873 and n.5. Accordingly, Cynthia's evidence that asbestos in Cashmere Bouquet exceeded background levels and that any exposure could cause mesothelioma is sufficient to avoid summary judgment.

Finally, Cynthia also presents several expert opinions explicitly finding that Cashmere Bouquet was a substantial factor in causing Donna to contract mesothelioma. See, e.g., Response, Ex. 94 ¶ 65 ("It is my opinion to a reasonable degree of medical probability that Donna Hayes' exposure to . . . Colgate Palmolive Company's Cashmere Bouquet . . . was a substantial factor in causing her to contract malignant mesothelioma."). As such, the Court cannot find that it would be impossible for a reasonable jury to conclude that asbestos in Cashmere Bouquet, even if minimal, was a substantial factor in Donna's development of mesothelioma. See Bailey, 95 S.W.3d at 873 (reversing summary judgment for defendant on asbestos claim, including because plaintiff's expert opined that defendant's product was a substantial contributing factor to plaintiff's illness).

6. *Causation – Alternative Exposure Theories and Lack of Epidemiological Studies*

Alternative exposure theories, such as Colgate's allegation that Donna may have been exposed to asbestos while laundering her husband's clothes, also do not entitle Colgate to summary judgment. The existence of other possible contributing factors does not foreclose a finding that the product at issue was also a substantial contributing factor. Landreth, 2017 WL 2392522 at *6 ("[T]he mere existence of other possible contributing factors, or that [decedent's] combined exposures were all substantial contributing factors, would not preclude the fact-finder from inferring liability as to any individual defendant. At the very least, that question is not properly presented on a motion for summary judgment."). As such, the opinions of Cynthia's experts stating that Cashmere Bouquet was a substantial contributing cause to Donna's

Entered    16-CI-003503    04/12/2019    David L. Nicholson, Jefferson Circuit Clerk

OO : 000016 of 000042

mesothelioma is sufficient to overcome summary judgment, even if there may also have been other contributing factors.

The alleged lack of epidemiological studies drawing a connection between use of cosmetic talcum powder and mesothelioma also does not warrant summary judgment in Colgate's favor.  Although epidemiological studies may be the best proof that a substance likely causes a particular illness, other evidence may also be used to demonstrate such a connection. See Hyman & Armstrong, P.S.C. v. Gunderson, 279 S.W.3d 93, 105 (Ky. 2008) ("'Unquestionably, epidemiological studies provide the best proof of the general association of a particular substance with particular effects, but it is not the only scientific basis on which those effects can be predicted.'").  Here, Cynthia's experts rely on other forms of evidence in concluding that asbestos in cosmetic talcum powder can cause mesothelioma, including animal studies, human case reports, and the correlation between the fibers and talc found in both the products at issue and Donna's lymph and lung tissue.  Response, Ex. 94 ¶¶ 33-34, 62-63. Accordingly, because Cynthia presents evidence sufficient to raise genuine issues of material fact as to the presence of asbestos in Cashmere Bouquet and whether such asbestos was a substantial contributing factor to Donna's development of mesothelioma, summary judgment is not warranted.

7. *Punitive Damages*

Finally, Colgate asserts that even if summary judgment is not warranted as to the entirety of Cynthia's claims, summary judgment should nonetheless be granted on her claim for punitive damages.  Under Kentucky law, punitive damages may be recovered only upon a showing of negligence "'accompanied by wanton or reckless disregard for the lives, safety, or property of others.'"  Nissan Motor Co., Ltd. v. Maddox, 486 S.W.3d 838, 840 (Ky. 2016).  "Where the

17

potential for harm is great and directly evident, Kentucky has found that a reckless disregard for the rights of others may be inferred from the negligent act." <u>Peoples Bank of Northern Kentucky, Inc. v. Crowe Chizek & Co. LLC</u>, 277 S.W.3d 255, 268 (Ky. App. 2008).

Colgate argues it cannot be found to have acted wantonly or with reckless disregard because it utilized x-ray diffraction, optical microscopy, and transmission electron microscopy to examine samples for the presence of asbestos and would not use talc if any indication of asbestos contamination appeared. Motion, Ex. 33 at 581:17-21, Ex. 34 at 18:18-23, & Ex. 8 at 137:17-21, 215:3-11. Colgate also cites evidence of record that the FDA generally recognizes talc as safe for certain purposes. <u>Id</u>., Ex. 24 at 15861 & Ex. 19 at 311.

However, Cynthia presents evidence that could support findings Colgate was aware by 1971 that asbestos may be present in talc and that exposure to asbestos-containing commercial products could result in health hazards, but did not warn consumers of a potential presence of asbestos in its talc products. Response, Ex. 63 at 71:14-19 (testifying to awareness in 1971 of potential for asbestos in talc); <u>id</u>., at 247:14-248:11 (testifying no warnings were placed on Cashmere Bouquet); <u>id</u>., Ex. 107 at 25. Cynthia also points to evidence that Colgate may have used an ineffective method to test for asbestos despite knowing that more accurate testing methods were available. <u>Id</u>., Ex. 32 at 6 (noting that transmission electron microscopy is "the best, most reliable method" and sensitive to a level of 0.1%); <u>id</u>., Ex. 111 at 2 (noting that J4-1 testing method used instead by Colgate failed to find asbestos in 6 out of 7 tests of spiked talc).

Both the knowing distribution of products with known dangerous defects and the knowing use of inadequate testing methods may serve as the basis for an award of punitive damages. <u>Owens-Corning Fiberglas Corp. v. Golightly</u>, 976 S.W.2d 409, 411 (Ky. 1998) (affirming award of punitive damages where evidence supported finding that defendant

18

knowingly sold and distributed asbestos-containing products without warning labels, despite awareness of the health hazards presented by asbestos); <u>Nissan Motor Co.</u>, 486 S.W.3d at 845 (holding that punitive damages may be warranted upon a showing of "extremely bad conduct, such as continuing to distribute a product with known dangerous defects or where the manufacturer knows that the federal testing is invalid."). Thus, although Colgate's evidence shows efforts taken to prevent the distribution of asbestos-contaminated talc, Cynthia's evidence that Colgate may have continued to knowingly distribute a potentially dangerous product without warnings and to knowingly use an ineffective method to detect asbestos could lead a reasonable juror to conclude punitive damages are warranted. Accordingly, Colgate is not entitled to summary judgment as to Cynthia's claim for punitive damages.

