# In The Matter Of:

*Donna A. Olson and Robert M. Olson v.*
*Brenntag North America, Inc. et al*

---

*March 5, 2019*

---

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

Page 2131

```
 1
 2   SUPREME COURT OF THE STATE OF NEW YORK
     COUNTY OF NEW YORK - CIVIL TERM - PART 7
 3   ----------------------------------------X
 4   DONNA A. OLSON and ROBERT M. OLSON,
 5                    Plaintiff,
                                    Index No.
 5        -against-                 190328/2017
 6
     BRENNTAG NORTH AMERICA, INC.;
 7   BRENNTAG SPECIALTIES, INC.,
        Individually, and f/k/a Mineral Pigment
 8      Solutions, Inc., as successor-in-interest to
        Whittaker, Clark & Daniels, Inc.,
 9   CYPRUS AMAX MINERALS COMPANY,
        Individually and as successor-in-interest to
10      American Talc Company, Metropolitan Talc
        Company, Inc., Charles Mathieu, Inc., and
11      Resource Processors, Inc.;
     IMERYS TALC AMERICA, INC.,
12   JOHNSON & JOHNSON CONSUMER, INC.;
     WHITTAKER, CLARK & DANIELS, INC.,
13      Individually and as successor-in-interest
        To American Talc Company, Metropolitan Talc
14      Company, Inc., Charles Mathieu, Inc., and
        Resource Processors, Inc.;
15
                    Defendants.
16   ----------------------------------------X
                             60 Centre Street
17   Jury Trial              New York, New York
                             March 5, 2019
18
19   B E F O R E :
20        HONORABLE  GERALD LEBOVITS,
21                    JUSTICE
22   A P P E A R A N C E S :
23        LEVY KONIGSBERG, LLP
          ATTORNEYS FOR THE PLAINTIFFS
24             800 THIRD AVENUE
               NEW YORK, NEW YORK 10022
25        BY:   JEROME H. BLOCK, ESQ.,
```

Page 2132

```
 1                    CONTINUED:
 2   APPEARANCES CONTINUED:
 3   MAUNE RAICHLE HARTLEY FRENCH & MUDD, LLC
          150 WEST 30TH STREET
 4        NEW YORK, NEW YORK 10001
     BY:   SUZANNE M. RATCLIFFE, ESQ.,
 5        CHRISTIAN HARTLEY, ESQ.,
          MARGARET SAMADI, ESQ.
 6
 7   PATTERSON BELKNAP WEBB & TYLER, LLP
     ATTORNEYS FOR JOHNSON & JOHNSON
 8        1133 AVENUE OF THE AMERICAS
          NEW YORK, NEW YORK  10036
 9   BY:   THOMAS P. KURLAND, ESQ.,
          LOUIS M. RUSSO, ESQ.,
10             -and-
     KIRKLAND & ELLIS, LLP
11        300 NORTH LaSALLE STREET
          CHICAGO, IL  60654
12   BY:   MIKE BROCK, ESQ.,
          STACEY GARBIS PAGONIS, ESQ.,
13        BARRY E. FIELDS, ESQ.,
          ALLISON RAY, ESQ.,
14
15
16
17                    Lori A. Sacco
18                    Michael Ranita
                      Official Court Reporters
19        *         *         *
20
21
22
23
24
25
```

Page 2133

PROCEEDINGS

1
2   **MR. BLOCK:** Could you mark these in evidence.
3   (Whereupon Plaintiffs' Exhibit No. 322 was marked
4   received in evidence as of this date.)
5   (Whereupon Plaintiffs' Exhibit No. 56 was marked
6   received in evidence as of this date.)
7   (Whereupon Plaintiffs' Exhibit No. 330-A was marked
8   received in evidence as of this date.)
9   (Whereupon Plaintiffs' Exhibit No. 348 was marked
10  received in evidence as of this date.)
11  **THE COURT:** Ready? Thank you so very much. Good
12  morning. I understand that with regard to the evidentiary
13  issues, plaintiff would like to argue. Go ahead.
14  **MS. SAMADI:** Yes, your Honor. Margaret Samadi on
15  behalf of the plaintiff. Your Honor, I would like to make a
16  few points regarding the adverse event reports discussed at
17  length yesterday. First, we want to point out that Dr.
18  Moline's opinion does not rely solely on Johnson & Johnson's
19  individual adverse inference report, rather as you heard, it
20  relies on her extensive medical education, background,
21  experience, reasoned scientific methodology, generally
22  accepted scientific and medical principles.
23  **THE COURT:** More slowly, please.
24  **MS. SAMADI:** Generally accepted scientific medical
25  principles regarding the link between asbestos and

Page 2134

PROCEEDINGS

1   mesothelioma and personal knowledge gained from treating
2   mesothelioma patients. Many of the cases cited by Johnson &
3   Johnson preclude expert testimony when it is the sole --
4   based solely on adverse reports or and nothing else. For
5   example, Heckstall versus Pincus case, that's 797 N.Y.S.2d 2
6   445 out of the First Department. There the expert relied
7   solely on "unverified listings and recording of adverse
8   reactions". That's not what's happening here. The same
9   with Saarai case, S-A-A-R-A-I. In New York case reports can
10  supplement opinions based on other substantive evidence. I
11  would like to point the Court to Zito versus Zabarsky case,
12  28 A.D.3d 42. And I've given the Court a copy. That's out
13  of the Second Department in 2006. And in that it was held
14  that the trial court errored in excluding causation expert
15  testimony that relied upon a single case study coupled with
16  generally scientific theory of the dose response
17  relationship and other scientific --
18  **THE COURT:** A little bit more slowly, please.
19  Because I'm trying to digest everything you're telling me.
20  **MS. SAMADI:** Okay -- and other scientifically
21  accepted methodology. So, your Honor, the issue is twofold.
22  Whether the adverse event reports are admissible and whether
23  Dr. Moline may reference the adverse event reports in her
24  testimony. Plaintiffs believe the answer is yes to both
25  inquiries. But if the Court believes one or the other, the

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

---

PROCEEDINGS                                         Page 2135

1   answer should be no.  I would like to point out that that
2   does not preclude the answer to be yes for the other
3   inquiry.
4        So first adverse inference or adverse event
5   reports --
6        THE COURT: Right.
7        MS. SAMADI: -- are admissible as they are evidence
8   of prior incidents that are substantially the same as the --
9   as that alleged by plaintiffs.  Here its use of Johnson's
10  Baby Powder caused mesothelioma.  I won't belabor the cases
11  that --
12       THE COURT: So, would you be allowed simply to file
13  the complaints and in all those cases, the summonses, the
14  complaints, the pleadings and just give them to the jury?
15       MS. SAMADI: I don't believe that's the case here,
16  no.
17       THE COURT: But isn't that a related issue?
18  Because the jurors are going to think wow, there are a lot
19  of people who are suing for this and let's be true.
20       MS. SAMADI: That's certainly something Johnson &
21  Johnson can bring out on cross and point out.  But that's
22  not what we have here.
23       THE COURT: How do we know all of those complaints
24  are related to the plaintiffs in this case?  To Ms. Olson?
25       MS. SAMADI: Well --

---

PROCEEDINGS                                         Page 2136

1        THE COURT: What's the relationship?
2        MS. SAMADI: -- I would point to the Bellinger v.
3   Deere and Co. case where it said admitting other evidence in
4   product liability actions is appropriate when the similarity
5   of the accident is based upon the same product at issue.
6   And the same product at issue here is Johnson's Baby Powder.
7   And the same injury at issue here is mesothelioma or cancer.
8   So I would say it is definitely related.  And differences,
9   I'm reading from that case, differences in the surrounding
10  circumstances go to the weight to be given to the evidence
11  rather than admissibility.  So, Johnson & Johnson is free to
12  point out on cross hey, we don't know anything about these
13  plaintiffs or, you know, what do you know about them.  The
14  fact is, this is a document that came --
15       THE COURT: Who are they going to cross for the
16  adverse events reports?
17       MS. SAMADI: Well, your Honor.  They have all of
18  the information.  So they may have documentary evidence
19  about this.  They are certainly free to address it in their
20  corporate representative if they want.  They could even, you
21  know, they could even ask Dr. Moline if she shows, although
22  I doubt she does, but this is something that goes to the
23  weight of the evidence.
24       THE COURT: How do we know that it's not just a lot
25  of plaintiffs' side lawyers filing lots of complaints just

---

PROCEEDINGS                                         Page 2137

1   to bolster their interest in saying there are a lot of
2   complaints, therefore there must be something to this?
3        MS. SAMADI: They are confirmed cases of
4   mesothelioma.  And I think it would also require evidence on
5   Johnson & Johnson's behalf that there are all of these
6   members of the bar fraudulently filing cases everywhere.  I
7   mean, that would certainly be unethical and improper.  If
8   they want to allege that in some way, again it goes to the
9   weight of the evidence.  It doesn't go to its admissibility.
10       I would like to point out, your Honor, this case
11  Berger v. Amchem Products, 13 Misc 3d 335.  It is written
12  by --
13       THE COURT: Yeah.  Judge Friedman, sure.
14       MS. SAMADI: Yeah.  She wrote a great treaties on
15  some New York evidentiary law.  But if you look at her
16  language in that case she cites multiple asbestos cases
17  where case reports are relied upon.  Then at the very end
18  she ultimately decides a Frye hearing is unnecessary for
19  what we call the chrysotile defense.  That's General Motors
20  for other friction defendants relying on wanting to push out
21  plaintiffs' experts in part because they rely on case
22  studies.  At the very end she denies them a Frye hearing and
23  says "Scientist and physicians use various means to
24  establish causation in particular situations, not the least
25  of which are toxicological and pathological studies and

---

PROCEEDINGS                                         Page 2138

1   documented case studies."
2        So, in asbestos, your Honor, this has been -- case
3   studies are regularly relied upon.  Yesterday the doctor or
4   my colleague pointed out to the Bogner study in 1960, where
5   there was only 33 cases that was relied upon.  And that was
6   enough for a causation to be published.  Dr. Moline's own
7   testimony --
8        THE COURT: Just a moment.  I'm wondering whether
9   you're melding the arguments about the case studies with the
10  adverse events reports and whether there is a distinction.
11  Let's first, if it's okay, talk about the case study.  Are
12  the patients representative?  Because they came to the
13  doctor in the context of litigation, right?  Are the case
14  studies of the individuals about whom Dr. Moline can testify
15  with regard to the case studies, are they -- didn't they --
16  are they representative?
17       MS. SAMADI: I believe they are.  And you heard her
18  yesterday say that her opinion doesn't change whether or not
19  a case comes through litigation or any other factor.  So,
20  she said that doesn't matter to her opinion.  Insofar as
21  they -- You might think they are self selecting in any way,
22  that is -- again goes to the weight of the evidence and
23  something that Johnson & Johnson can point out and try to
24  disclaim or something of that fact.
25       THE COURT: Would it -- Do you know whether she

---

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

PROCEEDINGS                          Page 2139

1   talked to people with similar usage levels of talcum?
2       MR. BLOCK: Your Honor, could I address that?
3       THE COURT: No. She's doing great. Come on.
4       MS. SAMADI: Of course Dr. Moline can testify to
5   details of people that she has seen. I don't believe we
6   know the amount used in the adverse event reports, but if it
7   is different -- Some of them might state it. I'm not sure.
8   But if it is different, again we have heard testimony in
9   this case from Dr. Moline and Dr. Webber that very small
10  amounts of asbestos in talc can cause mesothelioma. So --
11  so, you know, and that there is no safe level is what Dr.
12  Moline said. So, it doesn't really particularly matter, as
13  long as there is some asbestos.
14      THE COURT: Were her case studies published?
15      MS. SAMADI: I do not believe so. But this is her
16  personal --
17      THE COURT: Were they peer reviewed in some ways?
18      MS. SAMADI: I don't believe so. Excuse me. I
19  want to clarify. Are we talking about the 40 and 50 cases?
20      THE COURT: Yes. I think that there is a
21  difference between how we're to view the adverse events
22  evidence and the case study evidence, although both have a
23  lot in common. There are still plenty of differences. I
24  want to talk about each one separately. The case studies,
25  Dr. Moline's case studies.

PROCEEDINGS                          Page 2140

1       MS. SAMADI: Okay. Sorry. Your Honor, they are
2   not published yet, but they are based on her personal
3   knowledge. And that's another thing that experts are able
4   to testify about. Your Honor, she has published case
5   studies on asbestos and very small amounts of asbestos. I
6   would point to her dental tape study that was peer reviewed
7   and published that she testified about yesterday, and there
8   were only six cases in that -- in that study. She was able
9   to peer review, get that through the peer-review process and
10  draw a causal connection.
11      THE COURT: How do we know that the people in her
12  study were exposed to asbestos in their talc? Did the --
13  did the talc itself in the products they use test positive
14  for asbestos?
15      MS. SAMADI: Well, it's impossible to test products
16  that are already used, but we do have testimony from Dr.
17  Webber and Dr. Longo, I believe, that a large percentage of
18  Johnson & Johnson's talc product would contain asbestos.
19  And oh, and she can give that testimony apparently. She
20  will lay the foundation for that.
21      THE COURT: How?
22      MS. SAMADI: Based upon her knowledge of the
23  products used in those cases for her clients that she has
24  seen, just as she did here for the products used in this
25  case. She has looked at internal documents. She does know

PROCEEDINGS                          Page 2141

1   the makeup of these products. She is able to give that
2   testimony based on personal knowledge.
3       THE COURT: I need to know whether there is
4   something that would establish a causal link between --
5   beyond simple association. So, is her testimony going to be
6   that the patients in these studies have mesothelioma. The
7   only thing that causes mesothelioma is asbestos exposure.
8   The only possible source of asbestos exposure in their lives
9   beyond ambient background exposure is talc. Therefore,
10  their mesothelioma was caused by asbestos in talc rather
11  than something else.
12      MS. SAMADI: Yeah. I believe she can say that
13  these people had substantially similar exposures to
14  Mrs. Olson. I would like to point back to the Berger case
15  where Justice Friedman said this is not -- this is not new
16  evidence. This is not new science that asbestos causes
17  mesothelioma.
18      THE COURT: How much asbestos do you think the
19  patients in the other studies were exposed to compared to
20  Ms. Olson's here? Meaning, did she use potentially asbestos
21  contaminated talc products more often, less often, as often
22  as the patients in the other studies? And does that matter?
23  The theory of disease ideology. I need to know what the
24  relationship between the case study -- case studies and
25  Ms. Olson.

PROCEEDINGS                          Page 2142

1       MS. SAMADI: That is something Dr. Moline can
2   certainly testify about and lay a foundation for. She is
3   able to say that these cases are substantially similar to
4   plaintiffs in this case. And if they want to cross examine
5   her about how it's how similar, they are -- they are
6   certainly able to do that. That doesn't mean the testimony
7   doesn't come in.
8       THE COURT: How do I get around the following. How
9   do you get around it. The Appellate Division First
10  Department ruled unanimously in the Heckstall case that case
11  reports are at least in that matter inadmissible. Judge
12  Jaffe cited that case in Juni. Juni also involved Dr.
13  Moline. The Court of Appeals agreed with the exclusions.
14  So that's the --
15      MS. SAMADI: The Heckstall case merely stands for
16  the proposition that reliance solely on unverified listings
17  and reporting of adverse reactions is unacceptable for
18  causation. That is not what we have here. We have more
19  than the mere reliance on case reports. We have
20  epidemiology. We have her -- her medical testimony and
21  reliance on airborne asbestos exposure from talcum powders.
22  This is not a case -- case where all the case studies is all
23  we have got.
24      THE COURT: But here's it's the second to last
25  paragraph, the last sentence, "Courts have recognized that

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

| PROCEEDINGS | Page 2143 |
|---|---|

1 such observational studies or case reports are not generally
2 accepted in the scientific community on questions of
3 causation" citing Polland.
4     MS. SAMADI: Well I think you have to look at that
5 case -- A few points. I think you have to look at that case
6 in context. That is again just talking about when all they
7 have is case reports and adverse expert or adverse events
8 reports. But more importantly that is -- that is not
9 applicable to a mesothelioma case. Mesothelioma is a very
10 rare disease. I would point the Court to, and I can get a
11 copy if you want, the reference manual and scientific
12 evidence, third edition, 2000 states that physicians have
13 access to case reports in medical literature when
14 considering causation for rare diseases. And they
15 specifically reference asbestos as an example of when that
16 should be used or can be used. So, I think in a case here,
17 where we have what did she say 13 in a million, then, you
18 know, it's -- it's more reliable to rely on case reports.
19 And often for rare cases a study with a specific product is
20 impossible. That's particularly true when so many of the
21 users of the product have no idea that asbestos is in the
22 product.
23     THE COURT: How do you square your thinking then
24 with Juni?
25     MS. SAMADI: Two points, your Honor. Unlike Juni

| PROCEEDINGS | Page 2144 |
|---|---|

1 this is not a case where there is allegations of the
2 asbestos was somehow modified. Second -- By a heating
3 process. Second, we in this case do have evidence of the
4 amount of exposure through Dr. Longo and through Dr. Moline
5 I believe and through Dr. Webber. So that did not exist in
6 Juni. And that exists here.
7     THE COURT: What's the causal theory of
8 mesothelioma in Dr. Moline's case studies, is it more than
9 simply well it had to be the talc because people got
10 mesothelioma?
11     MS. SAMADI: No, your Honor. She relies on much
12 more than that. She relies on published literature and
13 government documents that say the amount of exposure that
14 our client had was sufficient to cause mesothelioma. And
15 substantially similar cases that she has seen that inform
16 her opinion on causation. So, it's much more than these
17 adverse event reports or these case studies. And here I
18 would like to point out, your Honor --
19     MR. BLOCK: Your Honor.
20     MS. SAMADI: Your Honor, I would like to point out
21 unlike Juni this is a product that --
22     THE COURT: Somebody said "your Honor".
23     MR. BLOCK: I didn't know if you were prepared for
24 Ms. Samadi to continue.
25     THE COURT: Yes, I was.

| PROCEEDINGS | Page 2145 |
|---|---|

1     MS. SAMADI: Your Honor, I would like to point out
2 that unlike Juni here, we have testimony that there can be
3 millions and millions of fibers per gram in a tainted baby
4 powder. Unlike Juni, this is a product we have testimony
5 about, that is a powder that is in the breathing zone and
6 easily breathed by. And nothing is holding it together.
7 There is nothing encapsulating it in any way. So, that is
8 another distinction with Juni.
9     Your Honor, she relies on evidence in all form.
10 There has never been -- There is never going to be as
11 careful a study and as much evidence of a case report as
12 those that show up in litigation because everything is
13 inquired about. You have direct testimony. You have all
14 kinds of things. So, she relies on evidence in all forms.
15     THE COURT: Do we have a copy of her report? Of
16 her case studies where she typed it out? Something she just
17 recalls? I understand that it's not published, but what is
18 it -- what does her case study report look like? Do you
19 have a copy?
20     MS. SAMADI: Well, I think what the Court is
21 calling her case studies is really her personal knowledge
22 and her personal experience that she has learned over the
23 years. So she's certainly able to answer any questions.
24 I'm not aware of a certain document.
25     THE COURT: There is nothing typed up?

| PROCEEDINGS | Page 2146 |
|---|---|

1     MS. SAMADI: Not that --
2     THE COURT: Her case studies, it's not written?
3 It's not typed?
4     MS. SAMADI: It's her experience. It's her
5 personal knowledge of she's seen patients is my
6 understanding in substantially similar conditions.
7     THE COURT: So, you're -- you're asking that she
8 talk about her other cases?
9     MS. SAMADI: When they are substantially similar
10 and --
11     THE COURT: And there is nothing typed up?
12     MS. SAMADI: I'm unaware of anything typed out.
13 Again, it's based on her personal knowledge of substantially
14 similar exposures. She's gained in her medical field and
15 her medical practice.
16     Your Honor, we would like to mark the adverse event
17 reports. We have them in a binder here. They are all
18 tabbed, if we could, for the record.
19     THE COURT: She didn't write out her observational
20 study or case report or anything like that? It's just
21 something that she knows about?
22     MS. SAMADI: I mean, in other cases she has. In
23 some of the cases she has written reports. She has been
24 deposed on those cases, but it is primarily based on her
25 personal knowledge as a medical expert who has seen these

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

PROCEEDINGS                                        Page 2147

1  patients.  So, is there a single document where she's
2  written all of them up?  I don't believe that exists.  But
3  there are reports and deposition testimony concerning some
4  of these that she's seen.
5          THE COURT: I thought that this was --
6          MS. SAMADI: I mean, your Honor, it's essentially
7  no different than what she testified about how she had seen
8  somebody who the spouse got mesothelioma when the insulator
9  did not.  This is based on her years of expertise and her
10 years of personal knowledge that she has seen with her --
11 her eyes, and she's certainly able to testify about that.
12         THE COURT: That's not what I understood a case
13 report to be.  If she's talking about things which she has
14 personal knowledge, that's very different from accumulating
15 something in a report about the variety of cases.
16         MS. SAMADI: I think a lot of the case report --
17         THE COURT: So I -- I --
18         MS. SAMADI: I think a lot --
19         THE COURT: Why did I stay up until midnight
20 studying these last night.
21         MS. SAMADI: Your Honor, I think a lot of the case
22 report, case law goes to the adverse event reports because
23 those can be considered.
24         THE COURT: Okay.  I think, of course, I want to
25 hear from Mr. Kurland, but what about the idea of talking to

PROCEEDINGS                                        Page 2148

1  Dr. Moline outside the presence of the jury to find out what
2  it is precisely she's referring to with regard to the case
3  reports.
4          MR. BLOCK: Your Honor, as the lawyer putting Dr.
5  Moline on the stand, I want to make one statement, which is
6  that we have in binders Johnson & Johnson adverse events
7  reports, 117 of them.  Their tabbed up.  They are written
8  out.  They contain greatly detailed information about each
9  and every event report showing Johnson & Johnson's knowledge
10 of all the details of these event reports.
11         THE COURT: Then it's admissible maybe for notice.
12         MR. BLOCK: I want to make the statement.
13         THE COURT: And I'm not saying for sure.
14         MR. BLOCK: I want to make a statement.  Maybe we
15 could cut it short.  If I'm permitted to ask Dr. Moline if
16 she's aware and she's looked at the event reports that
17 Johnson & Johnson has collected and ask her about the
18 significance of those event reports that are written out,
19 that have the details in them that your Honor was asking
20 about, then I would not ask Dr. Moline about, you know,
21 whether she has also seen patients, you know, who have
22 developed mesothelioma after exposure to Johnson Baby Powder
23 and other talcum products.  I think precluding both, your
24 Honor, is -- is unfair and not correct under the law,
25 particularly when Johnson & Johnson told this jury to use

PROCEEDINGS                                        Page 2149

1  their common sense.  That people don't get mesothelioma from
2  using baby powder.
3          THE COURT: Okay.
4          MR. BLOCK: So --
5          THE COURT: I heard that argument.
6          MR. BLOCK: -- I would like these marked as a court
7  exhibit, because I think they need to be part of the record,
8  because they show the great detail contained in the event
9  reports.  We would ask that this be marked as Exhibit 350
10 for identification, the binders be marked as 350 -- Let me
11 just identify it for the record.  So, event reports one
12 through 25, including the chart, would be 350.  Next binder
13 containing 26 to 50 would be 350-A.  The next binder
14 containing event reports 51 to 75 would be 350-C.  Event
15 reports 76 through 100, 350-D.  And event reports 101
16 through 117 would be 350-E.  And I know passed up to your
17 Honor a few of the event reports yesterday, but these are in
18 great detail.  They are doing a medical review.  They are
19 talking about the possibility of causation being
20 established.  They talk about the details of the exposure.
21 And although it's been asserted these are only cases from
22 litigation, that has not necessarily been established as
23 true.  And I don't think it matters, your Honor.
24         (Continue on the next page.)
25

Proceedings                                        Page 2150

1          MR. BLOCK: So we have -- we could mark these
2  later, but we have these here, if your Honor is interested
3  in reviewing them.
4          THE COURT: Show me.
5          MR. BLOCK: Okay.  Thank you.
6          MR. KURLAND: We object to these even being marked,
7  but I just wanted to note that.
8          MR. BLOCK: Well, I would like them to be part of
9  the record.  So this is 350, 350A, 350B.  Your Honor, can I
10 put a sticker on 350, the book you have.
11         So I believe there's four notebooks, or five
12 notebooks.
13         MR. HARTLEY: Five.
14         MR. BLOCK: And they are marked 350, 350A, 350B,
15 350C and 350D.  And that includes the event reports one
16 through 117.  And there's a chart on the cover page of the
17 notebooks.
18         THE COURT: So tell me again -- I know that I just
19 asked that question -- but why can't I just admit complaints
20 from another action into evidence in this case?  What would
21 be the difference?
22         MR. BLOCK: Because a claim in another action, I
23 think, is seen as an allegation.  And Johnson & Johnson --
24         THE COURT: Isn't that what these are?
25         MR. BLOCK: No, no.  If you look -- if you read the

