Page 1

1                    GRAVES CIRCUIT COURT
                           DIVISION 1
2                  COMMONWEALTH OF KENTUCKY
                    JUDGE TIMOTHY C. STARK
3     ---------------------------------------------------X
      CAROLYN WARD WIMAN and LATTA W. WIMAN,
4
                              Plaintiffs,
5
6     vs.                          DEPOSITION UNDER ORAL
                                      EXAMINATION OF
7                                  JACQUELINE MOLINE, M.D.
8
      TRIANGLE ENTERPRISES, et al.,
9
                              Defendants.
10
      Case No:  18-CI-00181
11    ---------------------------------------------------X
12
13
14
15         Transcript of the deposition of the witness,
      called for Oral Examination in the above-captioned
16    matter, said deposition being taken pursuant to
      Federal Rules of Civil Procedure by and before BRENDA
17    FITZGERALD, a Notary Public and Shorthand Reporter,
      at the Northwell Health, 175 Community Drive, Great
18    Neck, New York on Monday, November 25, 2019,
      commencing at 10:10 in the forenoon.
19
20
21
           PRIORITY-ONE COURT REPORTING SERVICES, INC.
22                290 West Mt. Pleasant Avenue
                  Livingston, New Jersey 07039
23                      (718) 983-1234
24
      Job No. 3782925
25

Page 2

I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Jacqueline Moline, M.D. | Mr. Ewald | 4 |
| | Mr. Gault | 117 |

EXHIBITS

| MOLINE | DESCRIPTION | FOR IDENT |
|---|---|---|
| 1 | Deposition notice | 20 |
| 2 | Dr. Moline's Reference & Reliance List | 20 |
| 3 | Dr. Moline's Curriculum Vitae | 22 |
| 4 | Dr. Moline's Deposition/Trial List | 25 |
| 5 | Dr. Moline's handwritten notes | 26 |
| 6 | Dr. Moline's Materials Reviewed/Relied | 27 |
| 7 | Accepted copy of manuscript entitled Mesothelioma Associated with the Use of Cosmetic Talc | 27 |
| 8 | AMA Analytical Services, Inc. Certificate of Analysis | 94 |
| 9 | Johnson & Johnson press release | 97 |
| 10 | Accepted copy of Exponent manuscript | 101 |
| 11 | Copy of article entitled Health Effects of Censored Elongated Mineral Particles | 107 |
| 12 | Copy of PowerPoint slide | 110 |
| 13 | Copy of PowerPoint slide | 111 |
| 14 | Copy of PowerPoint slide | 113 |
| * 15 | List of contents of documents in three binders | 117 |

* To be provided

- oOo -

Page 3

1  A P P E A R A N C E S :
2      LEVY KONIGSBERG, LLP
          Attorneys for Plaintiff
3      800 Third Avenue
          New York, New York 10022
4      BY:   AMBER LONG, ESQ.
5
6      ORRICK, HERRINGTON & SUTCLIFFE, LLP
          Attorneys for the Defendant(s)
7      Johnson & Johnson
          51 West 52nd Street
8      New York, New York 10019-6142
          BY:   JOHN L. EWALD, ESQ.
9                ANNA E. STUART, ESQ.
10
11     NAPIER, GAULT, SCHUPBACH & STEVENS, PLC
          Attorneys for the Defendant(s)
12     Continental Tire
          730 West Main Street
13     Louisville, Kentucky 40202
          BY:   PATRICK W. GAULT, ESQ.
14           (TELEPHONICALLY)
15
16                - oOo -

Page 4

1 J A C Q U E L I N E   M O L I N E, having been first
2 duly sworn by a Notary Public of the State of New
3 York, was examined and testified as follows:
4 EXAMINATION BY
5 MR. EWALD:
6     Q.    Good morning, Dr. Moline.
7     A.    Good morning.
8     Q.    How many hours have you spent preparing
9 for your deposition today?
10    A.    Can you define what you mean by that?
11    Q.    Sure.  Let's make it broader.  How much
12 time have you spent on your work in this case
13 specifically?
14    A.    I would say approximately ten hours.
15    Q.    Can you please detail how you spent
16 those ten hours.
17    A.    Reading through the medical records,
18 going through taking notes on the medical records.
19 Reading through the materials that were sent to me
20 was the majority of the time, and then I had a brief
21 meeting with Ms. Long on Friday.
22    Q.    How long was that meeting?
23    A.    Where we discussed the case, probably
24 about 30 minutes, if that long.
25    Q.    Have you prepared an invoice for your

Page 5

1 work in this case?
2     A.    No, not yet.
3     Q.    What are the case-specific opinions
4 you're offering here?
5          MS. LONG:  Objection to form.
6     A.    That Carolyn Wiman is suffering from
7 peritoneal mesothelioma as a result of her exposures
8 to asbestos.
9     Q.    What asbestos exposures have you
10 identified that Ms. Wiman encountered?
11    A.    She had exposure from her husband who
12 worked at General Tire, her first husband.  Her
13 second husband also worked at General Tire, but he
14 was retired by the time they married, and her
15 exposures to Johnson & Johnson products.
16         There is a question with no information
17 whether her father might have had exposure when he
18 worked as a carpenter helper at the gaseous diffusion
19 plant in Kentucky, but there's no -- it's a possible
20 exposure because there is no information related to
21 what he actually did there, and also she assisted her
22 mother with the laundry, but really helped hang it
23 rather than shake it out and do the laundering, she
24 did more of the hanging to dry, but that is a
25 potential exposure, but the ones where -- the others

2 (Pages 2 - 5)

Page 6

1 were the ones I mentioned.
2     Q.   Let's take the last one first.  The
3 father's potential exposure, what kind of work would
4 he have to have been doing for it to be an actual
5 exposure to asbestos in your view?
6         MS. LONG:  Objection to form.
7     A.   Well, it isn't necessarily the work he
8 was doing, it's the environment he was in and whether
9 they were using asbestos in the areas where he was
10 working in the building of this plant.  His work as a
11 carpenter might or might not have included direct use
12 of asbestos-containing materials, but he could have
13 been around others who were using asbestos-containing
14 materials.
15     Q.   So you're offering the opinion that that
16 was a potential exposure to asbestos?
17     A.   I feel in the interest of completeness I
18 have to include it as a potential exposure, but I
19 have no information beyond that he worked there.  I
20 think it would be erroneous to not mention that that
21 is a potential exposure for approximately four years,
22 but beyond that I cannot testify specifically that he
23 had an exposure that led to Ms. Wiman's having an
24 exposure.
25     Q.   What information did you review

Page 7

1 regarding the father's work as a carpenter?
2     A.    Whatever was provided in these binders.
3 It was Ms. Wiman and then her sister's deposition
4 were the ones that had any information at all.
5     Q.   Did you attempt to conduct any
6 additional investigation beyond the materials that
7 were provided to you by counsel?
8         MS. LONG:  Objection to form.
9     A.   At this point I did not.  Also, there
10 was -- I don't know if Mr. Ellenbecker was just asked
11 about these questions, so it would have been from
12 reading his industrial hygiene -- he's an industrial
13 hygienist, from reading his deposition.  I did not
14 personally go to the plant.  I don't even know if the
15 plant is still there.  I did not seek to obtain work
16 records, which would not be particularly helpful
17 anyway for folks that have passed on.
18     Q.   Let's talk a little bit about the
19 exposure that you detailed relating to the first
20 husband at General Tire.  Can you describe the nature
21 of asbestos exposure that he had and then the
22 secondary exposure to Ms. Wiman?
23     A.   So based on the descriptions of the
24 co-workers, there was asbestos insulation from pipes
25 in the roof that were in the warehouse area, which

Page 8

1 was very large, that fell down on a regular basis and
2 they either fell on top of them or fell to the floor
3 that were then run over by the forklifts with
4 re-entrainment from the fallen asbestos.  That was
5 from the depositions of the co-workers.
6         There was also an issue when there was a
7 tornado and there was a significant amount of dust
8 that was generated during the period when there were
9 multiple -- when everything was shaken up, and then
10 there was also some discussion of Mr. Ward working as
11 a tire builder and in the calendering area where
12 there was a potential where he had asbestos exposure
13 during the manufacturing of the tires, similarly from
14 the insulated steam pipes or from other insulation
15 that might have occurred in the tire production area.
16     Q.   Do you have an opinion as to the length
17 of time by years that Mr. Ward would have been
18 exposed to asbestos in his job?
19     A.   Well, Mr. Ward worked there, I think he
20 stopped in 1997, he retired in 1997 and he worked
21 there -- I mean does it matter?  It only matters when
22 they were married.
23     Q.   Sure.  Let's start --
24     A.   They were married in 1950 and he started
25 working there after they were married, so he started

Page 9

1 working there I believe it was in 1960 he started
2 working at General Tire.
3     Q.   For the exposures that were relevant to
4 Ms. Wiman, if it starts in 1960 at his employment, at
5 what point in time do you cut off his workplace
6 exposures at General Tire with respect to whether or
7 not they're relevant to Ms. Wiman?
8         MS. LONG:  Objection to form.
9         MR. GAULT:  Object to form.
10     A.   I believe around 1980 they moved from
11 the south warehouse to the north warehouse where
12 there was less asbestos or no asbestos being used, so
13 his exposure would have diminished if he was no
14 longer working in that area.  I think it's unclear
15 exactly where he was working during that time, if he
16 was never going back into the south warehouse, but at
17 one point they did move to a cleaner environment from
18 the asbestos standpoint.
19     Q.   What is your understanding of when
20 Mr. Ward passed away?
21     A.   I think he passed away around 2004 or
22 2005.
23     Q.   What is your understanding of when
24 Mr. Ward and Ms. Wiman got divorced?
25     A.   They never got divorced, he died.

3 (Pages 6 - 9)

Page 10

1    Q.   I apologize.  With respect to the job
2  change in 1997, what were you referring to?
3    A.   He retired.
4    Q.   Understood, but then I thought you said
5  something with respect to that would not have
6  impacted Ms. Wiman's exposure; did I mishear you?
7    A.   She didn't have any exposure after he
8  retired.  His General Tire exposure closed in 1997
9  since he wasn't working there anymore.
10   Q.   Do you have an opinion as to the types
11 of asbestos that Mr. Ward would have been exposed to
12 in his job?
13   A.   It was a combination of amosite and
14 chrysotile.
15   Q.   Do you have an opinion as to how much of
16 that exposure was amosite as opposed to chrysotile?
17   A.   I did not do the sampling.  There's a
18 comprehensive sampling included in there of whatever
19 was in the pipes at whatever time they did the
20 sampling, but I don't know the exact percentage.
21   Q.   Did that sampling material that you
22 reviewed inform the opinions that you're offering in
23 this case?
24   A.   To the extent that it demonstrated that
25 the pipes had asbestos insulation.

Page 11

1    Q.   Does it matter to your opinions in this
2  case the level of, for example, amosite that was
3  present in the insulation?
4    A.   If you're trying to get a long-winded
5  way of asking me if all types of asbestos causes
6  mesothelioma, they do.  Certainly his exposures to
7  asbestos are what counted.  If there's pipe
8  insulation, then you say there's exposure to both
9  amphibole and chrysotile.
10   Q.   That wasn't a long-winded way of getting
11 at whether they all cause it, I know your opinions in
12 that regard, but you also have opinions with respect
13 to potency as between the different types of asbestos
14 fibers; is that accurate?
15   A.   On a fiber per fiber basis with respect
16 to mesothelioma, yes.
17   Q.   With respect to your opinions in this
18 case, does it matter to you how much amosite Mr. Ward
19 was exposed to as opposed to how much chrysotile he
20 was exposed to in his job?
21   A.   Only to the extent that if there's a
22 higher percentage of amosite there might be a higher
23 fiber per fiber risk of developing mesothelioma, but
24 because it's a combined exposure it exists in a
25 combined manner, so you'd look at both.  It's just

Page 12

1  something that you note that there was both
2  chrysotile and amosite.  I think there was more
3  chrysotile than amosite.  If you got something that's
4  four times as potent or two and a half times as
5  potent but you've got four times as much of the less
6  potent, then they're sort of equivalent, so it all
7  evens out in the wash, so to speak, as long as you
8  don't shake it.
9    Q.   Have you attempted to quantify the
10 exposure to asbestos that Mr. Ward experienced in his
11 job?
12   A.   I personally have not.
13   Q.   Do you have a view on, let's say, the
14 fibers per cc or fiber per cc years how much asbestos
15 exposure Mr. Ward experienced in his job?
16   A.   I don't have a specific opinion with a
17 quantitative value associated with it.  I would defer
18 to Dr. Ellenbecker if he's going to do that.  I think
19 it's challenging when there was no air testing done,
20 which they certainly could have done when they were
21 doing the surveys, but I don't have the data to be
22 able to do that.
23        I could tell from a qualitative
24 standpoint their descriptions of asbestos in the air
25 being disturbed led to a significant exposure.

Page 13

1    Q.   Are you able to provide any additional
2  opinion with respect to the exposure beyond that it
3  was significant?
4        MS. LONG:  Objection to form.
5    A.   There's no numbers that were done;
6  there's no air measurements that were done so one
7  could look to the literature and say what the
8  exposures would be from disturbing pipe insulation
9  and come up with an estimate that way.  I have not
10 done a quantitative measurement.
11   Q.   Do you have any citations to that
12 literature that you just referenced that you would
13 look at if you wanted to actually come up with a
14 quantitative estimate?
15   A.   Balzer and Cooper is one of the
16 classics.
17   Q.   Any others come to mind?
18   A.   I would have to look at my reference
19 list.  There's a number of studies.  I'm sure
20 Dr. Ellenbecker would be able to provide you with
21 that information as an industrial hygienist.
22   Q.   Let's talk about your opinions with
23 respect to the exposure to asbestos that Ms. Wiman
24 had in connection with her husband's work.  What are
25 your opinions with respect to that?

4 (Pages 10 - 13)

1    A.    That her exposure is from laundering his
2 dust-ladened clothes.  She shook out his clothes
3 before she washed them, after she washed them, after
4 she dried them.  She liked to shake clothes and after
5 shaking out the clothes it caused asbestos to become
6 airborne.  She was exposed in that fashion.
7    Q.    Do you have an opinion that that
8 exposure would be to both amosite and chrysotile?
9        MR. GAULT:  Object to form.
10   A.    Based on the pipe insulation contents,
11 yes.
12   Q.    Have you done any kind of quantitative
13 exposure assessment that Ms. Wiman had from
14 laundering and shaking out the clothes?
15   A.    I have not done a numerical value from
16 that.  There are references in the literature.  I'm
17 not sure.  There are a number of studies that have
18 measured it.  I don't know if it's in Anderson or
19 Vianna and Polan and a number of other take-home
20 exposures.
21   Q.    Do you have an opinion as to the
22 frequency with which Ms. Wiman would have been
23 exposed to asbestos in the laundering of her
24 husband's work clothes?
25   A.    She stated that she laundered -- she did

1 laundry approximately twice a week, but also it
2 contaminates the household or the area where she was
3 doing the laundry, so it could have been additional,
4 but she did laundry twice a week based on her
5 description.
6    Q.    Do you recall Ms. Wiman testifying that
7 her husband would not take off his clothing when he
8 immediately returned home from work?
9    A.    I think in general he did not, on some
10 occasions he did.
11   Q.    The testimony that Mr. Ward left his
12 work clothes on when he came home, in your opinion
13 would that have led to additional exposure to
14 asbestos that Ms. Wiman experienced?
15       MR. GAULT:  Object to form.
16   A.    Absolutely if she's interacting with
17 him, if he's contaminating the house, the dust gets
18 on the floor and she's cleaning the house.  It would
19 be additional exposure not just from laundering his
20 clothes, if dust falls down or she's greeting him and
21 hugging him has potential to breathe in asbestos from
22 other encounters.
23   Q.    Let's talk about what you reviewed
24 specifically for this case.  You brought with you I
25 see three binders today; is that fair?

1    A.    Yes.
2    Q.    What is contained in those binders
3 generally?
4    A.    Medical records.  There's a whole list
5 of what's in the binders.  You have that.  I think
6 it's deposition transcripts of co-workers, her
7 daughter, her sister.  There's the asbestos survey
8 that was done at the plant.  There's Dr. Longo's
9 deposition.  There's Dr. Ellenbecker's deposition.
10   Q.    Have you reviewed all of the materials
11 that are contained in the three binders that were
12 brought with you today?
13   A.    Yes.
14   Q.    Are there any case-specific materials
15 that you reviewed in this case that are not contained
16 within those three binders?
17   A.    No.
18   Q.    Have you spoken with any other expert
19 witnesses in connection with your opinions in this
20 case?
21   A.    No.
22   Q.    Have you spoken with Ms. Wiman?
23   A.    I have not.
24   Q.    Did you ask counsel for the opportunity
25 to speak with Ms. Wiman?

1    A.    I didn't because I noted that Dr. Longo
2 had spoken to her.  She's quite ill and I felt that
3 it would be duplicative in terms of some of the
4 questions we might be asking and I did not want to
5 call a very ill woman out of the blue.  If Dr. Longo
6 had not reached out to her and asked her some of the
7 questions that I would have asked that were not
8 specifically asked in her deposition, then I would
9 have asked for that opportunity.
10   Q.    Have you spoken with any of Ms. Wiman's
11 family members?
12   A.    I have not spoken to her family members.
13 I've not spoken to her treating physician.
14   Q.    Have you spoken with any of Mr. Ward's
15 co-workers at General Tire?
16   A.    Apple Jaw seems like a very interesting
17 person, but I have not spoken to any of the
18 co-workers.  He has the best name of a witness I have
19 ever seen.
20   Q.    When were you retained as an expert in
21 this case?
22   A.    I don't know.  It was many months ago.
23 I think the case was initially scheduled to move
24 forward a little sooner and then it was delayed.  It
25 was several months ago, but I began reviewing the

Page 18

1 materials within the past few weeks.
2    Q.   When was the first time that you started
3 reviewing materials in connection with this case?
4    A.   I would say about two weeks ago.
5    Q.   Do you have any record of when you would
6 have been retained in this case?
7    A.   It would have been in the cover letter
8 that is included in the binders since I didn't throw
9 anything away.  You're looking in the wrong one.
10    Q.   I appreciate the help.  There's a letter
11 enclosing additional records dated November 7, 2019.
12    A.   Those were sent to me whatever that date
13 was.  The binder you have there was the original one
14 and I don't know if the cover letter is in there or
15 not, but it was somewhere around February, the end of
16 February I believe, but I didn't review anything
17 until more recently.
18    Q.   February 2019?
19    A.   I believe so.  I think there was one
20 binder sent and then additional binders were sent
21 more recently.  I'm sure the Kazan firm or whoever
22 wrote it can provide that correspondence.
23         MR. EWALD:  We would request a copy of
24 that initial correspondence enclosing the materials
25 that are in one of the three binders.  The original

Page 19

1 set of materials.
2    A.   They didn't do a good job of labeling.
3         MS. LONG:  Counsel, will you send me a
4 letter or Kazan's firm a letter?
5         MR. EWALD:  Sure.  No problem.
6    Q.   In this binder there is a -- I'll hand
7 this to you to take a look.  It says documents sent
8 to Moline; is that something counsel prepared or that
9 you prepared?
10    A.   I don't refer to myself in the third
11 person.
12    Q.   Some people do.
13    A.   The president does, but I don't
14 personally myself.  I don't appreciate not having a
15 doctor in front of that, but anyway, I will raise
16 that with the person who provided this.  I did not
17 provide this.  This was provided by the law firm.
18         Just to clarify, these were included in
19 the binders.  I took them out because I read them at
20 different times, so it was just for ease of not
21 carrying a binder.
22         MR. EWALD:  For the record, Dr. Moline
23 is referring to Exhibits 9 and 10 from one of the
24 three binders.
25    A.   It was from the initial binder.

Page 20

1         MR. EWALD:  The initial binder.  Let's
2 go ahead just for the record mark this as Exhibit 1,
3 please.
4         (Whereupon, deposition notice was
5 received and marked Moline Exhibit 1, for
6 identification, as of this date.)
7    Q.   Doctor, I am handing you what's been
8 marked as Exhibit 1.  Have you seen this before?
9    A.   I glanced at it briefly.  I think it was
10 included in one of the binders, but I basically noted
11 it was there, but didn't go through it
12 comprehensively.
13         MR. EWALD:  For the record, this is the
14 deposition notice, the amended deposition notice,
15 Exhibit 1.
16    Q.   Let's talk about the reference and
17 reliance list.
18         MR. EWALD:  If you could mark this as
19 Exhibit 2.
20         (Whereupon, Dr. Moline's Reference &
21 Reliance List received and marked Moline Exhibit 2,
22 for identification, as of this date.)
23    Q.   Doctor, I am handing you what's been
24 marked as Exhibit 2.  What is that?
25    A.   It is a reference list.  It is missing

Page 21

1 the second part, which is the reliance documents, but
2 during a break I can pull that.  It's a list of
3 references that I've been adding as I read more
4 articles that I've been complying for a number of
5 years.
6    Q.   When was this reference list prepared?
7    A.   It's an iterative documents.
8    Q.   When is the last time you updated it?
9    A.   Probably within the last couple of
10 weeks.
11    Q.   Do you recall what's been added to the
12 list?
13         MS. LONG:  Objection to form.
14    A.   I don't specifically recall what might
15 have been added in the past two weeks.  I work with
16 one of my colleagues who helps me manage my
17 references.
18    Q.   Which colleague is that?
19    A.   Her name is Elizabeth Salas (phonetic).
20    Q.   I may be mistaken, but I believe the
21 last time I saw a reference list it was numbered 202
22 and this one is 436.  Has there been a significant
23 addition of references within the last couple of
24 months?
25    A.   I don't know when the 202 came from, but

6 (Pages 18 - 21)

Page 22

1 it's been significantly more than 202 for a while.
2 Going through the reference list I realized that I
3 was missing certain types of articles, whether it was
4 on the stack of articles related to different types
5 of exposure. I didn't have some of the take-home
6 exposures at one point so I made sure they were
7 added, and then there were some articles I referenced
8 on asbestos cement that weren't on there, so we added
9 those, and then I add some related to ovarian cancer
10 at some point.
11       I just mostly am keeping one list and
12 allowing you to earn more time as you go through the
13 list, so you should thank me.
14       MR. EWALD: Can you please mark this as
15 Exhibit 3, please.
16       (Whereupon, Dr. Moline's Curriculum
17 Vitae was received and marked Moline Exhibit 3, for
18 identification, as of this date.)
19   Q.   Dr. Moline, I am handing you what's been
20 marked as Exhibit 3. What is that?
21   A.   It's a copy of my CV dated
22 November 11th.
23   Q.   2019?
24   A.   Correct.
25   Q.   What additions, revisions did you make

Page 23

1 to your CV for this version?
2   A.   At what point in time?
3   Q.   It's dated November 11, 2019. I'm
4 asking basically when you revised it on or around
5 that date, what changes did you make?
6   A.   Added some new interviews. Added some
7 new publications. Let's see if they incorporated
8 that I became president of the New York Occupational
9 and Environmental Medicine Association. That
10 occurred the week before or, no, actually the month
11 before.
12   Q.   You said if they incorporated, who is
13 they?
14   A.   I'm smart enough not to attempt to mess
15 with a formatted document, so I have my assistant
16 help me.
17   Q.   What opinions are you offering in this
18 case with respect to Ms. Wiman's exposure to Johnson
19 & Johnson talc products?
20   A.   That she used talc products for
21 virtually her entire life that were Johnson & Johnson
22 products and they contributed to her cumulative
23 asbestos exposure that led to her mesothelioma.
24   Q.   Have you attempted to quantify
25 Ms. Wiman's exposure to asbestos from her use of

Page 24

1 Johnson & Johnson talc products?
2   A.   I have not done a dose estimate. It
3 would be a gross estimate in the sense that there was
4 no air monitoring done, but I did not attempt it. In
5 this particular case I was not asked to do a dose
6 calculation.
7   Q.   As between potential asbestos exposures
8 that Ms. Wiman had from Johnson & Johnson products
9 and from her husband's work at General Tire, do you
10 have an opinion as to which was more offensive?
11   A.   Certainly years-wise her exposure to
12 Johnson & Johnson was more extensive. It was
13 something she used from early childhood to very
14 recently, but in terms of relative exposure I have
15 not attempted to do a relative contribution. They're
16 both cumulative and it's specious to try to separate
17 them.
18   Q.   Do you have an opinion as to what role,
19 if any, genetics played in contributing to
20 Ms. Wiman's mesothelioma?
21       MS. LONG: Objection to form.
22   A.   There's certainly a family history of
23 cancer. There's no evidence of any genetic testing;
24 so it's speculative. There's no history of
25 mesothelioma in the family, but there are other

Page 25

1 cancers that may indicate there's a genetic
2 predisposition to certain types of cancers.
3   Q.   You indicated a family history of
4 cancer. What family history of cancer are you aware
5 of with respect to Ms. Wiman?
6   A.   That her mother had breast cancer, her
7 sister had breast cancer, and another sister had
8 ovarian cancer, her father had pancreatic cancer, and
9 her brother had lung cancer.
10   Q.   Did you also review testimony that her
11 mother had colon cancer?
12   A.   Yes, I believe she also did. I think
13 the breast cancer was not something that she died
14 from. I think she died from her colon cancer.
15       MR. EWALD: I'm going to mark this as
16 Exhibit 4.
17       (Whereupon, Dr. Moline's Attorney
18 Deposition/Trial List was received and marked Moline
19 Exhibit 4, for identification, as of this date.)
20   Q.   Dr. Moline, I'm showing you what's been
21 marked as Exhibit 4. Please identify what that is.
22   A.   It's a list of deposition and trial
23 testimony over the past four years.
24   Q.   Is it current as of today?
25   A.   I don't include today's deposition, but

Page 26

1 yes.
2    Q.    Fair enough. Dr. Moline, you've
3 reviewed medical records of Ms. Wiman in connection
4 with this case, correct?
5    A.    Yes.
6    Q.    Are you aware of any medical records
7 where a medical provider attributes Ms. Wiman's
8 mesothelioma to her talc use?
9    A.    There's no mention of her talc use in
10 the medical records in any way, shape or form,
11 whether she even used it that I recall, no medical
12 provider mentioned talc.
13    Q.    The medical records do identify asbestos
14 exposure from the husband; is that correct?
15    A.    Yes.
16       MR. EWALD: Mark this please as
17 Exhibit 5.
18       (Whereupon, Dr. Moline's handwritten
19 notes were received and marked Moline Exhibit 5, for
20 identification, as of this date.)
21    Q.    Dr. Moline, I'm handing you what has
22 been marked as Exhibit 5. What is that, please?
23    A.    They are my handwritten notes that I
24 took as I reviewed the various documents contained in
25 the three binders that we discussed.

Page 27

1       Do you want to take a break?
2    Q.    Yes, I'm about to switch topics. I was
3 going to say let's take a break.
4       (A recess was taken.)
5       MR. EWALD: Could you please mark this
6 as Exhibit 6, please.
7       (Whereupon, Dr. Moline's Materials
8 Reviewed/Relied on was received and marked Moline
9 Exhibit 6, for identification, as of this date.)
10    Q.    I'm handing you what's been marked as
11 Exhibit 6. What is that, please?
12    A.    It's the reliance list that should have
13 been included in Exhibit 2. It's just a general
14 reliance list for talc-related issues.
15    Q.    Do you recall when that list was last
16 updated?
17    A.    I don't. I think the last -- it may
18 need to be updated if there's been an additional
19 report, but certainly it was updated at some point
20 after August 27, 2019.
21       MR. EWALD: Please mark this as
22 Exhibit 7.
23       (Whereupon, accepted copy of manuscript
24 entitled Mesothelioma Associated with the Use of
25 Cosmetic Talc was received and marked Moline Exhibit

Page 28

1 7, for identification, as of this date.)
2    Q.    Doctor, I'm handing you what's been
3 marked as Exhibit 7. Can you please identify that
4 for the record.
5    A.    It's an accepted manuscript entitled
6 Mesothelioma Associated with the Use of Cosmetic Talc
7 that I am the first author of.
8    Q.    Whose idea was it to draft this article?
9       MS. LONG: Objection to form.
10    A.    To write this article?
11    Q.    Yes.
12    A.    It was something I've been thinking
13 about doing for a long time, to do a case series, and
14 at some point I had a conversation with Ron Gordon
15 and we decided to collaborate.
16    Q.    So you had the idea for the article and
17 talked to Dr. Gordon about writing it with you?
18    A.    They were actually in parallel. I had
19 the idea of writing a case series for a long time.
20 Dr. Gordon and I, in the course of a discussion, it
21 came up and we said why don't we collaborate on an
22 article. He had done tissue digestion in several
23 cases that I realized that I had also reviewed and
24 that's how it came about.
25    Q.    When you say that you had been thinking

Page 29

1 about doing a case series for a long time, how long a
2 time are we talking about?
3    A.    A couple of years at least. I'm an
4 academic physician, I'm always thinking about what
5 kind of articles I can write. As I was reviewing
6 more and more cases of mesothelioma with cosmetic
7 talc exposure I felt it was important to get it into
8 the medical literature.
9    Q.    So at some point after 2017; is that
10 correct?
11    A.    I can't give you an exact time. It
12 would have been at some point in all likelihood in
13 2017, yes.
14    Q.    Just for the record, you were reviewing
15 your list of cases that's been marked as Exhibit 4?
16    A.    Correct, because that's when I began
17 reviewing more cases of talc exposure and started
18 putting my academic hat on in addition to my other
19 hats.
20    Q.    The title, Mesothelioma Associated with
21 the Use of Cosmetic Talc, who came up with that
22 title?
23    A.    I did.
24    Q.    Was that the same title in the draft
25 that was sent to the peer reviewers?

8 (Pages 26 - 29)

1    A.    Yes.
2    Q.    Was there a different title in earlier
3  drafts of the article?
4    A.    There was no title in the earlier drafts
5  of the article.
6    Q.    When did you come with the title?
7    A.    Around the time that we submitted it.
8  Titles are not as important as what's in the content.
9    Q.    I hear you.  Your co-author is Kristen
10  Bevilacqua; is that correct?
11    A.    Yes.
12    Q.    What is her educational background?
13    A.    She has a Master's of Public Health
14  degree and she is currently in graduate school for a
15  Ph.D.
16    Q.    What role did Ms. Bevilacqua play in
17  connection with this article?
18    A.    She assisted in compiling some of the
19  tables, working with me as we went through the cases,
20  assisted in some of the -- we worked together on
21  developing the background and section of the paper
22  and she did more of the -- helped submit the IRB
23  application.  Actually, she is actually the one who
24  submitted the IRB application.
25    Q.    Has Ms. Bevilacqua in the past assisted

1  you with your litigation consulting work?
2    A.    No.
3    Q.    To your knowledge, has Ms. Bevilacqua
4  been involved at all in consulting for litigation?
5    A.    No.
6    Q.    Maya Alexandri is also listed as a
7  co-author, correct?
8    A.    Correct.
9    Q.    What is her educational background?
10    A.    She was a lawyer, but she's a medical
11  student now.  Her legal degree was immaterial in the
12  writing of this paper, but she is a medical student
13  at the Hofstra School of Medicine and she assisted in
14  some of the writing of the paper, not in the data
15  collection.
16    Q.    How did Ms. Alexandri come to be
17  involved in connection with this paper?
18    A.    She has done rotations with me.  She has
19  an interest in occupational medicine.  We worked
20  together on another case report that she presented to
21  the medical students research day, and was interested
22  in continuing to work with me on any projects and it
23  just so happened she had some free time over the
24  summer and assisted us.
25    Q.    Has Ms. Alexandri previously assisted

1  with you in connection with your litigation
2  consulting?
3    A.    Never.
4    Q.    I failed to ask, apologies.  How did
5  Ms. Bevilacqua come to be involved in connection with
6  this article?
7    A.    I asked her if she would be interested.
8    Q.    Why did you ask her?
9    A.    Because I knew she was going into
10  epidemiology, she's a brilliant woman, and she's good
11  with things like IRB, and also she's a phenomenal
12  researcher, so it was someone to assist me in some of
13  the aspects of the paper.
14    Q.    Jumping around a little bit, but in the
15  paper it states that the study was conducted with the
16  approval of the Northwell Health Feinstein Institute
17  for Medical Research.  What does that mean?
18    A.    It means that we submitted an
19  application describing the protocol and it was
20  accepted and reviewed by our institutional review
21  board.
22    Q.    Is it your understanding that the
23  approval would have been required in order for the
24  article to be written?
25    A.    I felt that it was necessary since there

1  are humans involved and it's a publication that has
2  personal health information.  Actually, there's no
3  identifiable personal health information in the
4  paper, but because we were writing a case series, I
5  felt that it was important to ensure that we were
6  abiding by all requirements for the protection of
7  human subjects.
8    Q.    What was the nature of the application
9  that was provided to Northwell Health?
10    A.    They have a list of questions about what
11  the project entails and what kind of data is going to
12  be collected, how the data is going to be stored,
13  things along those lines.
14    Q.    Was there any request or communications
15  from Northwell Health after you submitted your
16  application for approval?
17    A.    Apart from getting the approval?
18    Q.    Apart from getting the approval.
19    A.    I don't know.  I don't recall that they
20  asked for any revisions or clarifications.  I
21  honestly don't recall.  I don't think -- if they did
22  it wasn't substantive.
23    Q.    Would that request have been made to you
24  or one of your co-authors?
25    A.    Ms. Bevilacqua is the one who

1 spearheaded it.  I would have been cc'd as the
2 principal investigator.  I don't think there were
3 significant requests for anything to be changed.
4      Q.    You mentioned a conversation with
5 Dr. Gordon that you had in connection with proceeding
6 with the paper; is that accurate?
7      A.    Yes.
8      Q.    Do you recall when that conversation
9 was?
10      A.    It was probably at some point in 2017,
11 2018.  I don't recall.  Probably early 2018.
12      Q.    Do you recall where the conversation
13 took place?
14      A.    I'm pretty sure it was a phone
15 conversation.
16      Q.    You talked to Dr. Gordon about
17 proceeding with this case series.  What did
18 Dr. Gordon have to say about it?
19      A.    He wanted to collaborate.  He realized
20 he needed a clinician in order to flesh out the case
21 reports since he is not somebody who could describe
22 the clinical courses of the patients.  I've known
23 Dr. Gordon for many, many years and it just was a
24 natural conversation that we had when we realized
25 that we had a common interest in publishing work

1 related to these cases.
2      Q.    What role did Dr. Gordon play in
3 connection with this article?
4      A.    He did all the tissue digestions.
5      Q.    There are six tissue digestions that are
6 identified in the article, correct?
7      A.    Yes.
8      Q.    So beyond the tissue digestions, what
9 work did he do?
10      A.    Described the methodology that he used,
11 also provided information about the control samples
12 that are described in the paper, as well as obviously
13 the results of the tissue digestion.
14      Q.    What role did you play with respect to
15 the drafting of the article?
16      A.    I was the principal author in drafting
17 it.  I provided -- I worked very closely with
18 Ms. Bevilacqua in drafting it, but we talked about
19 what kind of topics to include in the background and
20 then I drafted the case reports, and then in writing
21 up the results and then the discussion, it was a
22 combination of the two of us writing it together.
23      Q.    When you say you drafted the case report
24 descriptions, is that you physically typing on the
25 computer?

