Peter C. Harvey
Thomas P. Kurland (*pro hac vice*)
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036-6710
T: 212-336-2000
F: 212-336-2222
E:  pcharvey@pbwt.com
     tkurland@pbwt.com

*Attorneys for Plaintiff*
*LTL Management LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LTL MANAGEMENT LLC,<br><br>                              Plaintiff,<br><br>               -v-<br><br>DR. JACQUELINE MIRIAM MOLINE,<br><br>                              Defendant. | Civil Action No.<br>3:23-cv-02990-GC-DEA<br><br>Motion Return Date:<br>October 16, 2023 |

## PLAINTIFF LTL MANAGEMENT'S OPPOSITION TO DEFENDANT'S
## <u>MOTION TO DISMISS</u>

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................1

BACKGROUND .......................................................................................5

    *Dr. Moline: Plaintiffs' Expert Witness* ........................................5

    *Dr. Moline Published Her Article And Then Repeated Her Disparaging Statements.* ...............................................................6

    *Dr. Moline Statements Were Knowingly False.* ...........................7

    *LTL Was Harmed By Dr. Moline's False Statements.* ...............10

LEGAL STANDARD ..............................................................................10

ARGUMENT ...........................................................................................11

I.     LTL Stated A Claim For Product Disparagement. ......................11

    A.    Dr. Moline statements are actionable statements of fact. ...................11

        1.    The statements' "content" demonstrates that they are actionable. .................................................................12

        2.    The statements' "verifiability" demonstrates that they are actionable. ...........................................................14

        3.    The statements' "context" demonstrates that they are actionable. .................................................................19

    B.    LTL has sufficiently alleged special damages. ..................23

        1.    LTL need not plead exact dollar figures. .................24

        2.    LTL need not exclude or parse potential alternative causes at the pleading stage. ...................................27

        3.    Legal fees and expenses to mitigate false statements are recoverable. ............................................................28

II.    LTL Stated a Lanham Act Violation. .........................................30

III.   LTL Stated a Claim for Fraud. ...................................................35

CONCLUSION ........................................................................................37

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Angio-Medical Corp. v. Eli Lilly & Co.*,
  720 F. Supp. 269 (S.D.N.Y. 1989) ....................................................29

*Ariix, LLC v. NutriSearch Corp.*,
  985 F.3d 1107 (9th Cir. 2021) ...........................................................32

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................................33

*Bayer Healthcare Pharms. Inc. v. RJ Health Sys. Int'.l LLC*,
  2016 WL 3574325 (D.N.J. June 30, 2016)...........................................34

*Bell v. Am. Int'l Indus. et al.*,
  No. 1:17-CV-00111 (M.D.N.C. Sept. 13, 2022) .......................................*passim*

*Blueprint Capital Advisors, LLC v. Murphy*,
  2022 WL 17887229 (D.N.J. Dec. 23, 2022)........................................24

*Bracco Diag., Inc. v. Amersham Health, Inc.*,
  627 F. Supp. 2d 384 (D.N.J. 2009)....................................................31

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997) ...........................................................18

*CHW Group, Inc. v. Better Business Bureau of New Jersey, Inc.*,
  2012 U.S. Dist. LEXIS 16336, 2012 WL 426292 (D.N.J. Feb. 8,
  2012) ..................................................................................................33

*Comdyne I, Inc. v. Corbin*,
  908 F.2d 1142 (3d Cir. 1990) ...........................................................29

*Covet & Mane, LLC v. Invisible Bead Extensions, LLC*,
  2023 WL 2919554 (S.D.N.Y. Mar. 23, 2023).....................................27

*CrossFit, Inc. v. Nat'l Strength & Conditioning Ass'n*,
  2016 WL 5118530 (S.D. Cal. Sept. 21, 2016).....................................32

*Dewey v. Volkswagen AG*,
  558 F. Supp. 2d 505 (D.N.J. 2008) ..................................................................... 35

*Doe v. Princeton Univ.*,
  30 F.4th 335 (3d Cir. 2022) ................................................................................ 27

*Educ. Impact, Inc. v. Danielson*,
  2015 WL 381332 (D.N.J. Jan. 28, 2015) ............................................................. 34

*Gillon v. Bernstein*,
  218 F. Supp. 3d 285 (D.N.J. 2016) ...................................................................... 27

*Graco, Inc. v. PMC Glob., Inc.*,
  2009 WL 904010 (D.N.J. Mar. 31, 2009) ............................................................ 24

*Guardant Health, Inc. v. Natera, Inc.*,
  580 F. Supp. 3d 691 (N.D. Cal. 2022) ................................................................. 19

*Hogan v. Herald Co.*,
  84 A.D.2d 470 (1982) ......................................................................................... 29

*Internet Prod. LLC v. LLJ Enterprises, Inc.*,
  2019 WL 5692010 (D.N.J. Nov. 4, 2019) ..................................................... 23, 24

*Intervet, Inc. v. Mileutis, Ltd.*,
  2016 WL 740267 (D.N.J. Feb. 24, 2016) ..................................................... 23, 26

*Jevremovic v. Courville*,
  2023 WL 5127332 (D.N.J. Aug. 10, 2023) .......................................................... 21

*Kunstlinger v. Lincoln Benefit Life Co.*,
  2023 WL 4669424 (D.N.J. July 20, 2023) (Castner, J.) ....................................... 10

*Lexmark International, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) ...................................................................................... 33, 34

*Lynch v. New Jersey Educ. Ass'n*,
  161 N.J. 152 (1999) ............................................................................... 13, 14, 17

*McLaughlin v. Rosanio, Bailets & Talamo, Inc.*,
  331 N.J. Super. 303 (App. Div. 2000) ................................................................. 13

*Merriman v. Oswald*,
   2021 WL 1060237 (M.D. Pa. Mar. 18, 2021) ....................................................27

*Milkovich v. Lorain J. Co.*,
   497 U.S. 1 (1990)...............................................................................................17

*MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC*,
   2019 WL 1418129 (D.N.J. Mar. 29, 2019) ........................................................36

*NOVAGOLD Res., Inc. v. J Cap. Rsch. USA LLC*,
   2022 WL 900604 (E.D.N.Y. Mar. 28, 2022)......................................................27

*NY Mach. Inc. v. Korean Cleaners Monthly*,
   2018 WL 2455926 (D.N.J. May 31, 2018).........................................................26

*ONY v. Cornerstone Therapeutics, Inc.*,
   720 F.3d 490 (2d Cir. 2013) ...................................................................18, 19, 21

*Pacira Biosciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*,
   63 F.4th 240 (3d Cir. 2023) ........................................................................*passim*

*Pactiv Corp. v. Perk-Up, Inc.*,
   2009 WL 2568105 (D.N.J. Aug. 18, 2009) ..................................................24, 25

*Phillips v. Cnty. of Allegheny*,
   515 F.3d 224 (3d Cir. 2008) ..........................................................................5, 22

*Roberts v. Mintz*,
   2016 WL 3981128 (N.J. Super. Ct. App. Div. July 26, 2016) ...........................20

*Sciore v. Phung*,
   2022 WL 950261 (D.N.J. 2022) ........................................................................27

*Semco, Inc. v. Amcast, Inc.*,
   52 F.3d 108 (6th Cir. 1995) ...............................................................................32

