**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| LTL MANAGEMENT LLC,<br><br>                    Plaintiff,<br><br>          v.<br><br>DR. JACQUELINE MIRIAM MOLINE,<br><br>                    Defendant. | Civil Action No. 23-02990 (GC) (JTQ)<br><br>**OPINION** |

**CASTNER, District Judge**

        **THIS MATTER** comes before the Court upon Defendant Dr. Jacqueline Moline's Motion to Dismiss Plaintiff LTL Management, LLC's Complaint pursuant to Federal Rule of Civil Procedure (Rule) 12(b)(6).  (ECF Nos. 1 & 28.)  Plaintiff opposed, and Defendant replied.  (ECF Nos. 29 & 30.)  The parties filed additional supplemental letter briefs.  (ECF Nos. 31 & 32.)  The Court carefully considered the parties' submissions and decides the Motion with oral argument heard on May 16, 2024.  (ECF No. 39.)  For the reasons set forth below, and other good cause shown, Defendant's Motion to Dismiss is **GRANTED**.

## I.  **BACKGROUND**[1]

In January 2020, Dr. Moline and several co-authors published an article in the widely read Journal of Occupational and Environmental Medicine.[2]  (ECF No. 1 ¶¶ 2, 28; ECF No. 1-2 at 2-6.[3])  Entitled *Mesothelioma Associated with the Use of Cosmetic Talc*, the 2020 Article describes "33 cases of malignant mesothelioma among individuals with no known asbestos exposure other than cosmetic talcum powder."  (ECF No. 1-2 at 2.)  The study purports to be "the first large case series to identify cosmetic talcum powder contaminated with asbestos as the cause of malignant mesothelioma in cosmetic talc users," and it concludes that "[e]xposure to asbestos-contaminated talcum powders can cause mesothelioma."  (*Id.* at 2, 5.)  The Article has been described as "groundbreaking," with "widespread influence" on nationwide litigation in which plaintiffs allege that exposure to cosmetic talcum powder caused their mesothelioma.  (ECF No. 1 ¶ 5 (citing *Bell v. Am. Int'l Indus.*, 627 F. Supp. 3d 520, 532 (M.D.N.C. 2022).)

Dr. Moline, the Article's lead author, is an occupational medicine specialist, professor of occupational medicine, and executive for various health departments and programs.  (*Id.* ¶ 13.)  She has also "made a career" as a paid expert testifying on behalf of plaintiffs in asbestos litigation over the course of twenty years.  (*Id.* ¶ 18.)  Dr. Moline has appeared in more than 200 cosmetic talc cases against LTL, deposed in 46 of those cases and testified at trial in 16.  (*Id.* ¶ 14.)

---

[1]  On a motion to dismiss under Rule 12(b)(6), the Court accepts as true all well-pleaded facts. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

[2]  The Article was published in the January 2020 issue of the Journal but became available online on October 10, 2019.  (ECF No. 1 ¶ 28.)  The Article is attached to the Complaint as Exhibit A.  (ECF No. 1-2.)

[3]  Page numbers for record cites (i.e., "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

LTL is a wholly owned indirect subsidiary of Johnson & Johnson Holdco (NA) Inc. (Johnson & Johnson).  (*Id.* ¶ 12.)  LTL is therefore responsible for all liabilities arising from claims against Johnson & Johnson related to its cosmetic talcum powder, including Johnson's Baby Powder and Shower-to-Shower products.  (*Id.*)

This case arises out of LTL's claim that the "foundational premise" of Dr. Moline's 2020 Article "has been proven false," and that Dr. Moline knew that it was false when she authored and published the Article.  (*Id.* ¶¶ 103, 123.)  LTL contends that the Article's "misinformation" not only caused LTL "commercial, reputational, and financial harm," but also "provided a foundation for the mass tort asbestos plaintiffs' bar's baseless claims against LTL."  (*Id.* ¶¶ 4, 6.)

Specifically, LTL challenges two categories of statements in the 2020 Article that LTL alleges are "simply not true."  (*Id.* ¶ 39.)  First is the Article's assertion that for all 33 case studies, "[n]o individual identified any asbestos exposure apart from contaminated talcum powder."  (*Id.* ¶ 36; ECF No. 1-2 at 5.)  According to LTL, "Dr. Moline . . . knew full well that individuals she cited in her Article had admitted to and claimed compensation for exposure to asbestos from other sources" than Johnson & Johnson's talcum powder.  (ECF No. 1 ¶ 87.)  Second is the Article's claim that in the six cases where tissue samples were evaluated, "[a]sbestos of the type found in talcum powder was found in all six cases evaluated."  (ECF No. 1-2 at 2, 5; ECF No. 1 ¶ 229.)  LTL contends that several of the tissue samples contained asbestos fibers of the type "encountered in cases of industrial and occupational exposure, not cosmetic talcum powder."  (ECF No. 1 ¶¶ 133-136.)

## A.   THE 2020 ARTICLE

The 2020 Article states that its objective is to "describe 33 cases of malignant mesothelioma among individuals with no known asbestos exposure other than cosmetic talcum

powder." (ECF No. 1-2 at 2.)   The cases "were referred to [Dr. Moline] for medico-legal evaluation as part of tort litigation." (*Id.*)  Plaintiff alleges that it was through Dr. Moline's position as an expert witness that she obtained the study's data, which were "gathered from each individual's medical records and sworn testimony (deposition transcripts). . . .  Exposure data was obtained from sworn testimony by the [individuals], which included extensive questioning regarding all sources of asbestos exposure." (*Id.*; ECF No. 1 ¶ 175.)  Dr. Moline's co-author, Dr. Ronald Gordon,[4] performed "tissue digestions" in 6 of the 33 cases.  (ECF No. 1-2 at 2.)

The Article states that in "all 33 cases, other potential exposures to asbestos were considered, with no identified source apart from the talcum powder." (*Id.*)  It adds that asbestos "of the type found in talcum powder" was found in all six cases of tissue digestion.  (*Id.*)  The Article concludes that "[e]xposure to asbestos-contaminated talcum powders can cause mesothelioma," and that clinicians "should elicit a history of talcum powder usage in all patients presenting with mesothelioma." (*Id.* at 2, 6-7 ("Our findings strongly suggest that asbestos exposure through asbestos-contaminated cosmetic talc explains cases once deemed . . . 'spontaneous,' and underline the importance of collecting detailed exposure histories . . . in patients presenting with mesothelioma.").)

The Article neither identifies the 33 individuals, nor does the body of the Article expressly identify Johnson & Johnson.  The Article's appendices, however, show that the 33 individuals used Johnson's Baby Powder and Shower to Shower more often than any other specific talcum

---

[4]     LTL has not named Dr. Gordon or the other two co-authors of the Article as defendants in this matter.

powder products.  (ECF No. 1 ¶ 32.)  And three of the Article's 53 footnotes directly or indirectly refer to Johnson's Baby Powder and Shower to Shower.[5]

Finally, the Article cautions that the study "should be understood in the context of its limitations," including the fact that the data "were obtained from medication records and transcripts of depositions, rather than structured, in-person interviews"; the risk of self-reporting and recall biases in these types of studies; and Dr. Moline's role as an expert witness in "asbestos litigation, including talc litigation for plaintiffs," which the Article labels as a conflict of interest. (ECF No. 1-2 at 2, 6.)

**B.   LTL'S CHALLENGES TO THE 2020 ARTICLE**

LTL alleges that Dr. Moline knew that the Article's premise was false, "or recklessly ignored available information demonstrating its falsity," due to her role as a plaintiff's expert in the 33 underlying tort cases where many of the individual plaintiffs had identified other sources of asbestos exposure.  (ECF No. 1 ¶¶ 85-87.)

LTL relies heavily on the case of Betty W. Bell, whose identity as one of the 33 individuals in the Article was confirmed in *Bell v. American International Industries*, 627 F. Supp. 3d 520, 526 (M.D.N.C. 2022).  There, Bell sued American International Industries (AII), claiming that her exposure to asbestos through AII's talcum powder caused her mesothelioma.  *Id.* at 524-25.  But Bell had also filed two workers' compensation claims asserting that she was exposed to asbestos while working for two textile employers.  *Id.* at 524.  During the *Bell* litigation, AII came to suspect that Bell was one of the 33 individuals in Dr. Moline's 2020 Article, which AII believed would

---

[5]     For example, Footnote 26 does not directly refer to these products but cites a website with statistics showing that Johnson & Johnson's products are the most commonly used brands of talcum powder.  Footnotes 35 and 37 cite reports that specifically name Johnson & Johnson's products in their titles.  (ECF No. 1-2 at 8.)

