Peter C. Harvey
Thomas P. Kurland (*pro hac vice*)
PATTERSON BELKNAP
WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036-6710
T: 212-336-2000
F: 212-336-2222
pcharvey@pbwt.com
tkurland@pbwt.com
*Attorneys for Plaintiff Pecos River Talc LLC*

Kristen Fournier (*pro hac vice*)
Matthew Bush (*pro hac vice*)
KING & SPALDING LLP
1185 Avenue of the Americas
New York, NY 10036
T: 212-556-2100
F: 212-556-2222
kfournier@kslaw.com
mbush@kslaw.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PECOS RIVER TALC LLC<br><br>                    Plaintiff,<br><br>    v.<br><br>DR. JACQUELINE MIRIAM MOLINE,<br><br>                    Defendant. | Civil Action No. 3:23-cv-02990-GC-DEA<br><br>Motion Day:<br>June 2, 2025 |

## BRIEF IN SUPPORT OF PLAINTIFF PECOS RIVER TALC LLC'S
## MOTION FOR RELIEF FROM JUDGMENT AND
## FOR LEAVE TO FILE AN AMENDED COMPLAINT
## PURSUANT TO RULE 60(b) AND RULE 15

# TABLE OF CONTENTS

TABLE OF AUTHORITIES......................................................................... ii

INTRODUCTION ...............................................................................1

BACKGROUND .................................................................................7

LEGAL STANDARD AND PROCEDURE WITH APPEAL PENDING..............14

ARGUMENT ..................................................................................17

I.   The New Evidence Is Material, Not Merely Cumulative, And Should Alter
     The Outcome Of This Court's Decision. ......................................17

     A.   The new evidence and allegations demonstrate that the content
          factor favors Pecos River....................................................17

     B.   The new evidence and allegations demonstrate that the
          verifiability factor favors Pecos River................................20

     C.   The new evidence and allegations demonstrate that the context
          factor favors Pecos River....................................................24

II.  The New Evidence Could Not Have Been Previously Discovered Through
     the Exercise of Reasonable Diligence. ........................................27

CONCLUSION ...............................................................................31

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Bell v. Am. Int'l Indus.*,
  627 F. Supp. 3d 520 (M.D.N.C. 2022) ............................................................2, 8

*Compass Tech., Inc. v. Tseng Lab'ys, Inc.*,
  71 F.3d 1125 (3d Cir. 1995) .........................................................................14

*Connelly v. Lan Const. Corp.*,
  809 F.3d 780 (3d Cir. 2016) .........................................................................18

*CrossFit Inc. v. National Strength and Conditioning Association*,
  2016 WL 5118530 (S.D. Cal. Sept. 21, 2016) ..............................................13

*Hancock Indus. v. Schaeffer*,
  811 F.2d 225 (3d Cir. 1987) .........................................................................16

*Hanson v. Colgate-Palmolive Co.*,
  353 F. Supp. 3d 1273 (S.D. Ga. 2018) .........................................................10

*Johnson & Johnson v. Northwell Health Inc.*,
  231 A.D.3d 481 (1st Dep't 2024) ...............................................................9, 29

*Johnson & Johnson v. Northwell Health Inc.*,
  42 N.Y.3d 1026 (2024) .................................................................................29

*Johnson & Johnson v. Northwell Health Inc.*,
  43 N.Y.3d 938 (2025) ...................................................................................30

*Johnson & Johnson v. Northwell Health Inc.*,
  No. 153527-2024 (Sup. Ct., N.Y. Cty.) (Dkt. No. 126) ...............................9, 30

*Johnson v. Northwell Health Inc.*,
  2025 WL 248897 (N.Y. Sup. Ct. Jan. 15, 2025) ...........................................30

*LLT Mgmt. LLC v. Emory*,
  2025 WL 438100 (E.D. Va. Feb. 7, 2025) ................................................*passim*

*Shepherd v. Int'l Paper Co.*,
  372 F.3d 326 (5th Cir. 2004) .........................................................................16

*Smeal v. Clark Equip. Co.*,
   2022 WL 1265532 (E.D. Pa. Apr. 28, 2022) ..................................................... 11

*In re Stage Presence Inc.*,
   2016 WL 3582650 (Bankr. S.D.N.Y. June 24, 2016) ........................................ 15

**Rules**

Fed. R. Civ. P. 60 .............................................................................................. 14, 15

Fed. R. Civ. P. 15 .................................................................................................... 15

Plaintiff Pecos River Talc LLC ("Pecos River")[1] submits this brief in support of its motion for relief from judgment and for leave to file an amended complaint.

## INTRODUCTION

The facts have shifted seismically since this Court's dismissal of Pecos River's complaint. These new developments warrant vacating the Court's judgment and permitting Pecos River to file an amended complaint.

At the center of this case is Defendant Dr. Jacquline Moline's article, *Mesothelioma Associated with the Use of Cosmetic Talc* (the "Article"). The Article involves 33 litigation plaintiffs with mesothelioma, whose identities were anonymized. Dr. Moline asserted that, based upon her review of the factual record in those cases, "[t]alcum powder usage was the only source of asbestos for all 33 cases." As she well-knew from her review, that foundational factual assertion was and is simply not true.

In her role as the compensated plaintiffs' expert in each of the cases, Dr. Moline knew that the subjects of her Article were exposed to asbestos from other sources. Yet for years, Dr. Moline and her employer Northwell Health engaged in a concerted effort to obfuscate the fraudulent nature of the Article by concealing the

---

[1] In the Third Circuit, Pecos River was substituted as plaintiff for its predecessor, LTL Management, LLC. *Pecos River Talc LLC v. Moline*, No. 24-235 (3d Cir.), Dkt. No. 19. This memorandum will use "Pecos River" to refer to both itself and its predecessors.

