# Exhibit A

Peter C. Harvey
Thomas P. Kurland (*pro hac vice*)
PATTERSON BELKNAP
WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036-6710
T: 212-336-2000
F: 212-336-2222
pcharvey@pbwt.com
tkurland@pbwt.com
*Attorneys for Plaintiff Pecos River Talc LLC*

Kristen Fournier (*pro hac vice*)
Matthew Bush (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
T: (212) 446-4800
F: (212) 446-4800
kristen.fournier@kirkland.com
matthew.bush@kirkland.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PECOS RIVER TALC LLC<br><br>Plaintiff,<br><br>v.<br><br>DR. JACQUELINE MIRIAM MOLINE,<br><br>Defendant. | Civil Action No. 3:23-cv-02990-GC-DEA<br><br>Motion Day:<br>June 2, 2025 |

## SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFF PECOS RIVER TALC LLC'S MOTION FOR RELIEF FROM JUDGMENT AND FOR LEAVE TO FILE AN AMENDED COMPLAINT PURSUANT TO RULE 60(b) AND RULE 15

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................. ii

INTRODUCTION ...............................................................................................1

ARGUMENT ......................................................................................................6

I.   Dr. Moline's Recent Deposition Confirms That Her Statements In The Article Are Objectively, Factually False..............................................6

    A.   Ms. Polokow..........................................................................8

    B.   Ms. Jackson ...........................................................................9

    C.   Ms. Schoeniger.....................................................................9

    D.   Mr. Garcia.............................................................................10

II.  Dr. Moline's Recent Deposition Shows She Knew Of The Subjects' Non-Talc Exposures.........................................................................10

III. Dr. Moline's Deposition Revealed That Her "Evaluation" Was Designed to Deliberately Disregard Evidence of Other Exposures. .............13

IV.  The Record Shows That Dr. Moline Lied To Conceal Her Deception..........15

CONCLUSION ..................................................................................................19

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989) ............................................................................................13

*Johnson & Johnson v. Northwell Health Inc.*,
    231 A.D.3d 481, 482 (1st Dep't 2024) ...............................................................2

*LLT Mgmt. LLC v. Emory*,
    2025 WL 438100 (E.D. Va. Feb. 7, 2025)....................................................5, 14

*Moline v. Pecos River Talc LLC,*
    2025 WL 2898086 (S.D.N.Y. Oct. 10, 2025) ........................................6, 16, 17

*Pecos River Talc LLC v. Emory*,
    2025 WL 1888565 (E.D. Va. July 8, 2025) ......................................................13

*Ward v. Zelikovsky*, 136 N.J. 516 (1994)....................................................................6

Plaintiff Pecos River Talc LLC ("Pecos River")[1] submits this supplemental brief in support of its Motion For Relief From Judgment And For Leave To File An Amended Complaint Pursuant To Rule 60(b) And Rule 15.

## INTRODUCTION

Additional evidence has now come to light confirming that Dr. Moline made objectively false statements of fact in her Article to promote "junk science" and then lied under oath in an attempt to conceal her conduct—reinforcing that Pecos River has a viable trade libel claim against Dr. Moline and that its Rule 60(b) motion should be granted.

On April 29, 2025, Pecos River asked this Court to grant it leave to file an amended complaint based on, *inter alia*, then-newly-discovered evidence revealing the names of the subjects of Dr. Moline's Article. Those disclosures confirmed Pecos River's allegations that the subjects were plaintiffs in litigations wherein (i) Dr. Moline participated as a plaintiffs' "expert" and (ii) the evidence showed that—contrary to Dr. Moline's attestation in her Article—approximately half the subjects were exposed to asbestos from sources other than talcum powder.

---

[1] In the Third Circuit, Pecos River was substituted as plaintiff for its predecessor, LTL Management, LLC. *Pecos River Talc LLC v. Moline*, No. 24-235 (3d Cir.), Dkt. No. 19. This brief will continue to use "Pecos River" to refer to both itself and its predecessors.

New York state courts ordered Dr. Moline and her employer to make those disclosures—after their non-compliance and over their vehement objections—pursuant to subpoenas authorized by a New Jersey state court.[2] The subpoena to Dr. Moline also required her to appear for deposition, which was recently completed. This was the first opportunity to depose Dr. Moline about the individuals in her Article, whom she had previously refused to name.

