**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| PECOS RIVER TALC LLC,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>DR. JACQUELINE MIRIAM MOLINE,<br><br>　　　　　　Defendant. | Civil Action No. 23-02990 (GC) (JTQ)<br><br>**OPINION** |

**CASTNER, District Judge**

　　**THIS MATTER** comes before the Court upon Plaintiff Pecos River Talc LLC's[1] Motion for Relief from Judgment and for Leave to File an Amended Complaint pursuant to Federal Rule of Civil Procedure (Rule) 60(b) and Rule 15.  (ECF No. 47.)  Defendant Dr. Jacqueline Miriam Moline opposed, and Plaintiff replied.  (ECF Nos. 48, 49.)  The parties submitted supplemental briefing following leave from the Court.  (ECF Nos. 50-1, 51, 52, 53.)[2]  The Court has carefully reviewed the parties' submissions and decides the matter without oral argument pursuant to Rule

---

[1]　　As relevant to this case, Pecos River Talc LLC (Pecos River) has since been allocated the liabilities and assets of the mesothelioma litigation in which LLT Management LLC (f/k/a LTL Management LLC) was involved, including this case.  (ECF No. 47-5 ¶ 14.)  Therefore, Pecos River now stands in LLT's shoes, (*id.* ¶ 16), and the Court will uniformly refer to Plaintiff as Pecos River for ease of reference.  LLT was a wholly owned indirect subsidiary of Johnson & Johnson Holdco (NA) Inc. (Johnson & Johnson) and was responsible for all liabilities arising from claims against Johnson & Johnson related to its cosmetic talcum powder, including Johnson's Baby Powder and Shower-to-Shower products.  (ECF No. 1 ¶ 12.)

[2]　　Pecos River thereafter submitted a letter, and Dr. Moline replied to that letter.  (ECF Nos. 54, 55.)  The Court need not consider these letters in deciding the instant Motion.

78(b) and Local Civil Rule 78.1(b).  For the reasons set forth below, and other good cause shown, Plaintiff's Motion is **GRANTED**.

## I.    <u>BACKGROUND</u>

### A.    Factual Background and Original Allegations

The Court assumes the parties' familiarity with the underlying facts, which are set forth in greater detail in the Court's prior Opinion addressing Defendant's Motion to Dismiss.  (*See* ECF No. 40.)  The Court outlines the factual background necessary to resolve the instant Motion.

In January 2020, Dr. Moline and several co-authors published an article in the widely read Journal of Occupational and Environmental Medicine (JOEM).  (ECF No. 47-5 ¶¶ 2, 31; ECF No. 1-2 at 2-7.)[3]  Entitled *Mesothelioma Associated With the Use of Cosmetic Talc*, the 2020 Article describes "33 cases of malignant mesothelioma among individuals with no known asbestos exposure other than cosmetic talcum powder."  (ECF No. 1-2 at 2.)  The study purports to be "the first large case series to identify cosmetic talcum powder contaminated with asbestos as the cause of malignant mesothelioma in cosmetic talc users," and it concludes that "[e]xposure to asbestos-contaminated talcum powders can cause mesothelioma."  (*Id.* at 2, 5.)  The Article has been described as "groundbreaking," with "widespread influence" on nationwide litigation in which plaintiffs allege that exposure to cosmetic talcum powder caused their mesothelioma.  (ECF No. 47-5 ¶ 5 (citing *Bell v. Am. Int'l Indus.*, 627 F. Supp. 3d 520, 532 (M.D.N.C. 2022)).)

Dr. Moline, the Article's lead author, is an occupational medicine specialist, professor of occupational medicine, and executive for various health departments and programs.  (*Id.* ¶ 17.)

---

[3]    Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.  ECF No. 47-5 refers to the redlined version of the Proposed Amended Complaint, which the Court cites to for ease of comparison.  The Proposed Amended Complaint can be found at ECF No. 47-4.  The original Complaint can be found at ECF No. 1.

She has also "made a career" as a paid expert testifying on behalf of plaintiffs in asbestos litigation over the course of twenty years.  (*Id.* ¶ 21.)  Dr. Moline has appeared in more than 200 cosmetic talc cases against Pecos River, was deposed in at least 46 of those cases, and testified at trial in 16. (*Id.* ¶ 18.)

This case arises out of Pecos River's claim that the "foundational premise" of Dr. Moline's 2020 Article "has been proven false," and that Dr. Moline knew that it was false when she authored and published the Article.  (*Id.* ¶¶ 109, 129.)  Pecos River contends that the Article's "misinformation" not only caused Pecos River "commercial, reputational, and financial harm," but also "provided a foundation for the mass tort asbestos plaintiffs' bar's baseless claims against [it]."  (*Id.* ¶¶ 4, 6.)

Specifically, Pecos River challenges two categories of statements in the 2020 Article that Pecos River alleges are "simply not true."  (*Id.* ¶ 43.)  First is the Article's assertion that for all 33 case studies, there was "no known asbestos exposure other than cosmetic talcum powder."  (ECF No. 1-2 at 2; *see also* ECF No. 47-5 ¶ 332.)  According to Pecos River, "Dr. Moline . . . knew full well that individuals she cited in her Article had admitted to and claimed compensation for exposure to asbestos from other sources" than Johnson & Johnson's talcum powder.  (ECF No. 47-5 ¶ 91.)  Second is the Article's claim that in the six cases where tissue samples were evaluated, "[a]sbestos of the type found in talcum powder was found in all six cases evaluated."  (ECF No. 1-2 at 2, 5; *see also* ECF No. 47-5 ¶ 332.)  Pecos River contends that several of the tissue samples contained asbestos fibers of the type "encountered in cases of industrial and occupational exposure, not cosmetic talcum powder."  (ECF No. 47-5 ¶¶ 149-152.)[4]

---

[4]    There are no new allegations or facts relevant to the tissue sample issue, so the Court will not readdress it in this Opinion and adopts its prior ruling that statements related to this issue are nonactionable scientific conclusions.  (*See* ECF No. 40 at 25-26.)

1.      *The 2020 Article*

The 2020 Article states that its objective is to "describe 33 cases of malignant mesothelioma among individuals with no known asbestos exposure other than cosmetic talcum powder." (ECF No. 1-2 at 2.) The cases "were referred to [Dr. Moline] for medico-legal evaluation as part of tort litigation." (*Id.*) Plaintiff alleges that it was through Dr. Moline's position as an expert witness in those tort cases that she obtained the study's data. (ECF No. 47-5 ¶ 34.) Dr. Moline obtained information about each of the 33 individuals by gathering "each individual's medical records and sworn testimony (deposition transcripts)." (ECF No. 1-2 at 2.) Data on asbestos exposure "was obtained from sworn testimony by the [individuals], which included extensive questioning regarding all sources of asbestos exposure." (*Id.*)

The Article states that in "all 33 cases, other potential exposures to asbestos were considered, with no identified source apart from the talcum powder." (*Id.*) The Article concludes that "[e]xposure to asbestos-contaminated talcum powders can cause mesothelioma," and that clinicians "should elicit a history of talcum powder usage in all patients presenting with mesothelioma." (*Id.* at 2, 6-7 ("Our findings strongly suggest that asbestos exposure through asbestos-contaminated cosmetic talc explains cases once deemed . . . 'spontaneous,' and underline the importance of collecting detailed exposure histories . . . in patients presenting with mesothelioma.").)