In sum, the evidence of record is sufficient to raise genuine issues of material fact as to whether Donna was exposed to asbestos in the course of her use of Cashmere Bouquet and as to whether such exposure was a substantial contributing factor to her development of mesothelioma. The evidence of record is also sufficient to raise a genuine issue of material fact as to whether Colgate's conduct with respect to the sale of Cashmere Bouquet was negligent and accompanied by a wanton or reckless disregard for the lives or safety of others.[2] Accordingly, Colgate's Motion for Summary Judgment is DENIED.

<u>**JOHNSON & JOHNSON'S MOTION FOR SUMMARY JUDGMENT**</u>

1. *Johnson & Johnson's Argument*

Johnson & Johnson argues that Cynthia has failed to produce evidence its talcum powder products contained asbestos. Johnson & Johnson asserts its own evidence shows the products

---

[2]     Colgate is free to seek reconsideration of this determination made upon consideration of the summary judgment briefing following the close of proof at trial.

did not contain asbestos, including evidence that Johnson & Johnson required suppliers to provide asbestos-free talc and sourced talc from asbestos-free mines.  Johnson & Johnson further points to evidence that the FDA tested its products and found them uncontaminated, as did third-party testing and audits.  Johnson & Johnson contends that test results relied upon by Cynthia are not relevant because they show only findings of "tremolite" or "amphiboles" rather than asbestos, were taken from mines not used by Johnson & Johnson, or do not indicate whether the testing was of industrial or cosmetic talc.

Johnson & Johnson also argues that Cynthia has no evidence to establish that the Johnson & Johnson products actually used by Donna were contaminated by asbestos.  Johnson & Johnson asserts that years of negative test results foreclose a showing that contamination of its products was sufficiently prevalent or pervasive to infer that Donna used contaminated product.  Johnson & Johnson also contends Cynthia lacks an expert to provide testimony regarding the statistical significance of any such prevalence.

Johnson & Johnson further argues that Cynthia cannot rely on the opinion of her expert Dr. Longo to establish Donna's exposure to asbestos in Johnson & Johnson's products.  Johnson & Johnson contends that Dr. Longo's opinion is based upon testing of samples drawn from vintage talcum powder containers obtained from eBay or law firms that represent plaintiffs in talc litigation.  Johnson & Johnson asserts it is common for collectors to obtain such vintage containers and refill them with talcum powder manufactured by a different company, raising significant questions about the authenticity of the samples.  Johnson & Johnson also maintains that the testing methodology used by Dr. Longo is flawed because it cannot distinguish between asbestiform and non-asbestiform fibers.  Johnson & Johnson asserts that Cynthia also cannot rely

OO : 000020 of 000042

on the opinion of her expert Lee Poye because he was unaware of the source of the samples he tested and did not test samples actually used by Donna.

Johnson & Johnson further argues that Cynthia cannot rely upon her tissue digestion analysis experts to establish causation.  According to Cynthia, those experts testified they cannot identify the origin of asbestos found in Donna's tissues, and that the dust found in her tissues was consistent with welding or friction product exposure.

Johnson & Johnson further argues that Cynthia's causation expert Dr. Jacqueline Moline has not calculated Donna's level of exposure to asbestos in Johnson & Johnson products or whether it was above background levels, despite testifying that asbestos exposure must exceed background levels to be a substantial cause of mesothelioma.  Johnson & Johnson contends Dr. Moline therefore has no basis to opine that Donna's mesothelioma was caused by Johnson & Johnson's products.

Johnson & Johnson also argues that Cynthia's conspiracy claim must be dismissed because she does not plead any actionable conduct by Johnson & Johnson, and because Cynthia seeks to impose liability based upon Johnson & Johnson's constitutionally protected petitioning of governmental bodies and related public information campaigns.  Johnson & Johnson maintains that Cynthia's fraudulent misrepresentation claim must also be dismissed because Cynthia does not identify any representations or misrepresentations by Johnson & Johnson in her pleading.  Finally, Johnson & Johnson contends that Cynthia cannot recover punitive damages because Johnson & Johnson tested its talc on a regular basis with the most sophisticated methods available, and that any presence of asbestos in its talc would therefore be entirely unintentional despite best efforts to prevent it.

OO : 000021 of 000042

21

2. *Cynthia's Argument*

Cynthia argues that the evidence of record shows asbestos was present in the Italian and Vermont mines used to source Johnson & Johnson's talc.  Cynthia contends that historical testing also demonstrates Johnson & Johnson's Shower to Shower and Baby Powder products contained asbestos.  Cynthia maintains that experts in this case have opined that Donna was exposed to asbestos above background levels in Johnson & Johnson's talcum powder products, and that such exposure was a substantial factor in Donna's development of mesothelioma.

Cynthia asserts she is not required to demonstrate that the containers actually used by Donna contained asbestos, but rather that she may prove her case with circumstantial evidence supporting a reasonable inference that Johnson & Johnson's products were a legal cause of Donna's illness.  Cynthia contends it would be unfair to require her to produce the bottles actually used by Donna because Johnson & Johnson indicated the product was safe and Donna therefore did not keep the bottles.

Cynthia asserts that her experts' testing is reliable because it was based upon authentic containers of Johnson & Johnson product taken from Johnson & Johnson itself or from verified bottles of the company's products.  Cynthia argues that she is not required to present a perfect chain of custody but rather only a reasonable probability that the containers tested contained authentic Johnson & Johnson product.  Cynthia notes that her expert Dr. Longo states the samples he tested were factory original samples, that nothing suggests they are not authentic, and that there is no evidence they have been or could be tampered with.