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

| Proceedings | Page 2151 |
| --- | --- |

1  adverse event reports, it is a collection of information
2  that the company has collected.  That document confirmed
3  cases of mesothelioma.  And you'll see in the event reports
4  it says, "Is it a confirmed case of mesothelioma?  Yes.
5  Yes.
6      So we have the confirmed case of mesothelioma.
7  Johnson & Johnson admits that in the event report.  And then
8  they summarize and identify the exposures.
9      That's no different, your Honor, than, you know,
10  so, what's Mr. Brock's evidence for telling a jury that
11  there's no evidence of an epidemic of mesothelioma in
12  Johnson's baby powder users?
13      What is Mr. Brock's evidence for telling the jury
14  that people don't get mesothelioma from Johnson & Johnson
15  baby powder?  It's been around for a hundred years.  So it
16  is relevant, your Honor, that this is not -- that this is
17  not -- I mean, are we going to engage in a fiction that this
18  is the first person who ever got mesothelioma, whose only
19  exposure was Johnson's baby powder, or is this going to be
20  put out there for the jury, because we have these event
21  reports, and let them argue the weight of the evidence.
22      If they want to say, gee, this many million people
23  used Johnson's baby powder, so this isn't a significant
24  number, they could do that.  They could have their corporate
25  witness come in and talk about the process of checking the

| Proceedings | Page 2152 |
| --- | --- |

1  event reports, talking about why they collect them, talking
2  about who the medical person is who is reviewing them,
3  because there is a medical review.  You could just see on
4  the face of the event reports, they are talking about a
5  medical review.
6      I mean, if you just read one or two of the event
7  reports, you could see what they are doing.  They are not
8  just, you know, saying here's what someone claims.  They are
9  looking to see if it's a confirmed diagnosis of
10  mesothelioma.  And they are assessing causality.  And in
11  court they say it's impossible, your Honor.  Outside of
12  court in the event reports, they say this is possible.
13      MR. KURLAND: Can you point to the portion of the
14  event report where they are assessing causality or saying
15  this is possible.
16      MR. BLOCK: Yes.  Yes, I can.
17      THE COURT: Saying something is possible is
18  different from an admission, but let's hear it.
19      Let's have a clear answer to this question:  Did
20  Johnson & Johnson merely take complaints and analyze them or
21  discuss them, or did they do some additional work?
22      MR. BLOCK: There is medical record reviews.  I
23  mean, here's one.  I'm just looking at tab 102.
24      MR. HARTLEY: Your Honor, you don't have it because
25  Mr. Block had to borrow that to answer your questions.

| Proceedings | Page 2153 |
| --- | --- |

1      MR. BLOCK: I'm looking at tab 102, event report in
2  June 2015.  The consumer had recurrent ascites.  They are
3  going through medical records.  They are talking about CT
4  scans.  They are talking about the staining for the
5  mesothelioma.  They are talking about the radiology.  They
6  are talking about the medical details of the tumor.  There's
7  a summary of all the medicals.
8      I mean, I'm looking at 102.  They are talking about
9  family history, social history.
10      THE COURT: And that goes beyond what's in the
11  complaint?
12      MR. BLOCK: Yeah.  They are reviewing the medical
13  records.  I mean, um:
14      "QUESTION: Did the event associated with the use
15  of this product cause inpatient hospitalization?"
16      "Yes."  Result.  They list it as "serious event."
17      Here, causality.  102, your Honor, tab 102.  I
18  could put it on the Elmo.
19      MS. PAGONIS: Tell us the page.  We don't have it.
20      MR. BLOCK: Sure.  The page -- actually, the page
21  is produced by Johnson & Johnson.  JNJTALC --
22  JNJTALC000125935.  ICH, modified.  Causality, possible.  So
23  they are listing causality as possible.  And I think there
24  is other references to that.  They are listing it as a
25  serious event just to tell you, you know, patient case

| Proceedings | Page 2154 |
| --- | --- |

1  summary.  Someone is doing a patient case summary, and it
2  includes medical, whether it's Shower to Shower or Johnson's
3  baby powder, the staining.
4      These aren't things alleged in the complaint, your
5  Honor.  That it stained positive for WT 1, that it was a
6  diagnosis of mesothelioma.
7      And then, as an example, you could see -- look at
8  all the medical review, your Honor.  All the details of the
9  patient.  "On April 29th, 2014, the consumer", the consumer,
10  your Honor.  They are customers who use the product.
11  "Underwent CT, abdomen and pelvis with contrast which
12  revealed stable size of large mass in the pelvis."  The
13  consumer, your Honor.
14      They say, oh, this is just plaintiffs.  They are
15  customers.  "The consumer underwent biopsy of cervix mass
16  which revealed..."  and then it's a big summary.
17      So, your Honor, they have made the decision to
18  collect the information, to have a medical review of the
19  information.  They've assessed causality as possible.  In
20  court they say it's impossible.  In court they tell jurors
21  that this is the only person.  Use your common sense, if
22  this really caused mesothelioma, you and your family, and
23  all the people who use this would be dropping dead.
24      In the meantime, we have -- this is a 37-page event
25  report, your Honor.  Still on tab 102.  "An unspecified CT

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

| Proceedings | Page 2155 |
| --- | --- |

1 scan showed stable disease." They are keeping track of the
2 course of disease for each and every person.
3 I mean, look at this, your Honor. They have a
4 coding system for it. Look at this: "Asbestos exposure
5 inhalation or ingested asbestos dust and fibers."
6 I'm in tab 103. On all of them, your Honor, that
7 I've seen, possible. Causality, possible. So, they are
8 having medical people -- this is outside of court -- and the
9 conclusion that their medical people have come to is that
10 all these people are getting mesothelioma who used our
11 product. "Our consumers." "Our customers." And they have
12 -- and their assessment is that causation is possible.
13 They are listing this as a medical adverse event.
14 It's hard to get this, but 103, it says -- and no one knows
15 more about these events than Johnson & Johnson. I mean,
16 they are able to come into court having reviewed all these
17 medical records in all these cases, having access to the
18 information in these cases, and explain anything they want
19 that goes to the weight of the evidence. We, on the other
20 hand, only have, you know, what they put up in these event
21 reports.
22 So 104, same thing. Causality, possible. So I
23 just went to three, 102, 103, 104. We could go through all
24 117, but I think you get the picture, your Honor. This is
25 not a memo inside Johnson & Johnson where they said, oh,

| Proceedings | Page 2157 |
| --- | --- |

1 and they want to -- the jury to think that Ms. Olson is the
2 first person who -- the first Johnson baby powder user whose
3 ever gotten mesothelioma, and that's not true. And if they
4 didn't think these event reports were important --
5 THE COURT: How are you going use the event
6 reports?
7 MR. BLOCK: Well, Dr. Moline -- I just planned on
8 asking Dr. Moline a few questions. You know, um, you know,
9 is looking at event reports that are kept about a product in
10 looking at a rare disease like mesothelioma something, you
11 know, that you view as significant?
12 Yes.
13 Why is that?
14 Because mesothelioma is a rare disease, so if there
15 is a collection of a large number of event reports, it is
16 significant from an occupational and environmental medicine
17 standpoint.
18 And have you reviewed event reports that Johnson &
19 Johnson has regarding the disease, mesothelioma?
20 And I think she'll say, yes.
21 And in those event reports, does it indicate
22 whether the person used Johnson's baby powder or Shower to
23 Shower within the known latency period for developing the
24 disease, mesothelioma?
25 Yes, it does.

| Proceedings | Page 2156 |
| --- | --- |

1 here's 117 cases that we've been sued in. It's not even
2 clear that in all these cases the information came from a
3 lawsuit. But even if it did, your Honor, they've gone
4 beyond cataloging being sued. And they are having a medical
5 person go through all the medical records in detail, and
6 they are assessing causality as possible.
7 And they are going through sort of a decision
8 treatise in evaluating causality outside of court. That is
9 different. I don't see in these event reports their in
10 court arguments that miners and millers aren't getting
11 mesothelioma, and therefore, these are rejected as not
12 causal. And it would definitely be admissible for notice,
13 your Honor. And certainly -- I mean, why would a medical
14 doctor not ordinarily rely upon event reports that are
15 contained in the file of the company?
16 THE COURT: Except that the notice issue, and it's
17 true, although that's always a possibility, but this was
18 after Ms. Olson stopped using the product.
19 MR. KURLAND: Correct, your Honor.
20 MR. BLOCK: I would just say, these are -- I would
21 say -- what I should've said is that it rebuts their
22 causation defense and it rebuts their claim that other
23 people are not getting sick. I mean, they did tell the jury
24 that, your Honor. And -- and -- well, their position is
25 that if mesothelioma can never be caused by their product,

| Proceedings | Page 2158 |
| --- | --- |

1 And does it indicate the years in which these event
2 reports were collected for? And it's primarily 2016 to
3 2018, and it's about 40 cases per year from 2016 to 2019.
4 And what is the significance of that from an
5 occupational and environmental medicine standpoint?
6 And I believe Dr. Moline will say that it's
7 significant because mesothelioma is a very rare disease, and
8 that number, 40 per year, is about ten percent, or
9 approaching ten percent in terms of the women who are
10 diagnosed with mesothelioma each year in the United States.
11 So just as Dr. Moline testified that when she
12 identified cases of dentists that -- that that was
13 significant, and she reported on that in the literature that
14 the dentists had developed mesothelioma -- and by the way,
15 that was -- those were disputed situations. The dental
16 company said that the mesothelioma wasn't caused by the
17 dental products, but she identified those sources of
18 exposure. The people developed mesothelioma, and that was
19 published in the American Journal of Industrial Medicine as
20 an important case series that showed -- or that supported
21 causation.
22 So -- and if they want to claim that they have some
23 legal duty to collect these, I don't believe they do. And
24 there's been no evidence that they do. But why are they
25 doing this, your Honor?

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

| Proceedings | Page 2159 |
| --- | --- |

1     They are having a medical person assess the facts
2 of these cases.  All the medical records assess causality
3 and they are collecting it because this is a real issue.
4 This is a real issue that is affecting their consumers.  And
5 they are currently looking at it out of court.  And we have
6 the documents, and they've produced it to us, but, your
7 Honor, if I'm able to ask her about the adverse event
8 reports, I don't need to ask her about her personal
9 experience in reviewing other cases where people got
10 mesothelioma where their only exposure was Johnson's baby
11 powder or where their only exposure was talcum powder
12 products.
13     So I thought it was important, one way or the
14 other, to bring out that this doctor is aware of other cases
15 and that that is significant.  And either through her
16 personal experience I should be able to bring that out, or
17 through her knowledge of the adverse event reports.
18     Thank you.
19     MR. KURLAND: Your Honor, the questions you've
20 asked this morning reveal the fundamental problem with using
21 this type of evidence.  And I want the Court to keep in mind
22 here that the question we are looking at is can these
23 fragments of evidence be used by a causation expert to
24 establish specific causation?  And all we know about each
25 piece of evidence here is that it reports use of Johnson's

| Proceedings | Page 2160 |
| --- | --- |

1 baby powder and mesothelioma.  It says nothing about a
2 causal relationship between the two things.
3     And unlike the cases where Dr. Moline has -- has
4 relied on small numbers of case reports to reach opinions on
5 causation, in each one of those cases, she testified about
6 four.  We are dealing with a particular product which
7 asbestos was an intentional ingredient at a known level.  So
8 the dental tape, small number of people.  Dealing with known
9 quantities of asbestos.
10     Here, the only evidence about asbestos
11 contamination in Johnson's baby powder has come in through
12 Dr. Webber and Dr. Longo and various historical documents
13 mentioning potential tremolite contamination, which we
14 dispute is even asbestos, but for purposes of this
15 conversation that doesn't really matter.
16     You have wildly varying potential asbestos
17 contamination in these containers.  Dr. Longo says he found
18 asbestos contamination in some 60 percent of the containers.
19 That means there's an entire universe of containers,
20 statistically significant universe of containers, that
21 Dr. Longo admits don't contain asbestos.  There is a
22 significant amount of talc in the mines that does not
23 contain asbestos.  The evidence that has already been educed
24 from the experts shows that.  So we are not dealing with any
25 known am amount of asbestos contamination for Dr. Moline to

| Proceedings | Page 2161 |
| --- | --- |

1 say, aha, Johnson's baby powder, mesothelioma, must have
2 caused -- you know, the baby powder must have caused the
3 mesothelioma, because your only basis for saying that is
4 there was asbestos in it, but she doesn't really know how
5 much asbestos was in it.  And she doesn't know if there was
6 any asbestos in any particular container that Ms. Olson
7 used.  And for her to use these to try to bolster the leap
8 she's making is improper, scientifically.  It's exactly what
9 the Court said in the Axel case, which is directly
10 applicable here.  The fact that mesothelioma is rare does
11 not change the analysis that isolated case reports that --
12     THE COURT: It might.  And that's what's been
13 troubling me.  It might, in the sense of the -- please
14 address this, if you would, in that you can have really good
15 studies when it comes to defective machinery or when you
16 have a major drug protocol, but when something is assertedly
17 rare, how do you show a causality?
18     Could not different standards apply in asbestos
19 cases?  And doubly so in asbestos talc cases.  Are not
20 asbestos cases treated differently from other cases?  Of
21 course they are.  We have a CMO that contradicts the CPLR in
22 material ways.  There are different rules in asbestos cases.
23 Why wouldn't this be one of them, given the rarity, given
24 the circumstances, given the differences in how there can be
25 experimentation that would show causality in more than the

| Proceedings | Page 2162 |
| --- | --- |

1 association.
2     MR. KURLAND: Your Honor, the rules of court do not
3 change the rules of science, and that's why the court needs
4 to exercise a gatekeeping function.  We are not saying that
5 Dr. Moline can't testify at all.  In fact, she's already
6 testified that she's applying the same level of intellectual
7 rigor to this case, the same that she would apply in her
8 ordinary medical practice.
9     What we are saying, these specific pieces of
10 isolated case reports and adverse event reports do not
11 inform a causation opinion.  Dr. Moline can say that based
12 on my training and experience and medical profession, I am
13 aware, and believe, and know that incredibly small amounts
14 of asbestos can cause mesothelioma.  She can say that.
15     And plaintiffs other experts can say we believe to
16 a reasonable degree of certainty within our particular
17 fields that it's possible that these containers were
18 contaminated with very small amounts of asbestos.
19     And then plaintiffs can argue to the jury that we
20 have presented evidence that there can be very small amounts
21 of asbestos.  We have presented evidence that very small
22 amounts of asbestos can cause mesothelioma, and therefore,
23 that's what's happened to Ms. Olson.  They can argue that
24 with evidence that we are not contesting.  It is using these
25 case reports.

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

Proceedings                                                        Page 2163

1    It is using these adverse event reports to say that
2    there are lots and lots of examples where Johnson's baby
3    powder has caused mesothelioma, that's our problem, because
4    none of these establish, in any way, that Johnson's baby
5    powder caused mesothelioma.
6        And I asked Mr. Block, where in these adverse event
7    reports is there an assessment of causation, and the only
8    thing he points to is this code that says that causation is
9    possible. And "possible" is -- is a question that we are
10   asking this jury to address. "Possible" is a question that
11   is being addressed in all of these cases. "Possible" is why
12   Johnson & Johnson is defending these cases.
13       And we are not disputing that Ms. Olson has
14   mesothelioma. In none of these case reports is Johnson &
15   Johnson disputing that the people have mesothelioma; that
16   there's a confirmed mesothelioma diagnosis does not touch on
17   the issue of a causal relationship.
18       And saying that just because a person used Johnson
19   baby powder and got mesothelioma is enough to have evidence
20   of causation, um, is -- is absolutely contrary to the law
21   and contrary to science.
22       And for what it's worth, I'll point out that the
23   ICH code assessing causality in all of these records is a
24   code that comes from the FDA, it's in their March 1995
25   guidance for industry document on adverse event reporting,

Proceedings                                                        Page 2164

1    and the ICH code for causality -- FDA, and I could point you
2    to the regulation, specifically instructs the company to
3    report what the complainant is saying. And every one of
4    these adverse event reports that Mr. Block put on the screen
5    says, comes in through an attorney. All of those medical
6    statements are excerpts from the medical records that the
7    company collects.
8        Now, do they have a specific regulatory obligation
9    from FDA to collect this medical information in the context
10   of a cosmetic product? I don't know the answer to that, but
11   it doesn't really matter. They do collect it. They collect
12   it for all of their products. Every single thing they sell,
13   they collect the information the same way. And it does not
14   establish causation. It shows that the company is
15   responsibly keeping track of this information.
16       And Mr. Block keeps saying, they have independent
17   medical experts, independent medical reviewers reviewing
18   these documents. First of all, I personally know that not
19   to be true.
20       Second of all, I don't think Mr. Block can adduce
21   any evidence that that is true, because it's just repeating
22   what's in the medical records that the plaintiffs provide in
23   discovery.
24       And I think more importantly, if this type of
25   evidence comes in, we are essentially going to have to have

Proceedings                                                        Page 2165

1    a mini trial on each one of these case reports about what
2    they say. It's going to look exactly like the larger trial
3    we are having here for Ms. Olson. Each one of these cases
4    is asking the same question, did Johnson's baby powder cause
5    mesothelioma? None of those case reports answer that
6    question. If they answered that question, if they were
7    probative of that question, then perhaps they would be
8    reliable, but they are not. At best, they show a temporal
9    relationship between two isolated facts.
10       And to the extent that the Court is considering
11   admitting these for notice purposes, you are absolutely
12   right to have observed that virtually all of these, if not
13   all of these, were collected by the company after the period
14   which Ms. Olson testified she stopped using any of the
15   powder products because she was concerned of the risks. So
16   it is not admissible as notice for that.
17       Even if it were admissible as notice, it certainly
18   wouldn't be able to be used to form the basis of an expert
19   opinion.
20       And again, what is happening here is plaintiffs
21   recognize that there's an inferential leap that they are
22   asking the jury to make. They have experts that say, we
23   believe there is a small amount of asbestos. They have come
24   up -- Dr. Longo has come up with a calculation about what he
25   believes the amount of asbestos would be released from a

Proceedings                                                        Page 2166

1    container of Johnson's baby powder. They point to the
2    Gordon study about Cashmere Bouquet, which comes up with a
3    calculation of fibers released by use of a product which
4    they say contained the same type of Italian talc that was in
5    Johnson's baby powder. They have these pieces of evidence
6    to suggest that a certain amount of asbestos may have been
7    released while Ms. Olson used Johnson's baby powder. Okay.
8    That evidence is in.
9        Then they have Dr. Moline saying that the certain
10   amount of asbestos that the other experts believe is in the
11   Johnson's baby powder, in her medical opinion to a
12   reasonable degree of medical certainty, is enough to cause
13   mesothelioma. That can come in. Fine.
14       Now they are trying to backfill this inferential
15   leap, which they are allowed to argue to the jury, and we
16   are going to argue about it too, and that's fine. That's
17   what this trial is about, but they are trying to backfill
18   this inferential leap with the fact that other plaintiffs
19   are filing lawsuits making the same claims. And that is not
20   a scientifically, justifiable basis for an opinion.
21       And -- and the distinctions with Juni are sort of
22   in opposite. The comparisons to the other studies where
23   they found small amounts of asbestos in particular products
24   with a small number of people are sort of in opposite,
25   because again, in that universe, we are dealing with known

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

| Proceedings | Page 2167 |

1 asbestos-containing products, and we are not dealing with
2 that here. So there is a gap. There is a gap. And that is
3 not the defendant's fault that that gap exists.
4     This is a difficult question to answer. If this
5 was an easy question to answer, we wouldn't be having this
6 trial right now. But to allow in all this other evidence,
7 essentially that other plaintiffs who have a confirmed
8 diagnosis of mesothelioma and have also used Johnson's baby
9 powder, even if you don't call them other plaintiffs, call
10 them consumers or customers, which is how the business rules
11 recognize -- instruct the adverse event reports to refer to
12 the person claiming an injury from having purchased a
13 product. Even if you don't say they are other plaintiffs,
14 it's still incredibly prejudicial to use this evidence that
15 establishes nothing as a basis for a scientific opinion.
16 And we think the case law is incredibly clear on that.
17     And I'm happy to address a couple of the other
18 points that were raced, but I don't think we need to take
19 the time.
20     If the Court has any other questions you would like
21 me to address.
22     MR. BLOCK: And if you do not have any other
23 questions for Mr. Kurland, I just wanted to show you one bit
24 of information from the event report that hasn't been
25 raised, your Honor.

| Proceedings | Page 2168 |

1     So looking at event report tab 103. All right.
2 One of their arguments is how do we know for these people,
3 these 117 event reports, whether there was some other
4 exposure that could have cause their mesothelioma. Well,
5 they evaluate that, too, your Honor.
6     All right. They have a decision treatise, cosmetic
7 products causality decision treatise. Is chronology
8 incompatible. So the appropriate latency there. So
9 chronology is not incompatible. But then look at this. Is
10 another etiology.
11     THE COURT: Where are you?
12     MR. BLOCK: I'm in JNJTALC125957, which is in tab
13 102, which I'll pass back up to you with the flags. Tab
14 103, "Is another etiology demonstrated medically" -- "Is
15 another etiology demonstrated medically, validated and
16 documented."
17     "No."
18     They reviewed these cases of people with
19 mesothelioma with Johnson's baby powder, and one of the
20 things they assess is, is another cause demonstrated
21 medically, validated and documented. No.
22     So, your Honor, in court they say oh, women who use
23 talcum powder, they get mesothelioma spontaneously 60 to 90
24 percent of the time. And the spontaneous mesothelioma is
25 the cause. And they say it's really straightforward.

| Proceedings | Page 2169 |

1 Ladies and gentlemen, these women who use powder, they get
2 it spontaneously. But in their evaluation of the event
3 reports, they evaluate whether something else could have
4 caused the person's mesothelioma. And they answer the
5 question yes or no.
6     (Continued on the next page.)

| PROCEEDINGS | Page 2170 |

1     MR. BLOCK: And here is another epidemiology
2 medically illustrated document, no. They say, your Honor,
3 they review each case and they say whether causality -- how
4 they assess causality. Causality was assessed as possible.
5 They are making an assessment of causality. They're
6 documenting whether there is any other possible cause, and
7 they're listing yes or no, whether the person had any other
8 exposure. So --
9     THE COURT: Just a second.
10     MR. BLOCK: So, I could pass that notebook up where
11 I have those yellow flags that I was just reading from. So
12 there is a lot of detail in there, and it's certainly not
13 simply taking what people say happened and just kind of
14 summarizing it. They are making an assessment. They are
15 doing a detailed review. It's inconsistent with their in
16 court position. These are business records of the company
17 that they produced in this case. The only issue right now
18 is whether doctor -- is whether I could lay a foundation
19 with Dr. Moline that looking at these event reports has
20 significance from an occupational-environmental medicine
21 standpoint, given the rarity of mesothelioma. And I think
22 that is the issue that needs to be decided. And we could
23 deal with issues of admissibility in terms of admitting
24 these in evidence or whether they could be used on cross
25 examination with defense experts at a later time. But with

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

PROCEEDINGS                                    Page 2171

1    Dr. Moline here, that's the issue that needs to be decided.
2    Is this something that with appropriate foundation laid, an
3    expert can refer to as something that they reasonably and
4    ordinarily rely upon or would rely upon as part of the
5    information that they consider to be important in looking at
6    mesothelioma being caused by this product.
7         Mr. Kurland is correct in that Dr. Moline has a
8    host of other information that she's already talked about,
9    and she will be able to give a causation opinion based upon
10   all that other information, but we think this is proper.
11   Our medical -- Dr. Moline is here, and we think it's proper
12   for her to give some limited testimony based upon her
13   awareness and review of these event reports.
14        MR. KURLAND: Again, the decision in there is part
15   of an FDA regulation, business rule. A function. There is
16   no foundation for what Mr. Block just said. There is not
17   going to be any foundation in this case, and there is not
18   any foundation for what I'm saying. I just happen to know
19   how the company keeps these records. That is an FDA
20   decision where they look to the information that has come in
21   through the course of discovery and break down the
22   information. So, if the information provided through the
23   course of discovery in litigation does not provide any other
24   information, then they don't report any other information.
25   But they never reach a causation conclusion. The best they