1      A.    I might have written it on a piece of
2 paper and then typed what I wrote.  Sometimes I write
3 longhand and sometimes I write directly into the
4 computer.  I don't remember.  I think some were on
5 the computer and some I might have transcribed.
6      Q.    The manuscript was ultimately accepted
7 by the Journal of Occupational and Environmental
8 Medicine, correct?
9      A.    Yes.
10      Q.    Why did you decide to submit the article
11 to that journal?
12      A.    Well, it's a journal in my field, it's a
13 journal that has published articles on cosmetic talc,
14 and it's also a journal that publishes case series.
15      Q.    Did you submit the manuscript to any
16 other journals?
17      A.    No.
18      Q.    Do you know any of the members of the
19 editorial board at that journal?
20      A.    I'm sure I do.  I don't know who's on
21 the board of the journal.  I know the
22 editor-in-chief.
23      Q.    Who's the editor-in-chief?
24      A.    Paul Brandt-Rauf.
25      Q.    How do you know him?

1      A.    I've known him since 1991 when he was at
2 Columbia and I spent time meeting with him.  He might
3 have even taught some classes and then our career
4 paths have overlapped.  I think he might have been a
5 mentor when I did my fellowship on biomarkers.  I
6 know we had specific conversations about cancer
7 biomarkers in 1992, 1993, 1994.
8      Q.    Do you know who reviewed your paper?
9      A.    The peer review process is anonymous or
10 is blinded.  I have no idea.
11      Q.    Just making sure.  Did you make any
12 changes to the article as a result of the peer review
13 process?
14      A.    Yes.
15      Q.    What changes were made?
16      A.    They asked that we -- they felt that
17 some of the background and discussions were
18 duplicative.  They asked for some clarification in
19 certain areas.  I think they wanted some clarity on
20 how the methodology was described for the tissue
21 digestion.  Those are the main things that I
22 remember.
23      Q.    When you say clarification in certain
24 areas to identify the methodology of the tissue
25 digestion, any other areas that you can recall that

Page 38

1 the peer reviewer requested clarification on?
2    A.   I think there were a couple of comments
3 that some sentences were fragments that they wanted
4 us to rewrite. I don't recall all the specific
5 changes that were requested.
6    Q.   Do you still have a record of
7 communications with the journal that you received
8 with respect to the peer review process?
9         MS. LONG: Objection to the form.
10    A.   I might have, I think I do have a copy
11 of the initial review, yes.
12         MR. EWALD: We would just ask at this
13 point in time that you maintain that copy and we will
14 discuss it with counsel.
15    Q.   I believe you said you have a copy of --
16 what did you call it, initial review?
17    A.   There was one review. I have a copy of
18 the actual review.
19    Q.   Were there any other communications with
20 the journal that you and/or your co-authors had with
21 respect to the article?
22         MS. LONG: Objection to form.
23    A.   Only they submitted -- they sent us the
24 proofs for us to make changes subsequent to the
25 online publication. So there was communication at

Page 39

1 that point where we fixed a couple of grammatical
2 errors. The final manuscript when it is published
3 will not be substantively changed, but will not be
4 verbatim.
5    Q.   I can't find it right now, I'm sure I'll
6 find it later. There was a double negative there
7 somewhere; did you see that one?
8    A.   Yes. Yes, we took it out. Aren't you
9 the king and queen of double negatives being lawyers?
10    Q.   We try not to be, but, yes, it ends up
11 coming out pretty awkward.
12         Before the journal accepted the article
13 for publication, did you have any communications with
14 any individuals about the article outside of the
15 group of authors and the journal?
16         MS. LONG: Objection to form.
17    A.   I called Dr. Brandt-Rauf when we were
18 envisioning writing the article to see if it would be
19 something that the journal would be interested in
20 publishing and he encouraged me to submit it. That's
21 something often you'll do, just say is this
22 appropriate because not all journals publish case
23 series. I have not had conversations with any other
24 individuals related to the paper except for my
25 colleagues in my department, but it would have been

Page 40

1 in passing.
2    Q.   What did you tell Dr. Brandt-Rauf about
3 the paper when you had that initial conversation with
4 him?
5    A.   I asked if they would be interested in
6 publishing a case series and I explained why I
7 thought it was a value to the readers of the journal
8 and that was basically it. He said send it on in.
9    Q.   Do you remember approximately when this
10 conversation occurred?
11    A.   It was at some point in 2018, but I
12 don't recall when it was.
13    Q.   Do you recall approximately when the
14 paper was actually submitted to the journal?
15    A.   It was late summer.
16    Q.   Of 2019?
17    A.   '19. I had a little hiccup in 2018 that
18 delayed me.
19    Q.   I recall. I take it from your testimony
20 that before the article was accepted for publication
21 by the Journal of Occupational and Environmental
22 Medicine that you did not communicate with any
23 lawyers with respect to the article?
24    A.   I did not. I did not include it in any
25 conversations and they were not even aware it had

Page 41

1 been submitted.
2    Q.   I also take it from your testimony that
3 the same answer with respect to any other individuals
4 that serve as experts in asbestos and talc
5 litigation, that you did not submit to them or have
6 it submitted to them before the journal accepted the
7 article for publication?
8         MS. LONG: Objection to form.
9    A.   I did not send drafts of the article to
10 anyone for their opinion or review at all. I did not
11 have any conversations specific to the article.
12    Q.   I just want to make sure those are two
13 separate things, right, there's the submitting of the
14 draft of the article and then there's having
15 conversations about the article, two separate things,
16 right?
17    A.   Right, no one saw this article before it
18 was submitted. In a passing conversation I might
19 have said I'm about to submit something, but I don't
20 remember even who it was, but it was not somebody
21 that I have seen on a witness list where I have
22 testified.
23    Q.   You talked about a little bit early
24 passing conversations with your colleagues; is that
25 now what you're referring to as well?

11 (Pages 38 - 41)

Page 42

1        MS. LONG:  Objection to form.
2        A.    People in my department know what
3    everyone is working on because we discuss those kinds
4    of things in faculty meetings, so that was what I was
5    discussing with respect to my colleagues.
6        Q.    What sort of things would you discuss at
7    a faculty meeting before the article was accepted for
8    publication?
9        MS. LONG:  Objection to form.
10       A.    That it was being submitted.  We keep
11   people up to date on what kind of activities people
12   are doing including what manuscripts are being
13   written about what.
14       Q.    On the funding it states, on the copy I
15   have, "no funds or external assistance were obtained
16   by any outside source in the development, writing,
17   analysis, conclusions of this manuscript."
18       Did I read that correctly?
19       A.    You did.
20       Q.    Were there any changes that were made to
21   the funding disclosure?
22       A.    No.
23       Q.    What are you trying to convey with that
24   sentence?
25       MS. LONG:  Objection to form.

Page 43

1        A.    That I was not paid to write this
2    article on behalf of plaintiff lawyers or defense
3    lawyers.  I received no assistance from any outside
4    source to help me write it.  I didn't have a company
5    author write it or a contractor write any part of
6    this article.  The analysis and conclusions are
7    solely based on the authors', me included,
8    interpretation of the results.
9        Q.    In this context when you say analysis,
10   what are you referring to?
11       A.    Looking at the data and synthesizing it
12   all into an article.
13       Q.    You had previously analyzed all 33 cases
14   in your capacity as an expert witness in litigation
15   before writing the manuscript, correct?
16       A.    They were all done separately and prior
17   to writing the manuscript, correct.
18       Q.    And you were compensated at your hourly
19   rate by plaintiffs' attorneys for your analysis in
20   those 33 cases, correct?
21       A.    For review of those, yes.
22       Q.    Do you have a sense of how many hours it
23   took you personally in working on this article?
24       A.    I can't even begin to imagine.  It was
25   done at various points and sometimes I worked on it a

Page 44

1    few hours, sometimes I worked on it for a shorter
2    period of time.  I honestly cannot give you an
3    estimate.  I didn't need to count my hours.
4        Q.    It must be nice.
5        A.    Academic freedom is a beautiful thing.
6        Q.    Can you tell me whether it's, for
7    example, less than 50 hours?
8        A.    I can't even venture a guess.  I don't
9    know how long it took.
10       Q.    The abstract, the objective is
11   identified in the copy I have as to describe
12   exposures to talcum powder leading to mesothelioma
13   among 33 individuals as a non-occupational asbestos
14   exposure.  Did I read that correctly?
15       A.    Yes.
16       Q.    You and your authors, co-authors use the
17   phrase leading to mesothelioma.
18       What do you mean by that?
19       A.    It's just a semantic way.  They had
20   exposure to talcum powder, they developed
21   mesothelioma.  I wasn't leading anybody, like leading
22   a witness.  It wasn't used in that context.
23       You have to also understand that the
24   rules of this journal are 150 words, so it's
25   truncated in terms of what can be put in the abstract

Page 45

1    and there are guidelines as to what could be in, not
2    article specific, there has to be a particular
3    format.
4        Q.    Who did the drafting of this abstract?
5        A.    Ms. Bevilacqua and I did it together.
6        Q.    You ultimately signed off on the content
7    of the abstract, correct?
8        A.    Yes.
9        Q.    Doctor, under the results of the
10   abstract the second sentence states, "talcum powder
11   usage was the only source of asbestos for all
12   33 cases."  Did I read that correctly?
13       A.    Yes.
14       Q.    To your knowledge, is that going to
15   remain unchanged in the version that's been
16   published?
17       A.    Yes.
18       Q.    What do you mean by that sentence?
19       A.    That in the 33 cases that were presented
20   in the article, that I was able to discern no other
21   exposure to asbestos.
22       For example, I would not have included
23   Ms. Wiman in this particular article.  She's a
24   perfect case of somebody who would not have been
25   included because she has not just exposure from

12 (Pages 42 - 45)

Page 46

1 cosmetic talc, but also take-home exposure from her
2 husband. So that was the differentiation. This case
3 actually allows us to give you a stark example of
4 what I meant.
5     Q.   Can you describe what the parameters you
6 used in choosing the individual cases for this
7 series?
8         MS. LONG: Objection to form.
9     A.   Only in a general sense in that I went
10 through various cases and looked to see if there was
11 alternate exposures or additional exposures in
12 addition. For example, a spouse or they were
13 involved in home renovations or something along the
14 like and excluded those cases from the 33 I wrote
15 about.
16    Q.   Were there any other general parameters
17 that you used in choosing the 33 that you write about
18 in the paper?
19    A.   It was the cases that I had to choose
20 from testimony that we were writing the paper.
21 Certainly there have been other cases since the paper
22 was started that I did not include, but it was just
23 going through them sequentially basically.
24    Q.   Is it your understanding, Dr. Moline,
25 that Dr. Gordon was compensated for the tissue

Page 47

1 digestion work that he did as an expert witness in
2 talc litigation for the six cases that are identified
3 here?
4         MS. LONG: Objection to form.
5     A.   I have had no conversations with
6 Dr. Gordon regarding that.
7     Q.   But do you have an understanding that
8 the six tissue digestions of his that are discussed
9 in this paper were done in the context as an expert
10 witness in asbestos litigation?
11        MS. LONG: Objection to form.
12    A.   Yes, that was the initial manner by
13 which he was asked to do the tissue digestion. I
14 think we were pretty explicit in the article about
15 the providence of these cases.
16    Q.   So there was six tissue digestions by
17 Dr. Gordon that are discussed in the paper, correct?
18    A.   Correct.
19    Q.   Did Dr. Gordon conduct any tissue
20 analysis of which you are aware in connection with
21 the other 27 cases discussed?
22    A.   I have not discussed that with him. We
23 decided to limit the number of cases to six. It
24 becomes overwhelming for a reader to read multiple
25 cases that are all very similar. I actually never

Page 48

1 had a discussion with him if he had ever done tissue
2 digestion on the other 27. We decided to write up
3 six cases and then describe other cases.
4     Q.   How did you choose the six cases?
5     A.   Again, it was six cases that Dr. Gordon
6 had, that he had done, and I had also reviewed those
7 cases and we realized in looking at those cases that
8 there had been no additional or no other sources of
9 asbestos apart from the cosmetic talc, so it was
10 looking at a list of these six cases and reviewing to
11 ensure there was no additional exposure.
12    Q.   Who selected the six cases?
13    A.   Dr. Gordon. It was Dr. Gordon did the
14 tissue digestion was the starting point, so it was
15 these six cases that had no additional exposures.
16    Q.   So Dr. Gordon identified these six cases
17 as ones where he did tissue digestions and you said
18 basically yes, we'll focus on these six cases?
19        MS. LONG: Objection to form.
20    A.   Yes, I believe he had given me a list of
21 eight or nine cases, but there were some that had
22 questionable additional exposures so we did not
23 include them. I don't remember the list.
24    Q.   The ones that were not included, are you
25 saying they weren't included amongst the six or they

Page 49

1 weren't included amongst the 33 overall?
2     A.   They weren't included in either.
3     Q.   But you did not tell Dr. Gordon that you
4 wanted to focus on one of the other 33 cases that are
5 listed in the article?
6         MS. LONG: Objection to form.
7     A.   Do you mean one of the other 27?
8     Q.   Yes.
9     A.   I did not. It was the cases he had
10 done, the cases I also reviewed. I did not discuss
11 the others.
12    Q.   Was it Dr. Gordon that thought that six
13 was the right number to focus on?
14    A.   No, it was my choice to limit it to six.
15    Q.   You testified that there were a couple
16 cases that you excluded because of potential
17 alternative exposures, right?
18    A.   Yes, at least one. There was one. I
19 don't know if there were additional.
20    Q.   Of the 33 that ended up being discussed
21 in your article, are there any that Dr. Gordon
22 presented to you as being one of the six that you
23 said no, we should not use that as one of the six?
24        MS. LONG: Objection to form.
25    A.   No, the only cases that I'm aware of

13 (Pages 46 - 49)

1 that Dr. Gordon had any involvement with is the six.
2 It is possible that he did a tissue digestion on the
3 others, but if he did, I did not focus on that
4 because I decided that we were going to stop at six.
5      Q.   Do you have let's call it a key that
6 matches up with each of the 33 case studies with the
7 litigation plaintiff's name?
8          MS. LONG:  Objection to form.
9      A.   Are you asking if I identified the
10 listing of the cases?
11     Q.   Yes.
12     A.   There is an identified case listing.
13 You will not get it.
14     Q.   Why is that?
15     A.   Because it's protected under IRB and
16 HIPAA and it's protected health information.
17     Q.   What is the basis of your understanding
18 for that?
19     A.   That this is a research endeavor and we
20 did not solicit consent with the understanding that
21 they would be anonymous and not identified by name in
22 the article or other identifying features apart from
23 age of diagnosis and occupation or other things along
24 those lines.
25     Q.   Why did you choose 33 as a number?

1      A.   Because I'm a history of science major.
2      Q.   You reference the Wagner paper; is that
3 the reason you chose 33?
4      A.   I thought it was a beautifully
5 symmetrical way to describe a -- since Dr. Wagner in
6 1960 made the connection or the widely accepted
7 connection between mesothelioma and asbestos based on
8 a case series of 33 individuals that has been widely
9 accepted in the medical literature, I thought it was
10 only fitting to use that same number in an article
11 almost 60 years later that's describing an exposure
12 that heretofore had not been comprehensively
13 described in the medical literature.  It's of a
14 historical reference.  I could have picked another
15 number, but I like the historical implications.
16     Q.   At the time that you were selecting
17 which cases to use in your case series, how many
18 cases did you have available to select from?
19     A.   More than 33.  I don't remember the
20 exact number.  I have not counted the exact number of
21 cases I've reviewed, so I can't give you an actual
22 number.
23     Q.   Do you have a sense of how many cases
24 you excluded from the series on the basis that they
25 were essential asbestos exposures separate and apart

1 from the talc usage?
2      A.   I don't recall the exact number.  It was
3 something initially going through the various cases
4 that I reviewed, which is many more than 33 over the
5 past years.  Honestly, I can't give you an exact
6 number.  I can't say it was 50 percent.  I can't say
7 25 percent.  I don't know because I wasn't cataloging
8 my exclusions.
9      Q.   For those cases where you did not
10 identify a potential other source of asbestos from
11 the cosmetic talc, what criteria did you use to
12 choose your 33?
13     A.   I'm sorry.  I lost you.
14     Q.   You talked about excluding some from the
15 case series where you identified a potential asbestos
16 exposure.
17     A.   Ms. Wiman, for example.
18     Q.   Without would not have been available to
19 you I don't think at the time you were drafting the
20 article, fair?
21         MS. LONG:  Right.  It should be clear
22 that you're using Wiman as an example of the type.
23     A.   She was not considered, nor excluded,
24 but because we're here, hopefully going to get back
25 to the case at some point in my life, she's a prime

1 example of someone who would not have been included
2 because she had a second exposure or potentially
3 others.  So that was the same type of analysis that I
4 went through; if in the course of either my interview
5 or the deposition transcripts or other information
6 available there was identification of an alternate
7 exposure, then they would have been excluded.
8      Q.   So my poorly worded question earlier,
9 this isn't much better, my question then is, of the
10 cases available to you at the time you were selecting
11 your 33 that did not in your estimation have a other
12 potential source of asbestos exposure, what criteria
13 did you use to use amongst those for your 33?
14     A.   It was basically sequential.  I went
15 through the various reports that I've written or
16 cases that I've reviewed and began compiling those
17 that are cosmetic talc.  It wasn't like I said
18 73 percent women and 27 percent men.  I didn't have
19 exclusion criteria along those lines apart from
20 having an additional exposure to asbestos or
21 potential asbestos exposure.
22     Q.   If I'm hearing you correctly, once you
23 got to 33 as you're going down the list where there
24 wasn't, in your estimation, other potential source of
25 asbestos exposure you stopped?

1    A.    Yes.  I could have continued, but I
2  wanted my 33 number.  If I were to write the paper
3  and include all of them, the number would be much
4  higher.
5    Q.    Do you have an estimate of how much
6  higher it would be?
7    A.    I don't know.  I haven't looked.  There
8  certainly are cases I've reviewed since then where
9  their sole exposure to asbestos has been to cosmetic
10  talc that are not included or were not considered in
11  the manuscript, but I can't give you a number.
12    Q.    I believe I know the answer to this
13  question based on your answer to the previous
14  question, but I'll ask it anyway.
15        In selecting the cases for your case
16  series, did it matter to you the type of mesothelioma
17  that the individual had been diagnosed with?
18    A.    Define type.
19    Q.    I will be very general with respect to
20  peritoneal, pericardial or pleural.
21    A.    You mean location of tumor?
22    Q.    Sure.
23    A.    That is the anatomically correct
24  question rather than type because type could mean --
25  do you mean biphasic?  Do you mean sarcomatoid?  Do

1  you mean epithelioid?
2    Q.    Sure.
3    A.    I did not pay attention or I did not
4  differentiate based on anatomical location or first
5  presentation of tumor.
6    Q.    If we are using your definition of type,
7  I take it you did not differentiate based on the type
8  of mesothelioma?
9    A.    I did not differentiate based on
10  pathological classification either.
11    Q.    You did not differentiate in choosing
12  your 33 cases as between whether or not the
13  individual was a male or female?
14    A.    No.
15    Q.    When you submitted the manuscript for
16  publication, did it have 33 cases?
17    A.    Yes.
18    Q.    Was there any peer review process,
19  comments about the number of cases that you had
20  chosen?
21    A.    No.
22    Q.    Is it accurate that you did not
23  encounter any of the 33 individuals referenced in the
24  article in the course of your clinical practice?
25    A.    Are you asking me if any of them came to

1  me on their own as opposed to being referred in by a
2  lawyer?  Is that what you're asking me?
3    Q.    Yes.
4    A.    No one came to me directly.
5    Q.    All of these came to you via lawyers in
6  connection with litigation?
7    A.    Correct.
8    Q.    When you say in the Background section,
9  "for all 33 cases, other potential exposures to
10  asbestos were considered, with no identified source
11  apart from the talcum powder."
12        Did I read that correctly?
13    A.    Yes.
14    Q.    What information did you consider in
15  determining whether or not there were other potential
16  exposures to asbestos?
17    A.    I think it's described later in the
18  manuscript and I think we've talked about it already.
19  It was whether they had any household exposure, they
20  worked in an occupation where there was asbestos
21  exposure apart from the use of cosmetic talc.
22        For example, there are three
23  hairdressers, so they had occupational exposure to
24  cosmetic talc, but it was all cosmetic talc, they
25  didn't have take-home exposure from living with

1  somebody who worked in an asbestos profession, they
2  were not living in an home or participating in home
3  renovations, they had no identifiable source of
4  asbestos exposure.
5    Q.    I understand it may be different, the
6  specifics may be different as to each individual of
7  the 33.  I'm trying to get a sense of your process
8  overall, so I'll start general.
9        In reviewing materials for other
10  potential asbestos exposures, did you or your
11  co-authors do any new investigation for any of the
12  cases that had not already been done in litigation?
13    A.    No.
14    Q.    In reviewing other potential asbestos
15  exposures, did you review any data other than that
16  which you reviewed at the time of your deposition in
17  that particular case?
18    A.    I have no idea how to answer that
19  question.  I don't know what you're asking me.  If
20  you're asking me if I was deposed in case A, I would
21  have been asked what I reviewed at that deposition.
22  Maybe I was provided something subsequent which would
23  have been in a supplemental report if there was one,
24  but I don't recall any specifically with these
25  33 cases.

Page 58

1    Q.    It's not a trick question.
2    A.    No, I understand.  I don't really know
3  what you're asking me.  I hadn't been provided with
4  any other information that I recall apart from the
5  information that had initially been provided that I
6  used in generating my reports.
7    Q.    Let's take not a hypothetical case,
8  let's just take one of the cases, typically in one of
9  your talc cases you will receive materials from
10  counsel as you prepare your opinions in that case,
11  correct?
12    A.    Correct.
13    Q.    That could include medical records,
14  correct?
15    A.    Yes.
16    Q.    It can include expert reports both from
17  the plaintiffs' side and from the defense side,
18  correct?
19    A.    Occasionally, not always.  I rarely get
20  defense reports.
21    Q.    It can include the plaintiff's
22  depositions?
23    A.    It always includes the plaintiff
24  depositions if they're alive.
25    Q.    And any family member that may be

Page 59

1  talking about exposure information, correct?
2    A.    Or other individuals that may have
3  information like a very close friend.
4    Q.    Or a co-workers, for example, correct?
5    A.    In general, yes.
6    Q.    In some jurisdictions you will issue a
7  written report, correct?
8    A.    Correct.
9    Q.    And then you are usually deposed,
10  correct?
11    A.    In some jurisdictions thankfully I'm
12  not.  So I would not be deposed in certain
13  jurisdictions, other jurisdictions, unfortunately,
14  I'm deposed, which makes you happy because you get to
15  sit in this airless room.
16    Q.    This does not make me happy.
17    A.    With a lovely court reporter who is
18  among the best.
19    Q.    Is it fair that some of these 33 cases
20  ultimately went to trial?
21    A.    Do not know, will not comment.
22    Q.    Well, are you saying that --
23    A.    I will not comment on any specific case
24  included in the paper.
25    Q.    I'm not asking about a specific case.

Page 60

1  Let me finish my question before you say you won't
2  comment.
3    A.    Okay.
4    Q.    Thank you.  Hypothetically if one of the
5  33 cases went to trial, I'm not saying they did or
6  they didn't, would you have reviewed your trial
7  testimony in that case?
8        MS. LONG:  Objection to form.
9    A.    In general I never look at my trial
10  testimony once I've uttered the words unless I'm
11  asked a question about it in a subsequent trial where
12  I'm impeached on my prior trial testimony.  I did not
13  include any of my personal testimony in consideration
14  for any cases in this.
15    Q.    In reviewing potential other exposures
16  apart from cosmetic talc to asbestos, would you have
17  reviewed testimony at trial of other witnesses if it
18  existed?
19        MS. LONG:  Objection form.
20    A.    I would not have reviewed other
21  testimony at trial.  I don't believe I'm allowed to
22  do that, certainly not before I testify.
23    Q.    I'm talking about, and it does depend on
24  the jurisdiction, but I'm talking about in connection
25  with this report, with this article.

Page 61

1    A.    With respect to this article I did not
2  look at any trial testimony, it was only based on the
3  initial information provided to me in order to keep
4  it as uniform as possible.
5    Q.    To the extent that you had given a
6  deposition or depositions in connection with one of
7  the 33 cases, would you have reviewed that as you
8  were assessing for this article whether that
9  particular case had other potential sources of
10  asbestos exposure?
11    A.    I did not review any of the transcripts
12  of my personal depositions in the generation of this
13  article.
14    Q.    If we go to Case Histories under
15  Materials and Methods, it talks about there in the
16  middle of that first paragraph, "exposure data was
17  obtained from sworn testimony by the cases, which
18  included extensive questioning regarding all sources
19  of asbestos exposure."  Did I read that correctly?
20    A.    Yes.
21    Q.    In connection with this article, did you
22  review any exposure data apart from sworn testimony
23  of the individual and the family member?
24    A.    Only if it had been provided to me, but
25  in all likelihood it would have included alternate

Page 62

1  exposures that would not have led to them being
2  included in this particular manuscript.
3      But if it had been present, for example,
4  if I had been provided with evidence that an
5  individual had asbestos exposure from sampling done
6  in their home that showed that there was asbestos
7  from construction materials and they described home
8  renovations, then that would have been considered and
9  I would have included that individual.
10     Q.   I do apologize, but in there did you
11 talk about it coming out in testimony?  One of the
12 questions I have of you is, did you review in
13 connection with this article and these 33 patients
14 anything apart from the testimony that's identified
15 here and medical records?
16     MS. LONG:  Objection, asked and
17 answered.
18     A.   Again, what I reviewed is included.  If
19 there was additional information provided then I
20 would have reviewed it.  Again, chances are if there
21 was additional information provided, they would not
22 be included in the paper because that would have
23 prevented them from not having any other source of
24 exposure.  For the cases included in this paper, they
25 would not have had an alternative exposure for which

Page 63

1  exposure data was presented.
2      Q.   If in evaluating potential asbestos
3  exposures in giving your opinions in a particular
4  case you did not identify a potential source of
5  asbestos exposure until you were asked about it at
6  your deposition, would that have been reviewed in
7  connection with this article?
8      MS. LONG:  Objection to form.
9      A.   It depends on the timing of when the
10 deposition might have been.  If I was asked about a
11 exposure, the question is, was it a real exposure or
12 was it a hypothetical exposure that might not have
13 had any basis in provable fact that I am often
14 confronted with in depositions.
15     So if I had any question whether there
16 was exposure to an alternate source at the time I was
17 writing this paper, I would have excluded them.  I
18 don't recall that that occurred in any of these
19 33 cases, but if it did, on further consideration I
20 would have substituted in another individual for whom
21 there was no additional exposure.
22     I honestly don't recall that happening,
23 but that's what I would have done.  My scientific
24 reputation is on the line.  This is to the best of my
25 understanding, the cases had no alternative exposure.

Page 64

1  That was based in fact, not on hypothesis or
2  conjecture.
3      Q.   I appreciate all that, but how would you
4  have been able to assess whether those other
5  potential exposures were, as you say, hypothetical or
6  legitimate if it was raised for the first time at
7  your deposition and you didn't review your deposition
8  transcript in connection with the writing of this
9  article?
10     MS. LONG:  Objection to form.
11     A.   Again, I don't recall that this happened
12 with respect to any of these cases and I don't recall
13 that I was presented with hard evidence of exposure.
14     I've been presented with some really
15 creative potential exposures just because someone
16 lived in an area with no air sampling, with no proof
17 that what was claimed actually transpired in
18 manufacturing plants and that was claimed as an
19 alternate exposure that had no basis in fact and I
20 would not have included because there was no
21 information. I'm just speaking hypothetically.  We
22 were limited to the data we had in hand with respect
23 to what was described.
24     Q.   Is it your testimony that as you sit
25 here today you can't recall a single time in cosmetic

Page 65

1  talc litigation where you found out for the first
2  time at your deposition of a legitimate potential
3  asbestos exposure?
4      A.   Legitimate?
5      Q.   Legitimate.
6      A.   Meaning there was air testing, air
7  sampling, air monitoring, there was proof that the
8  individual was there?  I don't recall a specific
9  instance where I have seen specific I was in a plant,
10 my spouse was in a plant that I didn't know used
11 asbestos and they brought it home to me that was
12 real.
13     I have been provided with various
14 exposure scenarios based on someone living in a
15 community where -- that they live in a city that has
16 buildings and being asked if that was a risk factor
17 without any evidence that the individual had specific
18 exposure to asbestos and I'm supposed to assume just
19 because a person lived in a city that that provided
20 them with exposure to asbestos above what the
21 background might be.  I don't recall if I've been
22 provided with credible information.
23     To circle back to your full question so
24 you won't say I'm not responsive, I don't recall
25 specifically.  I've been in too many depositions

17 (Pages 62 - 65)

1 clearly. I don't recall specifically and certainly
2 not for these 33 cases where I've been provided with
3 credible, measurable asbestos exposure in a
4 deposition.
5    Q.   In your article under that same
6 paragraph you talk about in the context of sources of
7 asbestos exposure residents --
8    A.   What page are you on?
9    Q.   It's under Materials and Methods under
10 Case Histories.
11    A.   There are page numbers at the bottom.
12    Q.   I have an un-paginated copy because I
13 got it hot off the presses.
14    A.   Page six.
15    Q.   Page six. On page six under Case
16 Histories it talks about potential sources of
17 asbestos exposure, "residence in an area that might
18 have had asbestos industry leading to possible
19 environmental exposures." Did I read that correctly?
20    A.   Yes.
21    Q.   Is it your testimony that you would only
22 consider such exposures if there was what data
23 available?
24       MS. LONG: Objection to form.
25    A.   If there's actual data available. I've

1 had individuals, not included in this paper, who
2 describe asbestos on their front lawn or on their car
3 from a plant that was in their community. That would
4 be sufficient for me to say that the asbestos
5 industry led to a potential exposure to asbestos.
6    Q.   A little bit further up it says, "all
7 cases were reviewed by an occupational physician with
8 experience evaluating exposure in thousands of
9 patients"; is that you?
10    A.   Yes.
11    Q.   Skipping around a little bit, but just
12 trying to stay on topic, on page 31, let me know when
13 you're there.
14    A.   Yes.
15    Q.   I'm looking at the asterisk under the
16 table that reads, "tissue analysis presented done by
17 author. Tissue analysis might have been done in some
18 cases by other investigator, these results are not
19 presented in this paper." Did I read that correctly?
20    A.   Yes.
21    Q.   The author, just for the record, that's
22 Dr. Gordon, correct?
23    A.   Correct.
24    Q.   It talks about tissue analysis might
25 have been done in some cases by other investigator,

1 these results are not presented in this paper.
2    Q.   Why did you not, as part of your review
3 of these 33 cases and potential sources of asbestos
4 exposure, review any other tissue analysis that might
5 have been done in a particular case by an
6 investigator other than Dr. Gordon?
7    A.   Because we felt it important to have the
8 same lab do all the analysis of the cases that we
9 presented in detail and other labs might have used
10 different tissue methodology or analysis, and for
11 consistency sake we chose the six cases, but there
12 might have been others, I don't recall, and I
13 certainly don't know who, if any, but it's possible
14 that there were tissue digestion done on some of the
15 other cases.
16    Q.   As you sit here today, do you know
17 whether any of the 33 had tissue digestion done by
18 someone other than Dr. Gordon?
19    A.   I can't answer that question with any
20 degree of certainty. It's possible, but we wanted to
21 make sure that we said that it's possible that there
22 might have been tissue analysis, I just was not
23 presenting a detail case report with any of that
24 information.
25    Q.   One of the points that you emphasize in

1 the discussion is that amosite and crocidolite were
2 not found in any of these cases; is that accurate?
3    A.   In the six cases, yes.
4    Q.   The six cases. To the extent that there
5 was amosite or crocidolite found by an investigator
6 in tissue digestion other than Dr. Gordon, you would
7 not have reviewed that in connection with this
8 article, correct?
9    A.   Correct.
10    Q.   You talk about how your reputation as a
11 scientist is on the line with this paper, right? You
12 made that reference earlier.
13    A.   Any time someone publishes you are
14 basing it to the best of your ability, which is why
15 we put paragraphs about limitations of a paper in
16 there because there are opportunities for us to
17 get -- there's always opportunities in any paper,
18 there's always limitations. I would not knowingly
19 put out anything that was not to the best of my
20 knowledge correct.
21    Q.   In that vein, if in one of these
22 33 cases there was a tissue digestion done by
23 multiple analysts that identified crocidolite, as a
24 scientist writing this paper why would you ignore
25 that?