*Seven-Up Co. v. Coca-Cola Co.*,
   86 F.3d 1379 (5th Cir. 1996) .............................................................................31

*United States v. Nayak*,
   2023 WL 2911659 (6th Cir. Apr. 12, 2023)......................................................19

*Wachs v. Winter*,
   569 F. Supp. 1438 (E.D.N.Y. 1983) ....................................................................30

*Ward v. Zelikovsky*,
   136 N.J. 516 (1994) ...................................................................................*passim*

*Zinn v. Seruga*,
   2006 WL 2135811 (D.N.J. July 28, 2006) ...........................................................26

**Statutes and Rules**

15 U.S.C. § 1125(a)(1)(B) ..........................................................................................30

Fed. R. Civ. P. 12(b)(6).................................................................................10, 11, 27

**Other Authorities**

*Right to recover as damages attorneys' fees incurred in earlier
   litigation with a third person because of involvement therein
   through a tortious act of present adversary*, 45 A.L.R.2d 1183 ........................29

Plaintiff LTL Management, LLC ("LTL") respectfully submits this opposition to Defendant Dr. Jacqueline Moline's motion to dismiss.

## PRELIMINARY STATEMENT

Dr. Moline made false factual statements. She stated that talcum powder was the exclusive source of asbestos exposure for certain individuals with mesothelioma when she knew that representation to be patently untrue. Dr. Moline made these false factual statements not just once, but over and over again. And she did so not just in a published article, but to the media, at public conferences, on her professional website, and to Congress, judges, and juries.

Dr. Moline's deception was first laid bare in September 2022 by a federal judge in the District Court for the Middle District of North Carolina. Compl. Ex. B, *Bell v. Am. Int'l Indus. et al.*, No. 1:17-CV-00111 (M.D.N.C. Sept. 13, 2022), ECF No. 398 at 4, 17, 22 (the "*Bell* Opinion"). Like this case, *Bell* concerned Dr. Moline's article about 33 individuals who were plaintiffs in lawsuits in which they alleged they were exposed to asbestos from talcum powder which caused their mesothelioma. Dr. Moline claimed in that article that "[t]alcum powder usage was the only source of asbestos for all 33 cases." Compl. Ex. A, Article at 11. There is now *no dispute* that this statement is false.

The *Bell* Opinion excoriated Dr. Moline because of her "concealment" of information about occupational asbestos exposures of Betty Bell—a plaintiff in

cosmetic talc litigation who was also confirmed to be one of the individuals included in Dr. Moline's article. *Id.* at 16-18, 20. The court found that the inclusion of an individual with asbestos exposures apart from allegedly contaminated talc had "direct bearing on the study's credibility" as it contradicted the article's entire foundation. *Id.* It expressed grave concern about the "groundbreaking nature" and "widespread influence" of Dr. Moline's article "on the cosmetic talc litigation nationwide" given that this critical information had been shielded from public disclosure until the *Bell* Opinion was issued. *Id.*

Unfortunately, the *Bell* Opinion has neither discouraged Dr. Moline from repeating her false claims nor stopped plaintiffs' lawyers from promoting her paper in litigation. And yet, at the same time that Dr. Moline and plaintiffs' lawyers tout her article, Dr. Moline now has *admitted* that *another* individual beyond Betty Bell had exposures to asbestos that had nothing to do with allegedly contaminated talc. In this instance, the second individual was exposed to asbestos from smoking cigarettes with asbestos-contaminated filters.

As laid out in great detail in its Complaint, LTL has been able to identify multiple other examples of individuals included within Dr. Moline's study with non-talc based asbestos exposures. And there are likely further examples still that LTL cannot ascertain because Dr. Moline has concealed the identities of the individuals

in her article, underscoring the need for discovery into Dr. Moline's deceptive conduct.

This Court should not countenance Dr. Moline's attempts to avoid responsibility for her own statements—indeed, to avoid even basic *discovery*. Nor should the Court credit Dr. Moline's fabricated framing that this dispute involves legitimate scientific disagreement or criticisms of Dr. Moline's methodology. Her article began as a litigation ploy to evade prior adverse rulings excluding her testimony and to help her continue to profit from her lucrative work for the plaintiffs' bar. It has now become a ticket to a speaking circuit.

Dr. Moline chiefly argues that her demonstrably and admittedly false statements are not "actionable," effectively granting her immunity from liability because her statements appeared in a scientific article. The law is not as unsophisticated and one-dimensional as Dr. Moline asserts. Indeed, the Third Circuit case on which she relies explicitly recognizes that "statements are not protected solely because they appear in a peer-reviewed journal." *Pacira Biosciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*, 63 F.4th 240, 247 (3d Cir. 2023).

In fact, Dr. Moline does not even *mention* the proper test used to determine whether a statement is actionable or not, outlined in *Pacira* itself. Courts consider three factors: "the (1) content, (2) verifiability, and (3) context of the statements." *Id*. at 245. Under the actual law, Dr. Moline's bid to twist a verifiably false

3

representation into a so-called "scientific opinion" does not hold water. Her assertion that the subjects of her made-for-litigation paper had no alternative sources of asbestos exposure is a factual statement that is actionable.

The remainder of Dr. Moline's arguments are similarly unavailing. She argues that LTL was not sufficiently "damage[d]" by her false statements. Mot. at 2. However, the Complaint clearly alleges that Dr. Moline's falsehoods contributed to the significant reduction in sales of Johnson's Baby Powder, as well as the expenditure of millions of dollars to defend against Dr. Moline's deception, and all inferences must be construed *against* Dr. Moline at the pleading stage. And although Dr. Moline argues that LTL's allegation that it relied on an expert opposing it in litigation is "implausible," Mot. at 2, 21, that is not so "[g]iven the groundbreaking nature of the article" and "the influence the article has had on cosmetic talc litigation nationwide." *Bell* Op. at 17. As the Complaint makes clear, it was not until the *Bell* Opinion that LTL discovered Dr. Moline's fraud, and before that, it made business decisions "in reasonable and justifiable reliance on her fraudulent partial disclosures." Compl. ¶ 246.

LTL's allegations more than suffice to state claims for product disparagement, fraud, and violation of the Lanham Act, and Dr. Moline's motion to dismiss should be denied.

4

## BACKGROUND

The following are the facts as alleged in the complaint and the attached exhibits, which must be accepted as true with all inferences construed in LTL's favor. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).

### *Dr. Moline: Plaintiffs' Expert Witness*

Dr. Moline is an expert who testifies on behalf of the mass tort asbestos plaintiffs' bar. Compl. ¶ 18. She has been testifying as a paid expert in asbestos litigation for over 20 years, always on behalf of plaintiffs. *Id.* For playing that role, she is paid between approximately $250,000 and $300,000 per year (about 40% of her total income) and, in aggregate, has received over $3 million. *Id.*

In recent years, Dr. Moline has testified mainly in mesothelioma cases against LTL (and other manufacturers of talc powder products). She has been disclosed as a plaintiff's expert in over 200 cases, provided deposition testimony in 46 cases, and testified in 16 separate trials against LTL. *Id.*

In the very first cosmetic talc/mesothelioma case to go to trial involving Johnson's Baby Powder, Dr. Moline was a key plaintiffs' witness. Compl. ¶ 88. There, she attempted to discuss plaintiffs in other cases who allegedly used talc, but the court limited that testimony. Compl. ¶ 92. Many other courts thereafter also repeatedly barred Dr. Moline from offering testimony regarding her litigation case review of these various plaintiffs. Compl. ¶ 93.