"undermine the article's express premise . . . that none of the individuals had any known exposure to asbestos other than talcum powder." *Id.* at 525. Dr. Moline's employer eventually produced a document confirming that Bell was included in the 2020 Article. *Id.* at 525-26. The document was at first sealed via a protective order by the district court, but at the case's conclusion, the court granted AII's motion to vacate the protective order, in part because "Bell's employment history, as well as her belief that she may have been exposed to asbestos during her textile employment, undermine[d] the weight of Dr. Moline's finding that each of the '33 cases . . . had no known exposure to asbestos other than prolonged use of talcum powder.'" *Id.* at 526, 530 (quoting the 2020 Article).

When Bell was deposed by AII, she discussed her workers' compensation claims and the fact that they were dismissed without prejudice. (ECF No. 1 ¶¶ 100-103.) Dr. Moline had been retained as an expert in the *Bell* case, and Dr. Moline included Bell's deposition in the "list of materials [she] reviewed in her 2016 expert report." (*Id.* ¶ 103.) Four years later, in the 2020 Article, Dr. Moline claimed that she reviewed "each individual's . . . sworn testimony (deposition transcripts)." (ECF No. 1-2 at 2.) Therefore, according to LTL, when Dr. Moline authored the 2020 Article, she "knew or recklessly ignored available information" that contradicted the Article's central premise. (ECF No. 1 ¶ 103.)

LTL further alleges that for at least four other individuals included in Dr. Moline's 2020 Article, "it appears that alternative sources of exposure were present and known to Dr. Moline at the time the Article was written."[6] (ECF No. 1 ¶ 126.) For example, LTL claims that in one of

---

[6]     Unlike Bell, these other individuals have not been confirmed as being included in the 2020 Article. But LTL provides side-by-side comparisons of Dr. Moline's expert report in each individual's underlying case with the Article's description of a corresponding individual, suggesting that each plaintiff in the underlying case is one of the 33 individuals in the Article. (*See, e.g.*, ECF No. 1 ¶ 132.) Additionally, LTL claims that Dr. Moline failed to account for the

the individual cases, tissue analysis in the underlying talc litigation revealed the presence of asbestos fibers caused only by "industrial and occupational exposure, not cosmetic talcum powder." (*Id.* ¶¶ 133-136.)  Thus, according to LTL, the 2020 Article falsely asserts that "[a]sbestos of the type found in talcum powder" was present in all six tissue analyses.  (*Id.*; ECF No. 1-2 at 2.)  In another individual case, Dr. Moline went so far as to issue an erratum, disclosing that one of the 33 persons should not have been included in the 2020 Article because the individual had been exposed not only to talcum powder, but also to "asbestos contaminated cigarette filters."  (ECF No. 1-12 at 2.)  LTL alleges that this erratum further demonstrates that the premise of the 2020 Article was false.  (ECF No. 1 ¶ 157.)

### C. DR. MOLINE'S REPUBLICATIONS OF THE ALLEGEDLY FALSE STATEMENTS

LTL asserts that Dr. Moline "repeated the false premise of the Article time and time again, in myriad settings and with large and varied audiences," including to several news media organizations, conferences, and oral and written testimony that Dr. Moline delivered before a United States House of Representatives subcommittee on talc litigation.  (ECF No. 1 ¶¶ 40-74.)  According to LTL, Dr. Moline made these false statements in the 2020 Article and to the public "for her own professional aggrandizement and financial gain," and to "add a veneer of credibility" after courts had "repeatedly barred Dr. Moline from offering testimony."  (*Id.* ¶¶ 93-94, 199.)  As a result of Dr. Moline's statements, LTL contends, the sales volume and profits from Johnson's Baby Powder have declined, leading to the discontinuation of talc-based Johnson's Baby Powder in the United States and Canada.  (*Id.* ¶¶ 224-225.)  LTL asserts three causes of action against Dr.

---

alternative source of asbestos exposure of an individual she allegedly included in a similar study published in 2023.  (*Id.* ¶¶ 173-189.)

Moline: trade libel (Count I);[7] common-law fraud (Count II); and false advertising under the Lanham Act, 15 U.S.C. § 1125(a) (Count III).[8]

## II.     STANDARD OF REVIEW

On a motion to dismiss for failure to state a claim upon which relief can be granted, courts "accept the factual allegations in the complaint as true, draw all reasonable inferences in favor of the plaintiff, and assess whether the complaint and the exhibits attached to it 'contain enough facts to state a claim to relief that is plausible on its face.'"  *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023) (quoting *Watters v. Bd. of Sch. Directors of City of Scranton*, 975 F.3d 406, 412 (3d Cir. 2020)).  "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Clark v. Coupe*, 55 F.4th 167, 178 (3d Cir. 2022) (quoting *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 372 (3d Cir. 2019)).  When assessing the factual allegations in a complaint, courts "disregard legal conclusions and recitals of the elements of a cause of action that are supported only by mere conclusory statements."  *Wilson*, 57 F.4th at 140 (citing *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 903 (3d Cir. 2021)).  The defendant bringing a Rule 12(b)(6) motion bears the burden of "showing that a complaint fails to state a claim."  *In re Plavix Mktg., Sales Pracs. & Prod. Liab. Litig. (No. II)*, 974 F.3d 228, 231 (3d Cir. 2020).

---

[7]      Count I is for "Injurious Falsehood / Product Disparagement."  (ECF No. 1 at 60.)  Trade libel has been referred to by a variety of different names, but for consistency, the Court will refer to this cause of action as "trade libel."  *See Pacira BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*, 63 F.4th 240, 244 n.7 (3d Cir. 2023).

[8]      This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction over the state-law claims under § 1367(a).

## III.    DISCUSSION

### A.    "FACT" VERSUS "OPINION" IN ACADEMIC SPEECH

To survive a motion to dismiss and be actionable, LTL's causes of action must be based on statements of fact that are "capable of objective proof of truth or falsity."[9]  *See Pacira Biosciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*, 583 F. Supp. 3d 654, 658 (D.N.J. 2022), *aff'd*, 63 F.4th 240 (3d Cir. 2023) (quoting *Ward v. Zelikovsky*, 643 A.2d 972, 979 (N.J. 1994)).[10] Statements of opinion, on the other hand, are protected by the First Amendment and are nonactionable unless the opinions "imply false underlying objective facts," otherwise known as "mixed" opinions. *Lynch v. New Jersey Educ. Ass'n*, 735 A.2d 1129, 1137 (N.J. 1999); *see also Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990) (rejecting a wholesale constitutional

---

[9]      All three of LTL's claims require a showing of false statements of fact.  In New Jersey, the elements of trade libel are (1) publication; (2) with malice; (3) of false allegations concerning a plaintiff's property, product, or business; and (4) special damages, i.e., pecuniary harm. *Mayflower Transit, LLC v. Prince*, 314 F. Supp. 2d 362, 378 (D.N.J. 2004); *see also Patel v. Soriano*, 848 A.2d 803, 834 (N.J. Super. Ct. App. Div. 2004), *cert. denied*, 861 A.2d 845 (N.J. 2004).  Similarly, a common-law fraud claim under New Jersey law, which requires a showing of a "material misrepresentation of a presently existing or past fact" and "knowledge or belief by the defendant of its falsity," cannot be premised on statements of opinion. *See Johnson v. Draeger Safety Diagnostics, Inc.*, 594 Fed. App'x 760, 766 (3d Cir. 2014); *Lavine v. Am. Acad. of Pediatrics Inc.*, Civ. No. 21-17099, 2023 WL 3431212, at *7 (D.N.J. May 31, 2024) (holding that the plaintiffs could not state a claim for fraud based on "scientific conclusions and medical opinions").  And because false advertising claims under the Lanham Act proscribe "conduct that, but for its false or misleading character, would be protected by the First Amendment, free speech principles inform [courts'] interpretation of the Act." *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 496 (2d Cir 2013).  In a claim under the Lanham Act, "statements of pure opinion — that is, statements incapable of being proven false — are protected under the First Amendment." *Id.* (citation omitted); *see also Pacira*, 63 F.4th at 246 n.10 (citing *ONY* to note that opinions are nonactionable in both trade libel and false advertising claims).