1

identities of the Article's subjects and, thereby, thwarting any scrutiny of their alternative exposures. In 2022, however, the District Court for the Middle District of North Carolina presiding over the *Bell* mesothelioma action[2] unveiled the identity of one of the subjects as the plaintiff in the suit, having concluded that the record in the case belied the "principal ***factual*** underpinning of the article," *i.e.*, that the plaintiff's purported sole exposure to asbestos was talc. Evincing concern regarding the "widespread influence" the Article has had "on the cosmetic talc litigation nationwide," the *Bell* court unsealed its findings to enable other interested parties to pursue the veracity of Dr. Moline's assertion with respect to the remaining subjects. To that end, Pecos River brought a claim for trade libel, alleging that the Article's factual premise was false because Pecos River suspected that some of the subjects in the Article were exposed to asbestos from non-talc sources.

This Court dismissed that claim without prejudice on the grounds that the complaint failed to adequately allege a knowing misstatement of fact which this Court required to maintain a trade libel claim. Newly discovered evidence establishes—and allows for the particular pleading of—extensive knowing misstatements of material facts. And new precedent affirms the actionable nature of Pecos River's claim. The Third Circuit granted Pecos River extensions of time on its

---

[2] *See Bell v. Am. Int'l Indus.*, 627 F. Supp. 3d 520, 526, 530, 532 (M.D.N.C. 2022)

2

appeal to pursue this Rule 60(b) motion so that this Court could re-evaluate the new evidence.

The new evidence was secured by subpoena issued by the New Jersey state court on Northwell Health, and enforced over its repeated objections, by the highest state court in New York. Just this month, Pecos River has finally obtained a document identifying the Article's subjects (the "Key").

Refuting Dr. Moline's prior arguments, the Key proves that the statements in the Article are false and that the Article is nothing more than a made-for-litigation attempt to distort the literature with something posing as "science" to support the plaintiff bar's tort claims in the talc litigation.

The Key confirms that Betty Bell, Helene Kohr, Stephen Lanzo, Doris Jackson, and Valeria Dalis (suspected as being subjects of the Article per Pecos River's original complaint) are in fact all subjects of the Article. As shown by the record that Dr. Moline affirmatively asserted she reviewed in connection with the Article, all were exposed to asbestos from sources other than talc, contrary to the claims of the Article:

- Betty Bell filed workers' compensation claims swearing that she was exposed to asbestos during her prior employment with two textile employers.

- Helene Kohr smoked asbestos-containing cigarettes, and Dr. Moline stated in her own expert report that Ms. Kohr was exposed to asbestos that way.

3

- Stephen Lanzo's basement had 60 linear feet of exposed asbestos pipe; his schools had hundreds of bags of asbestos removed after he left those schools; and his tissues had a type of asbestos not even alleged to be present in cosmetic talc.
- Doris Jackson's medical records note that she was exposed to "[c]eiling pipes with degrading insulation" during her more than 30-year career as a public-school teacher.
- Valeria Dalis sought compensation for a non-talc exposure by filing a claim for $450,000 from the Manville Personal Injury Settlement Trust (and collected over $28,000).

Moreover, the Key has allowed Pecos River to identify many more examples of knowing falsehoods. In her Article and in her sworn testimony, Dr. Moline stated that someone with even a "potential exposure" would be *excluded* from the Article. Nevertheless, Pecos River has now uncovered numerous individuals beyond those alleged in its original complaint who were exposed to asbestos from sources other than cosmetic talc:

- Carol Schoeniger lived in a home where joint compound was applied and sanded which Dr. Moline's *own expert report* described as a "potential exposure" to asbestos.
- Edward Garcia worked at Eastern Molding which Dr. Moline's *own expert report* described as a source of "potential exposure" to asbestos.
- Sharon Hanson did the laundry for her husband who worked as an engineer in an area where raw asbestos was handled—which Dr. Moline *herself* testified represented a "potential exposure" to asbestos.
- Mary Anne Caine's own complaint alleged exposure to asbestos brought home from her husband's job.

4

- Kayla Martinez's medical records state: "Her father worked at a company with known asbestos exposure and held her in his work clothes as a child."

- Barbara Arend's medical records state: "Barbara denies any asbestos exposure other than the possibility of asbestos presence in the house where she grew up as a child (apparently this was an old house that might have had asbestos shingles)."

- Irma Verdolotti's father was a steamfitter who worked with insulation, and Ms. Verdolotti shared a room with her sister while the sister worked in a shipyard during World War II (and brought her work clothes home).

- Blondia Clemons's father worked as a mechanic at the family home performing 2 to 3 brake jobs a day.

The vast number of individuals with non-talc exposures—including multiple examples where Dr. Moline herself acknowledged the potential alternative exposure—demonstrates that the premise of the Article is simply false.

Yet knowing full well that the Key demonstrated that the Article is fraudulent, Dr. Moline opposed Pecos River's request to this Court for expedited discovery to obtain the Key while at the same time arguing that her statements about exposures were merely scientific "opinion" that were "based on inferences from data." ECF No. 30 at 1. The Court credited that argument on the information available at the time. ECF No. 40 at 20. But that analysis can no longer hold with the new evidence that has finally been brought to light. Dr. Moline's assertion that the litigation records she reviewed showed that the subjects' sole exposure to asbestos was talc was not a scientific opinion. It was a demonstrably false knowing representation. It was a lie.

5

In addition to acquiring the Key, new caselaw has emerged since this Court's decision. At the motion to dismiss hearing, this Court asked for any cases involving a similar situation of a journal article that would support Pecos River's arguments. Since then, the Eastern District of Virginia in *Emory* permitted a nearly identical product disparagement claim filed by Pecos River to go forward, denying a motion to dismiss.

In that case, Pecos River's claim involved a follow-on paper to Dr. Moline's Article published by plaintiff-side expert Dr. Theresa Emory and two co-authors. Like the Moline Article, Dr. Emory's paper stated all 75 of its litigation-plaintiff subjects had no exposures to asbestos other than cosmetic talc. And like Dr. Moline's Article, that statement is false.

Considering the same product disparagement claim under the same New Jersey law and evaluating nearly identical false statements in a journal article, the *Emory* Court denied the defendants' motion to dismiss and permitted the claim to go forward to discovery. *LLT Mgmt. LLC v. Emory*, 2025 WL 438100 (E.D. Va. Feb. 7, 2025). Analyzing the content, verifiability, and context factors, the *Emory* Court rejected the authors' argument that Pecos River's claim "fails as a matter of law because the statements on which it is based are scientific opinions, not statements of fact" as "incorrect." *Id.* at *12.