Dr. Moline's new deposition testimony now confirms both that the statements in her Article are objectively false and that the process she used for the Article was designed to deliberately disregard evidence of non-talc exposures.

The Article is premised on Dr. Moline's express and unqualified factual assertions that, based upon her "medico-legal evaluation" of 33 plaintiffs with mesothelioma:

- "*No individual identified any exposure* apart from contaminated talcum powder";

- "For all 33 cases, other *potential exposures* to asbestos were considered, with *no identified source* apart from the talcum powder"; and

- All 33 subjects had "*no known asbestos exposure* other than cosmetic talcum powder."

---

[2] *Johnson & Johnson v. Northwell Health Inc.*, 231 A.D.3d 481, 482, *leave to appeal denied*, 42 N.Y.3d 1026 (2024), *reargument denied*, 43 N.Y.3d 938 (2025). Pecos River's Rule 60(b) motion outlined the extensive efforts to overcome the vehement objections to ultimately obtain the subjects' names. Mot. at 27-30 (ECF No. 47-1).

Opp. Ex. A.[3]

The plain reading and necessary legal implication of these factual assertions is that, for each of the 33 subjects, Dr. Moline *reasonably investigated* the potential sources of asbestos exposure identified in his or her case, and made a *factually supported* determination, based on that investigation, that cosmetic talc was his or her only potential exposure to asbestos. That is exactly how Dr. Moline construed her statements when first questioned regarding her Article, testifying under oath that she excluded individuals from her study who had even "*potential* exposures" to asbestos other than cosmetic talc, or who "*might*" have such exposures, or where there was "*any question*" about such an exposure.

But Dr. Moline's recent deposition testimony confirms that—contrary to these objective factual assertions—she knew of exposures or potential exposures to asbestos other than cosmetic talc that were identified in the subjects' underlying cases, and she simply ignored those non-talc sources in preparing her Article. Unable to legitimately refute the factual falsity of her Article, Dr. Moline tried to disavow the Article's plain language, to no avail. Further, Dr. Moline's testimony revealed that the "medico-legal evaluation" she purportedly employed to assess the subjects'

---

[3] Exhibits submitted with Pecos River's Rule 60(b) motion and Dr. Moline's opposition are cited "Mot. Ex. __" and "Opp. Ex. __" respectively. Exhibits submitted with this supplemental brief are cited "Supp. Ex. __."

exposures to asbestos was *designed* to disregard record evidence of non-talc exposures—which she had personally seen and/or admittedly had full access to.

In other words, Dr. Moline did not reach some carefully considered "opinion" regarding what exposures occurred. Rather, Dr. Moline's deposition testimony revealed that the "process" she used was intentionally calibrated to reach a predetermined false conclusion. Dr. Moline conceded that, with one or two exceptions, *all* she did to determine whether to include a plaintiff in her Article was to review a *particular section* of her own expert reports proffered on plaintiffs' behalf in the talc powder litigation. She did not even look at the conclusion section at the end of her reports where it was her practice to acknowledge that plaintiffs had a non-talc exposure to asbestos, or consider the rest of the record that showed the alternative exposures.

Dr. Moline simply ignored information that did not comport with her predetermined plan to publish a paper stating that 33 people had no non-talc exposures to asbestos, in order to align herself with an earlier study of 33 subjects exposed to asbestos from "occupational and environmental" sources (the "1960 Wagner Study") that drew a connection between asbestos and mesothelioma.[4] Supp. Ex. 3 at 50:25-51:15.

---

[4] The Article states: "In 1960, Wagner presented 33 individuals exposed to crocidolite asbestos from occupation and environmental exposures, providing the

As the Eastern District of Virginia held in allowing a related action to proceed, such evidence in the litigation record establishes the viability of a trade libel claim. *LLT Mgmt. LLC v. Emory*, 2025 WL 438100, *13 (E.D. Va. Feb. 7, 2025).

Finally, this Court dismissed Pecos River's complaint in part because "the Article was published in a peer-reviewed journal with a self-described purpose of 'underlin[ing] the importance of collecting detailed exposure histories . . . in patients presenting with mesothelioma.'" *Id.* (quoting Article at 6-7 (ECF No. 1-2)). New evidence has further disproven Dr. Moline's stated purpose. In fact, the Article was designed to bolster her litigation opinions that represent a significant source of her income. With the aid of the plaintiffs' asbestos law firm Simon Greenstone Panatier, Dr. Moline coordinated with the authors of the follow-on paper authored by Dr. Emory, Dr. Maddox, and Dr. Kradin to generate so-called "science" that could be cited in litigation.