The Article neither identifies the 33 individuals, nor does the body of the Article expressly identify Johnson & Johnson. The Article's appendices, however, show that the 33 individuals used Johnson's Baby Powder and Shower-to-Shower products more often than any other specific talc powder products. (ECF No. 47-5 ¶ 35.) And at least three of the Article's 53 footnotes directly or indirectly refer to Johnson's Baby Powder and Shower-to-Shower products. (ECF No. 1-2 at 8.)

Finally, the Article cautions that the study "should be understood in the context of its limitations," including the fact that the data "were obtained from medication records and transcripts of depositions, rather than structured, in-person interviews"; the risk of self-reporting and recall biases in these types of studies; and Dr. Moline's role as an expert witness in "asbestos litigation, including talc litigation for plaintiffs," which the Article labels as a conflict of interest. (*Id.* at 2, 6-7.)

### 2.    *Pecos River's Original Challenges to the 2020 Article*

In its original Complaint, Pecos River alleged that the Article states multiple times that the individuals in the Article had "*no other exposure to asbestos*" apart from the alleged exposure to asbestos from talcum powder.  (ECF No. 47-5 ¶ 39 (emphasis in original).)  Pecos River cited to the following statements:

> Objective: To describe 33 cases of malignant mesothelioma among individuals with no known asbestos exposure other than cosmetic talcum powder.
>
> Results: Asbestos of the type found in talcum powder was found in all six cases evaluated.  Talcum powder usage was the only source of asbestos for all 33 cases.
>
> For all 33 cases, other potential exposures to asbestos were considered, with no identified source apart from the talcum powder.
>
> The table identifies talcum powder as the only asbestos exposure these patients have experienced.  No individual identified any asbestos exposure apart from contaminated talcum powder from workplace or household exposures.
>
> [W]e present 33 cases, predominantly of women, who had no known exposure to asbestos other than prolonged use of talcum powder.

(*Id.* (citing ECF No. 1-2 at 2,5).)

Pecos River also alleged that Dr. Moline knew that the Article's premise—"that she conducted a study of 33 mesothelioma patients whose sole exposure to asbestos was through talc

powder"—was false, "or recklessly ignored available information demonstrating its falsity." (ECF No. 47-5 ¶ 89.) Dr. Moline knew the premise was false, Pecos River alleged, because she was "intimately familiar with the case histories of the 33 individuals" given "her role as a plaintiffs' expert in the underlying tort cases" pursued by those individuals. (*Id.* ¶ 90.)

Pecos River relied heavily on the case of Betty W. Bell, whose identity as one of the 33 individuals in the Article was confirmed in *Bell v. American International Industries*, 627 F. Supp. 3d 520, 526 (M.D.N.C. 2022). There, Bell sued American International Industries (AII), claiming that her exposure to asbestos through AII's talcum powder caused her mesothelioma. *Id.* at 524-25. But Bell had also filed two workers' compensation claims asserting that she was exposed to asbestos while working for two textile employers. *Id.* at 524. During the *Bell* litigation, AII came to suspect that Bell was one of the 33 individuals in Dr. Moline's 2020 Article, which AII believed would "undermine the article's express premise . . . that none of the individuals had any known exposure to asbestos other than talcum powder." *Id.* at 525. Dr. Moline's employer eventually produced a document confirming that Bell was included in the 2020 Article. *Id.* at 525-26.

When Bell was deposed by AII, she discussed her workers' compensation claims and the fact that they were dismissed without prejudice. (ECF No. 47-5 ¶¶ 107-109.) Dr. Moline had been retained as an expert in the *Bell* case, and Dr. Moline included Bell's deposition in the "list of materials [she] reviewed in her 2016 expert report." (*Id.* ¶ 109.) Four years later, in the 2020 Article, Dr. Moline claimed that she reviewed "each individual's . . . sworn testimony (deposition transcripts)." (ECF No. 1-2 at 2.) Therefore, according to Pecos River, when Dr. Moline authored the 2020 Article, she "knew or recklessly ignored available information" that contradicted the Article's central premise. (ECF No. 47-5 ¶ 109 (emphasis omitted).)

In Pecos River's original Complaint, it further alleged that, for at least four other individuals included in Dr. Moline's 2020 Article, "it appears that alternative sources of exposure were present and known to Dr. Moline at the time the Article was written." (ECF No. 47-5 ¶ 131.) At the time of the Complaint, these other individuals were not confirmed to have been included in the 2020 Article. But Pecos River provided a side-by-side comparison of Dr. Moline's expert report in each individual's underlying case with the 2020 Article's description of a corresponding individual, suggesting that each plaintiff in the underlying case was one of the 33 individuals in the Article. (*See, e.g., id.* ¶ 147.)

One of those individuals, listed as Case #17 in the Article, was suspected to be Helen Kohr. (*Id.* ¶¶ 132-134.) Pecos River alleged that Kohr "was exposed to asbestos-containing cigarettes known as Kent cigarettes." (*Id.* ¶ 136.) Pecos River made this allegation because Dr. Moline, in her expert report in Kohr's litigation, wrote that "Ms. Kohr was exposed to asbestos from Kent Micronite cigarettes, which she smoked from 1952-1956 when crocidolite asbestos was used in the filters." (*Id.* ¶ 137.) In that report, Dr. Moline also wrote that Kohr's "exposures to asbestos-contaminated face powder and asbestos-contaminated body powder and to Kent cigarettes were the cause of her mesothelioma" and that "Ms. Kohr had malignant mesothelioma . . . as a result of her exposure to asbestos from Kent cigarettes and cosmetic talc." (*Id.* ¶ 138.) In 2023, in response to a letter to the editor of JOEM, Dr. Moline wrote to the editor that she "re-reviewed the cases included in the article" and "identified one individual with an alternative exposure" because that individual was exposed to "crocidolite asbestos-laden cigarette filters." (*Id.* ¶ 140.) Dr. Moline issued an erratum to the Article but stated that the "error does not negate the other 32 cases, in which no other source of asbestos was present apart from cosmetic talcum powder." (*Id.* ¶¶ 140-141.)

7

Another individual, listed as Case #6, was suspected to be Stephen Lanzo.  (*Id.* ¶ 147.)  Dr. Moline served as an expert witness in Lanzo's 2016 case.  (*Id.* ¶¶ 143-144.)  Dr. Moline served an expert report, sat for a deposition, and testified at trial.  (*Id.* ¶ 144.)  During the trial, which took place in 2018, Dr. Moline testified that "60 linear feet of exposed asbestos pipe were removed from Mr. Lanzo's basement."  (*Id.* ¶ 157.)  In her 2020 Article, Dr. Moline "does not mention the asbestos pipe in the basement as a potential source of exposure."  (*Id.* ¶ 159.)  Pecos River also alleged that Lanzo had potential exposure to asbestos during his schooling years and that his schools implemented asbestos abatement efforts.  (*Id.* ¶¶ 160-165.)  In the Article's "Methods" section, Dr. Moline wrote that she considered "known abatement of asbestos while the patient was in school."  (*Id.* ¶ 166; ECF No. 1-2 at 2.)  But Dr. Moline "did not mention any of the abatement in Mr. Lanzo's schools in her Article."  (ECF No. 47-5 ¶ 166.)  Pecos River therefore concluded that "Dr. Moline's statement that there were no other asbestos exposures" for Lanzo is false.  (*Id.* ¶ 167.)

A third suspected individual, listed as Case #3, was Doris Jackson.  (*Id.* ¶ 170.)  Dr. Moline appeared as an expert in Jackson's case.  (*Id.* ¶ 169.)  In Dr. Moline's expert report in that case, she wrote that Jackson "noted that she was exposed for over thirty years to ceiling pipes with degrading insulation while working as a teacher."  (*Id.* ¶ 173.)  In her Article, Dr. Moline "represented that Case #3 had no exposures to asbestos other than talcum powder."  (*Id.* ¶ 174.)