Cynthia also asserts that her conspiracy claim is viable because Johnson & Johnson, along with other defendants, endeavored to design testing deliberately intended not to detect asbestos.  Cynthia further argues that her fraudulent misrepresentation claim is viable because

22

OO : 000022 of 000042

Johnson & Johnson falsely denied that its products contained asbestos and failed to warn consumers of the dangers.  Cynthia contends that these causes of action may proceed because her claims are not based upon petitioning of the government but rather upon Johnson & Johnson's concealment of the hazards in its products.

Cynthia also asserts that her claim for punitive damages should be submitted to the jury. According to Cynthia, the evidence of record demonstrates Johnson & Johnson knew its talcum powder products contained asbestos and were hazardous, yet knowingly relied upon inadequate testing methods, pressured and controlled scientific research, concealed the dangerous nature of its products, and failed to warn consumers.

    3.   *Presence of Asbestos in Johnson & Johnson Cosmetic Talcum Powder Products*

The Court finds that there is a genuine issue of material fact as to whether Johnson & Johnson's Shower to Shower and Baby Powder products contained asbestos.  The talc used in the manufacture of those products was mined in Italy, Vermont, and China.  Motion, Ex. 3 ¶¶ 46, 55, 61.  Although Johnson & Johnson presents affidavit testimony of its expert Dr. Sanchez opining that the Italian mines did not and do not contain asbestos, as noted above Cynthia presents contradictory evidence that Italian mines did contain asbestos.  Id. at ¶ 46; supra at 11-12. Cynthia also presents evidence to contradict Johnson & Johnson's proof that asbestos was not present in the Vermont mines.  Compare Motion, Ex. 3 ¶ 55 (opining that Vermont talc was not and is not contaminated by asbestos) and Response, Ex. 40 at JNJMX68_000002667 (noting presence of asbestiform minerals in Vermont talc samples), Ex. 43 (reporting findings of up to medium amounts of asbestos in Vermont talc samples), & Ex. 48 at 3 (reporting up to 4.5% asbestos by weight in Vermont talc samples).  This competing evidence is sufficient to raise a

OO : 000023 of 000042

genuine issue of material fact as to whether asbestos was present in the mines from which talc was sourced for the manufacture of Johnson & Johnson's cosmetic talcum powder products.

The evidence of record is also sufficient to raise a genuine issue of material fact as to whether asbestos was also present in the products themselves. On the one hand, Johnson & Johnson points to evidence in the record that its products did not contain asbestos, such as historical FDA and third-party testing that did not reveal asbestos in Johnson & Johnson's products, the FDA's finding that asbestos warnings were not required for talcum powder, and Johnson & Johnson's requirement that all talc be tested and certified as asbestos-free by suppliers. Motion, Ex. 3 ¶¶ 95, 98-100, Ex. 4, & Ex. 7.

On the other hand, Cynthia points to evidence of record that could lead a reasonable juror to conclude that Johnson & Johnson's cosmetic talcum powder products did contain asbestos. For example, Cynthia points out that Johnson & Johnson's expert Dr. Sanchez has previously testified he did not disagree that asbestos had been found in Johnson & Johnson Baby Powder. Response, Ex. 83 at 3038:1-10. Cynthia also cites to a finding by her expert Dr. Longo that a sample of Johnson & Johnson's Baby Powder ordered to be produced from Johnson & Johnson's historical archives contained "millions of asbestos structures per gram of talc." Response, Ex. 77 ¶ 19. Dr. Longo also opines that his testing of 20 of 35 samples of Shower to Shower and Baby Powder revealed the presence of asbestos. Id. at ¶ 22. Dr. Longo therefore concludes that users of these products were likely exposed to asbestos. Id. at ¶ 45.

Johnson & Johnson objects to Cynthia's reliance on Dr. Longo's opinions on a number of grounds. First, Johnson & Johnson asserts that Dr. Longo testified the transmission electron microscopy method used in testing the products cannot determine whether a fiber is asbestiform or non-asbestiform. Motion, Ex. 15 at 1172:4-9 ("You can't say it's asbestiform and

nonasbestiform. You're absolutely correct for a single fiber."). However, Dr. Longo also testified that he can determine whether the sample contains asbestos by looking at the sample more broadly and applying certain rules regarding length, aspect ratio, and the presence of parallel sides in the fibers. Id. at 1172:13-17. Read in the light most favorable to Cynthia, Dr. Longo's testimony establishes only that while he could not designate a single fiber as asbestiform or non-asbestiform, he can conclude from consideration of the sample more broadly whether or not asbestos is present.

Johnson & Johnson also contends that Dr. Longo's opinions are unreliable because they are based upon testing of samples whose authenticity cannot be established. Johnson & Johnson notes that Dr. Longo relies on samples obtained from plaintiffs' law firms or that were purchased on eBay. Motion, Ex. 12 at 47:25-48:7, 52:5-9. However, "'it is unnecessary to establish a perfect chain of custody or to eliminate all possibility of tampering or misidentification, so long as there is persuasive evidence that 'the reasonable probability is that the evidence has not been altered in any material respect.'" Muncy v. Commonwealth, 132 S.W.3d 845, 849 (Ky. 2004). Here, Dr. Longo testified that 25 of the samples were in what he believes are factory-sealed containers, that examination of the containers under a microscope did not reveal evidence of tampering, that it would be practically impossible to replace original powder with substitute powder, that the contents were consistent with known Johnson & Johnson product, and that nothing suggests the samples were inauthentic. Motion, Ex. 12 at 48:10-14, 56:20-58:18; Response, Ex. 77 ¶¶ 29-35. This evidence is sufficient to support a reasonable finding that the containers have not been altered or tampered with in any material respect.