PROCEEDINGS                                    Page 2172

1    come to is possible, and possible does not -- I mean,
2    anything is possible. As I said yesterday, you know, if you
3    have a person who has a color TV and also has diabetes, you
4    can report those two things in a temporal relationship to
5    one another, and it is possible that there is a
6    relationship, but there is no scientific basis to assert one
7    of those isolated pieces of information. That's essentially
8    what the plaintiffs are attempting to do here. Dr. Moline
9    cannot create a foundation for these documents. There is
10   not going to be a witness that can create foundation. If we
11   were going to create foundation for these documents, we
12   would be having the same trial that we're having now through
13   Mrs. Olson for every single one of these plaintiffs that are
14   identified in these case reports in this courtroom. That is
15   not something that we should be doing here.
16        And I brought the chart just to be clear.
17   Mr. Block's statements in opening were based on two things.
18   The sale of cosmetic talc and the rate of diagnosis. That's
19   what he was talking about. So, it is a red herring to say
20   we have somehow opened the door to all of these other
21   plaintiffs. We're not disputing there are people who used
22   Johnson's Baby Powder that have mesothelioma and claim the
23   two things are related. We are litigating these cases
24   actively around the country, 'cause we don't think there is
25   a causal relationship and the plaintiffs do, and that's

PROCEEDINGS                                    Page 2173

1    fine. That's why we're having a trial. But the Court has
2    an obligation to prevent baseless, nonscientific information
3    from coming out of the mouth of an expert to confuse the
4    jury. Opinion testimony as a general principle is
5    disfavored in New York courts. And, therefore it, is
6    narrowly curtailed. Experts are allowed to opine within
7    their expertise, but it needs to be based on reliable
8    science. That's exactly what the First Department said in
9    Heckstall. That's all we're asking here is that the Court
10   apply the law as the First Department has described it.
11   This is not a complicated question. These case reports,
12   these adverse event reports are inadmissible to establish
13   causation, and we believe they would also be inadmissible
14   for notice, because they postdate all of the use of this
15   particular plaintiff.
16        These case reports are really no different than a
17   complaint with a Bill of Particulars. It's a complaint plus
18   medical records. That's what we have here. They are bare
19   allegations. They are not evidence of causation.
20        MR. BLOCK: Your Honor, Mr. Brock, this board was
21   separate and apart from what he said to the jury. This
22   board just talks about talc use generally and tries to track
23   it with incidents of mesothelioma. We'll see if they
24   develop a foundation through an expert where they can talk
25   about that. But he flat out told the jury that because this

PROCEEDINGS                                    Page 2174

1    product has been around for a hundred years, use your common
2    sense and that people are not getting mesothelioma from this
3    disease. There is not an "epidemic" of people with
4    mesothelioma from Johnson's Baby Powder. Mr. Kurland, I
5    think, just said that we're not disputing that people who
6    use Johnson's Baby Powder have gotten mesothelioma. Yes,
7    they are. Yes, they are. They have fought and they have
8    made application to the Court. They have said -- they have
9    indicated to the Court that there should be no evidence of
10   anyone else who has ever developed mesothelioma after using
11   Johnson's Baby Powder, okay. And that was -- that was the
12   purpose of their original application, to preclude Dr.
13   Moline from talking about other cases that she's assessed.
14   Because they want to create a fiction in this court that
15   Donna Olson is the first customer of Johnson & Johnson who
16   used baby powder and got mesothelioma when in reality
17   they're collecting over a hundred cases, they're assessing
18   causality and they are making a statement in each of those
19   whether there is any other possible cause, yes or no. So,
20   we have a lot of detailed information in those event
21   reports.
22        THE COURT: When did Ms. Olson stop using --
23        MR. BLOCK: In 2015.
24        MR. KURLAND: Just to be clear, your Honor, we have
25   never said, nor will we say that there is not a person who

**Donna A. Olson and Robert M. Olson v.**
**Brenntag North America, Inc. et al**

March 5, 2019

| PROCEEDINGS | Page 2175 |
| --- | --- |

1 has used Johnson Baby Powder and has gotten mesothelioma.
2 What we're disputing in this case and all of these cases is
3 whether or not the use of Johnson's Baby Powder in and of
4 itself is a cause of mesothelioma. We are looking at
5 specific causation. And there is a three prong test under
6 Juni. There is a clear requirement that plaintiffs induce
7 evidence of specific causation. They are using Dr. Moline
8 to do that. There are certain things she's allowed to rely
9 in forming that opinion. She needs to have a scientific
10 expression of that causality. And these case reports and
11 these adverse event reports are not a scientific expression
12 of anything, which is why they are routinely excluded as a
13 basis for a causation opinion. So, this idea that we're
14 saying no one who has used Johnson's Baby Powder ever got
15 mesothelioma is simply not a genuine statement of our
16 position. We are saying that we don't believe Johnson's
17 Baby Powder causes mesothelioma. And that's the question
18 this jury is being asked to decide.
19     THE COURT: Okay. I just by coincidence opened up,
20 thank you, one of the binders. It's 103. Here the consumer
21 stopped using Johnson's powder in approximately 2003.
22     MR. KURLAND: Your Honor, I would ask what's the
23 date of the case report, because that would be the relevant
24 question for whether or not it would be admissible for
25 notice purposes. When the company received notice, not when

| PROCEEDINGS | Page 2176 |
| --- | --- |

1 the person said they stopped using the powder.
2     THE COURT: Where does it say that?
3     MR. KURLAND: I believe it's on the first page,
4 your Honor. I don't have the one you're looking at in front
5 of me. I believe there is an entered date on the top.
6     THE COURT: Yes. This one doesn't have it.
7     MR. KURLAND: Typically there is more information.
8     MR. HARTLEY: I'm sorry. Oh, sure. It's right on
9 the first page where they have the entry date.
10     MR. HARTLEY: Your Honor, if you look --
11     THE COURT: February 9th, 2017.
12     MR. HARTLEY: I'm looking at -- I don't know the
13 number in the binder, but it's event number 30000133514.
14 And on the first page in the upper right-hand side column,
15 the first line, it gives you a J & J awareness date. So,
16 that would be helpful in terms of when they were aware.
17 This particular one their awareness of it was February 19,
18 2010. And there are going to be a number of others. We
19 would argue that the cutoff date for notice is the date of
20 diagnosis in this case.
21     MR. KURLAND: Based on the charts that the
22 plaintiffs prepared that they handed up yesterday, I believe
23 it was marked, there are two adverse event reports that they
24 are referring to that have a date prior to the plaintiff's
25 statement when she discontinued using the product. It's

| PROCEEDINGS | Page 2177 |
| --- | --- |

1 event number 30000151575. It says date reported 2/19/2010.
2 And 30000133514 says date reported 10/11/2012. Every other
3 one postdates the plaintiff's use. But again --
4     THE COURT: In all binders?
5     MR. KURLAND: Yes. This is all. This list the
6 plaintiffs prepared is all of them. The next one is
7 1/4/2016 and then they go through 2/24/2017, and all the
8 dates are in that period. Again, even if the Court were
9 inclined to admit these for some sort of notice purpose,
10 putting them in through Dr. Moline would be incredibly
11 prejudicial, because it would imply to the jury with any
12 kind of instruction that it's forming her causation opinion
13 and these are improper to form a causation opinion. So, if
14 the plaintiffs want to put these in through a Johnson &
15 Johnson witness and say well isn't it true that you received
16 this report in 2010, maybe that's one thing. It would be
17 admissible for the fact the report was received, not notice
18 of anything. But it's a completely different thing to allow
19 Dr. Moline to talk about them.
20     I'll just read from the one that was just referred
21 to by Mr. Hartley, the notes where it reports what the
22 company learned. It says "Consumer was hurt and injured in
23 her health, strength and activity, sustaining serious and
24 severe injuries to her person and body and to her lungs,
25 respiratory and cardiovascular systems and permanent

| PROCEEDINGS | Page 2178 |
| --- | --- |

1 injuries and have caused and continue to cause great
2 physical, mental and nervous pain and suffering and mental
3 anguish, all of her general damage in a sum which has yet to
4 be ascertained."
5     Now, if that -- if a doctor talks like that, I
6 would be shocked to see it. If a doctor says "damages in a
7 sum yet to be ascertained", I would be shocked to see it.
8 That sounds very much to me this is a cut and paste from a
9 complaint, not a medical investigation of causation, which
10 is what plaintiffs are purporting these are. These are
11 litigation complaints.
12     THE COURT: Let's take a ten minute break and I'll
13 think about it.
14     MR. KURLAND: Thank you, your Honor.
15     (Whereupon a recess was taken.)
16     THE COURT: Thanks counsel for their excellent
17 argument on these difficult issues. The issue before the
18 Court is whether the adverse event reports may be admitted
19 and whether the case studies may be admitted.
20     With respect to the case studies, plaintiffs have
21 not shown that Dr. Moline has personal knowledge of other
22 cases through treating patients who have mesothelioma.
23 Plaintiffs do not provide written documents by which the
24 Court can assess the probative value of information about
25 the cases to which Dr. Moline would testify or would show

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

| PROCEEDINGS | Page 2179 |
| --- | --- |

1  that these cases are similar in any way to the one here.
2  Dr. Moline may not refer to those other cases in support of
3  her opinion on causation.
4         With respect to the adverse event reports, the
5  Court similarly concludes that Dr. Moline may not refer to
6  those reports as bases for her causation opinion.  Court
7  finds that defendants argued correctly that the report
8  simply reflect the consumer statements, that the consumer
9  used Johnson's talcum products, and the consumers' medical
10 records showing that the consumer has mesothelioma and does
11 not show any causal connection between the two, nor do these
12 documents purport to rule out alternative or other causal
13 explanations for the consumers' mesothelioma.  So, applying
14 the First Department's decision in Heckstall,
15 H-E-C-K-S-T-A-L-L, testimony about these reports is
16 inadmissible.
17         MR. BLOCK: Can Dr. Moline know take the stand?
18         THE COURT: Yes.  Please.
19 J A C Q U E L I N E   M O L I N E,   P h.D, after having been
20 previously duly sworn, was examined and testified further as
21 follows:
22         THE WITNESS: I know you guys were talking a lot,
23 and there was a lot of hot air probably, but it's freezing
24 in here.
25         MR. HARTLEY: May I close the window, your Honor.

| Direct-Moline-Block | Page 2180 |
| --- | --- |

1         THE COURT: Doctor, it's possible a juror might
2  complain about --
3         THE WITNESS: That's fine.
4         THE COURT: -- if it gets a little bit stuffy.
5  Maybe we can try to get you a jacket if that happens or
6  maybe a juror won't complain and everything will be fine.
7  We try to accommodate.
8         THE WITNESS: Thank you.
9         COURT OFFICER: All rise.  Jury entering.
10        (Whereupon the jury panel entered the courtroom.)
11        THE COURT: Good morning.  And please be seated
12 everyone.  Thank you.  We apologize for the delay.  Please
13 continue.
14 CONTINUED DIRECT EXAMINATION
15 BY MR. BLOCK:
16 Q   Good morning, Dr. Moline.
17        MR. BLOCK: Good morning, ladies and gentlemen.
18        THE JURY: Good morning.
19 Q   Dr. Moline, I want to go back to one point from
20 yesterday.  You testified yesterday about something called a
21 fiber per cc year.  Do you remember that?
22 A   Yes.
23 Q   And we talked about that exposure to 0.1 fiber per cc
24 level for ten years, that would equal one fiber per cc year.  Do
25 you recall that testimony from yesterday?

| Direct-Moline-Block | Page 2181 |
| --- | --- |

1  A   Yes.
2  Q   You testified yesterday that published studies
3  demonstrate that exposure at a level of one fiber per cc year is
4  sufficient to cause mesothelioma, is that right?
5  A   Yes.
6  Q   All right.  So, let's do another number here.  So, 0.1
7  fiber per cc times one year, okay.  And does that equal 0.1
8  fiber per cc year?
9  A   Yes.
10 Q   And have published studies demonstrate that even
11 exposure at the zero point fiber per cc level for one year is
12 sufficient to cause mesothelioma?
13 A   They show that there is a significantly increased risk
14 at that level, yes.
15 Q   And how significantly increased?
16 A   I believe it's four fold in some studies.  In other
17 studies if you go to about .15 the rates could go up to about 20
18 fold.
19 Q   Okay.  So -- And so -- And even if the fiber per cc
20 year level is below 0.1, would there still be a significant
21 increased risk but it would just be less?
22 A   Correct.
23 Q   And is that part of a dose-response effect of asbestos
24 in causing mesothelioma?
25 A   Yes.  You can look at it that way.  Mesothelioma is a

| Direct-Moline-Block | Page 2182 |
| --- | --- |

1  dose-response disease where you see it, of all the asbestos-
2  related diseases, it's something you can see at the lowest dose.
3  And we also know the more of a dose you get, the more likely you
4  are to develop mesothelioma.  So, for individuals who have had
5  even more exposure, their risk is even higher.
6  Q   Okay.  And yesterday you talked about the Gordon,
7  Millette paper published in the peer-reviewed literature in
8  2014.  Where does Dr. Gordon work?
9  A   At Mount Sinai.
10 Q   Here in New York?
11 A   Correct.
12 Q   Okay.  And you testified yesterday that exposure at the
13 level that that they identified of asbestos of being in the air
14 when talcum powder is used of 1.9 fiber per cc is sufficient to
15 cause mesothelioma.  Do you recall that testimony from
16 yesterday?
17 A   I do.
18 Q   Did the authors in the Gordon, Millette article
19 conclude that exposure to asbestos from talcum powder is capable
20 of causing mesothelioma?
21 A   Yes.
22 Q   Did they?
23 A   They did, yes.
24 Q   And do you agree with that?
25 A   I do agree with that, yes.

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

Direct-Moline-Block                                    Page 2183

1   Q   Yesterday you talked about the amount of baby powder
2   that Johnson and Johnson has found is typically applied, and I
3   think you said 3.7 grams.  Do you recall that testimony?
4   A   Yes.
5   Q   And have you reviewed Johnson & Johnson documents on
6   that issue?
7   A   I have.
8   Q   Let me show you what has been marked as Exhibits 319
9   and 320.  So, 319 and 320 --
10       MS. PAGONIS: Your Honor, we do have objections to
11  these two exhibits.
12       MR. BLOCK: Can I lay a foundation before you hear
13  their objection, your Honor?
14       THE COURT: Go ahead.
15   Q   Okay.  Are these documents based upon the bates label
16  that appears on the bottom, are these documents that are
17  produced by Johnson & Johnson?
18   A   Yes.
19   Q   And are these documents that have Johnson & Johnson
20  letterhead on them?
21   A   Yes.
22   Q   And do these two documents, Exhibits 319 and 320,
23  document user studies that Johnson & Johnson conducted or one of
24  the findings that Johnson & Johnson made was the amount of
25  talcum powder in terms of the number of grams that is typically

Direct-Moline-Block                                    Page 2184

1   applied by a Johnson & Johnson Baby Powder product user?
2   A   Yes, they do.
3       MR. BLOCK: Your Honor, plaintiffs move Exhibits
4   319 and 320 into evidence.
5       MS. PAGONIS: Same objection, your Honor.
6       THE COURT: Shall we have a conversation in the
7   back.
8       MS. PAGONIS: We shall.
9       (Whereupon the following proceedings were held
10  outside of the presence of the jury.)
11       THE COURT: Yes.  Do I know what these are?  Oh,
12  yes.  This is what we were walk talking about yesterday.  We
13  didn't talk about it much.  You just showed it to me.
14       MR. BLOCK: Right.  This is what Dr. Moline
15  testified somewhat about.
16       MS. PAGONIS: What she's testified to is that it
17  has a J & J bates number on it.  We object to both documents
18  319 and PX 320 on the basis they are both hearsay and to
19  relevance.  These documents are surveys or refer to survey
20  and survey results that were done with respect to employees
21  and their use of baby powder.  Has nothing to do with the
22  allegations in this case of baby powder containing any type
23  of asbestos.  There is no correlation to Mrs. Olson's use of
24  the product and these survey participants who were
25  characterized as heavy users.  So, they're completely

PROCEEDINGS                                            Page 2185

1   irrelevant to the issues in this case.  And there has been
2   really no foundation other than it has a bates, J & J bates
3   number for this witness to be discussing these two
4   documents.
5       MR. BLOCK: Your Honor, these are -- these are
6   clearly ancient documents of Johnson & Johnson.  They are
7   more than 30 years old.  They're on Johnson & Johnson
8   letterhead.  They are produced by Johnson & Johnson in
9   litigation.  There is no dispute as to authenticity.  They
10  were produced from the proper custody of Johnson & Johnson.
11  There is no indication of fraud or invalidity.
12       As to the hearsay issue, the ancient document rule,
13  they clearly come in.  Of course they're likely also
14  admissible under the business record exception.  We don't
15  have to get there.
16       In terms of relevance, your Honor, Dr. Moline has
17  testified that it is significant in her opinion that Johnson
18  & Johnson has determined that the average amount of baby
19  powder that is applied by women based upon Johnson &
20  Johnson's own studies is approximately 3.7 grams.  If you
21  look at Exhibit 319, Johnson & Johnson did a study and they
22  found that the average amount, third paragraph of 319, the
23  average amount of powder applied per application was
24  6.1 grams for males and 3.7 grams for females.
25       On Exhibit 320 there is another -- they talk about

PROCEEDINGS                                            Page 2186

1   a study, 60 members, in-house panel participated in a baby
2   home usage study.  And if you go to the next page, it says
3   amount used.  And you see the female column, your Honor,
4   3.7 grams.  And this is really relevant information.  It's
5   relevant to Dr. Moline.  It's relevant for the jury in that
6   there has been evidence that there is thousands or millions
7   or even billions of asbestos fibers per gram in Johnson's
8   Baby Powder.  And so the amount that is typically applied,
9   Johnson & Johnson has a study about it.  We can't go back
10  and measure the precise number of grams that Mrs. Olson
11  used.  We know that, you know -- we know that she shook it
12  on her body.  We know she shook it on her hand, put it on
13  her body.  But Johnson & Johnson did a study.  This is the
14  best evidence of the issue of how much is applied, and Dr.
15  Moline has already testified to the jury without objection
16  that she has reviewed Johnson & Johnson historical
17  documents, and they show that 3.7 grams is typically
18  applied.  And Dr. Moline testified that the Gordon, Millette
19  study they only applied 0.37 grams.  So, that was a light
20  usage, the Gordon, Millette study, as compared to what
21  actual users use according to Johnson & Johnson.  This is an
22  admissible document, your Honor, and it should be admitted
23  now.  I should be able to proceed with my exam.
24       THE COURT: Thank you.  You have the last word.
25       MS. PAGONIS: Your Honor, if you look at 319, the

Case 3:23-cv-02990-GC-DEA   Document 18-6   Filed 06/30/23   Page 16 of 43 PageID: 690
Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

Page 2187
Moline - Plaintiff - Direct (Mr. Block)

1 first paragraph, and you'll see it's referring to another
2 report done by a Mr. Newman and his memoranda.  So, you have
3 hearsay within hearsay in this document.  We don't have the
4 Newman report.  And again, you know, this is survey results
5 of limited people, again having nothing to do with the
6 allegation of contamination.  And these users again
7 characterizes heavy users.  And no foundation laid for these
8 documents.
9     MR. BLOCK: It all goes to the weight of the
10 evidence, your Honor.  If they have some other study that's
11 referred to here --
12     THE COURT: Thank you.  Let me just read it,
13 please.  (Examining).  I'm not troubled by the reference to
14 Mr. Newman's memoranda dated September 14 and 19, because
15 this is understandable, even without regard to that
16 reference, it's relevant.  These are ancient documents.  I
17 don't see any reason to exclude them.  They are admitted and
18 Dr. Moline may talk about them.  Thank you.
19     MS. PAGONIS: Thank you.
20     (Continue on the next page.)

Page 2188
Moline - Plaintiff - Direct (Mr. Block)

1     (Whereupon, the following takes place in open court
2 in the presence of all parties and the sworn jurors that are
3 properly seated.)
4     THE COURT: Thank you.  Objection overruled.
5     MR. BLOCK: So, your Honor, plaintiff moves
6 Exhibits 319 and 320 into evidence.  Should they be marked
7 now or later?
8     THE COURT: What do you prefer?
9     MR. BLOCK: The actual marking can take place
10 later, but they are admitted into evidence.
11     (Whereupon, Plaintiff's Exhibits 319 and 320 are
12 deemed marked in evidence.)
13     THE COURT: Yes.
14     MR. BLOCK: Thank you.
15 Q   Dr. Moline, have you seen Exhibit 319 before?
16 A   I have.
17 Q   And is this one of the documents that you are relying
18 upon for your statement yesterday to the jury that Johnson &
19 Johnson has conducted studies and determined that with respect
20 to females, approximately 3.7 grams of baby powder are typically
21 applied?
22 A   Yes.
23     (Whereupon, a demonstrative aid was shown on the
24 screen.)
25 Q   And so if we look -- we could look at this document

Page 2189
Moline - Plaintiff - Direct (Mr. Block)

1 together with the jury.  Is this a document from Johnson &
2 Johnson dated October 18, 1978?
3 A   Yes.
4 Q   And it says here that, um, they had a group, 60
5 panelists were identified as probably being heavy users of JBP,
6 Johnson's baby powder, and that they were recruited for a home
7 usage study; is that right?
8 A   Correct.
9 Q   It says here, "The average amount of powder applied per
10 application was 6.1 grams for males, 3.7 grams for females, and
11 4.9 grams for the entire panel."  Is that what it says?
12 A   Yes, it does.
13 Q   Then it says that there was a -- they also did some
14 "motel studies" where they recruited people to apply the baby
15 powder.  And they conducted studies at a motel; is that right?
16 A   Correct.
17 Q   And then on the bottom they also calculated an average
18 amount of baby powder that is used by mothers on babies; is that
19 right?
20 A   Correct.
21 Q   And it says here that "The average amount used per
22 application by mothers on babies after bathing them was found to
23 be 0.9 grams"; is that right?
24 A   Correct.
25 Q   So was the amount that Johnson & Johnson found that was

Page 2190
Moline - Plaintiff - Direct (Mr. Block)

1 applied to babies, typically by mothers, was that also more than
2 the amount of powder that was used in the Gordon/Millette study
3 which showed a 1.9 fiber per cc of asbestos in the air?
4 A   Yes.
5 Q   And do these studies look at the different ways women
6 and men would apply the powder --
7     (Whereupon, a demonstrative aid was shown on the
8 screen.)
9 Q   -- on the next page here?
10 A   Yes.
11 Q   It talks about shaking the powder directly from the
12 container onto the body, shaking the powder into the hand and
13 then rubbing on the body.  Those were the two most common ways?
14 A   Yes.
15     (Whereupon, a demonstrative aid was shown on the
16 screen.)
17 Q   And is Exhibit 320 similar?  Does it discuss similar
18 studies by Johnson & Johnson, or I guess in some cases the same
19 studies?
20     We just looked at a document from October 18, 1978.  So
21 now we are going back two years, December 15, 1976.  And it
22 talks about a "60 member in-house panel participated in a baby
23 powder home usage study.  These panelists were selected because
24 they were heavy powder users."
25     Do you see that?

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

1  A  Yes. I think these 60 folks are referenced in the '78
2  memo, and then they did an additional motel study --
3  Q  Right.
4  A  -- they called it. That looked at additional
5  individuals for their powder use. So they were comparing the
6  two different groups to see if the powder usage amounts were
7  similar, or what they were.
8  Q  Okay.
9  (Whereupon, a demonstrative aid was shown on the
10  screen.)
11  Q  If we look at this 1976 document, does it indicate that
12  number 3.7 grams for females?
13  A  Yes.
14  Q  Are those the type of documents, historical documents
15  from Johnson & Johnson that you are relying upon when you gave
16  the testimony to the jury that the amount of baby powder that
17  Johnson & Johnson found is typically applied by users is
18  actually about ten times higher than what was used in the
19  Gordon/Millette study when asbestos was monitored into the air?
20  A  Yes, it is.
21  Q  Okay. Let me go back to where we left off yesterday.
22  And we were talking about the fact that even if there is less
23  than .25 percent of asbestos in talc, that you could still have
24  billions of asbestos fibers per gram in that material; is that
25  right?

1  A  Yes.
2  Q  And you talked about a published study by Rohl, from
3  Mt. Sinai, as one of the bases in your opinion in that regard?
4  A  Yes.
5  Q  So if we look at Exhibit 44, which is in evidence, and
6  I'll just put it up on the screen.
7  (Whereupon, a demonstrative aid was shown on the
8  screen.)
9  Q  I'll try to make it larger, Dr. Moline. And if you are
10  able to, from sitting there -- I'm going to blow it up.
11  (Whereupon, a demonstrative aid was enlarged on the
12  screen.)
13  Q  Dr. Moline, have you seen this testing, which is in
14  evidence as Exhibit 44, done by this laboratory, Forensic
15  Analytical, December 19, 2003, which tested Johnson's baby
16  powder for the presence of asbestos?
17  A  Yes, I've seen this document.
18  Q  Okay.
19  And looking at this document, it says the asbestos, in
20  terms of the weight percentage, is .20 percent; is that right?
21  A  Yes.
22  Q  Point two zero percent. And it indicates this is in
23  2003. And it finds anthophyllite asbestos in Johnson's baby
24  powder; is that correct?
25  A  Yes.