1          MS. LONG:  Objection to form.
2      A.    That's assuming I had it available prior
3  to writing up the cases and, again, I'm using
4  Dr. Gordon's analysis.
5      Q.    When you say available to you, you
6  certainly have access to other defendant expert
7  reports or plaintiff expert reports in connection
8  with the cases in which you're testifying, correct?
9      A.    At certain points during the litigation
10  possibly.
11      Q.    Certainly if in connection with the
12  Wiman case you want to look at a defense expert
13  report submitted in the case, you're confident, I
14  take it, that you can ask plaintiff's counsel and she
15  would give it to you, right?
16      A.    I'm sure she would.
17      Q.    So in trying to reach your scientific
18  conclusions, why, as a scientist, did you not look at
19  data that bore directly on the questions presented by
20  your article?
21          MS. LONG:  Objection to form.
22      A.    Again, if you're speaking about a tissue
23  digestion then that would have been under
24  Dr. Gordon's realm and I would have expected that he
25  would have looked at whatever data were available

1  with respect to tissue digestion.  I don't recall the
2  specific -- I don't know what case you're speaking
3  about.
4      Q.    I can show you.
5      A.    Well, I'm not going to discuss whether
6  that person is included in the paper or not.
7      Q.    Okay.
8      A.    But was that something that Dr. Gordon
9  found and that would be a question you can ask
10  Dr. Gordon, why might somebody have found something
11  that he didn't, but we were basing it on the initial
12  tissue digestion or the only tissue digestions that
13  we were aware of at the time that these cases were
14  written up, which was in 2018.
15      Q.    Talk more about your process of
16  evaluating the potential other asbestos sources.  If
17  it was a jurisdiction in which you had authored a
18  written report, would you have reviewed that in
19  connection with this paper?
20      A.    Yes.
21      Q.    In those cases where you had authored a
22  written report, what else would you have reviewed?
23      A.    The materials leading up to the
24  generation of that report.
25      Q.    If you authored a supplemental report in

1  a particular case that was one of these 33, would you
2  also have reviewed that and any materials cited in
3  that report?
4      A.    If they existed; I don't recall that
5  they did.
6      Q.    I'm not saying that there is one.
7      A.    I don't think there was.  It's certainly
8  not in the generation of the 33.
9      Q.    As you noted, there are some cases in
10  which you don't or didn't provide a written report,
11  how in preparing this article would you have
12  identified the materials to review?
13      A.    I think there was only one case that I
14  had not provided a report in and the other one would
15  have been going through notes.
16      Q.    So the one where you didn't provide a
17  report, you would have gone through notes similar to
18  what you have done for Ms. Wiman in this case?
19      A.    Correct.
20      Q.    For the other 32, in assessing potential
21  alternative asbestos exposures you would have
22  reviewed your report and anything referenced in that
23  report, correct?
24      A.    Correct.
25      Q.    Would you have reviewed anything else?

1      A.    Whatever materials were referenced in
2  the report is what I have reviewed.
3      Q.    That was part of my question.  Apart
4  from the report and any materials referenced in the
5  report, would you have reviewed anything else with
6  respect to those 32 cases?
7      A.    Not that I can think of.  Certainly not
8  at the time that we wrote the manuscript.
9      Q.    So if there was an alternative source of
10  exposure that was raised with you after you issued
11  your report in those 32 cases, whether it be a
12  deposition or a trial or otherwise, you would not
13  have considered that in connection with this article,
14  correct?
15          MS. LONG:  Objection to form.
16      A.    The cases were written when the cases
17  were written.  They were written fairly early on.  I
18  did not go back and revise it based on any further
19  activities that might have transpired in a deposition
20  or in a trial.  I will not comment on any further
21  cases that might or might not be included in the
22  paper.
23      Q.    I understand that maybe you find out --
24  you write the case report description and then you
25  find out some new stuff afterwards, but what I'm

Page 74

1  talking about is a situation in which you are deposed
2  in a particular case, an alternative exposure to
3  asbestos is identified to you for the first time in
4  that deposition, if that deposition occurred before
5  you started writing this article, you would not have
6  considered the alternative exposure in this article,
7  correct?
8        MS. LONG: I'm going to object to the
9  form. I just want to make sure we're speaking now in
10  hypothetical terms because the more that you lay out
11  specific situations and represent that maybe that's
12  the way things went, I think by asking Dr. Moline to
13  comment on them, then it becomes difficult for her to
14  maintain the anonymity of the subject.
15       Again, just to make sure that's in a --
16  if that were to happen and if hypothetically this was
17  the situation I think, Dr. Moline, you can answer to
18  the extent you understand the question.
19       A.   The cases were written up at the
20  beginning of the first thing that we did, which was
21  to pick six cases for which there is a longer case --
22  were done -- that was done -- that was the easy part
23  for me because I'm writing up a clinical case, and
24  that was done at the beginning of when we embarked on
25  this endeavor, and they were not revised based on any

Page 75

1  additional information apart from what was done to
2  make it consistent with all of the articles.
3        When are we going to stop because we've
4  been going for an hour and a half?
5        MS. LONG: Do you want to do a lunch
6  break now?
7        MR. EWALD: Sure.
8        (A recess was taken.)
9        (Time noted: 12:40 p.m.)
10  *****************************************************
11     A F T E R N O O N   S E S S I O N
12  *****************************************************
13       (Time noted: 1:15 p.m.)
14  CONTINUED EXAMINATION
15  BY MR. EWALD:
16       Q.   Doctor, do you agree that the only
17  potential asbestos exposures you considered in
18  connection with your article are those referenced in
19  your expert reports or your case notes for each
20  individual case?
21       A.   Yes.
22       Q.   At some point in our back and forth, in
23  our discussion before lunch, at some point in time
24  you were talking about whether or not the potential
25  asbestos exposures were exposures above background.

Page 76

1  Do you recall talking about that?
2        A.   I think I was talking about it in your
3  hypothetical, what might be presented to me in a
4  deposition based not on fact but on conjecture with
5  no information that the exposures were above
6  background, correct.
7        Q.   My question is, in the article it talks
8  about just whether or not there were other potential
9  asbestos exposures and doesn't mention whether or not
10  they are above background, correct?
11       A.   I don't use that terminology in the
12  paper.
13       Q.   Okay. So my question then is, in
14  assessing whether there were other potential asbestos
15  exposures, did you look for any potential alternative
16  asbestos exposures or only ones you determined would
17  be above background?
18       MS. LONG: Objection to form.
19       A.   I looked at the information that was
20  provided to me based on the questioning which was
21  more extensive than one would typically get from a
22  standard questionnaire in general from these cases.
23       So I took any exposures that were
24  assessed whether it be eight brake changes that they
25  accompanied their spouse with. I would have not

Page 77

1  tried to quantify that exposure, but I would have
2  excluded that individual from the report because
3  there was a potential exposure.
4        Q.   If I'm hearing you correctly, if during
5  your review of the materials you reviewed in
6  connection with this article, if you identified a
7  potential source of asbestos exposure that one of the
8  33 patients suffered -- one of the patients was
9  exposed to, that you would have removed that patient
10  from the case series regardless of whether or not
11  that exposure to asbestos was above background?
12       A.   I wasn't assessing in my analysis if
13  there was any suggestion that someone had an
14  additional exposure based on their deposition
15  transcripts or other information provided to me, I
16  did not include them in the 33 based on the
17  information I had at the time I wrote the paper.
18       Q.   You talked about how every scientific
19  article has limitations, right?
20       A.   Yes.
21       Q.   In your paper, specifically on page 21
22  and 22, you discuss the limitations in which the case
23  series should be understood, correct?
24       A.   Correct.
25       Q.   In that discussion of the paper's

20 (Pages 74 - 77)

Page 78

1 limitations, you do not discuss as one limitation the
2 possibility of other tissue digestions for the 33
3 patients that were not considered in this article,
4 correct?
5      A.   I did not specifically mention that in
6 the limitations, that is correct.
7      Q.   I'm almost certain I know how you're
8 going to answer, but I'm just going to make my record
9 and then we can move along and deal with it later.
10           It's my intent, if counsel permits it on
11 plaintiffs and if Dr. Moline answers, to show
12 Dr. Moline expert reports that she has previously
13 authored and use those expert reports to match up the
14 identities of some or all of the 33 cases that are
15 identified in the article.
16           My question to I guess you is, if I
17 proceed with that, will you answer my questions?
18      A.   I will not.
19           MR. EWALD:  Counsel, do you I guess --
20           MS. LONG:  Am I following the witness'
21 advice?
22           MR. EWALD:  Yes.
23           MS. LONG:  Yes.  Dr. Moline has a right
24 not to testify about information protected by HIPAA
25 and by restrictions put in place by her internal

Page 79

1 review board, and certainly she's made her position
2 clear on where she feels comfortable testifying about
3 the article and where she doesn't.
4           I agree that matching up the reports to
5 specific people in the article would go further than
6 she feels is correct under the privileges and
7 protections that she cited, so I'm not going to
8 instruct her to answer contrary to her ethics and
9 guidelines on that.
10           MR. EWALD:  I appreciate that, Counsel.
11 Just for the record I will note that we disagree with
12 that position and that we will take it up later, but
13 certainly reserve our rights to ask those questions
14 if the Court permits or we otherwise reach some other
15 agreement.  Thank you both for that.
16      Q.   As part of your clinical practice you
17 ordinarily take an extensive exposure history when
18 dealing with a patient that has mesothelioma,
19 correct?
20      A.   Is that presupposing that I don't take
21 an extensive exposure history when a patient doesn't
22 present with mesothelioma?
23      Q.   That is not at all what I'm saying.  I'm
24 not trying to get every negative out there.  I'm just
25 trying to say when you have a patient come to you as

Page 80

1 part of your clinical practice that has mesothelioma,
2 you typically take an extensive exposure history,
3 right?
4      A.   Correct.
5      Q.   You previously testified that taking a
6 proper exposure history is a crucial element of the
7 work that occupational medicine doctors do, right?
8      A.   Correct.
9      Q.   For the 33 cases discussed in your
10 article, how many, if any, did you personally take an
11 asbestos exposure history of the patient for
12 rendering the opinion that their mesothelioma was
13 caused by talcum powder?
14      A.   I don't recall how many.
15      Q.   As you sit here today do you recall any?
16      A.   I know there were some, but I can't
17 recall and I will not comment further.
18      Q.   On page seven before you get into the
19 case descriptions of the six, you talk about how
20 these six case reports are presented in greater
21 detail; their clinical course was similar to all 33
22 cases evaluated and the same rigor with respect to
23 obtaining information related to any asbestos
24 exposure as applied to all 33 cases.
25           Did I read that correctly?

Page 81

1      A.   Yes.
2      Q.   How are you able to make a
3 determination, comparative determination as to the
4 rigor by which asbestos exposure information was
5 obtained across the 33 cases?
6      A.   It was referring to the same rigor that
7 I used, meaning that the same methodology used in the
8 six cases was used to evaluate the other 27.
9      Q.   Why you can't or won't both tell me
10 how many of the 33 patients you personally did
11 exposure history of, you would agree with me that
12 there are many of the 33 in which you did not conduct
13 any exposure history, correct?
14           MS. LONG:  Objection to form.
15      A.   First of all, I honestly don't remember
16 how many, so I don't appreciate the can't or won't.
17 I honestly have no recollection of how many of them I
18 did.
19      Q.   To be clear on that, I was saying the
20 can't because you also say that somehow gets into the
21 privacy concerns.  That's all I was referring to.
22 I'm not suggesting that you are withholding
23 information.
24      A.   I'm not trying to deceive you.  I have
25 no recollection.

21 (Pages 78 - 81)

1    Q.    I was not suggesting otherwise.
2    A.    Can I please have the question again.
3    Q.    It's your recollection that at least,
4  we'll say at least one, I'm not saying there was one,
5  but at least one of the 33 you have a recollection of
6  personally taking an asbestos exposure history of
7  that patient, right?
8    A.    It's potential.
9    Q.    Let's say as you sit here today, do you
10  remember any of it that you know you took exposure
11  history of those 33?
12    A.    Yes.
13    Q.    Conversely, there are at least some
14  patients where you did not personally take an
15  exposure history of that are discussed in this
16  article, correct?
17    A.    Yes.
18    Q.    In those circumstances where you did not
19  personally take the exposure history, who are you
20  relying on to obtain that exposure history?
21    A.    I think it's spelled out either two or
22  three times in the article that the information was
23  obtained through deposition transcripts of the
24  individual, the family members or anyone who had
25  personal knowledge of the individual using the talcum

1  powder.
2    Q.    So the questioning in that circumstance
3  where you did not personally conduct exposure history
4  would have been done by lawyers, correct?
5    A.    Correct.
6    Q.    You talk about how in the article that
7  even some med students don't know how to take proper
8  occupational exposure histories, correct?
9    A.    I don't know if I said that med
10  students. I discussed that there's very little
11  discussion in the medical school curriculum in
12  general about occupational histories. I don't recall
13  that I said med students don't know how to take
14  occupational histories.
15    Q.    Do you have any knowledge as to the
16  medical training of any of the lawyers that
17  questioned the patients or their family members or
18  people with relevant knowledge at deposition in the
19  33 cases that you rely on?
20    A.    It's not really medical knowledge that's
21  important for an exposure history per se. I'm not
22  familiar with the educational background of the
23  various questioners. I was more evaluating the
24  questions and answers to see how comprehensive they
25  were and using the information that was available to

1  me.
2    Q.    Understood. My question is, you
3  testified today and previously that one of the major
4  specialties that you bring to the table as an
5  occupational medicine doctor is your knowledge of
6  these potential asbestos exposures, correct?
7    A.    Particularly in a case where there's no
8  identifiable source, yes.
9    Q.    Presumably you're not aware of any of
10  the lawyers that questioned the patients or their
11  family members in connection with this article, the
12  33 plaintiffs, have any training as an occupational
13  medicine doctor, correct?
14    A.    Presumably not.
15    Q.    So when you're talking about the rigor
16  with which the questioning of these 33 cases for a
17  potential alternative exposures, you're relying on
18  lawyers for that rigor, correct?
19    A.    The term rigor was used with respect to
20  my evaluation of the cases was the same for all 33.
21  That's where I use the term rigor as we discussed
22  earlier today. With respect to the questioning, it's
23  dependent on the questions and answers asked of the
24  individual or their family members, that is correct.
25    Q.    Let's talk a little bit about the

1  discussion of control samples on page 17. There's a
2  paragraph on page 17 under control samples right
3  before the Results section, was this paragraph
4  drafted by Dr. Gordon?
5    A.    It was drafted by Dr. Gordon and then I
6  and Ms. Bevilacqua did some wordsmithing, but this
7  was based on Dr. Gordon's controls and this is his
8  data.
9    Q.    In connection with the drafting of this
10  article, did you discuss with Dr. Gordon details
11  regarding his control set?
12    A.    I had been aware of his control set well
13  before this paper. From conversations he had
14  discussed wanting to include the control samples in
15  the paper as a way of -- because there had been a
16  dearth of control samples in the medical literature
17  and including that in this paper.
18    Q.    Do you have an understanding as to
19  whether Dr. Gordon modified his control sample
20  universe in connection with this article than what
21  had previously been published about it?
22    A.    My understanding -- this is a question
23  for Dr. Gordon.
24    Q.    I'm asking your understanding.
25    A.    My understanding is that these control

Page 86

1 samples predated any discussion of certainly this
2 paper and, in fact, I'm aware that they predated any
3 discussion and actually probably predated any
4 consideration of talc.
5      Q.   I understand that -- I'm going to hold
6 you to your understanding of what the situation is,
7 but we'll ask Dr. Gordon the particulars.
8           In that paragraph it states that
9 "exposure histories had been obtained by treating
10 pulmonologists or surgeons from all individuals; all
11 were screened for asbestos exposure for personal use,
12 family exposure, and personal or family use of talcum
13 powder."
14           Is it your understanding that the
15 control group was asked about personal or family use
16 of talcum powder?
17      A.   Based on Dr. Gordon's -- this is from
18 Dr. Gordon.
19      Q.   I'm asking you.
20      A.   I don't know other than what Dr. Gordon
21 contributed to the article and what he wrote.  I know
22 that he was explicit in including that in this
23 section.  Dr. Gordon has written about talcum powder
24 in the past, about 20 years ago he published, and it
25 may be related to that, but these are questions that

Page 87

1 I don't have any further information beyond what is
2 in the text regarding Dr. Gordon's control samples.
3      Q.   I'm entitled and so I wanted to know
4 what your level of understanding is, so I'm not going
5 to go beyond that, but if it turns out that some or
6 all of the control group were not questioned about
7 their use of talcum powder, does that, in your view,
8 limit the usefulness of this control sample?
9           MS. LONG:  Objection to form.
10      A.   I think his control population was to
11 talk about a general control population of
12 individuals who had no known exposure to asbestos, so
13 if they did have exposure to talcum powder, then that
14 would not be a full control group.
15      Q.   Then it goes on to say that, "for those
16 patients in whom there was any question of asbestos
17 exposure, from any source, the pathologists conferred
18 with the treating clinician to make ensure there was
19 no known asbestos exposure."
20           Did I read that correctly?
21      A.   You did.
22      Q.   That is your understanding of what
23 happened with respect to the control population?
24      A.   From Dr. Gordon, yes, that's correct.
25      Q.   Based on your testimony today, the

Page 88

1 investigation that is described in that paragraph of
2 potential asbestos exposures was more extensive than
3 you did with the 33, fair?
4           MS. LONG:  Objection to form.
5      A.   With respect to the people as they were
6 collecting their tissue, they would have spoken to
7 the treating doctor, so yes, in most cases I did not
8 speak to the treating doctor.
9      Q.   In any cases did you speak to the
10 treating doctor?
11      A.   It's possible, but not that I
12 specifically recall.
13      Q.   On page 21, in talking about, again, the
14 limitations of the article, it talks about how the
15 depositions were thorough and included both
16 exhaustive questioning about alternative sources of
17 asbestos exposure.
18           On what basis do you and your co-authors
19 conclude that the depositions included, quote,
20 exhaustive questioning about alternative sources of
21 asbestos exposure?
22      A.   I read the depositions in these cases
23 where people are asked questions over and over again.
24 It's my description of the depositions and the
25 questioning that took place.

Page 89

1      Q.   But you're not in a position to make an
2 assessment that all potential sources of asbestos
3 exposure were, in fact, discussed at the patient's
4 depositions, correct?
5           MS. LONG:  Objection to form.
6      A.   You're asking me a hypothetical.  That's
7 unknowable.  They asked as many as were in these
8 categories.
9      Q.   I take it also that Dr. Gordon was the
10 person responsible for creating table three on page
11 33?
12      A.   It was a collaboration.  We worked on it
13 to just make it more presentable, but the data are
14 all directly from Dr. Gordon.  We just worked on it
15 together to make it so it was a more concise table.
16      Q.   Do you know what protocol Dr. Gordon
17 used in connection with his analysis of the control
18 population?
19      A.   Only what's described in the paper.
20 Again, this is Dr. Gordon's section of the paper.
21      Q.   I appreciate that.  I'm asking what you
22 independently know.
23      A.   He described his protocols.
24      Q.   I guess my question to you, and I
25 appreciate that, is I interpreted his discussion of

23 (Pages 86 - 89)

Page 90

1 the tissue sample analysis to be his protocol for the
2 six analyses here. I didn't necessarily interpret
3 that as the same protocol used for the control group.
4 Do you have an you understanding one way
5 or the other on that?
6 A. No. My assumption was that they were
7 the same, but that would be a question you would have
8 to pose to him.
9 Q. Understood. Before you leave page 33
10 there is that note A, "all fibers that were counted
11 were always one micrometer or less in length."
12 Did I read that correctly?
13 A. Where are you?
14 Q. Page 33. "All fibers that were counted
15 were always one micrometer or less in length."
16 Did I read that correctly?
17 A. Yes.
18 Q. Again, I'm going to ask Dr. Gordon, but
19 I want to know what your understanding is, is that
20 consistent with your understanding of what was
21 counted with respect to the control population?
22 A. Yes, that's what he described, wrote in
23 his tables. That's based on Dr. Gordon.
24 Q. Do you have an understanding that in the
25 tissue digestions for the six at issue in your

Page 91

1 article, whether or not Dr. Gordon counted everything
2 five micrometers or more in his analysis?
3 A. He in his methods described that they
4 were more than five micrometers.
5 Q. So based on what Dr. Gordon describes as
6 the method for the six tissue digestions at issue in
7 the paper, Dr. Gordon would not have counted any
8 fibers that were one micrometer or less in length,
9 correct?
10 A. In these six patients, no.
11 Q. In looking at the control group, still
12 on table three at the end, do you agree with me that
13 chrysotile is the most common type of asbestos that
14 was identified in the lung tissue or in the tissue
15 burdens of the control population?
16 A. In this table, yes.
17 Q. Is that consistent with your
18 understanding of chrysotile and its use and its
19 presence in the background?
20 MS. LONG: Objection to form.
21 A. It's consistent with my understanding of
22 the fact that 95 percent of commercial asbestos in
23 the United States is chrysotile.
24 Q. So from that you would expect to find
25 chrysotile in this control population of individuals

Page 92

1 with no history of asbestos exposure, correct?
2 A. Yes.
3 Q. In the paper you also talk about how
4 there were findings of chrysotile amongst the six
5 patients we discussed, correct?
6 A. Yes.
7 Q. You also, I believe, state that that is
8 consistent with exposure to talc products, correct?
9 A. Yes, chrysotile has been found in
10 various talc products.
11 Q. Are you, as part of the article,
12 concluding that any chrysotile found in the six
13 patients' tissue analyses was from talc?
14 MS. LONG: Objection to form.
15 A. Well, I think it was only found in one
16 of the individuals that we reported in the paper.
17 It's consistent with their history of exposure to
18 talc and that's all we can say from that.
19 Q. Would it also be, in your opinion,
20 consistent with exposure to background levels of
21 chrysotile, correct?
22 MS. LONG: Objection to form.
23 A. Potentially, except I've never heard of
24 fibrous in platy talc also being present in
25 background ambient general air, which was also found

Page 93

1 when they did the same evaluation of the tissue.
2 Q. Then are you suggesting that the
3 presence of talc found in the tissue analyses means
4 that the chrysotile that's also found must have come
5 from the talc?
6 A. No, you're conflating two sentences.
7 I'm just saying they also found talc and I'm unaware
8 of talc being in the general background, fibrous talc
9 being in the general background.
10 Q. If I wanted to look for the ultimate
11 conclusion of this paper, is that the final sentence
12 on page 22?
13 Just for the record it states, "this
14 paper provides evidence that mesothelioma cases once
15 considered idiopathic may be attributable to
16 asbestos-contaminated cosmetic talcum powder usage
17 and that the elicitation of a history of such usage
18 is imperative to obtaining a full exposure history in
19 all patients presenting with mesothelioma."
20 MS. LONG: Objection to form.
21 A. Yes.
22 Q. You would agree that this paper does not
23 conclude that cosmetic talcum powder causes
24 mesothelioma?
25 A. I think we're very careful to say that

24 (Pages 90 - 93)

Page 94

1 based on the study design it provides evidence that
2 it can cause, but because it's a case series,
3 although case series do have greater value in
4 evaluating a rare disease such as mesothelioma that
5 is associated with an exposure, that we were very
6 careful in our wording.
7    Q.   If you would go to page 18, the last
8 sentence before Discussion.  It's one of the I
9 thought maybe a double negative.  Can you state for
10 the record what you understand this sentence is
11 supposed to read, how it's supposed to read?
12    A.   What are you referring to?
13    Q.   "No aluminum silicates, aluminum
14 magnesium silicates and silica crystals, all
15 components of talcum powder identified in our
16 patients, were not found in the control population
17 that did not use talcum powder."
18    A.   I believe it should say were found.
19    Q.   FDA testing 2019.  What have you
20 reviewed in connection with the 2019 testing on
21 behalf of FDA of Johnson's baby powder?
22    A.   I've seen articles that have been
23 written about it.  I believe I've seen the FDA
24 report, but I need to take a look at it.
25       (Whereupon, AMA Analytical Services,

Page 95

1 Inc. Certificate of Analysis was received and marked
2 Moline Exhibit 8, for identification, as of this
3 date.)
4    Q.   Dr. Moline, I'm showing you show you
5 what's been marked as Exhibit 8.
6       Have you seen this before?
7    A.   Yes, I have seen it.
8    Q.   I think it would be helpful if you can
9 just state your understanding based on what you've
10 reviewed of the status of the FDA's testing with
11 respect to Johnson's baby powder, what they found.
12 What was your understanding?
13       MS. LONG:  Objection to form.
14    A.   The FDA speaks for itself.  I don't know
15 why you're asking me what the FDA said when they've
16 come out with statements and press leases.  The FDA's
17 comments are the FDA's comments.
18    Q.   I'll ask a question.  How does the FDA's
19 comments that you reviewed inform your opinions in
20 this case?
21    A.   I think this was from a bottle that
22 would be outside the time period of Ms. Wiman, it
23 would not have impacted Ms. Wiman's exposure because
24 she was not exposed to a bottle that was from this
25 vintage, meaning this time period, and there's not a

Page 96

1 sufficient latency period for the results of this
2 test to impact Ms. Wiman personally.
3    Q.   To the extent that there's a discussion
4 of Chinese talc deposit in this case, generally how
5 does the FDA testing of Johnson's baby powder inform
6 your opinions with respect to whether or not there is
7 asbestos in Johnson & Johnson's Chinese talc deposit?
8    A.   They're finding that there's asbestos in
9 the finished product.  It's consistent with other
10 findings I've seen, asbestos being found in Chinese
11 sourced Johnson & Johnson baby powder.
12    Q.   Are you aware of any previous findings
13 of chrysotile in the Johnson & Johnson Chinese talc
14 deposit?
15    A.   The only testing that I recall seeing
16 was not testing for chrysotile because the
17 methodology used would not -- explicitly states that
18 they cannot analyze for chrysotile, so I have not
19 seen chrysotile specifically that I recall in the one
20 document that I'm thinking of.
21    Q.   You see in the document I've shown you
22 that's been marked as Exhibit 8 under the mass
23 concentration of chrysotile, you would agree with me
24 the highest concentration by weight listed is
25 0.00002 percent?

Page 97

1    A.   Yes.
2    Q.   Do you have an opinion as to whether or
3 not exposure to talc that contains 0.00002 percent by
4 weight chrysotile asbestos would be an above
5 background exposure?
6       MS. LONG:  Objection to form.
7    A.   I would need someone to convert it
8 into -- this is a bulk sample.  I would need it to be
9 converted into a fiber per cc value in order for me
10 to make an appropriate assessment.
11    Q.   As you sit here today, you don't have an
12 opinion one way or another about whether or not
13 exposure to talc that contained 0.00002 percent
14 chrysotile asbestos would result in above background
15 exposure?
16    A.   Again, I would need the calculation
17 converted into a fiber per cc value to make that
18 statement.
19       MR. EWALD:  Let's go ahead and mark this
20 as Exhibit 9.
21       (Whereupon, Johnson & Johnson press
22 release was received and marked Moline Exhibit 9, for
23 identification, as of this date.)
24    Q.   There you go, Dr. Moline.  Dr. Moline,
25 we marked as Exhibit 9.  It is identified for the

1 record as a Johnson & Johnson press release dated
2 October 29, 2019, with a title 15 New Tests from the
3 Same Bottle of Johnson's Baby Powder Previously
4 Tested by FDA Find No Asbestos.
5          I'm going to ask you, Doctor, have you
6 seen this press release before?
7     A.   I have not seen the entire press
8 release. I've seen an excerpt, but I have not seen
9 the entire press release.
10    Q.   What do you recall in seeing the
11 previous excerpt that you read with respect to this
12 press release?
13    A.   That Johnson & Johnson retested it and
14 they said through their testing labs they did not
15 find the asbestos.
16    Q.   How does that, if at all, inform your
17 opinions with respect to whether or not Johnson &
18 Johnson Chinese talc has asbestos in it?
19        MS. LONG:  So this statement, how does
20 that --
21        MR. EWALD:  Yes.
22    A.   I took it at face value from the company
23 that has a vested interest in not finding anything,
24 that has a documented history on my reliance list of
25 misinforming results to federal agencies before.

1     Q.   What does that mean with respect to your
2 opinions?
3     A.   I took it in saying they had it tested
4 and they didn't find anything. We have one lab
5 finding it and another lab that's paid by someone who
6 has a vested interest in not finding it not finding
7 it. I took it at face value.
8     Q.   What does that mean in this context,
9 taking it at face value?
10    A.   Just what I said. The company who has a
11 financial interest in not finding asbestos in their
12 powder didn't find asbestos in their powder.
13    Q.   I won't argue with you about what face
14 value means in that context.
15        Do you have any knowledge about the FDA
16 testing of Johnson's baby powder and any subsequent
17 testing by Johnson & Johnson of that same bottle and
18 lot apart from what you've read publically?
19        MS. LONG:  You're just talking about
20 this testing of the two last exhibits?
21        MR. EWALD:  No, I'm asking more broadly.
22    Q.   I'm trying to get an understanding of
23 the source of your knowledge about the FDA testing of
24 Johnson's baby powder in 2019 and any follow-up
25 testing that Johnson & Johnson and other labs have

1 done.
2        MS. LONG:  In 2019?
3        MR. EWALD:  Yes.
4     A.   I had no knowledge that the FDA was
5 testing it. I had no knowledge that Johnson &
6 Johnson was going to retest it apart from what was
7 reported in the press. That's the extent of it. I
8 had no insider information, no one was feeding me
9 that this was being tested or retested or any other
10 information. I read it when everyone else did.
11    Q.   Since you read it you haven't since
12 become privy to information that you did not hear
13 publically?
14    A.   I didn't hear the last couple of words.
15    Q.   That you did not hear publically.
16    A.   I don't have any other information.
17    Q.   Do you have any opinions based on your
18 review of the press release and any other expertise
19 as to the conclusion by RJ Lee that there was
20 contamination in some initial samples?
21        MS. LONG:  Objection to form.
22    A.   I don't think that that's included in
23 this press release. I have not seen RJ Lee's
24 testing. My understanding of RJ Lee is they've been
25 criticized by the EPA for their methodology.

1        MR. EWALD:  Let's mark this as
2 Exhibit 10, please.
3        (Whereupon, Accepted copy of Exponent
4 manuscript was received and marked Moline Exhibit 10,
5 for identification, as of this date.)
6     Q.   Dr. Moline, I'm handing you what's been
7 marked as Exhibit 10. Can I ask you, Doctor, if
8 you've seen this before?
9     A.   Yes.
10    Q.   What is it?
11    A.   It's an accepted manuscript by Exponent
12 employees.
13    Q.   Have you reviewed this article before?
14    A.   I read parts of this article before. I
15 read through the article. I haven't critically
16 reviewed it.
17    Q.   Based on what you have reviewed, how, if
18 at all, does it inform your opinions as to whether or
19 not Johnson & Johnson's Vermont talc can cause
20 mesothelioma?
21    A.   My recollection is that they discuss
22 finding one mesothelioma at least and possibly a
23 second, which might be the mysterious talc man that
24 was referred to in the paper by Lamm.
25        My recollection was that there was

1 another mesothelioma in the miners and it was a
2 follow-up of a very small cohort, that was a very
3 small cohort when Sullivan started it, but they did
4 find one meso or two in this group.
5     Q.    First let's deal with that last point
6 you mentioned.  This is not numbered.  It's about
7 16 pages in, at the top it says, "In the updated
8 cohort of Vermont workers."
9     A.    Okay.
10     Q.    If you look there in the next paragraph
11 it talks about the one death was attributed to
12 mesothelioma as noted on the death certificate for
13 this worker.  "This worker was employed in the talc
14 industry for less than five years and death occurred
15 30 years following employment, leaving open the
16 possibility of exposure to asbestos in other
17 occupations or possible exposure to ionizing
18 radiation."  Did I read that correctly?
19     A.    Yes.
20     Q.    It goes on to say, "the death
21 certificate explicitly mentioned exposure to
22 asbestos.  This single death due to mesothelioma
23 occurred after 1975, after the end of follow-up in
24 the Selevan, et al. study."  Selevan is
25 S-e-l-e-v-a-n.