To circumvent these adverse rulings, Dr. Moline published her article, attempting to add a veneer of credibility to her testimony about other talc plaintiffs. Compl. ¶ 94.

### Dr. Moline Published Her Article And Then Repeated Her Disparaging Statements.

Dr. Moline is the lead author of *Mesothelioma Associated with the Use of Cosmetic Talc* (the "Article"). Compl. Ex. A. The Article is a "case series" of 33 individuals who brought lawsuits alleging that talcum powder caused their mesothelioma. Notably, however, Dr. Moline did not disclose the names of the 33 individuals featured in the Article and has gone to extreme lengths to conceal those individuals' identities. Compl. ¶ 35.

In the Article, Dr. Moline expressly represents multiple times that "[t]alcum powder usage was the only source of asbestos for all 33 cases." *Id.* at 11. She even went so far as to represent that "potential exposures were considered" but there was "no identified source apart from the talcum powder." *Id.* at 14; *see also id.* at 11 ("Objective: To describe 33 cases of malignant mesothelioma among individuals with no known asbestos exposure other than cosmetic talcum powder.); *id.* at 14 ("[W]e present 33 cases, predominantly of women, who had no known exposure to asbestos other than prolonged use of talcum powder."); *id.* ("The table identifies talcum powder as the only asbestos exposure."); *id.* ("No individual identified any

6

asbestos exposure apart from contaminated talcum powder from workplace or household exposures."); *id.* ("[N]o known asbestos exposure had occurred.").

Dr. Moline repeated the false premise of the Article time and time again, in myriad settings and with large and varied audiences. For example, shortly after her Article became available online, she was quoted in a Time Magazine article as saying, "This is the first time that anyone has said, 'Let me look at all these cases, put it all together and identify the ones where [talc] is the sole exposure.'" Compl. ¶¶ 41-43, Ex. C. She made her statements on before Congress, in online and in-person presentations, in a statement the FDA, and on her employer Northwell Health's business website (including in Dr. Moline's own professional biography). Compl. ¶¶ 40-84.[1]

### Dr. Moline Statements Were Knowingly False.

When Dr. Moline published her statements to all these audiences, she knew that the premise of her Article—that the 33 individuals had no other exposures to asbestos—was false. Compl. ¶¶ 86.

Dr. Moline was intimately familiar with the case histories of the 33 individuals referenced in the Article from her role as a plaintiffs' expert in the underlying tort

---

[1] In January 2023, Dr. Moline published another article in response to the *Bell* opinion entitled, *Exposure to cometic talc and mesothelioma.* Compl. ¶ 173; *see also* Harvey Decl. Ex. A, 2023 Moline Article. Dr. Moline states that "[i]n 122 cases, the only known exposure to asbestos was from cosmetic talc." Compl. ¶ 176. This too was false. Compl. ¶ 173-89.

cases in which those individuals had asserted claims. Compl. ¶¶ 86. Indeed, as an expert in those cases, Dr. Moline had an ethical and legal duty to closely review the relevant facts before testifying. Dr. Moline therefore knew full well that individuals she cited in her Article had admitted to—and in some instances claimed compensation for—exposure to asbestos from non-talc sources. Compl. ¶¶ 87.

Although Dr. Moline has concealed the identities of the individuals in her article, LTL has been able to match some of them to litigation plaintiffs who were exposed to non-talc sources of asbestos. Dr. Moline's Case #17, for example, is a match for plaintiff Helen Kohr. Compl. ¶¶ 151-53. Dr. Moline's own expert report in Ms. Kohr's case from 2017 (well before her Article was published) stated that Ms. Kohr "***was exposed to asbestos from Kent Micronite cigarettes***, which she smoked from 1952-1956 when crocidolite asbestos was used in the filters." Compl. ¶¶ 154-55 (emphasis added). Dr. Moline also wrote a response to a letter to the editor in which she stated that she "identified one individual with an alternative exposure" who was exposed to asbestos ... from asbestos-contaminated cigarette filters" and therefore "should not have been included in the article." Compl. Ex, J.

This was no isolated oversight. LTL has uncovered many more examples, addressed in detail in the Complaint. Compl. ¶¶ 96-189. The information regarding these individuals' other exposures was available *in the materials Dr. Moline claimed to have reviewed*. And there are likely more examples that LTL has not been able to

8

uncover because Dr. Moline has refused to identify the individuals in her Article to conceal the falsity of her statements. Compl. ¶¶ 190-98.

In one instance, Dr. Moline falsely testified that she could not identify the individual discussed in her Congressional testimony (described with the pseudonym "Ms. D.") because Ms. D was "based on an amalgam of different folks." Compl. ¶ 192. In fact, "Ms. D" was Betty Bell, who filed workers' compensation claims with the North Carolina Industrial Commission in September 2015, asserting, under criminal penalty for false statements, that she was exposed to asbestos during prior employment with two textile employers. Compl. ¶¶ 54, 101; *see also* Compl. ¶¶ 97-126.

The North Carolina district court expressed its deep concerns about the workers' compensation claims:

> The fact is that at least one study participant reported to a state agency that she did have another known asbestos exposure, at least one known to the study participant. Given the groundbreaking nature of the article and its express premise that all individuals studied had no known alternative asbestos exposures, the fact that one of the individuals claimed otherwise has direct bearing on the study's credibility. This court expressed concern about this seeming contradiction before and does so again.

Compl. Ex. B, *Bell* Opinion at 17. The court went on to state that its "concern is magnified considering the influence the article has had on cosmetic talc litigation nationwide." *Id.*

*LTL Was Harmed By Dr. Moline's False Statements.*

Dr. Moline's disparagement of Johnson's Baby Powder for her own aggrandizement harmed LTL. Compl. ¶ 220. As discussed in more detail below, the sales volume and profits from Johnson's Baby Powder declined in 2019 (the year the Article became available) and again in 2020. Compl. ¶ 220. LTL also incurred substantial costs as a direct result of Dr. Moline's false statements. Compl. ¶ 226 Among other costs, LTL spent millions of dollars in fees for attorneys, expert witnesses, and other professionals to investigate, respond to, defend against, and otherwise counteract Dr. Moline's false statements. *Id.*

## LEGAL STANDARD

"When deciding a motion to dismiss under Rule 12(b)(6), the Court must 'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Kunstlinger v. Lincoln Benefit Life Co.*, 2023 WL 4669424, at *2 (D.N.J. July 20, 2023) (Castner, J.) (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Importantly, on a Rule 12(b)(6) motion to dismiss, the defendant bears the burden of showing that no claim

has been presented." *Id.* (quoting *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005)) (internal quotation marks and brackets omitted).