[10]      The parties agree that because there is no conflict between the common-law claims for trade libel and fraud under the laws of New Jersey and New York, the law of the forum state applies.  (ECF No. 28-1 at 18 n.10; ECF No. 29 at 17 n.2.)  Accordingly, the Court will apply New Jersey law to LTL's common-law claims.  *See Snyder v. Farnam Companies, Inc.*, 792 F. Supp. 2d 712, 717 (D.N.J. 2011) ("[I]f no conflict exists, the law of the forum state applies.").

privilege "for anything that might be labeled 'opinion'" and finding that statements are actionable if they are "susceptible of being proved true or false"). "The higher the fact content of a statement, the more likely that the statement will be actionable." *Pacira*, 63 F.4th at 245 n.9 (quoting *Lynch*, 735 A.2d at 1137). But if a statement can be construed as either fact or opinion, courts "must construe it as an opinion. A contrary presumption would 'tend to impose a chilling effect on speech.'" *Id.* (quoting *Lynch*, 735 A.2d at 1137).

Statements made in the context of scholarly and academic debate, however, pose "several problems for the fact-opinion paradigm of First Amendment jurisprudence." *ONY, Inc. v. Cornerstone Therapeutics, Inc.*, 720 F.3d 490, 496 (2d Cir. 2013). The difficulty arises in large part because academic freedom is "a special concern of the First Amendment." *Id.* (quoting *Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 603 (1967)). As the United States Court of Appeals for the Second Circuit has explained:

> Most conclusions contained in a scientific journal article are, in principle, capable of verification or refutation by means of objective proof. Indeed, it is the very premise of the scientific enterprise that it engages with empirically verifiable facts about the universe. At the same time, however, it is the essence of the scientific method that the conclusions of empirical research are tentative and subject to revision, because they represent inferences about the nature of reality based on the results of experimentation and observation.
>
> [*Pacira*, 63 F.4th at 246 (quoting *ONY*, 720 F.3d at 496) (quotations and internal citation omitted).]

Based on this reasoning, the Second Circuit held in *ONY* that although scientific conclusions are "in principle matters of verifiable 'fact,' for purposes of the First Amendment and the laws relating to fair competition and defamation, they are more closely akin to matters of opinion, and are so understood by the relevant scientific communities." *ONY*, 720 F.3d at 497.

In *ONY*, a drug manufacturer (ONY, Inc.) sued a competing manufacturer for false

advertising under the Lanham Act. *Id.* at 492-93. ONY's competitor had hired researchers who published a study in a peer-reviewed medical journal concluding that the competitor's drug was more effective than ONY's drug at lowering the mortality rate of premature infants. *Id.* at 493. ONY argued that because the article omitted certain data that the researchers had in their possession, and failed to cite other studies with contradictory conclusions, the article was "intentionally deceptive and misleading" and "therefore constituted false advertising." *Id.* at 494-96. The Second Circuit disagreed. It found that scientific conclusions drawn "from non-fraudulent data, based on accurate descriptions of the data and methodology underlying those conclusions" do not provide "grounds for a claim of false advertising" even though the scientific conclusions are, in principle, capable of being proven true or false. *Id.* at 498.

The holding in *ONY* turned on the fact that the plaintiff did not allege that the data "were fabricated or fraudulently created." *Id.* at 497. Instead, the plaintiff alleged that "the inferences drawn from . . . data were the wrong ones, and that competent scientists would have included variables that were available to the defendant authors but that were not taken into account in their analysis." *Id.* at 497. According to the Second Circuit, such statements could not form a basis for claims "sounding in defamation," particularly where "the authors readily disclosed the potential shortcomings of their methodology and their potential conflicts of interest." *Id.* at 492, 498.

More recently, the United States Court of Appeals for the Third Circuit relied heavily on *ONY* to conclude that a claim for trade libel based on "tentative scientific conclusions" failed as a matter of law. *Pacira*, 63 F.4th at 246-48. Pacira BioSciences, Inc., a drug manufacturer, brought a claim for trade libel against "the American Society of Anesthesiologists, Inc., . . . the editor-in-chief of its medical journal, and the authors of three articles for statements made about one of Pacira's drug products." *Id.* The defendants had published articles stating that Pacira's drug

provided pain relief that was "inferior" to similar drugs.  *Id.*  Pacira alleged that each of the articles "employed flawed methodologies by . . . cherry-picking data, relying on studies that . . . were deficient, improperly discrediting studies favorable to [Pacira's drug], and failing to properly limit their conclusions."  *Pacira*, 583 F. Supp. 3d at 657.

The Third Circuit affirmed the district court's determination that the statements were nonactionable opinions.  *Pacira*, 63 F.4th at 243.  *First*, the Court noted that "[s]tating that something is 'not superior' or 'inferior'" is merely an expression of subjective opinion.  *Id.* at 246 (citations omitted).  *Second*, the Court found that the statements were not sufficiently "verifiable" because they were "tentative scientific conclusions and were expressly disclosed as such."  *Id.* at 246.  According to the Third Circuit, the argument that the authors should have included variables that were available to them but "were not taken into account in their analysis" boiled down to "disagreements about the reliability of the methodology and data underlying the statements."  *Id.* at 247.  And such an argument failed "to appreciate the difference between 'verifiability,'" which "turns on whether a statement is 'capable of . . . truth or falsity,'" and "reliability," which "turns on whether the basis for the statement is capable of being trusted."  *Id.* (citations omitted).  *Third*, the Court found that the statements' publication in a peer-reviewed scientific journal weighed towards them being nonactionable.  *Id.* at 248-49.  Nevertheless, the Third Circuit rejected "a categorical rule that scientific statements contained in academic journals are always immune from a trade libel claim," commenting that "a conclusion drawn from falsified or fraudulent data may be actionable."  *Id.* at 247 n.14, 249 n.20 (citing *ONY*, 720 F.3d at 497; then *CrossFit, Inc. v. Nat'l Strength & Conditioning Ass'n*, 2016 WL 5118530, at *7 (S.D. Cal. Sept. 21, 2016)).

Relying on this precedent, Dr. Moline argues that LTL's causes of action should be dismissed because the 2020 Article's challenged statements are "scientific opinions . . . protected under the First Amendment" and nonactionable as a matter of law.  (ECF No. 28-1 at 9-10.)

LTL counters that Dr. Moline's statements — that (1) the individuals had "no known asbestos exposure other than cosmetic talcum powder," and (2) the tissue analyses revealed only "[a]sbestos of the type found in talcum powder" — "are not protected statements of scientific opinion but, rather, economically-motivated, false, and inaccurate statements concerning the data underlying her Article."  (ECF No. 1 ¶¶ 36, 234; *see also* ECF No. 39 at 24-25.)

"Whether a statement is a nonactionable opinion is a threshold question of law."  *Pacira*, 63 F.4th at 245 (citing *Kotlikoff v. Cmty. News*, 444 A.2d 1086, 1090 (N.J. 1982)).  Thus, against this backdrop, the Court must determine whether Dr. Moline's statements are actionable false representations of fact, or scientific conclusions that are "more closely akin" to nonactionable matters of opinion.  *See ONY*, 720 F.3d at 497.  To determine whether a statement is a nonactionable opinion, "a court must consider three factors: (1) the content, (2) the verifiability, and (3) the context of the challenged statement."  *Leang v. Jersey City Bd. of Educ.*, 969 A.2d 1097, 1113 (N.J. 2009) (citation omitted); *see also Pacira*, 63 F.4th at 245.  The Court considers each factor in turn.