6

In fact, the court found each factor favored Pecos River. The court concluded that the "content of what the defendants wrote suggests it is a statement of fact." *Id.* The court concluded that "defendants' statement is verifiable because a factfinder can determine, based on proof at trial, whether any of the 75 study subjects had non-talc asbestos exposures that were 'known' to the defendants at the time they published the article." *Id.* And the court concluded that the "context of the defendants' statements also demonstrates that they are factual" in part because the Defendants' analysis "pre-existed the scientific process the article describes" as "they were discovered through litigation, not through any scientific method." *Id.* at *13.

The newly acquired evidence, either on its own or if viewed through the lens of the *Emory* ruling, warrants vacating the Court's judgment of dismissal to allow Pecos River to file an amended complaint.

## BACKGROUND

This Court is familiar with the facts of this case from its motion to dismiss decision. *See* ECF No. 40. In brief: Dr. Moline is the lead author of the Article, *Mesothelioma Associated with the Use of Cosmetic Talc*. The Article is a "case series" of 33 individuals who brought lawsuits alleging that talcum powder caused their mesothelioma.

Dr. Moline's misrepresentations relating to her Article first came to light when the Middle District of North Carolina in the *Bell* case unsealed the name of one the Article's subjects to allow interested parties to pursue the veracity of Dr. Moline's assertions—given the "groundbreaking nature and widespread influence" of the Article that has become the platform from which the mass tort bar and their experts launch the talc litigation. *See Bell v. Am. Int'l Indus.*, 627 F. Supp. 3d 520, 530 (M.D.N.C. 2022)

In the Article, Dr. Moline expressly represents multiple times that "[t]alcum powder usage was the only source of asbestos for all 33 cases." Article at 11 (ECF No 1-2).[3] She even went so far as to represent that "potential exposures were considered" but there was "no identified source apart from the talcum powder." *Id.* at 14.

Notably, however, Dr. Moline did not disclose the names of the 33 individuals featured in the Article and has gone to extreme lengths to conceal those individuals' identities. Compl. ¶ 35. Nevertheless, Pecos River believed it had identified five

---

[3] *See also id.* at 11 ("Objective: To describe 33 cases of malignant mesothelioma among individuals with no known asbestos exposure other than cosmetic talcum powder.); *id.* at 14 ("[W]e present 33 cases, predominantly of women, who had no known exposure to asbestos other than prolonged use of talcum powder."); *id.* ("The table identifies talcum powder as the only asbestos exposure."); *id.* ("No individual identified any asbestos exposure apart from contaminated talcum powder from workplace or household exposures."); *id.* ("[N]o known asbestos exposure had occurred.").

8

individuals in the Article based on the limited biographical data available who were exposed to asbestos from non-talc source. Compl. ¶ 35.[4]

On June 28, 2024, this Court granted Dr. Moline's motion to dismiss Pecos River's complaint. ECF No. 40. But since then, two new developments have occurred: Pecos River obtained the Key identifying the individuals in the Article, and the Eastern District of Virginia issued its decision in *Emory* concluding that Pecos River stated a claim for product disparagement in a nearly identical case.

### *Pecos River Obtains The Key*

Dr. Moline's employer, Northwell Health, produced the identities of the individuals in Dr. Moline's Article on April 8, 2025 pursuant to a court order. Ex. 3, Moline Article Identities (the "Key"); *see also* Ex. 4, March 25, 2025 Decision & Order, *Johnson & Johnson v. Northwell Health Inc.*, No. 153527-2024 (Sup. Ct., N.Y. Cty.) (Dkt. No. 126), at 7; *Johnson & Johnson v. Northwell Health Inc.*, 231 A.D.3d 481 (1st Dep't 2024).[5]

---

[4] In January 2023, Dr. Moline published another article in response to the *Bell* opinion entitled, *Exposure to cometic talc and mesothelioma.* Compl. ¶ 173; *see also* 2023 Moline Article (ECF No. 29-2). Dr. Moline states that "[i]n 122 cases, the only known exposure to asbestos was from cosmetic talc." Compl. ¶ 176. This too was false. Compl. ¶ 173-89.

[5] Northwell originally marked the document as "confidential" under a protective order. But the document later became de-designated on April 22, 2025 pursuant to the terms of that protective order.

This Key that Pecos River obtained proves its allegations. It shows that all the individuals with non-talc exposures that Pecos River believed were subjects of the Article were, in fact, subjects of the Article: Helene Kohr, Stephen Lanzo, Valeria Dalis, Betty Bell, and Doris Jackson. Dr. Moline's statement that these individuals did not have any non-talc exposures to asbestos is therefore demonstrably false.

The Key also reveals that *even more* individuals in the Article were exposed to asbestos from non-talc sources. And the evidence for all of these alternative exposures appears in litigation records that Dr. Moline claims she reviewed. Worse, in numerous instances Dr. Moline herself acknowledged a "potential exposure" to asbestos other than cosmetic talc existed despite claiming that those with such a "potential exposure" to would not be included.

- Carol Schoeniger's husband sanded and applied joint compound in their home in the 1960s. Ex. 5, Vol. 1 Schoeniger Dep. 102:22–106:23; Ex. 8, Vol. 2 Schoeniger Dep. 193:20–194:3. Dr. Moline described this as a "potential exposure" in her expert report in Ms. Schoeniger's case. Ex. 6, Moline *Schoeniger* Rpt. at 18.

- Edward Garcia worked as a press operator at Eastern Molding. In Dr. Moline's *own expert report*, she said exposure there to industrial talc (which can be as low as 35% talc) was a "potential exposure" to asbestos. Ex. 9, Moline *Garcia* Rpt. at 17.