Yet Dr. Moline lied to conceal this at her deposition. Dr. Moline testified that she had "no communications" with Dr. Emory, Dr. Maddox, or Dr. Kradin regarding either their paper or Dr. Moline's Article—including specifically about trying to determine an overlap in subjects between the two papers. But, two days later, the

---

first large case series of individuals diagnosed with mesothelioma with clearly identifiable exposure to asbestos. . . . Like Wagner, we present 33 cases . . . who had no known exposure to asbestos other than prolonged use of talcum powder." Opp. Ex. A

documents produced in the *Emory* case proved that this testimony was false. The documents revealed that Dr. Moline repeatedly communicated and coordinated with the authors of the *Emory* paper in advance of its publication. Presented with that evidence, the Southern District of New York recently found "sound reason to question whether [Dr. Moline's] deposition answers were false or misleading," and that "[s]uch evidence has clear potential to bear on Pecos River's claims of actual malice" in a trade libel suit. *Moline v. Pecos River Talc LLC,* 2025 WL 2898086, at *4 (S.D.N.Y. Oct. 10, 2025) (ordering Dr. Moline to appear for deposition in *Emory*).

This new evidence shows that Pecos River can plausibly state a claim of trade libel and should be permitted to amend its complaint to do so.

## ARGUMENT

### I.    Dr. Moline's Recent Deposition Confirms That Her Statements In The Article Are Objectively, Factually False.

When evaluating whether a statement is actionable, courts begin by looking to "the fair and natural meaning which will be given it by reasonable persons of ordinary intelligence." *Ward v. Zelikovsky*, 136 N.J. 516, 529 (1994). In other words, it is "[t]he *listener's reasonable interpretation*, which will be based in part on the context in which the statement appears" that "is the proper measure for whether the statement is actionable." *Id.* at 533 (emphasis added). And even if a statement is presented as an "opinion," it is still actionable "when the statement implies underlying objective facts that are false." *Id.* at 531. So a statement of "opinion" can

6

be actionable if it either "explicitly or impliedly rests on false facts that damage the reputation of another." *Id.*

Dr. Moline made the absolute, unconditional and unequivocal factual assertions in her Article that "***potential exposures*** to asbestos were considered, with ***no identified source*** apart from the talcum powder," and that "***[n]o individual identified any exposure*** apart from contaminated talcum powder." Opp. Ex. A at 11, 14 (emphasis added). The plain reading and necessary legal implication of these statements is that Dr. Moline conducted a reasonable and thorough investigation of the underlying pleadings and evidence in these individuals' court cases, and that based on this reasonable and thorough investigation, Dr. Moline made a factually supported determination that there were not even any "potential" non-talc exposures. That is how any reasonable reader would naturally understand her Article.

Indeed, that understanding is consistent with how Dr. Moline previously testified on multiple occasions. She stated under oath that her Article excluded individuals who had even "***potential*** exposure" to asbestos; cases where there was "***any question***" of an alternative asbestos exposure; or plaintiffs who "***might***" have had a non-talc exposure. Supp. Ex. 3, Moline *Wiman* Dep. at 53:8-21; Mot. Ex. 22, Moline *Zimmerman* Dep. 50:7-12 (all emphasis added). She gave this testimony in 2019 and 2020 shortly after the Article came out when she was not facing any

7

potential liability stemming from it. This testimony is the best indication both of what Dr. Moline meant her Article to convey and how a reader would interpret it.

When the names of the subjects of Dr. Moline's Article were finally revealed after the New York Appellate Division ordered their disclosure, it became clear that approximately half the Article's subjects had non-talc exposures to asbestos—directly contrary to the Article's factual assertions. Dr. Moline's recent deposition testimony now shows that she *knew* of exposures or potential non-talc exposures to asbestos and simply ignored them. The following are illustrative examples of Dr. Moline's testimony concerning the subjects of her Article that demonstrate her statements are objectively, factually false and thus actionable.