The fourth suspected individual, listed as Case #4, was Valerie Jo Dalis.  (*Id.* ¶ 178.)  Dalis had "submitted an asbestos bankruptcy trust claim for $450,000 and collected over $28,000 from the Manville Personal Injury Settlement Trust."  (*Id.* ¶ 180.)  Pecos River alleged that the bankruptcy trust claim was discussed at Dalis's deposition and her husband's deposition in her lawsuit.  (*Id.* ¶ 182.)  Yet, "Dr. Moline represented that [Ms. Dalis] had no exposures to asbestos

other than talcum powder." (*Id.* ¶ 183.)  Pecos River concluded that this representation was false. (*Id.*)

### 3.       *Pecos River's Original Challenges to the 2023 Article*

Pecos River also sued on the basis of representations made by Dr. Moline in a 2023 Article. In that Article, Dr. Moline presented "166 cases of individuals who have substantial asbestos exposure to cosmetic talc products as well as some who have potential or documented additional exposures to other asbestos-containing products and who subsequently developed mesothelioma." (*Id.* ¶ 255.)  As in the 2020 Article, Dr. Moline served as an expert witness on behalf of those 166 individuals in separate litigation matters.  (*Id.* ¶ 256.)  Dr. Moline wrote that in 122 of those cases, "the only known exposure to asbestos was from cosmetic talc."  (*Id.* ¶ 257.)  For the other 44, "potential or documented alternate exposures in addition to the cosmetic talc were described." (*Id.*)  Dr. Moline did not disclose the names of the individuals in the study, but Pecos River suspected one of the 122 individuals who was listed as having no other known exposure was Ricardo Rimondi.  (*Id.* ¶¶ 261, 274.)  Pecos River alleged that Rimondi "had alternative exposures to asbestos from living near the Eternit Plant in Peru (which purchases asbestos cement machine products)."  (*Id.* ¶ 265.)  Pecos River alleged that "Dr. Moline knew about this exposure from her testimony at the trial," that "Dr. Moline was aware of where Mr. Rimondi lived in Peru," that "Dr. Moline had been taught to ask about whether someone lived near an asbestos factory," and that "Dr. Moline was cross-examined about Mr. Rimondi's Eternit factory exposure at trial." (*Id.* ¶¶ 265, 269, 271-272.)

### 4.       *Dr. Moline's Republication of the Allegedly False Statements*

Pecos River asserted that Dr. Moline "repeated the false premise of the [2020] Article time and time again, in myriad settings and with large and varied audiences," including to several news media organizations, conferences, and oral and written testimony that Dr. Moline delivered before

a United States House of Representatives subcommittee on talc litigation. (*Id.* ¶¶ 44-78.) According to Pecos River, Dr. Moline made these false statements in the 2020 Article and to the public "for her own professional aggrandizement and financial gain," and to "add a veneer of credibility" after courts had "repeatedly barred Dr. Moline from offering testimony." (*Id.* ¶¶ 97-98, 301.) As a result of Dr. Moline's statements, Pecos River contended, the sales volume and profits from Johnson's Baby Powder declined, leading to the discontinuation of talc-based Johnson's Baby Powder in the United States and Canada. (*Id.* ¶¶ 327-328.)

### B. Procedural Background

Based on the above allegations, Pecos River asserted three causes of action against Dr. Moline in its original Complaint: trade libel (Count I); common-law fraud (Count II); and false advertising under the Lanham Act, 15 U.S.C. § 1125(a) (Count III). Dr. Moline moved to dismiss the Complaint in its entirety, (ECF No. 28), and on June 28, 2024, the Court granted Dr. Moline's motion. (ECF No. 40.)

The Court dismissed each of the claims because they all challenged Dr. Moline's non-actionable scientific opinions. (*Id.* at 9 n.9, 34.) As for the trade libel claim, the Court noted that in addition to pleading the elements,[5] the claim must be based on statements of fact rather than statements of opinion, as the latter are generally protected by the First Amendment. (*Id.* at 9.) To analyze whether Dr. Moline's statements were actionable false representations of fact or scientific conclusions "more closely akin" to nonactionable matters of opinion, the Court considered the (1) content, (2) verifiability, and (3) context of the challenged statements. (*Id.* at 13 (citing *Leang*

---

[5] In New Jersey, these elements are (1) publication; (2) with malice; (3) of false allegations concerning a plaintiff's property, product, or business; and (4) special damages, *i.e.*, pecuniary harm. *Mayflower Transit, LLC v. Prince*, 314 F. Supp. 2d 362, 378 (D.N.J. 2004); *see also Patel v. Soriano*, 848 A.2d 803, 834 (N.J. Super. Ct. App. Div. 2004), *cert. denied*, 861 A.2d 845 (N.J. 2004).

*v. Jersey City Bd. of Educ.*, 969 A.2d 1097, 1113 (N.J. 2009); *Pacira BioSciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*, 63 F.4th 240, 245 (3d Cir. 2023)).)

As for content, the Court considered whether "[t]he impression created by these words in the mind of a reasonable person could be that they were purporting to state the truth of the matter, not merely the author's opinion." (*Id.* (quoting *NXIVM Corp. v. Sutton*, Civ. No. 06-1051, 2007 WL 1876496, at *8 (D.N.J. June 27, 2007)).) It found that the "higher factual content of Dr. Moline's statements," when viewed in isolation, "weighs in favor of finding that the statements are actionable." (*Id.* at 15.) However, when viewed in conjunction with the "context" factor, the statements supported a finding of nonactionable, tentative scientific conclusions protected by the First Amendment. (*Id.* at 17.)

As for verifiability, the Court analyzed whether "the statements at issue are pure statements of fact 'capable of . . . truth or falsity,' or [whether they] constitute 'tentative scientific conclusions' that are more closely akin to nonactionable opinions." (*Id.* at 17 (quoting *Pacira*, 63 F.4th at 246-247).) With respect to the statements concerning known exposure to asbestos, the Court analyzed "whether Dr. Moline's multiple assertions that each of the '33 cases . . . had no known exposure to asbestos other than prolonged use of talcum powder' [were] verifiable statements of fact" or opinion. (*Id.* at 17 (quoting ECF No. 1-2 at 5).)

The Court found the allegations concerning Bell, Kohr, Lanzo, Dalis, and Jackson did not render Dr. Moline's finding of no known alternate asbestos exposure a verifiably false statement of fact rather than a nonactionable scientific conclusion. (*Id.* at 18-24.) The *Bell* case demonstrated that Dr. Moline's statements were inferences drawn from her review of deposition transcripts and medical records. (*Id.* at 20.) These inferences, this Court concluded, went to questions regarding the reliability of her findings but not their verifiability. (*Id.* at 20-21.) The mere existence of a

workers' compensation claim did not definitively establish that Dr. Moline knew that Bell was exposed to asbestos through an alternative source, and Dr. Moline may have been able to explain why that claim did not constitute a known exposure. (*Id.* at 21.) And, even accepting the allegations as true for the other four individuals, the "fact that Dr. Moline could conceivably explain why these other alleged sources do not constitute 'known asbestos exposure' shows that the statement is a scientific opinion, and not a matter of simple truth or falsity." (*Id.* at 22.) At most, Dr. Moline failed to include "variables that were available to" her, *ONY, Inc. v. Cornerstone Therapeutics, Inc.,* 720 F.3d 490, 497 (2d Cir. 2013), which the Third Circuit found was not actionable. (ECF No. 40 at 22-23 (citing *Pacira*, 63 F.4th at 247).) And the erratum with respect to Kohr did "not plausibly demonstrate that [Dr. Moline] fabricated or falsified data," which at the time Pecos River did not allege. (*Id.* at 23.) Instead, it demonstrated why the peer-review process rather than a courtroom was the proper forum for resolving scientific uncertainties. (*Id.* (citing *Pacira Biosciences, Inc. v. Am. Soc'y of Anesthesiologists, Inc.*, 583 F. Supp. 3d 654, 658 (D.N.J. 2022)).)