Moreover, "a gap in the chain of custody usually goes 'to the weight of the evidence rather than to its admissibility.'" Muncy, 132 S.W.3d at 849. As such, Johnson & Johnson's

OO - 000025 of 000042

concerns regarding the authenticity of the samples tested by Dr. Longo are more properly addressed by cross-examination rather than by exclusion of Dr. Longo's opinions. Accordingly, because the Court finds that the evidence of record is sufficient to raise a genuine issue of material fact as to whether Johnson & Johnson's products contained asbestos, Johnson & Johnson is not entitled to summary judgment.

4. *Causation*

Cynthia has also presented evidence sufficient to raise a genuine issue of material fact as to whether Donna's use of Johnson & Johnson's talcum powder products was a legal cause of her mesothelioma. As noted above, Kentucky law does not bar reliance upon expert opinion that even minimal asbestos exposure can cause mesothelioma. Supra at 15-16. Cynthia therefore is not required to produce evidence that Donna was exposed to a threshold dose of asbestos in Johnson & Johnson's products in order to prevail.

Moreover, Cynthia produces expert opinions that Donna's mesothelioma was caused by exposure to asbestos in Johnson & Johnson's cosmetic talcum powder products. For example, Cynthia's expert Dr. Egilman opines that there is more than a 99% chance Cynthia was exposed to asbestos in her use of those products. Response, Ex. 101 ¶ 66. Dr. Egilman also expressly concludes "to a reasonable degree of medical and scientific probability that Donna Hayes' mesothelioma was caused by her lifelong exposure to asbestos in talc and talcum powders sold by Johnson & Johnson" and that such exposure was a "substantial factor in causing her to contract malignant mesothelioma." Id. at ¶ 65. Dr. Egilman further states that fibers found in Donna's lung and lymph tissue are consistent with those found in Johnson & Johnson's cosmetic talcum powder products, and indeed are a "finger print" matching those products. Id. at ¶ 62. Finally, as noted above Donna's exposure to other potential sources of asbestos does not

26

OO : 000026 of 000042

foreclose a finding that her use of Johnson & Johnson's products was also a substantial factor in her illness. As such, the evidence of record raises a genuine issue of material fact as to whether Donna was exposed to asbestos in Johnson & Johnson's cosmetic talcum powder products and whether any such exposure was a substantial factor in her development of mesothelioma.

    5. *Conspiracy*

    Johnson & Johnson argues that Cynthia's allegations are not sufficiently specific to state a claim for conspiracy. To prevail on a conspiracy claim, the plaintiff "must show an unlawful/corrupt combination or agreement between the alleged conspirators to do by some concerted action an unlawful act." Peoples Bank, 277 S.W.3d at 261. Similarly, a claim for concert of action against manufacturers is viable if the plaintiff can prove "that the manufacturers acted tortiously, pursuant to a common design, or rendered substantial assistance to others to accomplish a tortious act." Id. Here, Cynthia alleges in her Complaint that Johnson & Johnson and the other defendants worked together to control industry standards, disseminate false information, and conceal and ignore health and safety issues raised by their products. Complaint ¶¶ 82-87. These allegations are sufficiently specific to state a claim for civil conspiracy.

    However, Cynthia's civil conspiracy claim fails as a matter of law to the extent it is based upon Johnson & Johnson's advocacy before the FDA. As recognized by the *Noerr-Pennington* doctrine, the Petition Clause of the First Amendment bars subjecting a party to liability for engaging in non-sham efforts to influence governmental action. Grand Communities, Ltd. v. Stepner, 170 S.W.3d 411, 414 (Ky. App. 2004). Although originating in the context of antitrust claims based upon petitioning of legislative and executive bodies, the doctrine also protects the petitioning of administrative agencies. Id. The doctrine has also been expanded to protect not only against antitrust liability, but also against tort liability. Id. at 416 (affirming dismissal of

OO : 000027 of 000042

tort claims based upon defendant's efforts to persuade municipality to annex property and his subsequent appeal of a municipal zoning decision).

Under this doctrine, Johnson & Johnson cannot be subjected to tort liability for non-sham efforts to influence decisions of the FDA or other governmental bodies.  Thus, those portions of Cynthia's conspiracy claim based upon the Defendants' alleged advocacy before the FDA, including advocacy for certain testing methodologies and against asbestos warnings on talcum powder products, must be dismissed.[3]  See Complaint ¶ 77.

However, the Court disagrees with Johnson & Johnson's contention that the protections of the *Noerr-Pennington* doctrine also extend to Johnson & Johnson's alleged public information campaign.  A party's orchestration of a public information campaign may be protected by the *Noerr-Pennington* doctrine when the campaign is aimed at influencing government action.  See Noerr, 365 U.S. at 143 (finding public information campaign activity protected where it was aimed at influencing government action).  Here, Cynthia does not allege that Johnson & Johnson engaged in a public information campaign to influence government action, but rather that it did so for the purpose of deceiving the public.  See Complaint ¶¶ 86 (alleging that Defendants attempted to control the dissemination of information, distorted results, and released invalid information in a "plan of deception intended to deprive the public at large . . . of alarming

---

[3]        Although the protections of the *Noerr-Pennington* doctrine do not extend to mere "sham" efforts to influence government action, Cynthia has not presented evidence to support a finding that Johnson & Johnson's alleged advocacy before the FDA was a sham effort.  To be a sham effort, the conduct must be objectively baseless, *i.e.* "'no reasonable [proponent] could realistically expect success on the merits.'"  Id. at 415.  There can be no finding that Johnson & Johnson's efforts were objectively baseless since it appears those efforts were successful insofar as the FDA did not require talcum powder to carry an asbestos warning.  See E. R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 144 (1961) (finding efforts to influence government action genuine because those efforts were successful).

Entered        16-CI-003503        04/12/2019        David L. Nicholson, Jefferson Circuit Clerk

medical and scientific findings."). Accordingly, Johnson & Johnson's alleged public information campaign does not fall within the protections of the *Noerr-Pennington* doctrine.