1  Q  So from an occupational and environmental medicine
2  standpoint, what is the significance of a finding of point zero
3  -- of .20 percent anthophyllite asbestos, by weight, in
4  Johnson's baby powder?
5  What's the significance of this finding, in terms of
6  from a standpoint of occupational and environmental medicine and
7  health?
8  A  Well, it is showing in a bulk sample that there is a
9  percentage that is measurable of anthophyllite asbestos that is
10  capable of elaborating billions of fibers into the air, and it's
11  -- can cause health consequences.
12  Q  So in terms of the use of the product, what is the
13  significance of the fact that this product is being shaken onto
14  a person's body, let's say in the chest area, near the breathing
15  zone?
16  A  Well, it's -- it's getting into the air and people have
17  the opportunity to breathe it in. Whether it's being put on the
18  chest or below the waist, it still gets into the air.
19  But someone pouring a powder that is not bound by
20  anything that is, um, is described as like a cloud of dust by
21  many individuals, but it is light and it gets into the air, and
22  it's close to where someone is going to take a breath.
23  Q  So let's take like a floor tile that contains asbestos.
24  Now, a floor tile that contains asbestos, if you are not
25  scraping it or if you are not cutting it, if it's just sitting

1  there, is that going to be a dusty, powdery product?
2  A  It is not, because it's bound up in resins and in a
3  variety of other compounds that make it so that the -- the
4  asbestos is not what we call friable or respirable. So it's a
5  totally different type of product.
6  Q  Is the asbestos contained in Johnson's baby powder, as
7  reported here in 2003, is that asbestos friable, as you just
8  used the term?
9  A  Yes.
10  Q  And what does that mean? What does the word friable
11  mean as discussed by the EPA and in the scientific literature?
12  A  "Friable" means it's capable of generating dust. When
13  you use it in the term, um, with dusts and asbestos. It has
14  some other medical terms, but something that is -- can be broken
15  up and become airborne.
16  Q  Let me show you Plaintiff's Exhibit 54A.
17  (Whereupon, Plaintiff's Exhibit 54A was handed to the
18  witness.)
19  Q  Have you seen Exhibit 54A before?
20  A  Yes.
21  Q  Is Exhibit 54A a memo discussing testing of Italian
22  talc at the South Plainfield, New Jersey Mill, where the Italian
23  talc that was used in Cashmere Bouquet and in Johnson's baby
24  powder was milled?
25  MS. PAGONIS: Objection. Leading.

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

Moline - Plaintiff - Direct (Mr. Block)     Page 2195

1    THE COURT: You may answer that.
2  A  Yes, it is.
3  Q  And does this Exhibit 54A identify asbestos in the air
4  from that Italian talc?
5  A  Yes, it does.
6    MR. BLOCK: Plaintiff moves Exhibit 54A into
7  evidence.
8    MS. PAGONIS: No objection.
9    THE COURT: It's admitted.
10    (Whereupon, Plaintiff's Exhibit 54A is deemed
11  marked in evidence.)
12  Q  So the jury has heard --
13    (Whereupon, a demonstrative aid was shown on the
14  screen.)
15  Q  -- that Italian talc was used in Johnson's baby powder
16  prior to 1967, in the 1950s, as far back as 1940s, um, through
17  1967, and that also the Italian talc was used in 1980 when the
18  Vermont talc workers went on strike.  Is that consistent with
19  your understanding?
20  A  Yes.
21  Q  So here we have, from the 1980s, and let's look at the
22  date.  It refers to a visit by MSHA.  Who are they?
23  A  The Mine Safety and Health Administration.
24  Q  It's referring to a visit by the Mine Safety and Health
25  Administration to Cyprus Industrial Minerals Company, South

Moline - Plaintiff - Direct (Mr. Block)     Page 2196

1  Plainfield Mill, and does it indicate that the MSHA tested
2  personnel, monitored them with air filter, and took air filter
3  samples, that were sent and analyzed by optical and electron
4  microscope, and that the filters reported 5.8 percent
5  anthophyllite and asbestiform amphiboles; is that what it
6  states?
7  A  Yes.
8  Q  And then lower on the page it states that in terms of
9  the percentage of total fibers, that the MSHA found from that
10  Italian talc being milled, 5.8 percent of the total fibers were
11  anthophyllite asbestos; is that what it indicates?
12  A  Yes.
13  Q  And then are you familiar with, later on in this
14  document --
15    (Whereupon, a demonstrative aid was shown on the
16  screen.)
17  Q  -- that it says that they are estimating that there
18  would be approximately 0.6 percent anthophyllite asbestos in the
19  Italian talc?
20  A  In the bulk talc, yes.
21  Q  So this is 1984, MSHA.  And we have a statement about
22  point six percent anthophyllite asbestos in the Italian talc; is
23  that correct?
24  A  Yes.
25  Q  So how is this document significant to your opinions in

Moline - Plaintiff - Direct (Mr. Block)     Page 2197

1  terms of the MSHA finding anthophyllite asbestos in the air from
2  the talc, and in terms of what they are saying about the
3  percentage of asbestos in that talc?
4  A  Well, it's consistent with the finding that there's a
5  percentage of asbestos that can be measured in the Italian talc.
6  And then what they were able to do was both measure the bulk
7  sample and take that bulk sample and see what percent of that
8  became airborne.  And they were able to measure that on filters
9  in a standard method that is done in -- when one is doing an
10  assessment of what would be in the breathing zone of an
11  individual.
12    So they are using standard protocols to do the
13  measurements to see what is actually -- they are taking the bulk
14  product and then looking to see what goes into the air, which
15  is, from the health perspective, the important aspect.
16  Q  It says here at the bottom, the question was asked "Why
17  did Cyprus Industrial Minerals not detect the anthophyllite in
18  the Italian talc?"
19    And it indicates here, "The answer is that the
20  detection limit for anthophyllite by XRD is only about two
21  percent."  Do you see that?
22  A  Yes.
23    MS. PAGONIS: Objection.  Leading.
24  Q  Well, did I read that sentence correctly?
25    THE COURT: Overruled.

Moline - Plaintiff - Direct (Mr. Block)     Page 2198

1  A  You did.
2  Q  What if any concern or significance is there about that
3  from an environmental medicine and occupational medicine
4  standpoint?
5  A  If a result is reported as non-detect, you have to look
6  and see what the limits of detection are, because if a method
7  doesn't detect small amounts because it's incapable of
8  differentiating, then they are going to report the result as
9  asbestos not found in this case.
10    Yet, if they use a more sophisticated measurement, they
11  can actually detect that it is truly present, so it would no
12  longer be a non-detect.
13    So if you are using a methodology that has a high limit
14  of detection, then you don't know what the levels might be below
15  their limit of detection.
16    So a non-detect does not mean zero.  It means that the
17  analytical method is not sensitive enough to be able to find it.
18  Q  Let me show you another exhibit admitted into evidence.
19  It's Exhibit 42?
20    (Whereupon, a demonstrative aid was shown on the
21  screen.)
22  Q  Again, I want to see if I could project it onto the
23  screen sufficient for you to see it.  This is a document that is
24  admitted into evidence, Exhibit 42, which documents testing done
25  by the FDA on samples looked at by Dr. Lewin.

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

---

Moline - Plaintiff - Direct (Mr. Block) — Page 2199

1    Are you familiar with this testing?
2    A   Yes, I am.
3    Q   And the jury has seen that in this document there is a
4    signature by a Yates, a Mr. Yates, January 2nd, 1974.  And then
5    an Eiermann from January 1st, 1974.  And the jury has seen the
6    results on this page that I would like to ask you about.
7        (Whereupon, a demonstrative aid was shown on the
8    screen.)
9    Q   It says here, "Examination of talc samples by optical
10   microscopy, according to the method published in the federal
11   register is proceeding."  And then is says they tested sample
12   84.  And Sample Number 84 was found to contain 107 fibers of
13   tremolite/actinolite per milligram.
14       What is the conversion of that for a gram?
15   A   I'm sorry.  What's the conversion of?
16   Q   Of 107 fibers of tremolite/actinolite per milligram.
17   What does that convert to in terms of a gram?  How many fibers
18   of tremolite/actinolite asbestos per gram would that be?
19   A   So there are a thousand milligrams in a gram.  So it
20   would be 107,000 fibers per gram.
21   Q   Okay.
22       And are you aware, the jury has seen that Exhibit 43
23   identifies Lewin's Sample Number 84 as Shower to Shower --
24       (Whereupon, a demonstrative aid was shown on the
25   screen.)

---

Moline - Plaintiff - Direct (Mr. Block) — Page 2200

1    Q   -- manufactured by Johnson & Johnson.
2    A   Yes.
3    Q   And what is the significance of the use of a powder
4    that contains thousands of asbestos fibers per gram being put
5    onto a person's chest, or a person's underarms, shaking it onto
6    their body?  What is the health significance of that?
7    A   That when they are shaking it onto the body, it goes
8    not only onto the body, but into the air, and they are going to
9    be breathing in asbestos.
10   Q   And -- so yesterday I had a one liter bottle.  So
11   yesterday you described that the level of asbestos in the
12   ambient air or the background air is something like point -- is
13   approximately .0001 fibers per cc, and you described that that
14   would be one fiber in ten liters of air?
15   A   Correct.
16   Q   And so when you take a powder that contains thousands
17   or millions of asbestos fibers per gram and you put it onto your
18   body, what exposure is that going to create compared to the
19   level of asbestos in the ambient air?
20   A   The orders of magnitude higher.
21   Q   We looked at the OSHA PEL of zero point one fibers per
22   cc, and you talked about how that would be 100 fibers in one
23   liter of air, and if someone is taking a powder that contains
24   thousands of fibers per gram, or millions of fibers of asbestos
25   per gram and it's put on their body and up in the air, how is

---

Moline - Plaintiff - Direct (Mr. Block) — Page 2201

1    that going to compare to the OSHA permissible exposure level of
2    zero point one fiber per cc?
3    A   It's orders of magnitude higher.  We know from the
4    testing that's been done that it's at least -- it's almost 20
5    times higher.  In some case even higher than that.
6    Q   Let me show you another document that's admitted into
7    evidence.
8        (Whereupon, a demonstrative aid was shown on the
9    screen.)
10   Q   Have you reviewed and seen the paper by Dr. Alice
11   Blount, published in the peer-reviewed literature in 1991?
12   A   Yes.
13   Q   And are you familiar with a journal, Environmental
14   Health Prospectus?
15   A   Yes.
16   Q   Tell us about that journal?
17   A   It's a journal that is published by the National
18   Institute of Environmental Health Sciences, which is a division
19   of the National Institutes of Health.
20   Q   And the jury has seen the table showing -- let me see
21   if I could get this?
22       (Whereupon, a demonstrative aid was shown on the
23   screen.)
24   Q   Okay.
25       The jury has seen the table showing the identification

---

Moline - Plaintiff - Direct (Mr. Block) — Page 2202

1    of tremolite asbestos, needles and fibers, in what is referred
2    to as Sample I.  Do you see that?
3    A   Yes.
4    Q   And is that something you've reviewed before?
5    A   It is.
6    Q   And is that something you've considered in your
7    testimony -- one of the things you considered in giving your
8    testimony and opinions here today?
9    A   Yes.
10   Q   And if you were a clinician or a doctor and you go to
11   the peer-reviewed literature and you want to know, what is this
12   Sample I that is found to contain needles and fibers of
13   tremolite asbestos, is there anything in this article that would
14   alert the practicing doctor, clinician about what Sample I is?
15   A   No.  You would have to contact the scientist to find
16   out which one -- what Sample I is.  You would ask for a key.  It
17   might be as an appendix to the article, or it might be provided
18   by the author.
19       I mean, typically products aren't listed in articles by
20   convention.  You don't list the brand name of something, unless
21   you are doing a clinical trial on the brand name of a drug.  But
22   it's typical to give letters to it.  But you want to know the
23   key.  If you had a patient that might have had exposure, you
24   would want to know what the various samples were.
25   Q   And when you go to the last page of the article --

---

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

Moline - Plaintiff - Direct (Mr. Block)          Page 2203

1    (Whereupon, a demonstrative aid was shown on the
2  screen.)
3    Q  -- there is no identification of what Sample I is; is
4  that right?
5    A  Correct.
6    Q  But have you seen Exhibit 12, which was produced by
7  Johnson & Johnson, where their copy of the article, the very
8  next page -- so we have 436. The very next page, 437?
9    (Whereupon, a demonstrative aid was shown on the
10  screen.)
11    Q  Identifies Sample I as being J&J, Johnson's baby
12  powder?
13    A  Yes.
14    Q  When was the first time you saw this?
15    A  I saw the key probably about three years ago.
16    Q  And was it only after it was produced in litigation by
17  Johnson & Johnson?
18    A  Yes.
19    Q  And what is the significance, from a health standpoint,
20  of Dr. Blount finding tremolite asbestos, needles and fibers in
21  Sample I, which is identified here as Johnson & Johnson,
22  Johnson's baby powder?
23    MS. PAGONIS: Objection, your Honor. If we could
24  approach.
25    THE COURT: Do you want to go in the back or on the

Moline - Plaintiff - Direct (Mr. Block)          Page 2204

1  side?
2    MS. PAGONIS: The back, your Honor.
3    THE COURT: Be right back.
4    (Whereupon, the following takes place on the record
5  in the robing room among the Court and all Counsel.)
6    THE COURT: Yes. May I see the document we are
7  talking about.
8    MS. PAGONIS: It's actually an objection to the
9  question, your Honor.
10    MR. BLOCK: This is Exhibit 12. It was admitted
11  into evidence for all purposes, pursuant to Johnson &
12  Johnson's stipulation in your written order.
13    MS. PAGONIS: Your Honor, two points with respect
14  to our objection.
15    First of all, he keeps referring to the document --
16  what is that?
17    MR. BLOCK: Exhibit 12.
18    MS. PAGONIS: Exhibit 12 as a finding of tremolite
19  and that table doesn't refer to tremolite. But more
20  importantly, our objection is in your Honor's order.
21    MR. KURLAND: Asbestos.
22    MS. PAGONIS: Tremolite asbestos. I'm sorry.
23    In your Honor's order, with respect to the Blount
24  testimony, you had said that testimony about Sample I from
25  Ms. Blount -- excuse me, that Dr. Blount found asbestos I to

Moline - Plaintiff - Direct (Mr. Block)          Page 2205

1  be J&J is out, excluded. And his question referred to, I
2  believe, referenced Dr. Blount's finding Sample I containing
3  tremolite asbestos, which is a J&J product. So it violates
4  the Court's order.
5    MR. BLOCK: Your Honor, first of all, I can bring
6  out, if they would like, where it says tremolite asbestos in
7  the article. So that's the first argument.
8    The second argument is that Dr. Moline is relying
9  upon Exhibit 12, which is the key. And I specifically asked
10  her about her opinions about the finding of tremolite
11  asbestos in what has been identified here. The key is
12  Johnson & Johnson's baby powder and the health significance
13  of that.
14    And Exhibit 12 has been admitted for all purposes.
15  Your Honor specifically ruled that you were not going to
16  allow Dr. Blount's testimony with the respect to the
17  identification of Sample I, but that plaintiffs --
18    THE COURT: Deposition.
19    MR. BLOCK: Her deposition testimony. But that
20  plaintiffs are free to present evidence from other sources
21  about the identity of Sample I. Exhibit 12, you have a
22  written order admitting this for all purposes, including the
23  truth. And I think my question is proper. And Dr. Moline
24  is giving expert opinion about asbestos in Johnson's baby
25  powder.

Moline - Plaintiff - Direct (Mr. Block)          Page 2206

1    MR. KURLAND: I just will read the Court's
2  statement with this regard. The Court's order it says,
3  "Plaintiffs may not introduce into evidence any statements
4  from Dr. Blount's deposition regarding Sample I, or argue
5  that Dr. Blount's deposition testimony shows that her 1991
6  study found asbestos in Johnson & Johnson talc."
7    So we are very close to the line here. To be
8  specific is a statement elicited from either in the question
9  or from an answer that Dr. Blount found asbestos in
10  Johnson & Johnson talc in this study. And that is the
11  issue.
12    The study is in. It doesn't say what Sample I is.
13  The key is in. It says what Sample I is. But drawing the
14  connection that the key means that Dr. Blount found asbestos
15  in Sample I in the study is what the Court said, in our
16  understanding of the order, is out.
17    So they could use the key; they could use the
18  study, but to connect those dots and say Dr. Moline, is it
19  significant to you that Dr. Blount found Sample I to be
20  asbestos in this study, that's the inference that the court
21  is not permitting here. And that is what we are concerned
22  about in this question.
23    MR. BLOCK: Your Honor, your decision is a written
24  order. You wrote it so you could be clear to the parties.
25  You said -- it was a ruling on Dr. Blount's deposition and

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

| Moline - Plaintiff - Direct (Mr. Block) | Page 2207 |
| --- | --- |

1   those designations. And you said that you felt that
2   Dr. Blount's testimony about Sample I was confusing, or that
3   it was uncertain. And so you weren't allowing Dr. Blount to
4   talk about that in her depositions. You were putting those
5   portions out.
6       But your Honor, in the same order, admitted Exhibit
7   12 for all purposes, including its truth. And your Honor,
8   specifically said that plaintiff -- it says here,
9   "Plaintiffs may seek to establish, through other evidence,
10  that Sample I in the 1991 study was Johnson & Johnson talc,
11  but not by means of Dr. Blount's deposition." And your
12  Honor, please.
13      THE COURT: What other way are you establishing.
14      MR. BLOCK: I mean, your Honor, it's obvious. They
15  produced the document from their files in a document that's
16  been admitted for all purposes, and they have the key
17  attached. Whether they wrote it or whether Dr. Blount wrote
18  it is irrelevant. It's got A through O, and it says
19  "Johnson & Johnson, JBP."
20      If they want to bring in someone from Johnson &
21  Johnson that says that, you know, either this didn't come
22  from Dr. Blount, or the person who wrote it just, you know
23  got it wrong. If they have a foundation with somebody who
24  could do that, they could do that. But, your Honor, I mean,
25  we have the key. And if they want to cross examine

| Moline - Plaintiff - Direct (Mr. Block) | Page 2208 |
| --- | --- |

1   Dr. Moline, just like they did Dr. Webber. Do you remember?
2   Dr. Webber, let's look at what she says in the article about
3   you know all the different talcs she tested, and does it
4   match up precisely with the key? And they could try to
5   undermine that, your Honor, but this goes to the weight of
6   the evidence. And the witness is going -- is taking this
7   document at face value and just giving her medical opinion
8   about asbestos in Johnson's baby powder.
9       MR. KURLAND: It's a very specific thing. The key
10  does not establish that Dr. Blount found asbestos in Sample
11  I, which was Johnson's baby powder. The key, which is
12  admitted, is what it is. And it is a key. And no one knows
13  who made that key that says Sample I.
14      THE COURT: How can you rephrase the question and
15  still get your point, mostly?
16      MR. BLOCK: I don't think -- your Honor, they are
17  making a factual argument. You know, if they want to argue
18  to the jury that, ladies and gentlemen, even though we
19  produced this article with a key that identifies Johnson's
20  baby powder as Sample I, it's not really Sample I. They
21  could argue that, your Honor. If they want it to cross
22  examine Dr. Moline on that, they could do that, your Honor.
23  But we should not have to adopt their incredible, and it's
24  not credible, position that Sample I is not what they say it
25  is in the document they produced.

| | Page 2209 |
| --- | --- |

1       And that really goes to if they want it try to
2   undermine --
3       THE COURT: Let me get your exact question. Let me
4   write it down, how did you phrased it.
5       MR. BLOCK: Can it be read back?
6       THE COURT REPORTER: Yes.
7       THE COURT: Okay. I'm going to think about that
8   over lunch. If you ask other questions, or is that a
9   problem?
10      MR. BLOCK: Your Honor, I will rephrase it to try
11  to keep going. I will just say, what is the significance of
12  this article identifying tremolite asbestos in Sample I,
13  which is identified in this key as Johnson's baby powder? I
14  mean, it's identified in the key as Johnson's baby powder.
15      THE COURT: Okay.
16      MS. PAGONIS: Your Honor, one last issue. Not on
17  this exhibit. But Mr. Block showed Dr. Moline Plaintiff's
18  Exhibit 44 and said this had been admitted into evidence.
19  And that's actually not a correct statement. It was only
20  admitted as to notice. I think that is very confusing to
21  the jury to hear Mr. Block say that this has been admitted.
22  And Ms. Moline testified, but no instruction was given,
23  because you didn't remind us that it was, you know for
24  purposes of notice only. That's the TV station testing that
25  was --

| | Page 2210 |
| --- | --- |

1       MR. BLOCK: I think we are past that point. And if
2   we want to take that up later, I think we can, but --
3       THE COURT: Okay.
4       MR. BLOCK: Thank you.
5       (Continued on the next page.)

**Donna A. Olson and Robert M. Olson v.**
**Brenntag North America, Inc. et al**

March 5, 2019

---

Direct-Moline-Block                                    Page 2211

1    THE COURT: Okay thank you. Please rephrase the
2    question.
3    Q    Okay. Dr. Moline, when you were talking to the jury
4    about why asbestos is so dangerous, I believe one of the things
5    you talked about was how the asbestos fibers can get up in the
6    air, they're aerodynamic, can remain suspended, where they can
7    be breathed in and they can get down into and evade the defense
8    mechanics and into the lungs. Do you remember all that
9    testimony?
10   A    Right.
11   Q    So, what is the health significance of the finding of
12   needles and fibers of tremolite asbestos in Sample I in Dr.
13   Blount's article which is identified by the key attached by
14   Johnson & Johnson as identifying Sample I as Johnson Baby
15   Powder? What is the health significance of that?
16   A    That these -- She identified fibers in the talcum
17   powder, needles and fibers is how she described it. And they
18   can be breathed in and make it into the lung, and some of them
19   will get into the pleural space, and that's where the
20   mesothelioma arises.
21   Q    Thank you, Dr. Moline. Now, Dr. Moline, have you
22   reviewed materials relating to Donna Olson specifically in order
23   to render an expert opinion as to her diagnosis, the cause of
24   her disease, her medical treatment procedures that she's had and
25   also her prognosis?

---

Direct-Moline-Block                                    Page 2212

1    A    Yes.
2    Q    And for the work that -- for the time that you're
3    putting into this case, are you or the hospital charging for
4    your time?
5    A    Yes.
6    Q    And what is the hourly rate? And how does it work as
7    between you and Northwell Hospital?
8    A    So, the rate is $600 an hour. The rate is the same
9    whether I'm reviewing or I'm in court. If I'm in court, the
10   money all goes to the hospital. Since they are paying my
11   salary, the money should go to them, since they would otherwise
12   be -- I would otherwise be at work. If it's work that I do on
13   my personal time, then I will bill for it separately.
14   Q    And, Dr. Moline, have you testified in many trials in
15   cases on behalf of the plaintiff?
16   A    Yes.
17   Q    And how far back does that go?
18   A    I started, it was somewhere around '96, '97 in a
19   handful of cases. And it's -- I've been doing it since then and
20   it ebbs and flows.
21   Q    Have you ever been asked to testify for a defendant
22   in an asbestos case?
23   A    I've been asked to review cases and evaluate
24   individuals, but the case never went to trial.
25   Q    Okay. And in terms of you, said you testified at

---

Direct-Moline-Block                                    Page 2213

1    trials. Have you also given what's called depositions?
2    A    Yes.
3    Q    All right. Is a deposition when you go to a law office
4    or a conference room and there is a court reporter taking down
5    the questioning (gesturing) and the defendant gets to ask you
6    questions to find out what you're going to talk about in court?
7    A    Yes.
8    Q    And when you are requested to give a deposition, is
9    that something you have any choice over?
10   A    No.
11   Q    Okay. And have many companies taken your deposition
12   multiple times?
13   A    Yes.
14   Q    Has Johnson & Johnson taken your deposition on a number
15   of occasions?
16   A    They have.
17   Q    When do you do most of your medical/legal consulting
18   work in these cases? How do you fit that into your schedule?
19   A    I do a lot of the work in the evenings or on weekends.
20   Recently I went with my family on vacation. They were off
21   skiing and I was doing work. So, that's how I fit it in to just
22   maximize the amount of time I have.
23   Q    Okay. So, in terms of the materials that you reviewed
24   in this case, did you review deposition testimony?
25   A    I did.