1     A.    It's Selevan just so you know.
2     Q.    "While Selevan, et al. 1979 did not
3 mention mesothelioma, Lamm and Starr in 1988 reported
4 there was one death from mesothelioma in the Vermont
5 cohort before 1975; however, no information was
6 provided regarding this worker so we are unable to
7 verify this claim or identify how this death was
8 coded in the present study."
9         Did I read that correctly?
10     A.    Yes.
11     Q.    Let me first ask you from the
12 perspective of this.  You've previously given
13 opinions with respect to the Lamm article, correct?
14     A.    Yes.
15     Q.    Does the Fordyce 2019 article inform
16 your previously stated opinions with respect to the
17 Lamm article in any way?
18     A.    No, they have no additional information,
19 so he remains the talc man.
20     Q.    Do you have any information regarding
21 the single death due to mesothelioma occurring after
22 1975 reference in the article apart from what is
23 stated in the article itself?
24     A.    No, I have no personal knowledge of the
25 death certificate of this individual.

1     Q.    You have no knowledge with respect to
2 any prior potential exposure to asbestos separate
3 from any talc work at the Vermont mine?
4     A.    Correct, if there was any.
5     Q.    If there was.
6     A.    There was?
7     Q.    If there was.  I was agreeing with you.
8     A.    Okay.
9     Q.    Would you agree with me that based on
10 the information provided in this article it is not
11 possible to conclude whether the single death due to
12 mesothelioma involves a talc worker that worked at
13 Johnson & Johnson Vermont talc mines?
14     A.    Sorry, can you say that again?
15     Q.    Sure.  Would you agree with me that it
16 is not possible based on the information provided in
17 the Fordyce article about the single death due to
18 mesothelioma that occurred after 1975 to conclude
19 that that talc worker worked at the Vermont talc
20 mines used by Johnson & Johnson?
21     A.    They described him as working in the
22 talc industry.  I don't know what other talc
23 industries there were that he could have worked in,
24 but I have no way of -- they're very vague about it
25 for this particular individual so I have no

1 additional information.
2     Q.    If you look at the last paragraph before
3 the references, the conclusion paragraph, let me know
4 when you're there.  It states, "In conclusion, this
5 study provides further evidence that excess deaths
6 among Vermont miners and millers are due largely to
7 excess mortality from non-malignant respiratory
8 disease; there is no evidence of increased risk of
9 respiratory cancer."  Did I read that correctly?
10     A.    You did.
11     Q.    Do you agree with that conclusion?
12     A.    Well, I think if you look at the first
13 sentence of the page, I think one of the limitations
14 of this study is pointed out about the fact that
15 there's concern that it lacked adequate statistical
16 power to detect an increase in rare diseases like
17 mesothelioma.  I would say that before I would say
18 there's no evidence, I would make sure that that was
19 more evident because they have inadequate, as they
20 say, statistical power to make such a sweeping
21 characterization.
22     Q.    Do you agree that the study does not
23 provide any evidence of increased risk of respiratory
24 cancer?
25     A.    They do not have -- they have a very

Page 106

1 close to statistically significant increase, it is
2 elevated, but it is not statistically significant.
3 If they were to be truly comprehensive they would say
4 there was an increase, although it did not reach
5 statistical significance.
6     Q.    Just so I'm clear on what you mean by
7 that, could you just explain in a little bit more
8 detail what you mean by saying that it was not
9 statistically significant?
10    A.    They report on all deaths, all causes of
11 death with an elevated standardized mortality ratio
12 of 133.4 that they say is statistically significant
13 because the confidence interval does not include 100.
14        The rates of cancers of the respiratory
15 system are 137.4 and of the bronchus, trachea and
16 lung are 143.9 with a confidence interval that
17 approaches 100 but does not make it so that it is
18 technically not statistically significant, but it is
19 close to statistically significant especially if you
20 were to look at, for example, the confidence interval
21 for cancer of the kidney, which is based on three
22 cases and has a very wide confidence interval, but
23 ranges from 36 to 500. This one ranges from 98.4 to
24 203, which is lot closer to 100, so while it does not
25 approach the statistically significant values, it is

Page 107

1 elevated and they do not mention that in their
2 conclusion.
3     Q.    Have you consulted with any statistician
4 in connection with the findings of this article?
5     A.    I have not.
6     Q.    Have you been provided any information
7 from counsel by a statistician in connection with
8 this article?
9        MS. LONG:  I'm going to -- it's fine.
10    A.    I don't recall specifically related to
11 this article. It may have been in a report that I
12 read, but I don't recall if there was an analysis of
13 this article. I have seen other statistical analyses
14 of the Vermont talc cohort. I don't recall whether
15 it included an analysis of this article. To be
16 complete in my answer, I can't recall whether the
17 statistical report included this article.
18    Q.    We've been going for a little more than
19 an hour. I'm finished with that line of questioning.
20 I have some sort of odds and ends I want to ask. Why
21 don't we take a quick break. Off the record.
22        (A recess was taken.)
23        MR. EWALD: Mark as Exhibit 11, please.
24        (Whereupon, copy of article entitled
25 Health Effects of Censored Elongated Mineral

Page 108

1 Particles was received and marked Moline Exhibit 11,
2 for identification, as of this date.)
3     Q.    Dr. Moline, I'm handing you what's been
4 marked as Exhibit 11. Have you seen this document
5 before?
6     A.    I've seen it.
7     Q.    Can you identify it for the record,
8 please?
9        MS. LONG:  Do you have a copy for me?
10        MR. EWALD:  Sure. I'm not sure I'm
11 going to ask any questions about it.
12    A.    The article is Health Effects of
13 Censored Elongated Mineral Particles: A Critical
14 Review. The first author is Egilman.
15    Q.    You said you haven't seen it before. Are
16 you relying on this article for your opinions in this
17 case?
18    A.    I have this on the top of my reading
19 list, which is why I have seen it. It is literally
20 an article that I have in my possession. It's on my
21 to-do list for this week so I can't answer any
22 questions about the article.
23    Q.    That's fair. My only statement on the
24 record is, to the extent that you do read it and you
25 intend to rely on it for your opinions in this case,

Page 109

1 that you tell counsel and we can discuss whether or
2 not an additional deposition will be necessary.
3     A.    I'm happy to.
4     Q.    Would you agree with me that you, when
5 testifying at trial in Simon Greenstone cases, use
6 more PowerPoint slides than when you testify in,
7 let's say, Levy Konigsberg cases?
8     A.    I think that's a mischaracterization.
9     Q.    Okay.
10    A.    I think it depends on the lawyers'
11 preferences. For example, I believe in a case that I
12 testified for Levy Konigsberg recently with Ms. Long
13 it was a very limited PowerPoint which just provided
14 some background information. I think in the past
15 Simon Greenstone has asked that we prepare a more
16 comprehensive PowerPoint.
17    Q.    That's fair. I didn't mean to be so
18 reductive in the question. I guess how does that
19 process typically work when you're testifying at
20 trial? Do you create the slides yourself?
21    A.    Just like I don't touch my CV, I will go
22 over them with the lawyers the content to be included
23 and then I allow them to work with the program since
24 they are more facile than I.
25    Q.    Maybe not the lawyer.

28 (Pages 106 - 109)

1    A.    Or their paralegal or somebody who is
2 much better at PowerPoint presentations than me, but
3 there are a couple of standard background slides that
4 seem to be in circulation now.
5    Q.    Just so the record is clear, when you
6 talked about your CV, the actual work of the document
7 was by your assistant, right?
8    A.    I provide them the content, they just
9 type it.
10    Q.    For your CV, an assistant, like the
11 assistant that you work with here in your job,
12 correct?
13    A.    Correct.
14    Q.    Then in the context of the slides, you
15 provide counsel with the content, is your testimony,
16 and then counsel or somebody working for counsel puts
17 together the slides?
18    A.    We're often sitting together when it's
19 being done but yes.
20       MR. EWALD:  Mark this as Exhibit 12,
21 please.
22       (Whereupon, copy of PowerPoint slide was
23 received and marked Moline Exhibit 12, for
24 identification, as of this date.)
25    Q.    I'm going to mark one more thing and

1 we're going to talk briefly about it.  Let's mark
2 this as Exhibit 13, please.
3       (Whereupon, copy of PowerPoint slide was
4 received and marked Moline Exhibit 13, for
5 identification, as of this date.)
6    Q.    I'm showing you what's been marked as
7 Exhibit 13.  For the record, I will represent that
8 Exhibit 12 was from slides that you presented in the
9 Cabibi, C-a-b-i-b-i, case.  Exhibit 13 was from
10 slides you presented in the Weirick case.
11       Do these look like slides that you
12 previously presented?
13    A.    Yes.
14    Q.    On Exhibit 12 there's a listing for the
15 J&J adult estimate and the J&J diapering estimate.
16       Do you see that?
17    A.    Yes.
18    Q.    When you look at the slide in Weirick on
19 13 with the same title and some of the same figures,
20 the J&J adult estimate and the J&J diapering estimate
21 do not appear, correct?
22    A.    Yes.
23    Q.    The two additions to the chart on
24 Weirick relate to two MAS exposure studies, below the
25 waist and baby diapering, correct?

1    A.    Correct.
2    Q.    Why did you present to the jury in
3 Weirick the J&J adult and diapering estimate and then
4 not do so in the Weirick case?
5    A.    You said Weirick twice.
6    Q.    I knew it.  Why did you present to the
7 jury in the Cabibi case the J&J adult and J&J
8 diapering estimate reflected on Exhibit 12 and not in
9 the Weirick case?
10    A.    Because there has been overwhelmingly
11 conflicting testimony from the Johnson & Johnson
12 corporate representative with respect to what the 4.5
13 plus fibers per cc meant and whether it was fibers or
14 fibers per cc.
15       Based on information, he had previously
16 stated that it represented 4.5 fibers per cc and then
17 he changed his testimony in subsequent depositions.
18 So after I became aware of that I felt that it was
19 important to just leave it out because there is so
20 much uncertainty as to whether what that actual
21 testing reflected so I did not include that in
22 subsequent PowerPoints.
23    Q.    So going forward, are you affirmatively
24 relying on the J&J, what's listed here as the J&J
25 adult and diapering estimates for the opinions that

1 you're offering in this case?
2       MS. LONG:  Objection to form.
3    A.    Not until I think there's a straight
4 answer from the corporate representative.  It doesn't
5 change depending on the wind, so I will not be
6 relying on that particular number.
7    Q.    You can set that aside.
8       (Whereupon, a copy of PowerPoint slide
9 received and marked Moline Exhibit 14, for
10 identification, as of this date.)
11    Q.    I'm showing you what has been marked as
12 Exhibit 14.  We'll represent because I was there that
13 you used this slide in connection with your Weirick
14 testimony.  Does that look familiar?
15    A.    Yes.
16    Q.    My question to you is when it said what
17 was known, you would agree that's in the passive
18 voice?
19    A.    You know my son is taking grammar and
20 I'm not anymore, but, yes, I believe it is passive.
21    Q.    It's ambiguous to me, the reader, about
22 who is being referred to here.  So my question is,
23 when are you talking about what was known, who knows?
24    A.    Well, it's not talking about who.  It's
25 talking about what.  Why does it have to say who?

Page 114

And he's not on first.  What's on second.

2    Q.    When you're offering opinions about what
was known, are you offering an opinion that Johnson &
Johnson should have known these things at these
various points in time?

6        MS. LONG:  Objection to form.

7    A.    First of all, this might be used for
non-Johnson & Johnson.  It's basically talking about
the health hazards of when there was an
identification that asbestos was a health hazard and
when there was an identification that asbestos may be
found with talc and the health effects of talc.

13        So it's basically just to give a
reference point in terms of saying what was known in
the '30s or what was known in the '40s and the '50s
and '60s, and they stop in the '60s because there was
an explosion of growth in the asbestos literature.

18    Q.    Are you talking about what was known in
the scientific community?

20    A.    Yes, the scientific or medical
community.

22    Q.    You gave testimony actually in the
Weirick trial in sum and substance that asbestos can
remain in the air for hours, if not days, before it
settles; is that consistent with your opinions in

Page 115

this case?

2        MS. LONG:  Objection to form.

3    A.    In general, yes.

4    Q.    What do you rely on for the opinion that
asbestos can remain in the air for essentially days?

6    A.    It's something that I learned way back
when.  I don't even know if I can point you to a
source.  It's just one of those things that I'm aware
of from industrial hygiene courses where it may have
been discussed.  There have been area studies I know
from joint compound, for example, where asbestos has
been measured at the time it's been used and then at
various times later to measure how long asbestos may
be present in the air after its use.

15    Q.    But as you sit here today, you can't
identify any authority that you rely on for the
proposition that asbestos can remain in the air for
days?

19        MS. LONG:  Objection to form.

20    A.    It may be in the Anderson paper.  It may
be in a Fischbein paper.  Those are the joint
compound papers that I'm thinking of.  It could
actually be in a Rohl/Langer or a Nicholson paper
from the '70s where they were measuring asbestos
content.

Page 116

1        MR. EWALD:  I'm going to pass the
witness in a second while I look over my notes.  I
assume that counsel on the phone has at least a
couple of questions, but before I do I just wanted to
state on the record that I discussed with counsel off
the record about the three binders that Dr. Moline
brought with her.  I do not have the intention to
have the court reporter copy all of the contents of
those three binders, but I do want to ensure that we
have a clear record of all the materials that
Dr. Moline considered in this case and I don't think
that there is a single page that currently reflects
that.

14        I am open to any number of solutions,
but I would propose that we make Exhibit 15 a
placeholder to then reach agreement with counsel on
what contents are included within those three binders
and put that there.

19        MS. LONG:  I just want to make sure I'm
clear on what you're proposing.

21        MR. EWALD:  Sure.

22        MS. LONG:  Are you proposing that
Exhibit 15 will eventually be a copy of the binders
or some sort of list?

25        MR. EWALD:  Just a list.

Page 117

1        MS. LONG:  Okay.  I think we can work
that out.

3        MR. EWALD:  Great.  With that I will
pass the witness, look over my notes and see where we
are.

6        (Whereupon, list of contents of
documents in three binders will be provided and
marked Moline Exhibit 15, for identification, as of
this date.)

10 EXAMINATION BY

11 MR. GAULT:

12    Q.    Dr. Moline, can you hear me okay?

13    A.    Yes.

14    Q.    My name is Patrick Gault.  I represent
Continental in this case.  Do you have an
understanding that General Tire was acquired by
Continental Tire?

18    A.    Yes.

19    Q.    I'm just going to refer to it as the
General Tire plant regardless of the time period or
who actually owned the plant; is that okay?

22    A.    That's fine.

23    Q.    First, this may be a little bit of an
odd question, but do you recall a radiologist by the
name of Dr. Ray Herrin?

1   A.   I saw a medical report from him.  I've
2 never met him.  I've never heard of him before I saw
3 this report, but yes, I saw a B reading and a listing
4 of pulmonary function tests on Mackey Ward.
5   Q.   But you don't know anything about him
6 losing his medical license, being sanctioned by the
7 court or anything like that?
8   A.   I know nothing.  I don't know the name.
9   Q.   Obviously Dr. Ellenbecker is involved in
10 this case.  You mentioned that earlier if I'm not
11 mistaken.  Did you review his deposition?
12   A.   Yes.
13   Q.   Did you review two volumes or three
14 volumes or just the first volume?
15   A.   I reviewed it it was two volumes.
16 I know I reviewed two volumes.  I don't remember that
17 there was a third.
18   In fairness, I just got it e-mailed to
19 me today, so you wouldn't have had time to see it.
20   What specific General Tire documents did
21 you receive and review?  I know you mentioned I think
22 the 1991-'92 asbestos survey.
23   A.   Correct.
24   Q.   Did you receive or review any General
25 Tire-specific documents?

1   A.   Only that were attachments to
2 depositions that may have been a site map.  That's
3 the extent that I recall.
4   Q.   You mentioned Apple Jaw, that's Kenneth
5 Simmons; is that correct?
6   A.   Correct.
7   Q.   Did you review John Paul Simmons'
8 deposition?
9   A.   I did.
10   Q.   What other depositions, co-worker
11 depositions did you review?  And I mean co-workers of
12 Mackey Lyn Ward?
13   A.   Those were the only two that I was
14 provided with.
15   Q.   Did you do any highlighting or make any
16 notes on those transcripts?
17   MS. LONG:  On the transcript themselves
18 you mean, Counsel?
19   MR. GAULT:  Yes, ma'am.
20   A.   I did not make any.  I don't highlight
21 and I didn't make any comments that would be
22 relatable to the case.  Sometimes I'm jotting
23 something that has nothing to do with it just because
24 I need to write a number down, but there's nothing on
25 them.  I take notes.  I don't make comments on the

1 transcript.
2   Q.   Other than you've already mentioned,
3 what specific articles will you rely on to comment
4 with regard to Mackey Lyn Ward's potential for
5 exposure to asbestos at General Tire, if any?
6   A.   I mentioned a couple earlier which is
7 the Anderson, and the Vianna and Polan, and then an
8 article, I think it's Magnani from Casale Monferrato
9 talking about take-home exposure.  I'm not sure if
10 there is an article that Nicholson did where he
11 measured exposure in the home.  There are others on
12 my reference list that talk about take-home
13 exposures.  I would have to go through the list.
14   Q.   All those articles, I'm just generally
15 speaking, the exposure to the individual who
16 allegedly brought home the asbestos on his or her
17 clothing would have been exposed to a much greater
18 degree than Mackey Lyn Ward was exposed potentially
19 at General Tire; is that fair?
20   MS. LONG:  Objection to form.
21   A.   It depends on the circumstances of their
22 exposure.  There are cases reported from take-home
23 exposure of individuals in brake manufacturing
24 plants.  There are other reports in the literature of
25 take-home exposure that may not have been extensive.

1   With respect to the Italian study on the
2 asbestos cement plants, yes, in all likelihood they
3 had a higher exposure.
4   Q.   Have you ever been in a tire facility,
5 tire manufacturing facility?
6   A.   No, not that I recall.
7   Q.   Do you recall ever testifying on behalf
8 of a plaintiff who worked in a tire manufacturing
9 facility?
10   A.   I have certainly reviewed other cases of
11 individuals who worked in tire manufacturing
12 facilities.  I am not sure if I've actually testified
13 on those cases or I've just written reports.
14   Q.   Were those cases involving asbestos or
15 some kind of chemical or do you recall?
16   A.   They would have been asbestos cases.
17 There are chemicals in tire plants, but I would have
18 been asked to comment on the asbestos.
19   Q.   Sorry to jump around on you a little
20 bit, but I forgot to ask you about Dr. Herrin.  You
21 said you did have that ILO form and the PFT on Mackey
22 Lyn Ward.
23   A.   Yes.
24   Q.   You're not going to testify at trial
25 that Mr. Ward in fact did have what is shown in those

Page 122

1  medical records, are you?
2      MS. LONG: Objection to form.
3      A.   I just noted it in my notes. I don't
4  have any -- I will answer the questions I'm asked. I
5  do know that Ms. Wiman referenced that her husband
6  had been diagnosed with asbestosis, but I don't know
7  from where she derived that data, if it was from this
8  physician or it was from other sources or her own
9  personal physician.
10     Q.   Without additional information or even
11 the X-ray to review or have someone review it, you
12 can't come to that conclusion independently just
13 based on those records; is that fair?
14     A.   The records speak for themselves. The
15 PFTs are the PFTs. I don't know how you can fudge a
16 diffusing capacity. Apart from that, again, I know
17 nothing about this physician and whether it's
18 something that one would, based on information -- I'm
19 relying on you to discuss this particular physician.
20 I would have to get some further information before I
21 would testify or take a look at the film myself or
22 have another B reader look at it if this gentleman
23 has been discredited.
24     Q.   That's fair enough. You mentioned that
25 some of the General Tire documents you may have seen

Page 123

1  were the ones attached to the deposition of the
2  co-worker depositions and I think you specifically
3  referenced a schematic I think you called it of the
4  plant.
5      A.   It wasn't schematics per se. I think it
6  was actually like an architectural drawing of the
7  plants. I didn't pay much attention to it since I'm
8  not an architect.
9      Q.   Do you know where the General Tire plant
10 at issue is located?
11     A.   I don't think it exists anymore. I
12 think it moved to Mexico.
13     Q.   What do you base that on, deposition
14 testimony?
15     A.   Correct. I think it was in Mayfield,
16 Kentucky, I believe was the town.
17     Q.   Do you have an idea in terms of the size
18 of the facility in terms of acres? I mean the plant
19 itself, not the property around it.
20     A.   There were some references to 45 to
21 60 acres for the plant. I don't know if that's true
22 or not. Those were just the numbers I recall.
23     Q.   Do you have an idea or a concept of the
24 size of the warehouses?
25     A.   From the descriptions I saw the

Page 124

1  warehouses were a large part, but I don't recall that
2  there was a specific description of the acreage or
3  the square footage of the warehouse, just that the
4  warehouses were huge.
5      Q.   The document we were talking about, it
6  has a legend in the upper left-hand corner that lists
7  the square footage of all the buildings. I added it
8  up and it looks like it was 638,900 square feet. You
9  have no way to agree or disagree with that
10 calculation I'm assuming?
11     A.   Correct, I didn't look at the legend, I
12 didn't try to figure it out.
13     Q.   If I said it appears that the warehouses
14 were over 14 acres in size, the warehouses combined
15 total, does that seem about correct?
16         MS. LONG: Objection to form.
17     A.   I'm not sure how you convert square feet
18 to acreage.
19     Q.   Google and a calculator.
20     A.   I'm sure that's the way we all do it
21 now, but I can't tell you off the top of my head. My
22 farming days have long passed.
23     Q.   They're huge warehouses, that's fair to
24 say?
25     A.   That's what the description was.

Page 125

1      Q.   Did you see distinctions between the
2  north and the south warehouses?
3      A.   There was a description of the north and
4  the south, that something was built over a creek, so
5  there was definitely a distinction, yes.
6      Q.   Did you get the understanding that the
7  warehouses were only connected to the production area
8  by two aisles where you could drive a couple of fork
9  trucks back and forth?
10     A.   That I don't recall.
11     Q.   Did you happen to match up the asbestos
12 survey to the warehouses in terms of where there was
13 asbestos-containing material located?
14     A.   I did not. I assumed that would be
15 something that Dr. Ellenbecker was going to do. I
16 just skimmed through it and noted that there was
17 reports of asbestos being present.
18     Q.   Did you get the understanding that the
19 only material that may have contained asbestos in the
20 warehouses was from the steam pipes up in the ceiling
21 that fed the steam heaters in the warehouse?
22     A.   That was what I gleaned, although it's
23 unclear whether there was also insulation around the
24 Banbury or other equipment, but there was no
25 information apart from I think a passing reference to

32 (Pages 122 - 125)

Page 126

1 that.
2      Q.     I'm specifically talking about the
3 warehouse.  The Banbury is in the production area.
4      A.     Correct.  My understanding is it was
5 from the steam pipes, correct.
6      Q.     Dr. Moline, you don't have any opinion
7 in terms of whether or not Mr. Ward was exposed to
8 industrial talc at General Tire, do you?
9      A.     There was a passing mention in one of
10 the depositions, but there wasn't enough information
11 for me to be able to give an opinion to a reasonable
12 degree of medical certainty.
13          My understanding from the tire
14 manufacturing is that industrial talc can be used,
15 but I don't know if it was used at General Tire and I
16 did not see any specific information to that effect.
17      Q.     There was no asbestos material used in
18 the construction of tire manufacturing that you saw
19 from these depositions anyway?
20      A.     I don't know what you mean by
21 construction of tire manufacturing.
22      Q.     That no asbestos products are utilized
23 in the production process of manufacturing a tire.
24      A.     Unless there was industrial talc that
25 contains asbestos, but, again, there wasn't

Page 127

1 sufficient information to know whether that was used
2 in this plant or not, but other than that, I'm not
3 aware of any asbestos products being used in tire
4 manufacturing.
5      Q.     Did you see some testimony about roofing
6 material in the warehouses?
7      A.     Yes.
8      Q.     If Dr. Ellenbecker testified that the
9 roofing material -- if the roofing material did
10 contain asbestos, it would be considered non-friable,
11 would you agree with that?
12      A.     If it were intact then it would not be
13 friable.  If it were cut or broken apart or parts of
14 the roof fell down, then it had potential to become
15 friable.
16      Q.     How would that be?
17      A.     Well, if a tornado comes through and
18 knocks off part of the roof and then breaks off bits
19 of the roof and the tar paper, then it could
20 conceivably become friable.  I think Apple Jaw
21 described that.  I think Mr. Kenneth Simmons
22 described all sorts of dust including dust from the
23 roof during the tornado.
24      Q.     You obviously recall both Kenneth
25 Simmons and John Paul Simmons testifying about pipe

Page 128

1 insulation falling from the ceiling of the warehouse?
2      A.     Correct.
3      Q.     Mr. John Paul Simmons testified that
4 he'd run over it and sometimes he'd end up cleaning
5 it up himself.  Do you remember that?
6      A.     Yes.
7      Q.     Do you remember Kenneth Simmons
8 testifying that if pipe insulation fell from the
9 ceiling of the warehouse, he would call the
10 janitorial or his supervisor would call the
11 janitorial staff and they would come clean it up.
12          Do you recall that?
13      A.     Yes.
14      Q.     He never personally cleaned it up; is
15 that fair?
16      A.     Not when he was in the warehouse.
17      Q.     Right, he used to be in the janitorial
18 department.  Do you remember the first testimony,
19 co-worker or eyewitness testimony about Mackey Lyn
20 Ward being present in the warehouse came from John
21 Paul Simmons and that wasn't until the mid-1970s?
22      A.     Correct.
23      Q.     Neither John Paul Simmons or Kenneth
24 Simmons testified that Mackey Lyn Ward was in the
25 area of the warehouse when pipe insulation fell from

Page 129

1 the ceiling; is that correct?
2      A.     Yes.
3          MS. LONG:  Objection to form.
4      A.     No, I don't recall that.  I recall that
5 they discussed that the insulation was falling from
6 the ceiling and they saw it with respect to it
7 occurring when he was there as well.  That wasn't my
8 read of their depositions.  I thought that they were
9 describing that the pipe insulation fell in the
10 warehouse during the times that they were working
11 with him.
12      Q.     Correct.  When they were working on the
13 same shift, but I mean actually Mr. Ward physically
14 being present when pipe insulation fell?
15      A.     I think they were not concentrating on
16 what was falling on Mr. Ward, they were probably
17 concentrating on what was falling on them, so I don't
18 think they were able to answer what specifically
19 might have fallen, but they were describing the
20 environment at the same time he was working in there.
21      Q.     Let me see if you agree or disagree with
22 what Dr. Ellenbecker says.  I asked him, "so what I
23 gather, you correct me, that Mr. John Paul Simmons
24 assumed Mackey Lyn Ward experienced those same
25 things, but he couldn't testify as to firsthand

1 knowledge witnessing that occurring by Mackey Lyn
2 Ward?" He said, "that's my recollection of his
3 deposition."
4     A.   Okay. Dr. Ellenbecker could have said
5 that. I had a slightly different read, but
6 Dr. Ellenbecker is entitled to his opinion.
7     Q.   Dr. Ellenbecker described Mackey Lyn
8 Ward's potential exposure to asbestos from this
9 falling pipe insulation as episodic.
10         Would you agree with that?
11    A.   Yes.
12    Q.   In other words, it didn't happen on a
13 daily basis; is that fair?
14         MS. LONG: Objection to form. We're
15 talking now just about the falling or any exposure
16 from the material that had fallen?
17         MR. GAULT: That is a fair objection.
18    Q.   First let's start with the falling pipe
19 insulation, that didn't happen every day?
20    A.   It might have occurred every day for a
21 period of time, but certainly it wasn't a
22 five-day-a-week occurrence.
23    Q.   What about exposure to asbestos, can you
24 testify whether or not that would have been a daily
25 occurrence?

1     A.   Again, if there was disruption of the
2 pipe covering, whether it was from the forklifts and
3 the pallets or from the asbestos on the floor, it
4 sounds like it was not a daily occurrence but it was
5 something that occurred with regularity.
6     Q.   Neither Kenneth Simmons or John Paul
7 Simmons could really quantify how often it happened;
8 is that fair?
9     A.   Correct.
10    Q.   If you'll assume for me that the south
11 warehouse contained no asbestos-containing insulation
12 or material, would you agree with me then when
13 Mr. Ward was working in the south warehouses, he
14 wouldn't have been exposed to asbestos?
15    A.   Correct.
16    Q.   Do you have any concept of the
17 ventilation in the warehouses?
18    A.   No, I don't think it was well described.
19    Q.   Do you remember the testimony about they
20 could literally pull a freight train inside the
21 warehouse?
22    A.   Meaning they could have a freight train
23 come into the warehouse?
24    Q.   Correct.
25    A.   Yes.

1     Q.   There were several truck bay doors too,
2 correct?
3     A.   Yes.
4     Q.   Do you recall the testimony about
5 leaving those open and the ventilation that would
6 come through because of that?
7     A.   Yes.
8     Q.   There were also roof exhaust fans in the
9 warehouse too. Do you remember that?
10    A.   There was some mention of it, yes, and
11 there was also a description of heaters and blowers
12 blowing dust.
13    Q.   I'm sorry.
14    A.   I recall that they also described
15 blowers that blew dust around within the warehouse.
16    Q.   I believe that was John Paul Simmons; is
17 that to your recollection?
18    A.   Yes.
19    Q.   He was talking about the blowers on the
20 steam heaters that even in the summertime the steam
21 heater would be off, but they would leave the blower
22 on; is that what you're recalling?
23    A.   I just remember they talked about
24 heaters and blowers and I didn't make that
25 distinction.