## ARGUMENT

### I.     LTL Stated A Claim For Product Disparagement.

Dr. Moline raises two arguments to dismiss LTL's product disparagement claim (sometimes called "trade libel"). She contends (A) that the claim is based on a nonactionable opinion; and (B) that the Complaint does not adequately allege special damages. Dr. Moline is wrong on both counts.[2]

#### A.     Dr. Moline statements are actionable statements of fact.

Dr. Moline first argues that her statements represent "an opinion that is not actionable." Mot. 11. Her argument boils down to the overly simplistic and incorrect contention that statements made in scientific publications are invariably "opinions" and thus can never be the subject of defamation claims.

She relies almost exclusively on the Third Circuit's decision in *Pacira Biosciences, Inc. v. American Society of Anesthesiologists, Inc*., 63 F.4th 240 (3d Cir. 2023). But *Pacira* does not provide blanket protection for all libelous statements in scientific articles. To the contrary, the Third Circuit made clear that "statements

---

[2] LTL agrees that for the purposes of this motion there is no conflict of law. Thus, under New Jersey's choice-of-law rules, "the law of the forum state applies," here, New Jersey. *Snyder v. Farnam Companies*, Inc., 792 F. Supp. 2d 712, 717 (D.N.J. 2011).

are *not* protected solely because they appear in a peer-reviewed journal." *Id.* at 247 (emphasis added); *see also id.* at 247 n.20 ("We decline to hold that New Jersey law mandates" "a categorical rule that scientific statements contained in academic journals are always immune from a trade libel claim").

According to the Court of Appeals, whether such statements are protected turns on three factors: "the (1) content, (2) verifiability, and (3) context of the statements." *Id*. at 245. Although Dr. Moline does not even mention the relevant test set forth in her own authority—much less attempt to apply it—all three factors show that Moline's false statements are actionable.

### 1. The statements' "content" demonstrates that they are actionable.

The "content" factor weighs in favor of finding that the statements are actionable. "Evaluation of content involves consideration not merely of a statement's literal meaning, but also of the fair and natural meaning that reasonable people of ordinary intelligence would give to it." *Id.* (quoting *Lynch v. New Jersey Educ. Ass'n*, 161 N.J. 152, 167 (1999)). Under this factor, courts "distinguish between genuinely defamatory communications as opposed to obscenities, vulgarities, insults, epithets, name-calling, and other verbal abuse." *Ward v. Zelikovsky*, 136 N.J. 516, 530 (1994). "Likewise, courts differentiate between defamatory statements and statements of rhetorical hyperbole." *Id.*

12

For example, calling a state senator the "Boss of Bosses"—referencing the senator's alleged links to organized crime—was deemed to be "hyperbole and name-calling" because a reader would not believe that the senator was literally the "head of a leading crime family." *Lynch*, 161 N.J. at 162. But the factual assertion that senator was a "partner or officer in three mob-owned companies fined for illegal toxic dumping" was deemed actionable. *Id.* at 170; *see also McLaughlin v. Rosanio, Bailets & Talamo, Inc.*, 331 N.J. Super. 303, 310-11, (App. Div. 2000) (statement that police officer "jeopardized an organized crime investigation by leaking confidential information to the Scarfo crime family" was actionable because it "would be commonly understood as a specific act of illegal communication").

Dr. Moline's principal case—*Pacira*—is instructive. The product disparagement in that case concerned statements that a particular analgesic was "not superior" to local anesthesia and an "inferior" analgesic. *Id.* at 243. The Court of Appeals reasoned that the "not superior"/"inferior" statements were "loose or figurative language" that constituted "rhetorical hyperbole." *Id.* at 245 (internal quotation marks omitted). The Third Circuit explained that "claims of relative superiority" are usually nonactionable opinions. *Id.*; *see also id.* (citing cases concerning statements such as "the best possible paint job," "best," and "superior image and color quality").

13

Here, by contrast, LTL's product disparagement claim is not based on Dr. Moline's name-calling, loose language, figurative speech, or "rhetorical hyperbole." Her statements do not concern whether one product is "better" than any other. Rather, LTL's claim is based on Dr. Moline's unequivocal—and repeated—statement that 33 individuals were not exposed to any other source of asbestos beyond talc. Any reasonable reader would believe that this statement was intended as a literal truth. The content factor shows that her statements are actionable.

### 2. The statements' "verifiability" demonstrates that they are actionable.

The "verifiability" factor also weighs in favor of finding that the statements are actionable. "A statement's verifiability refers to whether it can be proved true or false." *Lynch*, 161 N.J. at 167. "Statements of opinion, like unverifiable statements of fact, generally cannot be proved true or false." *Id.* "The higher the 'fact content' of a statement, the more likely that the statement will be actionable." *Ward*, 136 N.J. at 531-32. Courts "require verifiability because insofar as a statement lacks a plausible method of verification the trier of fact who is charged with assessing a statement's truth will have considerable difficulty returning a verdict based upon anything but speculation." *Id.* at 531 (internal quotation marks and brackets omitted). Moreover, there is not a "a wholesale defamation exemption for anything that might be labeled 'opinion.'" *Id.* "Harm from a defamatory opinion statement is redressable when the statement implies underlying objective facts that are false." *Id.*

14

Whether the individuals in the Article were, in fact, exposed to other sources of asbestos is capable of being proven true or false. There cannot possibly be a concern that the trier of fact would have undue difficulty determining that issue. Juries are asked to ascertain if individuals were exposed to asbestos from a particular source *all the time*, including in cases *against LTL*.

Dr. Moline's own response to a letter to the editor demonstrates that her statements are verifiable. She admitted that one of the Article's subjects "should not have been included in the article" precisely because "the individual was exposed to asbestos ... from asbestos-contaminated cigarette filters." Compl. ¶ 158, Ex. J, Letter to the Editor Response. The individual's exposure is an issue of fact—i.e., she *did* smoke cigarettes, that *did* contain asbestos, and therefore *was* exposed to asbestos that way. Dr. Moline's acknowledgement that at a minimum one of the individuals in her Article *was* exposed to asbestos from a non-talc source means that it is *undisputed* that Dr. Moline's statements—such as "[t]alcum powder usage was the only source of asbestos for all 33 cases," Compl. Ex. A, Article at 11—are false. And Dr. Moline had actual knowledge of the falsity at the time, discussing the exposure from cigarettes in her prior expert report for that individual. Compl ¶¶ 154-55. That *alone* is sufficient to deny Dr. Moline's motion to dismiss.

As another example, asbestos was found in the tissue of a different subject of her Article that Dr. Moline herself states is a type of asbestos "encountered in cases

of industrial and occupational exposure, not cosmetic talcum powder." Compl. ¶¶ 133-39, Ex. A, Article at 11. It is verifiably false that this individual was not exposed to asbestos from any other source other than talc.

Pacira does not dictate a different result. There, the statements at issue were "expressly disclosed" as "tentative scientific conclusions." 63 F.4th at 246-47. Indeed, the challenged articles themselves pointed out many of the precise critiques that the plaintiff leveled against them. Id. To try to align herself with the caselaw, Dr. Moline highlights in her motion that she "expressly noted the 'limitations' of the study, including the risk that the subjects' testimony was influenced by the bias inherent in self-reporting their exposures." Mot. 7; see also Mot. 15-16. But those noted limitations are irrelevant as they do not address what Dr. Moline did here: state that individuals had no other asbestos exposure even when Dr. Moline knew that to be false or the materials she relied on showed otherwise.