### 1.    CONTENT

"Evaluation of content involves consideration not merely of a statement's literal meaning, but also of the fair and natural meaning that reasonable people of ordinary intelligence would give to it."  *Pacira*, 63 F.4th at 245 (quoting *Lynch*, 735 A.2d at 1136.)  The Court must determine whether "[t]he impression created by these words in the mind of a reasonable person could be that they were purporting to state the truth of the matter, not merely the author's opinion."  *NXIVM*

*Corp. v. Sutton*, Civ. No. 06-01051, 2007 WL 1876496, at *8 (D.N.J. Jun. 27, 2007) (quoting

*Church of Scientology Int'l v. Eli Lilly & Co.*, 778 F. Supp. 661, 668 (S.D.N.Y. 1991)).

Here, the bases for LTL's claims include the following statements made by Dr. Moline in

both the 2020 Article and in various other media:

- Dr. Moline's "multiple factual assertions" in the 2020 Article, including:

    o "Talcum powder usage was the only source of asbestos for all 33 cases."

    o "For all 33 cases, other potential exposures to asbestos were considered, with no identified source apart from the talcum powder."

    o "[W]e present 33 cases, predominantly of women, who had no known exposure to asbestos other than prolonged use of talcum powder."

    o "The table identifies talcum powder as the only asbestos exposure these patients have experienced. No individual identified any asbestos exposure apart from contaminated talcum powder from workplace or household exposures."

    o "Amosite and crocidolite, asbestos fibers . . . were not found in any" of the six subjects whose tissue samples were tested.

- Dr. Moline's statement to *Time* Magazine that "[t]his is the first time that anyone has said, 'Let me look at all these cases, put it all together and identify the ones where [talc] is the sole exposure.'"

- Dr. Moline's statements to Romper.com that "[a]ll the folks in the study used cosmetic talc, usually for decades, and they all had mesothelioma with no other asbestos source," and "[w]e couldn't find any other source apart from the cosmetic talc."

- Dr. Moline's statements at two events organized by the Asbestos Disease Awareness Organization that "[w]hat we found in these individuals is that these 33 did not have any other known source of asbestos exposure that we could discern from the information that we were provided," and "[w]e were unaware of any asbestos exposure apart from talc."

- Dr. Moline's repetition of these statements in oral and written Congressional testimony, her written comment addressing the Environmental Protection Agency's draft risk evaluation on asbestos, and her biography page on her employer's website.

    [(*See* ECF No. 1 ¶¶ 36, 64-74, 229.)]

Viewed in isolation, these statements appear to have a higher "fact content"[11] than the statements about the relative effectiveness of drugs at issue in *Pacira* and *ONY*. *See Pacira*, 63 F.4th at 245-46 ("Stating that something is 'not superior' or 'inferior' is . . . 'more likely to be deemed non-actionable as rhetorical hyperbole.'"); *ONY*, 720 F.3d at 494-98 (finding that conclusions about the "relative effectiveness" of certain drugs, "presented alongside an accurate description of the data taken into account and the methods used," were nonactionable).  The statements challenged by LTL are factually distinguishable from the "statement[s] of qualification" at issue in *Pacira*.  (ECF No. 39 at 14-15.)  And statements with a higher "fact content" are more likely to be found actionable.  *See, e.g.*, *Lynch*, 735 A.2d at 1137-39 (finding that an advertisement calling a state senator the "Boss of Bosses" was nonactionable "hyperbole and name-calling," but specific accusations that the senator was a "partner or officer in three mob-owned companies fined for illegal toxic dumping" could be actionable).  The higher factual content of Dr. Moline's statements weighs in favor of finding that the statements are actionable.  (*See* ECF No. 1 ¶ 229.)

Nevertheless, when evaluating a statement's fair and natural meaning, courts consider not only the specific statements at issue, but also the "content of the whole communication, its tone and apparent purpose."  *NXIVM Corp.*, 2007 WL 1876496, at *8 (quoting *Immuno AG v. Moor-Jankowski*, 567 N.E.2d 1270, 1281-82 (N.Y. 1991)).  Some courts, when analyzing a statement's content, have found it necessary to simultaneously consider the context.  *See, e.g.*, *id.* at *8-10 (considering the context of the statements at issue when analyzing their content, including "not only the tone and tenor of the articles but also the broader context of the . . . website" where they were published, all of which supported a finding that the statements were nonactionable and

---

[11]     *See Lynch*, 735 A.2d at 1137 (citing *Ward*, 643 A.2d at 972).

constituted "an academic critique or analysis of Plaintiff's program") (citing *Farber v. City of Paterson*, Civ. No. 03-4535, 2006 WL 3485919, at \*5 (D.N.J. Nov. 29, 2006) (noting that determining whether the content of a statement was nonactionable as a matter of law could not be made "without examining the context" where the statements did not explicitly name the plaintiff). This is because the "context of a statement can affect significantly its fair and natural meaning." *Lynch*, 735 A.2d at 1138 (citing *Ward*, 643 A.2d at 980) (finding that even if calling a state senator the "Boss of Bosses" was verifiable by implying a connection to organized crime, in the context of a heated political campaign, it was not defamatory).

In the context of scholarly debate, other courts have noted that "[i]solating challenged speech . . . indeed may result in identifying many more implied factual assertions than would a reasonable person encountering that expression in context." *See, e.g.*, *Immuno AG v. Moor-Jankowski*, 567 N.E.2d 1270, 1278, 81-82 (N.Y. 1991) ("It has long been our standard in defamation actions . . . not to isolate particular phrases but to consider the publication as a whole."). For example, in *Immuno AG*, the New York Court of Appeals considered under New York law[12] whether a letter to the editor published in a scientific journal, which accused the plaintiffs of illegally importing chimpanzees, was actionable for defamation. *Id.* at 1271. The court found that even though the statements viewed in isolation "could be found to contain implied factual assertions," the context of the letter — including its publication in a scientific journal and its stated purpose of voicing "conservationist concerns" — supported a finding that the letter was "an expression of opinion rather than a statement of fact." *Id.* at 1280-81. And in *NXIVM Corp.*, even

---

[12]   "New York and New Jersey law concerning product disparagement [trade libel] . . . are virtually identical." *NXIVM Corp.*, 2007 WL 1876496, at \*6 (first citing *IBM Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004), and then citing *Zavala v. Wal-Mart Stores, Inc.*, 393 F. Supp. 2d 295, 333 (D.N.J. 2005)).

where the plaintiff identified at least six specific factual assertions that it contended were "demonstrably false," the court considered the statements together with their academic contexts and found it "evident that the authors are offering their opinions based on their academic and occupational training."  2007 WL 1876496, at *8-13.

Similarly here, although Dr. Moline's statements appear to have a higher "fact content" than the "rhetorical hyperbole" in *Pacira* and *ONY*, this difference is not dispositive.  The Court must also consider the content of the whole communication and its apparent purpose.  Here, the Article was published in a peer-reviewed journal with a self-described purpose of "underlin[ing] the importance of collecting detailed exposure histories . . . in patients presenting with mesothelioma."  (ECF No. 1-2 at 6-7; ECF No. 1-5 at 5 (quoting Dr. Moline as saying "The main reason I wanted to [conduct this study] is I wanted to alert clinicians that you need to take a comprehensive exposure history . . . for all of these people who have been diagnosed with mesothelioma . . . no one ever asked if they used cosmetic talcum powder").)  As discussed below, the content of Dr. Moline's statements, considered alongside their context and verifiability, supports a finding that her statements in both the 2020 Article and in other media are nonactionable "tentative scientific conclusions" protected by the First Amendment.  *Pacira*, 63 F.4th at 246-47.

### 2.   VERIFIABILITY

The "verifiability" prong requires the Court to determine whether the statements at issue are pure statements of fact "capable of . . . truth or falsity," or constitute "tentative scientific conclusions" that are more closely akin to nonactionable opinions.  *Id.*; *ONY*, 720 F.3d at 497.  The Court first examines whether Dr. Moline's multiple assertions that each of the "33 cases . . . had no known exposure to asbestos other than prolonged use of talcum powder" are verifiable statements of fact.  (ECF No. 1-2 at 5.)

### a.   STATEMENTS CONCERNING KNOWN EXPOSURES TO ASBESTOS

LTL argues that Dr. Moline's statement that the 33 individuals in the Article "had no known exposure to asbestos other than prolonged use of talcum powder" is a "false and untrue assertion[] of fact," because the underlying data show that certain individuals had other potential sources of exposure as evidenced by their depositions and medical records.  (ECF No. 1 ¶ 229 (quoting ECF No. 1-2 at 5).)