- Sharon Hanson performed the laundry for her household. Ex. 12, Moline *Hanson* Dep. 95:15–17. Her husband, Douglas Hanson, worked in an area where people worked hands on with raw asbestos and other asbestos-containing products. Ex. 10, Douglas Hanson Dep. 131:14–132:15; 114:11–115:20; Ex. 11, Shelton Dep. 10:1–8; 20:4–13. Dr. Moline stated this

10

represented a "potential exposure" to Ms. Hanson. Ex. 12, Moline *Hanson* Dep. 94:3–95:1.

    o  Dr. Moline's causation opinions were *excluded* in the *Hanson* case. *Hanson v. Colgate-Palmolive Co.*, 353 F. Supp. 3d 1273, 1299 (S.D. Ga. 2018).

- Mary Anne Caine alleged in her complaint that she may have been exposed to asbestos that her then-husband brought home from work for a telephone company. Ex. 13, *Caine* Compl. ¶ 2. She also included this exposure—which she claimed lasted 26 years—in her initial fact sheet. Ex. 14, *Caine* Initial Fact Sheet.

- Kayla Martinez's medical records state: "Her father worked at a company **with known asbestos exposure** and held her in his work clothes as a child." Ex. 15, Martinez Medical Record (emphasis added).

- Barbara Arend's medical records state: "Barbara denies any asbestos exposure **other than the possibility of asbestos presence in the house where she grew up** as a child (apparently this was an old house that might have ha[d] asbestos shingles)." Ex. 16, Arend Medical Record (emphasis added).

- Blondia Clemons was just a few feet away from her father during his work as a mechanic. For the duration of Ms. Clemons's childhood, Mr. Clemons performed two to three brake jobs a day, six days a week, *at the family's home*. Ex. 19, Clemons 08/02/2018 Dep. 25:17–34:8.

    o  Automotive friction products like brakes are a common source of asbestos exposure. *See* Moline 2023 Article at 4-9 (listing numerous examples of automotive friction exposures to asbestos) (ECF No. 29-2).

    o  Dr. Moline has testified that typically there is still exposure 10 to 30 feet away from brake work. Ex. 31, Moline *Crudge* Dep. (Vol. 2) at 262:12-14; *see also Smeal v. Clark Equip. Co.*, 2022 WL 1265532, at *12 (E.D. Pa. Apr. 28, 2022) (discussing Dr. Moline's statements that bystanders 5-10 feet away from brake work would be exposed to asbestos).

- Irma Verdolotti's father worked as a steamfitter, and he specifically worked with insulation. Ex. 17, Verdolotti 11/17/2016 Dep. 28:22–31:18; Ex. 18, Verdolotti 02/15/2017 Dep. 63:1–20. She also shared a bedroom with her sister at a time when her sister worked in Providence shipyard during World War II, and her sister wore her work-clothes home. Ex. 18, Verdolotti 02/15/2017 Dep. 64:5–65:17.

  - o Dr. Moline has testified that working in a shipyard is considered a "classical occupational asbestos exposure" and that "take-home asbestos exposures resulting from family members working on ships or in a shipyard have also been well documented in the literature." Ex. 7, Moline *Chenet* Dep. 103:2–11, 104:1–6.

  - o Because shipyard exposures have been associated with asbestos-related disease for decades, Dr. Moline considers an individual to have a "potential exposure" if their family member worked on a shipyard—even without specific information into where precisely on the shipyard the family member worked or for how long. *Id.* at 19:7–16.[6]

  - o She also testified that if there was evidence an individual's family member worked in a shipyard, that "potential exposure" would mean the individual would not be in the Article. *Id.* at14:19–15:5.[7]

Although Dr. Moline intentionally obfuscated the individuals in her 2023 Article, Pecos River has nevertheless found new examples of alternative asbestos exposure in that paper for individuals Dr. Moline claimed no exposure exists. Those

---

[6] For example, Vita Chenet appears to be case number 84 in Dr. Moline's 2023 Article and Dr. Moline listed her as having a "likely exposure."

[7] Although Dr. Moline intentionally obfuscated the individuals in her 2023 Article, Pecos River has nevertheless found examples of alternative asbestos exposure in that paper for individuals Dr. Moline claimed no exposure exists. *See* Ex. 1, Proposed Am. Compl. ¶¶ 229–262.

individuals include Rafaella Marisco who herself asserted non-talc exposure from her work with phenolic molding compounds; Santa Rea whose medical records state that dust from the 9/11 attacks and insulation were believed to be the source of her asbestos exposure; and Christina Lopez whose medical records state she had asbestos exposure growing up in her home and in the canning factory she worked in. *See* Ex. 1, Proposed Am. Compl. ¶¶ 254–268. The Key also confirmed that Ricardo Rimondi is a subject of the 2023 Article, as Pecos River originally alleged. *Id*. ¶¶ 235–253.

Pecos River's new allegations drastically change the facts before this Court when analyzing whether the amended complaint states a claim. *See* Ex. 1, Proposed Am. Compl. ¶¶ 166–268.

### *The Emory Court Concludes Pecos River Stated a Claim*

Since this Court's decision, the Eastern District of Virginia issued a ruling in *LLT Mgmt. LLC v. Emory*, 2025 WL 438100 (E.D. Va. Feb. 7, 2025). At the motion to dismiss hearing, this Court stated: "other than the California case, I haven't seen, unless you're pointing to another case, where a Court would allow something like this to proceed in the scientific realm because of the First Amendment implications and the need to encourage lively debate and discussion." Ex. 20, Hr'g Tr. 30:20–24. And this Court ruled that the California case—*CrossFit Inc. v. National Strength and Conditioning Association*, 2016 WL 5118530, at *7 (S.D. Cal. Sept. 21, 2016)—was

13

distinguishable from the facts alleged in Pecos River's complaint. ECF No. 40 at 23–24.