### A.    Ms. Polokow

In her Article, Dr. Moline stated that "***no individual identified*** any asbestos exposure" apart from cosmetic talc. But for Ms. Polokow's case, Dr. Moline admitted that an individual ***did*** identify an exposure to asbestos apart from talc:

| Moline Article at 14 | Moline *Clark* Dep. 163:15-20 |
|---|---|
| **RESULTS**<br>The data associated with the exposure history of all 33 patients is presented in Table 1. The table identifies talcum powder as the only asbestos exposure these patients have experienced. No individual identified any asbestos exposure apart from contaminated talcum powder from workplace or household exposures. | Q. There's someone here that is identifying an exposure to asbestos from a non-talc source in this case, bystander exposure to repair work using asbestos-containing roofing cement, correct?<br>A. In the work history, yes. |
| *Opp. Ex. A* | *Supp. Ex. 1* |

8

**B.    Ms. Jackson**

Similarly, the medical intake form produced in the litigation brought by Ms. Jackson indisputably shows an individual identifying a non-talc asbestos exposure:



Supp. Ex. 4, Jackson Medical Record (*Clark* Dep. Ex. 39).

Confronted with that evidence, Dr. Moline again acknowledged in her testimony that an individual identified an asbestos exposure other than talc, contrary to the statement in her Article:

| Moline Article at 14 | Moline *Clark* Dep. 227:2-6 |
|---|---|
| **RESULTS**<br><br>The data associated with the exposure history of all 33 patients is presented in Table 1. The table identifies talcum powder as the only asbestos exposure these patients have experienced. No individual identified any asbestos exposure apart from contaminated talcum powder from workplace or household exposures.<br><br>*Opp. Ex. A* | Q. So someone here is identifying an exposure to asbestos from a non-talc source, whether you agree with it or not?<br><br>A. They're showing that they believe there was exposure.<br><br>*Supp. Ex. 1* |

**C.    Ms. Schoeniger**

As discussed above, Dr. Moline stated in her Article that "***potential exposures*** to asbestos were considered, with ***no identified source*** apart from the talcum powder." Consistent with that plain reading, Dr. Moline previously testified: that even "potential alternative exposures" were excluded from the Article.

Yet Dr. Moline's recent deposition testimony makes clear that Ms. Schoeniger had a "potential exposure" to asbestos from a non-talc source.

| Moline *Zimmerman* Dep. 50:7-12 | Moline *Clark* Dep. 110:25-11:4 |
|---|---|
| Q. And my understanding is that in selecting those 33 cases, you specifically didn't include any cases where there was a potential alternative exposure; is that right?<br><br>A. To the best of my ability based on the information I have, that is correct.<br><br>*Mot. Ex. 22* | Q. And so you described Ms. Shoeniger's exposure to asbestos from joint compound as a potential exposure here in your expert report, right?<br>A. Yes.<br><br><br><br><br><br>*Supp. Ex. 1* |

### D.    Mr. Garcia

Similarly, Dr. Moline's deposition makes clear that Mr. Garcia had a "potential exposure" to asbestos from a source other than cosmetic talc.

| Moline *Zimmerman* Dep. 50:7-12 | Moline *Clark* Dep. 128:3-7 |
|---|---|
| Q. And my understanding is that in selecting those 33 cases, you specifically didn't include any cases where there was a potential alternative exposure; is that right?<br><br>A. To the best of my ability based on the information I have, that is correct.<br><br>*Mot. Ex. 22* | Q. And so you, for this case, also called Mr. Garcia's exposure to asbestos a potential exposure, right?<br>A. Well, I think I say both "possible" and "potential" in this paragraph.<br><br><br>*Supp. Ex. 1* |

## II.    Dr. Moline's Recent Deposition Shows She Knew Of The Subjects' Non-Talc Exposures.

Dr. Moline's deposition also shows that Dr. Moline was aware of these non-talc exposures to asbestos and that she willfully lied about them—or, at best,

recklessly disregarded them. Take Ms. Dalis's case. Ms. Dalis sought—and received—compensation from the Manville Personal Injury Settlement Trust for exposures to asbestos from Johns-Manville products. Supp. Ex. 5 at 1, Dalis Claim Information Report (*Clark* Dep. Ex. 29). Dr. Moline knew that Johns-Manville was a manufacturer of asbestos and asbestos-containing products—including automotive parts—that went bankrupt. Supp. Ex. 1, Moline *Clark* Dep. 164:1-15. And she knew that a trust was created with respect to the bankruptcy. *Id.* at 165:2-3.