Finally, as for context, the Court reasoned that a statement being published in a peer-reviewed journal, while not dispositive, weighed heavily in favor of finding the statements nonactionable. (*Id.* at 26 (citing *Pacira*, 63 F.4th at 248).) Moreover, Dr. Moline provided readers with (1) a methodology for how cases were referred to her and how determinations of no known exposure were made and (2) a section on limitations of the study and conflicts of interest. (*Id.* at 26-27.) These facts, together with the analytical tone of the Article, "notify readers that Dr. Moline's statements should be understood as scientific conclusions that are 'tentative and subject to revision.'" (*Id.* (quoting *Pacira*, 63 F.4th at 246).)

Thus, having analyzed the three factors, this Court found the asbestos exposure statements were nonactionable and granted Dr. Moline's motion.  (*Id.* at 30, 34.)[6]  The Court dismissed the case without prejudice and invited Pecos River to file an amended complaint.  (ECF No. 41.)

In lieu of filing an amended complaint, on July 23, 2024, Pecos River appealed this Court's decision to the Third Circuit, thereby turning that decision into a final judgment.  (ECF No. 44.)  On April 29, 2025, Pecos River filed a Motion for Leave to File an Amended Complaint and for Relief from Judgment, (ECF No. 47), which is now pending before this Court.[7]  In its Proposed Amended Complaint, Pecos River abandons its fraud and false advertising claims, retains its trade libel claim, and adds new allegations based on intervening events that have come to light after this Court issued its decision.  (*See* ECF No. 47-5.)[8]

## C.    New Allegations

Pecos River's new allegations are based on two events: (1) the disclosure of a "Key" confirming the identities of the individuals in Dr. Moline's 2020 and 2023 Articles, and (2) a decision issued by the Eastern District of Virginia, *LLT Mgmt. LLC v. Emory*, 766 F. Supp. 3d 576 (E.D. Va. 2025), involving a different article related to Dr. Moline's work on asbestos exposure.

---

[6]    Aside from this threshold issue of fact versus opinion, the only other argument Defendant raised in its motion to dismiss was that Plaintiff failed to plead special damages.  (ECF No. 28-1 at 23-26.)  The Court stated it was "skeptical of Dr. Moline's argument" on this point because Plaintiff "pled that immediately after the 2020 Article's publication, [Plaintiff] experienced a decrease of the sales volume and profits from Johnson's Baby Powder."  (ECF No. 40 at 30 n.16.)  By contrast, the Court noted, "[o]ther claims for trade libel in this district have survived motions to dismiss with less robust allegations of damages."  (*Id.*)  The parties have not re-briefed this issue, so the Court's position has not changed.  Therefore, Plaintiff has pled special damages.

[7]    The Third Circuit stayed the appeal pending the resolution of this Motion.  *See Pecos River Talc LLC v. Moline*, No. 24-2345 (3d Cir.), Dkt. No. 31.

[8]    The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

1.      ***The Key***

In April 2025, in a separate matter in New York state court, the Appellate Division, First Department authorized the deanonymization of the identities of the individuals in the 2020 Article. (ECF No. 47-1 at 13 (citing *Johnson & Johnson v. Northwell Health Inc.*, 231 A.D.3d 481 (N.Y. App. Div. 2024)); *see also* ECF No. 47-6.)   The Key—a document listing the names of the individuals in the Article—confirmed that Kohr, Lanzo, Jackson, and Dalis were indeed four of the 33 subjects of the 2020 Article.  (ECF No. 47-5 ¶¶ 135, 148, 171, 179.)  But it also revealed, according to Pecos River, the identities of at least seven other individuals who "in fact were exposed to asbestos from sources other than cosmetic talc." (*Id.* ¶¶ 101-102.)  Pecos River alleges that the "extensiveness of the fraudulent nature of the Article demonstrates that Dr. Moline fabricated the data presented in her Article." (*Id.* ¶ 101.)

First is Carol Schoeniger. (*Id.* ¶¶ 184-191.)  Schoeniger filed a claim against cosmetic talc defendants, and Dr. Moline served as an expert in that case. (*Id.* ¶¶ 184-185.)  Schoeniger testified that her "husband sanded and applied joint compound in their home in the 1960s." (*Id.* ¶ 188.)  In her expert report, Dr. Moline wrote that "asbestos from joint compound that was applied and sanded in [Schoeniger's] home in the 1960s" was a "potential exposure" for Schoeniger.  (*Id.* ¶ 189.)  But in her Article, Dr. Moline "represented that Ms. Schoeniger had no exposure to asbestos other than talcum powder." (*Id.* ¶ 190.)

Pecos River alleges two similar examples.  In Edward Garcia's case, he "testified that he worked as a press operator at Eastern Molding." (*Id.* ¶ 196).  Dr. Moline wrote in her expert report that exposure to talc at that location represented a "potential exposure." (*Id.* ¶ 197.)  Yet in Dr. Moline's 2020 Article, she "represented that Mr. Garcia had no exposures to asbestos other than cosmetic talcum powder." (*Id.* ¶ 198.)  In Sharon Hanson's case, her husband "testified that he was potentially exposed to asbestos while working" at two different jobs from the 1970s to the

1990s.  (*Id.* ¶¶ 200, 205.)  Ms. Hanson testified that during her husband's employment at these two companies, she was primarily responsible for household laundry.  (*Id.* ¶ 205.)  Dr. Moline wrote in her expert report that Mr. Hanson's work represented a "'potential exposure' to Ms. Hanson."  (*Id.* ¶ 206.)  So, Pecos River alleges, "Dr. Moline's statement that there were no other asbestos exposures for Ms. Handson is knowingly false."  (*Id.* ¶ 207.)

Pecos River's other allegations are not based on Dr. Moline's underlying expert reports, but rather on the facts in the individual talc cases.  Mary Anne Caine was identified in the 2020 Article, but the complaint (and fact sheet) in her case alleged that, for a period of 26-years, she "may have been exposed to asbestos which may have been brought home on the clothing of her former husband."  (*Id.* ¶¶ 208-215.)  For Kayla Martinez, "a medical record" stated that "[h]er father worked at a company with known asbestos exposure and held her in his work clothes as a child."  (*Id.* ¶¶ 216, 220.)  For Barbara Arend, a "medical record" stated "Barbara denies any asbestos exposure ***other than the possibility of asbestos presence in the house where she grew up*** as a child."  (*Id.* ¶¶ 223, 227 (emphasis in original).)

The remaining allegations with respect to the 2020 Article are based on indirect connections between the individuals' testimony in the underlying talc litigation compared to Dr. Moline's statements about those topics in other scenarios.  First, Blondia Clemons testified that her father was a mechanic who performed several brake jobs a day, six days a week, at the family's home when Ms. Clemons lived there and that she would sometimes be on the porch only a few feet away from her father while he was working.  (*Id.* ¶¶ 238-239.)  Dr. Moline has served as an expert on behalf of plaintiffs who worked with brakes as a mechanic and "testified those plaintiffs were exposed to asbestos from that work."  (*Id.* ¶ 235.)  And Dr. Moline "has also testified that typically there is still exposure to asbestos 10 to 30 feet away from brake work."  (*Id.* ¶ 237.)