6. *Fraud*

Finally, Johnson & Johnson argues that Cynthia's fraud claim must be dismissed because Cynthia does not allege any misrepresentation by Johnson & Johnson. The Court disagrees. In her Complaint, Cynthia alleges that the Defendants knowingly and intentionally disseminated false statements regarding the risks of asbestosis, cancer, mesothelioma and other illnesses allegedly caused by use of talcum powder. Complaint ¶ 84. Cynthia also alleges that the Defendants failed to warn of the potential presence of and safety risks from asbestos in their products. Id. at ¶ 83. Cynthia supports this allegation with Johnson & Johnson's admission that it did not place such warnings on its products. Response, Ex. 113 at 3. Accordingly, the Court does not find Cynthia's allegations insufficient to state a cause of action for fraud.

7. *Punitive Damages*

Finally, Johnson & Johnson argues that it is entitled to summary judgment as to Cynthia's claim for punitive damages. However, Cynthia presents evidence that could lead a reasonable juror to find that Johnson & Johnson was aware of the health hazards of asbestos, had reason to believe asbestos was present in its products, and yet did not place warnings on those products. Response, Ex. 73 (informing Johnson & Johnson's counsel that trace levels of asbestos were detected in Johnson & Johnson's Vermont talc); id., Ex. 113 at 3. Cynthia also presents evidence that could support a finding that Johnson & Johnson knowingly used less effective testing methods that would not detect the presence of asbestos in its products. Response, Ex. 90 at 1945:8-16 (indicating that Johnson & Johnson used the J4-1 testing method). As noted above, such facts may support an award of punitive damages. Supra at 18-19.

In sum, Cynthia presents sufficient evidence of record to raise genuine issues of material fact as to whether Johnson & Johnson's cosmetic talcum powder products contained asbestos and whether exposure to such asbestos in the course of Donna's use of those products was a substantial factor in her development of mesothelioma. Moreover, Cynthia's allegations are sufficient to state claims for civil conspiracy and fraud. However, pursuant to the *Noerr-Pennington* doctrine, Johnson & Johnson may not be held liable for its alleged advocacy before the FDA. Finally, the evidence of record is also sufficient to submit Cynthia's claim for punitive damages to the jury.[4] Accordingly, Johnson & Johnson's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART. To the extent Cynthia's claims are based upon Johnson & Johnson's advocacy before the FDA, those claims are DISMISSED WITH PREJUDICE. Summary judgment is denied as to the remainder of Cynthia's claims against Johnson & Johnson.

### MOTION FOR MISSING EVIDENCE INSTRUCTION AGAINST COLGATE

1. *Cynthia's Argument*

Cynthia argues that she is entitled to a missing evidence instruction because Colgate destroyed evidence it knew would be relevant to asbestos litigation regarding Cashmere Bouquet. Cynthia contends Colgate referenced potential litigation in a 1979 request for testing of its talcum powder products for asbestos. Cynthia also asserts that Colgate had a policy requiring preservation of testing samples, but allowed third-party testing vendors to destroy samples according to their own policies. Cynthia maintains that Colgate also nonetheless destroyed historical testing samples and associated grids containing asbestos fibers, as well as

---

[4]     Johnson & Johnson is free to seek reconsideration of this determination made upon consideration of the summary judgment briefing following the close of proof at trial.

Entered          16-CI-003503     04/12/2019          David L. Nicholson, Jefferson Circuit Clerk

OO : 000030 of 000042

related documentary materials and internal documents discussing asbestos testing. Cynthia

contends that although the absence of this evidence alone is sufficient to allow an inference of

intentional bad-faith destruction, Colgate also admits in its discovery responses that the

destruction was intentional. Cynthia argues that she will face undue prejudice in the absence of a

spoliation instruction, given that Colgate's defense to her claims is that Cashmere Bouquet

historically did not contain asbestos.

2. *Colgate's Argument*

Colgate argues that Cynthia cannot show Colgate had a duty to preserve documents and

physical evidence or that it destroyed such materials in bad faith. Colgate asserts that it

discarded documents and product samples in the ordinary course of business, and that other

courts have rejected the contention that Colgate had a duty to preserve that evidence before a

Cashmere Bouquet asbestos claim was first filed in 2008. Colgate also maintains that neither a

general concern over litigation nor alleged positive tests for asbestos are sufficient to give rise to

a duty to preserve evidence. Colgate further notes that it sold the right to manufacture and sell

Cashmere Bouquet to another company in 1995, and has not manufactured or sold the product

itself in more than twenty years.

Colgate also notes that it has produced a significant amount of information including all

available formula cards, purchasing specifications and orders, shipping invoices, laboratory

notebook pages, and documents from its third-party testing vendor, as well as hundreds of testing

results. Colgate further states it has made current and former employees available for more than

thirty days of depositions. Colgate asserts that Cynthia has no proof it destroyed any evidence in

bad faith or in an effort to avoid its discovery obligations.

3. *Standard*

31

OO : 000031 of 000042

Under Kentucky law, the issue of destroyed or missing evidence is addressed by evidentiary rules and missing evidence instructions.  Monsanto Co. v. Reed, 950 S.W.2d 811, 815 (Ky. 1997).  A missing evidence instruction is warranted if a reasonable juror could conclude that a party "'intentionally and in bad faith lost or destroyed'" evidence material to the case.  Univ. Med. Ctr., Inc. v. Beglin, 375 S.W.3d 783, 787 (Ky. 2011) (quoting approved missing evidence instruction).  Direct proof of intentional and bad faith spoliation of such evidence is not required.  Rather, "the requisite elements giving rise to the missing evidence inference may be proven, like virtually any other factual issue, by circumstantial evidence and reasonable inferences."  Id. at 789.

However, where the loss or destruction of the evidence at issue is the result of mere negligence, natural events such as floods or fires, or "destruction in the normal course of file maintenance," the necessary element of bad faith is absent and the missing evidence instruction should not be given.  Id. at 791.  Moreover, no instruction is warranted if the loss or destruction occurred before litigation was ongoing or could reasonably be anticipated.  See id. (noting that "[n]o missing evidence inference is proper when evidence was destroyed long before litigation was anticipated."); see also id. at 789 ("'The inference depends, of course, on a showing that the party had notice that the documents were relevant at the time he failed to produce them or destroyed them.'").  The decision to grant or deny a missing evidence instruction is within the Court's discretion.  Id. at 791 (reviewing trial court grant of missing evidence instruction for abuse of discretion).