---

Direct-Moline-Block                                    Page 2214

1    Q    And I know that you have an expert report in this case,
2    and if you need to refer to that at any time, please feel free
3    to. And whose deposition testimony did you review in this case?
4    A    I reviewed Ms. Olson's deposition transcript at the
5    time I wrote the report and I've also reviewed her husband's
6    deposition.
7    Q    And have you reviewed medical records relating to Donna
8    Olson, including related to her mesothelioma?
9    A    I have.
10   Q    Have you reviewed answers to discovery where the
11   plaintiff has to give answers to certain questions?
12   A    Yes.
13   Q    Have you reviewed any other records such as social
14   security records that show employment history or anything like
15   that?
16   A    I did.
17   Q    And, Dr. Moline, do you have an opinion within a
18   reasonable degree of medical certainty as to the disease that
19   Donna Olson suffers from?
20   A    Yes.
21   Q    And what disease is that?
22   A    Malignant mesothelioma.
23   Q    And where -- what part of her body did Donna Olson
24   develop malignant mesothelioma in?
25   A    In her pleura. In the right pleura to be specific.

---

**Donna A. Olson and Robert M. Olson v.**
**Brenntag North America, Inc. et al**

**March 5, 2019**

---

Direct-Moline-Block — Page 2215

1  Q   And did you review all of the materials, including Mr.
2  and Mrs. Olson's deposition testimony, to determine whether
3  Donna Olson had any exposures to asbestos?
4  A   Yes.
5  Q   And based upon your review of the materials in this
6  case, the medical records, the depositions and all the
7  materials, what information did you obtain about Donna Olson's
8  history of exposure to asbestos that she had starting from when
9  she was very young?
10  A   Well, she -- her exposure to asbestos came from her use
11  of talcum powder.  She knew her mother had used it on her when
12  she was a young girl, but she specifically remembered it
13  starting around age five and remembered that her mom would apply
14  the powder directly onto her chest and then rub -- and her body
15  and rubbed it in.  And it was done after her mom gave her a
16  bath.  And then at other times when it was warm out and she
17  would go out to play and she was hot, her mom would apply it
18  additional time.
19      Then Ms. Olson used it as she got older.  When she was
20  around eight or nine she started using the powder herself and
21  applied it in a similar fashion, where she would put it in her
22  hands and put it onto her body, onto her chest and under her
23  arms.  And she continued to use Johnson's Baby Powder in this
24  fashion after she bathed until around 1995, when she switched to
25  Shower to Shower.

---

Direct-Moline-Block — Page 2216

1  Q   If I could just stop you there.  Now in terms of
2  Mrs. Olson's exposure to asbestos, starting when she gave those
3  memories from starting at about age five, do you have an opinion
4  as to whether young children are more vulnerable when it comes
5  to the health effects of asbestos when a young child breathes in
6  asbestos?
7  A   I do have an opinion.  One of the factors is what young
8  children have also is a life in front of them.  And so they have
9  a long latency period.  So, one of the issues is that as they
10  become adults and middle aged and older, they will have had
11  decades from when they first were exposed.  So that's an
12  additional risk factor, because they always will have the
13  opportunity to have that sufficient latency, in some cases it
14  could be very long.  There is also concern that children may be
15  more susceptible to carcinogens at a younger age.  Their cells
16  are rapidly developing.  In fact, that's why there is often a
17  factor of ten, in children's environmental health, sort of
18  standard practice is to lower whatever a permissible exposure,
19  although it's not used in that terminology for children, but a
20  level -- allowable level would be, you lower it by a factor of
21  ten when children are involved, because children may be more
22  susceptible plus they have a longer lifespan.
23  Q   Okay.  So, just to be clear, based upon your review of
24  the depositions in this case, was the product that you described
25  Donna Olson being exposed to starting from approximately age

---

Direct-Moline-Block — Page 2217

1  five and then when she started to use it herself, starting from
2  about the age of eight or nine, all the way up until 1995, was
3  that Johnson Baby Powder, the product?
4  A   That's what she said.  She said that was all she
5  recalled in her house.
6  Q   And in terms of the use of this product on her by her
7  mother and the use of this product herself, up until 1995, the
8  use of Johnson Baby Powder, was that described by Mrs. Olson as
9  essentially a daily event, a daily practice?
10  A   Yes.
11  Q   Now, before we get to 1995, in 1991 did you learn from
12  the depositions that Donna Olson had a daughter?
13  A   Yes.
14  Q   And what did you find out about Donna Olson's use of
15  Johnson Baby Powder on her daughter?
16  A   That she used the powder in the same fashion that her
17  mom had used it in her.  That she would apply the baby powder
18  after she bathed her, until she was able to bathe herself, at
19  age eight or nine, just like Ms. Olson.
20  Q   And did it indicate in Mrs. Olson's deposition that she
21  used the Johnson Baby Powder on her daughter until her daughter,
22  Kimberly, from the time Kimberly was born until the time
23  Kimberly was about eight years old?
24  A   Yes.
25  Q   So then in 1995 did you read about Donna Olson

---

Direct-Moline-Block — Page 2218

1  switching over to primarily Shower to Shower?
2  A   Yes.
3  Q   And what did you learn reading the deposition testimony
4  about Donna Olson's use of the Shower to Shower product starting
5  in 1995?
6  A   That she used that regularly.  Would apply it in the
7  same manner that she had used the Johnson Baby Powder.  Put it
8  in her hand, applied it to her chest and to her underarms and
9  used it on a daily basis.
10  Q   And did you read in Donna Olson's testimony about any
11  cleanup activities in terms of the powder that would accumulate
12  in the bathroom?
13  A   Yes.
14  Q   And what did you read about that that was significant
15  from an occupational-environmental medicine standpoint?
16  A   She would basically clean the powder by putting it onto
17  the shower rug or the rug that was in the bathroom and then she
18  vacuumed that rug every other day.
19  Q   And would that cause additional exposures to asbestos?
20  A   Yes.
21  Q   So, I'm hearing about vacuuming.  It sounds like well,
22  you are removing it.  But what does the published literature
23  tell you about the use of this regular vacuum on powdery
24  material that contains asbestos?
25  A   That you shouldn't use a regular vacuum when you're

---

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

Direct-Moline-Block                                              Page 2219

1   removing asbestos, because the active vacuuming it and
2   disturbing it will actually not pick up although microscopic
3   fibers but instead will put them into the air and have
4   opportunity to be breathed in again.
5        Q   Okay.  And based upon your review of Mrs. Olson's
6   deposition testimony and her husband's deposition testimony did
7   you find that her use of the Johnson's Baby Powder and Shower to
8   Shower was substantially similar to the use of the product as
9   talked about in Johnson & Johnson own studies on their users
10  which talked about how the product users used the product and
11  the amount of powder typically used by consumers?
12       A   Yes.
13           MS. PAGONIS: Objection.  Leading.
14           THE COURT: Overruled.
15       Q   Dr. Moline, do you have an opinion within a reasonable
16  degree of medical certainty as to whether Donna Olson's use of
17  Johnson's Baby Powder and Shower to Shower products and the use
18  of those products on her from the 1950s to the early 2000s
19  resulted in significant exposures to of asbestos to Donna Olson?
20       A   Yes.
21           MS. PAGONIS: Objection, your Honor, based on the
22  argument we made yesterday.
23           THE COURT: Please tell me the argument.  I didn't
24  hear you.
25           MS. PAGONIS: We made yesterday in our motion, just

Direct-Moline-Block                                              Page 2220

1   reiterating that same objection for the record.
2           THE COURT: Yes.  Overruled.
3        A   Yes.  I do have an opinion, and those exposures were
4   significant and capable of causing her mesothelioma.
5        Q   All right.  In terms of Donna Olson's exposure to
6   asbestos from the use of Johnson's Baby Powder and Shower to
7   Shower products, from her use of the products and the use of the
8   products on her and the use of the products on her own baby,
9   during the years of the 1950s to the early 2000s, how would you
10  compare the level of exposure that Donna Olson would have from
11  those products to the level of asbestos in the ambient air?
12       A   It's -- it's like comparing a grape to a watermelon in
13  terms of they're both fruits, but one is very small and the
14  other can be very large.  I'm thinking of a big watermelon.  But
15  it's orders of magnitude higher.
16       Q   When you say "orders of magnitude", that's a scientific
17  term.  What does that mean?
18       A   Well, if we take the urban ambient air level by the
19  government, ATSDR is a government agency, we know that what's
20  been measured by the government, whether it's MSHA or by other
21  scientists has been 10,000 times greater.  So, that would be
22  orders of magnitude.  It's four orders of magnitude more than
23  what is seen in the urban air.  So, what we're seeing is levels
24  that are even higher than one would be regulated in the
25  workplace.  And there is no protections against cleanup and

Direct-Moline-Block                                              Page 2221

1   additional exposures from that activity.
2        Q   All right.  And we have talked about the Gordon,
3   Millette study and airborne exposure found there.  And just in
4   terms of Donna Olson having this powder put onto her chest, that
5   contains thousands or millions of asbestos fibers per gram, what
6   is her use of that to you indicate when comparing her exposure
7   to the asbestos in the ambient air?
8        A   Again, that it's orders of magnitude higher.  It's --
9   it's -- it's so much more significant than what her exposure
10  would be from background.
11       Q   All right.  How would you compare Donna Olson's level
12  of asbestos exposure from her use of Johnson's Baby Powder and
13  Shower to Shower products from the 1950s to the early 2000s,
14  including the use of Johnson's Baby Powder on her by her mother
15  and Donna Olson's use of that Baby Powder on her own child, how
16  would you compare that to the level of asbestos exposure of zero
17  0.1 fibers per cc, which is the OSHA PEL that you talked about
18  with the jury earlier?
19       A   It's probably, using the Gordon numbers, it's 20 times
20  higher than the OSHA permissible exposure limit.
21       Q   And do you base your opinion in that regard not only on
22  the Gordon study but your review of historical documents,
23  finding asbestos in the source talc used by Johnson & Johnson
24  for its products, historical documents, finding asbestos in the
25  Johnson Baby Powder, Shower to Shower products and the published

Direct-Moline-Block                                              Page 2222

1   literature as well?  You base it on all those things, your
2   opinion that you've just given to the jury?
3        A   Yes.
4           MS. PAGONIS: Leading.
5           THE COURT: Repeat the question.
6           (Whereupon the above-requested testimony was read
7   back.)
8           THE COURT: Sustained.
9        Q   Okay.  In terms of comparing Mrs. Olson's exposure to
10  asbestos from the use of the Johnson & Johnson products to the
11  OSHA PEL, what do you rely upon other than the Gordon article?
12       A   There is historical documents dating back to the mid
13  50s, mid to late 50s, I think I remember '57, '58, that began to
14  measure the amount of asbestos in Johnson's -- Johnson & Johnson
15  products and other products that contain the Italian talc.
16  Other testing has been done by numerous different laboratories.
17  Some hired by the companies.  Some done by independent
18  scientists at different organizations.  People like Dr. Blount
19  who found tremolite in -- when she evaluated it for example.
20  Based on the MSHA findings.  Based on the Rohl description of
21  billions of fibers when you have a percentage of .25 by bulk
22  weight.  So those are some of the factors.  Looking at the
23  historical documents that have been done on testing of the
24  product as well as the published literature up to Gordon in 2014
25  as well as other reports of testing that have been done.

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

Direct-Moline-Block                                    Page 2223

1    Q    And are the levels of asbestos exposure that Donna
2    Olson had from Johnson's Baby Powder and Shower to Shower
3    products sufficient to cause her mesothelioma?
4    A    Yes.
5    Q    And do you base your opinion on the published
6    literature?
7    A    I base my opinion on the published literature. The
8    concept here is she was exposed to asbestos that was contained
9    within the product. So, you look at the published literature
10   and see how many folks have developed mesothelioma at levels and
11   regardless of what the product might be, and that level is
12   sufficient to cause mesothelioma.
13   Q    And was Donna Olson's exposure to asbestos from Johnson
14   & Johnson talcum powder products a long-term, frequent exposure
15   that she had over many years?
16   A    Yes. She used it daily. We could add up how many
17   times she did it by multiplying the number of days in the year
18   by the number of years she used the powder, and it's going to be
19   well over 20,000 if we think about using it every day from when
20   she was five to up until let's say the year 2000 it's going to
21   be 20,000 times or more that she used it. So, that's regular
22   and frequent. And she used it on a daily or sometimes more than
23   daily basis, both on herself and on her child. So when she was
24   applying it to herself, then she also was applying it to her
25   child. So, during the years that she was applying to her

Direct-Moline-Block                                    Page 2224

1    daughter she, was applying powder twice a day at least.
2    Q    And when you talked about the Helsinki consensus report
3    earlier to the jury, you talked about a brief or low level
4    exposure asbestos being sufficient as published in that
5    consensus report, how do you apply that when looking at Donna
6    Olson's long-term exposure to asbestos from Johnson & Johnson
7    talcum powder products?
8    A    Well, it was -- Each incident might be for a short
9    period of time when she's actually applying it, but it still
10   stays in the air. So, it's not just the actual minute or two
11   minutes that it took to apply the powder. It still remains in
12   the air. Then she had additional exposure from cleaning it up.
13   But I wouldn't consider decades to be a brief exposure.
14        With respect to whether it's low level, as an episode,
15   that's not low level exposure, given the numbers that we have
16   seen before. They're levels that are capable of causing
17   disease. So, she has more than a low or brief level of
18   exposure.
19   Q    The jury will hear Mrs. Olson's testimony. Did you
20   hear a lot of questions asked of Mrs. Olson about other possible
21   exposures to asbestos?
22   A    Yes.
23   Q    And having reviewed Mrs. Olson's deposition testimony
24   in detail, did you identify any other possible exposures from
25   asbestos products that she could have had?

Direct-Moline-Block                                    Page 2225

1    A    No. You -- I've looked at her work history. She
2    actually worked in a dentist office. Of course I was interested
3    in what she did, since I had written a paper about dental tape.
4    She was a receptionist. She had nothing to do with the
5    formulation of crowns and did not use dental tape. Then she
6    worked for CBS Television and was a systems analyst and had no
7    exposure to asbestos in the workplace. And then when she had
8    her daughter, she chose to stay home with her daughter. So was
9    not in the workplace after 1991.
10   Q    Have you reviewed Dr. Longo's study by his lab,
11   Material Analytical Services, which is called the Below the
12   Waist Study, where they took a container of Johnson's Baby
13   Powder that the lab had tested and found asbestos, and they
14   simulated the use of it below the waist of a person?
15   A    Yes, I have.
16   Q    And what is the significance of the fact that Donna
17   Olson used Johnson's Baby Powder and Shower to Shower above her
18   waist, whereas Dr. Longo with Material Analytical Services did
19   the testing with a person using it below the waist?
20   A    I mean, it's a matter of a couple feet, but it's closer
21   to your -- where you breathe, where Mrs. Olson was applying it
22   to her upper body and not below the waist. So, Dr. Longo found
23   an average of 2.57 fibers per cc even when he was measuring
24   individuals who were applying powder lower down on their body.
25   Mrs. Olson was applying it higher up. So it would have been

Direct-Moline-Block                                    Page 2226

1    closer to her breathing zone.
2    Q    And do you find, based upon your review of the Gordon,
3    Millette study and the Material Analytical Services study on the
4    below the waist use of the product, do you find that these
5    results are consistent in terms of the release of asbestos in
6    the air from the use of talcum powder products that contain
7    asbestos?
8    A    Yes.
9    Q    Now, I want you to assume that the jury heard that the
10   container that Dr. Longo used in this below the waist study had
11   15.1 million asbestos fibers per gram, okay.
12   A    Okay.
13   Q    So, if the container contained ten times less asbestos
14   than that, would there still be a significant exposure?
15   A    Yes.
16   Q    If the container contained a hundred times asbestos
17   than that, would there still be significant exposure?
18   A    Yes.
19   Q    And even a thousand times less asbestos in a container,
20   would that still be a significant exposure above normal
21   background levels found in the urban air?
22   A    It would be.
23   Q    Dr. Moline, I would like you to assume that Dr. Longo
24   testified in this case that when Donna Olson applied Johnson's
25   Baby Powder and Shower to Shower, that he calculated that she

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

Direct-Moline-Block                                    Page 2227

1  had about 21,000 applications on herself over the course of her
2  life. Is that consistent with what you read in her deposition
3  testimony?
4     A   Yes.
5     Q   And I want you to assume that Dr. Longo testified that
6  when Donna Olson applied Johnson's Baby Powder and Shower to
7  Shower, that over -- that on over 50 percent of those occasions
8  she would have been exposed to asbestos at the level of
9  approximately 0.1 fibers per cc to one fiber per cc. Is that
10  level of exposure, based upon your review of Donna Olson's use
11  of the product, sufficient to have caused Mrs. Olson's
12  mesothelioma?
13     A   Yes.
14     Q   And you base that opinion on the published literature,
15  the historical documents and the other sources that you
16  supported your opinions with regard to the cause of Mrs. Olson's
17  mesothelioma?
18     A   Yes.
19     Q   Dr. Moline, have you ruled out other potential causes
20  of mesothelioma however rare they may be?
21     A   Well, virtually, as we said, virtually all cases in the
22  United States of mesothelioma are from asbestos. There is some
23  individuals, there is -- are being evaluated who have had
24  therapeutic radiation, meaning they had treatment for cancers
25  and received radiation. Then decades later mesotheliomas can

Direct-Moline-Block                                    Page 2228

1  arise in the area that had been radiated. Mrs. Olson never had
2  radiation treatments. She did not have a cancer before that.
3  So, I ruled that out. She had no occupational exposure. Her
4  husband worked at the time that they were knew each other he
5  also worked at CBS and then he worked in IT. So, he did not
6  have any occupational exposure. I don't recall that her family,
7  her parents had jobs that would have exposed her. And there was
8  no other information that I was provided with to show that she
9  had -- that she had traveled to Montana where there is asbestos
10  in a particular community in Montana. She hadn't traveled to
11  Turkey, where there is a type of fiber that's been associated
12  with mesothelioma. So, there is no other information of any
13  other exposure apart from the talcum powder.
14     Q   Did you read deposition testimony that after the Olsons
15  found out in 2015 -- Strike that. Did you read deposition
16  testimony that the Olsons saw something on TV in 2015 that talc
17  could cause cancer and that Mrs. Olson in 2015 promptly stopped
18  using talcum powder products?
19     A   Yes.
20     Q   Did you read that they went around the house and tried
21  to locate all the talcum powder products and throw them away?
22     A   Yes.
23     Q   Did you also read that Mr. Olson went back during the
24  time this case was going on and he ended up finding three
25  products that were stored in some closets?

Direct-Moline-Block                                    Page 2229

1     A   Yes.
2     Q   And I want you to assume that Mr. Olson will testify in
3  this case that the dates on those products that they found, that
4  it says on the products one is 2004, one is 2009 and the other
5  is 2013. So, let me start with the products that are dated 2009
6  and 2013. Are products from that date in your opinion ones that
7  would be important to look at in terms of assessing Mrs. Olson's
8  the cause of her mesothelioma?
9     A   No.
10     Q   Why not?
11     A   As we talked about it yesterday, there is a latency
12  period. So, you don't get disease right after you've had the
13  exposure. It can take minimum of let's say ten or 11 years, but
14  typically longer. So, any exposure she had less than ten years
15  ago would not be relevant to her current disease.
16     Q   All right. And in terms of the one dated 2004, it says
17  2004 on the container. Assuming there is no testimony about
18  when that container was used or are you able to assess the
19  importance of -- of whether any talc used from that container
20  would have been important or would have been relevant from a
21  causation perspective in this case enlight of the latency
22  period?
23     A   It's right on the cusp. She developed symptoms in
24  2016. Don't know when she actually started using, if she even
25  used that container. So, it's right on the cusp. I don't think

Direct-Moline-Block                                    Page 2230

1  it would be very important with respect to her disease, because
2  mostly because of the latency period.
3     Q   Were Donna Olson's exposure -- Strike that. Were Donna
4  Olson's exposure to asbestos to Johnson & Johnson talcum powder
5  products prior to 2004 sufficient to cause her mesothelioma?
6     A   Yes.
7     Q   Dr. Moline, are you familiar with the analysis of lung
8  tissue in certain cases where you could look at someone's lung
9  tissue and see whether there is talc or asbestos in the lung
10  tissue?
11     A   Yes.
12     Q   And you talked about the Helsinki consensus report, and
13  based upon that consensus report and based upon your experience
14  and the review of the published literature, you need a lung
15  tissue analysis of Donna Olson in order to come to your opinion
16  that her exposure to asbestos from Johnson & Johnson talcum
17  powder products caused her mesothelioma?
18     A   No.
19     Q   Is that one of the consensus statements from the
20  Helsinki consensus group, that you do not need a lung tissue
21  analysis in order to attribute a mesothelioma to asbestos?
22     A   Yes. They say you don't need it. They talk about if
23  you have it, it's helpful or can be informative, but it is
24  certainly not a requirement for attribution or causation.
25     Q   All right. We'll see more about this when we look at

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

| Direct-Moline-Block | Page 2231 |
| --- | --- |

1  some medical records this afternoon.  Did Donna Olson have a
2  procedure called a talc pleurodesis after she developed
3  mesothelioma that would pose a problem in looking at her lung
4  tissue?
5     A   Yes.  It would -- The talc pleurodesis is done in
6  people with malignant conditions nowadays.  Typically it's only
7  used in malignant or terminal conditions to prevent fluid from
8  developing.  It's for symptom relief.
9          The installation of talc in the pleural cavity is going
10 to contaminate the field, so that any sample you're going to be
11 analyzing is going to in all likelihood have talc related to the
12 installation of the talc that's been placed in there for medical
13 purpose.
14    Q   All right.  So, in sum, if someone was to take Donna
15 Olson's lung tissue and analyze it --
16         THE COURT:  I apologize.  Why don't you finish your
17 question.
18    Q   In sum, if someone were to take Donna Olson's lung
19 tissue and analyze it for talc and asbestos, would it be really
20 impossible to determine whether any findings were from the
21 talcum powder she used or from the talc they put in her as part
22 of that talc pleurodesis procedure after she developed
23 mesothelioma?
24    A   I have no idea how they would be able to separate out
25 which is which.  The results would not be valid.

| | Page 2232 |
| --- | --- |

1     Q   All right.
2          MR. BLOCK:  Thank you for letting me finish that
3  question, your Honor.
4          THE COURT:  Of course.  Let us resume at 2:15.
5  Thank you so much.
6          COURT OFFICER:  All rise.  Jury exiting.
7          (Whereupon the jury panel departed the courtroom.)
8          (Whereupon a luncheon recess was taken.)
9          (Continue on the next page.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| Moline - Plaintiff - Direct (Mr. Block) | Page 2233 |
| --- | --- |

1   *    *    *    *    *    *    *    *    *
2              A F T E R N O O N   S E S S I O N
3      *    *    *    *    *    *    *    *    *
4          THE COURT:  Doctor, if you would like to come up,
5  you may.
6          (Whereupon, the witness stepped into the witness
7  stand.)
8          THE COURT OFFICER:  All rise.  Jury entering.
9          (Whereupon, the jurors entered the courtroom and
10 were properly seated in the jury box.)
11         THE COURT:  Good afternoon, everyone.  Please be
12 seated.
13         Whenever you are ready.
14         MR. BLOCK:  Thank you, your Honor.
15    Q   Dr. Moline, the jury has been told that Donna Olson
16 lives in Delaware.  Were you able to meet with her personally?
17    A   I was not.
18    Q   Did her detailed deposition testimony and the
19 deposition of her husband, along with the medical records and
20 the other case specific materials you reviewed, did that give
21 you sufficient information to give the opinions that you've
22 given here today for the jury?
23    A   Yes.
24    Q   And were you able to gain the type of detail about her
25 exposure history that you would have asked if you would have met

| Moline - Plaintiff - Direct (Mr. Block) | Page 2234 |
| --- | --- |

1  with her personally?
2     A   Probably I would have asked questions slightly
3  different because I come at -- from a medical, not a legal
4  perspective.  But there were certainly many detailed questions
5  in her deposition that allowed me to get a sense of how often
6  she used it, where she used it, and factors that were important
7  to assess her exposure.
8     Q   Dr. Moline, if a person has -- strike that.
9          If a person has repeatedly had significant exposures to
10 asbestos within the known latency period for mesothelioma, and
11 develops mesothelioma, is that case of mesothelioma spontaneous?
12    A   No.
13    Q   And can you explain that opinion to the jury?
14    A   Mesothelioma, as we talked about, was a signal tumor
15 for asbestos exposure.  So when someone presents with
16 mesothelioma, the thing one looks for is whether someone had
17 asbestos exposure.
18         When somebody has information about asbestos exposure,
19 particularly someone who has had exposure, or it doesn't even
20 have to be over decades, but in this particular case it was
21 exposure over decades, on a daily basis, then they had exposure
22 to asbestos.  So it's not -- you would say it's related to
23 asbestos exposure.  And you wouldn't use such terminology such
24 as spontaneous.  You would say it was a mesothelioma caused by
25 asbestos exposure.