1     Q.   Do you recall Kenneth Simmons testifying
2 about wet sweepers coming through the warehouse and
3 wet sweeping the aisles once a day?
4     A.   I remember him talking about wet
5 sweepers coming through; I don't recall that it was
6 daily, but I don't recall that specific element.
7     Q.   If that is the case, if wet sweepers
8 swept the floors, the aisles every day, to the extent
9 there may be asbestos dust on the floor, that would
10 help remove it; is that fair?
11    A.   If the sweepers are effective. What it
12 would also do is make it less likely to become
13 airborne.
14    Q.   With a wet sweeper?
15    A.   If the wet sweeper is wetting the
16 asbestos on the floor, yes, then it's less likely to
17 become airborne if it's wet.
18    Q.   I thought you said more likely.
19    A.   Sorry.
20    Q.   That's why I asked again.
21         MS. LONG: You said less likely.
22         MR. GAULT: That's okay.
23    Q.   Were you aware of a study that was
24 conducted, a joint study between the United Rubber
25 Workers union, General Tire and other tire

Page 134

1 manufacturing companies, University of North Carolina
2 and Harvard joint study of potential health hazards
3 at tire manufacturing plants?
4     A.    It sounds vaguely familiar.  I didn't
5 review it in advance of this deposition.
6     Q.    Do you know if you received it?  It was
7 produced by General Tire.
8     A.    I did not receive it as part of the
9 materials given to me.
10    Q.    I'm sorry, just to clarify, did you say
11 you didn't review it or you didn't receive it?
12    A.    I definitely didn't receive it and I
13 said I did not review it in conjunction with this
14 particular case.  I know I've read studies in the
15 past about tire or rubber workers.
16    Q.    Would you find it surprising if that
17 study that started in the early '70s, went on
18 throughout the '70s did not focus at all on asbestos
19 as a potential health hazard?
20        MS. LONG:  Objection to form.
21    A.    It depends on what the hypothesis of the
22 study was.  I would have to see what the
23 comprehensive nature of the study was.
24    Q.    If it's potential health hazards to tire
25 manufacturing employees, does that change that at

Page 135

1 all?
2        MS. LONG:  Objection as to form.
3     A.    They might have been looking at the
4 immediate, not what might happen in the future.
5 Again, I would have to look at what they were
6 actually analyzing.
7     Q.    Do you recall Kenneth Simmons testifying
8 that when they finished their shift, they being the
9 forklift operators, would sometimes blow out their
10 clothes with an air hose before going home?
11    A.    I recall he mentioned that, yes.
12    Q.    If Mr. Ward would do that, that would
13 certainly decrease the amount of asbestos fibers that
14 he may have had on his clothes when he went home; is
15 that fair?
16    A.    Correct.
17    Q.    You testified earlier today about
18 sometimes when Mr. Ward came home he wouldn't change
19 right away.  Do you recall that?
20    A.    Yes.
21    Q.    Do you recall Ms. Wiman testifying that
22 he often when he came home from work went right to
23 work on the farm?
24    A.    Yes.
25    Q.    Wouldn't that work on the farm, to the

Page 136

1 extent there may have been asbestos fibers on his
2 clothes, would that help decrease the amount that he
3 had on his clothes when he eventually went in the
4 house for the night?
5        MS. LONG:  Objection to form.
6     A.    I can't comment on whether it would
7 change the fibers imbedded in the fabric.  I don't
8 know.  I've never seen a study that compared
9 individuals with asbestos fiber on their clothes
10 before and after going to work in a field.
11    Q.    Do you recall Ms. Wiman testifying that
12 Mr. Ward's clothes were much cleaner once he started
13 working in the warehouse or less dusty I should say?
14    A.    Well, he moved from working with carbon
15 black to no longer working directly with carbon black
16 so, yes, they were less dusty.
17    Q.    Do you recall the co-worker testimony
18 that the warehouse was the least dirty and dusty
19 place in the facility?
20    A.    Yes, which doesn't necessarily say a
21 lot.  That's compared to what?
22    Q.    Production.
23    A.    Understood.
24    Q.    Do you recall Mr. Kenneth Simmons
25 testifying about how dust would blow in from the

Page 137

1 parking lot into the warehouse through the truck
2 docks?
3     A.    Yes.
4     Q.    So that would obviously increase the
5 level of dust in the warehouse just from that alone?
6        MS. LONG:  Objection to form.
7     Q.    Let me ask you this way, you're not
8 testifying that all the dust in the warehouse came
9 from insulation on pipes; is that fair?
10    A.    Correct.
11    Q.    There were many sources for the dust and
12 some of it could have even come from production?
13        MS. LONG:  Objection to form.
14    A.    Correct.
15        MR. GAULT:  Actually, strike that.
16    Q.    Do you recall the testimony that when
17 the pipe insulation fell from the pipes, do you
18 recall how long or how long of sections of pipe
19 insulation fell from the pipes?
20    A.    I think it varied.  I think one time
21 there was mention of eight feet and the rest of it
22 was different pieces that didn't have necessarily a
23 length associated with it.
24    Q.    If I'm getting beyond where you're
25 comfortable testifying, you just tell me, but do you

35 (Pages 134 - 137)

Page 138

1  know much about asbestos-containing thermal
2  insulation in terms of how it's applied on pipes?
3      A.   More than most doctors, but it depends
4  on how it's applied and what product is applied.
5      Q.   If we say calcium silicate, let's say
6  Kaylo was applied to pipe insulation.  First of all,
7  Kaylo comes in three-foot sections, is that fair, if
8  you know?
9      A.   I don't know what size it comes in.
10     Q.   In terms of installing Kaylo or other
11 calcium silicate thermal insulation products on pipe,
12 do you know one way or the other when the insulators
13 initially installed it they would use stainless steel
14 wire or stainless steel straps to put it up?
15         MS. LONG:  Objection to form.
16     A.   I think it depends on the nature of how
17 they were doing it.  I've seen it where it was
18 installed with chicken wire.  I don't think it was
19 stainless steel.  In other places they may have used
20 bands that might have been stainless steel.  There
21 are all different ways of installing insulation.  I
22 don't know what makes one insulator choose one method
23 versus another.
24     Q.   But given what you said, how does it
25 make sense that an eight-foot section of pipe

Page 139

1  insulation could fall from a pipe?
2          MS. LONG:  Objection to form.
3      A.   Well, pipes are sequential and they're
4  long and it could have been that there was a leak
5  around the eight-foot section of pipe insulation and
6  it got wet and it dried and it contracted and it all
7  fell.  I don't know if Mr. Simmons was actually
8  measuring the piece.  It may have looked like it was
9  a long piece.  Once it's put together, they're
10 joined, the various pieces.  It doesn't mean that it
11 necessarily -- if it has an external coating around
12 it, it could all come down at once.
13     Q.   Obviously the insulation that fell to
14 the floor, whether or not it had asbestos in it, we
15 don't know; is that fair?
16     A.   The actual insulation that fell on the
17 floor we don't know.  We do know that there was
18 asbestos insulation based on the survey results on
19 the pipes.
20     Q.   I understand, but in terms of what
21 actually fell, we don't know whether it contained
22 asbestos or not?
23     A.   I don't recall that General Tire did any
24 measurements; so we don't know the exact amount.
25     Q.   Would you agree that any exposure

Page 140

1  Ms. Wiman would have had to asbestos as a result of
2  Mr. Ward being exposed to asbestos at General Tire
3  would be significantly less than Mr. Ward's actual
4  exposure at General Tire?
5      A.   In general, yes.
6      Q.   When I asked Dr. Ellenbecker if he could
7  put a percentage on that one exposure versus the
8  other, he cited an article, the Sammel, S-a-m-m-e-l,
9  article and said it would be about 20 percent of the
10 initial exposure.
11         Do you agree or disagree or have a
12 different opinion?
13         MS. LONG:  Objection to form.
14     A.   I know I read that article, but I don't
15 recall the exact number.
16     Q.   In terms of Dr. Ellenbecker, what areas
17 of your opinion do you rely on Dr. Ellenbecker's
18 opinion as an industrial hygienist?  If that didn't
19 make sense, let me know.
20     A.   Dr. Ellenbecker has expertise with
21 respect to the measurement of asbestos and other
22 industrial hazards, he can comment on what exposures
23 from the exposure standpoint could be within the
24 plant, so he can do an analysis of the amount of
25 asbestos that was used based on the survey that was

Page 141

1  done.
2      Q.   Would you agree there's been no
3  testimony that a forklift operator, much less Mackey
4  Lyn Ward, actually hit one of the steam lines going
5  to the steam heaters?
6      A.   No, the steam lines were above the
7  forklifts, but they described dust from the steam
8  lines on the top pallet.
9      Q.   Right, but I guess I meant like stacking
10 pallets or something like that, there was no
11 testimony that any of the forklift operators actually
12 struck the steam line, the insulated steam line with
13 the forks or the palletizers or anything like that?
14     A.   Correct.
15     Q.   One of the areas in your disclosure said
16 that you are expected to testify that the defendants
17 were in violation of asbestos regulations promulgated
18 by state governments and the United States
19 government, and that defendants violated their duties
20 under the Occupational Safety and Health Act.
21         Would you agree that you can't testify
22 that Mr. Ward was exposed above the then existing TLV
23 or PEL at any time at General Tire?
24         MS. LONG:  Objection to form.
25     A.   There's no information related to the

Priority-One Court Reporting Services Inc. – A Veritext Company
718-983-1234

Page 142

1 measurements; so I wouldn't be able to testify to a
2 specific level.
3    Q.   So you can't testify in terms of
4 exposure to asbestos that General Tire violated
5 Kentucky OSHA or OSHA vis-à-vis Mr. Ward?
6        MS. LONG:  Objection to form.
7    A.   Based on numerical values, that's
8 correct.
9    Q.   Just a couple more things from your
10 disclosure.  Would you agree with me that to the
11 extent Mr. Ward was exposed or was potentially
12 exposed to asbestos at General Tire, it would have
13 been as a bystander?
14    A.   From his work in the warehouse, yes.
15    Q.   Do you know when the General Tire
16 facility was built?
17    A.   I seem to recall seeing something about
18 1960.
19    Q.   Correct, it was started in '59 and
20 finished in '60; so that's correct.  Do you know when
21 the north warehouse was constructed or finished?
22    A.   I think that was around 1979 or 1980.
23    Q.   If the documents in this case show that
24 the north warehouse was finished in '73, do you
25 recall anything that leads you to disagree with that?

Page 143

1    A.   I don't recall either way.  I thought it
2 was later.
3    Q.   In fairness, the south warehouses were
4 completed in '78; so that might have been what you
5 were thinking.
6    A.   Okay.  I think there was some testimony
7 somewhere that the warehouses expanded and kept
8 expanding and maybe that's where I'm confused, but I
9 don't know the years of the various warehouses.
10    Q.   Actually, in fairness, I think some of
11 the testimony from the co-workers was based on their
12 recollection and I think they did say something about
13 those years, but the documents prove otherwise, but
14 whatever.
15        It says in your disclosure, Dr. Moline
16 is expected to testify when it was known that
17 bystander and household exposure were known to cause
18 disease.  I think you talked a little bit about this
19 earlier, but when is that in your opinion?
20    A.   I think the first time it was really
21 described was in 1963 by Newhouse where there was a
22 description of household exposure.
23    Q.   What were the workers doing in the
24 Newhouse study that brought home the asbestos to
25 their house?

Page 144

1    A.   That I don't remember.  Working with
2 asbestos.
3    Q.   I guess the distinction is they weren't
4 driving a forklift in a warehouse?
5    A.   I don't think there's any specificity
6 regarding that, no.
7    Q.   When do you believe that General Tire
8 should have known that Mackey Lyn Ward could
9 potentially expose his family to asbestos in his job
10 as a forklift operator in a warehouse?
11        MS. LONG:  Objection to form.
12    A.   The health hazards of asbestos were
13 known in the 1950s in the United States after
14 articles were published in the Journal of the
15 American Medical Association.  Certainly in the 1950s
16 there was knowledge in the major medical publications
17 that asbestos was a health hazard.
18    Q.   My question actually was when should
19 General Tire have known that Mr. Ward could
20 potentially take home asbestos fibers to his house
21 and expose his family?  When should General Tire have
22 known that given he's a forklift operator in a
23 warehouse?
24        MS. LONG:  Objection to form.
25 Objection, asked and answered.

Page 145

1    A.   Again, I think that they should have
2 understood that after the plant was built in 1960 if
3 there was potential exposure of the employees to
4 asbestos, then they should have known at some point
5 in the '60s.
6    Q.   Is that for all employees regardless of
7 where they're working in the plant?
8        MS. LONG:  Objection to form.
9    A.   They should be aware of the fact that
10 asbestos was present in the plant and been aware that
11 there was potential exposure, and also they should
12 have known the condition of the plant and the fact
13 that the insulation was falling down from leaks at
14 various points that could lead to exposure.
15    Q.   Were you aware that Triangle Insulation
16 was a defendant in this case?
17    A.   Only because I saw their name.  I don't
18 know what they are.  All I know is I saw their name
19 and I saw some people from Triangle asking questions
20 in depositions.
21    Q.   Were you provided any depositions of
22 former Triangle employees taken in cases years ago?
23    A.   No.
24    Q.   So you don't know what role, if any,
25 Triangle had in insulating any part of the General

Page 146

1 Tire plant?
2     A.   I do not.
3     Q.   If there's evidence that Triangle
4 insulated the north warehouses, what kind of duty
5 would Triangle have in terms of using
6 asbestos-containing pipe insulation?
7          MS. LONG:  Objection to form.  This is
8 not a question -- this witness is not here to give
9 legal conclusions as to what any defendant or
10 company's legal duty would be, that's not within her
11 disclosure or her expert opinion.  It would be a
12 conclusion for a judge or a jury.
13          If you want to ask her about factual
14 questions or opinion on things within her expertise,
15 I think that's fine, but asking her what duty another
16 company had, which is a very loaded legal term, is
17 not appropriate for this witness.
18          MR. GAULT:  Let me try to rephrase.
19 First of all, I appreciate your objection, but just
20 object to form would be fine.  The doctor can say I
21 can't testify as to a duty.
22     A.   I can't testify as to a duty.
23     Q.   There we go.  Dr. Moline, what is your
24 definition of a significant exposure to asbestos?
25     A.   One that is above background, that's

Page 147

1 non-trivial.
2     Q.   I believe that's Dr. Ellenbecker's
3 opinion too, anything above background.
4          Your disclosure says that you're
5 expected to testify that the levels of asbestos to
6 which the plaintiff was exposed during her use of and
7 exposure to defendant's talcum powder products and
8 other products would have likely exceeded established
9 TLVs and PELs in many instances.  I want to go to the
10 other products in that sentence.
11          We've already talked about that,
12 correct, you will not testify that Mr. Ward or
13 Ms. Wiman was exposed above the TLVs or PEL for
14 asbestos; is that fair?
15          MS. LONG:  Objection to form.
16     A.   Ms. Wiman is not covered by any TLV or
17 PEL because her exposures were household and those
18 are levels that are workplace exposure levels.  I
19 don't have numerical values for her actual exposure
20 level so I would not testify to them, but there is no
21 PEL, that she is not covered under any PEL.
22     Q.   I agree with you, but the disclosure
23 says you're expected to testify about what the
24 plaintiff was exposed -- that the plaintiff was
25 exposed to levels over the TLV and PEL, but that

Page 148

1 being said I think we've taken care of that.
2          MR. GAULT:  Let me just look over my
3 notes.  I don't know if counsel has some follow-ups.
4 That being said I appreciate your time.
5          MR. EWALD:  No follow-up.
6          MS. LONG:  I think we're done.
7          MR. EWALD:  Thanks.
8          (Time Noted:  3:35 p.m.)

Page 149

1              J U R A T
2
3          I, Jacqueline Moline, M.D., the witness herein,
4 do hereby certify the foregoing testimony of the
5 pages of this deposition to be a true and correct
6 transcript, subject to the corrections, if any, shown
7 on the attached page.
8
9          _____
                JACQUELINE MOLINE, M.D.
10
11
12 Subscribed and sworn to before me
13 This _____ day of _____ 2019.
14
15
          _____
16    NOTARY PUBLIC
17
18
19
20
21
22
23
24
25

Page 150

1           C E R T I F I C A T E
2
3 STATE OF NEW YORK  )
              )  ss:
4 COUNTY OF NEW YORK  )
5
6         I, BRENDA FITZGERALD, a Shorthand
7 Reporter and Notary Public within and for the State
8 of New York, do hereby certify:
9         That, Jacqueline Moline, M.D., an expert
10 witness whose DEPOSITION was held on November 25,
11 2019, as hereinbefore set forth, was duly sworn by
12 me, and that this transcript of such Examination is a
13 true and accurate record of the testimony given by
14 such witness.
15         I further certify that I am not related
16 to any of the parties to this action by blood or by
17 marriage, and that I am in no way interested in the
18 outcome of this matter.
19         IN WITNESS WHEREOF, I have hereunto set
20 my hand this 2nd day of December 2019.
21

22         _Brenda Fitzgerald_

          _____
23
          BRENDA FITZGERALD
24
25

---

Page 151

1      ERRATA SHEET
          Priority-One Court Reporting/Veritext
2          718-983-1234
   ASSIGNMENT NO. P1-3782925
3 CASE NAME: Wiman, Carolyn v. Asbestos
   DATE OF DEPOSITION: 11/25/2019
4 WITNESS' NAME: Dr Jacqueline Moline
5
   PAGE/LINE(S)/  CHANGE      REASON
6 ____/____/_____/_____/_____
   ____/____/_____/_____/_____
7 ____/____/_____/_____/_____
   ____/____/_____/_____/_____
8 ____/____/_____/_____/_____
   ____/____/_____/_____/_____
9 ____/____/_____/_____/_____
   ____/____/_____/_____/_____
10 ____/____/_____/_____/_____
   ____/____/_____/_____/_____
11 ____/____/_____/_____/_____
   ____/____/_____/_____/_____
12 ____/____/_____/_____/_____
   ____/____/_____/_____/_____
13 ____/____/_____/_____/_____
   ____/____/_____/_____/_____
14 ____/____/_____/_____/_____
   ____/____/_____/_____/_____
15 ____/____/_____/_____/_____
   ____/____/_____/_____/_____
16 ____/____/_____/_____/_____
   ____/____/_____/_____/_____
17 ____/____/_____/_____/_____
   ____/____/_____/_____/_____
18 ____/____/_____/_____/_____
   ____/____/_____/_____/_____
19 ____/____/_____/_____/_____
   ____/____/_____/_____/_____
20
        _____
        Dr Jacqueline Moline
21 (Notary not required in California)
   SUBSCRIBED AND SWORN TO
22 BEFORE ME THIS_____DAY
   OF_____, 2019.
23
   _____
24    NOTARY PUBLIC
25 MY COMMISSION EXPIRES_____

| & | | | |
|---|---|---|---|
| **&** 2:8,17 3:6,7,11 5:15 20:20 23:19 23:21 24:1,8,12 96:7,11,13 97:21 98:1,13,17 99:17 99:25 100:5 101:19 104:13,20 112:11 114:3,8 | **137.4** 106:15 **14** 2:22 113:9,12 124:14 **143.9** 106:16 **15** 2:23 98:2 116:15,23 117:8 **150** 44:24 **16** 102:7 **17** 85:1,2 | **2019** 1:18 18:11,18 22:23 23:3 27:20 40:16 94:19,20 98:2 99:24 100:2 103:15 149:13 150:11,20 151:22 **202** 21:21,25 22:1 **203** 106:24 **21** 77:21 88:13 | **36** 106:23 **3782925** 1:24 **3:35** 148:8 |

| 0 | | | 4 |
|---|---|---|---|
| **0.00002** 96:25 97:3 97:13 **00181** 1:10 **07039** 1:22 | **175** 1:17 **18** 1:10 94:7 **19** 40:17 **1950** 8:24 **1950s** 144:13,15 **1960** 9:1,4 51:6 142:18 145:2 | **22** 2:9 77:22 93:12 **25** 1:18 2:10 52:7 150:10 **26** 2:11 **27** 2:12,14 27:20 47:21 48:2 49:7 53:18 81:8 | **4** 2:3,10 25:16,19 25:21 29:15 **4.5** 112:12,16 **40202** 3:13 **40s** 114:15 **436** 21:22 **45** 123:20 |

| 1 | | | 5 |
|---|---|---|---|
| **1** 1:1 2:7 20:2,5,8 20:15 **10** 2:18 19:23 101:2,4,7 **100** 106:13,17,24 **10019-6142** 3:8 **10022** 3:3 **101** 2:18 **107** 2:19 **10:10** 1:18 **11** 2:19 23:3 107:23 108:1,4 **11/25/2019** 151:3 **110** 2:20 **111** 2:21 **113** 2:22 **117** 2:4,24 **11th** 22:22 **12** 2:20 110:20,23 111:8,14 112:8 **12:40** 75:9 **13** 2:21 111:2,4,7,9 111:19 **133.4** 106:12 | **1963** 143:21 **1970s** 128:21 **1975** 102:23 103:5 103:22 104:18 **1979** 103:2 142:22 **1980** 9:10 142:22 **1988** 103:3 **1991** 37:1 118:22 **1992** 37:7 **1993** 37:7 **1994** 37:7 **1997** 8:20,20 10:2 10:8 **1:15** 75:13 | **29** 98:2 **290** 1:22 **2nd** 150:20 | **5** 2:11 26:17,19,22 **50** 44:7 52:6 **500** 106:23 **50s** 114:15 **51** 3:7 **52nd** 3:7 **59** 142:19 |

| | | 3 | 6 |
|---|---|---|---|
| | | **3** 2:9 22:15,17,20 **30** 4:24 102:15 **30s** 114:15 **31** 67:12 **32** 72:20 73:6,11 **33** 43:13,20 44:13 45:12,19 46:14,17 49:1,4,20 50:6,25 51:3,8,19 52:4,12 53:11,13,23 54:2 55:12,16,23 56:9 57:7,25 59:19 60:5 61:7 62:13 63:19 66:2 68:3 68:17 69:22 72:1 72:8 77:8,16 78:2 78:14 80:9,21,24 81:5,10,12 82:5,11 83:19 84:12,16,20 88:3 89:11 90:9 90:14 | **6** 2:12 27:6,9,11 **60** 51:11 123:21 142:20 **60s** 114:16,16 145:5 **638,900** 124:8 |

| 2 | | | 7 |
|---|---|---|---|
| **2** 2:8 20:19,21,24 27:13 **20** 2:7,8 86:24 140:9 **2004** 9:21 **2005** 9:22 **2017** 29:9,13 34:10 **2018** 34:11,11 40:11,17 71:14 | | | **7** 2:13 18:11 27:22 28:1,3 **70s** 115:24 134:17 134:18 **718** 1:23 **718-983-1234** 151:2 **73** 53:18 142:24 **730** 3:12 **78** 143:4 |

| **8** |
|---|
| **8** 2:15 95:2,5 96:22 |
| **800** 3:3 |

| **9** |
|---|
| **9** 2:17 19:23 97:20 97:22,25 |
| **92** 118:22 |
| **94** 2:16 |
| **9485** 150:21 |
| **95** 91:22 |
| **97** 2:17 |
| **98.4** 106:23 |
| **983-1234** 1:23 |

| **a** |
|---|
| **abiding** 33:6 |
| **ability** 69:14 |
| **able** 12:22 13:1,20 45:20 64:4 81:2 126:11 129:18 142:1 |
| **absolutely** 15:16 |
| **abstract** 44:10,25 45:4,7,10 |
| **academic** 29:4,18 44:5 |
| **accepted** 2:13,18 27:23 28:5 32:20 36:6 39:12 40:20 41:6 42:7 51:6,9 101:3,11 |
| **access** 70:6 |
| **accompanied** 76:25 |
| **accurate** 11:14 34:6 55:22 69:2 150:13 |
| **acquired** 117:16 |
| **acreage** 124:2,18 |

**acres** 123:18,21 124:14
**act** 141:20
**action** 150:16
**activities** 42:11 73:19
**actual** 6:4 38:18 51:21 66:25 110:6 112:20 139:16 140:3 147:19
**add** 22:9
**added** 21:11,15 22:7,8 23:6,6 124:7
**adding** 21:3
**addition** 21:23 29:18 46:12
**additional** 7:6 13:1 15:3,13,19 18:11,20 27:18 46:11 48:8,11,15 48:22 49:19 53:20 62:19,21 63:21 75:1 77:14 103:18 105:1 109:2 122:10
**additions** 22:25 111:23
**adequate** 105:15
**adult** 111:15,20 112:3,7,25
**advance** 134:5
**advice** 78:21
**affirmatively** 112:23
**age** 50:23
**agencies** 98:25
**ago** 17:22,25 18:4 86:24 145:22
**agree** 75:16 79:4 81:11 91:12 93:22

96:23 104:9,15 105:11,22 109:4 113:17 124:9 127:11 129:21 130:10 131:12 139:25 140:11 141:2,21 142:10 147:22
**agreeing** 104:7
**agreement** 79:15 116:16
**ahead** 20:2 97:19
**air** 12:19,24 13:6 24:4 64:16 65:6,6 65:7 92:25 114:24 115:5,14,17 135:10
**airborne** 14:6 133:13,17
**airless** 59:15
**aisles** 125:8 133:3 133:8
**al** 1:8 102:24 103:2
**alexandri** 31:6,16 31:25
**alive** 58:24
**allegedly** 120:16
**allow** 109:23
**allowed** 60:21
**allowing** 22:12
**allows** 46:3
**alternate** 46:11 53:6 61:25 63:16 64:19
**alternative** 49:17 62:25 63:25 72:21 73:9 74:2,6 76:15 84:17 88:16,20
**aluminum** 94:13 94:13

**ama** 2:15 94:25
**amber** 3:4
**ambient** 92:25
**ambiguous** 113:21
**amended** 20:14
**american** 144:15
**amosite** 10:13,16 11:2,18,22 12:2,3 14:8 69:1,5
**amount** 8:7 135:13 136:2 139:24 140:24
**amphibole** 11:9
**analyses** 90:2 92:13 93:3 107:13
**analysis** 2:16 42:17 43:6,9,19 47:20 53:3 67:16 67:17,24 68:4,8,10 68:22 70:4 77:12 89:17 90:1 91:2 95:1 107:12,15 140:24
**analysts** 69:23
**analytical** 2:15 94:25
**analyze** 96:18
**analyzed** 43:13
**analyzing** 135:6
**anatomical** 55:4
**anatomically** 54:23
**anderson** 14:18 115:20 120:7
**anna** 3:9
**anonymity** 74:14
**anonymous** 37:9 50:21
**answer** 41:3 54:12 54:13 57:18 68:19 74:17 78:8,17

79:8 107:16
108:21 113:4
122:4 129:18
**answered** 62:17
144:25
**answers** 78:11
83:24 84:23
**anybody** 44:21
**anymore** 10:9
113:20 123:11
**anyway** 7:17
19:15 54:14
126:19
**apart** 33:17,18
48:9 50:22 51:25
53:19 56:11,21
58:4 60:16 61:22
62:14 73:3 75:1
99:18 100:6
103:22 122:16
125:25 127:13
**apologies** 32:4
**apologize** 10:1
62:10
**appear** 111:21
**appears** 124:13
**apple** 17:16 119:4
127:20
**application** 30:23
30:24 32:19 33:8
33:16
**applied** 80:24
138:2,4,4,6
**appreciate** 18:10
19:14 64:3 79:10
81:16 89:21,25
146:19 148:4
**approach** 106:25
**approaches**
106:17

**appropriate** 39:22
97:10 146:17
**approval** 32:16,23
33:16,17,18
**approximately**
4:14 6:21 15:1
40:9,13
**architect** 123:8
**architectural**
123:6
**area** 7:25 8:11,15
9:14 15:2 64:16
66:17 115:10
125:7 126:3
128:25
**areas** 6:9 37:19,24
37:25 140:16
141:15
**argue** 99:13
**article** 2:19 28:8
28:10,16,22 30:3,5
30:17 32:6,24
35:3,6,15 36:10
37:12 38:21 39:12
39:14,18 40:20,23
41:7,9,11,14,15,17
42:7 43:2,6,12,23
45:2,20,23 47:14
49:5,21 50:22
51:10 52:20 55:24
60:25 61:1,8,13,21
62:13 63:7 64:9
66:5 69:8 70:20
72:11 73:13 74:5
74:6 75:18 76:7
77:6,19 78:3,15
79:3,5 80:10
82:16,22 83:6
84:11 85:10,20
86:21 88:14 91:1
92:11 101:13,14

101:15 103:13,15
103:17,22,23
104:10,17 107:4,8
107:11,13,15,17
107:24 108:12,16
108:20,22 120:8
120:10 140:8,9,14
**articles** 21:4 22:3
22:4,7 29:5 36:13
75:2 94:22 120:3
120:14 144:14
**asbestos** 5:8,9 6:5
6:9,12,13,16 7:21
7:24 8:4,12,18
9:12,12,18 10:11
10:25 11:5,7,13
12:10,14,24 13:23
14:5,23 15:14,21
16:7 22:8 23:23
23:25 24:7 26:13
41:4 44:13 45:11
45:21 47:10 48:9
51:7,25 52:10,15
53:12,20,21,25
54:9 56:10,16,20
57:1,4,10,14 60:16
61:10,19 62:5,6
63:2,5 65:3,11,18
65:20 66:3,7,17,18
67:2,4,5 68:3
71:16 72:21 74:3
75:17,25 76:9,14
76:16 77:7,11
80:11,23 81:4
82:6 84:6 86:11
87:12,16,19 88:2
88:17,21 89:2
91:13,22 92:1
93:16 96:7,8,10
97:4,14 98:4,15,18
99:11,12 102:16

102:22 104:2
114:10,11,17,23
115:5,11,13,17,24
118:22 120:5,16
121:2,14,16,18
125:11,13,17,19
126:17,22,25
127:3,10 130:8,23
131:3,11,14 133:9
133:16 134:18
135:13 136:1,9
138:1 139:14,18
139:22 140:1,2,21
140:25 141:17
142:4,12 143:24
144:2,9,12,17,20
145:4,10 146:6,24
147:5,14 151:3
**asbestosis** 122:6
**aside** 113:7
**asked** 7:10 17:6,7
17:8,9 24:5 32:7
33:20 37:16,18
40:5 47:13 57:21
60:11 62:16 63:5
63:10 65:16 84:23
86:15 88:23 89:7
109:15 121:18
122:4 129:22
133:20 140:6
144:25
**asking** 11:5 17:4
23:4 50:9 55:25
56:2 57:19,20
58:3 59:25 74:12
85:24 86:19 89:6
89:21 95:15 99:21
145:19 146:15
**aspects** 32:13
**assess** 64:4

assessed  76:24
assessing  61:8
  72:20 76:14 77:12
assessment  14:13
  89:2 97:10
assignment  151:2
assist  32:12
assistance  42:15
  43:3
assistant  23:15
  110:7,10,11
assisted  5:21
  30:18,20,25 31:13
  31:24,25
associated  2:14
  12:17 27:24 28:6
  29:20 94:5 137:23
association  23:9
  144:15
assume  65:18
  116:3 131:10
assumed  125:14
  129:24
assuming  70:2
  124:10
assumption  90:6
asterisk  67:15
attached  123:1
  149:7
attachments  119:1
attempt  7:5 23:14
  24:4
attempted  12:9
  23:24 24:15
attention  55:3
  123:7
attorney  25:17
attorneys  3:2,6,11
  43:19
attributable  93:15

attributed  102:11
attributes  26:7
august  27:20
author  28:7 30:9
  31:7 35:16 43:5
  67:17,21 108:14
authored  71:17,21
  71:25 78:13
authority  115:16
authors  33:24
  38:20 39:15 43:7
  44:16,16 57:11
  88:18
available  51:18
  52:18 53:6,10
  66:23,25 70:2,5,25
  83:25
avenue  1:22 3:3
aware  25:4 26:6
  40:25 47:20 49:25
  71:13 84:9 85:12
  86:2 96:12 112:18
  115:8 127:3
  133:23 145:9,10
  145:15
awkward  39:11

### b

b  111:9,9 118:3
  122:22
baby  94:21 95:11
  96:5,11 98:3
  99:16,24 111:25
back  9:16 52:24
  65:23 73:18 75:22
  115:6 125:9
background  30:12
  30:21 31:9 35:19
  37:17 56:8 65:21
  75:25 76:6,10,17
  77:11 83:22 91:19
  92:20,25 93:8,9

97:5,14 109:14
  110:3 146:25
  147:3
balzer  13:15
banbury  125:24
  126:3
bands  138:20
base  123:13
based  7:23 14:10
  15:4 43:7 51:7
  54:13 55:4,7,9
  61:2 64:1 65:14
  73:18 74:25 76:4
  76:20 77:14,16
  85:7 86:17 87:25
  90:23 91:5 94:1
  95:9 100:17
  101:17 104:9,16
  106:21 112:15
  122:13,18 139:18
  140:25 142:7
  143:11
basically  20:10
  23:4 40:8 46:23
  48:18 53:14 114:8
  114:13
basing  69:14
  71:11
basis  8:1 11:15
  50:17 51:24 63:13
  64:19 88:18
  130:13
bay  132:1
beautiful  44:5
beautifully  51:4
began  17:25 29:16
  53:16
beginning  74:20
  74:24
behalf  43:2 94:21
  121:7

believe  9:1,10
  18:16,19 21:20
  25:12 38:15 48:20
  54:12 60:21 92:7
  94:18,23 109:11
  113:20 123:16
  132:16 144:7
  147:2
best  17:18 59:18
  63:24 69:14,19
better  53:9 110:2
bevilacqua  30:10
  30:16,25 31:3
  32:5 33:25 35:18
  45:5 85:6
beyond  6:19,22
  7:6 13:2 35:8 87:1
  87:5 137:24
binder  18:13,20
  19:6,21,25 20:1
binders  2:24 7:2
  15:25 16:2,5,11,16
  18:8,20,25 19:19
  19:24 20:10 26:25
  116:6,9,17,23
  117:7
biomarkers  37:5,7
biphasic  54:25
bit  7:18 32:14
  41:23 67:6,11
  84:25 106:7
  117:23 121:20
  143:18
bits  127:18
black  136:15,15
blew  132:15
blinded  37:10
blood  150:16
blow  135:9 136:25
blower  132:21

**blowers**  132:11,15
  132:19,24
**blowing**  132:12
**blue**  17:5
**board**  32:21 36:19
  36:21 79:1
**bore**  70:19
**bottle**  95:21,24
  98:3 99:17
**bottom**  66:11
**brake**  76:24
  120:23
**brandt**  36:24
  39:17 40:2
**break**  21:2 27:1,3
  75:6 107:21
**breaks**  127:18
**breast**  25:6,7,13
**breathe**  15:21
**brenda**  1:16 150:6
  150:23
**brief**  4:20
**briefly**  20:9 111:1
**brilliant**  32:10
**bring**  84:4
**broader**  4:11
**broadly**  99:21
**broken**  127:13
**bronchus**  106:15
**brother**  25:9
**brought**  15:24
  16:12 65:11 116:7
  120:16 143:24
**builder**  8:11
**building**  6:10
**buildings**  65:16
  124:7
**built**  125:4 142:16
  145:2
**bulk**  97:8

**burdens**  91:15
**bystander**  142:13
  143:17

**c**

**c**  1:2 3:1 4:1 111:9
  150:1,1
**cabibi**  111:9 112:7
**calcium**  138:5,11
**calculation**  24:6
  97:16 124:10
**calculator**  124:19
**calendering**  8:11
**california**  151:21
**call**  17:5 38:16
  50:5 128:9,10
**called**  1:15 39:17
  123:3
**cancer**  22:9 24:23
  25:4,4,6,7,8,8,9,11
  25:13,14 37:6
  105:9,24 106:21
**cancers**  25:1,2
  106:14
**capacity**  43:14
  122:16
**captioned**  1:15
**car**  67:2
**carbon**  136:14,15
**care**  148:1
**career**  37:3
**careful**  93:25 94:6
**carolina**  134:1
**carolyn**  1:3 5:6
  151:3
**carpenter**  5:18
  6:11 7:1
**carrying**  19:21
**casale**  120:8
**case**  1:10 4:12,23
  5:1,3 10:23 11:2
  11:18 15:24 16:14

16:15,20 17:21,23
18:3,6 23:18 24:5
26:4 28:13,19
29:1 31:20 33:4
34:17,20 35:20,23
36:14 39:22 40:6
45:24 46:2 50:6
50:12 51:8,17
52:15,25 54:15
57:17,20 58:7,10
59:23,25 60:7
61:9,14 63:4
66:10,15 68:5,23
70:12,13 71:2
72:1,13,18 73:24
74:2,21,23 75:19
75:20 77:10,22
80:19,20 84:7
94:2,3 95:20 96:4
108:17,25 109:11
111:9,10 112:4,7,9
113:1 115:1
116:11 117:15
118:10 119:22
133:7 134:14
142:23 145:16
151:3
**cases**  28:23 29:6
  29:15,17 30:19
  35:1 43:13,20
  45:12,19 46:6,10
  46:14,19,21 47:2
  47:15,21,23,25
  48:3,3,4,5,7,7,10
  48:12,15,16,18,21
  49:4,9,10,16,25
  50:10 51:17,18,21
  51:23 52:3,9
  53:10,16 54:8,15
  55:12,16,19 56:9
  57:12,25 58:8,9