Simply put, Dr. Moline purported to state a fact—i.e., that "[t]alcum powder usage was the only source of asbestos for all 33 cases," Compl. Ex. A, Article at 11—which is verifiably false. But even if this Court were to conclude that Dr. Moline's statements represent opinions, they would be "[m]ixed opinions, which are opinions based on undisclosed facts or assumptions." Pacira, 63 F.4th at 245. These opinions are actionable if they "imply reasonably specific assertions of fact." Ward,

136 N.J. at 531; *see also Lynch*, 161 N.J. at 167 (stating opinions are actionable if they "imply false underlying objective facts").

For example, "[i]f a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 18-19 (1990). Put another way, "[e]ven if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact" and be actionable. *Id.*

Dr. Moline did not make the underlying materials she claims to base her statements on available to readers, such as tissue analyses, medical records, and deposition transcripts. Ex. A, Moline Article at 11. Nor did she even identify the individuals in her Article. If this Court were to construe her statements as an opinion (which it should not), the statements at a bare minimum imply that the underlying, undisclosed documentation demonstrates that no alternative exposures to asbestos exist. But the materials *Dr. Moline says she reviewed* show that individuals in her Article were, in fact, exposed to asbestos from non-talc sources. Those materials include tissue samples (Compl. ¶¶ 135-39), medical records (Compl. ¶¶ 163-64), deposition transcripts (Compl ¶¶ 169-71), and even in her own prior expert reports (Compl ¶¶ 154-55). LTL's claims are far different than mere "critiques about the Article[]'[s] data and methodology." *Pacira*, 63 F.4th at 248.

17

Moreover, Dr. Moline should not be permitted to benefit from concealing the identities of her Article's subjects. Because of her obfuscation, LTL cannot ascertain every example of her Article's falsity. *Cf. In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997) (noting that pleading rules should be "relaxed somewhat where the [relevant] factual information is peculiarly within the defendant's knowledge or control," to prevent "sophisticated defrauders [from] successfully conceal[ing] the details of their fraud"). Given the examples LTL has been able to identify despite Dr. Moline's efforts to hide them—including one instance where Dr. Moline has now herself admitted the individual was in fact exposed to asbestos—it is at minimum *plausible* that there are additional instances where the sources Dr. Moline claims she reviewed contradict her Article. That is sufficient at the pleading stage.

Finally, Dr. Moline's own cases explain that "a conclusion drawn from falsified or fraudulent data may be actionable." *Pacira*, 63 F.4th at 248; *see also ONY v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 497 (2d Cir. 2013) ("[I]t is relevant that plaintiff does not allege that the data presented in the article were fabricated or fraudulently created. If the data were falsified, the fraud would not be easily detectable by even the most informed members of the relevant scientific

18

community.").[3] In fact, the Third Circuit approvingly cited a case where "a statement published in an academic journal was [found] actionable [because] 'a reasonable fact finder could conclude that the defendant fabricated the data." *Id.* (quoting *CrossFit, Inc. v. Nat'l Strength & Conditioning Ass'n*, 2016 WL 5118530, at *7 (S.D. Cal. Sept. 21, 2016)) (alterations omitted). Dr. Moline falsely stating individuals in her article had no alternative asbestos exposures is no different than falsely reporting the results of empirical testing.

The verifiability factor shows that her statements are actionable.

### 3. The statements' "context" demonstrates that they are actionable.

Finally, the "context" factor also weighs against Dr. Moline's argument. "Courts do not automatically decide a case on the literal words of the challenged statement." *Ward*, 136 N.J. at 532 (internal quotation marks and brackets omitted). "Rather, courts must consider the impression created by the words used as well as the general tenor of the expression, as experienced by a reasonable person. *Id.* (internal quotation marks omitted). "When considering the statement's 'fair and

---

[3] *See also Guardant Health, Inc. v. Natera, Inc.*, 580 F. Supp. 3d 691, 701-02 (N.D. Cal. 2022) (refusing to dismiss the defendant's false advertising claim, noting that plaintiff "alleges here that the Parikh study is based on fraudulent data and inaccurate descriptions of the data and methodology," and that the author "manipulated the methodology and analysis to reach predetermined conclusions."); *United States v. Nayak*, 2023 WL 2911659, at *2 (6th Cir. Apr. 12, 2023) ("[F]raudulent research, like fraudulent evidence, can be worthless and sometimes even less than worthless.").

natural' meaning, therefore, courts permit the context in which the statement appears to inform its determination of whether the statement was capable of a defamatory meaning." *Id.* "The listener's reasonable interpretation, which will be based in part on the context in which the statement appears, is the proper measure for whether the statement is actionable." *Id.*

For example, "[w]ords uttered face to face during an altercation may well be understood merely as abuse or insult, while words written after time for thought or published in a newspaper may be taken to express the defamatory charge and to be intended to be taken seriously." *Id.* at 533 (quoting Restatement (Second) of Torts § 566 comment e). Courts also look at the "medium by which the statement is disseminated and the audience to which it is published." *Pacira,* 63 F.4th at 248.

Take one case involving statements that dog sellers were "grifters," operating a "fraudulent" business that "scammed" people. *Roberts v. Mintz*, 2016 WL 3981128, at *6 (N.J. Super. Ct. App. Div. July 26, 2016). The Court considered these statements nonactionable based on their context because they were surrounded by "sarcastic quips," were part of an "exchange of insults," and were made under a header entitled "Rants and Raves." *Id.* at *7.

In another example, it was relevant that the "statements were delivered by a social media influencer on Instagram" where in "satirical spirit, Defendant can be seen wearing either panda ears or bunny ears while making her statements, while a

sparkly unicorn piñata rests prominently in the background." *Jevremovic v. Courville*, 2023 WL 5127332, at \*5 (D.N.J. Aug. 10, 2023).

In *Pacira*, the Third Circuit found it relevant that the statements being challenged were directed at "physicians practicing in anesthesiology as well as anesthesiologist assistants and scientists interested in anesthesiology." 63 F.4th at 248. Here, by contrast, Dr. Moline's audience is the public at large. Indeed, Dr. Moline repeated her false statements in a Time Magazine story shortly after her Article came out, demonstrating that her statements were directed at individuals outside the medical and scientific community. *See* Compl. ¶¶ 41-43, Ex. C.

Moreover, it was critical to the Third Circuit's analysis in *Pacira* that "the journal's readers were provided the basis for the statements, have the expertise to assess their merits based on the disclosed data and methodology, and thus are equipped to evaluate the opinions the authors reached." *Id.* (these readers are "specialists in their fields and are best positioned to identify opinions and choose to accept or reject them on the basis of an independent evaluation of the facts") (internal quotation marks and brackets omitted).[4] Here, Dr. Moline did *not* provide the readers with any information to evaluate for themselves the sources of the individuals'

---

[4] The same was true in *ONY*. 720 F.3d at 497-98 ("But when the conclusions reached by experiments are presented alongside an accurate description of the data taken into account and the methods used, the validity of the authors' conclusions may be assessed on their face by other members of the relevant discipline or specialty.").

asbestos exposure. Instead, she has gone to extreme lengths to *conceal* the underlying data and thereby prevent readers from verifying for themselves whether the 33 individuals in fact had non-talc asbestos exposures. Unlike in *Pacira*, a reader has no basis to evaluate Dr. Moline's statements other than her own say-so.