LTL's first example is Bell.  (*See id.* ¶ 96.)  LTL highlights Bell's two workers' compensation claims asserting that she had been exposed to asbestos during prior employment with two textile employers — claims that were eventually dismissed without prejudice.  *Bell*, 627 F. Supp. 3d at 524.  LTL submits that "Bell's workers' compensation claims were discussed at her deposition and included on Dr. Moline's list of materials reviewed in her 2016 expert report in Ms. Bell's case," which LTL says "means that Dr. Moline *knew or recklessly ignored available information* at the time she wrote and published the Article."  (ECF No. 1 ¶ 103.)

LTL alleges that at least four additional cases[13] in the 2020 Article are individuals who were unequivocally exposed to "known alternative sources" of asbestos, rendering Dr. Moline's statements in the 2020 Article "false."  *First*, LTL alleges that Stephen Lanzo is "Case #6" in the 2020 Article.  (ECF No. 1 ¶¶ 127-136.)  According to LTL, during Lanzo's 2018 trial, Dr. Moline

---

[13]     LTL also challenges one case in Dr. Moline's 2023 Article, which presented "166 cases of individuals who have substantial asbestos exposure to cosmetic talc products as well as some who have potential or documented additional exposures to other asbestos-containing products and who subsequently developed mesothelioma." (ECF No. 1 ¶ 174.) LTL alleges that Case #25's potential for alternative asbestos exposure was listed as "None" in the 2023 Article.  But LTL alleges that the person believed to be Case #25 lived near an industrial plant, and one doctor in the underlying talc litigation opined that such circumstances significantly increased the chance of a person developing mesothelioma. (*Id.* ¶ 182.) LTL's allegation that Dr. Moline failed to take into account the opinion of another doctor when describing this person's potential asbestos exposure as "none" amounts to an argument that Dr. Moline failed to consider certain data, or to draw a "correct" conclusion based on the data — allegations that are nonactionable.  *ONY*, 720 F.3d at 496-97.

testified that 60 feet of exposed asbestos pipe were removed from Lanzo's basement and that Lanzo had spent time in the basement.[14]  (*Id.* ¶¶ 141-142.)  *Second*, LTL claims that Doris Jackson is "Case #3" in the 2020 Article.  (*Id.* ¶ 162.)  In Jackson's case, Dr. Moline reviewed Jackson's medical records, which included an intake form showing that Jackson reported that she was exposed to "ceiling pipes with degrading insulation" during her 30-year career as a public school teacher.  (*Id.* ¶¶ 163-165.)  *Third*, LTL contends that Valerie Jo Dalis is "Case #4" in the 2020 Article.  (*Id.* ¶ 168.)  Before filing a complaint against another cosmetic talc defendant, Dalis "submitted an asbestos bankruptcy trust claim for $450,000 and collected over $28,000 from Manville Personal Injury Settlement Trust," which Dalis discussed in her deposition in her talc litigation.  (*Id.* ¶ 169-170.)  *Fourth*, and finally, LTL says that Helen Kohr is "Case #17" in the 2020 Article.  (*Id.* ¶ 153.)  In Kohr's case, Dr. Moline's expert report noted that Kohr smoked asbestos-containing cigarettes for several years, citing both the cigarettes and cosmetic talc as the cause of Kohr's mesothelioma.  (*Id.* ¶¶ 154-156.)  LTL insists that because Dr. Moline knew all of this information in each of these individuals' underlying talc cases, her statement in the 2020 Article that they had "no known asbestos exposure other than cosmetic talcum powder" was false, or "recklessly ignored available information" demonstrating its falsity.  (*See id.* ¶ 134.)

Having carefully reviewed the allegations, the Court finds that these other alleged sources of asbestos exposure identified by LTL do not render Dr. Moline's finding that the individuals had "no known asbestos exposure other than cosmetic talcum powder" a verifiably false statement of

---

[14]    LTL also alleges that Lanzo "had potential exposures" to asbestos in his elementary school, although LTL does not appear to allege facts indicating that the purported asbestos in his elementary school was a fact discussed in Lanzo's tort case or known by Dr. Moline before publishing the 2020 Article.

Moreover, LTL alleges that Dr. Moline lied about the results of Lanzo's tissue analyses. The Court discusses the allegations regarding tissue analyses more fully below.

fact, as opposed to a nonactionable scientific conclusion.  For the reasons explained below, LTL's allegations challenge the weight of Dr. Moline's statements but do not demonstrate that they are verifiable, actionable statements of truth or falsity that should not enjoy First Amendment protection.

The Court turns first to *Bell*.  LTL places great weight on the *Bell* case, describing it as the case where "Dr. Moline's deception was laid bare."  (ECF No. 1 ¶ 5.)  But the Court finds that LTL overstates the import of *Bell*.  The case does not stand for the proposition that Dr. Moline's statements regarding "no known asbestos exposure other than cosmetic talcum powder" are easily verifiable statements of fact.  (*See* ECF No. 1-2 at 2.)  To the contrary, *Bell* demonstrates that Dr. Moline's statements about asbestos exposure are inferences or conclusions drawn from her review of deposition transcripts and medical records.  Such inferences may be subject to critique about their reliability but are not sufficiently verifiable to be actionable as a matter of law.  *See Pacira*, 63 F.4th at 247.

Certainly, the district court in *Bell* expressed serious concern about the "seeming contradiction" between Bell's previous workers' compensation claims and the 2020 Article's statement that each of the 33 cases "had no known exposure to asbestos other than prolonged use of talcum powder."  *Bell*, 627 F. Supp. 3d at 530.  In vacating the protective order, the court found that Bell's employment history "undermines the weight of Dr. Moline's finding that each of the '33 cases . . . had no known exposure to asbestos other than prolonged use of talcum powder.'"  *Id.*  The court reasoned that "defendants in cosmetic talc cases deserve a fair opportunity to explore the weight to be assigned to Dr. Moline's facts and conclusions."  *Id.* at 532.

The district court's opinion focused on the *weight* to be given to Dr. Moline's findings, thereby demonstrating that they are more akin to opinions as opposed to statements of fact.  Indeed,

the court recognized "that the mere existence of the unsuccessful workers' compensation claims d[id] not definitively establish that Mrs. Bell was in fact exposed to asbestos at the textile workplaces." *Id.* at 530. Critically, the court noted that "[i]f presented with Mrs. Bell's workers' compensation claims, Dr. Moline and other expert witnesses for cosmetic talc plaintiffs may be able to persuasively explain that [the claims] do not constitute known alternative exposures because the claims never amounted to more than unproven allegations." *Id.* at 532. Thus, the *Bell* opinion recognized that the term "known asbestos exposure other than cosmetic talcum powder" is not a matter of simple truth or falsity, but a scientific *inference* that Dr. Moline could conceivably draw *even when presented with Bell's workers' compensation claims*. Such reasoning demonstrates that Dr. Moline's statements about "known asbestos exposure" are not sufficiently "capable of . . . truth or falsity" to be actionable as a matter of law, but are more closely akin to inferences or conclusions drawn from her review of the data and subject to First Amendment protection. *Pacira*, 63 F.4th at 247.

Furthermore, it is telling that the court in *Bell* does not describe Dr. Moline's statements as "false," or even "incorrect." Rather, it questions the validity of the inferences drawn from the results of the underlying data. *See id.* at 248 (quoting *ONY*, 720 F.3d at 497). While the weight of Dr. Moline's findings may certainly be subject to critique or criticism, they cannot form the basis for separate claims such as trade libel, as it poses too great a risk of "'chilling' the natural development of scientific research and discourse." *Id.* at 248 (quoting *Kotlikoff*, 444 A.2d at 1088).

The Court's reading of *Bell* weighs in favor of finding that Dr. Moline's statements constitute the type of scientific assertions that are nonactionable because "for purposes of the First Amendment and the laws relating to fair competition and defamation, they are more closely akin to matters of opinion." *ONY*, 720 F.3d at 497 (emphasis added).