But with *Emory* now decided, a more on-point case could not exist, *Emory* concerned a paper nearly identical to Dr. Moline's Article that billed itself as a follow-on to the Moline Article. Three plaintiff-side experts published an article concerning 75 individuals claiming that for all 75, their "only known exposure to asbestos was cosmetic talc" *Id.* at *1. Pecos River[8] filed a product disparagement claim alleging that that the paper was false because "at least six of the study's subjects had been exposed to non-talc asbestos." *Id.* The court evaluated the "content, verifiability, and context" of the statements under New Jersey law and concluded that each factor weighed in favor of Pecos River. *Id.* at *12, *15. The Court concluded that authors' argument that the claim "fails as a matter of law because the statements on which it is based are scientific opinions, not statements of fact" was "incorrect." *Id.*

## LEGAL STANDARD AND PROCEDURE WITH APPEAL PENDING

Rule 60(b)(2) permits a court to grant relief from judgment based on "newly discovered evidence that, with reasonable diligence, could not have been discovered." Fed. R. Civ. P. 60(b)(2). To vacate a judgment under this rule, the new

---

[8] As in the Third Circuit in this case, Pecos River was substituted as plaintiff in *Emory* after the motion to dismiss decision.

evidence should be "(1) be material and not merely cumulative, (2) could not have been discovered before trial through the exercise of reasonable diligence and (3) would probably have changed the outcome." *Compass Tech., Inc. v. Tseng Lab'ys, Inc.*, 71 F.3d 1125, 1130 (3d Cir. 1995).

Here, the judgment was based on a motion to dismiss under Rule 12(b)(6). Pecos River requests that this Court re-open the judgment to allow it to submit an amended complaint with new allegations based on its newly discovered evidence. The standard therefore is whether Pecos River's new allegations, accepted as true and with all inferences in Pecos River's favor—now plausibly state a claim. *See, e.g. In re Stage Presence Inc.*, 2016 WL 3582650, at *6 (Bankr. S.D.N.Y. June 24, 2016) (granting Rule 60(b)(2) motion to file an amended complaint because "the pleadings . . . would have been substantially different" had the plaintiffs previously had access to its new evidence); *Id.* at *5 ("The relevant question in this case is not whether the new evidence would result in a 'win' at a subsequent trial, but whether the new evidence would have altered the prior outcome.") (citing *Reese v. McGraw-Hill Cos., Inc.*, 293 F.R.D. 617, 622 (S.D.N.Y. 2013)). Rule 60(b)(6) also permits vacating a judgment based on "extraordinary circumstances." And Rule 15 of course provides that the court "should freely give leave" to amend "when justice so requires."

15

To facilitate this Court's review of the new allegations based on the newly discovered evidence, Pecos River has submitted a proposed amended complaint (Exhibit 1) along with a redline showing the changes since its original complaint (Exhibit 2).

Pecos River is filing this motion while its appeal from this Court's decision on the motion to dismiss is still pending. The Third Circuit has outlined the proper procedure in this scenario: "When an appellant in a civil case wishes to make a Rule 60(b) motion while his appeal is still pending, the proper procedure is for him to file his motion in the District Court." *Hancock Indus. v. Schaeffer*, 811 F.2d 225, 239 (3d Cir. 1987) (internal alterations and citations omitted). The district court has the power to entertain the motion. *Id.* at 240 (quoting *Venen v. Sweet*, 758 F.2d 117 (3d Cir. 1985)).

However, additional procedures are required to grant the motion. "If a district court is inclined to grant the motion or intends to grant the motion," the court should "certify its inclination or its intention to the appellate court." *Id.* At that point, the Third Circuit will "entertain a motion to remand the case" to the district court, and "[o]nce remanded, the district court will have power to grant the motion." *Id.*; *accord Shepherd v. Int'l Paper Co.*, 372 F.3d 326, 329 (5th Cir. 2004).

Pecos River outlined this procedure and its plan to move under Rule 60(b) for relief from judgment to the Third Circuit as Pecos River's basis for its motions for

extensions of time to file an opening brief (which the Third Circuit granted). Concurrent with this motion, Pecos River is moving in the Third Circuit for a stay of the appeal pending the outcome of its Rule 60(b) motion before this Court.

Pecos River therefore requests this Court issue a statement indicating its intent to grant Pecos River's motion. At that point, the Pecos River will request a remand from the Third Circuit so that this Court can formally enter an order granting its motion.

## ARGUMENT

### I.    The New Evidence Is Material, Not Merely Cumulative, And Should Alter The Outcome Of This Court's Decision.

Two aspects of the newly acquired evidence fundamentally change the nature of the facts before this Court compared to its original motion to dismiss decision. First, Pecos River now has multiple examples where Dr. Moline *herself* acknowledged that the plaintiff had a potential exposure to asbestos apart from cosmetic talc. Second, the sheer amount of examples of alternative exposures has increased dramatically. This Court faces an entirely new factual landscape now. That evidence—particularly when viewed through the lens of the new *Emory* decision— warrants vacating the judgment.

#### A.    The new evidence and allegations demonstrate that the content factor favors Pecos River.

This Court described the content factor in decision on the motion to dismiss:

17

"Evaluation of content involves consideration not merely of a statement's literal meaning, but also of the fair and natural meaning that reasonable people of ordinary intelligence would give to it." *Pacira*, 63 F.4th at 245 (quoting *Lynch*, 735 A.2d at 1136.) The Court must determine whether "[t]he impression created by these words in the mind of a reasonable person could be that they were purporting to state the truth of the matter, not merely the author's opinion." *NXIVM Corp. v. Sutton*, Civ. No. 06-01051, 2007 WL 1876496, at *8 (D.N.J. Jun. 27, 2007) (quoting *Church of Scientology Int'l v. Eli Lilly & Co.*, 778 F. Supp. 661, 668 (S.D.N.Y. 1991)).

ECF No 40 at 13.

The Court even concluded that "the higher factual content of Dr. Moline's statements weighs in favor of finding that the statements are actionable." *Id.* at 15. The Court, however, stated that it "must also consider the content of the whole communication and its apparent purpose." *Id.* at 16. The Court stated that: "Here, the Article was published in a peer-reviewed journal with a self-described purpose of 'underlin[ing] the importance of collecting detailed exposure histories . . . in patients presenting with mesothelioma.'" *Id.* (quoting Article at 6-7 (ECF No. 1-2)).