When seeking compensation from the Manville Trust, Ms. Dalis identified asbestos exposures from Johns Manville Products as a bystander to her ex-husband Jim Stark's work as a mechanic:

| **Exposure History:** | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **From:** | **To:** | **Industry:** | **Occupation:** | Country: | Exp Site: | **Exp Type:** | Vic Occ: | Vic Type: |
| 1/1965 | 1/1970 | **104** | **51** | USA | 0 | | 0 | |
| 1/1965 | 1/1970 | **104** | **6** | USA | 0 | iii | 0 | |
| | **Bystander Name:** | **Jim Stark** | | | | **Relationship:** | **Family** | |

Supp. Ex. 5 at 3, Dalis Claim Information Report (Dep. Ex. 29).

The codes are easily identifiable and mean:

- **Industry Code 104:** Automotive Dealers Repair Services, and Stations
- **Occupation Code 51:** Bystander (Including Family Member)
- **Occupation Code 6:** Mechanic
- **Exposure Type iii:** Altered, repaired or otherwise worked with an asbestos-containing product such that the

11

> claimant was exposed on a regular basis to asbestos fibers.

*See* Supp. Ex. 10 (*Clark* Dep. Ex. 30). at 10 (industry codes), 9 (occupation codes), 6 (exposure types); Supp. Ex. 1 Moline *Clark* Dep. 164:18-168:24.

Dr. Moline knew that Jim Stark was Ms. Dalis's ex-husband who worked as an amateur mechanic. Supp. Ex. 1, Moline *Clark* Dep. 164:18-168:24. And Dr. Moline "knew from the deposition [of Ms. Dalis] that she had submitted a claim to the Johns-Manville Trust" for persons injured by the company's asbestos-containing products, and also knew "from the deposition that she received money from the Johns-Manville Trust based on the claim that she submitted." Supp. Ex. 1, Moline *Clark* Dep. 175:10-18. The trust claim therefore plainly represents an individual *identifying* a non-talc asbestos exposure, contrary to the statement in her Article.

Dr. Moline's recent testimony demonstrates that she did not reach any sort of reasoned "scientific opinion" that Ms. Dalis had not, in fact, identified a non-talc asbestos exposure—Dr. Moline knew about that potential non-talc exposure and simply ignored it. She "did not go to investigate what the process was for obtaining money from the Johns-Manville Trust or what kind of exposure you needed to allege" and did not "know exactly what one needed to qualify for one of these." Supp. Ex. 1. Moline *Clark* Dep. 175:19-176:3.

She had never seen the document outlining the process for receiving compensation from the trust. If Dr. Moline had any interest in the actual truth of the

exposures, she could have easily learned that the Manville Trust requires that a "claimant must demonstrate meaningful and credible exposure to asbestos or asbestos-containing products supplied or manufactured by Manville." Supp. Ex. 6 at 14, Trust Distribution Process (*Clark* Dep. Ex. 31). That is public knowledge and has been for many years. A quick Google search confirms it.[5]

That she knew about the trust claim from Ms. Dalis's deposition and simply did not look into what it meant demonstrates that she did not reach any kind of scientific "opinion." Rather, Dr. Moline made false factual statements by (at best) recklessly ignoring the truth, rendering the claims actionable.

As the *Emory* Court explained, "a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity" can constitute "actual malice" for a trade libel claim. *See Pecos River Talc LLC v. Emory*, 2025 WL 1888565, at *6 (E.D. Va. July 8, 2025) (quoting *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989)). That is exactly what occurred here.

## III. Dr. Moline's Deposition Revealed That Her "Evaluation" Was Designed to Deliberately Disregard Evidence of Other Exposures.

Dr. Moline's process for developing her Article—as revealed by her recent deposition—was designed from the ground up to ignore non-talc exposures. This further shows why her statements are actionable. Pecos River raised in its Rule 60(b)

---

[5] *See* https://mantrust.claimsres.com/documents/; https://www.gorilaw.com/mesothelioma/trust-funds/johns-manville-corporation/

motion how a factor the *Emory* Court considered in finding the statements actionable was that the relevant "facts pre-existed the scientific process the article describes— in fact, they were discovered through litigation, not through any scientific method." *LLT Mgmt. LLC v. Emory*, 2025 WL 438100, *13 (E.D. Va. Feb. 7, 2025).