Second, Irma Verdolotti testified that her father worked as a steamfitter while she lived with him, (*id.* ¶¶ 242, 246), and that her sister worked in a shipyard warehouse during World War II while the sisters shared a room.  (*Id.* ¶ 247.)  Pecos River alleges that Dr. Moline has "testified that working in a shipyard is considered a classical occupational asbestos exposure" and that "Dr. Moline considers an individual to have a 'potential exposure' if their family member worked on a shipyard."  (*Id.* ¶¶ 249-250.)  Pecos River alleges "Dr. Moline testified that if there was evidence an individual's family member worked in a shipyard, that 'potential exposure' would mean the individual would not be in the Article."  (*Id.* ¶ 251.)

Based on the information in the Key, Pecos River added allegations that "Dr. Moline's stated purpose for her Article"—"underlin[ing] the importance of collecting detailed exposure histories . . . in patients presenting with mesothelioma"— "is not true but rather a pretext," (*id.* ¶ 310), and that "Dr. Moline fabricated the data presented in her Article," (*id.* ¶ 101.)

The Key also revealed the identities of the individuals in Dr. Moline's 2023 Article.  (*Id.* ¶ 260.)  It confirmed that Rimondi was in fact a subject of that Article.  (*Id.* ¶ 264).  And it also revealed, according to Pecos River, at least three other individuals in the Article who had exposure to asbestos.  Rafaella Marisco's complaint and interrogatory responses "asserted an exposure to asbestos from phenolic molding compounds at her prior employer."  (*Id.* ¶¶ 276, 279.)  But Dr. Moline's 2023 Article—which classified alternative asbestos exposure apart from cosmetic talc as "none," "possible," likely," and "definite" (ECF No. 29-2 at 2-3)—classified Marisco's alternative exposure as "none."  (ECF No. 47-5 ¶ 278.)  Santa Rea's "medical records state the fire-proof insulation where she lived and exposure to dust and debris in the aftermath of the 9/11 terrorist attacks is believed to be her asbestos exposures."  (*Id.* ¶¶ 281, 284.)  But Dr. Moline classified Rea in the same way as Marisco.  (*Id.* ¶ 283.)  And Dr. Moline classified Christina Lopez the same

despite "medical records stat[ing] that she had some asbestos exposure growing up in her home as well as in the canning factory she worked in." (*Id.* ¶¶ 286, 289.)

### 2. *The* Emory *Decision*

Pecos River's briefing relies heavily on the *Emory* decision. (*See* ECF 47-1 at 17-18, 24-30). In that case, the defendants published an article in a scientific journal "asserting that they had identified 75 people," not discussed in Dr. Moline's 2020 Article, "who had malignant mesothelioma but no known exposure to asbestos except through cosmetic talc." *Emory*, 766 F. Supp. 3d at 587. The plaintiff alleged that this statement was false because "at least six of the study's subjects had been exposed to non-talc asbestos." *Id.* at 588. The plaintiff sued for fraud, false advertising under the Lanham Act, and trade libel, and the defendants moved to dismiss the entire complaint. *Id.* at 587. The court denied the motion to dismiss with respect to the trade libel claim, which it analyzed under New Jersey law. *Id.* at 600. It analyzed whether the defendants' statement in the article was a nonactionable opinion or an actionable statement of fact by considering the statement's content, verifiability, and context. *Id.* at 600. The court found each factor favored actionability and therefore concluded that the statement was an actionable one of fact. *Id.* at 600-01.

Thus, based on the revelation of the Key and the approach adopted in *Emory*,[9] Pecos River asks this Court to revisit the final judgment under Rule 60(b)(2) and 60(b)(6).

---

[9] This Court finds the *Emory* decision is not a sufficient basis to grant relief. It has no bearing on the Rule 60(b)(2) "newly discovered evidence" requirement because "[t]hat phrase refers to evidence of facts," not new caselaw. *Brown v. Penn. R.R. Co.,* 282 F.2d 522, 527 (3d Cir. 1960), *cert. denied*, 365 U.S. 818 (1961). Nor is it relevant to the Rule 60(b)(6) "change in *controlling* precedent" analysis. *Bracey v. Superintendent Rockview SCI*, 986 F.3d 274, 295 (3d Cir. 2021) (emphasis added).

## II.    <u>LEGAL STANDARD</u>

Rule 60 governs motions for relief from a final judgment, order, or proceeding.  Under Rule 60(b), a party may seek relief from a final judgment and request that a case be reopened "under a limited set of circumstances." *Edwards v. New Jersey*, Civ. No. 22-2396, 2023 WL 3932848, at *2 (D.N.J. June 9, 2023) (quoting *Gonzalez v. Crosby*, 545 U.S. 524, 528 (2005)). "[T]he movant in a Rule 60(b) motion carries a heavy burden, as Rule 60(b) motions are viewed as 'extraordinary relief which should be granted only where extraordinary justifying circumstances are present.'" *Kiburz v. Sec'y, U.S. Dep't of the Navy*, 446 F. App'x 434, 436 (3d Cir. 2011) (quoting *Bohus v. Beloff*, 950 F.2d 919, 929 (3d Cir.1991)).

### A.    Rule 60(b)(2)

Rule 60(b)(2) outlines one of those six limited circumstances: it permits a court to grant relief from judgment based on "newly discovered evidence that, with reasonable diligence, could not have been discovered." Fed. R. Civ. P. 60(b)(2). To vacate a judgment under this Rule, 60(b)(2) "requires that the new evidence (1) be material and not merely cumulative, (2) could not have been discovered before trial through the exercise of reasonable diligence and (3) would probably have changed the outcome" of the previous proceeding. *Compass Tech. Inc.*, *v. Tseng Lab'ys, Inc.*, 71 F.3d 1125, 1130 (3d Cir. 1995) (citation omitted). "[W]hen the [previous] outcome is the granting of a motion to dismiss," the 60(b)(2) "inquiry requires analysis of whether the newly discovered evidence would have allowed Plaintiff[] to plausibly plead [its] claims." *TAL Props. of Pomona, LLC v. Village of Pomona*, Civ. No. 17-2928, 2019 WL 3287983, at *6 n.3 (S.D.N.Y. July 22, 2019).

In other words, the Court must determine whether the new, non-previously available information is sufficient for Plaintiff to likely state a claim under Rule 12(b)(6). To evaluate whether a litigant has stated a claim under Rule 12(b)(6), courts "accept the factual allegations in

18

the complaint as true, draw all reasonable inferences in favor of the plaintiff, and assess whether the complaint and the exhibits attached to it 'contain enough facts to state a claim to relief that is plausible on its face.'" *Wilson v. USI Ins. Serv. LLC*, 57 F.4th 131, 140 (3d Cir. 2023) (quoting *Watters v. Bd. of Sch. Dirs. of City of Scranton*, 975 F.3d 406, 412 (3d Cir. 2020)).  In addition to documents attached to the complaint, courts may consider documents that are "integral to or explicitly relied upon in the complaint." *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) (internal quotation marks and emphasis omitted).  To determine whether a court may consider those documents, the key question is "'whether the claims in the complaint are "based" on an extrinsic document and not merely whether the extrinsic document was explicitly cited' in the complaint." *Miller v. Brozen*, Civ. No. 23-2540, 2024 WL 4024363, at *5 (D.N.J. Aug. 30, 2024) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)).