### 4. *Duty to Preserve*

The parties do not appear to dispute that Colgate once held evidence that was material to the issues in this case, including whether Cashmere Bouquet contained asbestos.  Such evidence

32

OO : 000032 of 000042

included physical samples of raw talc and finished Cashmere Bouquet product, grids and other materials relating to the testing of those samples, and the asbestos-related document file of at least one former employee.  The parties also do not appear to dispute that Colgate no longer has that evidence.  See Motion, Ex. 32 at 4; id. at 10-13 ("Colgate also responds that it has discarded talc samples in the ordinary course of business . . ."); id., Ex. 33 at 4-5; id., Ex. 34 at 120:13-121:15 (testimony by former Colgate employee Dr. Simko that he destroyed his file of asbestos-related materials at the time of his retirement).

However, the Court does not find that Colgate had a duty to preserve that evidence at the time it was discarded or destroyed.  As noted above, the duty to preserve evidence arises only when a party anticipates or reasonably should anticipate litigation.  See Beglin, 375 S.W.3d at 791.  Here, the alleged destruction of evidence occurred between the 1970s and the 1990s. Motion at 8-9; Response at 1.  Cynthia first asserts that Colgate had a duty to preserve evidence at that time because it knew its product contained asbestos that presented health hazards. However, Colgate notes that it had no reason to anticipate litigation on that basis because in 1986 the FDA concluded "the risk from a worst-case estimate of exposure to asbestos from cosmetic talc would be less than the risk from environmental background levels of exposure to asbestos." Response, Ex. 7 at 2.  Colgate notes that it also did not in fact face any claims related to the alleged presence of asbestos in Cashmere Bouquet until 2008.  Under these circumstances, the Court does not find that Colgate's alleged general awareness that Cashmere Bouquet may be hazardous created a sufficiently concrete expectation of litigation to give rise to a duty to preserve all potentially material evidence.

Nor is the Court persuaded that a reference to a potential legal case in a 1979 Colgate request for asbestos testing of its talcum products demonstrates that Colgate was under such a

OO · 000033 of 000042

duty.  In that letter, Colgate sought testing of its talcum powder products for asbestos "for a potential legal case."  Motion, Ex. 29.  However, as Colgate notes, the letter does not relate to Cashmere Bouquet but rather to three other Colgate talcum powder products.  Moreover, the letter mentions only "potential" litigation, and the record contains no evidence as to what the claims presented in such litigation might be or whether it was ever filed.  Although a closer call, the Court also finds that this letter is not sufficient to establish that Colgate anticipated or should have anticipated litigation regarding the presence of asbestos in Cashmere Bouquet at the time the evidence was discarded.  Thus, because there is no basis to find that Colgate had a duty to preserve the missing evidence, a missing evidence instruction is not warranted.

5.  *Intentional and Bad Faith Destruction*

A missing evidence instruction is also not warranted because there is no support for a finding that Colgate discarded the evidence in bad faith.  As noted above, a missing evidence instruction is warranted only if a reasonable juror could conclude that the evidence was lost or destroyed in bad faith.  Beglin, 375 S.W.3d at 787.  Here, Cynthia does not point to any direct evidence of bad faith, nor does she present circumstantial evidence of bad faith aside from the mere fact that the evidence at issue is missing.

Moreover, the proof indicates that the samples and documents were discarded in the ordinary course of business pursuant to Colgate's document retention policies.  See Motion, Ex. 32 at 12 (stating in interrogatory response that talc samples were discarded "in the ordinary course of business"); id., Ex. 37 at QE-CPC00001904 (indicating that Colgate's policy was to preserve records relating to cosmetic products "for not less than 36 consecutive months"); Response, Ex. 18 at MK-CPC-00001117, 1128 (indicating that Colgate maintained research reports, correspondence, and general files for 5 years).  The discarding of samples, related testing

34

materials, and the asbestos file in conformity with Colgate's normal document preservation policies before any litigation was filed or anticipated cannot serve as the basis for a missing evidence instruction. Beglin, 375 S.W.3d at 791 ("[O]ther common types of cases where the instruction will not be warranted include . . . destruction in the normal course of file maintenance . . . .").

In addition, Colgate further explains that it had no reason to preserve the missing evidence because it sold the rights to manufacture and sell Cashmere Bouquet to another company in 1995, more than 13 years before any claim alleging the presence of asbestos in Cashmere Bouquet was filed. Accordingly, because there is no evidence that Colgate anticipated or should have anticipated litigation at the time the evidence was discarded, and because there is also no proof that the evidence was discarded in bad faith, Cynthia's Motion for a Missing Evidence Instruction against Colgate is DENIED. Cynthia may renew her Motion at the conclusion of proof at trial if she believes the evidence presented warrants such an instruction.

## MOTION FOR MISSING EVIDENCE INSTRUCTION
## AGAINST JOHNSON & JOHNSON

1. *Cynthia's Argument*

Cynthia argues that beginning in 1969, Johnson & Johnson was aware that it faced litigation regarding tremolite and asbestos in its talcum powder products. Cynthia points to additional litigation thereafter that she alleges also gave rise to a duty to preserve evidence. Cynthia contends that Johnson & Johnson nonetheless destroyed talc samples in accordance with its own retention schedule and allowed its suppliers and agents to destroy talc samples and other material in accordance with their retention schedules. Cynthia also asserts that Johnson & Johnson's subsidiary Windsor Minerals destroyed relevant documents upon its 1989 sale of a mine to another entity. Cynthia asserts that Johnson & Johnson's bad faith destruction of

35

OO : 000035 of 000042

evidence may be inferred from its knowledge of potential litigation to which that evidence would have been relevant.