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

Moline - Plaintiff - Direct (Mr. Block)                    Page 2235

1    Q    And have you ever seen any peer-reviewed literature
2    where cases of mesothelioma were documented and it was
3    documented that the people who developed mesothelioma had
4    significant and ongoing asbestos exposure, and the authors of
5    the publication said that these mesotheliomas just occurred
6    spontaneously?
7    A    No.
8    Q    Have there been studies that have categorized a certain
9    percentage of mesothelioma cases as one in which no asbestos
10   exposures were identified based upon the questions that were
11   asked or the criteria that was used for that particular study?
12   A    Yes.
13   Q    And can you give us an example so we could understand,
14   of a study in the peer-reviewed literature where they are
15   looking at people who develop mesothelioma and they are
16   categorizing them as having asbestos exposure, or not having
17   asbestos exposure, in terms of what they look at and what sort
18   of criteria is used?
19   A    There have been studies that look, trying to assess
20   whether someone has worked in an occupation that is known to
21   have had asbestos exposure, and that is typically the type of
22   studies that have been done where they focus more on jobs where
23   there was asbestos exposure.  And then they might say, did you
24   fit into one of these categories, um, and ask them, or ask the
25   individuals with mesothelioma.  Often they are asking family

Moline - Plaintiff - Direct (Mr. Block)                    Page 2236

1    members, which is a whole other issue, because family members
2    might not have known what folk did, especially the children
3    won't know what their parents did before they were born.  Um,
4    and the spouses often won't know the full extent of what
5    somebody did in their workplace or whether they had exposure.
6        So there are studies in the literature that have used
7    categorizations of jobs that have been associated with asbestos
8    exposure, and then asked questions that go from there, haven't
9    delved into household exposures with any specificity.
10   Q    So I want to ask you about a study that I think the
11   jury may hear about in the defense case, or maybe on cross
12   examination.
13       Are you familiar with a Spirtas study from 1994?
14   A    Yes.
15   Q    Did that study -- how did that study go about
16   categorizing the people with mesothelioma as being asbestos
17   exposed versus not asbestos exposed.  Do you recall?
18   A    This is the type of study I was talking about.  They
19   used eight or -- eight to ten job categories, or industries,
20   where asbestos was known to be used in the workplace.  And they
21   asked if either the individual, that they were alive, or the
22   people did have mesothelioma, had worked in that job, or in
23   those job categories.  They developed something called a job
24   exposure matrix where they assigned, whether it was high
25   probability, medium or low probability, that they had asbestos

Moline - Plaintiff - Direct (Mr. Block)                    Page 2237

1    exposure.  I believe they asked about -- in some individuals
2    they asked about a para-occupational exposure.
3    Q    What do you mean by that?
4    A    Did they have a hobby, a home remodeling -- I don't
5    believe -- actually, they didn't talk about construction.
6    Q    Okay.
7    A    They only talked about demolition.  She didn't talk
8    about people building.  They only talked about people tearing
9    down.  And we know from the published literature that there are
10   hundreds of studies of individuals who build things who had
11   asbestos exposure from building with asbestos-containing
12   materials.
13   Q    And you say some of the people questioned, instead of
14   -- some or all of the people questioned, were they the person
15   with the mesothelioma or were they what are called next of kin,
16   like family members?
17   A    So because mesothelioma is a fatal disease, by the time
18   they had -- many of the cases are -- some of them had passed on
19   and weren't able to complete the questionnaire.  So I believe
20   over 50 or 55 percent of the folks they had to ask next of kin.
21   And next of kin could be spouse, it could be child, it could be
22   sibling, it could be friend, and asked them if they knew the
23   individual had worked in any of these job categories or may have
24   had any other exposure.  But they didn't ask about household
25   exposures.

Moline - Plaintiff - Direct (Mr. Block)                    Page 2238

1    Q    So in terms of the hundreds or thousands of
2    asbestos-containing products that were manufactured, for
3    example, was there questions about a product called joint
4    compound in terms of the people in the study?
5    A    No.
6    Q    And is joint compound a product that some of the jurors
7    might be familiar with, where if you are putting drywall
8    together, it goes in the joints of the drywall.  You'll apply
9    it, sand it down before you paint.  Is that joint compound?
10   A    Yeah.  Sometimes people call it Spackle, to fill in
11   holes.
12   Q    And has joint compound been banned -- has joint
13   compound with asbestos been banned in the United States since
14   1978?
15   A    Yes.
16   Q    All right.
17       So in a study like the Spirtas study, do we have any
18   information about products like joint compound -- let's say
19   dental tape.  You talked about an article you published in the
20   peer-reviewed literature about dental tape.  Was that product,
21   or a lot of other products that had asbestos in them, asked
22   about in the study?
23   A    No.
24   Q    Okay.
25       Did the Spirtas study ask about the use of talcum

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

Moline - Plaintiff - Direct (Mr. Block)                    Page 2239

1  powder products?
2      A   No.
3      Q   So when the Spirtas study says -- does the Spirtas
4  study say that they only identified asbestos exposure based upon
5  the job categories they asked about, and based upon what they
6  did ask about, but they only identified that for 20 percent of
7  the women?
8          MS. PAGONIS: Objection. Leading.
9          THE COURT: Sustained.
10     Q   What did the Spirtas study say about women in terms of
11 the answers to the information that they were asking about in
12 terms of asbestos?
13     A   Well, they acknowledged that very few women fit into
14 these occupational categories that they used, because
15 historically women weren't in many of those trades.
16         But with respect to household exposure, they found that
17 only 20 percent of the women fit into the job categories, or the
18 exposure categories that they were using in the study.
19     Q   So, did you say 20 percent?
20     A   Yes.
21     Q   And so, does this study mean that 80 percent of women
22 have spontaneous mesothelioma?
23     A   No. It means in this study they only had information
24 about a limited number of asbestos-containing products. And
25 they never asked whether women had exposure to other sources of

Moline - Plaintiff - Direct (Mr. Block)                    Page 2240

1  asbestos, such as contaminated talcum powder, to be able to
2  answer that question.
3      Q   And are there many other studies that have categorized
4  certain people in the study with mesothelioma as asbestos
5  exposed versus non-asbestos exposed, that also did not ask about
6  talcum powder when asking about asbestos?
7      A   Yes. The vast majority of scientific literature does
8  not ask about the use of talcum powder.
9      Q   And based upon your experience in the area of
10 occupational and environmental medicine, and in communicating
11 with treating physicians and clinicians who see patients on a
12 regular basis, has there been awareness in the medical community
13 about asbestos in talcum powders?
14     A   When I talked to my colleagues, they weren't aware that
15 asbestos was in talcum powder. I was actually -- I've given
16 talks about this to my colleagues in other departments that were
17 unaware of it. So it's just not widely -- widely known in the
18 medical community. And --
19     Q   So when the jury hears evidence in this case that
20 Ms. Olson's treating physicians did not ask her about her talcum
21 powder use when asking about asbestos, does that surprise you,
22 based upon your experience?
23     A   No. In fact, it's more -- it's the norm. Rather, most
24 clinicians don't ask about whether someone used talcum powder.
25     Q   And when the jury sees medical records indicating that

Moline - Plaintiff - Direct (Mr. Block)                    Page 2241

1  Ms. Olson did not report any known exposures to asbestos, is
2  that unusual in your experience in terms of whether patients
3  would know that talcum powders contain asbestos?
4      A   No, that is not unusual at all. Patients don't know
5  that there was asbestos in talcum powder. So when they are
6  asked, do you know of any asbestos exposure, they would say, no.
7      Q   Have you considered epidemiology -- let me ask you,
8  first. Has there been an epidemiology study specifically on the
9  users of cosmetic talcum powder products?
10         So I'm asking about a study where you look at regular
11 users of talcum powder products and you compare their health
12 outcomes for the disease, mesothelioma, with people who did not
13 regularly use talcum powder products?
14     A   No.
15     Q   And to your knowledge, has Johnson & Johnson ever done
16 that study?
17     A   No.
18     Q   So if there's not been a study looking at the disease,
19 mesothelioma, on people who use talcum powder products versus
20 people that did not, how are you still able to conclude that
21 Donna Olson's mesothelioma was caused by asbestos exposure from
22 her use of talcum powder products?
23     A   In the same way that I'm able to conclude that patients
24 who have been exposed to asbestos from various sources from
25 which there wasn't an epidemiologic study of the end users

Moline - Plaintiff - Direct (Mr. Block)                    Page 2242

1  develop mesothelioma, and by looking at whether they had
2  exposure to asbestos, looking at levels that have been measured
3  and are reported in the literature and in testing, saying was
4  there asbestos there? Looking to see how often they used it.
5  What kind of exposure they had? How many years old they use it?
6  How many years ago did they start using it? Is there sufficient
7  latency?
8          It's -- you -- I'm treating it as an
9  asbestos-containing product in the same way that I would
10 consider whether a patient coming to see me who had asbestos
11 exposure from using burlap bags that contained asbestos, had
12 asbestos-related disease.
13         There is no study that I'm aware of burlap bag handlers
14 with asbestos-related diseases, yet this individual had one.
15 And he could describe that the bags contained asbestos.
16     Q   Okay.
17         And similarly, you told the jury about how you
18 published a study on dentists that developed mesothelioma from
19 dental tape use, even though there was not a study of the people
20 who made the dental tape or a study of dentists comparing
21 dentists who use dental tape compared to others who did not, but
22 you were still able to draw that conclusion and publish that in
23 the peer-reviewed literature?
24     A   Correct.
25     Q   Have you considered epidemiology studies, or any study

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

Moline - Plaintiff - Direct (Mr. Block)                    Page 2243

1   on the miners and millers of Vermont talc?

2       A   I have seen -- I'm only aware of one study on Vermont

3   miners and millers. There's another study that talks about

4   somebody who was a talc man, but I have reviewed a study --

5           MS. PAGONIS: Your Honor, we have a motion with

6   respect to that. We move to strike.

7           THE COURT: I didn't hear you.

8           MS. PAGONIS: We have a motion with respect to --

9   may I approach, your Honor?

10          MR. BLOCK: I disagree with striking any testimony

11  there, your Honor, and I could lay a foundation.

12          THE COURT: I have to know with the objection is.

13          (Whereupon, there is a brief pause in the

14  testimony.)

15          THE COURT: Yes. Let's go to the back.

16          (Whereupon, the following takes place on the record

17  in the robing room among the Court and all Counsel.)

18          THE COURT: This is the Lamm thing?

19          MS. PAGONIS: So the question was whether she was

20  aware of any epidemiology study in Vermont, and then she

21  answered with the Lamm study, which is not an epidemiology

22  study. So I didn't object with the question, but I am

23  objecting to strike her response, because it's subject to a

24  pending motion in limine, the Lamm study that your Honor

25  has.

Moline - Plaintiff - Direct (Mr. Block)                    Page 2244

1           MR. BLOCK: She's prepared to talk about Vermont

2   talc workers. She's going to talk about a study that had, I

3   think, 300 or 400 workers, who were looked at. She'll talk

4   about the deficiencies of that study in terms of being a

5   small group, et cetera.

6           She also will add, and I will elicit the

7   questioning, that there has been a Vermont talc worker that

8   has been identified as having mesothelioma.

9           And if you look at this article, your Honor, it's

10  the Lamm article. Directing your attention to the second

11  column of the first page, first full paragraph, you see

12  where it says "The cohort of white male employees" --

13          THE COURT: Yes.

14          MR. BLOCK: -- "of the Vermont talc industry was

15  developed from the records of the Vermont State Health

16  Department's annual radiographic survey of employees." And

17  then it talked, lower in the sentence, about the Vermont

18  talc study cohort as "all white males in the Vermont talc

19  industry on or after January 1st, 1940 with at least one

20  year of talc employment prior to January 1st, 1970." So

21  they describe the cohort of Vermont talc workers that they

22  are talking about.

23          Then on page -- the next page, which is page 1577

24  of the article, it says, second paragraph, second column,

25  "As for other respiratory system deaths, influenza or

Moline - Plaintiff - Direct (Mr. Block)                    Page 2245

1   pneumonia -- excuse me, as for other respiratory system

2   deaths, influenza or pneumonia caused the death of one New

3   York State talc worker, but no Vermont talc miner or miller.

4   Mesothelioma caused the death of one New York State talc

5   man, parenthetical, 15 years after hire, which followed 28

6   years in mining and construction, and of one Vermont talc

7   man."

8           So let's not take this statement of Vermont talc

9   man in isolation. They are talking about a cohort of people

10  that worked in the Vermont talc industry for at least one

11  year. One of those people in the cohort was found to have

12  mesothelioma. So anyone who says, which they said in

13  opening, that no one has gotten mesothelioma who worked in

14  the Vermont talc industry, is mistaken and wrong. And this

15  is something that an expert would reasonably consider and

16  discuss in evaluating people who work with Vermont talc.

17          And so, I don't see the basis for excluding this or

18  striking any testimony that's been given so far.

19          MS. PAGONIS: Your Honor, this Lamm --

20          THE COURT: Just off the record for one second.

21          (Whereupon, there is a discussion held off the

22  record among the Court and all Counsel.)

23          THE COURT: Back on the record.

24          MR. KURLAND: The un-sourced, unattributed

25  observation that there's this one Vermont talc man with

Moline - Plaintiff - Direct (Mr. Block)                    Page 2246

1   mesothelioma is -- we know nothing about that. And there's

2   no attribution for that. It was laid out yesterday, and

3   it's similar to that one isolated Workers' Comp. claim.

4   These things were all sort of argued together, but this --

5           THE COURT: So how do we --

6           MR. KURLAND: -- it's hearsay.

7           MR. BLOCK: Your Honor, this document is published

8   in the peer-reviewed literature. It's from a Dr. Lamm,

9   Consultants in Epidemiology and Occupational Health from

10  Washington, D.C., and this is about the risks for malignant

11  and nonmalignant respiratory deaths of New York State and

12  Vermont State talc workers. It says it right in the start

13  of the abstract on the first page, your Honor.

14          And he finds that one person died of mesothelioma

15  who was a Vermont talc worker, in a cohort -- in a cohort

16  that is defined. And I already read it into the record.

17  It's defined in page one, paragraph two, second column.

18          So they told the jury that no person who worked

19  with Vermont talc, none of the miners and millers had ever

20  gotten mesothelioma. Here we have a defined cohort of

21  Vermont talc workers and we have one of the Vermont talc

22  workers being identified as having mesothelioma.

23          And if they want to cross examine and say, well,

24  Dr. Moline, it does, you know, define a cohort. And, you

25  know, but it doesn't say what that particular talc worker

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

---

Moline - Plaintiff - Direct (Mr. Block)                    Page 2247

1  did in the Vermont mines, and they might raise other issues.
2  We don't know what else he did when he wasn't working in the
3  Vermont talc mines, but it goes to the weight of the
4  evidence. And we think this is certainly proper for the
5  witness to discuss, particularly when one of the defenses in
6  this case is that the people mining and milling talc never
7  get mesothelioma.
8         MR. KURLAND: Your Honor, first of all, this is
9  hearsay. It is an out-of-court statement that plaintiffs
10  are seeking to admit for its truth. They are seeking to
11  admit the truth of the statement that one, quote, Vermont
12  talc man was found to have mesothelioma. They are seeking
13  to offer this for no other purpose except to establish the
14  truth of that statement. And to that purpose, it is
15  inadmissible hearsay. It is irrelevant that it may have
16  been published in the peer-reviewed literature.
17        Moreover, there is no indication here that this was
18  ever published in the peer-reviewed literature. It has
19  authors. It doesn't say whether it was published. And our
20  understanding of this is that it was presented at a
21  conference as part of a poster presentation. It was not
22  subject to peer review.
23        But even if it were subjected to peer review, you
24  can't admit a study in New York for the -- for its truth. I
25  mean, it is hearsay. And they are trying to admit an

---

Moline - Plaintiff - Direct (Mr. Block)                    Page 2248

1  isolated fact from the study. This is an out-of-court
2  statement that they seek to admit for its truth, and that is
3  an improper purpose.
4         MR. BLOCK: And, your Honor, if that's the standard
5  and their witnesses aren't going to talk about the absence
6  of mesotheliomas in Vermont and Italian talc miners and
7  millers, then I guess it all could be excluded from the
8  case, but I don't think that's the case. I think their
9  witnesses are going to give expert opinions about whether
10  there have been cases of mesothelioma among these talc
11  miners and millers.
12        My expert is entitled to rely upon materials that
13  she considers reliable and that she would ordinarily rely
14  upon in her profession, environmental and occupational
15  medicine. And the jury will have to, you know, weigh the
16  relevance of the miners and millers experience. And this is
17  part of the data that both experts are -- that all the
18  experts are aware of and discuss in these cases.
19        (Whereupon, there is a brief pause in the
20  proceedings.)
21        THE COURT: What about plaintiff's argument that it
22  responds to defendant's statement that no one dies from
23  this.
24        MR. BROCK: I didn't bring my reading glasses, but,
25  your Honor, the defendant's statement with regard to the

---

Moline - Plaintiff - Direct (Mr. Block)                    Page 2249

1  peer-reviewed literature is that in the epidemiological
2  studies, the studies themselves, there has -- there is not a
3  report of a miner or a Miller developing mesothelioma. In
4  the peer-reviewed literature epidemiological studies.
5  That's not an epidemiological study. So that is the
6  distinction that we are making here. And I have not said to
7  the jury -- we have not said to the jury that there is
8  nothing out there that says that someone may have developed
9  mesothelioma in association with mining.
10        There is another issue with regard to a random
11  miner in Italy, but that person is not part of the study
12  because the person didn't meet the study criteria, for
13  reasons that will be explained.
14        Our statement has been very clear, that if you look
15  at the scope of the epi data, that is the epidemiological
16  studies that are in the peer-reviewed literature, there are
17  a large number of patient years, over 60,000 patient years,
18  and within those studies there is not a case of
19  mesothelioma.
20        MR. BLOCK: Your Honor --
21        MR. BROCK: This is not peer-reviewed literature.
22        MR. BLOCK: Your Honor, this is a published study,
23  and I will lay the foundation for it. And it's -- it is an
24  epidemiological --
25        THE COURT: Where was it published?

---

Moline - Plaintiff - Direct (Mr. Block)                    Page 2250

1         MR. BLOCK: It says "epidemiology" at the top, your
2  Honor. And that's not the standard. The standard is
3  whether it's the type of material that would ordinarily and
4  reasonably be relied upon by an expert who is investigating
5  the issue and forming their expert opinions.
6         Here, how can an expert overlook the fact that
7  there is this published article that is an epidemiology
8  study.
9         If you look at the abstract, your Honor, it's
10  talking about, you know, elevated risk. It's comparing
11  mortality patterns. It's talking about a cohort of workers.
12  It's giving the results. It's talking about the mortality
13  ratios. It's -- there's a table that has comparative lung
14  mortality risks of New York and Vermont State talc workers.
15        So, your Honor, I should be able to lay a
16  foundation for my expert to testify about this document,
17  just as they are going to attempt to lay the foundation for
18  their experts to talk about any epidemiology studies or any
19  scientific studies on Vermont or Italian talc workers.
20        MR. KURLAND: I'll just --
21        MR. BLOCK: They did say, in opening, that none of
22  the miners and millers -- we could find it. Is this on the
23  CDC website?
24        MR. HARTLEY: It is.
25        MR. BLOCK: This is on the Center for Disease

---

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

| Moline - Plaintiff - Direct (Mr. Block) | Page 2251 |

1 Control's website right now, CDC.gov. So this is done -- I
2 mean, it's still on the CDC website now. So -- but, your
3 Honor, they told the jury that none of the miners and
4 millers get sick. And they even said, when Dr. Moline comes
5 in, we are going to show you that, you know, she used to say
6 the miners and miller studies were important, and now she
7 says they are not.
8        Dr. Moline has to be able to fully explain her
9 opinions with regard to the miner and miller studies, and
10 she's needs to be able to rely upon material that I could
11 lay a foundation for her to rely upon.
12        MR. KURLAND: I'll point out, it says
13 "Epidemiology" at the top. It does not contain any
14 particular citations. There is nowhere on this document
15 that says where it was published, when it was published or
16 whether it was subject to peer review.
17        The fact that you could find it on the CDC Pubmed
18 database doesn't indicate that it was published in any
19 particular piece of literature. I mean, that's not on the
20 face of this document either. I mean, there's no indication
21 this was published.
22        MR. HARTLEY: Your Honor, I just offer one thing
23 here. This is -- we've heard evidence like this throughout
24 case. This is data that an expert is relying upon. If
25 there's going -- if they win the day here on this article,

| Moline - Plaintiff - Direct (Mr. Block) | Page 2252 |

1 none of what they want to talk about about epidemiology
2 would be able to come in, because it's scientific evidence
3 that their experts want to rely upon, but it's hearsay
4 so it can't come in.
5        This is just -- the -- not to mention the fact that
6 Johnson & Johnson had this document within its files as
7 well. And we'll come to that later in the case, if we
8 decide to try to admit that, but this document is of the
9 sort that an expert would rely upon. This is squarely
10 within -- they may not like it, but that's not the standard
11 for admission. The standard for admission is, is it of the
12 type that an expert in the field would rely upon. It's --
13 experts can rely upon hearsay because that's the only way
14 they could do their job. And it is published in a
15 peer-reviewed document. And as Counsel point out, I will
16 disagree with Counsel that if something is on Pubmed, it's a
17 published peer-reviewed document, because only published
18 peer-reviewed evidence gets onto the CDC Pubmed website. He
19 says that's not true. I'm telling you --
20        THE COURT: I don't know whether that's true.
21        MR. HARTLEY: You could look, take judicial notice
22 of it, your Honor. If you looked at it -- because it's
23 crystal clear that only published peer review articles get
24 on the CDC website for Pubmed.
25        MR. KURLAND: There are letters to the editor on

| Moline - Plaintiff - Direct (Mr. Block) | Page 2253 |

1 there. There are responses. There are all kinds of things
2 that are on Pubmed that are not what is known in the
3 scientific community as a peer-reviewed article, which is a
4 very specific thing.
5        MR. HARTLEY: The letters to the editor that go on
6 Pubmed are peer reviewed. You'll hear about that.
7        MR. KURLAND: By definition, a letter to an editor
8 is not peer-reviewed.
9        THE COURT: Do I have 15 minutes to decide to think
10 about it. Can you move on?
11        MR. BLOCK: I don't think so, your Honor. I'm
12 sorry, I --
13        MR. KURLAND: Should we take our afternoon break?
14        MR. HARTLEY: We've only been going for 45 minutes.
15        MR. BLOCK: I have very limited ground to cover
16 before we do damages, some testimony about damages and show
17 some medical records.
18        I mean, so I did not anticipate --
19        THE COURT: Five minutes.
20        MR. BLOCK: Sure.
21        THE COURT: Give me five minutes.
22        MR. BLOCK: Your Honor, I'm not trying to limit
23 your time on anything. I'm surprised that there is an
24 objection to an expert relying upon a published article.
25        THE COURT: Why would you be surprised? They are

| | Page 2254 |

1 objecting about everything and you are objecting about
2 everything.
3        MR. BLOCK: I don't recall objecting to much
4 anything in this trial. But, your Honor, the point is, if
5 that's going on the standard, then I don't see how their
6 experts are going to testify.
7        THE COURT: You are not giving me five minutes?
8        MR. BLOCK: Take ten, 15, a half hour. I would
9 never impose upon the Court.
10        THE COURT: Let me think about it.
11        MR. HARTLEY: We will let you definitely you do
12 that.
13        (Continued on the next page.)
14
15
16
17
18
19
20
21
22
23
24
25

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

Direct-Moline-Block                                    Page 2255

1    THE COURT: We'll put this to the side for a
2 moment. Could you ask about something else or you cannot?
3    MR. BLOCK: I can -- I can try to go on to
4 something else, your Honor.
5    Q   Let's talk about the Italian talc miners and millers.
6 All right. Let's skip past the Vermont talc miners and millers
7 right now. You have reviewed epidemiology studies on the
8 Italian talc miners and millers?
9    A   Yes.
10   Q   And approximately how many people are in included in
11 the Italian talc workers study?
12   A   It was about less than 2,000.
13   Q   And were any cases of mesothelioma reported in the
14 studies of the Italian talc miners and millers in the studies
15 themselves?
16   A   No.
17   Q   And are you aware of the identification of a case of
18 mesothelioma among an Italian talc worker that was identified by
19 an author called Mirabelli?
20   A   Yes.
21   Q   And how did Mirabelli bring to the attention of the
22 scientific community that there is a case of mesothelioma in a
23 person who worked at the Italian talc miner mill?
24   A   He wrote a letter to the editor.
25   Q   And was it indicated in the letter to the editor from

Direct-Moline-Block                                    Page 2256

1 Mirabelli whether the person who developed mesothelioma met the
2 criteria of the people that were being looked at in the Italian
3 talc workers studies?
4    A   Mirabelli stated that he believed he did.
5    Q   Okay. And what was the criteria in terms of who they
6 looked at in the Italian talc studies, how long they worked
7 there, how old they were, gender, issues like that?
8    A   They looked for people who had worked there for a month
9 or more. So, if you worked there for 32 days, you could be
10 included. If you worked there for 30 years, you could be
11 included. So, one month was the criteria.
12   Q   What about the issue of latency. Did they only look at
13 workers that had worked there for a long time? How many people
14 had been working there for, you know, going back 40 years, do
15 you recall those details?
16   A   I don't. Some had worked there longer, but many had
17 not worked there for a long period of time. It was -- it was a
18 wide spectrum of the amount of time folks had spent in the
19 mines. I don't have the exact numbers memorized.
20   Q   Okay. Were there a significant percentage of people
21 that -- that where the latency may have been too short to
22 determine whether ultimately they will get mesothelioma?
23   A   Yes.
24       MS. PAGONIS: Objection. Leading.
25       THE COURT: Overruled. You may answer.