59:19 60:5,14
61:7,17 62:24
63:19,25 64:12
66:2 67:7,18,25
68:3,8,11,15 69:2
69:3,4,22 70:3,8
71:13,21 72:9
73:6,11,16,16,21
74:19,21 76:22
78:14 80:9,22,24
81:5,8 83:19
84:16,20 88:7,9,22
93:14 106:22
109:5,7 120:22
121:10,13,14,16
145:22
**cataloging**  52:7
**categories**  89:8
**cause**  11:11 94:2
  101:19 143:17
**caused**  14:5 80:13
**causes**  11:5 93:23
  106:10
**cc**  12:14,14 97:9
  97:17 112:13,14
  112:16
**cc'd**  34:1
**ceiling**  125:20
  128:1,9 129:1,6
**cement**  22:8 121:2
**censored**  2:19
  107:25 108:13
**certain**  22:3 25:2
  37:19,23 59:12
  70:9 78:7
**certainly**  11:6
  12:20 24:11,22
  27:19 46:21 54:8
  60:22 66:1 68:13
  70:6,11 72:7 73:7
  79:1,13 86:1

121:10 130:21
135:13 144:15
**certainty**  68:20
126:12
**certificate**  2:15
95:1 102:12,21
103:25
**certify**  149:4
150:8,15
**challenging**  12:19
**chances**  62:20
**change**  10:2 113:5
134:25 135:18
136:7 151:5
**changed**  34:3 39:3
112:17
**changes**  23:5
37:12,15 38:5,24
42:20 76:24
**characterization**
105:21
**chart**  111:23
**chemical**  121:15
**chemicals**  121:17
**chicken**  138:18
**chief**  36:22,23
**childhood**  24:13
**chinese**  96:4,7,10
96:13 98:18
**choice**  49:14
**choose**  46:19 48:4
50:25 52:12
138:22
**choosing**  46:6,17
55:11
**chose**  51:3 68:11
**chosen**  55:20
**chrysotile**  10:14
10:16 11:9,19
12:2,3 14:8 91:13
91:18,23,25 92:4,9

92:12,21 93:4
96:13,16,18,19,23
97:4,14
**ci**  1:10
**circle**  65:23
**circuit**  1:1
**circulation**  110:4
**circumstance**  83:2
**circumstances**
82:18 120:21
**citations**  13:11
**cited**  72:2 79:7
140:8
**city**  65:15,19
**civil**  1:16
**claim**  103:7
**claimed**  64:17,18
**clarification**  37:18
37:23 38:1
**clarifications**
33:20
**clarify**  19:18
134:10
**clarity**  37:19
**classes**  37:3
**classics**  13:16
**classification**
55:10
**clean**  128:11
**cleaned**  128:14
**cleaner**  9:17
136:12
**cleaning**  15:18
128:4
**clear**  52:21 79:2
81:19 106:6 110:5
116:10,20
**clearly**  66:1
**clinical**  34:22
55:24 74:23 79:16
80:1,21

**clinician**  34:20
87:18
**close**  59:3 106:1
106:19
**closed**  10:8
**closely**  35:17
**closer**  106:24
**clothes**  14:2,2,4,5
14:14,24 15:12,20
135:10,14 136:2,3
136:9,12
**clothing**  15:7
120:17
**coating**  139:11
**coded**  103:8
**cohort**  102:2,3,8
103:5 107:14
**collaborate**  28:15
28:21 34:19
**collaboration**
89:12
**colleague**  21:18
**colleagues**  21:16
39:25 41:24 42:5
**collected**  33:12
**collecting**  88:6
**collection**  31:15
**colon**  25:11,14
**columbia**  37:2
**combination**
10:13 35:22
**combined**  11:24
11:25 124:14
**come**  13:9,13,17
30:6 31:16 32:5
79:25 93:4 95:16
122:12 128:11
131:23 132:6
137:12 139:12
**comes**  127:17
138:7,9

**clinician**  34:20
**comfortable**  79:2
137:25
**coming**  39:11
62:11 133:2,5
**commencing**  1:18
**comment**  59:21,23
60:2 73:20 74:13
80:17 120:3
121:18 136:6
140:22
**comments**  38:2
55:19 95:17,17,19
119:21,25
**commercial**  91:22
**commission**
151:25
**common**  34:25
91:13
**commonwealth**
1:2
**communicate**
40:22
**communication**
38:25
**communications**
33:14 38:7,19
39:13
**community**  1:17
65:15 67:3 114:19
114:21
**companies**  134:1
**company**  43:4
98:22 99:10
146:16
**company's**  146:10
**comparative**  81:3
**compared**  136:8
136:21
**compensated**
43:18 46:25

compiling  30:18
53:16
complete  107:16
completed  143:4
completeness  6:17
complying  21:4
components  94:15
compound  115:11
115:22
comprehensive
10:18 83:24 106:3
109:16 134:23
comprehensively
20:12 51:12
computer  35:25
36:4,5
conceivably
127:20
concentrating
129:15,17
concentration
96:23,24
concept  123:23
131:16
concern  105:15
concerns  81:21
concise  89:15
conclude  88:19
93:23 104:11,18
concluding  92:12
conclusion  93:11
100:19 105:3,4,11
107:2 122:12
146:12
conclusions  42:17
43:6 70:18 146:9
condition  145:12
conduct  7:5 47:19
81:12 83:3
conducted  32:15
133:24

conferred  87:17
confidence  106:13
106:16,20,22
confident  70:13
conflating  93:6
conflicting  112:11
confronted  63:19
confused  143:8
conjecture  64:2
76:4
conjunction
134:13
connected  125:7
connection  13:24
16:19 18:3 26:3
30:17 31:17 32:1
32:5 34:5 35:3
47:20 51:6,7 56:6
60:24 61:6,21
62:13 63:7 64:8
69:7 70:7,11
71:19 73:13 75:18
77:6 84:11 85:9
85:20 89:17 94:20
107:4,7 113:13
consent  50:20
consider  56:14
66:22
consideration
60:13 63:19 86:4
considered  52:23
54:10 56:10 62:8
73:13 74:6 75:17
78:3 93:15 116:11
127:10
consistency  68:11
consistent  75:2
90:20 91:17,21
92:8,17,20 96:9
114:25

constructed
142:21
construction  62:7
126:18,21
consulted  107:3
consulting  31:1,4
32:2
contain  127:10
contained  16:2,11
16:15 26:24 97:13
125:19 131:11
139:21
containing  6:12,13
125:13 131:11
138:1 146:6
contains  97:3
126:25
contaminated
93:16
contaminates  15:2
contaminating
15:17
contamination
100:20
content  30:8 45:6
109:22 110:8,15
115:25
contents  2:23
14:10 116:8,17
117:6
context  43:9 44:22
47:9 66:6 99:8,14
110:14
continental  3:12
117:15,17
continued  54:1
75:14
continuing  31:22
contracted  139:6
contractor  43:5

contrary  79:8
contributed  23:22
86:21
contributing
24:19
contribution
24:15
control  35:11 85:1
85:2,11,12,14,16
85:19,25 86:15
87:2,6,8,10,11,14
87:23 89:17 90:3
90:21 91:11,15,25
94:16
controls  85:7
conversation
28:14 34:4,8,12,15
34:24 40:3,10
41:18
conversations
37:6 39:23 40:25
41:11,15,24 47:5
85:13
conversely  82:13
convert  97:7
124:17
converted  97:9,17
convey  42:23
cooper  13:15
copy  2:13,18,19,20
2:21,22 18:23
22:21 27:23 38:10
38:13,15,17 42:14
44:11 66:12 101:3
107:24 108:9
110:22 111:3
113:8 116:8,23
corner  124:6
corporate  112:12
113:4

**correct**  22:24 26:4
26:14 29:10,16
30:10 31:7,8 35:6
36:8 43:15,17,20
45:7 47:17,18
54:23 56:7 58:11
58:12,14,18 59:1,4
59:7,8,10 67:22,23
69:8,9,20 70:8
72:19,23,24 73:14
74:7 76:6,10
77:23,24 78:4,6
79:6,19 80:4,8
81:13 82:16 83:4
83:5,8 84:6,13,18
84:24 87:24 89:4
91:9 92:1,5,8,21
103:13 104:4
110:12,13 111:21
111:25 112:1
118:23 119:5,6
123:15 124:11,15
126:4,5 128:2,22
129:1,12,23 131:9
131:15,24 132:2
135:16 137:10,14
141:14 142:8,19
142:20 147:12
149:5
**corrections**  149:6
**correctly**  42:18
44:14 45:12 53:22
56:12 61:19 66:19
67:19 77:4 80:25
87:20 90:12,16
102:18 103:9
105:9
**correspondence**
18:22,24
**cosmetic**  2:14
27:25 28:6 29:6

29:21 36:13 46:1
48:9 52:11 53:17
54:9 56:21,24,24
60:16 64:25 93:16
93:23
**counsel**  7:7 16:24
19:3,8 38:14
58:10 70:14 78:10
78:19 79:10 107:7
109:1 110:15,16
110:16 116:3,5,16
119:18 148:3
**count**  44:3
**counted**  11:7
51:20 90:10,14,21
91:1,7
**county**  150:4
**couple**  21:9,23
29:3 38:2 39:1
49:15 100:14
110:3 116:4 120:6
125:8 142:9
**course**  28:20 53:4
55:24 80:21
**courses**  34:22
115:9
**court**  1:1,21 59:17
79:14 116:8 118:7
151:1
**cover**  18:7,14
**covered**  147:16,21
**covering**  131:2
**create**  109:20
**creating**  89:10
**creative**  64:15
**credible**  65:22
66:3
**creek**  125:4
**criteria**  52:11
53:12,19

**critical**  108:13
**critically**  101:15
**criticized**  100:25
**crocidolite**  69:1,5
69:23
**crucial**  80:6
**crystals**  94:14
**cumulative**  23:22
24:16
**current**  25:24
**currently**  30:14
116:12
**curriculum**  2:9
22:16 83:11
**cut**  9:5 127:13
**cv**  22:21 23:1
109:21 110:6,10

**d**

**d**  2:1
**daily**  130:13,24
131:4 133:6
**data**  12:21 31:14
33:11,12 43:11
57:15 61:16,22
63:1 64:22 66:22
66:25 70:19,25
85:8 89:13 122:7
**date**  18:12 20:6,22
22:18 23:5 25:19
26:20 27:9 28:1
42:11 95:3 97:23
101:5 108:2
110:24 111:5
113:10 117:9
151:3
**dated**  18:11 22:21
23:3 98:1
**daughter**  16:7
**day**  31:21 130:19
130:20,22 133:3,8
149:13 150:20

151:22
**days**  114:24 115:5
115:18 124:22
**deal**  78:9 102:5
**dealing**  79:18
**dearth**  85:16
**death**  102:11,12
102:14,20,22
103:4,7,21,25
104:11,17 106:11
**deaths**  105:5
106:10
**deceive**  81:24
**december**  150:20
**decide**  36:10
**decided**  28:15
47:23 48:2 50:4
**decrease**  135:13
136:2
**defendant**  3:6,11
70:6 145:16 146:9
**defendant's**  147:7
**defendants**  1:9
141:16,19
**defense**  43:2 58:17
58:20 70:12
**defer**  12:17
**define**  4:10 54:18
**definitely**  125:5
134:12
**definition**  55:6
146:24
**degree**  30:14
31:11 68:20
120:18 126:12
**delayed**  17:24
40:18
**demonstrated**
10:24
**department**  39:25
42:2 128:18

**depend** 60:23
**dependent** 84:23
**depending** 113:5
**depends** 63:9
  109:10 120:21
  134:21 138:3,16
**deposed** 57:20
  59:9,12,14 74:1
**deposit** 96:4,7,14
**deposition** 1:6,15
  1:16 2:7,10 4:9
  7:3,13 16:6,9,9
  17:8 20:4,14,14
  25:18,22,25 53:5
  57:16,21 61:6
  63:6,10 64:7,7
  65:2 66:4 73:12
  73:19 74:4,4 76:4
  77:14 82:23 83:18
  109:2 118:11
  119:8 123:1,13
  130:3 134:5 149:5
  150:10 151:3
**depositions** 8:5
  58:22,24 61:6,12
  63:14 65:25 88:15
  88:19,22,24 89:4
  112:17 119:2,10
  119:11 123:2
  126:10,19 129:8
  145:20,21
**derived** 122:7
**describe** 7:20
  34:21 44:11 46:5
  48:3 51:5 67:2
**described** 35:10
  35:12 37:20 51:13
  56:17 62:7 64:23
  88:1 89:19,23
  90:22 91:3 104:21
  127:21,22 130:7

  131:18 132:14
  141:7 143:21
**describes** 91:5
**describing** 32:19
  51:11 129:9,19
**description** 2:6
  15:5 73:24 88:24
  124:2,25 125:3
  132:11 143:22
**descriptions** 7:23
  12:24 35:24 80:19
  123:25
**design** 94:1
**detail** 4:15 68:9,23
  80:21 106:8
**detailed** 7:19
**details** 85:10
**detect** 105:16
**determination**
  81:3,3
**determined** 76:16
**determining** 56:15
**developed** 44:20
**developing** 11:23
  30:21
**development**
  42:16
**diagnosed** 54:17
  122:6
**diagnosis** 50:23
**diapering** 111:15
  111:20,25 112:3,8
  112:25
**died** 9:25 25:13,14
**different** 11:13
  19:20 22:4 30:2
  57:5,6 68:10
  130:5 137:22
  138:21 140:12
**differentiate** 55:4
  55:7,9,11

**differentiation**
  46:2
**difficult** 74:13
**diffusing** 122:16
**diffusion** 5:18
**digestion** 28:22
  35:13 37:21,25
  47:1,13 48:2,14
  50:2 68:14,17
  69:6,22 70:23
  71:1,12
**digestions** 35:4,5,8
  47:8,16 48:17
  71:12 78:2 90:25
  91:6
**diminished** 9:13
**direct** 6:11
**directly** 36:3 56:4
  70:19 89:14
  136:15
**dirty** 136:18
**disagree** 79:11
  124:9 129:21
  140:11 142:25
**discern** 45:20
**disclosure** 42:21
  141:15 142:10
  143:15 146:11
  147:4,22
**discredited** 122:23
**discuss** 38:14 42:3
  42:6 49:10 71:5
  77:22 78:1 85:10
  101:21 109:1
  122:19
**discussed** 4:23
  26:25 47:8,17,21
  47:22 49:20 80:9
  82:15 83:10 84:21
  85:14 89:3 92:5
  115:10 116:5

  129:5
**discussing** 42:5
**discussion** 8:10
  28:20 35:21 48:1
  69:1 75:23 77:25
  83:11 85:1 86:1,3
  89:25 94:8 96:3
**discussions** 37:17
**disease** 94:4 105:8
  143:18
**diseases** 105:16
**disruption** 131:1
**distinction** 125:5
  132:25 144:3
**distinctions** 125:1
**disturbed** 12:25
**disturbing** 13:8
**division** 1:1
**divorced** 9:24,25
**docks** 137:2
**doctor** 19:15 20:7
  20:23 28:2 45:9
  75:16 84:5,13
  88:7,8,10 98:5
  101:7 146:20
**doctors** 80:7 138:3
**document** 23:15
  96:20,21 108:4
  110:6 124:5
**documented** 98:24
**documents** 2:23
  19:7 21:1,7 26:24
  117:7 118:20,25
  122:25 142:23
  143:13
**doing** 6:4,8 12:21
  15:3 28:13 29:1
  42:12 138:17
  143:23
**doors** 132:1

**dose** 24:2,5
**double** 39:6,9 94:9
**dr** 2:8,9,10,11,12
 4:6 12:18 13:20
 16:8,9 17:1,5
 19:22 20:20 22:16
 22:19 25:17,20
 26:2,18,21 27:7
 28:17,20 34:5,16
 34:18,23 35:2
 39:17 40:2 46:24
 46:25 47:6,17,19
 48:5,13,13,16 49:3
 49:12,21 50:1
 51:5 67:22 68:6
 68:18 69:6 70:4
 70:24 71:8,10
 74:12,17 78:11,12
 78:23 85:4,5,7,10
 85:19,23 86:7,17
 86:18,20,23 87:2
 87:24 89:9,14,16
 89:20 90:18,23
 91:1,5,7 95:4
 97:24,24 101:6
 108:3 116:6,11
 117:12,25 118:9
 121:20 125:15
 126:6 127:8
 129:22 130:4,6,7
 140:6,16,17,20
 143:15 146:23
 147:2 151:4,20
**draft** 28:8 29:24
 41:14
**drafted** 35:20,23
 85:4,5
**drafting** 35:15,16
 35:18 45:4 52:19
 85:9

**drafts** 30:3,4 41:9
**drawing** 123:6
**dried** 14:4 139:6
**drive** 1:17 125:8
**driving** 144:4
**dry** 5:24
**due** 102:22 103:21
 104:11,17 105:6
**duly** 4:2 150:11
**duplicative** 17:3
 37:18
**dust** 8:7 14:2
 15:17,20 127:22
 127:22 132:12,15
 133:9 136:25
 137:5,8,11 141:7
**dusty** 136:13,16
 136:18
**duties** 141:19
**duty** 146:4,10,15
 146:21,22

## e

**e** 2:1 3:1,1,9 4:1,1
 4:1 75:11,11
 102:25,25 118:18
 140:8 150:1,1
**earlier** 30:2,4 53:8
 69:12 84:22
 118:10 120:6
 135:17 143:19
**early** 24:13 34:11
 41:23 73:17
 134:17
**earn** 22:12
**ease** 19:20
**easy** 74:22
**editor** 36:22,23
**editorial** 36:19
**educational** 30:12
 31:9 83:22

**effect** 126:16
**effective** 133:11
**effects** 2:19 107:25
 108:12 114:12
**egilman** 108:14
**eight** 48:21 76:24
 137:21 138:25
 139:5
**either** 8:2 49:2
 53:4 55:10 82:21
 143:1
**element** 80:6
 133:6
**elevated** 106:2,11
 107:1
**elicitation** 93:17
**elizabeth** 21:19
**ellenbecker** 7:10
 12:18 13:20 118:9
 125:15 127:8
 129:22 130:4,6,7
 146:16,20
**ellenbecker's** 16:9
 140:17 147:2
**elongated** 2:19
 107:25 108:13
**embarked** 74:24
**emphasize** 68:25
**employed** 102:13
**employees** 101:12
 134:25 145:3,6,22
**employment** 9:4
 102:15
**enclosing** 18:11,24
**encounter** 55:23
**encountered** 5:10
**encounters** 15:22
**encouraged** 39:20
**endeavor** 50:19
 74:25

**ended** 49:20
**ends** 39:10 107:20
**ensure** 33:5 48:11
 87:18 116:9
**entails** 33:11
**enterprises** 1:8
**entire** 23:21 98:7,9
**entitled** 2:13,19
 27:24 28:5 87:3
 107:24 130:6
**entrainment** 8:4
**environment** 6:8
 9:17 129:20
**environmental**
 23:9 36:7 40:21
 66:19
**envisioning** 39:18
**epa** 100:25
**epidemiology**
 32:10
**episodic** 130:9
**epithelioid** 55:1
**equipment** 125:24
**equivalent** 12:6
**errata** 151:1
**erroneous** 6:20
**errors** 39:2
**especially** 106:19
**esq** 3:4,8,9,13
**essential** 51:25
**essentially** 115:5
**established** 147:8
**estimate** 13:9,14
 24:2,3 44:3 54:5
 111:15,15,20,20
 112:3,8
**estimates** 112:25
**estimation** 53:11
 53:24
**et** 1:8 102:24
 103:2

**ethics** 79:8
**evaluate** 81:8
**evaluated** 80:22
**evaluating** 63:2
　67:8 71:16 83:23
　94:4
**evaluation** 84:20
　93:1
**evens** 12:7
**eventually** 116:23
　136:3
**evidence** 24:23
　62:4 64:13 65:17
　93:14 94:1 105:5
　105:8,18,23 146:3
**evident** 105:19
**ewald** 2:3 3:8 4:5
　18:23 19:5,22
　20:1,13,18 22:14
　25:15 26:16 27:5
　27:21 38:12 75:7
　75:15 78:19,22
　79:10 97:19 98:21
　99:21 100:3 101:1
　107:23 108:10
　110:20 116:1,21
　116:25 117:3
　148:5,7
**exact** 10:20 29:11
　51:20,20 52:2,5
　139:24 140:15
**exactly** 9:15
**examination** 1:6
　1:15 2:2 4:4 75:14
　117:10 150:12
**examined** 4:3
**example** 11:2 44:7
　45:22 46:3,12
　52:17,22 53:1
　56:22 59:4 62:3
　106:20 109:11

　115:11
**exceeded** 147:8
**excerpt** 98:8,11
**excess** 105:5,7
**excluded** 46:14
　49:16 51:24 52:23
　53:7 63:17 77:2
**excluding** 52:14
**exclusion** 53:19
**exclusions** 52:8
**exhaust** 132:8
**exhaustive** 88:16
　88:20
**exhibit** 20:2,5,8,15
　20:19,21,24 22:15
　22:17,20 25:16,19
　25:21 26:17,19,22
　27:6,9,11,13,22,25
　28:3 29:15 95:2,5
　96:22 97:20,22,25
　101:2,4,7 107:23
　108:1,4 110:20,23
　111:2,4,7,8,9,14
　112:8 113:9,12
　116:15,23 117:8
**exhibits** 2:5 19:23
　99:20
**existed** 60:18 72:4
**existing** 141:22
**exists** 11:24
　123:11
**expanded** 143:7
**expanding** 143:8
**expect** 91:24
**expected** 70:24
　141:16 143:16
　147:5,23
**experience** 67:8
**experienced** 12:10
　12:15 15:14
　129:24

**expert** 16:18 17:20
　43:14 47:1,9
　58:16 70:6,7,12
　75:19 78:12,13
　146:11 150:9
**expertise** 100:18
　140:20 146:14
**experts** 41:4
**expires** 151:25
**explain** 106:7
**explained** 40:6
**explicit** 47:14
　86:22
**explicitly** 96:17
　102:21
**explosion** 114:17
**exponent** 2:18
　101:3,11
**expose** 144:9,21
**exposed** 8:18
　10:11 11:19,20
　14:6,23 77:9
　95:24 120:17,18
　126:7 131:14
　140:2 141:22
　142:11,12 147:6
　147:13,24,25
**exposure** 5:11,17
　5:20,25 6:3,5,16
　6:18,21,23,24 7:19
　7:21,22 8:12 9:13
　10:6,7,8,16 11:8
　11:24 12:10,15,25
　13:2,23 14:1,8,13
　15:13,19 22:5
　23:18,23,25 24:11
　24:14 26:14 29:7
　29:17 44:14,20
　45:21,25 46:1
　48:11 51:11 52:16
　53:2,7,12,20,21,25

　54:9 56:19,21,23
　56:25 57:4 59:1
　61:10,16,19,22
　62:5,24,25 63:1,5
　63:11,11,12,16,21
　63:25 64:13,19
　65:3,14,18,20 66:3
　66:7,17 67:5,8
　68:4 73:10 74:2,6
　77:1,3,7,11,14
　79:17,21 80:2,6,11
　80:24 81:4,11,13
　82:6,10,15,19,20
　83:3,8,21 86:9,11
　86:12 87:12,13,17
　87:19 88:17,21
　89:3 92:1,8,17,20
　93:18 94:5 95:23
　97:3,5,13,15
　102:16,17,21
　104:2 111:24
　120:5,9,11,15,22
　120:23,25 121:3
　130:8,15,23
　139:25 140:4,7,10
　140:23 142:4
　143:17,22 145:3
　145:11,14 146:24
　147:7,18,19
**exposures** 5:7,9,15
　9:3,6 11:6 13:8
　14:20 22:6 24:7
　44:12 46:11,11
　48:15,22 49:17
　51:25 56:9,16
　57:10,15 60:15
　62:1 63:3 64:5,15
　66:19,22 72:21
　75:17,25,25 76:5,9
　76:15,16,23 84:6
　84:17 88:2 120:13

140:22 147:17
**extensive** 24:12
61:18 76:21 79:17
79:21 80:2 88:2
120:25
**extent** 10:24 11:21
61:5 69:4 74:18
96:3 100:7 108:24
119:3 133:8 136:1
142:11
**external** 42:15
139:11
**eyewitness** 128:19

**f**

**f** 75:11 150:1
**fabric** 136:7
**face** 98:22 99:7,9
99:13
**facile** 109:24
**facilities** 121:12
**facility** 121:4,5,9
123:18 136:19
142:16
**fact** 63:13 64:1,19
76:4 86:2 89:3
91:22 105:14
121:25 145:9,12
**factor** 65:16
**factual** 146:13
**faculty** 42:4,7
**failed** 32:4
**fair** 15:25 26:2
52:20 59:19 88:3
108:23 109:17
120:19 122:13,24
124:23 128:15
130:13,17 131:8
133:10 135:15
137:9 138:7
139:15 147:14

**fairly** 73:17
**fairness** 118:18
143:3,10
**fall** 139:1
**fallen** 8:4 129:19
130:16
**falling** 128:1 129:5
129:16,17 130:9
130:15,18 145:13
**falls** 15:20
**familiar** 83:22
113:14 134:4
**family** 17:11,12
24:22,25 25:3,4
58:25 61:23 82:24
83:17 84:11,24
86:12,12,15 144:9
144:21
**fans** 132:8
**farm** 135:23,25
**farming** 124:22
**fashion** 14:6
**father** 5:17 25:8
**father's** 6:3 7:1
**fda** 94:19,21,23
95:14,15 96:5
98:4 99:15,23
100:4
**fda's** 95:10,16,17
95:18
**features** 50:22
**february** 18:15,16
18:18
**fed** 125:21
**federal** 1:16 98:25
**feeding** 100:8
**feel** 6:17
**feels** 79:2,6
**feet** 124:8,17
137:21

**feinstein** 32:16
**fell** 8:1,2,2 127:14
128:8,25 129:9,14
137:17,19 139:7
139:13,16,21
**fellowship** 37:5
**felt** 17:2 29:7
32:25 33:5 37:16
68:7 112:18
**female** 55:13
**fiber** 11:15,15,23
11:23 12:14 97:9
97:17 136:9
**fibers** 11:14 12:14
90:10,14 91:8
112:13,13,14,16
135:13 136:1,7
144:20
**fibrous** 92:24 93:8
**field** 36:12 136:10
**figure** 124:12
**figures** 111:19
**film** 122:21
**final** 39:2 93:11
**financial** 99:11
**find** 39:5,6 73:23
73:25 91:24 98:4
98:15 99:4,12
102:4 134:16
**finding** 96:8 98:23
99:5,6,6,11 101:22
**findings** 92:4
96:10,12 107:4
**fine** 107:9 117:22
146:15,20
**finish** 60:1
**finished** 96:9
107:19 135:8
142:20,21,24
**firm** 18:21 19:4,17

**first** 4:1 5:12 6:2
7:19 18:2 28:7
55:4 61:16 64:6
65:1 74:3,20
81:15 102:5
103:11 105:12
108:14 114:1,7
117:23 118:14
128:18 130:18
138:6 143:20
146:19
**firsthand** 129:25
**fischbein** 115:21
**fitting** 51:10
**fitzgerald** 1:17
150:6,23
**five** 91:2,4 102:14
130:22
**fixed** 39:1
**flesh** 34:20
**floor** 8:2 15:18
131:3 133:9,16
139:14,17
**floors** 133:8
**focus** 48:18 49:4
49:13 50:3 134:18
**folks** 7:17
**follow** 99:24 102:2
102:23 148:3,5
**following** 78:20
102:15
**follows** 4:3
**foot** 138:7,25
139:5
**footage** 124:3,7
**fordyce** 103:15
104:17
**foregoing** 149:4
**forenoon** 1:18
**forgot** 121:20

**fork** 125:8
**forklift** 135:9
  141:3,11 144:4,10
  144:22
**forklifts** 8:3 131:2
  141:7
**forks** 141:13
**form** 5:5 6:6 7:8
  9:8,9 13:4 14:9
  15:15 21:13 24:21
  26:10 28:9 38:9
  38:22 39:16 41:8
  42:1,9,25 46:8
  47:4,11 48:19
  49:6,24 50:8 60:8
  60:19 63:8 64:10
  66:24 70:1,21
  73:15 74:9 76:18
  81:14 87:9 88:4
  89:5 91:20 92:14
  92:22 93:20 95:13
  97:6 100:21 113:2
  114:6 115:2,19
  120:20 121:21
  122:2 124:16
  129:3 130:14
  134:20 135:2
  136:5 137:6,13
  138:15 139:2
  140:13 141:24
  142:6 144:11,24
  145:8 146:7,20
  147:15
**format** 45:3
**formatted** 23:15
**former** 145:22
**forth** 75:22 125:9
  150:11
**forward** 17:24
  112:23

**found** 65:1 69:2,5
  71:9,10 92:9,12,15
  92:25 93:3,4,7
  94:16,18 95:11
  96:10 114:12
**four** 6:21 12:4,5
  25:23
**fragments** 38:3
**free** 31:23
**freedom** 44:5
**freight** 131:20,22
**frequency** 14:22
**friable** 127:10,13
  127:15,20
**friday** 4:21
**friend** 59:3
**front** 19:15 67:2
**fudge** 122:15
**full** 65:23 87:14
  93:18
**function** 118:4
**funding** 42:14,21
**funds** 42:15
**further** 63:19 67:6
  73:18,20 79:5
  80:17 87:1 105:5
  122:20 150:15
**future** 135:4

## g

**gaseous** 5:18
**gather** 129:23
**gault** 2:4 3:11,13
  9:9 14:9 15:15
  117:11,14 119:19
  130:17 133:22
  137:15 146:18
  148:2
**general** 5:12,13
  7:20 9:2,6 10:8
  15:9 17:15 24:9
  27:13 46:9,16

54:19 57:8 59:5
60:9 76:22 83:12
87:11 92:25 93:8
93:9 115:3 117:16
117:20 118:20,24
120:5,19 122:25
123:9 126:8,15
133:25 134:7
139:23 140:2,4,5
141:23 142:4,12
142:15 144:7,19
144:21 145:25
**generally** 16:3
  96:4 120:14
**generated** 8:8
**generating** 58:6
**generation** 61:12
  71:24 72:8
**genetic** 24:23 25:1
**genetics** 24:19
**gentleman** 122:22
**getting** 11:10
  33:17,18 137:24
**give** 29:11 44:2
  46:3 51:21 52:5
  54:11 70:15
  114:13 126:11
**given** 48:20 61:5
  103:12 134:9
  138:24 144:22
  150:13
**giving** 63:3
**glanced** 20:9
**gleaned** 125:22
**go** 7:14 20:2,11
  22:12 61:14 73:18
  79:5 87:5 94:7
  97:19,24 109:21
  120:13 146:23
  147:9

**goes** 87:15 102:20
**going** 4:18 9:16
  12:18 22:2 25:15
  27:3 32:9 33:11
  33:12 45:14 46:23
  50:4 52:3,24
  53:23 71:5 72:15
  74:8 75:3,4 78:8,8
  79:7 86:5 87:4
  90:18 98:5 100:6
  107:9,18 108:11
  110:25 111:1
  112:23 116:1
  117:19 121:24
  125:15 135:10
  136:10 141:4
**good** 4:6,7 19:2
  32:10
**google** 124:19
**gordon** 28:14,17
  28:20 34:5,16,18
  34:23 35:2 46:25
  47:6,17,19 48:5,13
  48:13,16 49:3,12
  49:21 50:1 67:22
  68:6,18 69:6 71:8
  71:10 85:4,5,10,19
  85:23 86:7,18,20
  86:23 87:24 89:9
  89:14,16 90:18,23
  91:1,5,7
**gordon's** 70:4,24
  85:7 86:17 87:2
  89:20
**government**
  141:19
**governments**
  141:18
**graduate** 30:14
**grammar** 113:19

**grammatical** 39:1
**graves** 1:1
**great** 1:17 117:3
**greater** 80:20 94:3
  120:17
**greenstone** 109:5
  109:15
**greeting** 15:20
**gross** 24:3
**group** 39:15 86:15
  87:6,14 90:3
  91:11 102:4
**growth** 114:17
**guess** 44:8 78:16
  78:19 89:24
  109:18 141:9
  144:3
**guidelines** 45:1
  79:9

**h**

**hairdressers** 56:23
**half** 12:4 75:4
**hand** 19:6 64:22
  124:6 150:20
**handing** 20:7,23
  22:19 26:21 27:10
  28:2 101:6 108:3
**handwritten** 2:11
  26:18,23
**hang** 5:22
**hanging** 5:24
**happen** 74:16
  125:11 130:12,19
  135:4
**happened** 31:23
  64:11 87:23 131:7
**happening** 63:22
**happy** 59:14,16
  109:3
**hard** 64:13

**harvard** 134:2
**hat** 29:18
**hats** 29:19
**hazard** 114:10
  134:19 144:17
**hazards** 114:9
  134:2,24 140:22
  144:12
**head** 124:21
**health** 1:17 2:19
  30:13 32:16 33:2
  33:3,9,15 50:16
  107:25 108:12
  114:9,10,12 134:2
  134:19,24 141:20
  144:12,17
**hear** 30:9 100:12
  100:14,15 117:12
**heard** 92:23 118:2
**hearing** 53:22
  77:4
**heater** 132:21
**heaters** 125:21
  132:11,20,24
  141:5
**held** 150:10
**help** 18:10 23:16
  43:4 133:10 136:2
**helped** 5:22 30:22
**helper** 5:18
**helpful** 7:16 95:8
**helps** 21:16
**hereinbefore**
  150:11
**heretofore** 51:12
**hereunto** 150:19
**herrin** 117:25
  121:20
**herrington** 3:6
**hiccup** 40:17