And far from including any language suggesting to a reader that Dr. Moline's statements were not to be taken literally (such as "Rants and Raves" or sarcastic quips), Dr. Moline states in the Article that the false asbestos-exposure representation is based on a rigorous investigation—an invitation for the reader to take the statement as literally true. These are "words written after time for thought" and therefore express that they are "intended to be taken seriously." *Ward*, 136 N.J. at 533 (quoting Restatement (Second) of Torts § 566 comment e).

The context factor weighs especially heavily toward finding the statements actionable given the broader made-for-litigation context in which Dr. Moline wrote the Article, which she penned simply to circumvent rulings from courts across the country had repeatedly barred Dr. Moline from offering testimony on her litigation case review. *See* Compl. ¶¶ 88-95. Policy concerns about "chilling" genuine scientific research and legitimate scientific discourse therefore do not exist here— especially on a motion to dismiss with all inferences construed in the light most favorable to the plaintiff. *See Phillips*, 515 F.3d at 228.

\* \* \*

22

In sum, Dr. Moline's statements are actionable. The content of the statements is not name-calling or hyperbole, but rather a straightforward and false representation of fact regarding 33 individuals' sources of asbestos exposure. Her statements are verifiably false, as Dr. Moline *admitted* in the aftermath of the *Bell* ruling. And the context shows that Dr. Moline intended her statements to be taken literally, promoting her false claims to the public at large and leaving readers without any mechanism to evaluate for themselves the truth or falsity or her statements.

### B.   LTL has sufficiently alleged special damages.

Dr. Moline is also wrong to argue that LTL has not sufficiently pled special damages. A complaint must "allege *either* the loss of particular customers by name, *or* a general diminution in its business, and extrinsic facts showing that such special damages were the natural and direct result of the false publication." *Internet Prod. LLC v. LLJ Enterprises, Inc.*, 2019 WL 5692010, at *6 (D.N.J. Nov. 4, 2019) (emphasis added). As Dr. Moline's own authority explains, an allegation naming specific customers is "not necessary" if the party "can plead the other facts sufficient to show a general diminution of business." *Intervet, Inc. v. Mileutis, Ltd.*, 2016 WL 740267, at *4 (D.N.J. Feb. 24, 2016). LTL has done just that.

Dr. Moline raises three arguments for why special damages were supposedly not adequately alleged: (1) that the complaint does not provide specific dollar figures; (2) that other factors may have led to lost sales; and (3) that legal fees and

expenses (i.e., one component of LTL's claimed special damages) are supposedly not recoverable. The Court should reject all of these arguments.

### 1.    LTL need not plead exact dollar figures.

Dr. Moline first argues that the complaint "does not identify the volume of sales before and after the Articles' publication." Mot. 16. But a plaintiff does not have to plead specific figures in terms of volume or dollars to survive a motion to dismiss; rather, it need only allege that it "lost sales and lost goodwill regarding established and prospective customers." *Pactiv Corp. v. Perk-Up, Inc*., 2009 WL 2568105, at *11 (D.N.J. Aug. 18, 2009).

For example, a motion to dismiss was *denied* when a party simply alleged it "was damaged by [the defendant's] conduct because it lost sales to established customers, existing distributors dropped its product lines, and it was prevented from acquiring new customers that were also recipients of the [disparaging] Letter." *Graco, Inc. v. PMC Glob., Inc.*, 2009 WL 904010, at *35 (D.N.J. Mar. 31, 2009); *see also, e.g.*, *Blueprint Capital Advisors, LLC v. Murphy*, 2022 WL 17887229, at *44 (D.N.J. Dec. 23, 2022) (plaintiff stated claim for trade libel where complaint alleged that false statement had "directly harmed Plaintiff through lost business opportunities, increased costs of capital and operations and reduced enterprise value"); *Internet Prod. LLC*, 2019 WL 5692010, at *7 (permitting claim to proceed where plaintiff alleged that defendant attempted to "persuade [a third party] not to

24

do business with [the plaintiff]" resulting in [the third party] actually "declining to do any business with [the plaintiff]"); *Pactiv Corp*, 2009 WL 2568105, at *11 ("Defendants did plead special damages with the required level of specify … because they alleged lost sales and lost goodwill regarding established and prospective customers").

LTL has alleged more than enough. As set forth in the Complaint, Dr. Moline's "Article became available online on October 10, 2019." Compl. ¶ 223. "In October 2019—immediately after the Article's publication—the call center handling the Consumer business of Johnson & Johnson saw a significant increase in contacts." *Id.* "The sales volume and profits from Johnson's Baby Powder declined in 2019 and again in 2020." Compl. ¶ 224. "And an ever-increasing percentage of Johnson's Baby Powder sales was the corn starch-based version compared to the talc-based version. Dr. Moline's statements and the resulting publicity were a substantial cause of this sales decline." *Id.*

The "discontinuation of talc-based Johnson's Baby Powder in the United States and Canada was announced in May 2020." Compl. ¶ 224. The press release at the time explained: "Demand for talc-based Johnson's Baby Powder in North America ha[d] been declining due in large part to changes in consumer habits and fueled by misinformation around the safety of the product and a constant barrage of

litigation advertising." *Id.* The Article is a central element of that misinformation. *Id.*

"LTL also incurred substantial costs as a direct result of Dr. Moline's false statements. Among other costs, LTL spent millions of dollars in fees paid to attorneys, expert witnesses, and other professionals to investigate, respond to, defend against, and otherwise counteract Dr. Moline's false statements." Compl. ¶ 226. These allegations taken together are far more detailed than the ones held sufficient at the pleading stage in the cases discussed above.

LTL's allegations are also far more robust than the conclusory damages allegations that were rejected in the cases cited by Dr. Moline in her motion, several of which consisted of just a single sentence:

- "[A]s a direct and proximate results of the trade libel of Plaintiff, Defendant has incurred and will continue to suffer damages."
  - *Intervet*, 2016 WL 740267, at *6 (internal brackets omitted)[5]

- "[A]lleging generally that NYM has lost sales from existing and prospective customers, and 'has incurred and will continue to suffer damages'"
  - *NY Mach. Inc. v. Korean Cleaners Monthly*, 2018 WL 2455926, at *6 (D.N.J. May 31, 2018)

- "[S]tatements published on the website 'caused Plaintiffs to sustain damages.'"
  - *Zinn v. Seruga,* 2006 WL 2135811, at *11 (D.N.J. July 28, 2006)

---

[5] After the pleading in *Intervet* was amended, the court concluded that damages were adequately pled based on "lost investors," who were not personally identified, and a "reduction of established sales." *Intervet, Inc.*, 2016 WL 11801179, at *5 n.2.

- "[S]pecial damages" that "include, but are not limited to, lost sales."
  - *Covet & Mane, LLC v. Invisible Bead Extensions, LLC*, , 2023 WL 2919554, at *15 (S.D.N.Y. Mar. 23, 2023).[6]

In short, LTL has sufficiently pled special damages, and Dr. Moline's argument should be rejected.