Similarly, even accepting the alleged facts as true in the Lanzo, Dalis, Jackson, and Kohr cases, the other sources of asbestos exposure alleged by LTL do not render verifiably false Dr. Moline's finding of "no known asbestos exposure other than cosmetic talcum powder." Indeed, the Article states that for "all 33 cases, other potential exposures to asbestos were considered, with no identified source apart from the talcum powder." (ECF No. 1-2 at 2.) Dr. Moline "may be able to persuasively explain that [these potential sources] do not constitute known alternative exposures." *See Bell*, 627 F. Supp. 3d at 532. The fact that Dr. Moline could conceivably explain why these other alleged sources do not constitute "known asbestos exposure" shows that the statement is a scientific opinion, and not a matter of simple truth or falsity.

Like in *Bell*, Dr. Moline's conclusion that these other four individuals had "no known asbestos exposure" other than talcum powder based on her review of the underlying data is not a sufficiently verifiable statement of fact — it is a tentative scientific conclusion that is nonactionable as a matter of law. Put differently, LTL accuses Dr. Moline of failing to include "variables that were available to [her]" — such as the pipes in Lanzo's basement or Jackson's workplace — "but that were not taken into account in [her] analysis." *ONY*, 720 F.3d at 497; *Pacira*, 583 F. Supp. 3d at 657. This same argument was rejected in *Pacira*, where the plaintiff "attempt[ed] to reframe these perceived flaws in methodology as 'false descriptions of data on which the studies rely.'" 583 F. Supp. 3d at 559-660. Just as the plaintiff in *Pacira* argued that the article "'failed to disclose' certain studies and data favorable to" the plaintiff, LTL's argument, at bottom, is that Dr. Moline failed to disclose information that LTL and perhaps other experts would consider to be "known exposures" to asbestos. *Id.* "But a scientific conclusion need not account for every piece of data that was *not* relied on to receive protection." *Id.* (citing *ONY*, 720 F.3d at 497). Indeed, allegations that "'scientists would have included variables that were available

to the defendant authors but . . . were not taken into account in their analysis' cannot create an actionable falsehood because they do not bear on whether the statements are verifiable." *Pacira*, 63 F.4th at 247 (quoting *ONY*, 720 F.3d at 497). For this reason, these statements are nonactionable regardless of whether, as LTL alleges, Dr. Moline knew this information when she published the 2020 Article.

Nor does the erratum that Dr. Moline published change the Court's analysis. Dr. Moline published her erratum after a letter to the editor of the journal prompted her to review the 2020 Article's cases. (ECF No. 1 ¶ 158.) After her review, she "identified one individual with an alternative exposure" — someone who was exposed to "asbestos-laden cigarette filters." (*Id.*) LTL alleges that her erratum refers to the Kohr case. (*Id.*) Dr. Moline stated that the error "does not negate the other 32 cases, in which no other source of asbestos was present apart from cosmetic talcum powder." (*Id.* ¶ 159.) Even when reviewed in a light most favorable to LTL, Dr. Moline's erratum does not plausibly demonstrate that she fabricated or falsified data — which LTL does not allege. Rather, it demonstrates exactly why the "peer-review process — not a courtroom — . . . provides the best mechanism for resolving scientific uncertainties." *Pacira*, 583 F. Supp. 3d at 658. Though LTL has "identified grounds for legitimate scholarly debate, it cannot breach the legal protection otherwise afforded to scientific conclusions." *See id.* at 660.

Finally, this case is unlike *CrossFit Inc. v. National Strength and Conditioning Association*, 2016 WL 5118530, at *7 (S.D. Cal. Sept. 21, 2016). There, the National Strength and Conditioning Association published an article in its peer-reviewed journal that "examined fitness results from more than fifty individuals participating in a CrossFit training program." *Id.* at *1. The article claimed that nine of the original participants, or 16%, "dropped out of the training program . . . citing overuse or injury," and concluded that programs such as CrossFit were "dangerous." *Id.* at

*2.   CrossFit later identified the nine individuals, who provided CrossFit with declarations explaining that they were not injured and had dropped out of the program for other reasons.  *Id.* The Association subsequently published an erratum, noting that only two individuals had dropped out of the program due to injury or health conditions.  *Id.* at *4.  The erratum stated that the "injury rate should not be considered a factor in this study."  *Id.*  CrossFit brought claims against the Association that included false advertising and trade libel, alleging that the Association, as one of CrossFit's competitors, knowingly published false data to harm CrossFit's popularity.  *Id.* at *7. On a motion for summary judgment, the district court found that a reasonable trier of fact could conclude that the injury data was fabricated.  *Id.* at *6-7.

Here, LTL does not allege that Dr. Moline fabricated the Article's underlying data.  And the statements in *CrossFit* were easily verifiable statements of fact, whose truth turned on whether the study's participants dropped out due to injury or for some other reason.  For instance, one participant stated that she stopped the program "because she moved out of state before it ended," and not because she was injured.  2016 WL 5118530, at *2.  *CrossFit* exemplifies the rare case where false statements of verifiable fact in an academic journal may form a basis for trade libel and false advertising.  But here, as the *Bell* opinion demonstrates, Dr. Moline could "persuasively explain" why these other alleged exposures do not constitute "known asbestos exposure," which shows that the statements are the type of tentative scientific conclusions that are nonactionable. *See Pacira*, 63 F.4th at 246.  For these reasons, the verifiability factor weighs in favor of finding these statements nonactionable.

**b.**   STATEMENTS CONCERNING TISSUE ANALYSES

LTL challenges not only the assertions about "no known asbestos exposure" other than talcum powder, but also the 2020 Article's statement that "Amosite and crocidolite, asbestos fibers . . . were not found in any" of the six subjects whose tissue samples were tested.  (ECF No. 1 ¶ 229.)

The Article states that the "tissue digestions were performed by author R.G.," or Dr. Ronald Gordon, as part of the 33 individuals' underlying talc litigation.  (ECF No. 1-2 at 2.)  The Article asserts that in all six cases where Dr. Gordon performed tissue digestion, only asbestos fibers "consistent with the types of asbestos found in talc" were present. "Amosite and crocidolite, asbestos fibers that are encountered in cases of industrial and occupational exposure, not cosmetic talcum powder, were not found in any of these cases."  (*Id.* at 5.)

LTL alleges that crocidolite asbestos was in fact found in the tissue samples of Stephen Lanzo (alleged to be Case #6 in the 2020 Article).  (ECF No. 1 ¶¶ 127-136.)  According to LTL, the Article's statement about tissue analysis was knowingly false because in Lanzo's underlying talc litigation, experts for both the plaintiff and defense found crocidolite asbestos in his tissue samples.  (*Id.* ¶¶ 137-138.)

But crucially, the 2020 Article does not purport to consider the tissue analyses performed by the plaintiff and defense experts in Lanzo's case.  In fact, the Article expressly discloses in a footnote that "[t]issue analysis presented done by author.  Tissue analysis might have been done in some cases by other investigator, these results are not presented in this paper."  (ECF No. 1-2 at 6.)  Even if all of LTL's allegations are true — that LTL has correctly identified Lanzo as Case #6, and that Dr. Moline was aware of these other tissue analyses — this statement is a nonactionable scientific conclusion published alongside an "accurate description of the data taken

into account." *ONY*, 720 F.3d at 498.  And LTL does not allege that the co-author who performed the tissue analyses, Dr. Ronald Gordon, falsified the results of the tissue analyses that were presented in the 2020 Article.  Instead, LTL's claim amounts to accusing Dr. Moline of failing to consider tissue analyses performed by other experts who reached different conclusions.  *See id.* at 496-97 (finding that a plaintiff's allegation that an article's authors omitted certain data, and "fail[ed] to cite articles with different primary conclusions," thereby rendering the article's findings "intentionally deceptive and misleading," could not form the basis for a false advertising claim).  Such "critiques about the [Article's] data and methodology . . . do not form the basis for trade libel under New Jersey law.  *Pacira*, 63 F.4th at 248.