Given the new evidence, this Court should no longer credit *Dr. Moline's* stated purpose for her Article, particularly on a Rule 12 standard where all inferences should be drawn in favor of the plaintiff. *See Connelly v. Lan Const. Corp.*, 809 F.3d 780, 790 (3d Cir. 2016). The number of individuals with non-talc exposures to asbestos that Dr. Moline nevertheless included in her Article demonstrates that her stated purpose for the Article is nothing more than a pretext.

18

Critically, Dr. Moline in her letter to the editor stated she "re-reviewed the cases included in the article" after questions arose regarding its veracity and yet only "identified one individual with an alternative exposure." *See* Compl. Ex. J. (ECF No. 1-10.). Even after a full re-review knowing the Article faced scrutiny, she still failed to inform the public regarding *any* of the other many examples of alternative exposures. While no inference should be drawn in Dr. Moline's favor at the pleading stage, any inference that she intended to altruistically explain the importance of taking exposure histories is simply no longer plausible.

Dr. Moline's real intent was to publish a paper regardless of its actual veracity so long as it bolstered her litigation opinions that represent a significant source of her income. To make this absolutely clear, Pecos River's proposed amended complaint now alleges that "Dr. Moline's stated purpose for her Article is not true but rather a pretext," Ex. 1, Proposed Am. Compl. ¶ 281—an allegation this Court should treat as true for purposes of its analysis of whether its decision would be altered by the new evidence.

The *Emory* Court concluded the content factor favored Pecos River. That court explained that the "content factor distinguishes between 'genuinely defamatory communications,' and figurative speech or rhetorical hyperbole, like name-calling, 'which cannot reasonably be understood to be meant literally.'" *Id.* (quoting *Ward v. Zelikovsky*, 643 A.2d 972, 979 (N.J. 1994)). The *Emory* Court concluded that "[t]he

defendants' statements are obviously the former." *Id.* It went on: "The claim that the defendants 'presented 75 subjects, with malignant mesothelioma, whose only known exposure to asbestos was cosmetic talc' is not an 'exaggeration.' Instead, the 'content of what the defendants wrote suggests it is a statement of fact.'" *Id.* (internal brackets and citations omitted). Pecos River's newly discovered evidence confirms that Dr. Moline's statement is factual and is literally false.

**B.    The new evidence and allegations demonstrate that the verifiability factor favors Pecos River.**

On the verifiability factor, the Court stated: "The 'verifiability' prong requires the Court to determine whether the statements at issue are pure statements of fact 'capable of . . . truth or falsity,' or constitute 'tentative scientific conclusions' that are more closely akin to nonactionable opinions." ECF No. 40 at 17 (quoting *Pacira*, 63 F.4th at 246–47).

The Court outlined the allegations regarding the five examples in the complaint at the time and concluded: "Having carefully reviewed the allegations, the Court finds that these other alleged sources of asbestos exposure identified by LTL do not render Dr. Moline's finding that the individuals had 'no known asbestos exposure other than cosmetic talcum powder' a verifiably false statement of fact, as opposed to a nonactionable scientific conclusion." ECF No. 40 at 19–20.

But this Court now has before it: (1) confirmation of the previous examples of subjects with alternative exposure that Dr. Moline improperly included in the

Article, and (2) many more confirmed examples of subjects with alternative exposures that Dr. Moline improperly included in the article. Based on this new evidence, Pecos River can add allegations to its complaint. And those new allegations should change the result of this Court's analysis.

This Court found the verifiability factor favored dismissal primarily because it concluded that "[t]he fact that Dr. Moline could conceivably explain why these other alleged sources do not constitute 'known asbestos exposure' shows that the statement is a scientific opinion, and not a matter of simple truth or falsity." The new evidence, however, shows that this Court should no longer credit what Dr. Moline *might* be able to explain away—particularly when all inferences are to be drawn in favor of the plaintiff.

As discussed above, the sheer number of examples of non-talc exposures cannot just be "conceivably explained" away so easily. But more than that, Pecos River is now able to present to this Court *multiple* examples where Dr. Moline's own expert report or testimony contradicts her Article. Dr. Moline should no longer get the benefit of a theoretically conceivable explanation. Whatever explanations Dr. Moline attempts to construct can be presented on a motion for summary judgment after full discovery into the issue.

Dr. Moline stated in her Article that "other ***potential*** exposures to asbestos were considered, with no identified source apart from the talcum powder." Article at

21

2 (ECF No. 1-2) (emphasis added). She testified that meant that she "didn't include any cases where there was a ***potential*** alternative exposure" and she excluded someone if there was "any question about if there would be an alternative exposure." Ex. 22, Moline *Zimmerman* Dep. 50:7–12, 53:16–20 (emphasis added). But the new evidence shows that Dr. Moline included numerous cases where *she herself* concluded there was a "potential exposure" other than cosmetic talc.

Dr. Moline's report in Carol Schoeniger's case states that "exposure to asbestos from joint compound that was applied and sanded in her home in the 1960s" was a "***potential exposure***." Ex. 6, Moline *Schoeniger* Rpt. at 18 (emphasis added). Dr. Moline's report in Edward Garcia's case discusses Mr. Garcia's work at Eastern Molding near industrial talc (which can be as low as 35% talc) and states: "This ***potential exposure***, is the only ***other potential source for asbestos exposure***[.]" Ex. 9, Moline *Schoeniger* Rpt. at 17 (emphasis added). And in Ms. Hanson's case, Dr. Moline testified that Mr. Hanson's work around others who handled raw asbestos constituted a "***potential exposure***" to Ms. Hanson (who did the family laundry). Ex. 12, Moline *Hanson* Dep. 94:3–95:17.

Dr. Moline's own statements in her expert reports and testimony from the Article's underlying cases contradict her Article. The new evidence shows that Pecos River's allegations are not about "Dr. Moline failing to include variables that were available to her." ECF No. 40 at 22 (internal brackets omitted). This is not a matter

of one variable or another. It is not a matter of reliable or not reliable. It is a matter of true or false. And what Dr. Moline said in her Article is false.

In its motion to dismiss decision, this Court stated that the erratum Dr. Moline submitted regarding Ms. Kohr's case (who Dr. Moline acknowledged in her expert report smoked asbestos-containing cigarettes) "demonstrates exactly why the 'peer-review process — not a courtroom — provides the best mechanism for resolving scientific uncertainties.'" ECF. No. 40 at 23 (quoting *Pacira*, 583 F. Supp. 3d at 658) (internal ellipses omitted).