Dr. Moline's recent testimony demonstrates that analysis has particular force here. When determining which cases to put in her Article, Dr. Moline's "medico-legal evaluation" consisted exclusively of looking at *her own* expert reports, with only one or two exceptions. Supp. Ex. 1, Moline *Clark* Dep. 91:7-20. She did not actually review the primary source documents outlined in the Article (*i.e.*, the underlying pleadings and evidence in the cases) but merely "relied on the reports" that she had previously written for purposes of litigation. *Id.* at 92:13-21.

But farcically, she did not even review the *entirety* of her own reports. Rather, for all "33 cases," she would generally "look at *just* the environmental and occupational history section of [her] report[s]." *Id.* at 127:3-8. That meant she did not even look at the sections at the end of her report where it was her practice to acknowledge that someone had a potential non-talc exposure to asbestos. *See, e.g.*, Mot. Ex. 6, Moline *Schoeniger* Rpt. at 18; Mot. Ex. 9, Moline *Garcia* Rpt. at 17. Obviously, Dr. Moline knew where in her own reports an acknowledgment of a non-talc exposure would appear—and she chose not to review those parts of her own

reports. Again, that is the definition of actionable reckless disregard for the truth—not scientific opinion.

So like *Emory*, all the relevant facts presented in the Article pre-existed any purported scientific process and were generated through litigation. This is not a question of Dr. Moline scientifically evaluating data to form a scholarly "opinion." She simply falsely described the facts of the subjects' underlying cases and ignored any information that did not comport with her preordained plan to have 33 subjects in her Article. Supp. Ex. 3 at 50:25-51:15.

## IV.    The Record Shows That Dr. Moline Lied To Conceal Her Deception.

The Court stated in its motion to dismiss decision that it "must also consider the content of the whole communication and its apparent purpose." ECF No 40 at 13. The Court stated that: "Here, the Article was published in a peer-reviewed journal with a self-described purpose of 'underlin[ing] the importance of collecting detailed exposure histories . . . in patients presenting with mesothelioma.'" *Id.* (quoting Article at 6-7 (ECF No. 1-2)).

New evidence has further disproven Dr. Moline's stated purpose. In fact, the Article was designed to bolster her litigation opinions that represent a significant source of her income. With the aid of the plaintiffs' asbestos law firm Simon Greenstone Panatier, Dr. Moline coordinated with the authors of the follow-on paper

15

authored by Dr. Emory, Dr. Maddox, and Dr. Kradin (the "Emory Paper") to create papers that could be cited in litigation.

In fact, the Southern District of New York recently permitted further discovery of Dr. Moline after concluding: "Pecos River has adduced evidence indicating that Dr. Moline likely possesses information bearing on communications among SGP [Simon Greenstone Panatier,] and the *Emory* defendants regarding overlap between the Moline and/or Steffen articles. Such evidence *has clear potential to bear on Pecos River's claims of actual malice"* for a trade libel claim." *Moline v. Pecos River Talc LLC*, 2025 WL 2898086, at *4 (S.D.N.Y. Oct. 10, 2025) (emphasis added).

Yet at her deposition, Dr. Moline lied to conceal the coordination between her Article and the Emory Paper that would have further demonstrated the papers' litigation purpose. She testified unambiguously that she did not have "any communications" with Dr. Emory, Dr Kradin, or Dr. Maddox regarding either of Dr. Moline's articles: "Q. Did you have any communications with Dr. Emory, Dr. Maddox or Dr. Kradin regarding either of your two articles? A. No." Supp. Ex. 1, Moline *Clark* Dep. 235:12-15. And when asked in a follow up question whether Dr. Emory, Dr Kradin, or Dr. Maddox asked Dr. Moline "to identify the individuals in your 2020 article to ensure that there wasn't an overlap between the two articles," she responded: "No, we didn't have communications." *Id.* at 235:16-19.