### B.    Rule 60(b)(6)

Rule 60(b)(6) is a catch-all provision that permits vacating a final judgment when there is "any other reason that justifies relief."  Fed. R. Civ. P. 60(b)(6).  This "option is available only when Rules 60(b)(1) through (b)(5) are inapplicable." *Kemp v. United States*, 596 U.S. 528, 533 (2022).  "Even then, extraordinary circumstances must justify reopening." *Id.* (internal quotation marks and citation omitted).  "[W]hat must be shown are extraordinary circumstances where, without such relief, an extreme and unexpected hardship would occur." *Cox v. Horn*, 757 F.3d 113, 115 (3d Cir. 2014) (internal quotation marks and citation omitted).  District courts must employ a "flexible, multifactor approach to Rule 60(b)(6) motions . . . that takes into account all the particulars of a movant's case." *Id.* at 122.  One factor used to analyze hardship is whether there has been a "change in controlling precedent," although "intervening changes in the law *rarely* justify [60(b)(6)] relief without more." *Bracey v. Superintendent Rockview SCI*, 986 F.3d 274, 295 (3d Cir. 2021) (internal quotation marks and citation omitted) (emphasis in original).  Changes in

law carry "particular weight where . . . that change concerns a constitutional rule or right for criminal defendants." *Id.* (internal quotation marks and citation omitted). Other factors, independent of whether the motion is based on a change in controlling law, include "the risk of injustice to the parties and the risk of undermining the public's confidence in the judicial process." *Buck v. Davis*, 580 U.S. 100, 123 (2017) (internal quotation marks and citation omitted); *see also Lasky v. Cont'l Prods. Corp.*, 804 F.2d 250, 256 (3d Cir. 1986) (listing factors).

## III.   **DISCUSSION**

Pecos River argues "[t]wo aspects of the newly acquired evidence" support vacating the judgment. (ECF No. 47-1 at 21.) First, Pecos River argues it "now has multiple examples where Dr. Moline *herself* acknowledged that the [P]laintiff had a potential exposure to asbestos apart from cosmetic talc." (*Id.* (emphasis in original).) Second, "the sheer amount of examples of alternative exposures has increased dramatically." (*Id.*) Pecos River contends that the "content, verifiability, context" analysis—"particularly when viewed through the lens of the new *Emory* decision"—is therefore altered and the outcome has changed. (*Id.* at 21-30.) On top of that, Pecos River argues that "the falsity of Dr. Moline's Article has been revealed to be so extensive that Pecos River now has a good-faith basis to allege that 'Dr. Moline fabricated the data presented in her Article.'" (*Id.* at 29 (quoting ECF No. 47-5 ¶ 101).)

Dr. Moline argues "[t]he new evidence Pecos River cites would only add more detail to its reasons for disputing the conclusions Dr. Moline drew from her scientific research." (ECF No. 48 at 10.) But these conclusions, Dr. Moline argues, are ones the Court has already decided are non-actionable opinions, and the new evidence does not alter the "content, verifiability, context" analysis that the Court used to make this determination. (*Id.* at 10, 31.) As for the *Emory* decision, Dr. Moline argues that it does not qualify as "newly discovered evidence" under Rule 60(b)(2), nor should the Court draw on its reasoning for guidance because it could not "survive scrutiny

under Third Circuit law." (*Id.* at 39-40.) And with respect to fabrication, Dr. Moline argues this allegation "is not based on any new data" because "Pecos River does not cite, for example, any instance of Dr. Moline falsifying deposition transcripts." (*Id.* at 32.) Instead, "Pecos River admits that this is simply its own conclusion drawn from the supposedly 'extensive' examples of alternative exposures." (*Id.*)

The success of Plaintiff's Rule 60(b)(2) Motion depends on whether the new evidence enables Pecos River to state a claim for trade libel as alleged in its Proposed Amended Complaint. As discussed in this Court's previous Opinion, when evaluating a trade libel claim, a court must first analyze whether the contested statements are actionable because "[w]hether a statement is a nonactionable opinion is a threshold question of law." *Pacira*, 63 F.4th at 245 (citation omitted). And as the parties are aware, to determine whether a statement is a nonactionable opinion, "a court must consider three factors: (1) the content, (2) the verifiability, and (3) the context of the challenged statement." *Leang*, 969 A.2d at 1113 (internal quotation marks and citation omitted); *see also Pacira*, 63 F.4th at 245. However, "[i]f a statement could be construed as either fact or opinion" then "we must construe it as an opinion" because a "contrary presumption would 'tend to impose a chilling effect on speech.'" *Pacira*, 63 F.4th at 245 n.9 (quoting *Lynch v. New Jersey Educ. Ass'n*, 735 A.2d 1129, 1137 (N.J. 1999)). Against this backdrop principle, the Court reevaluates these three factors to determine whether the new evidence and corresponding allegations alter the outcome.

### A.    Content

As discussed in this Court's previous Opinion, "[e]valuation of content involves consideration not merely of a statement's literal meaning, but also of the fair and natural meaning that reasonable people of ordinary intelligence would give to it." *Id.* at 245 (quoting *Lynch*, 735 A.2d at 1136). The Court must determine whether "[t]he impression created by these words in the

mind of a reasonable person could be that they were purporting to state the truth of the matter, not merely the author's opinion." *NXIVM Corp.*, 2007 WL 1876496, at *8 (quoting *Church of Scientology Int'l v. Eli Lilly & Co.*, 778 F. Supp. 661, 668 (S.D.N.Y. 1991)). However, when evaluating a statement's fair and natural meaning, courts consider not only the specific statements at issue, but also the "content of the whole communication, its tone and apparent purpose." *Id.* at *8 (quoting *Immuno AG. v. Moor-Jankowski*, 567 N.E.2d 1270, 1281 (N.Y. 1991)). This is because the "context of a statement can affect significantly its fair and natural meaning." *Lynch*, 735 A.2d at 1137 (*citing Ward v. Zelikovsky*, 643 A.2d 972, 980 (N.J. 1994)). And, in the context of scholarly debate, "[i]solating challenged speech . . . indeed may result in identifying many more implied factual assertions than would a reasonable person encountering that expression in context." *Immuno AG.*, 567 N.E.2d at 1278, 1281 ("It has long been our standard in defamation actions . . . not to isolate particular phrases but to consider the publication as a whole.").

Based on these standards, this Court originally found that Dr. Moline's statements, in isolation, "appear to have a higher 'fact content' than the statements" in *Pacira* and *ONY*, and that "statements with a higher 'fact content' are more likely to be found actionable." (ECF No. 40 at 15.) Thus, this Court concluded that the "higher factual content of Dr. Moline's statements weighs in favor of finding that the statements are actionable." (*Id.*) However, the statements when "considered alongside their context" supported a finding that they were nonactionable opinions. (*Id.* at 17.)

The Court sees no reason to change its initial finding. The challenged statements are the same, so the content in isolation cannot change. As for content in light of context, Pecos River argues that the Court must "consider the content of the whole communication and its apparent purpose," (ECF No. 47-1 at 22 (citing ECF No. 40 at 17)), and "[g]iven the new evidence, this

Court should no longer credit Dr. Moline's stated purpose for her Article." (*Id.*)  Pecos River alleges that one of the Article's stated purposes—"underlin[ing] the importance of collecting detailed exposure histories . . . in patients presenting with mesothelioma"—is "not true but rather a pretext." (ECF No. 47-5 ¶ 310.)  The Court finds Pecos River's argument unpersuasive.