### 2. *Johnson & Johnson's Argument*

Johnson & Johnson argues that it did not have a duty to preserve evidence prior to the 1996 filing of the first claim alleging mesothelioma from use of Johnson & Johnson's cosmetic talcum powder products.  Johnson & Johnson asserts that the earlier cases relied upon by Cynthia involved either industrial rather than cosmetic talc or talcosis rather than mesothelioma.  Johnson & Johnson contends the cases therefore did not give rise to a duty to preserve evidence regarding asbestos testing of talc and product samples.

Johnson & Johnson also argues that the sporadic filing of a few cases claiming mesothelioma from its cosmetic talcum powder products beginning in 1996 also did not give rise to a duty to preserve such evidence.  Johnson & Johnson contends that an obligation to preserve evidence arises in the context of mass tort litigation only where a steady increase in filed cases suggests a looming prospect of substantial litigation regarding a particular product.  Johnson & Johnson asserts that did not occur with respect to claims of mesothelioma arising from its cosmetic talcum powder products until 2016.

Johnson & Johnson further argues that Cynthia offers no proof evidence was destroyed intentionally or in bad faith.  Johnson & Johnson asserts that the missing count sheets were in the possession of third-party vendors and that the sheets were destroyed pursuant to those vendors' document retention policies.  Johnson & Johnson also contends that documents at Windsor's mine were not destroyed to avoid discovery but rather in connection with that mine's closing.

Johnson & Johnson further maintains that Cynthia has not shown any prejudice from loss of the evidence at issue.  According to Johnson & Johnson, an instruction going to the heart of a

Entered        16-CI-003503        04/12/2019        David L. Nicholson, Jefferson Circuit Clerk

OO : 000036 of 000042

critical issue in this case, namely whether asbestos was present in Johnson & Johnson's cosmetic talcum powder products, would be grossly disproportionate given the lack of any prejudice to Cynthia as a result of the lost evidence.  Johnson & Johnson also asserts that it has produced a number of samples that would not differ from the lost samples, and that the lost mining records relate to mining operations rather than the mineralogy of the talc mined.

3.  *Duty to Preserve*

The Court does not find that Johnson & Johnson had a duty to preserve the evidence at issue.  As noted above, a party has a duty to preserve evidence only when litigation is ongoing or can reasonably be anticipated.  Beglin, 375 S.W.3d at 791.  Cynthia first relies on a 1969 Johnson & Johnson letter stating that "it is not inconceivable that we could become involved in litigation in which pulmonary fibrosis or other changes might be rightfully or wrongfully attributed to our powder formulations."  Motion, Ex. 18.  Notably, however, the statement was made by a doctor rather than by an employee that might be expected to be responsible for assessing Johnson & Johnson's litigation risks.  Moreover, the doctor also states in the letter that Johnson & Johnson has "never been faced with any litigation involving either skin or lung penetration by our talc formulations."  Id.  Finally, the doctor's statement that litigation is "not inconceivable" falls short of a statement sufficient to support a finding that litigation was reasonably anticipated.  Thus, the Court does not find this document sufficient to support a finding that Johnson & Johnson had a duty to preserve evidence in 1969.

The Court also agrees with Johnson & Johnson's contention that the 1970s and 1980s talc cases also did not give rise to a reasonable anticipation of litigation regarding the asbestos content of cosmetic talc.  As Johnson & Johnson notes, these cases involved either industrial talc or talcosis, and did not involve cosmetic talc or mesothelioma.  See Response Ex. 4 ¶ 15; id. at ¶

37

OO : 000037 of 000042

9 (asserting that industrial talc differs from cosmetic talc in grade, processing and handling); Motion, Ex. 21 (noting that 1984 <u>Vanderbilt</u> case involved industrial talc). These cases therefore involved issues different from the presence or absence of asbestos in Johnson & Johnson's cosmetic talcum powder products. As such, they did not give rise to a duty to preserve the evidence Cynthia alleges is lost or destroyed.

Finally, the Court also does not find that the cases in the later 1990s gave rise to a duty to preserve evidence. Admittedly, those cases involved claims of mesothelioma arising from use of Johnson & Johnson's cosmetic talcum powder products. <u>See</u> Response, Ex 4 ¶ 7; Motion, Ex. 26. However, discovery in the cases was very limited and Johnson & Johnson was dismissed from the actions before trial. Response, Ex. 4 ¶¶ 6-7 and n.2. Thus, there was no reason the cases should have caused Johnson & Johnson to have a reasonable anticipation of additional future litigation regarding those issues. Accordingly, the Court does not find that Johnson & Johnson had a duty to preserve the evidence at issue.

4. *Intentional and Bad Faith Destruction*

The Court also does not find that Cynthia has shown a reasonable jury could conclude the evidence was lost or destroyed intentionally and in bad faith. As Cynthia acknowledges, the samples and related materials were discarded pursuant to standard retention policies. <u>See</u> <u>id</u>. at 791; Motion at 9, 15; <u>id</u>., Ex. 30. Nor is there evidence that the 1979 destruction of mining documents by Johnson & Johnson's subsidiary Windsor was a bad faith effort to avoid discovery. Rather, those documents were destroyed in anticipation of the closing of the mine where they were kept. Response, Ex. 2 ¶¶ 12-16. Moreover, the documents did not relate to relevant matters such as the mineralogy or testing of the talc mined but rather to details regarding the underground mining operations such as location of the mine, shafts, and ore and mining

38

methods employed within the mine.  Accordingly, because the Court does not find that Johnson

& Johnson had a duty to preserve the evidence at issue or that a reasonable jury could find the

evidence was destroyed intentionally and in bad faith, Cynthia's Motion for a Missing Evidence

Instruction against Johnson & Johnson is DENIED.  Cynthia may renew her Motion at the

conclusion of proof at trial if she believes the evidence warrants such an instruction.