Direct-Moline-Block                                    Page 2257

1    A   There were a number of folks that have had a very short
2 latency period. So -- And we don't know what happened after
3 they stopped looking at them for this study. So, we don't know
4 what happened to them in follow up.
5    Q   So, what conclusions were you able to draw from the
6 Italian talc worker miner and miller studies given the less than
7 2,000 people in that study group?
8    A   Well, it's a small study group for folks who are
9 working with product that has a very small percentage of
10 asbestos. We know from other miner studies of folks with --
11 that are mining pure asbestos or virtually pure asbestos, that
12 there is a small number of cases that you would expect to see in
13 people mine or milling a thousand percent asbestos compared to
14 less than one percent asbestos.
15   Q   Or a hundred percent asbestos compared to less than one
16 percent?
17   A   Correct. I'm sorry if I misspoke. So, it's a small
18 sample size. There is a question about latency. Some question
19 about disease ascertainment. But primarily it's a sample size.
20 And they also looked at mortality of less than a thousand
21 individuals to look at what they actually died of. So the whole
22 sample size was in the 2,000 range, but then the first study
23 that was published only looked at the death certificates of less
24 than 900 individuals who had passed on at the time of the study.
25 Subsequent studies -- There were two other studies that were

Direct-Moline-Block                                    Page 2258

1 done later of different groups, so it wasn't really a follow-up
2 study, after dust suppression had been put in place in the
3 mill -- in the mills and in the mines, so we don't know what the
4 exposures they had because there were some administrative
5 controls meaning the company did dust suppression. And in those
6 cases they excluded anybody who was over 85.
7    Q   What's the significance of studying a group of workers
8 and excluding people that are over age 85?
9    A   Well, I've certainly seen mesothelioma in people over
10 85. It means that if someone is 84, you could only -- they only
11 counted someone who had a mesothelioma up to 84 and 364 days.
12 If they were 85 and one day, they wouldn't look at them. And
13 you can't tell me there is any biological difference between
14 84 years, 364 days and 85 years and one day in terms of a
15 person. But they wouldn't be included. So they cut them off at
16 85. And that will also potentially cut off folks who had longer
17 latency.
18   Q   Were there any women who worked in the Italian talc
19 mines or mills for any amount of time?
20   A   There were a small number. They excluded them as well.
21   Q   Okay. Were -- Was there -- Were there peritoneal
22 cancers identified in the Italian talc miner, miller studies?
23   A   There were.
24   Q   Okay. How many, do you recall?
25   A   I believe there were two.

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

---

Direct-Moline-Block                                           Page 2259

1    Q   Now, you told us that Donna Olson has mesothelioma in
2  the pleura.  Where is the second most commonplace for
3  mesothelioma to occur?
4    A   In the peritoneum.
5    Q   And do the studies give any reason why they're
6  identifying these two peritoneal cancers as peritoneal cancer
7  versus peritoneal mesothelioma?
8    A   No.  They didn't give any further information that
9  would allow you to differentiate between what would be the more
10  common cause particularly in men of peritoneal cancers might be
11  mesothelioma.  They didn't give any information.  They just said
12  there were two peritoneal cancers, but they are not
13  mesothelioma, but there is no information for us to know whether
14  that's correct or not.
15    Q   So, based upon your knowledge and experience, is a
16  peritoneal based cancer in men often mesothelioma?
17    A   Without another primary, yes.  In women, sometimes you
18  have a disease called primary peritoneal cancer, but there are
19  cell markers that can differentiate.  They didn't provide any of
20  that information.  They said they are peritoneal cancers and
21  that was all the information they had.
22    Q   Now, over the last one to two years have you had access
23  or one or two or three years have you had access to the first
24  time to Johnson & Johnson's documents discussing certain of the
25  Italian talc miner and miller studies?

---

Direct-Moline-Block                                           Page 2260

1    A   Yes.
2    Q   And when you had testified prior to the last three
3  years about the Italian talc miners and miller studies, did you
4  ever before have any access to the Johnson & Johnson documents
5  discussing these studies?
6    A   I did not.
7    Q   And is there anything in terms of your review of
8  Johnson & Johnson's historical records regarding the Italian
9  talc miners and miller studies that have limited your reliance
10  on these studies?
11    A   Yes.
12    Q   And what is that?
13    A   I've seen documents that discuss that Johnson & Johnson
14  had to approve the protocol and they controlled the study.  They
15  paid the lead author.  It's unclear if other people received
16  money.  And that in and of itself is, people often get paid to
17  do studies, but it was never disclosed that J & J had paid, I
18  believe it was, $30,000 in 1976 for the lead author.
19    Q   Is that a person named Rubino?
20    A   Rubino, correct.
21    Q   Just because Johnson & Johnson paid money for the
22  study, is that an issue in and of itself or was it disclosed in
23  the published paper?
24    A   It was not disclosed in the paper.  Companies pay for
25  work to be done, but there has to be a wall between when the

---

Direct-Moline-Block                                           Page 2261

1  company has a vested interest in the findings and the research
2  that's being done, there has to be disclosure.  There has to be
3  transparency.  And there was none.  Another factor that I became
4  aware of was that Johnson & Johnson had people who are actively
5  writing the results and conclusions of the paper.  So, it's
6  unclear who actually wrote the paper, if it was Dr. Rubino and
7  coauthors or some other individuals who actually took part in
8  the paper, and that's against medical journal standards and
9  ethics.  There is actually rules about ghost writing now that it
10  has to be disclosed.  Certainly the people funding the study
11  should not be writing the paper without them being listed as
12  authors and there being transparency and there was none.
13    Q   Okay.  Just to be clear, did you know anything about
14  those details before the last three years when you first had the
15  opportunity to review the Johnson & Johnson documents produced
16  in litigation?
17    A   I did not.  I took the studies as being at face value
18  that they were independent work.  And what I've learned over the
19  past two, three years is that the work was not independent.
20    Q   And in terms of some of the other Italian talc miner,
21  miller studies, were any of those authored by people that were
22  affiliated with either Johnson & Johnson or the company that
23  supplied the talc in a way that was not identified in a
24  published article?
25    A   There is a second paper.  The author's name is

---

Direct-Moline-Block                                           Page 2262

1  Coggiola, C-O-G-G-I-O-L-A.  He was actually the medical director
2  for the mine company that was supplying the talc.
3    Q   Is that Imerys?
4    A   I believe so.  That was not disclosed in the paper.
5  That came out in the 90s, I think.
6    Q   And I think the jury will hear about that paper.  So
7  the paper that was -- where Coggiola was the lead author, was he
8  disclosed in that paper, in that paper as being employed by
9  Imerys, the mine company?
10    A   It was not disclosed.
11    Q   You mentioned I think -- So just in terms of the number
12  of people involved in the Italian talc miner, miller studies,
13  less than 2,000, just in terms of the rarity of the disease
14  mesothelioma, is that a large group of workers where you
15  necessarily expect to detect a case of mesothelioma?
16    A   No.  There are a number of factors that would go into
17  assessing whether you have what's called adequate statistical
18  power.  Part of that is how frequently do you expect to see the
19  disease in the population.  The second factor is what are they
20  being exposed to and what's the percentage.  Is it a high
21  exposure.  Is it a lower exposure.  That will affect the number
22  of folks that you need to include in your study to be able to
23  have sufficient statistical power.
24        We're dealing with a disease that has a rate of let's
25  say 13 per million in the United States.  I'm not exactly sure

---

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

| Direct-Moline-Block | Page 2263 |

1   what the Italian rates are. But it's still a rare disease. So,
2   here we have a population that's significantly less than a
3   million. And they were only looking at actually less than a
4   thousand folks who had passed away in the first study. So,
5   given the factors that it was less than one percent asbestos and
6   there were less than a thousand folks they were looking at, they
7   did not have adequate statistical power to see any
8   mesotheliomas, if they existed.
9     Q   Okay. I would like to talk to you about the Vermont
10  talc workers and --
11        THE COURT: Lay a foundation.
12        MR. BLOCK: On this issue?
13        THE COURT: Yes.
14        MR. BLOCK: Yes, your Honor.
15    Q   Dr. Moline, I want to ask you about some of the
16  Vermont -- I want to ask you about studies that have been done
17  looking at Vermont talc workers, and one of the studies I want
18  to ask you about is the study by Lamm. And is the Lamm article
19  a published study that you have considered in terms of looking
20  at all the information that's available, where there is
21  published literature looking at Vermont miners and millers and
22  health outcomes?
23    A   Yes.
24    Q   And is that article by Lamm, is that an epidemiology
25  study that looks at a particular cohort of Vermont talc workers?

| Direct-Moline-Block | Page 2264 |

1     A   Yes.
2     Q   And do they define the cohort they are looking at?
3     A   It was a cohort of Vermont talc, white, male, Vermont
4   talc workers that they identified from the Vermont State Health
5   Department, and they were looking at X-rays to look for
6   respiratory disease and lung cancer in the workers.
7     Q   All right. And is part of what you have done here is
8   to try to look at all the published literature on studies of
9   Vermont talk miners and millers in forming an expert opinion as
10  to what studies have been done and what information has been
11  found in those studies?
12    A   Yes.
13    Q   Is the Lamm publication one of the published materials
14  in which you have relied upon, and is it the type of material
15  that is ordinarily relied upon by experts in the field of
16  occupational and environmental medicine in forming opinions
17  about the epidemiology as it relates to Vermont talc miners and
18  millers?
19    A   Yes.
20    Q   Was there a case of mesothelioma identified in those
21  workers that are identified as being Vermont talc miners and
22  millers?
23    A   He described one death from mesothelioma in a, what he
24  called a Vermont talc man.
25    Q   All right. Now in terms of this one case of

| Direct-Moline-Block | Page 2265 |

1   mesothelioma, in what was called a Vermont talc man. Just to
2   give a little more detail about that, do they define the group
3   of Vermont talc workers that were being looked at in that study
4   in terms of when they worked with Vermont talc and for how long
5   they worked? Did they describe that in the first page of the
6   study?
7     A   They did in terms of the cohort they were following,
8   yes.
9     Q   And can you tell us what cohort or what group they were
10  looking at in that study?
11    A   It was employees of the Vermont talc industry that they
12  were following from 1940 to 1970 who had at least one year of
13  employment prior to 1970. So, I'm sorry. They were following
14  them through 1975.
15    Q   Okay. Does it say how many?
16    A   It looks likey they had mortality on 392.
17    Q   Does it say whether those workers -- I guess did the
18  study then continue to follow the workers to see if there are
19  any cases of mesothelioma in those Vermont talc workers?
20    A   No.
21    Q   Have you ever seen a follow-up study on that Lamm
22  publication that followed those workers into the future to see
23  if any other workers got mesothelioma?
24    A   No.
25    Q   When was that study published? That copy may not have

| Direct-Moline-Block | Page 2266 |

1   a date on it.
2     A   It does not have a date on it.
3     Q   Was it in the 70s?
4     A   It would have been probably in the late 70s, I think.
5     Q   I'll put approximately late 70s, understanding that it
6   looks like the copy you have does not have a date on it. So
7   were there any other studies of Vermont talc workers that you
8   looked at and considered?
9     A   There is one other that I'm aware of which is a study
10  by Selevan, S-E-L-E-V-A-N. And I think the cohort size was 492.
11  And they only followed them for ten years. And did not find any
12  disease or any mesothelioma after ten years, which is what we
13  would expect.
14    Q   Okay. So, give us a sense of the like time period when
15  they did the Selevan study, and then you said that they were
16  only followed for ten years, can you give us some more detail
17  about that and tell us the significance in terms of whether, you
18  know, if you're looking to see if -- if you're looking at the
19  disease mesothelioma?
20    A   So, it's too short a latency period to be able to
21  comment meaningfully. They didn't find any mesotheliomas in
22  individuals that had been working for ten years. So, there
23  wasn't sufficient latency. It's also a very small sample size.
24  I think some of the primary goals of this study were to look at
25  pulmonary function and other factors. They did look at

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

| Direct-Moline-Block | Page 2267 |

1 mortality experience in these individuals.
2   Q   Okay.  I have a notation from -- Let me ask you this.
3 If the NIOSH website indicates that the Lamm study was from
4 1990s, does that sound incorrect or you just don't know?
5   A   To be honest, I know it was before I got into the
6 field.  I don't remember when it was.
7   Q   All right.
8   A   1990 is totally possible, but the follow up was only
9 through '75.
10   Q   Okay.  And we'll get that squared away in the record
11 later in the case.  So, in terms of the Vermont talc workers and
12 the Selevan study, given that they looked at only 492 workers
13 and only followed them for ten years, what conclusions can you
14 draw from there?
15   A   You don't have enough information, because there hasn't
16 been a follow-up study to look to see what happened to any of
17 these individuals.  The latency wasn't long enough to see any
18 mesotheliomas, if they did arise.
19   Q   Okay.  Now, have you looked at whether the Italian talc
20 miners and millers or the Vermont miners and millers, whether
21 they were given any protective measures to suppress the dust or
22 to keep exposures down or to protect those workers?
23   A   Yes.  I've seen both in the Italian talc miner and
24 millers papers.  They discuss that in the late 1940s dust
25 suppression efforts were instituted within the mines and mills.

| Direct-Moline-Block | Page 2268 |

1 And I've seen documentation regarding very specific dust
2 suppression and other safety measures and controls in Vermont
3 talc mines.
4   Q   And have you reviewed a historical document from the
5 1970s that discusses very significant safety precautions being
6 taken to protect the Vermont talc workers from breathing in the
7 dust from the talc they were mining and milling?
8   A   Yes, I have.
9       MS. PAGONIS: Objection.  Leading.
10       THE COURT: Overruled.  You may answer.
11   A   Yes, I have.
12   Q   All right.  And did that include dust suppression?
13   A   It included dust suppression.  They actually separated
14 it from the miners, the millers and then folks packaging, I
15 believe.  So, there were very specific instructions to make sure
16 that the exposures were minimized in these workers.
17   Q   Is one of the industrial hygiene controls that could be
18 used to protect workers something called isolation?
19   A   Yes.
20   Q   Okay.  And was isolation used in the Vermont -- for the
21 benefit of the Vermont talc workers based upon your review of
22 historical documents?
23   A   Yes.
24   Q   And does that mean that when there were dusty
25 operations going on, those would be isolated in an area so

| Direct-Moline-Block | Page 2269 |

1 people would avoid breathing the dust?
2   A   Yes.  If you weren't directly involved in that
3 activity, you weren't in the area.  So, not only for the
4 individuals working with it, trying to isolate it with exhaust
5 and things like that, but you also make sure that other people
6 don't have bystander exposure.
7   Q   Have you reviewed historical documents showing that
8 Vermont talc workers at times were given masks and respirators
9 to protect them from breathing in the dust from the talc?
10   A   Yes.
11   Q   Dr. Moline, if a miner, if someone is mining talc rock
12 and they are breaking off a large piece of talc that contains
13 asbestos, is a rock, is a large rock something that's going to
14 be able to get in the air, remain suspended and get down into a
15 person's lung?
16       MS. PAGONIS: Objection.  Foundation.
17       THE COURT: I didn't hear the last words of what
18 you said.  Just a minute.  You may inquire about a
19 foundation.
20   Q   Are you aware of whether a large rock can be breathed
21 in by a human?
22   A   I am aware that it is impossible for us to breathe in a
23 large rock, yes.
24   Q   If a talc miner is breaking off a large piece of talc
25 rock, is that something that is going to pose a respiratory

| Direct-Moline-Block | Page 2270 |

1 hazard, that large talc rock?
2       MS. PAGONIS: Objection.  Foundation.  Leading.
3       THE COURT: Overruled.
4   A   The rock is -- is a rock.  They're not going to breathe
5 in a rock.
6   Q   How would you contrast someone who is breaking off a
7 large talc rock and mine the material versus a consumer who is
8 using a powder that is ground up into fine respirable particles?
9   A   So, a miner is going to be mining rocks.  There may be
10 some dust associated with breaking up the rocks, but it could
11 be -- it is not going to be the same as someone using a finished
12 product that is small and fine and is made to be put into the
13 air and put onto the body.
14   Q   And if in the mills if -- if dust suppression is being
15 used and if workers are being isolated into various areas to
16 avoid exposure and masks or respiratory are being worn, how does
17 that compare to one who is in their bathroom and using baby
18 powder and putting it on their chest and under their arms and
19 getting dust in the air without respiratory protection?
20   A   None of those safety or precautions are being taken in
21 the home.  So, they're not wearing the respiratory and they are
22 not using the appropriate ventilation to make sure that that
23 concentration in the air is low.  So, it's going to be a very
24 different exposure and it would be a higher exposure.
25   Q   Dr. Moline, we heard that just briefly, we'll see again

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

Direct-Moline-Block                                      Page 2271

1  Donna Olson had a procedure called a talc pleurodesis.  Is that
2  procedure recommended for people that do not already have a
3  malignancy?
4          MS. PAGONIS: Objection.  Leading.
5          THE COURT: You may answer.
6      A   It is not recommended for people who do not have a
7  terminal disease or malignancy.
8      Q   All right.  And have you looked at whether there are
9  studies with people who have had Italian talc pleurodesis who
10  don't already have mesothelioma, if those people have been
11  looked at sufficiently to see if they develop mesothelioma in
12  the future?
13     A   I'm aware of one study that looked at individuals that
14  used to be used for folks who develop something called a
15  spontaneous pneumothorax, meaning your lung collapses and then
16  they would put in a talc.  There is about a hundred folks or so
17  in that study that were followed.  So, the -- the number of
18  people that they followed, and they didn't follow them for
19  decades going forward.  So, it's a very small sample size.  And
20  I don't recall the exact latency, but it was not a long latency,
21  if I recall correctly, they did not find any disease among those
22  individuals, but we won't expect it given the short latency and
23  the small numbers of folks.
24     Q   The jury might hear some testimony about a disease
25  called talcosis.  Are you familiar with that disease?

Direct-Moline-Block                                      Page 2272

1      A   Yes.
2      Q   And is there any evidence that Donna Olson has the
3  disease called talcosis?
4      A   No.
5      Q   What is talcosis?
6      A   Talcosis is a scarring of the lungs due to inhalation
7  of talc.
8      Q   And does the fact that Donna Olson does not have
9  talcosis affect your opinion that her mesothelioma was caused by
10  asbestos from Johnson & Johnson talcum powder products?
11     A   No.  Talcosis, first of all, talcosis isn't malignant.
12  There is a case reported of somebody who worked with -- in a
13  talc manufacturing company who developed acute talcosis.  So,
14  it's possible for folks who are working with it to develop it.
15  There is only one case that I'm aware of in the medical
16  literature, so it's very rare from that exposure.  But you don't
17  need talcosis to develop mesothelioma and -- also talcosis
18  is within the lungs, and Ms. Olson had cancer outside the lungs
19  in the pleural space.
20     Q   Okay.
21         MR. BLOCK: Can we switch to the PowerPoint,
22  please.
23     Q   I would like to ask some questions about Ms. Olson's
24  medical history and her treatments that she's had for her
25  disease and her future prognosis.

Direct-Moline-Block                                      Page 2273

1          THE COURT: Is this a good time to take a break for
2  the jury?
3          MR. BLOCK: Yes, your Honor.  Thank you.
4          THE COURT: Ten minutes.  Thank you.
5          COURT OFFICER: All rise.  Jury exiting.
6      (Whereupon the jury panel departed the courtroom.)
7          MR. BLOCK: The plaintiffs move into evidence
8  Plaintiffs' Exhibit 326, 33, 43, which were medical records,
9  and Plaintiffs' Exhibits 326-A and 333-A, which are
10  radiology images, a printout of radiology images.
11         (Whereupon Plaintiffs' Exhibit Nos. 326, 33, 43,
12  326-A and 333-A were marked received in evidence as of this
13  date.)
14         MR. BLOCK: My understanding is there is no
15  objection to those.
16         MS. PAGONIS: No objection.
17         MR. BLOCK: Thank you.
18     (Whereupon Plaintiffs' Exhibit Nos. 330 through 343
19  were marked received in evidence as of this date.)
20         (Whereupon a recess was taken.)
21         COURT OFFICER: All rise.  Jury entering.
22     (Whereupon the jury panel entered the courtroom.)
23         THE COURT: Thank you.  Please be seated.
24         MR. BLOCK: May I proceed, your Honor?
25         THE COURT: Yes, please.

Direct-Moline-Block                                      Page 2274

1      Q   Dr. Moline, we have just admitted Exhibits 326 through
2  343 as well as Exhibit 333-A and 326-A.  And are those some of
3  the medical records that you have reviewed for Mrs. Olson that
4  we're going to discuss with the jury today?
5      A   Yes.
6      Q   How old was Donna Olson when she developed
7  mesothelioma?
8      A   I believe she was about 62.
9      Q   All right.  And if you need to, just for detail, if you
10  need to refer to your report at all with regard to any of the
11  details, please feel free to do that.  When Donna Olson was
12  diagnosed with mesothelioma, how was her health prior to that?
13     A   She had been in good health.  She was very active.
14     Q   And does smoking cause mesothelioma?
15     A   It does not.
16     Q   Regardless, was Donna Olson a cigarette smoker or
17  someone who had been identified as someone who ever smoked
18  cigarettes?
19     A   She never smoked cigarettes.
20     Q   All right.  What happened to Donna Olson in March of
21  2016 in terms of a change to her health?
22     A   She developed a cough and shortness of breath.  She
23  thought she had an upper respiratory infection and went to her
24  doctor on March 8th, and her doctor ordered a chest X-ray that
25  actually showed that she had fluid in her lung.