**higher** 11:22,22
  54:4,6 121:3
**highest** 96:24
**highlight** 119:20
**highlighting**
  119:15
**hipaa** 50:16 78:24
**historical** 51:14,15
**histories** 61:14
  66:10,16 83:8,12
  83:14 86:9
**history** 24:22,24
  25:3,4 51:1 79:17
  79:21 80:2,6,11
  81:11,13 82:6,11
  82:15,19,20 83:3
  83:21 92:1,17
  93:17,18 98:24
**hit** 141:4
**hofstra** 31:13
**hold** 86:5
**home** 14:19 15:8
  15:12 22:5 46:1
  46:13 56:25 57:2
  57:2 62:6,7 65:11
  120:9,11,12,16,22
  120:25 135:10,14
  135:18,22 143:24
  144:20
**honestly** 33:21
  44:2 52:5 63:22
  81:15,17
**hopefully** 52:24
**hose** 135:10
**hot** 66:13
**hour** 75:4 107:19
**hourly** 43:18
**hours** 4:8,14,16
  43:22 44:1,3,7
  114:24

**house** 15:17,18
  136:4 143:25
  144:20
**household** 15:2
  56:19 143:17,22
  147:17
**huge** 124:4,23
**hugging** 15:21
**human** 33:7
**humans** 33:1
**husband** 5:11,12
  5:13 7:20 15:7
  26:14 46:2 122:5
**husband's** 13:24
  14:24 24:9
**hygiene** 7:12
  115:9
**hygienist** 7:13
  13:21 140:18
**hypothesis** 64:1
  134:21
**hypothetical** 58:7
  63:12 64:5 74:10
  76:3 89:6
**hypothetically**
  60:4 64:21 74:16

**i**

**idea** 28:8,16,19
  37:10 57:18
  123:17,23
**ident** 2:6
**identifiable** 33:3
  57:3 84:8
**identification** 20:6
  20:22 22:18 25:19
  26:20 27:9 28:1
  53:6 95:2 97:23
  101:5 108:2
  110:24 111:5
  113:10 114:10,11
  117:8

**identified** 5:10
35:6 44:11 47:2
48:16 50:9,12,21
52:15 56:10 62:14
69:23 72:12 74:3
77:6 78:15 91:14
94:15 97:25
**identify** 25:21
26:13 28:3 37:24
52:10 63:4 103:7
108:7 115:16
**identifying** 50:22
**identities** 78:14
**idiopathic** 93:15
**ignore** 69:24
**ilo** 121:21
**imagine** 43:24
**imbedded** 136:7
**immaterial** 31:11
**immediate** 135:4
**immediately** 15:8
**impact** 96:2
**impacted** 10:6
95:23
**impeached** 60:12
**imperative** 93:18
**implications** 51:15
**important** 29:7
30:8 33:5 68:7
83:21 112:19
**inadequate** 105:19
**include** 6:18 25:25
35:19 40:24 46:22
48:23 54:3 58:13
58:16,21 60:13
77:16 85:14
106:13 112:21
**included** 6:11
10:18 18:8 19:18
20:10 27:13 43:7
45:22,25 48:24,25

49:1,2 53:1 54:10
59:24 61:18,25
62:2,9,18,22,24
64:20 67:1 71:6
73:21 88:15,19
100:22 107:15,17
109:22 116:17
**includes** 58:23
**including** 42:12
85:17 86:22
127:22
**incorporated** 23:7
23:12
**increase** 105:16
106:1,4 137:4
**increased** 105:8
105:23
**independently**
89:22 122:12
**indicate** 25:1
**indicated** 25:3
**individual** 46:6
54:17 55:13 57:6
61:23 62:5,9
63:20 65:8,17
75:20 77:2 82:24
82:25 84:24
103:25 104:25
120:15
**individuals** 39:14
39:24 41:3 44:13
51:8 55:23 59:2
67:1 86:10 87:12
91:25 92:16
120:23 121:11
136:9
**industrial** 7:12,12
13:21 115:9 126:8
126:14,24 140:18
140:22

**industries** 104:23
**industry** 66:18
67:5 102:14
104:22
**inform** 10:22
95:19 96:5 98:16
101:18 103:15
**information** 5:16
5:20 6:19,25 7:4
13:21 33:2,3
35:11 50:16 53:5
56:14 58:4,5 59:1
59:3 61:3 62:19
62:21 64:21 65:22
68:24 75:1 76:5
76:19 77:15,17
78:24 80:23 81:4
81:23 82:22 83:25
87:1 100:8,10,12
100:16 103:5,18
103:20 104:10,16
105:1 107:6
109:14 112:15
122:10,18,20
125:25 126:10,16
127:1 141:25
**initial** 18:24 19:25
20:1 38:11,16
40:3 47:12 61:3
71:11 100:20
140:10
**initially** 17:23
52:3 58:5 138:13
**inside** 131:20
**insider** 100:8
**installed** 138:13
138:18
**installing** 138:10
138:21
**instance** 65:9

**instances** 147:9
**institute** 32:16
**institutional** 32:20
**instruct** 79:8
**insulated** 8:14
141:12 146:4
**insulating** 145:25
**insulation** 7:24
8:14 10:25 11:3,8
13:8 14:10 125:23
128:1,8,25 129:5,9
129:14 130:9,19
131:11 137:9,17
137:19 138:2,6,11
138:21 139:1,5,13
139:16,18 145:13
145:15 146:6
**insulator** 138:22
**insulators** 138:12
**intact** 127:12
**intend** 108:25
**intent** 78:10
**intention** 116:7
**interacting** 15:16
**interest** 6:17 31:19
34:25 98:23 99:6
99:11
**interested** 31:21
32:7 39:19 40:5
150:17
**interesting** 17:16
**internal** 78:25
**interpret** 90:2
**interpretation**
43:8
**interpreted** 89:25
**interval** 106:13,16
106:20,22
**interview** 53:4
**interviews** 23:6

**investigation** 7:6
57:11 88:1
**investigator** 34:2
67:18,25 68:6
69:5
**invoice** 4:25
**involved** 31:4,17
32:5 33:1 46:13
118:9
**involvement** 50:1
**involves** 104:12
**involving** 121:14
**ionizing** 102:17
**irb** 30:22,24 32:11
50:15
**issue** 8:6 59:6
90:25 91:6 123:10
**issued** 73:10
**issues** 27:14
**italian** 121:1
**iterative** 21:7

**j**

**j** 4:1 149:1
**j&j** 111:15,15,20
111:20 112:3,7,7
112:24,24
**jacqueline** 1:7 2:3
149:3,9 150:9
151:4,20
**janitorial** 128:10
128:11,17
**jaw** 17:16 119:4
127:20
**jersey** 1:22
**job** 1:24 8:18 10:1
10:12 11:20 12:11
12:15 19:2 110:11
144:9
**john** 3:8 119:7
127:25 128:3,20
128:23 129:23

131:6 132:16
**johnson** 2:17,17
3:7,7 5:15,15
23:18,19,21,21
24:1,1,8,8,12,12
96:7,11,11,13,13
97:21,21 98:1,1,13
98:13,17,18 99:17
99:17,25,25 100:5
100:6 101:19
104:13,13,20,20
112:11,11 114:3,4
114:8,8
**johnson's** 94:21
95:11 96:5,7 98:3
99:16,24 101:19
**joined** 139:10
**joint** 115:11,21
133:24 134:2
**jotting** 119:22
**journal** 36:7,11,12
36:13,14,19,21
38:7,20 39:12,15
39:19 40:7,14,21
41:6 44:24 144:14
**journals** 36:16
39:22
**judge** 1:2 146:12
**jump** 121:19
**jumping** 32:14
**jurisdiction** 60:24
71:17
**jurisdictions** 59:6
59:11,13,13
**jury** 112:2,7
146:12

**k**

**kaylo** 138:6,7,10
**kazan** 18:21
**kazan's** 19:4

**keep** 42:10 61:3
**keeping** 22:11
**kenneth** 119:4
127:21,24 128:7
128:23 131:6
133:1 135:7
136:24
**kentucky** 1:2 3:13
5:19 123:16 142:5
**kept** 143:7
**key** 50:5
**kidney** 106:21
**kind** 6:3 14:12
29:5 33:11 35:19
42:11 121:15
146:4
**kinds** 42:3
**king** 39:9
**knew** 32:9 112:6
**knocks** 127:18
**know** 7:10,14
10:20 11:11 14:18
17:22 18:14 21:25
33:19 36:18,20,21
36:25 37:6,8 42:2
44:9 49:19 52:7
54:7,12 57:19
58:2 59:21 65:10
67:12 68:13,16
71:2 78:7 80:16
82:10 83:7,9,13
86:20,21 87:3
89:16,22 90:19
95:14 103:1
104:22 105:3
113:19 115:7,10
118:5,8,8,16,21
122:5,6,15,16
123:9,21 126:15
126:20 127:1
134:6,14 136:8

138:1,8,9,12,22
139:7,15,17,17,21
139:24 140:14,19
142:15,20 143:9
145:18,18,24
148:3
**knowingly** 69:18
**knowledge** 31:3
45:14 69:20 82:25
83:15,18,20 84:5
99:15,23 100:4,5
103:24 104:1
130:1 144:16
**known** 34:22 37:1
87:12,19 113:17
113:23 114:3,4,14
114:15,18 143:16
143:17 144:8,13
144:19,22 145:4
145:12
**knows** 113:23
**konigsberg** 3:2
109:7,12
**kristen** 30:9

**l**

**l** 3:8 4:1,1 102:25
140:8
**lab** 68:8 99:4,5
**labeling** 19:2
**labs** 68:9 98:14
99:25
**lacked** 105:15
**ladened** 14:2
**lamm** 101:24
103:3,13,17
**langer** 115:23
**large** 8:1 124:1
**largely** 105:6
**late** 40:15
**latency** 96:1

**latta** 1:3
**laundered** 14:25
**laundering** 5:23
14:1,14,23 15:19
**laundry** 5:22 15:1
15:3,4
**law** 19:17
**lawn** 67:2
**lawyer** 31:10 56:2
109:25
**lawyers** 39:9
40:23 43:2,3 56:5
83:4,16 84:10,18
109:10,22
**lay** 74:10
**lead** 145:14
**leading** 44:12,17
44:21,21 66:18
71:23
**leads** 142:25
**leak** 139:4
**leaks** 145:13
**learned** 115:6
**leases** 95:16
**leave** 90:9 112:19
132:21
**leaving** 102:15
132:5
**led** 6:23 12:25
15:13 23:23 62:1
67:5
**lee** 100:19,24
**lee's** 100:23
**left** 15:11 124:6
**legal** 31:11 146:9
146:10,16
**legend** 124:6,11
**legitimate** 64:6
65:2,4,5
**length** 8:16 90:11
90:15 91:8 137:23

**letter** 18:7,10,14
19:4,4
**level** 11:2 87:4
137:5 142:2
147:20
**levels** 92:20 147:5
147:18,18,25
**levy** 3:2 109:7,12
**license** 118:6
**life** 23:21 52:25
**liked** 14:4
**likelihood** 29:12
61:25 121:2
**limit** 47:23 49:14
87:8
**limitation** 78:1
**limitations** 69:15
69:18 77:19,22
78:1,6 88:14
105:13
**limited** 64:22
109:13
**line** 63:24 69:11
107:19 141:12,12
151:5
**lines** 33:13 50:24
53:19 141:4,6,8
**list** 2:8,10,23
13:19 16:4 20:17
20:21,25 21:2,6,12
21:21 22:2,11,13
25:18,22 27:12,14
27:15 29:15 33:10
41:21 48:10,20,23
53:23 98:24
108:19,21 116:24
116:25 117:6
120:12,13
**listed** 31:6 49:5
96:24 112:24

**listing** 50:10,12
111:14 118:3
**lists** 124:6
**literally** 108:19
131:20
**literature** 13:7,12
14:16 29:8 51:9
51:13 85:16
114:17 120:24
**litigation** 31:1,4
32:1 41:5 43:14
47:2,10 50:7 56:6
57:12 65:1 70:9
**little** 7:18 17:24
32:14 40:17 41:23
67:6,11 83:10
84:25 106:7
107:18 117:23
121:19 143:18
**live** 65:15
**lived** 64:16 65:19
**living** 56:25 57:2
65:14
**livingston** 1:22
**llp** 3:2,6
**loaded** 146:16
**located** 123:10
125:13
**location** 54:21
55:4
**long** 3:4 4:21,22
4:24 5:5 6:6 7:8
9:8 11:4,10 12:7
13:4 19:3 21:13
24:21 28:9,13,19
29:1,1 38:9,22
39:16 41:8 42:1,9
42:25 44:9 46:8
47:4,11 48:19
49:6,24 50:8
52:21 60:8,19

62:16 63:8 64:10
66:24 70:1,21
73:15 74:8 75:5
76:18 78:20,23
81:14 87:9 88:4
89:5 91:20 92:14
92:22 93:20 95:13
97:6 98:19 99:19
100:2,21 107:9
108:9 109:12
113:2 114:6 115:2
115:13,19 116:19
116:22 117:1
119:17 120:20
122:2 124:16,22
129:3 130:14
133:21 134:20
135:2 136:5 137:6
137:13,18,18
138:15 139:2,4,9
140:13 141:24
142:6 144:11,24
145:8 146:7
147:15 148:6
**longer** 9:14 74:21
136:15
**longhand** 36:3
**longo** 17:1,5
**longo's** 16:8
**look** 11:25 13:7,13
13:18 19:7 60:9
61:2 70:12,18
76:15 93:10 94:24
102:10 105:2,12
106:20 111:11,18
113:14 116:2
117:4 122:21,22
124:11 135:5
148:2
**looked** 46:10 54:7
70:25 76:19 139:8

**looking** 18:9 43:11
48:7,10 67:15
91:11 135:3
**looks** 124:8
**losing** 118:6
**lost** 52:13
**lot** 99:18 106:24
136:21 137:1
**louisville** 3:13
**lovely** 59:17
**lunch** 75:5,23
**lung** 25:9 91:14
106:16
**lyn** 119:12 120:4
120:18 121:22
128:19,24 129:24
130:1,7 141:4
144:8

**m**

**m** 4:1 140:8,8
**m.d.** 1:7 2:3 149:3
149:9 150:9
**ma'am** 119:19
**mackey** 118:4
119:12 120:4,18
121:21 128:19,24
129:24 130:1,7
141:3 144:8
**magnani** 120:8
**magnesium** 94:14
**mailed** 118:18
**main** 3:12 37:21
**maintain** 38:13
74:14
**major** 51:1 84:3
144:16
**majority** 4:20
**making** 37:11
**male** 55:13
**malignant** 105:7

**man** 101:23
103:19
**manage** 21:16
**manner** 11:25
47:12
**manufacturing**
8:13 64:18 120:23
121:5,8,11 126:14
126:18,21,23
127:4 134:1,3,25
**manuscript** 2:13
2:18 27:23 28:5
36:6,15 39:2
42:17 43:15,17
54:11 55:15 56:18
62:2 73:8 101:4
101:11
**manuscripts** 42:12
**map** 119:2
**mark** 20:2,18
22:14 25:15 26:16
27:5,21 97:19
101:1 107:23
110:20,25 111:1
**marked** 20:5,8,21
20:24 22:17,20
25:18,21 26:19,22
27:8,10,25 28:3
29:15 95:1,5
96:22 97:22,25
101:4,7 108:1,4
110:23 111:4,6
113:9,11 117:8
**marriage** 150:17
**married** 5:14 8:22
8:24,25
**mas** 111:24
**mass** 96:22
**master's** 30:13
**match** 78:13
125:11

**matches** 50:6
**matching** 79:4
**material** 10:21
125:13,19 126:17
127:6,9,9 130:16
131:12
**materials** 2:12
4:19 6:12,14 7:6
16:10,14 18:1,3,24
19:1 27:7 57:9
58:9 61:15 62:7
66:9 71:23 72:2
72:12 73:1,4 77:5
116:10 134:9
**matter** 1:16 8:21
11:1,18 54:16
150:18
**matters** 8:21
**maya** 31:6
**mayfield** 123:15
**mean** 4:10 8:21
32:17 44:18 45:18
49:7 54:21,24,25
54:25 55:1 99:1,8
106:6,8 109:17
119:11,18 123:18
126:20 129:13
139:10
**meaning** 65:6 81:7
95:25 131:22
**means** 32:18 93:3
99:14
**meant** 46:4 112:13
141:9
**measurable** 66:3
**measure** 115:13
**measured** 14:18
115:12 120:11
**measurement**
13:10 140:21

**measurements**
13:6 139:24 142:1
**measuring** 115:24
139:8
**med** 83:7,9,13
**medical** 4:17,18
16:4 26:3,6,7,10
26:11,13 29:8
31:10,12,21 32:17
51:9,13 58:13
62:15 83:11,16,20
85:16 114:20
118:1,6 122:1
126:12 144:15,16
**medicine** 23:9
31:13,19 36:8
40:22 80:7 84:5
84:13
**meeting** 4:21,22
37:2 42:7
**meetings** 42:4
**member** 58:25
61:23
**members** 17:11,12
36:18 82:24 83:17
84:11,24
**men** 53:18
**mention** 6:20 26:9
76:9 78:5 103:3
107:1 126:9
132:10 137:21
**mentioned** 6:1
26:12 34:4 102:6
102:21 118:10,21
119:4 120:2,6
122:24 135:11
**mentor** 37:5
**meso** 102:4
**mesothelioma**
2:14 5:7 11:6,16
11:23 23:23 24:20

24:25 26:8 27:24
28:6 29:6,20
44:12,17,21 51:7
54:16 55:8 79:18
79:22 80:1,12
93:14,19,24 94:4
101:20,22 102:1
102:12,22 103:3,4
103:21 104:12,18
105:17
**mess** 23:14
**met** 118:2
**method** 91:6
138:22
**methodology**
35:10 37:20,24
68:10 81:7 96:17
100:25
**methods** 61:15
66:9 91:3
**mexico** 123:12
**micrometer** 90:11
90:15 91:8
**micrometers** 91:2
91:4
**mid** 128:21
**middle** 61:16
**millers** 105:6
**mind** 13:17
**mine** 104:3
**mineral** 2:19
107:25 108:13
**miners** 102:1
105:6
**mines** 104:13,20
**minutes** 4:24
**mischaracterizat...**
109:8
**mishear** 10:6
**misinforming**
98:25

**missing** 20:25 22:3
**mistaken** 21:20
118:11
**modified** 85:19
**moline** 1:7 2:3,6
4:6 19:8,22 20:5
20:21 22:17,19
25:18,20 26:2,19
26:21 27:8,25
46:24 74:12,17
78:11,12,23 95:2,4
97:22,24,24 101:4
101:6 108:1,3
110:23 111:4
113:9 116:6,11
117:8,12 126:6
143:15 146:23
149:3,9 150:9
151:4,20
**moline's** 2:8,9,10
2:11,12 20:20
22:16 25:17 26:18
27:7
**monday** 1:18
**monferrato** 120:8
**monitoring** 24:4
65:7
**month** 23:10
**months** 17:22,25
21:24
**morning** 4:6,7
**mortality** 105:7
106:11
**mother** 5:22 25:6
25:11
**move** 9:17 17:23
78:9
**moved** 9:10
123:12 136:14
**mt** 1:22

**multiple** 8:9 47:24
69:23
**mysterious** 101:23

**n**

**n** 2:1 3:1 4:1,1
75:11,11,11
102:25
**name** 17:18 21:19
50:7,21 117:14,25
118:8 145:17,18
151:3,4
**napier** 3:11
**natural** 34:24
**nature** 7:20 33:8
134:23 138:16
**necessarily** 6:7
90:2 136:20
137:22 139:11
**necessary** 32:25
109:2
**neck** 1:18
**need** 27:18 44:3
94:24 97:7,8,16
119:24
**needed** 34:20
**negative** 39:6
79:24 94:9
**negatives** 39:9
**neither** 128:23
131:6
**never** 9:16,25 32:3
47:25 60:9 92:23
118:2,2 128:14
136:8
**new** 1:18,22 3:3,3
3:8,8 4:2 23:6,7,8
57:11 73:25 98:2
150:3,4,8
**newhouse** 143:21
143:24

**nice** 44:4
**nicholson** 115:23
120:10
**night** 136:4
**nine** 48:21
**non** 44:13 105:7
114:8 127:10
147:1
**north** 9:11 125:2,3
134:1 142:21,24
146:4
**northwell** 1:17
32:16 33:9,15
**notary** 1:17 4:2
149:16 150:7
151:21,24
**note** 12:1 79:11
90:10
**noted** 17:1 20:10
72:9 75:9,13
102:12 122:3
125:16 148:8
**notes** 2:11 4:18
26:19,23 72:15,17
75:19 116:2 117:4
119:16,25 122:3
148:3
**notice** 2:7 20:4,14
20:14
**november** 1:18
18:11 22:22 23:3
150:10
**number** 13:19
14:17,19 21:4
47:23 49:13 50:25
51:10,15,20,20,22
52:2,6 54:2,3,11
55:19 113:6
116:14 119:24
140:15

**numbered** 21:21 102:6
**numbers** 13:5 66:11 123:22
**numerical** 14:15 142:7 147:19

**o**

**o** 4:1 75:11,11,11
**object** 9:9 14:9 15:15 74:8 146:20
**objection** 5:5 6:6 7:8 9:8 13:4 21:13 24:21 28:9 38:9 38:22 39:16 41:8 42:1,9,25 46:8 47:4,11 48:19 49:6,24 50:8 60:8 60:19 62:16 63:8 64:10 66:24 70:1 70:21 73:15 76:18 81:14 87:9 88:4 89:5 91:20 92:14 92:22 93:20 95:13 97:6 100:21 113:2 114:6 115:2,19 120:20 122:2 124:16 129:3 130:14,17 134:20 135:2 136:5 137:6 137:13 138:15 139:2 140:13 141:24 142:6 144:11,24,25 145:8 146:7,19 147:15
**objective** 44:10
**obtain** 7:15 82:20
**obtained** 42:15 61:17 81:5 82:23 86:9

**obtaining** 80:23 93:18
**obviously** 35:12 118:9 127:24 137:4 139:13
**occasionally** 58:19
**occasions** 15:10
**occupation** 50:23 56:20
**occupational** 23:8 31:19 36:7 40:21 44:13 56:23 67:7 80:7 83:8,12,14 84:5,12 141:20
**occupations** 102:17
**occurred** 8:15 23:10 40:10 63:18 74:4 102:14,23 104:18 130:20 131:5
**occurrence** 130:22 130:25 131:4
**occurring** 103:21 129:7 130:1
**october** 98:2
**odd** 117:24
**odds** 107:20
**offensive** 24:10
**offering** 5:4 6:15 10:22 23:17 113:1 114:2,3
**okay** 60:3 71:7 76:13 102:9 104:8 109:9 117:1,12,21 130:4 133:22 143:6
**once** 53:22 60:10 93:14 133:3 136:12 139:9,12

**ones** 5:25 6:1 7:4 48:17,24 76:16 123:1
**online** 38:25
**ooo** 2:25 3:16
**open** 102:15 116:14 132:5
**operator** 141:3 144:10,22
**operators** 135:9 141:11
**opinion** 6:15 8:16 10:10,15 12:16 13:2 14:7,21 15:12 24:10,18 41:10 80:12 92:19 97:2,12 114:3 115:4 126:6,11 130:6 140:12,17 140:18 143:19 146:11,14 147:3
**opinions** 5:3 10:22 11:1,11,12,17 13:22,25 16:19 23:17 58:10 63:3 95:19 96:6 98:17 99:2 100:17 101:18 103:13,16 108:16,25 112:25 114:2,25
**opportunities** 69:16,17
**opportunity** 16:24 17:9
**opposed** 10:16 11:19 56:1
**oral** 1:6,15
**order** 32:23 34:20 61:3 97:9
**ordinarily** 79:17

**original** 18:13,25
**orrick** 3:6
**osha** 142:5,5
**outcome** 150:18
**outside** 39:14 42:16 43:3 95:22
**ovarian** 22:9 25:8
**overall** 49:1 57:8
**overlapped** 37:4
**overwhelming** 47:24
**overwhelmingly** 112:10
**owned** 117:21

**p**

**p** 3:1,1
**p.m.** 75:9,13 148:8
**p1-3782925** 151:2
**page** 2:2 66:8,11 66:14,15,15 67:12 77:21 80:18 85:1 85:2 88:13 89:10 90:9,14 93:12 94:7 105:13 116:12 149:7 151:5
**pages** 102:7 149:5
**paginated** 66:12
**paid** 43:1 99:5
**pallet** 141:8
**palletizers** 141:13
**pallets** 131:3 141:10
**pancreatic** 25:8
**paper** 30:21 31:12 31:14,17 32:13,15 33:4 34:6 35:12 36:2 37:8 39:24 40:3,14 46:18,20 46:21 47:9,17 51:2 54:2 59:24

62:22,24 63:17
67:1,19 68:1
69:11,15,17,24
71:6,19 73:22
76:12 77:17,21
85:13,15,17 86:2
89:19,20 91:7
92:3,16 93:11,14
93:22 101:24
115:20,21,23
127:19
**paper's** 77:25
**papers** 115:22
**paragraph** 61:16
66:6 85:2,3 86:8
88:1 102:10 105:2
105:3
**paragraphs** 69:15
**paralegal** 110:1
**parallel** 28:18
**parameters** 46:5
46:16
**parking** 137:1
**part** 21:1 43:5
68:2 73:3 74:22
79:16 80:1 92:11
124:1 127:18
134:8 145:25
**participating** 57:2
**particles** 2:19
108:1,13
**particular** 24:5
45:2,23 57:17
61:9 62:2 63:3
68:5 72:1 74:2
104:25 113:6
122:19 134:14
**particularly** 7:16
84:7
**particulars** 86:7

**parties** 150:16
**parts** 101:14
127:13
**pass** 116:1 117:4
**passed** 7:17 9:20
9:21 124:22
**passing** 40:1 41:18
41:24 125:25
126:9
**passive** 113:17,20
**pathological** 55:10
**pathologists** 87:17
**paths** 37:4
**patient** 79:9 79:18
79:21,25 80:11
82:7
**patient's** 89:3
**patients** 34:22
62:13 67:9 77:8,8
78:3 81:10 82:14
83:17 84:10 87:16
91:10 92:5,13
93:19 94:16
**patrick** 3:13
117:14
**paul** 36:24 119:7
127:25 128:3,21
128:23 129:23
131:6 132:16
**pay** 55:3 123:7
**peer** 29:25 37:9,12
38:1,8 55:18
**pel** 141:23 147:13
147:17,21,21,25
**pels** 147:9
**people** 19:12 42:2
42:11,11 79:5
83:18 88:5,23
145:19
**percent** 52:6,7
53:18,18 91:22

96:25 97:3,13
140:9
**percentage** 10:20
11:22 140:7
**perfect** 45:24
**pericardial** 54:20
**period** 8:8 44:2
95:22,25 96:1
117:20 130:21
**peritoneal** 5:7
54:20
**permits** 78:10
79:14
**person** 17:17
19:11,16 65:19
71:6 89:10
**personal** 33:2,3
60:13 61:12 82:25
86:11,12,15
103:24 122:9
**personally** 7:14
12:12 19:14 43:23
80:10 81:10 82:6
82:14,19 83:3
96:2 128:14
**perspective**
103:12
**pft** 121:21
**pfts** 122:15,15
**ph.d.** 30:15
**phenomenal** 32:11
**phone** 34:14 116:3
**phonetic** 21:19
**phrase** 44:17
**physically** 35:24
129:13
**physician** 17:13
29:4 67:7 122:8,9
122:17,19
**pick** 74:21

**picked** 51:14
**piece** 36:1 139:8,9
**pieces** 137:22
139:10
**pipe** 11:7 13:8
14:10 127:25
128:8,25 129:9,14
130:9,18 131:2
137:17,18 138:6
138:11,25 139:1,5
146:6
**pipes** 7:24 8:14
10:19,25 125:20
126:5 137:9,17,19
138:2 139:3,19
**place** 34:13 78:25
88:25 136:19
**placeholder**
116:16
**places** 138:19
**plaintiff** 3:2 43:2
58:23 70:7 121:8
147:6,24,24
**plaintiff's** 50:7
58:21 70:14
**plaintiffs** 1:4
43:19 58:17 78:11
84:12
**plant** 5:19 6:10
7:14,15 16:8 65:9
65:10 67:3 117:20
117:21 123:4,9,18
123:21 127:2
140:24 145:2,7,10
145:12 146:1
**plants** 64:18
120:24 121:2,17
123:7 134:3
**platy** 92:24
**play** 30:16 35:2,14

played 24:19
plc 3:11
pleasant 1:22
please 4:15 20:3
  22:14,15 25:21
  26:16,22 27:5,6,11
  27:21 28:3 82:2
  101:2 107:23
  108:8 110:21
  111:2
pleural 54:20
plus 112:13
point 7:9 9:5,17
  22:6,10 23:2
  27:19 28:14 29:9
  29:12 34:10 38:13
  39:1 40:11 48:14
  52:25 75:22,23
  102:5 114:14
  115:7 145:4
pointed 105:14
points 43:25 68:25
  70:9 114:5 145:14
polan 14:19 120:7
poorly 53:8
population 87:10
  87:11,23 89:18
  90:21 91:15,25
  94:16
pose 90:8
position 79:1,12
  89:1
possession 108:20
possibility 78:2
  102:16
possible 5:19 50:2
  61:4 66:18 68:13
  68:20,21 88:11
  102:17 104:11,16
possibly 70:10
  101:22

potency 11:13
potent 12:4,5,6
potential 5:25 6:3
  6:16,18,21 8:12
  15:21 24:7 49:16
  52:10,15 53:12,21
  53:24 56:9,15
  57:10,14 60:15
  61:9 63:2,4 64:5
  64:15 65:2 66:16
  67:5 68:3 71:16
  72:20 75:17,24
  76:8,14,15 77:3,7
  82:8 84:5,17 88:2
  89:2 104:2 120:4
  127:14 130:8
  134:2,19,24 145:3
  145:11
potentially 53:2
  92:23 120:18
  142:11 144:9,20
powder 44:12,20
  45:10 56:11 80:13
  83:1 86:13,16,23
  87:7,13 93:16,23
  94:15,17,21 95:11
  96:5,11 98:3
  99:12,12,16,24
  147:7
power 105:16,20
powerpoint 2:20
  2:21,22 109:6,13
  109:16 110:2,22
  111:3 113:8
powerpoints
  112:22
practice 55:24
  79:16 80:1
predated 86:1,2,3
predisposition
  25:2

preferences
  109:11
prepare 58:10
  109:15
prepared 4:25
  19:8,9 21:6
preparing 4:8
  72:11
presence 91:19
  93:3
present 11:3 62:3
  79:22 92:24 103:8
  112:2,6 115:14
  125:17 128:20
  129:14 145:10
presentable 89:13
presentation 55:5
presentations
  110:2
presented 31:20
  45:19 49:22 63:1
  64:13,14 67:16,19
  68:1,9 70:19 76:3
  80:20 111:8,10,12
presenting 68:23
  93:19
president 19:13
  23:8
press 2:17 95:16
  97:21 98:1,6,7,9
  98:12 100:7,18,23
presses 66:13
presumably 84:9
  84:14
presupposing
  79:20
pretty 34:14 39:11
  47:14
prevented 62:23
previous 54:13
  96:12 98:11

previously 31:25
  43:13 78:12 80:5
  84:3 85:21 98:3
  103:12,16 111:12
  112:15
prime 52:25
principal 34:2
  35:16
prior 43:16 60:12
  70:2 104:2
priority 1:21
  151:1
privacy 81:21
privileges 79:6
privy 100:12
probably 4:23
  21:9 34:10,11
  86:3 129:16
problem 19:5
procedure 1:16
proceed 78:17
proceeding 34:5
  34:17
process 37:9,13
  38:8 55:18 57:7
  71:15 109:19
  126:23
produced 134:7
product 96:9
  138:4
production 8:15
  125:7 126:3,23
  136:22 137:12
products 5:15
  23:19,20,22 24:1,8
  92:8,10 126:22
  127:3 138:11
  147:7,8,10
profession 57:1
program 109:23

**project** 33:11
**projects** 31:22
**promulgated** 141:17
**proof** 64:16 65:7
**proofs** 38:24
**proper** 80:6 83:7
**property** 123:19
**propose** 116:15
**proposing** 116:20 116:22
**proposition** 115:17
**protected** 50:15 50:16 78:24
**protection** 33:6
**protections** 79:7
**protocol** 32:19 89:16 90:1,3
**protocols** 89:23
**provable** 63:13
**prove** 143:13
**provide** 13:1,20 18:22 19:17 72:10 72:16 105:23 110:8,15
**provided** 2:25 7:2 7:7 19:16,17 33:9 35:11,17 57:22 58:3,5 61:3,24 62:4,19,21 65:13 65:19,22 66:2 72:14 76:20 77:15 103:6 104:10,16 107:6 109:13 117:7 119:14 145:21
**providence** 47:15
**provider** 26:7,12
**provides** 93:14 94:1 105:5

**public** 1:17 4:2 30:13 149:16 150:7 151:24
**publically** 99:18 100:13,15
**publication** 33:1 38:25 39:13 40:20 41:7 42:8 55:16
**publications** 23:7 144:16
**publish** 39:22
**published** 36:13 39:2 45:16 85:21 86:24 144:14
**publishes** 36:14 69:13
**publishing** 34:25 39:20 40:6
**pull** 21:2 131:20
**pulmonary** 118:4
**pulmonologists** 86:10
**pursuant** 1:16
**put** 44:25 69:15,19 78:25 116:18 138:14 139:9 140:7
**puts** 110:16
**putting** 29:18