### 2. LTL need not exclude or parse potential alternative causes at the pleading stage.

Dr. Moline's next argument flips the Rule 12 standard on its head, positing that other matters outside the pleadings may have caused some or all of the diminution in business. But potential "alternative explanations are not fatal to [a plaintiff's] ability to survive a Rule 12(b)(6) motion to dismiss." *Doe v. Princeton Univ.*, 30 F.4th 335, 344 (3d Cir. 2022). In other words, "a plaintiff is simply not required to disprove alternative explanations ... at the pleading stage." *Merriman v. Oswald*, 2021 WL 1060237, at *4 (M.D. Pa. Mar. 18, 2021). LTL need only allege a plausible entitlement to relief, which it has done.

The only case Dr. Moline cites in support of her argument does not hold otherwise. The complaint in that case did "not actually allege ***any*** divestment or loss of investors occurred as the result of the Report [at issue], only that its stock price declined." *NOVAGOLD Res., Inc. v. J Cap. Rsch. USA LLC*, 2022 WL 900604, at

---

[6] Dr. Moline also cites summary-judgment cases which have no bearing on the pleading stage question. *See Sciore v. Phung*, 2022 WL 950261 (D.N.J. 2022); *Gillon v. Bernstein*, 218 F. Supp. 3d 285, 298 (D.N.J. 2016).

*11 (E.D.N.Y. Mar. 28, 2022) (emphasis added). It was only because the plaintiff had not alleged causation *at all* that its complaint had failed to state a claim.

Here, the Complaint includes numerous specific allegations of loss of baby powder sales (including the discontinuation of Johnson's Baby Powder in North America) and hefty legal fees and other litigation costs that LTL has plausibly tied to the Dr. Moline's deception. At best, Dr. Moline raises a factual dispute not proper to resolve on a motion to dismiss. To the extent any other factors may have contributed to the decrease in sales in the relevant time period, that does not establish that LTL suffered no lost business due to the Article, and thus no special damages. It merely goes to the amount of damages recoverable. Discovery will ultimately uncover whether (and, if so, to what extent) any other factors may have contributed to the decrease in sales in the relevant time period, which is not a pleading-stage issue.

### 3. Legal fees and expenses to mitigate false statements are recoverable.

Finally, Dr. Moline argues that LTL's costs of defending against Dr. Moline's misinformation and counteracting it in the marketplace are not a compensable item of special damages. As a threshold matter, legal fees are only one component of LTL's claimed special damages. Thus, even if Dr. Moline were correct, it would not be a basis to dismiss the product disparagement claim.

But in any event, Dr. Moline's argument is wrong as a matter of law. "Special damages are defined as the 'loss of something having economic or pecuniary value.'" *Ward*, 136 N.J. at 541. "New Jersey courts have held that a wronged party can recover for 'expenditures made in a reasonable effort' to avert the harm caused by the defendant." *Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149-50 (3d Cir. 1990). This is a "general rule" that the Third Circuit has applied "in the context of a defamation action." *Id.* Attorneys' fees, litigation costs, and other remedial expenses incurred as a direct result of Dr. Moline's false statements fit squarely within these principles.[7]

The authority Dr. Moline cites merely states that "legal fees and executive time, *standing alone* do not comprise special damages." *Angio-Medical Corp. v. Eli Lilly & Co.*, 720 F. Supp. 269, 274 (S.D.N.Y. 1989) (emphasis added). Dr. Moline ignores that the same authority recognizes that money can be "awarded for special damages *including* legal fees" when combined with other damages. *Id.* Indeed, the cases the *Angio-Medical* Court cites awarded damages based on legal fees, proving that they are recoverable as special damages in trade-libel cases. *See Hogan v.*

---

[7] Indeed, it is "well settled that where the natural and proximate consequence of a tortious act of defendant has been to involve plaintiff in litigation with a third person, reasonable compensation for attorneys' fees incurred by plaintiff in such action may be recovered as damages against the author of the tortious act." *Right to recover as damages attorneys' fees incurred in earlier litigation with a third person because of involvement therein through a tortious act of present adversary*, 45 A.L.R.2d 1183 (collecting cases, including New Jersey cases).

*Herald Co.*, 84 A.D.2d 470, 481 (1982) ("legal fees of $1,500.00"); *Wachs v. Winter*, 569 F. Supp. 1438, 1448 (E.D.N.Y. 1983) ("$12,000 (10 days x 8 hours x $150 per hour)").[8]

Accordingly, LTL's allegations of legal fees and other litigation expenses support the special damages element of its product disparagement claim.

## II.    LTL Stated a Lanham Act Violation.

With respect to LTL's Lanham Act claim, Dr. Moline reiterates her arguments that the statements at issue are not "actionable" and that her statements did not cause LTL's harm. *See* Mot. at 25, 28. Those arguments should be rejected for the same reasons discussed above.

Dr. Moline primarily focuses on whether the statements were made "in commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B). She argues that the statements do not satisfy this standard because: (1) they are not "commercial speech"; (2) that Dr. Moline and LTL are not in commercial competition with one another; and (3) her statements were not "disseminated sufficiently widely to the

---

[8] Dr. Moline asserts, without any explanation, that the allegations regarding litigation expenses are "foreclosed by the American Rule, under which … each party must bear its own expenses in litigation." Mot. at 18. However, that rule generally prohibits a winning party from recovering its legal fees from the losing party in the underlying litigation. It does not preclude a party injured by product disparagement from recovering litigation expenses that the tortfeasor caused it to expend in other litigation.

relevant purchasing public." Mot. 26-27. Each of these arguments lacks merit and does not support dismissal of LTL's Lanham Act claim.

**Commercial Speech Is At Issue.** It is well-settled that the type of promotional speech subject to the Lanham Act is "broader than merely the 'classic advertising campaign.'" *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1384 (5th Cir. 1996).

Dr. Moline focuses primarily on the Article itself, which she asserts does not relate "solely to the economic interests of the speaker and its audience." Mot. at 26 (quoting *Bracco Diag., Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 456-57 (D.N.J. 2009)). However, *Bracco* concerned the "validity of ... scientific *theories* "promulgated in scientific journals," 627 F. Supp. 2d at 457 (emphasis added), not factual statements like the one related to sources of asbestos exposure that are the basis of LTL's lawsuit.

In any event, Dr. Moline does not grapple with the various other forums in which she perpetuated the false premise underlying the Article. As set forth in the Complaint, Dr. Moline's Northwell Health web bio offered to promote her professional services reads: "Dr. Moline published the first case series, identifying cosmetic talc as the asbestos source leading in mesothelioma in 33 individuals." Compl. ¶ 74, Ex. I. A piece also ran on Northwell's commercial website promoting her Article, stating that the individuals in her study had "no other known exposure to asbestos" and "no additional exposure to asbestos." Compl. ¶¶ 203-04 & n.25. Dr.

31

Moline is described there as a "nationally-recognized expert in World Trade Center health effects, asbestos exposure, occupational lung disorders and heavy metal toxicity." Harvey Decl. Ex. B, Northwell Article (discussed at Compl. ¶¶ 203-04 & n.25).[9]

Plainly these examples, at minimum, represent commercial speech intended to promote Dr. Moline's professional services. Moreover, statements in journals have also been found to constitute commercial speech for Lanham Act purposes when, as here, they were commercially motivated. *See, e.g.*, *Semco, Inc. v. Amcast, Inc.*, 52 F.3d 108, 112–13 (6th Cir. 1995) (article in trade journal was subject to Lanham Act claim where it "refer[red] generally to Amcast products, and a rational jury could easily find that Amcast had an economic motivation for submitting the article"); *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115-17 (9th Cir. 2021); *CrossFit, Inc. v. Nat'l Strength & Conditioning Ass'n*, 2016 WL 5118530, at *7 (S.D. Cal. Sept. 21, 2016).