### 3.   CONTEXT

The Court turns next to the context of Dr. Moline's statements.  In considering context, New Jersey courts examine the "medium by which the statement is disseminated and the audience to which it is published." *Pacira*, 63 F.4th at 248 (quoting *Wilson v. Grant*, 687 A.2d 1009, 1014 (N.J. Super. Ct. App. Div. 1996)) (citing, among others, *NXIVM Corp.*, 2007 WL 1876496, at *10 (noting that the case considered statements "in the context of a scholarly article")).  "While statements are not protected solely because they appear in a peer-reviewed journal, such journals are often 'directed to the relevant scientific community,'" who are "best positioned to identify opinions and 'choose to accept or reject [them].'" *Id.* at 248 (first quoting *ONY*, 720 F.3d at 496-97; then *Redco Corp. v. CBS, Inc.*, 758 F.2d 970, 972 (3d Cir. 1985)).

### a.   STATEMENTS PUBLISHED IN A PEER-REVIEWED JOURNAL

Here, the first category of Dr. Moline's statements was made in "the peer-reviewed Journal of Occupational and Environmental Medicine."  (ECF No. 1-3 at 4.)  The Article also provided readers with the methodology on which the statements were based, including the fact that (1) the

cases were referred to Dr. Moline "for medico-legal evaluation as part of tort litigation"; (2) data "for all 33 patients were gathered from each individual's medical records and sworn testimony (deposition transcripts)"; and (3) the tissue analyses were performed by author R.G., and that any other analyses done by other investigators "are not presented in this paper." (ECF No. 1-2 at 2-6.) The authors also expressly noted the Article's limitations, including the fact that the 33 individuals were plaintiffs in talc litigation; Dr. Moline and another author's conflict of interest due to serving "as expert witnesses in . . . talc litigation for plaintiffs"; "[d]ata were obtained from medication records and transcripts of depositions, rather than structured, in-person interviews"; and their medico-legal analysis carried a risk of self-reporting and recall bias. (*Id.* at 2, 7.) Finally, the Article uses language framing its conclusions as tentative opinions, noting that the findings "strongly suggest" that cases of mesothelioma once deemed "spontaneous" could be explained through exposure to cosmetic talc. (*Id.* at 6.) The Article emphasizes "the importance of collecting detailed exposure histories that incorporate these findings in patients presenting with mesothelioma," and its overall conclusion is that clinicians "should elicit a history of talcum powder usage in all patients presenting with mesothelioma." (*Id.* at 2, 6-7.)

All of these disclosures, together with the "analytical tone and tenor" of the Article, notify readers that Dr. Moline's statements should be understood as scientific conclusions that are "tentative and subject to revision." *Pacira*, 63 F.4th at 246 (citing *ONY*, 720 F.3d at 496); *see NXIVM Corp.*, 2007 WL 1876496, at *13 (finding that similar disclaimers in scholarly articles rendered specific factual assertions in the articles nonactionable for trade libel). The Article's position that clinicians "should elicit a history of talcum powder usage" in mesothelioma patients further supports its "analytical tone and tenor." And the statements' publication in a peer-reviewed journal, while not dispositive, weighs heavily in favor of finding them nonactionable. *See Pacira*,

27

63 F.4th at 249 (finding that the statements' publication in a scientific journal, together with the data, methodology, and the possible shortcomings of the study's methodology, weighed in favor of finding the statements nonactionable); *Lavine v. Am. Acad. of Pediatrics Inc.*, Civ. No. 21-17099, 2023 WL 3431212, at *7 (D.N.J. May 31, 2024) (citing *Pacira*, 63 F.4th at 247) (dismissing a claim for common-law fraud that challenged statements—such as "[t]here is no evidence that meatitis leads to stenosis of the urethral meatus"—published in a report about the safety of circumcisions, finding that the context of a peer-reviewed journal, together with the report's disclaimers, indicated that the statements were nonactionable "scientific conclusions").

### b.   STATEMENTS PUBLISHED IN OTHER MEDIA

As summarized above, LTL also challenges statements that Dr. Moline made in various other media.  LTL argues that Dr. Moline's statements to news outlets and other entities disparage Johnson & Johnson's products in the public.  LTL also asserts that excluding Dr. Moline and the 2020 Article from talc litigation will not remedy the harm that her statements have caused to Johnson & Johnson in the public eye, so a suit for trade libel, fraud, and false advertising is the appropriate remedy.  (ECF No. 39 at 57.)  Dr. Moline responds that the appropriate manner to combat these public statements is not to sue her, but to attack the reliability of her findings in their own peer-reviewed research.  (*Id.* at 63.)

The relevant case law does not support LTL's argument that the only way it can combat Dr. Moline's public statements is by suing her for trade libel, fraud, or false advertising.  As the district court in *Pacira* stated, the "peer-review process — not a courtroom — . . . provides the best mechanism for resolving scientific uncertainties." *Pacira*, 583 F. Supp. 3d at 658.  Merely repeating scientific conclusions in a non-scientific context does not strip the statements of First Amendment protection.  *ONY*, 720 F.3d at 492 ("[T]he secondary distribution of excerpts . . .

cannot give rise to liability, so long as the excerpts do not mislead a reader about the conclusions of the article.").  Here, Dr. Moline's statements in other media merely summarize the 2020 Article's findings.  Thus, these statements cannot give rise to liability simply because they were re-published in non-scientific outlets as opposed to a peer-reviewed journal.

In addition, the actual context of Dr. Moline's statements in other media also weighs in favor of finding these statements nonactionable.  For example, the *Time* Magazine article summarizes the 2020 Article as presenting "case studies of 33 people . . . whose only substantial exposure to asbestos was through the use of talcum powder — theoretically ruling out other causes of the disease."  (ECF No. 1-4 at 5.)  The article's context characterizes Dr. Moline's findings as tentative scientific conclusions, not unequivocal statements of fact.  And in the *Romper.com* article, Dr. Moline repeats the overall tenor and tone of the 2020 Article, stating that her "main reason" for publishing the article was to "alert clinicians that you need to take a comprehensive exposure history."  (ECF No. 1-5 at 5.)  LTL alleges not that Dr. Moline misrepresented the 2020 Article's findings, but that she repeated findings with which they disagree.   Accordingly, the content, verifiability, and context of Dr. Moline's statements in various other media all weigh in favor of finding them nonactionable.[15]   The "secondary distribution" of Dr. Moline's nonactionable

---

[15]     The Court further finds that Dr. Moline's challenged statements in her written and verbal Congressional testimony are nonactionable because they are privileged.  *See Koch v. Pechota*, 744 F. App'x 105, 113-14 (3d Cir. 2018) ("New Jersey and New York's litigation privilege is absolute. . . . This privilege extends to defamatory statements as long as they have some relation to the proceedings."); *Yip v. Pagano*, 606 F. Supp. 1566, 1571 (D.N.J. 1985), *aff'd*, 782 F.2d 1033 (3d Cir. 1986), *cert. denied*, 476 U.S. 1141 (1986) (finding that under New Jersey law, statements made to a legislative body are absolutely privileged, even when made voluntarily and not under oath, if the statements are related to the subject matter of proceedings that are properly within the jurisdiction of the legislative body conducting them).  Dr. Moline's statements to Congress were made to the United States House of Representative's Subcommittee on Economic and Consumer Policy of the Committee on Oversight and Reform, entitled "Examining Carcinogens in Talc and the Best Methods for Asbestos Detection."  (ECF No. 1-8 at 2-31.)  Because the statements were

statements in non-scientific publications does not automatically render her statements actionable. *See ONY*, 720 F.3d at 492.

LTL has therefore failed to demonstrate that any of the challenged statements are actionable. Accordingly, the Court must dismiss all three of LTL's causes of action on this basis.[16]

## C.   FRAUD

Even if Dr. Moline's statements were actionable, Count II would not survive. In New Jersey, a common-law fraud claim requires "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting

---

relevant to the proceedings and LTL does not allege that the proceeding was outside of the Subcommittee's jurisdiction, the statements are privileged.