The new evidence shows that the peer review process is not the proper mechanism to address the falsity of Dr. Moline's Article. That evidence shows that the peer review process is simply not capable or at least not well-suited for that task. Indeed, Dr. Moline did not provide the peer reviewers with any of the underlying materials, so they had no way to vet Dr. Moline's assertion that none of the Article's subjects had alternative asbestos exposures. Ex. 23, Moline *Lopez* Dep. 82:20–84:4; Ex. 24, Moline *O'Riorden* Dep. 144:9–20; *see also* Ex. 1, Proposed Am. Compl. ¶ 23.

Finally, this court reasoned that Pecos River did "not allege that Dr. Moline fabricated the Article's underlying data." ECF No. 40 at 24. The vast examples of alternative exposures show that Dr. Moline did not need to forge a fake deposition transcript or medical record in order to make a false statement. Since she did not

23

make the underlying material available to readers, she could simply misrepresent what deposition transcripts and medical records stated while hiding behind the shield of the anonymity of the subjects. But with the production of the Key, the falsity of her Article is now apparent. And the falsity of Dr. Moline's Article has been revealed to be so extensive that Pecos River now has a good-faith basis to allege that "Dr. Moline fabricated the data presented in her Article." Ex. 1, Proposed Am. Compl. ¶ 26.

On this same verifiability factor, the *Emory* court concluded that "defendants' statement is verifiable because a factfinder can determine, based on proof at trial, whether any of the 75 study subjects had non-talc asbestos exposures that were 'known' to the defendants at the time they published the article." *Id.* The new evidence shows that the same is true here.

## C. The new evidence and allegations demonstrate that the context factor favors Pecos River.

On the final context factor, this court stated:

> In considering context, New Jersey courts examine the "medium by which the statement is disseminated and the audience to which it is published." *Pacira*, 63 F.4th at 248 (quoting *Wilson v. Grant*, 687 A.2d 1009, 1014 (N.J. Super. Ct. App. Div. 1996)) (citing, among others, *NXIVM Corp.*, 2007 WL 1876496, at *10 (noting that the case considered statements "in the context of a scholarly article")). "While statements are not protected solely because they appear in a peer-reviewed journal, such journals are often 'directed to the relevant scientific community,'" who are "best positioned to identify opinions and 'choose to accept or reject [them]." *Id.* at 248 (first quoting *ONY*,

720 F.3d at 496- 97; then *Redco Corp. v. CBS, Inc.*, 758 F.2d 970, 972 (3d Cir. 1985)).

ECF No. 40 at 26.

This Court concluded that the context factor favored Dr. Moline on the ground that "the authors also expressly noted the Article's limitations, including the fact that the 33 individuals Dr. Moline and another author's conflict of interest due to serving 'as expert witnesses in . . . talc litigation for plaintiffs'; '[d]ata were obtained from medication records and transcripts of depositions, rather than structured, in-person interviews'; and their medico-legal analysis carried a risk of self-reporting and recall bias." *Id.* at 27 (quoting Article at 2-7 (ECF No 1-2)).

None of those "limitations" are relevant for the new evidence. A deponent's potential "recall bias" is simply not at issue. Dr. Moline misrepresented what deponents actually said or what was in their medical records. The absence of a structured interview is equally irrelevant. And that Dr. Moline disclosed she was an expert in litigation (and therefore may be biased) does not disclose that she would flagrantly misrepresent the facts.

This Court also pointed to the fact that "the Article uses language framing its conclusions as tentative opinions, noting that the findings 'strongly suggest' that cases of mesothelioma once deemed 'spontaneous' could be explained through exposure to cosmetic talc." ECF No. 40 at 27 (quoting Article at 6 (ECF No. 1-2)). But the language in the Article like "strongly suggest" concerns what *conclusions*

25

she claims to draw from her stated facts. The problem is the stated facts that serve as the premise are false. And those are not expressed with any tentative language.

The *Emory* Court explained that "statements are not protected solely because they appear in a peer-reviewed journal." *Emory*, 2025 WL 438100, at *13 (quoting *Pacira*, 63 F.4th at 248). That court found critical to the analysis of the context factor "whether the facts are adduced through a scientific method, or whether they exist independent of the scientific process." *Id.* The *Emory* Court concluded that the context factor favored Pecos River because the relevant "facts pre-existed the scientific process the article describes—in fact, they were discovered through litigation, not through any scientific method." *Id.* The same is true here. Dr. Moline did not do "any new investigation for any of the cases that had not already been done in litigation." Ex. 25, Moline *Wiman* Dep. 57:9–13; Ex. 1, Proposed Am. Compl. ¶ 17.

* * *

There has to be *some point* where the falsity of even of a journal article is so flagrant that a trade libel claim is viable. Dr. Moline's Article is far across that line. And here, this Court need only ask if Pecos River's new allegations—taken as true with all inferences drawn in Pecos River's favor—state a *plausible* claim for relief. It is at the very least *plausible* that Pecos River has a valid trade libel claim. The time to sort out whatever justifications Dr. Moline may try to come up with for

including all these individuals with non-talc exposures in her Article is after full discovery into that issue.

## II.    The New Evidence Could Not Have Been Previously Discovered Through the Exercise of Reasonable Diligence.

Pecos River diligently attempted to learn the identities of the 33 individuals described in Dr. Moline's Article, and those attempts were opposed by Dr. Moline, Northwell, and plaintiffs' firms at every turn.

For *years*, Dr. Moline refused to identify the Article's subjects at depositions. For example:

- **November 2019:** "I will not comment on any further cases that might or might not be included in the paper." Ex. 25, Moline *Wiman* Dep. 73:20–22.

- **February 2020:** "I will not name names in this deposition. That is correct." Ex. 22, Moline *Zimmerman* Dep. 44:24–25.

- **June 2020:** "I am not willing to discuss any names of any of the individuals in the paper of any of the 33." Ex. 23, Moline *Lopez* Dep. 94:9–11.