But we know now that is false. The Southern District of New York even concluded after reviewing the evidence that "there is sound reason to question whether her deposition answers were false or misleading." *Moline*, 2025 WL 2898086, at *4 (S.D.N.Y. Oct. 10, 2025)

The documents produced in the *Emory* case—where summary judgment motions are currently being briefed—show that Dr. Emory and Dr. Moline did in fact communicate for exactly that reason:

| From: | "Moline, Jacqueline" <JMoline@northwell.edu> |
| --- | --- |
| Sent: | Thu, 13 Feb 2020 21:47:22 -0500 (EST) |
| To: | "Theresa Emory" <temorymd@gmail.com> |
| Subject: | Re: [EXTERNAL] Query |

please give me a ring tomorrow

From: Theresa Emory <temorymd@gmail.com>
Sent: Thursday, February 13, 2020 1:03 PM
To: Moline, Jacqueline <JMoline@northwell.edu>
Subject: [EXTERNAL] Query

*External Email. Use Caution.*
Dr. Moline,

I am working with John Maddox and Richard Kradin on a study.

Before we submit for publication, I want to make sure that a few of the cases have not already been published by you.

If possible, I would appreciate the opportunity to discuss this with you.

Supp. Ex. 2, Feb. 13, 2020 Email Chain.

Dr. Emory and Dr. Moline appear to have discussed the subjects of the two articles, because the morning of the phone call between the two, Dr. Emory removed four subjects from her paper that were in Dr. Moline's (anonymized) paper.

17

| From: | "Theresa Emory" <temorymd@gmail.com> |
|---|---|
| Sent: | Fri, 14 Feb 2020 11:03:08 -0500 (EST) |
| To: | "Dr. John Maddox" <jcm73773@msn.com>; "Richard Kradin" <richardkradin@googlemail.com> |
| Subject: | Study number 75 cases |

I am removing 4 cases from the study because they have already been reported.

The final number will be 75 cases.

I will get back with the data and tables and the next draft ASAP.
Thanks-
Theresa

Supp. Ex. 7, Feb. 14, 2020 Email.

Dr. Moline also testified at her recent deposition that she did not have any communications with the authors of the Emory Article regarding *their* article: "Q. Did you have any communications with either Dr. Maddox, Dr. Emory or Dr. Kradin regarding their article regarding the 75 individuals? A. I did not." Supp. Ex. 1, Moline Clark Dep. 236:9-12. As we now know, this is also false. Dr. Moline spoke with Dr. Kradin and encouraged him to submit his article "asap."

| From: | Richard Kradin <richardkradin@googlemail.com> |
|---|---|
| Sent: | Wed, 23 Oct 2019 14:20:43 -0400 (EDT) |
| To: | John Maddox <jcm73773@msn.com> |
| Subject: | Talc |
| Attachments: | Meso Associated with the Use of Cosmetic Talc, Article.pdf |

John:
I'm enclosIng the Moline article. I spoke with her and she encouraged us to submit our article asap. Let me know when you have another draft.
Rich

Supp. Ex. 8, Oct. 23, 2019 Email.

And Dr. Moline later gave advice to Dr. Emory regarding the citations in Dr. Emory's paper:



Supp. Ex. 9, Feb. 29, 2020 Email Chain.

Dr. Moline should not get the benefit of the doubt regarding the stated purpose of her Article—particularly at the pleading stage. This Court should make a determination regarding the actionability of the statements after full discovery into the Article, how it was prepared, and the circumstances surrounding it. Pecos River has plausibly alleged a trade libel claim.

## CONCLUSION

This Court should grant Pecos River's motion, reinstating its trade libel claim.

Dated: November 4, 2025                                  Respectfully submitted,

**KIRKLAND & ELLIS LLP**                **PATTERSON BELKNAP WEBB & TYLER LLP**

                                        By:  */s/ Peter C. Harvey*

Kristen Fournier (*pro hac vice*)              Peter C. Harvey
Matthew Bush (*pro hac vice*)                  Thomas P. Kurland (*pro hac vice*)
601 Lexington Avenue                           1133 Avenue of the Americas
New York, NY 10022                             New York, NY 10036-6710
T: (212) 446-4800                              T: 212-336-2000
F: (212) 446-4800                              F: 212-336-2222
kristen.fournier@kirkland.com                  pcharvey@pbwt.com
matthew.bush@kirkland.com                      tkurland@pbwt.com

*Attorneys for Plaintiff Pecos River Talc LLC*