In its previous Opinion, this Court relied on *NXIVM Corporation* for the proposition that a court must consider the "content of the whole communication, its tone and apparent purpose." (ECF No. 40 at 15 (quoting *NXIVM Corp.*, 2007 WL 1876496, at *8).)  In *NXIVM Corporation*, defendants published articles on another defendant's website concluding that the plaintiffs' organization had characteristics of a cult or was "cult-like." *NXIVM Corp.*, 2007 WL 1876496, at *4-5.  When evaluating the content of the challenged statements, the court concluded that "a reasonable reader would not believe that the articles contain assertions of fact that [p]laintiffs' organization constitutes a cult." *Id.* at *8.  The court's content finding was based in large part on the context in which the alleged defamatory statements were made. *Id.* (citing *Farber v. City of Paterson*, Civ. No. 03-4535, 2006 WL 3485919, at *5 (D.N.J. Nov. 29, 2006) (stating that the determination of whether the content of an article was defamatory could not be made without examining the context within which the statements were made)).  The court explained that the "context of the alleged defamatory statements may be the most important of the three factors" and requires the court to evaluate the impression of a reasonable reader. *Id.* at *12.  Evaluating a reader's reasonable impression, the court stated, involves "assessing the impression created by words used, as well as the general tenor of the expression, as experienced by a reasonable person." *Id.* (internal quotation marks and citation omitted).  Courts are also "required to take into consideration the larger context in which the statements were published." *Id.* (quoting *Brian v. Richardson*, 660 N.E.2d 1126, 1130 (N.Y. 1995)).

The *NXIVM* court found that the tone and tenor of the articles at issue were analytical because the articles offered an academic critique and analysis of the plaintiffs' programs. *Id.* at *13. The court explained that the authors were offering their opinions based on their academic and occupational training as well as research in their respective fields. *Id.* at *9. The court also concluded that when viewing the websites on which the articles were published, in a broader context, the websites included a disclaimer that "the materials therein offer viewpoints" that were not expressly endorsed or supported. *Id.* at *12. Thus, the court concluded that, unlike "reporting coverage or news," the "articles indicate[] to a reasonable reader that information contained on the website is rife with opinions and viewpoints. It does not contain statements of fact." *Id.*

The same analysis applies here. This Court's content in light of context evaluation is based on the impression of a reasonable reader—not any motive of Dr. Moline's. The Article is published in a peer-reviewed journal and is premised on Dr. Moline's academic and occupational training. (*See* ECF No. 1-2.) Therefore, the tone and tenor of the Article's statements regarding no known exposures supports a finding of non-actionability. And, when viewed in the broader context, the Article provides disclaimers: the conclusions were tentative; the cases were referred to Dr. Moline "as part of tort litigation;" and Dr. Moline had a conflict of interest in having served "as an expert witness[] in asbestos litigation, including talc litigation for plaintiffs." (*Id.* at 2, 6.) Thus, the Article indicates to a reasonable reader that the information contained therein is "rife" with opinions and not statements of fact. *See NXIVM Corp.*, 2007 WL 1876496, at *12. Therefore, the Court's conclusions on this factor remain the same: content in light of context militates in favor of non-actionability. Having touched on context, the Court will turn to it next.

**B.    Context**

In further considering context, New Jersey courts examine the "medium by which the statement is disseminated and the audience to which it is published." *Pacira*, 63 F.4th at 248

(quoting *Wilson v. Grant*, 687 A.2d 1009, 1014 (N.J. Super. Ct. App. Div. 1996)) (citing, among others, *NXIVM Corp.*, 2007 WL 1876496, at *10 (noting that the case considered statements "in the context of a scholarly article")). "While statements are not protected solely because they appear in a peer-reviewed journal, such journals are often 'directed to the relevant scientific community,'" and the members of that community are "best positioned to identify opinions and 'choose to accept or reject [them]." *Id.* (citations omitted and alteration adopted).

The Court previously found the context factor favored Dr. Moline when (1) her statements were made in a peer-reviewed journal, (2) she provided "readers with the methodology on which the statements were based," (3) she "expressly noted the Article's limitations," (4) she "use[d] language framing [the Article's] conclusions as tentative opinions," and (5) the Article adopted an "analytical tone and tenor." (ECF No. 40 at 26-27.) These factors, taken together, "notif[ied] readers that Dr. Moline's statements should be understood as scientific conclusions that are 'tentative and subject to revision.'" (*Id.* (quoting *Pacira*, 63 F.4th at 246).)

In arguing the context analysis has changed, Pecos River narrows in on two of the Court's prior reasons: the Article's disclosed limitations and the tentative language framing Dr. Moline's conclusions as opinions. First, Pecos River argues the context has changed because "[n]one of th[e] 'limitations' are relevant for the new evidence." (ECF No. 47-1 at 29.) Dr. Moline's 2020 Article acknowledged its limits: (1) Dr. Moline had a conflict of interest due to her role as a plaintiff's expert in the underlying tort cases; and (2) the data used to collect study participants was obtained from medical records and deposition transcripts rather than in-person interviews. (ECF No. 1-2 at 2, 7.) Pecos River argues that these limitations are irrelevant because Dr. Moline "does not disclose that she would flagrantly misrepresent the facts." (ECF No. 47-1 at 29.) Second, Pecos River targets the language's framing, contending that the tentative approach

25

"concerns what *conclusions* [Dr. Moline] claims to draw from her stated facts" but "the stated facts that serve as the premise are false" and "are not expressed with any tentative language." (*Id.* at 29-30 (emphasis added).) Dr. Moline argues that the context is static. (ECF No. 48 at 31.)

Like the content factor, the Court finds this factor is similarly unchanged. Again, the statements here were made in a peer-reviewed journal whose readers are positioned to identify opinions and "choose to accept or reject [them] on the basis of an independent evaluation of the facts." *Pacira*, 63 F.4th at 248 (citation omitted and alteration adopted). Pecos River does not appear to challenge this proposition but rather contends that there has to be "*some point*" where the falsity of even a journal article is so flagrant that a trade libel claim is viable. (ECF No. 47-1 at 30 (emphasis in original).) Indeed, Pecos River's arguments focus on the alleged "flagrant[] misrepresent[ation of] the facts" and that the "stated facts that serve as the premise are false." (*Id.* at 29-30.) The Court will address the alleged fabrication under the verifiability factor. But as for the context factor, it remains unchanged and in favor of non-actionability.

## C. Verifiability

The "verifiability" prong requires the Court to determine whether the statements at issue are pure statements of fact "capable of . . . truth or falsity," or constitute "tentative scientific conclusions" that are more closely akin to nonactionable opinions. *Pacira*, 63 F.4th at 246-47. "Requiring that a statement be verifiable ensures that defendants are not punished for exercising their First Amendment right to express their thoughts." *Ward*, 643 A.2d at 979. And as a practical matter, courts "require verifiability because . . . the trier of fact who is charged with assessing a statement's truth will have considerable difficulty returning a verdict based upon anything but speculation" if the "statement lacks a plausible method of verification." *Id.* (internal quotation marks omitted). A "term without a universal or concrete meaning . . . is not a verifiable fact." *NXIVM Corp.*, 2007 WL 1876496, at *11 (finding defendant's "characterization of [plaintiff] as a

26

cult" not verifiable); *see also Lynch*, 735 A.2d at 1137 ("A statement's verifiability refers to whether it can be proved true or false [and] [a]bsent a settled meaning, the truth or false of [the statement] is not susceptible to such proof.").