## **MOTIONS IN LIMINE**

In the interest of judicial economy, the Court addresses the numerous pending Motions in

Limine as follows:

| Number | Motion | Ruling | Basis |
|---|---|---|---|
| 1 | Defendants' Motions To Exclude Dr. William Longo | DENIED | The objections raised are more properly addressed by cross-examination than exclusion of witness. |
| 2 | Defendants' Motions to Exclude Dr. Steven Compton | DENIED | The objections raised are more properly addressed by cross-examination than exclusion of witness. |
| 3 | Colgate's Motion to Exclude Testing and Opinions of Non-Testifying Experts | GRANTED | Hearsay; relevance; lack of proper foundation. |
| 4 | Plaintiff's Motion in Limine to Exclude Dr. Matthew Sanchez | DENIED | The objections raised are more properly addressed by cross-examination than exclusion of witness. |
| 5 | Plaintiff's Motion to Exclude Reference to FDA Positions and Reference to FDA Regulation of Talc | DENIED | Information is relevant and reliable. |
| 6 | Plaintiff's Motion to Exclude Evidence that FDA Regulates Talc Industry | DENIED | Information is relevant and reliable. |
| 7 | Colgate's Motion to Exclude Evidence of Unauthenticated Talcum Powder | DENIED | Authenticity of samples can be addressed on cross-examination; the evidence is best available given the historical nature of claims. |

Entered          16-CI-003503     04/12/2019          David L. Nicholson, Jefferson Circuit Clerk

| Number | Motion | Ruling | Basis |
|--------|--------|--------|-------|
| 8 | Defendants' Motion to Exclude Dr. Jacqueline Moline | GRANTED IN PART, DENIED IN PART | Granted as to information regarding 40 other asbestos plaintiffs not parties to this case on grounds of lack of relevance.  Remainder denied. |
| 9 | Defendants' Motion Regarding Dr. David Egilman | GRANTED IN PART, DENIED IN PART | Granted on grounds of lack of relevance as to: 1) asphyxiation deaths; 2) ovarian cancer; 3) mesothelioma caused by asbestos-free talc; 4) Dr. Egilman's own talc testing; and 5) lack of alternative exposure sources. Remainder denied. |
| 10 | Plaintiff's Motion to Exclude Dr. Stanley Geyer | DENIED | The objections raised are more properly addressed by cross-examination than exclusion of witness. |
| 11 | Plaintiff's Motion to Exclude Dr. Alan Gibbs | DENIED | The objections raised are more properly addressed by cross-examination than exclusion of witness. |
| 12 | Plaintiff's Motion to Exclude Dr. John Bailey | DENIED | The objections raised are more properly addressed by cross-examination than exclusion of witness. |
| 13 | Colgate's Motion to Exclude Dr. Lee Poye | PENDING DAUBERT HEARING | The record at this time is insufficient for the Court to exercise its gatekeeper function to measure the proffered opinion against the standards of reliability and relevance. |
| 14 | Colgate's Motion to Exclude Dr. Ronald Dodson | PENDING DAUBERT HEARING | The record at this time is insufficient for the Court to exercise its gatekeeper function to measure the proffered opinion against the standards of reliability and relevance. |
| 15 | Colgate's Motion to Exclude Dr. Jerrold Abraham | GRANTED IN PART, DENIED IN PART | Granted as to testimony regarding opinions of other experts; however, Dr. Abraham may testify that Donna Hayes had mesothelioma. |
| 18 | Plaintiff's Motion to Exclude Alternative Theories of Exposure | DENIED | The information is relevant. |
| 19 | Plaintiff's Motion to Exclude Dr. Mark Taragin | PENDING DAUBERT HEARING | The record at this time is insufficient for the Court to exercise its gatekeeper function to measure the proffered opinion against the standards of reliability and relevance. |

OO : 000040 of 000042

| Number | Motion | Ruling | Basis |
|--------|--------|--------|-------|
| 20 | Plaintiff's Motion to Exclude Dr. Mossman | DENIED | The objections raised are more properly addressed by cross-examination than exclusion of witness. |

## ORDER

**WHEREFORE, IT IS HEREBY ORDERED AND ADJUDGED** that Motion of the Defendant, Cyprus Amax Minerals Company, for Summary Judgment is **GRANTED**. The claims of Plaintiff Cynthia Hayes, as Executrix of the Estate of Donna Hayes, against CAMC are **DISMISSED WITH PREJUDICE**.

**WHEREFORE, IT IS HEREBY ORDERED AND ADJUDGED** that Motion of the Defendant, Colgate-Palmolive Company, for Summary Judgment is **DENIED**.

**WHEREFORE, IT IS HEREBY ORDERED AND ADJUDGED** that Motion of the Defendant, Johnson & Johnson, for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**. To the extent Cynthia's claims are based upon Johnson & Johnson's advocacy before the FDA, those claims are **DISMISSED WITH PREJUDICE**. Summary judgment is denied as to the remainder of Cynthia's claims against Johnson & Johnson.

**WHEREFORE, IT IS HEREBY ORDERED AND ADJUDGED** that Cynthia's Motion for a Missing Evidence Instruction against Colgate is **DENIED**.

**WHEREFORE, IT IS HEREBY ORDERED AND ADJUDGED** that Cynthia's Motion for a Missing Evidence Instruction against Johnson & Johnson is **DENIED**.

**WHEREFORE, IT IS HEREBY ORDERED AND ADJUDGED** that the Parties' Motions in Limine are addressed as indicated <u>supra</u> at 39-41. The Parties may utilize the Court's motion docket for the scheduling of a *Daubert* hearing in conformity with those rulings.

OO · : 000041 of 000042

Finally, pursuant to KRE 611 and in consideration of the standard two-week service period of Jefferson County jurors, the Court reiterates that it **WILL LIMIT TRIAL** of this matter to a maximum length of three weeks.

**IT IS SO ORDERED** this____day of _____, 2019.

/s/ HON. ANGELA MCCORMICK BISIG
electronically signed
4/12/2019 2:30:56 PM

_____
JUDGE ANGELA MCCORMICK BISIG
DIVISION TEN (10)
JEFFERSON CIRCUIT COURT

cc:    Counsel of Record

42

OO : 000042 of 000042