---

Direct-Moline-Block                                Page 2275

1    Q    All right.  So, here's a record, Exhibit 326, and it
2  refers to Mrs. Olson in early March of 2016 not feeling well,
3  having upper respiratory symptoms.  And then a chest X-ray was
4  identified in a pleural effusion.  Now looking at Exhibit 326-A
5  from March 8th, 2016, Donna Olson (pointing), 62 years old,
6  female, what is the jury looking at in terms of this chest X-ray
7  that is significant in terms of the change that was happening
8  with her health?
9    A    So, we're looking at what's called a chest X-ray.
10  That's called a PA view.  And what that is showing is on the
11  right side -- And remember yesterday we talked about how that's
12  the right and that's the left (gesturing).  So, on the right
13  side of her chest there is -- Well, actually if you look at the
14  left side first, you see how at the base there it comes to a
15  nice, sharp point.  Move your fingers.  There you go.  That's
16  actually called the costophrenic angle, that where the ribs and
17  the diaphragm join.  Normally you have that on both sides.  If
18  you look on the right side, she doesn't have that sharp angle
19  and you actually see that it's white about half way up, which is
20  -- it looks like a pleural effusion.  That there is fluid
21  occupying a space where her lung should be.
22    Q    And is this a classic initial sign of mesothelioma to
23  come in with respiratory pain and a pleural effusion is
24  discovered?
25    A    Yes.  It's classic.  People often have a cough,

---

Direct-Moline-Block                                Page 2276

1  shortness of breath.
2    Q    And why does mesothelioma cause fluid to build up in
3  that manner what is called pleural effusion?
4    A    Well, the tumor is occurring in that space.  It can be
5  that some of the normal drainage for the fluid is blocked by the
6  tumor.  It could be the tumor is irritating the pleura and the
7  body's reaction is to swell up and produce fluid in response.
8  It's -- it's such a classic finding of mesothelioma.
9    Q    And do pleura effusions like that with people with
10  mesothelioma produce pain and discomfort?
11    A    Often times they do.  Often sometimes people will just
12  have a cough and shortness of breath.  Sometimes they will have
13  pain, and they can actually have pain in their shoulder, even
14  though the fluid may be at the base of their lung, because it's
15  called referred pain.  But those are all classic findings.
16    Q    So what happened then?  So, Donna Olson was having this
17  discomfort.  She had the chest X-ray.  It's all white on the
18  right side.  So they identify this pleural effusion.  What
19  happened next?
20    A    So then she went and had additional testing.  And she
21  had a CAT scan that showed she had a pleural effusion, but they
22  didn't see much else.  And then she was treated for a possible
23  pneumonia.  In some cases pneumonia can cause fluid to develop.
24  That wasn't the case here, but that was the initial thought,
25  that maybe because she had symptoms of an upper respiratory

---

Direct-Moline-Block                                Page 2277

1  infection, maybe in fact she had pneumonia and the pneumonia was
2  causing some fluid.  She did not get better after -- with
3  respect to the plural effusion after the treatment for pneumonia
4  and her -- she initially had a fever and cough.  That seemed to
5  have gotten better.  And then in mid April she had actually some
6  fluid taken out of her lung and a procedure called a
7  thoracentesis.
8    Q    All right.  So, the jury knows, we have blowups of
9  portions of medical records that are in evidence as Exhibit 327.
10  So, this procedure called a thoracentesis she had in mid April
11  of 2016, what kind of procedure was that, and what did they, I
12  guess, remove from her body?
13    A    So, it's a procedure that -- where you use a needle.
14  You put it in the back, into the chest cavity and you withdraw
15  the fluid.  So --
16    Q    And it indicates here that 2.1 liters of fluid were
17  removed.  So that's 2.1 liter of fluid were removed from
18  Ms. Olson's pleural space on her right side?
19    A    Correct.
20    Q    And was anything done to try to keep the pleural
21  effusions from continuing to happen over and over again?
22    A    So, she had a second -- she had a second thoracentesis
23  after the first one in April, and then the fluid kept
24  reaccumulating.  In June she had the procedure where they
25  removed the fluid, took a look and some biopsies.  They did a

---

                                                   Page 2278

1  surgical procedure called a thoracoscopy where they made small
2  incisions.  Put a camera in.  Removed the fluid that was there.
3  Took biopsies.  And then put the talc in to prevent the fluid
4  from reaccumulating.  Basically it makes the two pleural
5  surfaces that we talked about yesterday, the parietal and the
6  visceral, makes them stick together in the hopes that the fluid
7  won't reaccumulate.  And they did that at that point.
8        (Continue on the next page.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

Moline - Plaintiff - Direct (Mr. Block)                    Page 2279

1   Q   It indicates that they actually put four grams of talc
2   in the pleural surface of Ms. Olson.  And is this common that
3   people with mesothelioma have these pleural effusions that keep
4   happening, such that one of the only things that could be done
5   is to do this talc pleurodesis procedure to keep the fluid from
6   reaccumulating and then having to be drained over and over?
7   A   They either do the talc pleurodesis or they could do a
8   pleurodesis with different chemicals.  Sometimes they put a
9   catheter that stays in the pleural space and then people will
10  drain it once a day, if they don't put the talc in.
11  Q   All right.  And this next slide Exhibit 329.
12      (Whereupon, a demonstrative aid was shown on the
13  screen.)
14  Q   It indicates that just after that pleuroscopy, was the
15  preliminary diagnosis -- they did not have a diagnosis yet?
16  A   They did not.  So the initial frozen, what -- it's
17  called frozen section because it's done immediately, did not
18  show that there was any abnormality.
19      The pathology was then sent over, what is called final
20  pathology, and I think sent to the Mayo Clinic for review.  And
21  the pathologist at the Mayo Clinic did special testing on it,
22  special stains that are the type of stains that differentiate to
23  see what kind of cancer it is to be able it say it's a
24  mesothelioma.  And that's where they found that it was a
25  mesothelioma.

Moline - Plaintiff - Direct (Mr. Block)                    Page 2280

1   Q   And it says that "Patient became very anxious when I
2   asked her questions about past medical history.  Her" -- maybe
3   husband -- "has also become very anxious and said were happy in
4   the knowledge that the biopsies done yesterday were normal, and
5   in this process where someone is getting a biopsy and they are
6   trying to determine what the disease is."  Was this something
7   that can cause distress in patients and anxiety?
8   A   Yes.  And often the waiting period, sometimes it's
9   challenging to diagnose mesothelioma, and so the pathology will
10  often take several days, and some cases weeks to come back.  And
11  it's tremendously anxiety producing for folks not to know what
12  is wrong with them.
13      They may know they have some kind of cancer, but they
14  don't know what kind, or they might be told that there's nothing
15  there, but let's get the final review, and then they do find out
16  that they have a mesothelioma.
17  Q   And ultimately, was there a definitive diagnosis of
18  malignant mesothelioma for Ms. Olson, and did she go forth with
19  a major surgery to try to prolong her life?
20  A   She did.
21      (Whereupon, a demonstrative aid was shown on the
22  screen.)
23  Q   What was that surgery that she had, and when did it
24  take place.  And we have Exhibit 330 in evidence.
25  A   So on August 18, 2016, she had a procedure called a

Moline - Plaintiff - Direct (Mr. Block)                    Page 2281

1   right extra pleuropneumonectomy, and she had resection of her
2   diaphragm, with reconstruction.  And she also had a resection
3   and reconstruction of her pericardium.
4       Basically, what they are doing, is they are cutting out
5   part of her rib to gain access to the chest, and then they are
6   removing the right lung, with the pleura surrounding the lung.
7   They are trying to get as much visible tumor as possible, so
8   they are removing all the pleura, both on the chest wall and on
9   the lung itself.  And then they are also removing either part or
10  all of the diaphragm, because the diaphragm is covered with the
11  pleura as well, so there's often areas of tumor on the pleura.
12      And then the surgeon will put in mesh, or another
13  material, to have that same barrier between the chest cavity
14  and abdominal cavity that the diaphragm muscles serve.  So that's
15  what the surgeon did there.
16      And also as we talked about yesterday, the heart sac,
17  the pericardium has the same type of tissue, and there can often
18  be tumor on the outside of the pericardium and sometimes can
19  grow into the pericardium.  So often the surgeons will also
20  remove part of the pericardium and also put a patch there to
21  make sure that it's -- the integrity is more intact.
22  Q   Have you reviewed records, and we have Exhibit 331 in
23  evidence, and other records?
24      (Whereupon, a demonstrative aid was shown on the
25  screen.)

Moline - Plaintiff - Direct (Mr. Block)                    Page 2282

1   Q   Was this an 11-day hospitalization for this surgery?
2   A   Yes.
3   Q   And looking at some of the notes, I would like to ask
4   you about from August 18 to August 29, 2016.  There is a note
5   here.  "The day after the surgery that plaintiff has been
6   nauseous and vomited.  Plaintiff medicated with zofran with
7   little to no relief."
8       What is it about major surgery that can cause nausea
9   and vomiting in that manner?
10  A   There are a variety of factors.  I mean, they were
11  mucking around with her in the area around her abdominal cavity,
12  and also some of the medications, the postanesthesia -- it's a
13  very extensive surgery.  It's usually several hours.  And people
14  can have adverse reactions to the anesthesia, as well as some of
15  the pain medication that they are given.  So somebody having
16  nausea is very common.  She was given a medication.  Zofran is a
17  medication for nausea.  It didn't seem to be helping her too
18  much right after surgery?
19  Q   And it indicates here, a few days later, "Possible
20  psych for depression related to cancer diagnosis."
21      Have you seen throughout the medical records references
22  -- some references of depression and a number of references to
23  anxiety, that Ms. Olson has related to her diagnosis of
24  mesothelioma?
25  A   Yes.

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

Moline - Plaintiff - Direct (Mr. Block)                     Page 2283

1    Q   And is there also an indication in the medical records
2    that prior to her mesothelioma that Ms. Olson did not have a
3    prior history of depression and anxiety?
4    A   I did not see any notice of that in her prior records.
5    I do know that she had at least one visit to the emergency room
6    where she had an anxiety attack.
7    Q   After she developed the mesothelioma?
8    A   After the mesothelioma.
9    Q   Okay.  And looking more at this hospital stay.
10       (Whereupon, a demonstrative aid was shown on the
11   screen.)
12   Q   It says -- states "She she is very weak."  Talked about
13   use of a walker, taking stool softeners.
14       And what about the surgery or the pain medication has
15   impacts on the bowels that would require stool softeners?
16   A   So narcotics are given postoperative.  This is major
17   surgery and she would have had narcotics.  And one of the side
18   effects of narcotics is that they actually will slow the gut
19   down.
20       THE COURT: Slow the?
21       THE WITNESS: The gut, the intestines.
22   A   And as a result, typically people are given stool
23   softeners, because opiate related constipation can be intensely
24   painful, it can also lead to vomiting and other things that you
25   don't want in somebody who's just had chest surgery.  You don't

Moline - Plaintiff - Direct (Mr. Block)                     Page 2284

1    want that in anyone.  But -- so there's -- people are put on
2    what is called a bowel regimen to make sure that they don't
3    develop this side effect of the medication.
4    Q   And the next day, on August 27th, 2016 it says, "Some
5    complaints of increasing shortness of breath when she lies flat,
6    as well as swelling in her legs."
7        And so, talk to us about the shortness of breath while
8    lying flat, and the swelling of the legs, in light of
9    Ms. Olson's surgery and her condition.
10   A   So she's having increasing shortness of breath, which
11   is she's -- her body is adapting to the fact that it used to
12   have two sides -- two lungs, in essence, and now she only has
13   one lung.  So her body is getting used to that.
14       And she's not -- the sensation that she is not able to
15   lie flat.  Many people don't feel comfortable lying flat.  They
16   feel like they can't take a deep enough breath.  Also, it hurts
17   to take a deep breath because you've had surgery on one side of
18   your chest, then you are not able to take that deep breath, so
19   that can lead to more of increasing shortness of breath when you
20   are lying flat.
21       The swelling in her legs can be due to fluid shifts, as
22   a result of the surgery.  It can be due to the problems with the
23   lymphatics.  It's something that is seen in individuals with
24   mesothelioma, which they can develop a condition called
25   lymphedema, where there can be problems with the lymph flow

Moline - Plaintiff - Direct (Mr. Block)                     Page 2285

1    coming back so that there is swelling in their extremities,
2    particularly their lower legs, because gravity doesn't help in
3    that fashion.
4    Q   Looking more at this hospitalization, "Patient sitting
5    in a recliner chair all day today.  Cannot be comfortable in
6    bed."
7        Is that along the same lines that you were just
8    explaining to us?
9    A   Yes.
10   Q   All right.
11       (Whereupon, a demonstrative aid was shown on the
12   screen.)
13   Q   Let's go onto -- I want to ask you about this:  So
14   after the surgery and before the surgery they diagnosed
15   mesothelioma.  Is there a description here that mesothelioma, I
16   guess that's significant in any way in terms of the encasing of
17   the lung, the involvement of the pleura, parietal and visceral,
18   and the infiltrating or the invasion into the diaphragm muscle.
19       How is that significant in looking at Ms. Olson and
20   what she was experiencing, and her prognosis?
21   A   So it shows that the tumor was pretty extensive.  As
22   mesothelioma grows, it becomes like a rind, or like a peel.
23   Think of an orange and it's encasing, the inside pulp of an
24   orange.  In this case the lung is like the pulp, and the orange
25   peel or the skin is what the tumor is like.

Moline - Plaintiff - Direct (Mr. Block)                     Page 2286

1        So they are removing that.  The concern was that
2    actually they found that the tumor invaded into the muscle, so
3    then your concern is that it spread into the chest wall muscles
4    as well, as well as the diaphragm.  And then it means it might
5    be able to get into the abdomen where it can spread into the
6    abdomen.
7        Another concern is -- was that the margin of the tumor
8    was not clean.  So they knew that even when they removed part of
9    -- they weren't able to remove all of the tumor because it was
10   too close to a major blood vessel and it was too dangerous to do
11   that.  So there was some residual tumor left, even after this
12   very extensive surgery, which puts her at greater risk of
13   reoccurrence.
14   Q   So what happened after Ms. Olson's surgery after she
15   was discharged from the hospital after that 11-day stay?  What
16   sort of happened in the course of her medical treatment and care
17   and her disease process?
18   A   So typically when people have this very aggressive
19   surgery they -- it doesn't only -- the treatment doesn't stop
20   with the surgery, but people are given what is called adjuvant
21   chemotherapy, meaning chemotherapy after surgery, typically for
22   four cycles of combination chemotherapy.  And then they are also
23   given radiation treatments to make sure that if there is any
24   residual tumor left that the radiation will affect the cells,
25   the cancer cells that are remaining.

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

Moline - Plaintiff - Direct (Mr. Block)                    Page 2287

1   Ms. Olson received both of those treatments over the
2  course of the fall of 2016.  And then she basically -- after the
3  radiation, there wasn't much more treatment that is typically
4  done.  And she was just followed by her oncologist and her other
5  doctors.
6       She did have difficulty with -- the swelling that
7  started when she was in the hospital persisted, and has, to my
8  understanding, continued to persist.  From the reading of the
9  medical records, that's impaired her ability to ambulate.
10  Q   To ambulate, to move?
11  A   To walk, to -- she can't go up her bedroom upstairs
12  because she can't climb the stairs.
13  Q   Let me stop you there.  I want to ask you about some of
14  the records.
15      (Whereupon, a demonstrative aid was shown on the
16   screen.)
17  Q   So after the surgery that she had and her
18  hospitalization, there is a record, Exhibit 333, that says there
19  was a Port-A-Cath placement and procedure for that.
20      What is a Port-A-Cath and what was it used for with
21  Ms. Olson?
22  A   So a Port-A-Cath is an implantable device that is put
23  so that the chemotherapy can be administered, and other
24  intravenous fluids, but it provides an easier access rather than
25  trying to find a vein and putting in an intravenous line, which

Moline - Plaintiff - Direct (Mr. Block)                    Page 2288

1  often can be difficult in individuals, especially if someone is
2  having swelling in their arms.  So it's -- it was a way for them
3  to get the chemotherapy.
4  Q   And then we have another chest x-ray from November 15,
5  2016 --
6      (Whereupon, a demonstrative aid was shown on the
7   screen.)
8  Q   -- after the extra pleuropneumonectomy.  And I think --
9  do we see here a rib that had been cut out?
10  A   Yes.  So that was -- as part of the surgery they had to
11  cut out her rib to gain access to the chest.  And you could see
12  evidence of a missing rib on that film.
13      What you also see is no lung is present on the right
14  side anymore, and it's all filled with fluid, except for the --
15  there is a tiny bit of air at the very top, but eventually that
16  will fill with fluid.  That is the body's normal response after
17  a lung is removed.
18      (Whereupon, a demonstrative aid was shown on the
19   screen.)
20  Q   You mentioned chemotherapy.  And here, on January 27th,
21  2017.  It indicates that she completed four cycles of cisplatin
22  and alimta.  Is that the chemotherapy she had?
23  A   Correct.
24  Q   Last cycle, December 8th, 2018.  It says, "She
25  tolerated this overall poorly.  She indicates, including with

Moline - Plaintiff - Direct (Mr. Block)                    Page 2289

1  the development of lower extremity edema, which has been
2  limiting her ambulation."
3      Is that what you are explaining to the jury?
4  A   Yes.
5  Q   And in terms of this note here, "No known asbestos
6  exposure."
7      Again, does that surprise you, in terms of the
8  indication of no known asbestos exposure, based upon the
9  questions you would expect Ms. Olson's treating doctors to ask
10  about, and what you would expect people to know in terms of
11  asbestos in talcum powder?
12  A   It's not surprising at all.
13      (Whereupon, a demonstrative aid was shown on the
14   screen.)
15  Q   Here it indicates the radiation treatments that you
16  told the jury about, that she had 30 radiation treatments which
17  ended March 28th, 2017.
18      It says, "Prior to cancer diagnosis, patient was
19  independent with self care and ambulation."  It indicates here,
20  on June 15th, 2017, "That patient requires wheelchair for
21  community ambulation and requires assistance for all self care,
22  such as bathing, dressing, and with all household and cooking
23  tasks from her husband.  And it says she sleeps in a recliner."
24      Based upon your review of the medical records, was
25  Donna Olson ever able to sleep in her bed after she had the

Moline - Plaintiff - Direct (Mr. Block)                    Page 2290

1  extra pleuropneumonectomy surgery?
2  A   No.
3  Q   And these issues with the lymphedema and the swelling,
4  and needing a wheelchair or a walker, not being able to climb
5  stairs to the bedroom, um, based upon your review of the medical
6  records, has that been continuing from the time that she had
7  that surgery back in 2016, up to this day?
8  A   Yes.
9      (Whereupon, a demonstrative aid was shown on the
10   screen.)
11  Q   And it says here, July 11, 2017, "Increased swelling
12  and pitting in bilateral feet."  And wearing these foot garments
13  to try to help with that.  What does it mean, pitting?
14  A   "Pitting" is when you -- someone has swelling in their
15  feet, you actually can press your finger down and you'll see the
16  pit or the -- it's a way of assessing how much fluid is in
17  someone's lower legs, typically in the lower legs.  It can be
18  anywhere in the body, but it just shows there's a significant
19  amount of swelling.
20  Q   Here, on July 11, 2017, it says, "Painful (B)LE."  What
21  does that mean?
22  A   Bilateral lower extremity.  Means pain in both her
23  lower legs.
24  Q   Is that from the lymphedema that followed the surgery
25  and chemotherapy?

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

Moline - Plaintiff - Direct (Mr. Block)                    Page 2291

1    A    And the swelling, yes.
2         (Whereupon, a demonstrative aid was shown on the
3    screen.)
4    Q    Do we see this condition continuing August 8th, 2017,
5    "Patient requiring wheelchair, requiring assistance for all self
6    care, such as bathing, dressing, all household tasks."
7         Is that indicated in the medical records?
8    A    Yes.
9    Q    And based upon your experience with patients, in
10   addition to the physical pain, is it difficult for people who
11   are always independent to need to have help with everything,
12   including bathing?
13   A    It's a tremendous challenge.  It's a challenge not only
14   for the individual who has lost their autonomy, but for their
15   caregivers who change from being a partner to a caregiver, so
16   that it puts -- it provides a lot of challenges.  But it can be
17   very difficult for the patients who want to do things on their
18   own and they are just physically unable to.
19   Q    And here it says that Ms. Olson -- or Mr. Olson is
20   helping Ms. Olson with bathing, dressing, and as you said, is
21   that difficult for caregiver as well?
22   A    It's -- it becomes a full-time job, and it can
23   emotionally very draining as well to see your loved one
24   suffering and have having to do all -- not to mention having to
25   do all the work around the house that might have been shared

Moline - Plaintiff - Direct (Mr. Block)                    Page 2292

1    before.
2         (Whereupon, a demonstrative aid was shown on the
3    screen.)
4    Q    And from later in 2018 to the present, have there been
5    some CAT scans that have looked at Ms. Olson to see if there is
6    any progression in her disease?
7    A    Yes.
8    Q    And we see a CT chest, a CAT scan report from Exhibit
9    338, which is in evidence.
10        And what does it indicate about Ms. Olson and about
11   what's happening with her condition?
12   A    It shows that there's pleural thickening that has
13   gotten worse since the prior scan three months earlier.  And it
14   was suspicious for progression or recurrence of her malignancy,
15   of her cancer coming back to that area.
16        (Whereupon, a demonstrative aid was shown on the
17   screen.)
18   Q    And in August of 2018, it indicated that Ms. Olson, who
19   at this point in August of 2018 is 65-years old, that she went
20   to the emergency department with a severe anxiety attack.  It
21   says, "She mentions that she has been anxious over the past two
22   years.  She was never treated for anxiety before.  Per husband,
23   she wakes up in the middle of the night complaining that she
24   hears noises."  And it talks about the different medications
25   she's prescribed.  And we have Xanax and a number of other

Moline - Plaintiff - Direct (Mr. Block)                    Page 2293

1    medications.
2         And what are those designed to try to help with?
3    A    With her anxiety and depression, as well as sleep.
4         (Whereupon, a demonstrative aid was shown on the
5    screen.)
6    Q    In October of 2018, it indicates that starting with one
7    of these drugs she's experiencing nausea and that she's
8    continuing to feel weak.  "Pneumectomy two years ago.  Has been
9    weak and unable to climb stairs by herself since."
10        So were these continuing issues from that surgery in
11   2016 through October of 2018, and through the present?
12   A    Yes.
13   Q    And it says, "Her husband, who was present, is very
14   frustrated and at his wits end."
15        It can be difficult for a caregiver who was in a
16   marriage where they were able to share their companionship and
17   do activities together, when the spouse is essentially a 24-hour
18   home care provider?
19   A    It's a tremendous challenge.
20        THE COURT OFFICER: Judge.
21        MR. BLOCK: Can I have five minutes, your Honor?
22        THE COURT: Yes.
23        MR. BLOCK: Thank you.
24        (Whereupon, a demonstrative aid was shown on the
25   screen.)

Moline - Plaintiff - Direct (Mr. Block)                    Page 2294

1    Q    January 24th, 2019, so this year.  What does it
2    indicate about Ms. Olson's mesothelioma in terms of the
3    progression and her condition?
4    A    It is showing that -- the CT shows that there's more
5    progression of pleural thickening and nodularity, and she
6    continues to have the fluid in the right chest, which is not
7    uncommon, but she has the mild fatigue.  And now she's having
8    some chest tightness and pain, which she -- I don't believe she
9    was describing early on after she recovered from the surgery,
10   but that's a concern that the tumor might be infiltrating the
11   chest wall.
12   Q    On January 24th, 2019, when they reviewed Ms. Olson's
13   bodily systems, does she -- is she basically having difficulty
14   in every area; respiratory, psychiatric, gastrointestinal,
15   musculoskeletal?
16   A    Yes.
17   Q    And what is it about mesothelioma that causes this type
18   of pain and discomfort, both mentally, physically in all areas?
19   A    Well, I mean, it's a diagnosis that is -- basically
20   it's a fatal diagnosis, so that causes depression in most
21   individuals.
22        The shortness of breath is related to she only has one
23   lung.  And the nausea, the weakness, a lot of this are also
24   related to the fact that she has a cancer.  And the cancer can
25   make people feel weak and nausea and have a decreased appetite.

Donna A. Olson and Robert M. Olson v.
Brenntag North America, Inc. et al

March 5, 2019

Moline - Plaintiff - Direct (Mr. Block)                    Page 2295

1   Those are symptoms that are often related to cancer being
2   present in the body.
3       Q    And based upon your review of all the medical records
4   and your experience and knowledge with the disease mesothelioma,
5   do you have an opinion within a reasonable degree of medical
6   certainty as to how long Donna Olson will continue to live with
7   mesothelioma before she dies from this disease?
8       A    I mean, that's always challenging to be able to give
9   life expectancy.  You can look at the literature and see how
10  people have done after having the procedure she had and this
11  cell type of cancer she had.
12          With this type of surgery, the average life expectancy
13  is usually about four years after the surgery.  Given her
14  relative young age, she's had all the treatments, she's been
15  able to tolerate all the treatments, meaning she was able to
16  complete the treatments, um, so, you know, obviously I don't
17  have a crystal ball, but based on what it looks like, it looks
18  like there might be increased tumor recurrence, which is very
19  common, um, that it's about four years from when she first was
20  diagnosed.  So that's about another year or so.
21      Q    And based upon your knowledge and experience with the
22  disease mesothelioma what are the types of symptoms and pain and
23  suffering that Donna Olson is likely to experience in the months
24  and weeks and days leading up to her death from mesothelioma?
25      A    She's going to develop more pain.  She'll develop more

                                                           Page 2296

1   shortness of breath.  There's concern that the tumor will spread
2   to the left pleura, and then she only has one lung, so that will
3   lead to problems with more shortness of breath.
4           She could develop what we call "air hunger", where she
5   is literally hungry to get air in because she can't feel like
6   she could take a deep breath in.  The tumor can often, as it
7   spreads in the chest wall, can be extraordinarily painful as it
8   invades the nerves.
9           She'll have constitutional symptoms like weakness and
10  nausea, decreased appetite.  Eventually she'll become incapable
11  of getting up, she'll be so weak, and will require -- she'll
12  become bed bound and require total care, and eventually will
13  pass away.
14      Q    Dr. Moline, we are out of time for today.  I thank you
15  very much for your testimony today.
16          THE COURT: Thursday 9:30; correct?
17          MR. BLOCK: Yes, your Honor.
18          THE COURT: Jury, tomorrow I'll be handling other
19  matters.  I'll see you Thursday at 9:30.  Thank you so much.
20          (Whereupon, the trial was adjourned to Thursday,
21  March 7, 2019 at 9:30 a.m. )
22
23
24
25