**q**

**qualitative** 12:23
**quantify** 12:9 23:24 77:1 131:7
**quantitative** 12:17 13:10,14 14:12
**queen** 39:9
**question** 5:16 53:8 53:9 54:13,14,24 57:19 58:1 60:1 60:11 63:11,15 65:23 68:19 71:9

73:3 74:18 76:7 76:13 78:16 82:2 84:2 85:22 87:16 89:24 90:7 95:18 109:18 113:16,22 117:24 144:18 146:8
**questionable** 48:22
**questioned** 83:17 84:10 87:6
**questioners** 83:23
**questioning** 61:18 76:20 83:2 84:16 84:22 88:16,20,25 107:19
**questionnaire** 76:22
**questions** 7:11 17:4,7 33:10 62:12 70:19 78:17 79:13 83:24 84:23 86:25 88:23 108:11,22 116:4 122:4 145:19 146:14
**quick** 107:21
**quite** 17:2
**quote** 88:19

**r**

**r** 3:1 75:11 149:1 150:1
**radiation** 102:18
**radiologist** 117:24
**raise** 19:15
**raised** 64:6 73:10
**ranges** 106:23,23
**rare** 94:4 105:16
**rarely** 58:19
**rate** 43:19

**rates** 106:14
**ratio** 106:11
**rauf** 36:24 39:17 40:2
**ray** 117:25 122:11
**reach** 70:17 79:14 106:4 116:16
**reached** 17:6
**read** 19:19 21:3 42:18 44:14 45:12 47:24 56:12 61:19 66:19 67:19 80:25 87:20 88:22 90:12 90:16 94:11,11 98:11 99:18 100:10,11 101:14 101:15 102:18 103:9 105:9 107:12 108:24 129:8 130:5 134:14 140:14
**reader** 47:24 113:21 122:22
**readers** 40:7
**reading** 4:17,19 7:12,13 108:18 118:3
**reads** 67:16
**real** 63:11 65:12
**realized** 22:2 28:23 34:19,24 48:7
**really** 5:22 58:2 64:14 83:20 131:7 143:20
**realm** 70:24
**reason** 51:3 151:5
**reasonable** 126:11
**recall** 15:6 21:11 21:14 26:11 27:15 33:19,21 34:8,11

34:12 37:25 38:4
40:12,13,19 52:2
57:24 58:4 63:18
63:22 64:11,12,25
65:8,21,24 66:1
68:12 71:1 72:4
76:1 80:14,15,17
83:12 88:12 96:15
96:19 98:10
107:10,12,14,16
117:24 119:3
121:6,7,15 123:22
124:1 125:10
127:24 128:12
129:4,4 132:4,14
133:1,5,6 135:7,11
135:19,21 136:11
136:17,24 137:16
137:18 139:23
140:15 142:17,25
143:1
**recalling** 132:22
**receive** 58:9
118:21,24 134:8
134:11,12
**received** 20:5,21
22:17 25:18 26:19
27:8,25 38:7 43:3
95:1 97:22 101:4
108:1 110:23
111:4 113:9 134:6
**recess** 27:4 75:8
107:22
**recollection** 81:17
81:25 82:3,5
101:21,25 130:2
132:17 143:12
**record** 18:5 19:22
20:2,13 28:4
29:14 38:6 67:21
78:8 79:11 93:13

94:10 98:1 107:21
108:7,24 110:5
111:7 116:5,6,10
150:13
**records** 4:17,18
7:16 16:4 18:11
26:3,6,10,13 58:13
62:15 122:1,13,14
**reductive** 109:18
**refer** 19:10 117:19
**reference** 2:8
13:18 20:16,20,25
21:6,21 22:2 51:2
51:14 69:12
103:22 114:14
120:12 125:25
**referenced** 13:12
22:7 55:23 72:22
73:1,4 75:18
122:5 123:3
**references** 14:16
21:3,17,23 105:3
123:20
**referred** 56:1
101:24 113:22
**referring** 10:2
19:23 41:25 43:10
81:6,21 94:12
**reflected** 112:8,21
**reflects** 116:12
**regard** 11:12
120:4
**regarding** 7:1 47:6
61:18 85:11 87:2
103:6,20 144:6
**regardless** 77:10
117:20 145:6
**regular** 8:1
**regularity** 131:5
**regulations** 141:17

**relatable** 119:22
**relate** 111:24
**related** 5:20 22:4,9
27:14 35:1 39:24
80:23 86:25
107:10 141:25
150:15
**relating** 7:19
**relative** 24:14,15
**release** 2:17 97:22
98:1,6,8,9,12
100:18,23
**relevant** 9:3,7
83:18
**reliance** 2:8 20:17
20:21 21:1 27:12
27:14 98:24
**relied** 2:12 27:8
**rely** 83:19 108:25
115:4,16 120:3
140:17
**relying** 82:20
84:17 108:16
112:24 113:6
122:19
**remain** 45:15
114:24 115:5,17
**remains** 103:19
**remember** 36:4
37:22 40:9 41:20
48:23 51:19 81:15
82:10 118:16
128:5,7,18 131:19
132:9,23 133:4
144:1
**remove** 133:10
**removed** 77:9
**rendering** 80:12
**renovations** 46:13
57:3 62:8

**rephrase** 146:18
**report** 27:19 31:20
35:23 57:23 59:7
60:25 68:23 70:13
71:18,22,24,25
72:3,10,14,17,22
72:23 73:2,4,5,11
73:24 77:2 94:24
106:10 107:11,17
118:1,3
**reported** 92:16
100:7 103:3
120:22
**reporter** 1:17
59:17 116:8 150:7
**reporting** 1:21
151:1
**reports** 34:21
35:20 53:15 58:6
58:16,20 70:7,7
75:19 78:12,13
79:4 80:20 120:24
121:13 125:17
**represent** 74:11
111:7 113:12
117:14
**representative**
112:12 113:4
**represented**
112:16
**reputation** 63:24
69:10
**request** 18:23
33:14,23
**requested** 38:1,5
**requests** 34:3
**required** 32:23
151:21
**requirements** 33:6
**research** 31:21
32:17 50:19

researcher 32:12
reserve 79:13
residence 66:17
residents 66:7
respect 9:6 10:1,5
  11:12,15,17 13:2
  13:23,23 23:18
  25:5 35:14 38:8
  38:21 40:23 41:3
  42:5 54:19 61:1
  64:12,22 71:1
  73:6 80:22 84:19
  84:22 87:23 88:5
  90:21 95:11 96:6
  98:11,17 99:1
  103:13,16 104:1
  112:12 121:1
  129:6 140:21
respiratory 105:7
  105:9,23 106:14
responsible 89:10
responsive 65:24
rest 137:21
restrictions 78:25
result 5:7 37:12
  97:14 140:1
results 35:13,21
  43:8 45:9 67:18
  68:1 85:3 96:1
  98:25 139:18
retained 17:20
  18:6
retest 100:6
retested 98:13
  100:9
retired 5:14 8:20
  10:3,8
returned 15:8
review 6:25 18:16
  25:10 32:20 37:9
  37:12 38:8,11,16

38:17,18 41:10
43:21 55:18 57:15
61:11,22 62:12
64:7 68:2,4 72:12
77:5 79:1 100:18
108:14 118:11,13
118:21,24 119:7
119:11 122:11,11
134:5,11,13
reviewed 2:12
10:22 15:23 16:10
16:15 26:3,24
27:8 28:23 32:20
37:8 48:6 49:10
51:21 52:4 53:16
54:8 57:16,21
60:6,17,20 61:7
62:18,20 63:6
67:7 69:7 71:18
71:22 72:2,22,25
73:2,5 77:5 94:20
95:10,19 101:13
101:16,17 118:15
118:16 121:10
reviewer 38:1
reviewers 29:25
reviewing 17:25
18:3 29:5,14,17
48:10 57:9,14
60:15
revise 73:18
revised 23:4 74:25
revisions 22:25
33:20
rewrite 38:4
right 39:5 41:13
41:16,17 49:13,17
52:21 69:11 70:15
77:19 78:23 80:3
80:7 82:7 85:2
110:7 128:17

135:19,22 141:9
rights 79:13
rigor 80:22 81:4,6
84:15,18,19,21
risk 11:23 65:16
105:8,23
rj 100:19,23,24
rohl 115:23
role 24:18 30:16
35:2,14 145:24
ron 28:14
roof 7:25 127:14
127:18,19,23
132:8
roofing 127:5,9,9
room 59:15
rotations 31:18
rubber 133:24
134:15
rules 1:16 44:24
run 8:3 128:4

**s**

s 3:1,6,11 75:11,11
75:11 102:25
140:8 151:5
safety 141:20
sake 68:11
salas 21:19
sammel 140:8
sample 85:19 87:8
90:1 97:8
samples 35:11
85:1,2,14,16 86:1
87:2 100:20
sampling 10:17,18
10:20,21 62:5
64:16 65:7
sanctioned 118:6
sarcomatoid 54:25
saw 21:21 41:17
118:1,2,3 123:25

126:18 129:6
145:17,18,19
saying 48:25 59:22
60:5 72:6 79:23
81:19 82:4 93:7
99:3 106:8 114:14
says 19:7 67:6
102:7 129:22
143:15 147:4,23
scenarios 65:14
scheduled 17:23
schematic 123:3
schematics 123:5
school 30:14 31:13
83:11
schupbach 3:11
science 51:1
scientific 63:23
70:17 77:18
114:19,20
scientist 69:11,24
70:18
screened 86:11
se 83:21 123:5
second 5:13 21:1
45:10 53:2 101:23
114:1 116:2
secondary 7:22
section 30:21 56:8
85:3 86:23 89:20
138:25 139:5
sections 137:18
138:7
see 15:25 23:7
39:7,18 46:10
83:24 96:21
111:16 117:4
118:19 125:1
126:16 127:5
129:21 134:22

seeing 96:15 98:10
142:17
seek 7:15
seen 17:19 20:8
41:21 65:9 94:22
94:23 95:6,7
96:10,19 98:6,7,8
98:8 100:23 101:8
107:13 108:4,6,15
108:19 122:25
136:8 138:17
select 51:18
selected 48:12
selecting 51:16
53:10 54:15
selevan 102:24,24
103:1,2
semantic 44:19
send 19:3 40:8
41:9
sense 24:3 43:22
46:9 51:23 57:7
138:25 140:19
sent 4:19 18:12,20
18:20 19:7 29:25
38:23
sentence 42:24
45:10,18 93:11
94:8,10 105:13
147:10
sentences 38:3
93:6
separate 24:16
41:13,15 51:25
104:2
separately 43:16
sequential 53:14
139:3
sequentially 46:23
series 28:13,19
29:1 33:4 34:17

36:14 39:23 40:6
46:7 51:8,17,24
52:15 54:16 77:10
77:23 94:2,3
serve 41:4
services 1:21 2:15
94:25
set 19:1 85:11,12
113:7 150:11,19
settles 114:25
seven 80:18
shake 5:23 12:8
14:4
shaken 8:9
shaking 14:5,14
shape 26:10
sheet 151:1
shift 129:13 135:8
shook 14:2
shorter 44:1
shorthand 1:17
150:6
show 71:4 78:11
95:4 142:23
showed 62:6
showing 25:20
95:4 111:6 113:11
shown 96:21
121:25 149:6
side 58:17,17
signature 150:21
signed 45:6
significance 106:5
significant 8:7
12:25 13:3 21:22
34:3 106:1,2,9,12
106:18,19,25
146:24
significantly 22:1
140:3

silica 94:14
silicate 138:5,11
silicates 94:13,14
similar 47:25
72:17 80:21
similarly 8:13
simmons 119:5,7
127:21,25,25
128:3,7,21,23,24
129:23 131:6,7
132:16 133:1
135:7 136:24
139:7
simon 109:5,15
single 64:25
102:22 103:21
104:11,17 116:12
sister 16:7 25:7,7
sister's 7:3
sit 59:15 64:24
68:16 80:15 82:9
97:11 115:15
site 119:2
sitting 110:18
situation 74:1,17
86:6
situations 74:11
six 35:5 47:2,8,16
47:23 48:3,4,5,10
48:12,15,16,18,25
49:12,14,22,23
50:1,4 66:14,15,15
68:11 69:3,4
74:21 80:19,20
81:8 90:2,25 91:6
91:10 92:4,12
size 123:17,24
124:14 138:9
skimmed 125:16
skipping 67:11

slide 2:20,21,22
110:22 111:3,18
113:8,13
slides 109:6,20
110:3,14,17 111:8
111:10,11
slightly 130:5
small 102:2,3
smart 23:14
sole 54:9
solely 43:7
solicit 50:20
solutions 116:14
somebody 34:21
41:20 45:24 57:1
110:1,16
son 113:19
sooner 17:24
sorry 52:13
104:14 121:19
132:13 133:19
134:10
sort 12:6 42:6
107:20 116:24
sorts 127:22
sounds 131:4
134:4
source 42:16 43:4
45:11 52:10 53:12
53:24 56:10 57:3
62:23 63:4,16
73:9 77:7 84:8
87:17 99:23 115:8
sourced 96:11
sources 48:8 61:9
61:18 66:6,16
68:3 71:16 88:16
88:20 89:2 122:8
137:11
south 9:11,16
125:2,4 131:10,13

143:3
**speak**  12:7 16:25
 88:8,9 122:14
**speaking**  64:21
 70:22 71:2 74:9
 120:15
**speaks**  95:14
**spearheaded**  34:1
**specialties**  84:4
**specific**  5:3 12:16
 16:14 37:6 38:4
 41:11 45:2 59:23
 59:25 65:8,9,17
 71:2 74:11 79:5
 118:20,25 120:3
 124:2 126:16
 133:6 142:2
**specifically**  4:13
 6:22 15:24 17:8
 21:14 57:24 65:25
 66:1 77:21 78:5
 88:12 96:19
 107:10 123:2
 126:2 129:18
**specificity**  144:5
**specifics**  57:6
**specious**  24:16
**speculative**  24:24
**spelled**  82:21
**spent**  4:8,12,15
 37:2
**spoken**  16:18,22
 17:2,10,12,13,14
 17:17 88:6
**spouse**  46:12
 65:10 76:25
**square**  124:3,7,8
 124:17
**ss**  150:3
**stack**  22:4

**stacking**  141:9
**staff**  128:11
**stainless**  138:13
 138:14,19,20
**standard**  76:22
 110:3
**standardized**
 106:11
**standpoint**  9:18
 12:24 140:23
**stark**  1:2 46:3
**starr**  103:3
**start**  8:23 57:8
 130:18
**started**  8:24,25 9:1
 18:2 29:17 46:22
 74:5 102:3 134:17
 136:12 142:19
**starting**  48:14
**starts**  9:4
**state**  4:2 92:7 94:9
 95:9 116:5 141:18
 150:3,7
**stated**  14:25
 103:16,23 112:16
**statement**  97:18
 98:19 108:23
**statements**  95:16
**states**  32:15 42:14
 45:10 86:8 91:23
 93:13 96:17 105:4
 141:18 144:13
**statistical**  105:15
 105:20 106:5
 107:13,17
**statistically**  106:1
 106:2,9,12,18,19
 106:25
**statistician**  107:3
 107:7

**status**  95:10
**stay**  67:12
**steam**  8:14 125:20
 125:21 126:5
 132:20,20 141:4,5
 141:6,7,12,12
**steel**  138:13,14,19
 138:20
**stevens**  3:11
**stop**  50:4 75:3
 114:16
**stopped**  8:20
 53:25
**stored**  33:12
**straight**  113:3
**straps**  138:14
**street**  3:7,12
**strike**  137:15
**struck**  141:12
**stuart**  3:9
**student**  31:11,12
**students**  31:21
 83:7,10,13
**studies**  13:19
 14:17 50:6 111:24
 115:10 134:14
**study**  32:15 94:1
 102:24 103:8
 105:5,14,22 121:1
 133:23,24 134:2
 134:17,22,23
 136:8 143:24
**stuff**  73:25
**subject**  74:14
 149:6
**subjects**  33:7
**submit**  30:22
 36:10,15 39:20
 41:5,19
**submitted**  30:7,24
 32:18 33:15 38:23

 40:14 41:1,6,18
 42:10 55:15 70:13
**submitting**  41:13
**subscribed**  149:12
 151:21
**subsequent**  38:24
 57:22 60:11 99:16
 112:17,22
**substance**  114:23
**substantive**  33:22
**substantively**  39:3
**substituted**  63:20
**suffered**  77:8
**suffering**  5:6
**sufficient**  67:4
 96:1 127:1
**suggesting**  81:22
 82:1 93:2
**suggestion**  77:13
**sullivan**  102:3
**sum**  114:23
**summer**  31:24
 40:15
**summertime**
 132:20
**supervisor**  128:10
**supplemental**
 57:23 71:25
**supposed**  65:18
 94:11,11
**sure**  4:11 8:23
 13:19 14:17 18:21
 19:5 22:6 34:14
 36:20 37:11 39:5
 41:12 54:22 55:2
 68:21 70:16 74:9
 74:15 75:7 104:15
 105:18 108:10,10
 116:19,21 120:9
 121:12 124:17,20

surgeons 86:10
surprising 134:16
survey 16:7
  118:22 125:12
  139:18 140:25
surveys 12:21
sutcliffe 3:6
sweeper 133:14,15
sweepers 133:2,5
  133:7,11
sweeping 105:20
  133:3
swept 133:8
switch 27:2
sworn 4:2 61:17
  61:22 149:12
  150:11 151:21
symmetrical 51:5
synthesizing 43:11
system 106:15

**t**

t 75:11 149:1
  150:1,1
table 67:16 84:4
  89:10,15 91:12,16
tables 30:19 90:23
take 6:2 14:19
  15:7 19:7 22:5
  27:1,3 40:19 41:2
  46:1 55:7 56:25
  58:7,8 70:14
  79:12,17,20 80:2
  80:10 82:14,19
  83:7,13 89:9
  94:24 107:21
  119:25 120:9,12
  120:22,25 122:21
  144:20
taken 1:16 27:4
  75:8 107:22
  145:22 148:1

talc 2:14 23:19,20
  24:1 26:8,9,12
  27:14,25 28:6
  29:7,17,21 36:13
  41:4 46:1 47:2
  48:9 52:1,11
  53:17 54:10 56:21
  56:24,24 58:9
  60:16 65:1 86:4
  92:8,10,13,18,24
  93:3,5,7,8,8 96:4,7
  96:13 97:3,13
  98:18 101:19,23
  102:13 103:19
  104:3,12,13,19,19
  104:22,22 107:14
  114:12,12 126:8
  126:14,24
talcum 44:12,20
  45:10 56:11 80:13
  82:25 86:12,16,23
  87:7,13 93:16,23
  94:15,17 147:7
talk 7:18 13:22
  15:23 20:16 62:11
  66:6 69:10 71:15
  80:19 83:6 84:25
  87:11 92:3 111:1
  120:12
talked 28:17 34:16
  35:18 41:23 52:14
  56:18 77:18 110:6
  132:23 143:18
  147:11
talking 29:2 59:1
  60:23,24 74:1
  75:24 76:1,2
  84:15 88:13 99:19
  113:23,24,25
  114:8,18 120:9
  124:5 126:2

130:15 132:19
  133:4
talks 61:15 66:16
  67:24 76:7 88:14
  102:11
tar 127:19
taught 37:3
technically 106:18
telephonically
  3:14
tell 12:23 40:2
  44:6 49:3 81:9
  109:1 124:21
  137:25
ten 4:14,16
term 84:19,21
  146:16
terminology 76:11
terms 17:3 24:14
  44:25 74:10
  114:14 123:17,18
  125:12 126:7
  138:2,10 139:20
  140:16 142:3
  146:5
test 96:2
tested 98:4 99:3
  100:9
testified 4:3 41:22
  49:15 80:5 84:3
  109:12 121:12
  127:8 128:3,24
  135:17
testify 6:22 60:22
  78:24 109:6
  121:24 122:21
  129:25 130:24
  141:16,21 142:1,3
  143:16 146:21,22
  147:5,12,20,23

testifying 15:6
  70:8 79:2 109:5
  109:19 121:7
  127:25 128:8
  133:1 135:7,21
  136:11,25 137:8
  137:25
testimony 15:11
  25:10,23 40:19
  41:2 46:20 60:7
  60:10,12,13,17,21
  61:2,17,22 62:11
  62:14 64:24 66:21
  87:25 110:15
  112:11,17 113:14
  114:22 123:14
  127:5 128:18,19
  131:19 132:4
  136:17 137:16
  141:3,11 143:6,11
  149:4 150:13
testing 12:19
  24:23 65:6 94:19
  94:20 95:10 96:5
  96:15,16 98:14
  99:16,17,20,23,25
  100:5,24 112:21
tests 98:2 118:4
text 87:2
thank 22:13 60:4
  79:15
thankfully 59:11
thanks 148:7
thermal 138:1,11
thing 44:5 74:20
  110:25
things 32:11 33:13
  37:21 41:13,15
  42:4,6 50:23
  74:12 114:4 115:8
  129:25 142:9

146:14
**think** 6:20 8:19
9:14,21 12:2,18
15:9 16:5 17:23
18:19 20:9 25:12
25:14 27:17 33:21
34:2 36:4 37:4,19
38:2,10 47:14
52:19 56:17,18
72:7,13 73:7
74:12,17 76:2
82:21 87:10 92:15
93:25 95:8,21
100:22 105:12,13
109:8,10,14 113:3
116:11 117:1
118:15,21 120:8
123:2,3,5,11,12,15
125:25 127:20,21
129:15,18 131:18
137:20,20 138:16
138:18 142:22
143:6,10,12,18,20
144:5 145:1
146:15 148:1,6
**thinking** 28:12,25
29:4 96:20 115:22
143:5
**third** 3:3 19:10
118:17
**thorough** 88:15
**thought** 10:4 40:7
49:12 51:4,9 94:9
129:8 133:18
143:1
**thousands** 67:8
**three** 2:23 15:25
16:11,16 18:25
19:24 26:25 56:22
82:22 89:10 91:12
106:21 116:6,9,17

117:7 118:13
138:7
**throw** 18:8
**time** 4:12,20 5:14
8:17 9:5,15 10:19
18:2 21:8,21
22:12 23:2 28:13
28:19 29:1,2,11
30:7 31:23 37:2
38:13 44:2 51:16
52:19 53:10 57:16
63:16 64:6,25
65:2 69:13 71:13
73:8 74:3 75:9,13
75:23 77:17 95:22
95:25 114:5
115:12 117:20
118:19 129:20
130:21 137:20
141:23 143:20
148:4,8
**times** 12:4,4,5
19:20 82:22
115:13 129:10
**timing** 63:9
**timothy** 1:2
**tire** 3:12 5:12,13
7:20 8:11,15 9:2,6
10:8 17:15 24:9
117:16,17,20
118:20,25 120:5
120:19 121:4,5,8
121:11,17 122:25
123:9 126:8,13,15
126:18,21,23
127:3 133:25,25
134:3,7,15,24
139:23 140:2,4
141:23 142:4,12
142:15 144:7,19
144:21 146:1

**tires** 8:13
**tissue** 28:22 35:4,5
35:8,13 37:20,24
46:25 47:8,13,16
47:19 48:1,14,17
50:2 67:16,17,24
68:4,10,14,17,22
69:6,22 70:22
71:1,12,12 78:2
88:6 90:1,25 91:6
91:14,14 92:13
93:1,3
**title** 29:20,22,24
30:2,4,6 98:2
111:19
**titles** 30:8
**tlv** 141:22 147:16
147:25
**tlvs** 147:9,13
**today** 4:9 15:25
16:12 25:24 64:25
68:16 80:15 82:9
84:3,22 87:25
97:11 115:15
118:19 135:17
**today's** 25:25
**top** 8:2 102:7
108:18 124:21
141:8
**topic** 67:12
**topics** 27:2 35:19
**tornado** 8:7
127:17,23
**total** 124:15
**touch** 109:21
**town** 123:16
**trachea** 106:15
**train** 131:20,22
**training** 83:16
84:12

**transcribed** 36:5
**transcript** 1:15
64:8 119:17 120:1
149:6 150:12
**transcripts** 16:6
53:5 61:11 77:15
82:23 119:16
**transpired** 64:17
73:19
**treating** 17:13
86:9 87:18 88:7,8
88:10
**trial** 2:10 25:18,22
59:20 60:5,6,9,11
60:12,17,21 61:2
73:12,20 109:5,20
114:23 121:24
**triangle** 1:8
145:15,19,22,25
146:3,5
**trick** 58:1
**tried** 77:1
**trivial** 147:1
**truck** 132:1 137:1
**trucks** 125:9
**true** 123:21 149:5
150:13
**truly** 106:3
**truncated** 44:25
**try** 24:16 39:10
124:12 146:18
**trying** 11:4 42:23
57:7 67:12 70:17
79:24,25 81:24
99:22
**tumor** 54:21 55:5
**turns** 87:5
**twice** 15:1,4 112:5
**two** 12:4 18:4
21:15 35:22 41:12
41:15 82:21 93:6

99:20 102:4
111:23,24 118:13
118:15,16 119:13
125:8

**type** 52:22 53:3
54:16,18,24,24
55:6,7 91:13
110:9

**typed** 36:2

**types** 10:10 11:5
11:13 22:3,4 25:2

**typically** 58:8
76:21 80:2 109:19

**typing** 35:24

**u**

**u** 4:1 149:1

**ultimate** 93:10

**ultimately** 36:6
45:6 59:20

**un** 66:12

**unable** 103:6

**unaware** 93:7

**uncertainty**
112:20

**unchanged** 45:15

**unclear** 9:14
125:23

**understand** 44:23
57:5 58:2 73:23
74:18 86:5 94:10
139:20

**understanding**
9:19,23 32:22
46:24 47:7 50:17
50:20 63:25 85:18
85:22,24,25 86:6
86:14 87:4,22
90:4,19,20,24
91:18,21 95:9,12
99:22 100:24
117:16 125:6,18

126:4,13

**understood** 10:4
77:23 84:2 90:9
136:23 145:2

**unfortunately**
59:13

**uniform** 61:4

**union** 133:25

**united** 91:23
133:24 141:18
144:13

**universe** 85:20

**university** 134:1

**unknowable** 89:7

**updated** 21:8
27:16,18,19 102:7

**upper** 124:6

**ups** 148:3

**usage** 45:11 52:1
93:16,17

**use** 2:14 6:11
23:25 26:8,9
27:24 28:6 29:21
44:16 49:23 51:10
51:17 52:11 53:13
53:13 56:21 76:11
78:13 84:21 86:11
86:12,15 87:7
91:18 94:17 109:5
115:14 138:13
147:6

**usefulness** 87:8

**usually** 59:9

**utilized** 126:22

**uttered** 60:10

**v**

**v** 102:25 151:3

**vague** 104:24

**vaguely** 134:4

**value** 12:17 14:15
40:7 94:3 97:9,17

98:22 99:7,9,14

**values** 106:25
142:7 147:19

**varied** 137:20

**various** 26:24
43:25 46:10 52:3
53:15 65:13 83:23
92:10 114:5
115:13 139:10
143:9 145:14

**vein** 69:21

**ventilation** 131:17
132:5

**venture** 44:8

**verbatim** 39:4

**verify** 103:7

**veritext** 151:1

**vermont** 101:19
102:8 103:4 104:3
104:13,19 105:6
107:14

**version** 23:1 45:15

**versus** 138:23
140:7

**vested** 98:23 99:6

**vianna** 14:19
120:7

**view** 6:5 12:13
87:7

**vintage** 95:25

**violated** 141:19
142:4

**violation** 141:17

**virtually** 23:21

**vis** 142:5,5

**vitae** 2:9 22:17

**voice** 113:18

**volume** 118:14

**volumes** 118:13,14
118:15,16

**vs** 1:6

**w**

**w** 1:3 3:13

**wagner** 51:2,5

**waist** 111:25

**want** 17:4 27:1
41:12 70:12 74:9
75:5 90:19 107:20
116:9,19 146:13
147:9

**wanted** 13:13
34:19 37:19 38:3
49:4 54:2 68:20
87:3 93:10 116:4

**wanting** 85:14

**ward** 1:3 8:10,17
8:19 9:20,24
10:11 11:18 12:10
12:15 15:11 118:4
119:12 120:18
121:22,25 126:7
128:20,24 129:13
129:16,24 130:2
131:13 135:12,18
140:2 141:4,22
142:5,11 144:8,19
147:12

**ward's** 17:14
120:4 130:8
136:12 140:3

**warehouse** 7:25
9:11,11,16 124:3
125:21 126:3
128:1,9,16,20,25
129:10 131:11,21
131:23 132:9,15
133:2 136:13,18
137:1,5,8 142:14
142:21,24 144:4
144:10,23

**warehouses** 123:24 124:1,4,13 124:14,23 125:2,7 125:12,20 127:6 131:13,17 143:3,7 143:9 146:4
**wash** 12:7
**washed** 14:3,3
**way** 11:5,10 13:9 26:10 44:19 51:5 74:12 85:15 90:4 97:12 103:17 104:24 115:6 124:9,20 137:7 138:12 143:1 150:17
**ways** 138:21
**we've** 56:18 75:3 107:18 147:11 148:1
**week** 15:1,4 23:10 108:21 130:22
**weeks** 18:1,4 21:10,15
**weight** 96:24 97:4
**weirick** 111:10,18 111:24 112:3,4,5,9 113:13 114:23
**went** 30:19 46:9 53:4,14 59:20 60:5 74:12 134:17 135:14,22 136:3
**west** 1:22 3:7,12
**wet** 133:2,3,4,7,14 133:15,17 139:6
**wetting** 133:15
**whereof** 150:19
**wide** 106:22
**widely** 51:6,8
**wiman** 1:3,3 5:6 5:10 7:3,22 9:4,7

9:24 13:23 14:13 14:22 15:6,14 16:22,25 24:8 25:5 26:3 45:23 52:17,22 70:12 72:18 95:22 96:2 122:5 135:21 136:11 140:1 147:13,16 151:3
**wiman's** 6:23 10:6 17:10 23:18,25 24:20 26:7 95:23
**wind** 113:5
**winded** 11:4,10
**wire** 138:14,18
**wise** 24:11
**withholding** 81:22
**witness** 1:15 2:2 17:18 41:21 43:14 44:22 47:1,10 78:20 116:2 117:4 146:8,17 149:3 150:10,14,19 151:4
**witnesses** 16:19 60:17
**witnessing** 130:1
**woman** 17:5 32:10
**women** 53:18
**worded** 53:8
**wording** 94:6
**words** 44:24 60:10 100:14 130:12
**wordsmithing** 85:6
**work** 4:12 5:1 6:3 6:7,10 7:1,15 13:24 14:24 15:8 15:12 21:15 24:9 31:1,22 34:25 35:9 47:1 80:7

104:3 109:19,23 110:6,11 117:1 135:22,23,25 136:10 142:14
**worked** 5:12,13,18 6:19 8:19,20 30:20 31:19 35:17 43:25 44:1 56:20 57:1 89:12,14 104:12,19,23 121:8,11
**worker** 102:13,13 103:6 104:12,19 119:10 123:2 128:19 136:17
**workers** 7:24 8:5 16:6 17:15,18 59:4 102:8 119:11 133:25 134:15 143:11,23
**working** 6:10 8:10 8:25 9:1,2,14,15 10:9 30:19 42:3 43:23 104:21 110:16 129:10,12 129:20 131:13 136:13,14,15 144:1 145:7
**workplace** 9:5 147:18
**write** 28:10 29:5 36:2,3 43:1,4,5,5 46:17 48:2 54:2 73:24 119:24
**writing** 28:17,19 31:12,14 33:4 35:20,22 39:18 42:16 43:15,17 46:20 63:17 64:8 69:24 70:3 74:5 74:23

**written** 32:24 36:1 42:13 53:15 59:7 71:14,18,22 72:10 73:16,17,17 74:19 86:23 94:23 121:13
**wrong** 18:9
**wrote** 18:22 36:2 46:14 73:8 77:17 86:21 90:22

**x**

**x** 1:3,11 2:1 122:11

**y**

**years** 6:21 8:17 12:14 21:5 24:11 25:23 29:3 34:23 51:11 52:5 86:24 102:14,15 143:9 143:13 145:22
**york** 1:18 3:3,3,8 3:8 4:3 23:8 150:3 150:4,8

**à**

**à** 142:5

Kentucky Rules of Civil Procedure

Part V. Depositions and Discovery

Rule 30

RULE 30.05: Submission to witness; changes; signing.  Any party to an action may make written request before the officer taking a deposition therein that it be submitted to the witness.  In such event, and when the testimony is fully transcribed the deposition shall be submitted to the witness for examination and shall be read to or by him. Any changes in form or substance which the witness desires to make shall be entered upon the deposition by the officer with a statement of the reasons given by the witness for making them. The deposition shall then be signed by the witness,unless the witness is ill or cannot be found or refuses to sign. If the deposition is not signed by the witness, the officer shall sign it and state on the record the fact of the illness or absence of the witness or the fact of the refusal to sign together with the reason, if any, given therefor;

and the deposition may then be used as fully as
though signed, unless on a motion to suppress under
Rule 32.04 the court holds that the reasons given
for the refusal to sign require rejection of the
deposition in whole or in part.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.