And as previously discussed, Dr. Moline repeated her false statements to an audience of non-expert consumers in a Time Magazine story shortly after her Article became available. *See* Compl. ¶¶ 41-43, Ex. C. Although Dr. Moline contends that "LTL fails to plead any facts demonstrating" that these "other forums in which the

---

[9]      https://feinstein.northwell.edu/news/the-latest/talc-powder-exposure-linked-tomesothelioma

Articles' conclusions were republished related solely to [her economic] interest," Mot. at 26, basic common sense supports the inference that Dr. Moline was attempting to drum up support for the talc litigation and ensure that she would remain a full-time "expert" for the plaintiffs' bar. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (evaluating a motion to dismiss "requires the reviewing court to draw on its judicial experience and common sense"). That is quintessentially an economic interest and forecloses Dr. Moline's argument.

**Competition Is Not Required.** Dr. Moline is wrong to argue that she and LTL must be in commercial competition with each other for LTL to state a claim under the Lanham Act. She relies primarily on a 2012 case, *CHW Group, Inc. v. Better Business Bureau of New Jersey, Inc.*, 2012 U.S. Dist. LEXIS 16336, 2012 WL 426292, at * 12 (D.N.J. Feb. 8, 2012) (cited in Mot. 27). But that case is no longer good law in light of the Supreme Court's 2014 decision in *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). In *Lexmark*, the Supreme Court held that a "direct-competitor" test "distorted the statutory language," and it rejected "a rule categorically prohibiting all suits by noncompetitor." *Id.* at 136. The Court concluded it is a "mistake to infer that because the Lanham Act treats false advertising as a form of unfair competition, it can protect only the false-advertiser's direct competitors." *Id.*

33

As other courts have explained, *Lexmark* eliminated any competition requirement that may have previously existed under some courts' interpretations of the statute. *See, e.g.*, *Educ. Impact, Inc. v. Danielson*, 2015 WL 381332, at *13 (D.N.J. Jan. 28, 2015) ("DGLLC's assertion that because DGLLC is not in 'commercial competition with plaintiff" there can be no violation of the Lanham Act is incorrect. Last year, the Supreme Court repudiated a 'direct-competitor test….'"); *Bayer Healthcare Pharms. Inc. v. RJ Health Sys. Int'.l LLC*, , 2016 WL 3574325, at *3 (D.N.J. June 30, 2016) ("RJ Health first argues that the Lanham Act claim should be dismissed because Bayer and RJ Health are not 'competitors.' The Supreme Court, however, has explained that the Lanham Act should not be read to apply only to actions between direct competitors.") *see also* 5 McCarthy on Trademarks & Unfair Competition 27:71 (5th ed., Sept. 2023 Update) ("The Supreme Court in its 2014 Lexmark case made it clear that direct competition between the parties is not required in a Lanham Act."). Accordingly, Dr. Moline's argument that the Lanham Act only covers conduct by competitors is contrary to law.

**Her Statements Were Disseminated Widely.** Finally, Dr. Moline argues in a perfunctory manner that "the Complaint fails to allege that the Articles or other media were disseminated sufficiently widely to the relevant purchasing public." Mot. 27. This argument is frivolous. As just discussed, Dr. Moline repeated the false statements on Northwell's publicly available website and in Time Magazine for the

world to see. *See* Compl. ¶¶ 40-84. Indeed, her statements were sufficiently well

known that a Congressional subcommittee requested her testimony. Compl. ¶¶ 50-

60. These allegations more than suffice to plead that Dr. Moline's statements reached

the customers of Johnson's Baby Powder.

## III.   LTL Stated a Claim for Fraud.

With respect to LTL's fraud claim, Dr. Moline again reiterates her arguments

that the statements at issue are not "actionable" and that her statements did not cause

LTL's damages. *See* Mot. at 19, 22-23. These arguments should be rejected for the

same reasons discussed above.

The only new argument Dr. Moline advances in moving to dismiss LTL's

fraud claim is that LTL supposedly fails to adequately allege both the "intent to rely"

and "reliance" elements of fraud. Mot. at 19-22. In particular, Dr. Moline asserts that

it "is not plausible" that Dr. Moline "intended for LTL—the adversary of the

plaintiffs on whose behalf she testified—to rely on the statements in the Articles,

and the Complaint fails to include any allegations to show it is." *Id.* at 20.

However, "general allegations of reliance are sufficient in light of the fact that

the specific facts as to the misrepresentations are within Defendants' control, not

Plaintiff's." *Dewey v. Volkswagen AG*, 558 F. Supp. 2d 505, 526 (D.N.J. 2008). And

it is enough to allege that the defendant "had reason to know that the public" would

rely on those misrepresentations. *MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC*, 2019 WL 1418129, at *19 (D.N.J. Mar. 29, 2019).

The Complaint plainly alleges that "Dr. Moline made the false statements … *intending* that they be relied upon by others," Compl. ¶ 245 (emphasis added)—an allegation that applies to LTL, which "did not know and could not have known of Dr. Moline's fraud until the *Bell* Opinion" was issued. *Id.* ¶ 246. The Complaint further alleges that "LTL therefore made its business decisions and defense of Talc Claims, including but not limited to LTL's investigation of claims, approaches to settling such claims, retention of experts, and trial strategies—in reasonable and justifiable reliance on [Dr. Moline's] fraudulent partial disclosures." *Id.*

There is nothing implausible about these allegations, which fully comport with the *Bell* court's recognition of "the groundbreaking nature of the article and its express premise that all individuals studied had no known alternative asbestos exposures[.]" 627 F. Supp. 3d at 530. "[C]onsidering the influence the article has had on cosmetic talc litigation nationwide," *id.*, it would be implausible to suggest that LTL simply ignored Dr. Moline's fraud in making its business decisions.

In short, the import of LTL's allegations is that had Dr. Moline disclosed the full truth, LTL would have acted differently, satisfying plaintiff's pleading obligation with respect to the reliance elements of its fraud claim.

## CONCLUSION

LTL has plausibly alleged that Dr. Moline committed demonstrable, verifiable, intentional deception, then went to extreme lengths to stop it from being discovered—with enormous consequences to LTL's business. Such objective falsehoods are not immunized from liability merely because it has the outward trappings of "science." This Court should deny Dr. Moline's motion to dismiss. Alternatively, the Court should allow LTL an opportunity to amend its complaint to correct any perceived deficiency.

Dated: September 22, 2023

Respectfully submitted,

**PATTERSON BELKNAP
WEBB & TYLER LLP**

By: /s/ *Peter C. Harvey*
    Peter C. Harvey
    Thomas P. Kurland (*pro hac vice*)
1133 Avenue of the Americas
New York, NY 10036-6710
T: 212-336-2000
F: 212-336-2222
E: pcharvey@pbwt.com
    tkurland@pbwt.com

*Attorneys for Plaintiff
LTL Management LLC*