[16]    Dr. Moline also argues that LTL's trade libel claim must be dismissed for failure to plead special damages. (*See* ECF No. 28-1 at 23-26.) The Court is skeptical of Dr. Moline's argument. To plead special damages, a plaintiff must "allege either loss of particular customers by name, or a general diminution of business, and extrinsic facts showing that such special damages were the natural and direct result of the false publication." *See Gillon v. Bernstein*, 218 F. Supp. 3d 285, 298 (D.N.J. 2016) (quoting *Bocobo v. Radiology Consultants of S. Jersey, P.A.*, 477 Fed. App'x 890, 901 (3rd Cir. 2012). Here, LTL had pled that immediately after the 2020 Article's publication, LTL experienced a decrease in the sales volume and profits from Johnson's Baby Powder and an "increase in contacts" to "the call center handling the Consumer business of Johnson & Johnson." (ECF No. 1 ¶¶ 223-224.) The percentage of sales of Johnson & Johnson's corn starch-based baby powder increased compared to the talc-based powder. (*Id.* ¶ 224.) And LTL announced in May 2020 that its discontinuation of talc-based powder was "due in large part to . . . misinformation around the safety of the product." (*Id.* ¶ 225.) LTL's allegations go beyond the conclusory allegations rejected in other cases at the motion-to-dismiss stage. *See, e.g.*, *NY Mach. Inc. v. Korean Cleaners Monthly*, Civ. No. 17-12269, 2018 WL 2455926, at *6 (D.N.J. May 31, 2018) (dismissing claim that alleged "generally that [the plaintiff] has lost sales from existing and prospective customers"). Other claims for trade libel in this district have survived motions to dismiss with less robust allegations of damages. *See, e.g.*, *Churchill Down, Inc. v. NLR Entertainment, LLC v. Carstanjen*, Civ. No. 14-03342, 2015 WL 5854134, at *8 (D.N.J. Oct. 5, 2015) (denying a motion to dismiss a claim for trade libel even though the allegations of damages were "quite thin"); *Pactiv Corp. v. Perk-Up, Inc.*, Civ. No. 08-5072, 2009 WL 2568105, at *11 (D.N.J. Aug. 18, 2009) (finding that a party's claim of "lost sales and lost goodwill regarding established and prospective customers" was sufficient to survive a motion to dismiss).

damages." *Johnson*, 594 Fed. App'x at 766 (quoting *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 367 (N.J. 1997)).

Here, LTL has not plausibly alleged that it reasonably relied on Dr. Moline's statements. To plead reliance, LTL alleges that it "made its business decisions and defense of Talc Claims, including but not limited to LTL's investigation of claims, approaches to settling such claims, retention of experts, and trial strategies — in reasonable and justifiable reliance on her fraudulent" statements. (ECF No. 1 ¶ 246; *see also* ECF No. 39 at 73 (arguing that LTL "couldn't have known that [Dr. Moline's statements] weren't true," and "that affected all of our approaches to settling claims or tendering experts, trial strategies, without knowledge of how these statements were fraudulent").)

But as Dr. Moline points out, LTL's allegations of reliance are inconsistent with its own Complaint and attachments. (*See* ECF No. 28-1 at 28-30.) LTL alleges in its Complaint that when it decided to discontinue its talc-based products in May 2020, it described questions about the products' safety — such as the conclusion of the 2020 Article — as "misinformation." (ECF No. 1 ¶ 225.) And in direct response to the *Time* Magazine article focusing on Dr. Moline's study, Johnson & Johnson refuted the study's conclusions by maintaining that its talcum powder "is safe, does not contain asbestos nor does it cause cancer, as reflected in more than 40 years of scientific evidence," and noted that Dr. Moline "has served as a paid witness in asbestos lawsuits and in the study drew on cases referred to her by plaintiffs' attorneys." (ECF No. 1-4 at 4-5.)

The record makes clear that the moment the 2020 Article was published, LTL responded as if the Article's conclusions were false. And LTL's allegation that it "made its business decisions and defense of Talc Claims" based on the Article is not sufficiently plausible where, from the beginning, LTL refuted Dr. Moline's claims. *See, e.g.*, *Roppo v. Travelers Commer. Ins. Co.*, 869

F.3d 568, 591-92 (7th Cir. 2017) ("A plaintiff must believe the alleged misrepresentation to be true in order to state reliance."). Because LTL has not plausibly alleged reasonable reliance, Count II is dismissed on this additional basis.

### D. LANHAM ACT

LTL's Lanham Act claim fails for similar reasons. "To establish a false advertising claim under the Lanham Act, a plaintiff must prove: 1) that the defendant has made false or misleading statements as to his own product [or another's]; 2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) that the deception is material in that it is likely to influence purchasing decisions; 4) that the advertised goods traveled in interstate commerce; and 5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc." *Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 248 (3d Cir. 2011) (citing *Warner-Lambert v. Breathasure*, 204 F.3d 87, 91-92 (3d Cir. 2000)).

As to Dr. Moline's statements contained in the 2020 Article, "there is an abundance of case law to support the proposition that a scientific article is protected noncommercial speech despite the potential for erroneous content" for claims under the Lanham Act. *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 456 (D.N.J. 2009) (collecting cases). Accordingly, LTL cannot base its Lanham Act claim on Dr. Moline's statements contained in a scientific journal "published for educational purposes and for the benefit of the medical field" because such statements are not "related solely to the economic interests of the speaker and its audience." *Id.* at 457 (citing *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 422 (1993)). This conclusion "is supported by a consideration of the chilling effect on speech in the academic and non-profit context that could be the result of allowing actions such as this to proceed." *Id.* at 457-58 (quoting *Gordon and Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521,

1542 (S.D.N.Y. 1994) (finding that articles about the high cost of scientific journals, published by the plaintiff's competitors and ranking the plaintiff's journals as the most expensive, "constitute[d] protected speech beyond the reach of the Lanham Act")).

To be sure, "secondary dissemination . . . can constitute commercial speech in certain circumstances," but "secondary dissemination of a fully protected article can constitute a violation of the Lanham Act" only if the excerpts mislead a reader about the conclusions of the article. *Id.* at 458-59; *see also ONY*, 720 F.3d at 492 ("[T]he secondary distribution of excerpts of [a protected scientific article] cannot give rise to liability [under the Lanham Act], so long as the excerpts do not mislead a reader about the conclusions of the article.").

Here, there are no allegations that Dr. Moline misstated the 2020 Article's findings or conclusions by way of "secondary dissemination." Illustrative of this concept is *Eastman Chemical Co. v. Plastipure, Inc.*, 775 F.3d 230 (5th Cir. 2014). There, a company dealing in BPA-free plastic resin published an article in a peer-reviewed journal summarizing the levels of harmful chemicals that it found when testing "more than 500 commercially available plastic products." *Id.* at 233. While the study did not mention the company's competitor by name, a manufacturer of plastic resin published a three-page sales brochure distributed directly to potential customers at trade shows and highlighting the competitor as "having significant levels of" harmful chemicals. *Id.* at 233-34. The Fifth Circuit compared these facts with those in *ONY* and found that the brochure violated the Lanham Act for false advertising. *Id.* at 236-37. In so holding, the Fifth Circuit noted that the brochure did not merely repeat the conclusions of a scientific article. It "transform[ed] snippets of . . . a paper which never mentions [the publisher's competitors] by name . . . into commercial advertisements" claiming that the competitor's plastic was harmful. *Id.* at 237. *See also Pacira*, 63 F.4th at 246 n.10 (comparing *ONY* with *Eastman*).

Here, LTL has not alleged any facts or attached any articles suggesting that Dr. Moline's statements in various media falsely misstated the 2020 Article's otherwise-protected conclusions. For the foregoing reasons, LTL has not alleged facts indicating that Dr. Moline's statements in both the 2020 Article and in other non-scientific publications are the type of false or misleading statements as to Johnson & Johnson's product necessary to bring a claim for false advertising under the Lanham Act.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's Motion is **GRANTED**. Plaintiff's Complaint is **DISMISSED WITHOUT PREJUDICE.**[17] An appropriate Order follows.

Dated: June 28, 2024

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE

---

[17]    Under Rule 15(a), courts should "freely give leave when justice so requires" and when amendment would not be futile. *Holst v. Oxman*, 290 F. App'x 508, 510 (3d Cir. 2008). Here, LTL requests an opportunity to amend its Complaint. (ECF No. 29 at 43.) Accordingly, LTL may move to amend the Complaint within 30 days from the date of this Opinion. At the conclusion of 30 days, absent a motion to amend the Complaint, the Court's Order dismissing the matter will become final. *See Batoff v. State Farm Ins. Co.*, 977 F.2d 848, 851 n.5 (3d Cir. 1992)