- **January 2021:** "I decline to disclose the identi[t]ies or facts apart from what is described in the paper, and my feelings on this have not changed or my position on that has not changed." Ex. 26, Moline *Castro* Dep. at 55:3–6.

Pecos River also sought expedited discovery into the identities of the Article's subjects before this Court, which Dr. Moline opposed, and this Court denied. ECF Nos. 7, 12, 18, 33.

Dr. Moline, her employer Northwell, and plaintiffs' attorneys obfuscated even *where* the Key with the identities of the individuals was located. Dr. Moline originally testified that she "personally" had a way of identifying all the individuals in her Article. Ex. 22, Moline *Zimmermann* Dep. 44:8–10.

So, Pecos River moved to compel Dr. Moline to disclose the identities in the *Lanzo* case in New Jersey (one of the individuals actually in the Article). There, the plaintiffs opposed that motion, stating that Dr. Moline's employer, Northwell, should have been the target of the motion rather than Dr. Moline. They wrote: "In reality, it is Northwell, not Dr. Moline, that owns the data sought by J&J" and that "it is Northwell, not Dr. Moline, that would have to be compelled to provide it." Ex. 27, *Lanzo* Opp. to Mot. to Compel at 2 n.2. That case resolved before the issue could be ruled on.

Based on the arguments made in *Lanzo*, Pecos River then subpoenaed *both* Dr. Moline and Northwell for the Key in another New Jersey case called *Clark*. Contradicting the previous arguments, Northwell objected on the grounds that Northwell *did not* have the key, stating that the subpoena is "based on the ***false premise*** that Northwell is in possession of the 'unredacted copy of the five page key.'" Ex. 28, *Clark* Northwell Objections at 2. In fact it did.

To try get to the bottom of the simple issue of where the key was even located, Pecos River questioned Dr. Moline about it in a California case *Krich*. When Dr.

28

Moline was asked if she ever had possession of the key, she admitted: "I ***have had*** possession of the unredacted key"—i.e., in the past. Ex. 29, Moline *Krich* Dep. 53:9–13. But when asked if she has "since ***relinquished*** possession of the unredacted key," Dr. Moline refused to answer, stating she does not own the key: "I'm not answering any further question without counsel present from Northwell and counsel present from my personal counsel. It is not -- ***I do not own the key***." *Id.* 53:14–18.

Hearing all this, the New Jersey court ordered Dr. Moline to sit for a deposition in *Clark* regarding "ownership/control/decisional rights" with respect to the key. Ex. 30, *Clark* Pre-Trial Order ¶ 1. The day before the deposition, Plaintiffs withdrew Dr. Moline as an expert and stated they would not be going forward with the deposition. The court in *Clark* concluded that it no longer had jurisdiction to order Dr. Moline's to appear for a deposition.

So, Pecos River therefore subpoenaed Dr. Moline and Northwell in New York where they are both located. Initially, a New York trial court quashed the subpoena. But Pecos River appealed that ruling, and on October 8, 2024, the New York Supreme Court's Appellate Division, First Department, ruled that Dr. Moline and Northwell must comply with subpoenas issued in *Clark* that compelled them to produce documents that reveal the identities of the subjects of Dr. Moline's Article. *Johnson & Johnson v. Northwell Health Inc.*, 231 A.D.3d 481 (1st Dep't 2024).

Northwell sought leave to appeal to the New York Court of Appeals, which was denied. *Johnson & Johnson v. Northwell Health Inc.*, 42 N.Y.3d 1026 (2024). Northwell then sought reconsideration of the Court of Appeals' decision and successfully obtained a stay of the enforcement of the subpoena from the trial court pending the outcome of that reconsideration motion. *See Johnson v. Northwell Health Inc.*, 2025 WL 248897, at *2 (N.Y. Sup. Ct. Jan. 15, 2025).

The Court of Appeals ultimately denied reconsideration. *Johnson & Johnson v. Northwell Health Inc.*, 43 N.Y.3d 938 (2025). At that point, the trial court ordered Dr. Moline and Northwell to comply with the subpoena by April 8. Ex. 4, March 25, 2025 Decision & Order, *Johnson & Johnson v. Northwell Health Inc.*, No. 153527-2024 (Sup. Ct., N.Y. Cty.) (Dkt. No. 126), at 7. On that day, after years of effort to obtain it, Northwell (not Dr. Moline) finally produced the Key. And even then, Northwell did not produce all the information that it produced in the *Bell* case. *Compare* Compl. ¶ 5 (excerpt of *Bell* production) *with* Ex. 3, Key.

The Key identifying the individuals in Dr. Moline's article could not have been discovered prior to this Court's motion to dismiss decision. Indeed, Pecos River steadfastly and diligently tried to obtain the Key, but was actively thwarted at every turn. It is now clear why so many different parties worked so hard to prevent anyone from seeing the Key. It demonstrates that Dr. Moline's Article is fraudulent.

30

## CONCLUSION

The judgment should be vacated and Pecos River should be permitted to file its proposed amended complaint. Ex. 1, Proposed Am. Compl. As discussed above, the proper procedure is for this Court to indicate its intent to grant Pecos River's Rule 60(b) motion, at which point Pecos River will seek a remand from the Third Circuit. After remand, this Court can formally grant the motion.

Dated: April 29, 2025                    Respectfully submitted,


**KING & SPALDING LLP**              **PATTERSON BELKNAP WEBB & TYLER LLP**

                                     By:  /s/ Peter C. Harvey

Kristen Fournier (*pro hac vice*)         Peter C. Harvey
Matthew Bush (*pro hac vice*)             Thomas P. Kurland (*pro hac vice*)
1185 Avenue of the Americas              1133 Avenue of the Americas
New York, NY 10036                       New York, NY 10036-6710
T: 212-556-2100                          T: 212-336-2000
F: 212-556-2222                          F: 212-336-2222
kfournier@kslaw.com                      pcharvey@pbwt.com
mbush@kslaw.com                          tkurland@pbwt.com

*Attorneys for Plaintiff Pecos River Talc LLC*

31