In *Pacira*, the Third Circuit found this factor favored non-actionability when (1) the challenged statements were "tentative scientific conclusions and were expressly disclosed as such" and (2) the allegations "boil[ed] down to disagreements about the reliability of the methodology and data underlying the statements." 63 F.4th at 246-47. These type of disagreements—such as disputes over what variables were factored in—had no bearing on whether the "statements themselves were verifiable." *Id.*

This Court originally found the verifiability factor favored Dr. Moline. It walked through the allegations concerning the previously known or suspected participants in the 2020 Article— Bell, Lanzo, Dalis, Jackson, and Kohr—and reasoned "[t]he fact that Dr. Moline could conceivably explain why these other alleged sources do not constitute 'known asbestos exposure' shows that the statement is a scientific opinion, and not a matter of truth or falsity." (ECF No. 40 at 17-22.) These cases demonstrated that Dr. Moline's statements were inferences drawn from her review of deposition transcripts and medical records. These inferences, this Court concluded, went to questions regarding the reliability of her findings but not their verifiability. (*Id.* at 20-21.)

Pecos River argues that the verifiability analysis has changed because Dr. Moline can no longer, nor should she be afforded the opportunity to, "'conceivably explain why these other alleged sources do not constitute 'known asbestos exposure.'" (ECF No. 47-1 at 25 (quoting ECF No. 40 at 22).) Dr. Moline argues that the new examples do not, and could not, change the verifiability analysis. The Court, Dr. Moline contends, "did not even need to analyze Pecos River's" original examples when analyzing verifiability. (ECF No. 48 at 31.) It only did so "to

27

illustrate why any attempt by Pecos River or any other litigant to disprove the Articles' statements about 'known exposures' would be an attack on scientific opinions." (*Id.*) Those attacks would entail "questioning the inferences drawn from data" and would have no bearing on the statements' verifiability. (*Id.*)

The Court again concludes that Dr. Moline's statements about "known" exposures constitute a scientific opinion. Opinion statements are generally not capable of proof of truth or falsity because they reflect a person's state of mind—here, what Dr. Moline believes to constitute a "known" versus "potential" exposure. *See Ward*, 643 A.2d at 979. Hence, opinion statements generally have received substantial protection under the law. *Id.* As the United States Supreme Court stated, "Under the First Amendment there is no such thing as a false idea." *Id.* (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339 (1974)). However, the Supreme Court also clarified that there is not a "wholesale defamation exemption for anything that might be labeled 'opinion.'" *Id.* (quoting *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 18 (1990)). In other words, if a statement "explicitly or implicitly rests on false facts," the alleged statement will be actionable. *Id.* Thus, a plaintiff must allege that the underlying or implied facts are untrue. *Id.* at 531-32; *see also Pacira*, 63 F.4th at 247 n.14 (noting that an opinion drawn from falsified or fraudulent data may be actionable); *NXIVM Corp.*, 2007 WL 1876496, at *7 ("Harm from a defamatory opinion statement is redressable when the statement implies underlying objective facts that are false.") (quoting *Ward*, 643 A.2d at 979); *ONY*, 720 F.3d at 498 ("We therefore conclude that, to the extent a speaker or author draws conclusions from *non-fraudulent* data . . . those statements are not grounds for a claim of false advertising.") (emphasis added); *CrossFit, Inc. v. Nat'l Strength & Conditioning Ass'n*, Civ. No. 14-1191, 2016 WL 5118530, at *6-7 (S.D. Cal. Sept. 21, 2016).

Pecos River alleges for the first time that "Dr. Moline fabricated the data presented in her Article." (ECF No. 47-5 ¶ 101.) And Pecos River argues that it now "has a good-faith basis" to make this allegation following the production of the Key. (ECF No. 47-1 at 28.) The Court finds that Pecos River's new allegations concerning the fabrication of data are sufficient to survive a motion to dismiss. Pecos River now confirms the individuals included in Dr. Moline's 2020 Article—information that could not have been previously discovered until the production of the Key. Pecos River also adds allegations regarding eight additional individuals in the 2020 Article. Despite Dr. Moline's representation that for the 33 case studies, she reviewed "each individual's medical records and sworn testimony" and found that "[n]o individual identified any asbestos exposure apart from contaminated talcum powder,"[10] (ECF No. 1-2 at 2, 5), Pecos River adds allegations of asbestos exposure identified by these individuals in medical records and sworn statements. (*See* ECF No. 47-5 ¶¶ 220-221 ("A medical record for Ms. Martinez states: 'Her father worked at a company with known asbestos exposure and held her in his work clothes as a child.'"); *id.* ¶ 227 (identifying medical record stating, "[Ms. Arend] denies any asbestos exposure ***other than the possibility of asbestos presence in the house where she grew up*** as a child (apparently this was an old house that might have ha[d] asbestos shingles")) (emphasis in original); *id.* ¶¶ 238-239 ("Ms. Clemons testified that her father was a mechanic and performed two to three brake jobs a day, six days a week, at the family's home during the entire period that Ms. Clemons resided

---

[10]    While the Court recognizes that this challenged statement may be an actionable statement of fact, it is skeptical that the statement, in isolation, could support a trade libel claim. *See Mayflower Transit, LLC*, 314 F. Supp. 2d at 378 (D.N.J. 2004) (requiring that challenged statement "concern[s]" a defendant's "property, product, or business"); *see also NXIVM Corp.,* 2007 WL 1876496, at *10 ("[E]ven if these statements are false statements of fact, they do not disparage [p]laintiffs' program."). Therefore, the Court finds this challenged statement more relevant to the data fabrication inquiry and analyzes it accordingly.

there."); *id.* ¶¶ 246-247 (alleging that Verdolotti testified that her father worked with insulation as a steamfitter and that her sister worked in a shipyard while she lived with them during World War II).) At bottom, Pecos River's new allegations when accepted as true for purposes of a motion to dismiss render it plausible that Dr. Moline fabricated or misrepresented the underlying data from which her conclusions were drawn.[11]

The Court maintains that Dr. Moline's conclusions are not statements of fact for trade libel purposes. However, because "a conclusion drawn from falsified or fraudulent data may be actionable," *Pacira*, 63 F.4th at 247 n.14, the Court finds Plaintiff has alleged enough under Rule 12(b)(6) and therefore will award relief from the final judgment under Rule 60(b)(2).[12]

## IV.   CONCLUSION

For the foregoing reasons, and other good cause shown, Plaintiff's Motion (ECF No. 47) is **GRANTED**. An appropriate Order follows.

Dated: February 27, 2026

Georgette Castner

**GEORGETTE CASTNER**
**UNITED STATES DISTRICT JUDGE**

---

[11]   For similar reasons, the Court finds that Pecos River has adequately alleged data fabrication with respect to Dr. Moline's 2023 Article. (*Compare* ECF No. 29-2 at 3 (stating data comprised of "individual's medical records . . . [and] sworn testimony"), *with* ECF No. 47-5 ¶¶ 283-284 (Dr. Moline concluded "Certainty of Alternate Exposure: None" for Rea but "Ms. Rea's medical records state the fire-proof insulation where she lived and exposure to dust and debris in the aftermath of the 9/11 terrorist attacks is believed to be her asbestos exposures"), *and id.* ¶¶ 288-289 (concluding the same for Lopez even when her "medical records stated that she had some asbestos exposure growing up in her home as well as in the canning factory she worked in").)

[12]   Because the Court finds Plaintiff has met its burden under Rule 60(b)(2), relief under Rule 60(b)(6) is inapplicable. *See Kemp v. United States*, 596 U.S. 528, 533 (2022).