Peter C. Harvey
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036-6710
Telephone: (212) 336-2000
Fax: (212) 336-2222
pcharvey@pbwt.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| PECOS RIVER TALC LLC,<br><br>　　　　　　　　Plaintiff,<br><br>　　　-v-<br><br>DR. JACQUELINE MIRIAM MOLINE,<br><br>　　　　　　　　Defendant. | Civil Action No.<br><br>**JURY TRIAL<br>DEMANDED** |

## AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

PARTIES.................................................................................................................4

JURISDICTION.....................................................................................................7

FACTS ...................................................................................................................8

I.      Dr. Moline: Plaintiffs' Paid Expert Witness....................................................8

II.     Dr. Moline Has Repeatedly Published Disparaging Statements About
        Johnson's Baby Powder and Shower to Shower in Multiple Forums...........10

        A.      Dr. Moline Published an "Influential" and "Groundbreaking"
                Talc Article.................................................................................10

        B.      Dr. Moline Repeatedly Republished Her False and Disparaging
                Statements ...................................................................................14

III.    Dr. Moline Knew Her Statements Were False or Recklessly Ignored
        Available Information Demonstrating Their Falsity When Made ................24

        A.      Dr. Moline's Intimate Knowledge of the True Asbestos
                Exposures of the 33 Individuals Referenced in the Article ...............25

        B.      The Record Now Shows that Individuals in the Article Claimed
                Exposures to Asbestos from Sources Other than Talc.......................27

IV.     Dr. Moline and Plaintiffs' Counsel Concealed the Falsity of Her
        Statements...................................................................................................61

V.      Dr. Moline Was Motivated by Fame and Fortune........................................62

VI.     Dr. Moline's Statements Perpetuated a Decades-Long Fraud in
        Asbestos Litigation .....................................................................................65

VII.    Pecos River Was Gravely Harmed by Dr. Moline's False Statements.........68

CAUSES OF ACTION ........................................................................................70

        Count I: Injurious Falsehood / Product Disparagement .............................70

PRAYER FOR RELIEF .......................................................................................76

DEMAND FOR JURY TRIAL .............................................................................77

i

## LOCAL CIVIL RULE 10.1(a) STATEMENT

Pursuant to Local Civil Rule 10.1(a), the names and addresses of the parties

to this action are:

- The address of Plaintiff Pecos River Talc LLC's principal place of business is One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933

- Defendant Dr. Jacqueline Miriam Moline's address is 223 W. 19th Street, Apt 5, New York, NY 10011.

ii

## INTRODUCTION

1. This is an action to recover for the knowing and repeated disparagement of Johnson's Baby Powder and Shower to Shower by Dr. Jacqueline Moline.

2. In 2019, Dr. Moline published an article claiming that 33 individuals who used talc powder and developed the asbestos-related cancer mesothelioma had no other potential exposures to asbestos—pointing the finger squarely at talc products such as Johnson's Baby Powder. *See* **Exhibit A**, Moline, et. al., *Mesothelioma Associated With the Use of Cosmetic Talc* (2019) (the "Moline Article" or the "Article") (reporting on individuals with pleural or peritoneal mesothelioma).

3. Dr. Moline knew that claim was false when she made it, and that individuals she referenced in her Article had admitted to—and indeed had made claims seeking compensation for—exposure to other sources of asbestos, or she recklessly disregarded substantial evidence of these individuals' alternative exposures. Dr. Moline nonetheless reiterated her false claims to the media, in scientific literature, at public conferences, and to Congress, judges and juries.

4. Dr. Moline engaged in this widespread deception—not for any laudable public purpose—but for her own personal aggrandizement and gain. She received accolades, speaking opportunities, and acclaim for her self-proclaimed novel and disruptive study. And her disparaging statements provided a foundation for the mass

1

tort asbestos plaintiffs' bar's baseless claims against Pecos River, which richly compensated her with millions of dollars of fees to act as their "expert" and mouthpiece.

5.     Dr. Moline's deception was laid bare in September 2022 by a federal judge in the District Court for the Middle District of North Carolina who rejected the efforts of certain plaintiffs' law firms for whom Dr. Moline works to keep the evidence of her deceit under seal. *See* **Exhibit B**, *Bell v. Am. Int'l Indus. et al.*, No. 1:17-CV-00111 (M.D.N.C. Sept. 13, 2022), ECF No. 398 at 4, 17, 22 (the "*Bell* Opinion"). The *Bell* Opinion excoriated Dr. Moline because of her "concealment" of information about occupational asbestos exposures of Betty Bell—a plaintiff in cosmetic talc litigation who was also confirmed to be one of the individuals included in Dr. Moline's article. *Id.* at 16-18, 20. The court found that the inclusion of an individual with asbestos exposures apart from allegedly contaminated talc had "direct bearing on the study's credibility" as it contradicted the entire foundation of the Article. The Court also expressed grave concern about the "groundbreaking nature" and "widespread influence" of the Moline Article "on the cosmetic talc litigation nationwide" given that this critical information had been shielded from public disclosure until the *Bell* Opinion was issued. *Id.*

6.     As Dr. Moline intended, her disparaging statements have caused Pecos River significant and ongoing commercial, reputational, and financial harm. In fact,

when Pecos River's predecessor announced that it would stop selling talc-based Johnson's Baby Powder in North America, it cited "declining" demand "due in large part to changes in consumer habits" that were "fueled by misinformation around the safety of the product and a constant barrage of litigation advertising." The Moline Article is a central element of that misinformation.

7.    With her malfeasance now unveiled, Dr. Moline should be held accountable for the egregious harm she has caused to Pecos River, and should be required to retract her Article and issue corrective disclosures. Further, the deliberate nature of Dr. Moline's conduct demands a stringent award designed to deter such conduct, which has become a hallmark of the mass tort plaintiffs' bar's business model.

8.    Indeed, the revelation of Dr. Moline's deceit is only further affirmation of a long-running and troubling trend of doctors leveraging their credentials to fabricate false narratives and support "junk science" to bolster the mass tort plaintiffs' bar's claims.[1] These purported experts contrive baseless opinions, which

---

[1] As just one example, in December 2022, the Southern District of Florida dismissed thousands of product liability claims advanced against pharmaceutical manufacturers, detailing the unfounded, unreliable and unscientific opinions that had been submitted by a roster of plaintiffs' experts—including Dr. Anne McTiernan, who also partnered with Dr. Moline to fabricate a false narrative regarding the very talc products at issue here. *In re Zantac (Ranitidine)*, MDL No. 2924, Doc. No. 6120 (S.D. Fla. Dec. 6, 2022). The long history of manipulating science in asbestos litigation, and now talc litigation, is laid out in more detail in Section VI below.

plaintiffs' lawyers then use to confuse juries, secure extreme verdicts, and in turn pay these same experts. This trend is on a steep upward trajectory, with increased litigation financing fueling extensive lawyer advertising that solicits large volumes of claimants regardless of merit. And all the while, the plaintiff firms and experts fight to conceal their duplicity behind protective orders and have fought disclosure of key facts that would illuminate this deceit.

9.    This cycle must end. The false narratives contrived by purported experts like Dr. Moline cause harm to the manufacturers whose products they target—and to those individuals who are suffering from harm wrongly attributed to such products. Rather than addressing the actual cause of their harm, these individuals are led astray by contrived claims amplified by the law firms that purport to represent their interests. This is a grave wrong that must be righted.

## PARTIES

10.    Pecos River Talc LLC ("Pecos River") is a Texas limited liability company with its principal place of business in New Jersey.

11.    Pecos River has one member: Johnson & Johnson Holdco (NA) Inc. Johnson & Johnson Holdco (NA) Inc. is a citizen of New Jersey. Johnson & Johnson

---

Sadly, the Moline Article is just the latest iteration that has come to light, but its impact—particularly as to Pecos River—has been substantial.

Holdco (NA) Inc. is a corporation incorporated in and with its principal place of business in New Jersey. Pecos River is therefore a citizen of New Jersey.

12. This case was originally filed by LTL Management LLC, which later changed its name to LLT Management LLC. In 2024, a restructuring occurred. LLT Management LLC ceased to exist and three new Texas limited liability companies were created, among which the liabilities and assets which formerly belonged to LLT were allocated. One of those was Pecos River.

13. Pecos River was allocated any direct talc personal injury claim that (i) alleges that the relevant injured or deceased individual was exposed to talc or the product or material containing talc, as applicable, in Canada or resided in Canada at the time such direct talc personal injury claim is filed, or was brought, threatened, or pursued in any court in Canada ("Canadian Talc Personal Injury Claims"); (ii) any talc personal injury claim asserted or assertable by or on behalf of any governmental unit under any federal, state, international or foreign consumer or employee protection rule, statute, or regulation ("Governmental Action Claims"); (iii) any direct talc personal injury claim that alleges that the relevant injured or deceased individual developed Mesothelioma or Lung Cancer (and not ovarian cancer, gynecological cancer, or any other disease) in connection with such individual's use of talc or a product or material containing talc ("Mesothelioma/Lung Cancer Talc

5

Personal Injury Claims"); and (iv) any indirect talc personal injury claims to the extent in respect of any of the foregoing; and specified assets.[2]

14. As relevant to this case, Pecos River was allocated both the liabilities and assets of the mesothelioma litigation in which LLT Management LLC (f/k/a LTL Management LLC) was involved, including this case, which asserts claims of trade libel arising from Defendant Dr. Jacqueline Miriam Moline's false statements about an association between cosmetic talcum powder use and the subsequent development of mesothelioma.

15. Pecos River was substituted for LTL Management LLC in the Third Circuit, and that substitution was uncontested. *See Pecos River Talc LLC v. Moline*, No. 24-235 (3d Cir.), Dkt. No. 19.[3]

16. As such, Pecos River now stands in the shoes of LLT Management LLC's (f/k/a LTL Management LLC) as the proper party to pursue this case as plaintiff. This Complaint will use "Pecos River" to refer to both itself and its predecessors.

---

[2] Pecos River was not allocated any claims of Imerys Talc America, Inc., Cyprus Mines Corporation or any of their current or former affiliates for contribution, reimbursement, subrogation, or indemnity.

[3] Further details regarding the restructuring can be found in Pecos River's substitution motion before the Third Circuit. *See id.*, Dkt. No. 16.

17.    Defendant Dr. Jacqueline Miriam Moline is an Occupational Medicine specialist and Professor of Occupational Medicine, Epidemiology and Prevention and Internal Medicine, and the Chairperson of the Department of Occupational Medicine, Epidemiology and Prevention at the Donald & Barbara Zucker School of Medicine at Hofstra/Northwell, as well as Director of the Northwell Health Queens World Trade Center Health Program, and Director of the New York State funded Occupational and Environmental Medicine of Long Island Clinical Center. Dr. Moline is a citizen of New York.

18.    Dr. Moline has been disclosed as a plaintiff's expert in over 200 cosmetic talc/mesothelioma cases against Pecos River. She has provided deposition testimony in at least 46 talc/mesothelioma cases against Pecos River, as well as trial testimony in 16 of those cases.

## JURISDICTION

19.    This Court has subject matter jurisdiction pursuant to 28 U.S.C § 1332. The parties are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest, costs and fees. Pecos River is a citizen of New Jersey, and Dr. Moline is a citizen of New York.

20.    Venue is proper under 28 U.S.C. § 1391, which provides for proper venue in the judicial district in which a substantial part of the events or omissions

7

giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.

**FACTS**

**I.      Dr. Moline: Plaintiffs' Paid Expert Witness**

21.     Dr. Moline has made a career and small fortune testifying on behalf of the mass tort asbestos plaintiffs' bar. She has been testifying as a paid expert in asbestos litigation for over 20 years, always on behalf of plaintiffs. For playing that role, she is paid between approximately $250,000 and $300,000 per year (about 40% of her total income) and, in aggregate, has received over $3 million.

22.     In recent years, Dr. Moline's testimony mainly was in mesothelioma cases against Pecos River (and other manufacturers of talc powder products)—having been disclosed as a plaintiff's expert in over 200 cases, provided deposition testimony in at least 46 cases, and testified in 16 separate trials against Pecos River.

23.     Even before the controversy concerning the Article, Dr. Moline's reliability has faced heavy criticism. Notably, multiple appellate courts have excluded her opinions or found them insufficient to establish that, as she posited, the asbestos in the talc products at issue caused mesothelioma.[4]

---

[4] Dr. Moline's opinions on the cause of mesothelioma also were rejected in cases involving other products. In *Juni*, Dr. Moline testified that asbestos allegedly in Ford Motor Company's friction products caused the plaintiff's mesothelioma. The New York Appellate Division found her opinion "insufficient" to, in fact, establish causation: "The evidence presented by plaintiff here was insufficient because it

8

24.     In *Lanzo*—a cosmetic talc case against Pecos River—the New Jersey Appellate Division "concluded that the trial court erred by allowing … Moline to provide expert testimony that non-asbestiform minerals can cause mesothelioma." *Lanzo v. Cyprus Amax Mins. Co.*, 467 N.J. Super. 476, 513 (N.J. App. Div. 2021).

25.     In *Olson*—another cosmetic talc case against Pecos River—the New York Appellate Division reversed judgment entered in plaintiffs' favor, concluding that Dr. Moline, as plaintiff's medical causation expert, failed "to establish sufficient exposure to a substance to cause the claimed adverse health effect." *Matter of New York City Asbestos Litig. (Olson)*, 207 A.D.3d 415, 416 (N.Y. 1st Dep't 2022).

26.     In *Nemeth*—a cosmetic talc case against another company—the New York Court of Appeals again concluded that Dr. Moline's opinion was insufficient to establish causation. The Court stated: "[T]he studies or scientific literature cited or relied upon by Dr. Moline" did not "provide the necessary support for her conclusion as to proximate causation." *Nemeth v. Brenntag N. Am.*, 38 N.Y.3d 336, 345 (2022).

---

failed to establish that the decedent's mesothelioma was a result of his exposure to a sufficient quantity of asbestos in friction products sold or distributed by defendant Ford Motor Company." *In re New York City Asbestos Litig. (Juni)*, 148 A.D.3d 233, 236-37, 239 (N.Y. App. Div. 1st Dcp't 2017). Thc Ncw York Court of Appeals affirmed. *Matter of N.Y.C. Asbestos Litig. (Juni)*, 32 N.Y.3d 1116, 1122 (2018).

9

27. These appellate courts' determinations of the unscientific and unreliable nature of the testimony Dr. Moline has offered time and again in various courts against Pecos River and others affirms Dr. Moline's proclivity to make knowingly false and disparaging statements published outside of court to the scientific community and general public.

## II. Dr. Moline Has Repeatedly Published Disparaging Statements About Johnson's Baby Powder and Shower to Shower in Multiple Forums

### A. Dr. Moline Published an "Influential" and "Groundbreaking" Talc Article

28. Starting in October 2019, Dr. Moline repeatedly and widely published disparaging statements regarding talc powder products, including, in particular, Johnson's Baby Powder and Shower to Shower.

29. Specifically, Dr. Moline repeatedly asserted that she had conducted the *first comprehensive* case study review of individuals whose *sole exposure to asbestos* was talc, and determined that the asbestos contamination in those talc products had caused their mesothelioma.

30. Dr. Moline concocted this "study"—along with another prominent plaintiffs' expert witness in asbestos and talc cases (Ronald E. Gordon, Ph.D.)—after courts began routinely excluding Dr. Moline's testimony regarding causation in other litigation cases, as discussed further below.

10

31.    That scheme culminated in Dr. Moline and her co-authors' publication of an article in the widely read Journal of Occupational and Environmental Medicine entitled *Mesothelioma Associated With the Use of Cosmetic Talc*. Ex. A, Moline Article. The Article became available online on October 10, 2019.

32.    As lead author, Dr. Moline asserted that the Article presented "the first large case series to identify cosmetic talcum powder contaminated with asbestos as the cause of malignant mesothelioma in cosmetic talc users." Ex. A, Moline Article at 14.

33.    Dr. Moline "present[s] 33 cases of individuals with malignant mesothelioma who were exposed to commercial talcum powder products." Ex. A, Moline Article at 11.

34.    These 33 individuals are all plaintiffs in litigation where Dr. Moline serves as an expert witness on behalf of plaintiffs' counsel. Ex. A, Moline Article at 11. Dr. Moline did not do any new investigation for any of the cases that had not already been done in litigation.

35.    The Article identifies Johnson's Baby Powder and Shower to Shower as the talc powders most commonly used by the individuals.[5]

---

[5] The Article asserts that the 33 individuals used 22 different brands of talc. Ex. A, Moline Article at 11, 15. Each brand is identified by a letter A through V. The Article contains "Appendix 3" for "type of talcum powder used," and provides a publicly available link to the Appendix: http://links.lww.com/JOM/A651. Ex. A,

11

36.    Dr. Moline also buttressed the Article by citing to 2017 statistics from the website Statista. Ex. A, Moline Article at 11 n. 26. Statista's 2017 statistics show that Johnson's Baby Powder was the most commonly used brand of talc, accounting for approximately 52% of users. That website also shows that Shower to Shower was the second most popular brand, accounting for approximately 17% of users (for a total of just under 70%).

37.    In the Article, Dr. Moline also relies on litigation testing that specifically names "Johnson & Johnson Baby Powder" and "Shower to Shower." Ex. A, Moline Article at 14 n. 35.[6]

---

Moline Article at 12. The Appendix is a key identifying which brand corresponds to each letter. It identifies Johnson's Baby Powder as "D" and Shower to Shower as "I." Ex. A, Moline Article at App'x 3. Of the 33 cases, 19 (over half) used Johnson's Baby Powder (brand "D"). Ex. A, Moline Article at 15. Johnson's Baby Powder was used by more individuals in the Article than any other brand. Ex. A, Moline Article at 15.

[6] This testing was conducted by Dr. William Longo, another professional plaintiffs' expert witness and a central figure in talc litigation. Dr. Longo suffers from a similar flaw to Dr. Moline, having falsely testified under oath at least 10 times—including in litigation against Pecos River—that before he was retained in talc cases, his laboratory had never tested cosmetic talc for the presence of asbestos. In reality, he had tested cosmetic talc and not found any asbestos, calling the idea of asbestos contamination an "an urban legend." That all changed when Dr. Longo was hired as a plaintiffs' expert in talc litigation. Suddenly, Dr. Longo began to find "trace" asbestos in virtually every sample of talc that he tested. His new tactic: *Call it asbestos even if it's not.* At this point, Dr. Longo will even call talc "asbestos" by using an unpublished and self-invented method of detection. Other scientists, including another plaintiff-side expert, have said that what Dr. Longo is calling "chrysotile asbestos" is really nothing more than talc. But juries,

38.    Notably, however, Dr. Moline *did not disclose* the names of the 33 individuals featured in the Article and has actively *attempted to conceal* the individuals' identities (as discussed further below).

39.    The Article states multiple times that the subjects of the Article had *no other exposure to asbestos* apart from alleged exposure to asbestos from talcum powder:

- "Objective: To describe 33 cases of malignant mesothelioma among individuals with no known asbestos exposure other than cosmetic talcum powder." Ex. A, Moline Article at 11.

- "Results: Asbestos of the type found in talcum powder was found in all six cases evaluated. Talcum powder usage was the only source of asbestos for all 33 cases." Ex. A, Moline Article at 11.

- "For all 33 cases, other potential exposures to asbestos were considered, with no identified source apart from the talcum powder." Ex. A, Moline Article at 11.

- "The table identifies talcum powder as the only asbestos exposure these patients have experienced. No individual identified any asbestos exposure apart from contaminated talcum powder from workplace or household exposures." Ex. A, Moline Article at 14.

- "Like Wagner, we present 33 cases, predominantly of women, who had no known exposure to asbestos other than prolonged use of talcum powder." Ex. A, Moline Article at 14.

---

judges, and the American public are told time and again that Dr. Longo has found asbestos in talc, including in Johnson's Baby Powder.

13

40.    Dr. Moline did not provide the peer reviewers with any of the underlying materials, so they had no way to vet Dr. Moline's assertion that none of the Article's subjects had alternative asbestos exposures.

41.    Since publishing the Article, Dr. Moline has doubled down on this proposition, testifying that a potential alternative asbestos exposure would have excluded that individual from the Article's case series.

42.    Indeed, as a North Carolina federal court has explained, the premise that all 33 cases did not have other potential exposures to asbestos apart from talcum powder was the "principal factual underpinning of the article." Ex. B, *Bell Opinion* at 22.

43.    Yet, facts have come to light making clear that Dr. Moline's statements that none of the 33 individuals had any other exposure to asbestos is simply not true, as described more fully in Part III below.

### B.    Dr. Moline Repeatedly Republished Her False and Disparaging Statements

44.    Dr. Moline has repeated the false premise of the Article time and time again, in myriad settings and with large and varied audiences.

### 1.    Time Magazine Article

45.    Shortly after the Moline Article became available online, *Time* magazine published a story about the Article on October 15, 2019. **Exhibit C**, A

14

New Study Suggests Tainted Talcum Powder Can Cause a Rare Cancer. Here's How That Could Play Out in the Courtroom (Oct. 15, 2019).[7]

46.    Dr. Moline is quoted in the story saying: "This is the first time that anyone has said, 'Let me look at all these cases, put it all together and identify the ones where [talc] is the sole exposure.'"

47.    She also said: "Everything points to cosmetic talc being the cause" of the Article's subjects' mesothelioma.

### 2.    Romper.com Article

48.    Dr. Moline similarly gave an interview for an article on Romper.com that was published on October 16, 2019. **Exhibit D**, Contaminated Baby Powders May Be Linked To Rare Cancer, New Study Suggests (Oct. 16, 2019).[8]

49.    The subject of the Romper piece was the Moline Article: "In a case study of 33 patients, researchers found strong evidence that exposure to asbestos-contaminated talcum powder, such as that's often used in baby powders, can result in malignant mesothelioma."

50.    That article quotes Dr. Moline:

- "All the folks in the study used cosmetic talc, usually for decades, and they all had mesothelioma with no other asbestos source."

---

[7] https://time.com/5692129/talcum-powder-mesothelioma/.

[8] https://www.romper.com/p/contaminated-baby-powders-may-be-linked-to-rare-form-of-cancer-study-suggests-19221063.

15

- "We couldn't find any other source [of exposure] apart from the cosmetic talc."

### 3.    Asbestos.com Article

51.    Dr. Moline's *Time* magazine quotes were reproduced in an October 18, 2019 article on Asbestos.com, *Case Study Shows Asbestos in Talc Causes Mesothelioma.*

52.    The Asbestos.com article emphasizes that: "'Everything points to cosmetic talc being the cause,' co-author Dr. Jacqueline Moline told Time Magazine. 'This is the first time that anyone has said, 'Let me look at all these cases, put it together and identify the ones where [talc] is the sole exposure.''" **Exhibit E**, Povtak T, Case Study Shows Asbestos in Talc Causes Mesothelioma (Jan. 5, 2021).[9]

53.    Asbestos.com is sponsored by plaintiffs' law firms concentrating in asbestos litigation.

### 4.    Congressional Subcommittee Testimony

54.    On December 10, 2019, Dr. Moline testified before a House Subcommittee on talc and talc litigation.

55.    The day before, CNBC, Reuters, and Yahoo! Finance all covered the upcoming hearing.

---

[9] https://www.asbestos.com/news/2019/10/18/talc-mesothelioma-case-study.

16

56.    In her written testimony, Dr. Moline stated: "[M]y colleagues and I reported on 33 individuals with no other identifiable source of exposure apart from cosmetic talc." **Exhibit F**, Written Testimony of Jacqueline Moline at 2.[10]

57.    She also repeated in her oral testimony: "This talc exposure was their only exposure to asbestos." **Exhibit G**, Hearing Transcript at 8 (Dec. 10, 2019).[11]

58.    In her testimony, she discussed "Ms. D" (*i.e.* Ms. Bell, addressed at length in Part III.B below). Dr. Moline testified that Ms. D "had worked in various industries, including textile and tobacco, and had no exposure to asbestos" in those jobs. *Id.* at 9.

59.    The witnesses who testified and the Representatives speaking throughout the session referred many times to Johnson & Johnson brand talcum powder products, even though Johnson & Johnson is a parent company.

60.    Indeed, the subcommittee's chairman began the hearing discussing the allegations of asbestos in "Johnson & Johnson's talc-based baby powder." *Id.* at 2.

61.    And in his opening statement, he displayed images of Johnson's Baby Powder:

---

[10] https://www.congress.gov/116/meeting/house/110311/witnesses/HHRG-116-GO05-Wstate-MolineJ-20191210.pdf.

[11] https://docs.house.gov/meetings/GO/GO05/20191210/110311/HHRG-116-GO05-Transcript-20191210.pdf.

17



62. The congressional hearing was broadcast on C-SPAN, which also posted the hearing on YouTube.

63. The relevant Congressional Committee put out a press release listing among the "takeaways" from the hearing that "Dr. Jacqueline Moline testified that individuals who have *only* been exposed to asbestos through the use of talc-based Johnson & Johnson Baby Powder have developed mesothelioma."[12]

64. The websites mesothelioma.com and mesothelioma.net—which are sponsored by plaintiffs' law firms specializing in asbestos litigation—published

---

[12] https://oversight.house.gov/news/press-releases/oversight-subcommittee-held-second-hearing-on-the-public-health-risks-of.

articles covering the hearing.[13] One story stated that "Dr. Moline "offered insights from 33 mesothelioma patients who were exposed to asbestos from talcum powder" and that "talcum powder was the only instance of asbestos exposure among all 33 patients in the study."

### 5.    2020 ADAO "Conversation"

65.    On May 13, 2020, Dr. Moline participated in an Asbestos Disease Awareness Organization event by Zoom called *ADAO Conversation with Dr. Jacqueline Moline & Robert Sussman Discuss Asbestos, Talc, Prevention, and Policy.*[14]

66.    During that event, she said of the Article: "What we found in these individuals is that these 33 did not have any other known source of asbestos exposure that we could discern from the information that we were provided."

67.    She also said: "[R]eally the whole point of our paper" was "to say that mesothelioma can occur in individuals whose sole exposure is to cosmetic talc."

### 6.    Statement on EPA's Risk Evaluation of Asbestos

68.    On March 30, 2020, the EPA invited public input on its draft risk assessment of asbestos.

---

[13] https://www.mesothelioma.com/blog/congressional-hearing-examines-asbestos-detection-in-talc; https://mesothelioma.net/mesothelioma-news/congressional-hearings-regarding-asbestos-in-talc-features-mesothelioma-victims-testimony/.

[14] https://www.youtube.com/watch?v=PUiFlYuajjQ.

69.    Dr. Moline submitted a comment, which was posted on the EPA's website on May 31, 2020. **Exhibit H**, Toxic Substances Control Act (TSCA) Science Advisory Committee on Chemicals Review of Risk Evaluation for Asbestos, Comment submitted by Jacqueline Moline (May 31, 2020).[15]

70.    In her statement, she wrote: "[M]y colleagues and I reported on 33 individuals with mesothelioma with no other identifiable source of exposure apart from cosmetic talc."

71.    Dr. Moline's statement was also made available on the Asbestos Disease Awareness Organization's website.[16]

### 7.    2022 ADAO Asbestos Awareness and Prevention Conference

72.    On September 17, 2022, Dr. Moline gave a presentation at the *2022 ADAO Asbestos Awareness and Prevention Conference*.[17] That presentation was just four days *after* the federal district court in *Bell* (discussed in Section III) issued its opinion identifying alternative asbestos exposures beyond allegedly contaminated talc for one of the individuals in the Article.

---

[15] https://www.regulations.gov/docket/EPA-HQ-OPPT-2019-0501/comments?filter=moline.

[16] https://www.asbestosdiseaseawareness.org/wp-content/uploads/2020/05/JACQUELINE-MOLINE-EPA-Statement.pdf.

[17] https://www.youtube.com/watch?v=sqWAzNM9SCA&t=20s.

20

73.   Dr. Moline spoke during Session II: Medical Advancements: Diagnosing and Treating Mesothelioma and Other Asbestos-Related Diseases.

74.   During her presentation, she spoke extensively about the Article.

75.   Although the *Bell* Court had just identified alternative asbestos exposures for Ms. Bell (aka Ms. D from her congressional testimony), and castigated Dr. Moline for stating otherwise in her Article, Dr. Moline made no reference to that alternative asbestos exposure. Instead, Dr. Moline reiterated once again that, with respect to the individuals referenced in her Article, "[w]e were unaware of any other asbestos exposure apart from talc."

76.   She also presented a slide regarding her Article stating: "Talcum powder as the only asbestos exposure":



### 8.    Dr. Moline Northwell Health Web Bio

77.    Dr. Moline has a web bio on Northwell Health's website. **Exhibit I**, Jacqueline Moline, MD, MSc, Feinstein Institutes for Medical Research Northwell Health.[18]

78.    Even after the central premise of the Article was exposed as false by the *Bell* Court, her web bio *to this day* reads: "Dr. Moline published the first case series, identifying cosmetic talc as the asbestos source leading in mesothelioma in 33 individuals."

### 9.    Dr. Moline and Other Plaintiffs' Experts Cite the Article in Court

79.    In addition to publicly and widely disseminating her false statements, Dr. Moline (and other plaintiffs' experts) have routinely referenced the Article in numerous cosmetic talc trials across the country. Ex. B, *Bell* Opinion at 17-18.

80.    After the online publication of the Article, Dr. Moline was disclosed in at least 58 other cosmetic talc/mesothelioma cases against Pecos River alone, where she began to routinely rely on the Article as the centerpiece of her testimony.

81.    In September 2021, a California state court ruled over Pecos River's objection that "Plaintiffs' experts can rely on the Article and state that they relied on it."

---

[18] https://feinstein.northwell.edu/institutes-researchers/our-researchers/jacqueline-moline-md-msc.

22

82.   Dr. Moline then testified for the first time at a Pecos River talc trial (*Shawn Johnson*) about the Article.

83.   That testimony included a statement that she "picked people [for the Article] who didn't have any other exposure other than cosmetic talc" to "the best of [her] knowledge."

84.   But during cross examination, Dr. Moline refused to identify any of the subjects of the Article: "I will not disclose the name of the individuals in the paper."

85.   Compounding this prejudice, another of plaintiff's experts (Dr. Allan Smith) testified that the Moline Article as a "main source of information that [he is] aware of today" and that he relies upon to testify that talcum powder causes mesothelioma.

86.   Shortly thereafter, in another Pecos River talc trial (*Prudencio*), another California court permitted plaintiffs' experts to rely on the Moline Article and summarize it "consistent with the established rules of expert reliance."

87.   These two Pecos River trials were not the only cases where an expert has relied on the Moline Article. As the North Carolina federal court explained: "other expert witnesses have begun relying on the article for the basis of their opinions." Ex. B, *Bell* Opinion at 17-18.

88.   In at least 63 other cases against Pecos River, a combined 20 other plaintiffs' experts relied on the Moline Article in either their deposition or court

23

disclosures: Drs. Brody, Castleman, Cohen, Compton, Dodson, Egilman, Emory, Finkelstein, Gordon, Haber, Horn, Kanarek, Kradin, Longo, Maddox, Madigan, Radecki, Rigler, Verschraegen, and Zhang.

## III. Dr. Moline Knew Her Statements Were False or Recklessly Ignored Available Information Demonstrating Their Falsity When Made

89.    When Dr. Moline published her statements in the public domain, to the scientific community, and in various courts across the country, she knew that the premise of her position—that she conducted a study of 33 mesothelioma patients whose sole exposure to asbestos was through talc powder—was false or recklessly ignored available information demonstrating its falsity.

90.    The truth is that Dr. Moline was intimately familiar with the case histories of the 33 individuals referenced in the Article from her role as a plaintiffs' expert in the underlying tort cases in which those individuals had asserted claims against Pecos River and others.

91.    Dr. Moline therefore knew full well that individuals she cited in her Article had admitted to and claimed compensation for exposure to asbestos from other sources, or she recklessly disregarded substantial evidence of alternative exposure.

24

**A.     Dr. Moline's Intimate Knowledge of the True Asbestos Exposures of the 33 Individuals Referenced in the Article**

92.     To truly understand Dr. Moline's familiarity with the 33 individuals covered in the Article, one must start with the very first cosmetic talc/mesothelioma case to go to trial involving Johnson's Baby Powder—a case called *Herford*, in which Dr. Moline was one of plaintiffs' key experts.

93.     During the *Herford* trial, Dr. Moline testified: "There are about 41 cases of individuals that I've reviewed records of [or] have in some cases had the opportunity to evaluate." Earlier, she had acknowledged in her deposition that all 41 of those cases involved people who came to her through litigation—in other words, each of them were plaintiffs in mesothelioma cases.

94.     Dr. Moline was examined at trial about her record review and evaluation of the 41 cases. When asked "And would those evaluations include learning about their occupational and environmental history of exposures," Dr. Moline responded: "Yes."

95.     On the Northwell website, Dr. Moline is quoted as saying that it is "important to take a comprehensive exposure history when evaluating patients presenting with cancers like mesothelioma."[19]

---

[19] https://feinstein.northwell.edu/news/the-latest/talc-powder-exposure-linked-to-mesothelioma

25

96.    Notably, the *Herford* court precluded Dr. Moline from testifying about her conclusions regarding the 41 individuals because she had evaluated them in "medicolegal matters" not in the "clinical context."

97.    For the same reason, other courts thereafter repeatedly barred Dr. Moline from offering testimony on her litigation case review of these various plaintiffs.[20] And so, for a period, Dr. Moline was stymied.

98.    But Dr. Moline ultimately pivoted. To circumvent these piling and adverse rulings, Dr. Moline published the Article to add a veneer of credibility to the other plaintiffs she wanted to testify about, and her claim that their sole source of asbestos exposure was talcum powder.

99.    That veneer was first dispelled by uncovered evidence disclosed in the *Bell* decision that demonstrates, unequivocally, that Ms. Bell's exposure to asbestos reaches well beyond exposure to talc, as Dr. Moline knew full well.

---

[20] *Fong et al. v. Johnson & Johnson, et al.*, No. BC675449 (Super. Ct. Ca., L.A. Cnty.); *Hayes v. Colgate-Palmolive Co., et al.*, No. 16-CI-003503 (Jefferson Cir. Ct., Ky.); *Olson et al. v. Brenntag North America, Inc., et al.*, No. 190328/2017 (Supr. Ct. N.Y., N.Y. Cnty.); *Pipes v. Johnson & Johnson, et al.*, No. CJ-2017-3487 (Dist. Ct., Okla. Cnty., Okla.); *Lanzo v. Cyprus Amax Minerals Co.*, ct al., No. MID-7385-16 AS (Super. Ct. N.J., Middlesex Cnty.); *Weirick v. Brenntag N. Am., Inc.*, No. BC656425 (Super. Ct. Ca., L.A. Cnty.).

**B.** **The Record Now Shows that Individuals in the Article Claimed Exposures to Asbestos from Sources Other than Talc**

100.  In September 2022, the *Bell* court unveiled the "concerning" contradiction between (1) Dr. Moline's representations that her study was confined to individuals whose sole exposure to asbestos was talc, and (2) the evidence that she knew they had other exposures.

101.  After years of efforts, Pecos River recently obtained the data that identifies all the individuals in Dr. Moline's Article (the "Key"). (**Exhibit M**). It is now clear why so many fought so hard to try to ensure the Key never came to light. The Key demonstrates that many of the Article's subjects in fact were exposed to asbestos from sources other than cosmetic talc. The extensiveness of the fraudulent nature of the Article demonstrates that Dr. Moline fabricated the data presented in her Article.

102.  Further scrutiny of the record indicates that this concerning contradiction extends beyond the individual who was the plaintiff in the *Bell* case to at least twelve other individuals in the 2020 Article.

**1.** **Betty Bell**

103.  The falsity of the Moline Article was first revealed in the context of the *Bell* case.

27

104. There, another talc defendant, American International Industries ("AII"), was able to uncover critical evidence regarding Case #9 from the Moline Article: Betty Whitley Bell.

105. Ms. Bell is the individual that Dr. Moline referred to as "Ms. D" in her testimony before Congress maligning Pecos River's talc products, *supra* ¶ 52.

106. Ms. Bell worked most of her career as a hairdresser. She alleged using "Clubman" brand talc powder for over thirty years, beginning in the 1970s. She was diagnosed with mesothelioma in July 2015. Ex. B, *Bell* Opinion at 2.

107. Ms. Bell filed workers' compensation claims with the North Carolina Industrial Commission in September 2015, asserting, under criminal penalty for false statements, that she was exposed to asbestos during prior employment with two textile employers—Hoechst Celanese Corporation and Pillowtex Corporation. Ms. Bell's worker's compensation claims were eventually dismissed without prejudice. Ex. B, *Bell* Opinion at 2.

108. Ms. Bell filed a lawsuit[21] in February 2017, arguing that exposure to asbestos in Clubman talc powder—not from her prior employment with textile

---

[21] Ms. Bell passed away in June 2017. The executor of her estate, Lloyd Bell, was substituted as Plaintiff in this action after Ms. Bell passed.

28

manufacturers—caused her mesothelioma: *Bell v. Am. Int'l Indus.*, No. 17-cv-111 (M.D.N.C).[22]

109.    Ms. Bell's workers' compensation claims were discussed at her deposition and included on Dr. Moline's list of materials reviewed in her 2016 expert report in Ms. Bell's case. That means Dr. Moline *knew or recklessly ignored available information* at the time she wrote and published the Article. Indeed, the Article itself states: "Data gathered for all 33 patients were gathered from each individual's medical records and sworn testimony (deposition transcripts) of individuals." Ex. A, Moline Article at 11.

110.    Because the facts of Ms. Bell's case paralleled the description of Ms. D in Dr. Moline's congressional testimony, defendant AII—which had purchased the Clubman brand in the late 1980s—suspected that Ms. Bell was one of the 33 anonymous individuals included in the Article. Ex. B, *Bell* Opinion at 4.

111.    In a deposition for a different mesothelioma case, AII asked Dr. Moline for specific information about the 33 individuals from the Article. As she did in the Pecos River cases, Dr. Moline declined to answer, claiming confidentiality concerns. Ex. B, *Bell* Opinion at 4.

_____

[22] Attempting to hide or ignore asbestos trust claims is nothing new in cosmetic talc litigation. In one matter with Pecos River, the plaintiffs' law firm Weitz & Luxcnbcrg (a firm that has rctaincd Dr. Molinc 30 timcs in cosmctic talc cascs against Pecos River) failed to turn over asbestos trust claims that they prepared themselves and were legally obligated to provide.

112.   Instead, the plaintiff's counsel advised AII that if it was determined to continue seeking information regarding the 33 individuals, it would have to subpoena Northwell Health (Dr. Moline's employer). When AII did so, plaintiff's counsel moved to quash the subpoena. Ex. B, *Bell* Opinion at 4-5.

113.   But AII persisted. And after AII provided Northwell with a HIPAA authorization form signed by the plaintiff, Northwell produced a single five-page document. The document is a spreadsheet containing information on each of the 33 individuals studied in the Article. Importantly, the entire document is redacted except for the row headings and the column listing Ms. Bell's information, which identified her as Case #9. Ex. B, *Bell* Opinion at 5:




114.    Upon learning that this document had been disclosed, plaintiff's counsel filed an emergency motion for a protective order to preclude any inquiry into the identities of these individuals. The motion also sought the destruction of all copies of the Northwell document and requested that the document not be disseminated in Ms. Bell's case or any other forum. Ex. B, *Bell* Opinion at 5.

115.    The plaintiff's counsel also reported AII's counsel to the Department of Health & Human Services for supposedly violating Ms. Bell's HIPAA rights. Counsel "requested" that Northwell claw back the document, threatened to also report Northwell's *counsel* to HHS if he did not, and stated that she was "considering reporting [his] violation to the New York bar as this is a staggering breach."

> Please provide all correspondence with counsel for AII and a copy of the HIPAA.
>
> I have reported Mr. ███████ to HHS for violating Ms. Bell's HIPAA rights. I again renew my request that you immediately claw back this production or I will have no choice but to report you as well.
>
> We will be filing a motion for a protective order and sanctions against Mr. ███████ in the Bell matter. I am also considering reporting your violation to the New York bar as this is a staggering breach. You had no right to produce any information regarding my client based on the misuse of a HIPAA authorization provided to you not by my client and without any notice to my client while a motion to quash was pending. I am just flabbergasted by your reckless conduct.

116.    The plaintiff's counsel later conceded in court that *none* of the information in the document Northwell provided to AII is HIPAA protected and therefore no HIPAA-protected information was at risk of disclosure. Ex. B, *Bell* Opinion at 36. AII had in any event provided Northwell with a HIPAA authorization form signed by the plaintiff. Ex. B, *Bell* Opinion at 5.

31

117.    In ruling on the plaintiff's motion for a protective order, the magistrate judge held that the Northwell document could be used in Ms. Bell's case, but that it, and the information therein confirming that Ms. Bell was one of the 33 individuals the Article studied, was "confidential and limited solely to this case." The magistrate judge explicitly stated that this limited protective order could potentially be reconsidered as the case progressed. Ex. B, *Bell* Opinion at 6.

118.    In response, Northwell filed a Motion to Intervene and Extend Protective Order and sought to prevent defense counsel from questioning Dr. Moline about any link between Ms. Bell and the Article. Ex. B, *Bell* Opinion at 6.

119.    Before Northwell's motion was adjudicated, the plaintiff essentially withdrew Dr. Moline as an expert by not offering her deposition by the court-ordered deadline. Accordingly, in February 2021, the magistrate judge denied Northwell's intervention motion as procedurally moot and untimely, as well as substantively meritless. Ex. B, *Bell* Opinion at 6.

120.    A few months later, AII filed a motion requesting that the court vacate the magistrate judge's protective order so that the information that it had learned could be used in defending other cases. Ex. B, *Bell* Opinion at 6-8.

121.    The *Bell* court did in fact vacate the earlier protective order—allowing the Northwell document to be used in other cases—and unsealed numerous items on the docket. Ex. B, *Bell* Opinion at 36-40.

32

122.   The court took great lengths to explain why the revelations uncovered in *Bell* should be made publicly available. The court began by observing the impact of the revelations on the Article's credibility: "Ms. Bell's employment history, as well as her belief that she may have been exposed to asbestos during her textile employment, undermines the weight of Dr. Moline's finding that each of the '33 cases ... had no known exposure to asbestos other than prolonged use of talcum powder.'" Ex. B, *Bell* Opinion at 16.[23]

123.   The court went on: "The fact is that at least one study participant reported to a state agency that she did have another known asbestos exposure, at least one known to the study participant. Given the groundbreaking nature of the article and its express premise that all individuals studied had no known alternative asbestos exposures, the fact that one of the individuals claimed otherwise has direct bearing on the study's credibility. This court expressed concern about this seeming contradiction before and does so again." Ex. B, *Bell* Opinion at 17.

---

[23] It's telling that one of the co-authors of the Moline Article is pathologist Dr. Ronald Gordon, an individual who has served as a plaintiff's expert witness in asbestos and cosmetic talc litigation. Dr. Gordon was arrested in the early 1990s for conspiracy to commit bank fraud and money laundering, and he admitted to committing those crimes in the course of testifying as a cooperating witness against a co-defendant. Yet Dr. Gordon repeatedly provided false testimony concerning this incident, including falsely testifying that he had never been arrested; never falsified a document; and that he had only ever testified in court as an expert witness.

124. The court stated that its "concern is magnified considering the influence the article has had on cosmetic talc litigation nationwide." Ex. B, *Bell* Opinion at 17.

125. The court pointed to the fact that "Dr. Moline gave testimony discussing her article in a California state court cosmetic talc trial" and that "plaintiff's counsel relied on Dr. Moline's article in his closing argument to connect cosmetic talc exposure to asbestos." Ex. B, *Bell* Opinion at 17.

126. Part of the court's concern included that "other expert witnesses have begun relying on the article for the basis of their opinions." And the court even noted that "[w]hen entering bankruptcy because of cosmetic talc liabilities, one prominent cosmetic talc seller [i.e., Pecos River] specifically discussed the article's integral role in supporting the plaintiffs' claims." Ex. B, *Bell* Opinion at 18.

127. The court concluded: "In this case, a principal factual underpinning of the article is that in all thirty-three cases studied 'no identified source apart from the talcum powder' was identified. The absence of any specific information on the identities of the individuals studied precludes inquiry into the basis of the factual underpinning of no known exposure to asbestos other than talcum powder." Ex. B, *Bell* Opinion at 22.

128. Lest there be any doubt about the brazenness of Dr. Moline's knowing or reckless disregard for the truth, at a public conference on September 17, 2022—*just four days after* the *Bell* court issued its decision confirming Ms. Bell's claims

34

for compensation from other sources of asbestos exposure and Dr. Moline's knowledge of the same—Dr. Moline *again* asserted that, with respect to the cases in her Article, she was "unaware of any asbestos exposure apart from talc."

129. In other words, even now and despite the *Bell* order, Dr. Moline refuses to acknowledge that the foundational premise of the Article has been proven false.

130. What's more, although Ms. Bell's example was uncovered after extensive discovery efforts in North Carolina federal court, she is not the only individual in the Article with other asbestos exposures. After years of further discovery efforts since *Bell,* Pecos River finally obtained the Key that identifies the individuals in Dr. Moline's 2020 Article. **Exhibit M.** The record demonstrates that additional individuals in the Article had alternative sources of asbestos exposures beyond alleged contamination in talc.

131. Below are the additional examples uncovered to date where alternative sources of exposure were present that were not cosmetic talc and known to Dr. Moline at the time the Article was written:

### 2.    Helen Kohr

132. Plaintiff Helen Kohr filed a claim against other cosmetic talc defendants alleging that she was exposed to asbestos in their products.

133. Dr. Moline appeared as an expert in Ms. Kohr's case.

134. Case #17 is a likely match for Ms. Kohr:

35

|  | Ms. Kohr | Case #17 |
|---|---|---|
| Gender | Female | Female |
| Year of Diagnosis | 2015 | 2015 |
| Age At Diagnosis | 80 | 81 |
| Mesothelioma Site | Pleural Epithelial | Pleural Epithelial |
| Talcum Powder Brand | Cashmere Bouquet, Coty Airspun, Helena Rubinstein | Cashmere Bouquet, Coty Airspun, Helena Rubinstein |
| Estimated Years Of Use | 40 | 40 |
| Occupation | Office Worker | Office Worker |

135.  The Key confirms that Ms. Kohr is a subject of the Article.

136.  Dr. Moline's *own expert report* in Ms. Kohr's case from *2017* (well before her Article was published) stated that Ms. Kohr was exposed to asbestos-containing cigarettes known as Kent cigarettes.

137.  Dr. Moline's report stated: "Ms. Kohr was ***exposed to asbestos from Kent Micronite cigarettes***, which she smoked from 1952-1956 when crocidolite asbestos was used in the filters" (emphasis added).

> Powder and in more recent fiber release studies of samples of these products. The bulk analysis and fiber release studies done recently by Fitzgerald and others from ore taken from the same source mines as those used in the manufacture of the Cashmere Bouquet and Coty products showed significant amounts of chrysotile, anthophyllite, and tremolite asbestos. Ms. Kohr was exposed to asbestos from Kent Micronite cigarettes, which she smoked from 1952-1956 when crocidolite asbestos was used in the filters. Studies have shown that each filter contained 10 milligrams of crocidolite asbestos and that millions of fibers of asbestos were released into the lungs during smoking. Dr. Steven Compton has personally evaluated Kent Micronite cigarettes and noted crocidolite asbestos fibers present in the Micronite filter. Longo et al tested Kent cigarettes (Cancer Research 1995) and noted crocidolite fibers in both the filters and in the cigarette smoke itself.

36

138. She even stated the Kent cigarettes were a cause of the plaintiff's mesothelioma:

    a.    "Her exposures to asbestos-contaminated face powder and asbestos-contaminated body powder *and to Kent cigarettes* were the cause of her mesothelioma" (emphasis added).

    b.    "Ms. Kohr had malignant mesothelioma of the pleura as a result of her *exposure to asbestos from Kent cigarettes* and cosmetic talc" (emphasis added).

139. But, in her Article, Dr. Moline represented that Ms. Kohr had no exposures to asbestos other than talcum powder. Dr. Moline's statement that there were no other asbestos exposures for Ms. Kohr is knowingly false.[24]

140. In response to a letter to the editor, Dr. Moline stated in May 2023 that she "re-reviewed the cases included in the article" and the associated medical records and "identified one individual with an alternative exposure"—someone who was exposed to "crocidolite asbestos-laden cigarette filters." **Exhibit J**, Response to the Letter to the Editor. She also issued a similar "Erratum" regarding the one case in May 2023. **Exhibit K**, *Mesothelioma Associated With the Use of Cosmetic Talc: Erratum*.

---

[24] Although this particular case did not involve claims against Pecos River, it serves as a stark example of Dr. Moline's willingness to make statements regarding the lack of exposures that she knew were false.

37

141. Dr. Moline did not acknowledge that any other individuals in her Article had potential alternative exposures to asbestos. In fact, she stated "This error does not negate the other 32 cases, in which no other source of asbestos was present apart from cosmetic talcum powder." Exs. J-K.

### 3.    Stephen Lanzo

142. The falsity of the Moline Article is also evident given the information uncovered in the *Lanzo* case.

143. In 2016, Stephen Lanzo brought a claim against Pecos River alleging that he was exposed to asbestos through use of Johnson's Baby Powder.

144. Dr. Moline served as an expert witness in Mr. Lanzo's case against Pecos River—she served an expert report, sat for deposition, and testified at trial.

145. Mr. Lanzo is a New Jersey resident, his case was filed in New Jersey, and Dr. Moline testified at trial in New Jersey.

146. During the course of that case, alternative sources of asbestos exposure beyond alleged contamination in talc were identified. Additionally, evidence of the presence of commercial asbestos—not a type of "asbestos" allegedly present in Johnson's Baby Powder—was found in plaintiff's tissue.

147. Despite this, Dr. Moline included Mr. Lanzo in her Article as Case #6:

| | Mr. Lanzo | Case #6 |
|---|---|---|
| Gender | Male | Male |
| Year of Diagnosis | 2016 | 2016 |
| Age At Diagnosis | 43 | 43 |
| Mesothelioma Site | Pleural | Pleural |
| Talcum Powder Brand | Johnson's Baby Powder | D (Johnson's Baby Powder) |
| Estimated Yrs Of Use | 40 | 40 |
| Occupation | Finance | Finance |
| Other Details | **Moline Expert Report at 5, 14**<br><br>"developed chest pain after playing hockey in 2012"<br>"Mr. Lanzo recalled using the talcum powder in the bathroom or his room, and that there would be powder on the floor."<br><br>"He applied the talcum powder to his torso, groin, legs and back, often twice a day after showering."<br><br>"He recalled getting mouthfuls of powder during the application." | **Moline Article at 13-14**<br><br>"developed chest pain after playing hockey in 2012"<br><br>"Case 6 recalled using the powder in the bathroom and in his room, and that there would be powder on his floor."<br><br>"He applied the talcum powder directly to his torso, groin, legs, and back, often twice a day after showering."<br><br>"He recalled getting mouthfuls of powder during the application." |

148. The Key confirms that Mr. Lanzo is a subject of the Article.

149. As further background, Dr. Moline states in her Article that "crocidolite" asbestos fibers "are encountered in cases of industrial and occupational exposure, *not cosmetic talcum powder*." Ex. A, Moline Article at 14 (emphasis added).

39

150. Dr. Moline knowingly made false statements or recklessly ignored available information demonstrating their falsity when she stated in her Article that crocidolite asbestos was not found in the tissue of Case #6.

151. Specifically, she states that "tissue samples from six patients were analyzed" (including Case #6) and that "[a]mosite and *crocidolite*, asbestos fibers . . . *were not found* in any of these cases." Ex. A, Moline Article at 14 (emphasis added). That tissue analysis was done in connection with Mr. Lanzo's New Jersey case. *Id.* at 11.

152. But in fact, crocidolite asbestos was found in the tissue of that Case #6—Mr. Lanzo.

40

153. In the *Lanzo* case, **Plaintiff's expert** Mr. Lee Poye analyzed Mr. Lanzo's tissue and found crocidolite asbestos:



41

154. Defense expert, Dr. Matthew Sanchez, also found crocidolite in Mr. Lanzo's tissue:



155. The statement in the Moline Article that no crocidolite was found in the tissue for Case #6 is false.[25]

156. Dr. Moline also stated in her Article that the exposure data she obtained included "known abatement of asbestos while the patient was in school, home

---

[25] Ignoring or concealing tissue analyses is also not a new tactic. In one case against Pecos River, plaintiffs' law firm Kazan, McClain, Satterley & Greenwood (another firm that has retained Dr. Moline as an expert witness in cases against Pecos River) hid its expert's tissue analysis because he found no asbestos. The firm never produced the expert's voluminous analysis even though it was required to be disclosed under both the relevant California rules of evidence and a case-specific deposition notice. And while the expert testified under oath that he did not know whether he ever tested the specific plaintiff's tissue, emails later leave no question that he did and knew that he did at the time of the false testimony.

renovations that might have used asbestos containing materials, and any other potential sources of asbestos exposure." Ex. A, Moline Article at 11.

157. But she testified at Mr. Lanzo's trial in 2018 (before her Article was published) that 60 linear feet of exposed asbestos pipe were removed from Mr. Lanzo's basement. She had reviewed the asbestos record of abatement.

158. Dr. Moline also testified that she understood that the basement was a family room with a TV and couches, and that Mr. Lanzo spent time in the basement.

159. Case #6 is one of the cases Dr. Moline discusses in detail in her Article. Yet she does not mention the asbestos pipe in the basement as a potential source of exposure. She instead says that other potential exposures to asbestos were considered, with no identified source apart from the talcum powder.

160. Mr. Lanzo also had potential exposures from his schools.

161. In his elementary school, damage to the asbestos pipe insulation was found in multiple locations, including hallways, classrooms, the lunchroom, and the boys' locker room.

162. In the school he attended from grades 1-4, the school district found what amounted to 64 bags of friable asbestos-containing material which would have been present while he attended (and removed after he left).

43

163. In the school he attended for grade 5, large amounts of friable asbestos were found and removed from the boys' bathroom and classrooms in the years after his attendance.

164. In his middle school, abatement records show that asbestos-containing material was removed from classrooms after Mr. Lanzo was a student at the school. At one point, 67 bags of friable waste was removed from the school. All this asbestos would have been present when Mr. Lanzo was there.

165. In his high school, hundreds of bags of friable asbestos were removed. The school district removed 200 square-feet of friable asbestos from the ground-floor lobby from 1989-1992—meaning some of the asbestos was removed during Mr. Lanzo's junior and senior year.

166. Dr. Moline stated in her Article that she considered "known abatement of asbestos while the patient was in school." Ex. A, Moline Article at 11. But she did not mention any of the abatement in Mr. Lanzo's schools in her Article.

167. Dr. Moline's statement that there were no other asbestos exposures for Mr. Lanzo is false.

### 4. Doris Jackson

168. Plaintiff Doris Jackson filed a claim against other cosmetic talc defendants alleging that she was exposed to asbestos in their products.

169. Dr. Moline appeared as an expert in Ms. Jackson's case.

44

170. Upon information and belief, Case #3 is a likely match for Doris Jackson.

| | Ms. Jackson | Case #3 |
|---|---|---|
| Gender | Female | Female |
| Year of Diagnosis | 2014 | 2014 |
| Age At Diagnosis | 84 | 84 |
| Mesothelioma Site | Pleural Biphasic | Pleural Biphasic |
| Talcum Powder Brand | Cashmere Bouquet | Cashmere Bouquet |
| Estimated Years Of Use | 70 | 70 |
| Occupation | Elementary School Teacher | Elementary School Teacher |
| Tissue Digestion | Yes | Yes |
| Digestion Asb. Type | Tremolite | Tremolite |
| Site Found | Lung, Lymph Node | Lung, Lymph Node |
| Concentration | 0; 9,409 | 0; 9,409 |
| Other Details | **Moline Expert Report at 3-4**<br><br>"developed shortness of breath with exertion in September 2014, along with a cough and chest tightness. . ."<br><br>"a chest x-ray showed a very large left pleural effusion." | **Moline Article at 12**<br><br>"In September 2014, Case 3 . . . developed shortness of breath, a cough, and chest tightness."<br><br>"A chest x-ray in November 2014 showed a large left pleural effusion" |

171. The Key confirms that Ms. Jackson is a subject of the Article.

172. A medical record history form from Ms. Jackson's examination with Dr. Robert Cameron included a handwritten statement that she had been exposed to "[c]eiling pipes with degrading insulation" during her more than 30-year career as a public school teacher.

173. Dr. Moline noted the evidence of alternative exposure in her expert report for the *Jackson* case:

45

> Dr. Robert Cameron, a thoracic surgeon, saw Ms. Jackson on February 4, 2015. In her intake form, she noted that she was exposed for over thirty years to ceiling pipes with degrading insulation while working as a teacher in the DC Public Schools. An MRI of the

174.   But, in her Article, Dr. Moline represented that Case #3 had no exposures to asbestos other than talcum powder.

175.   Dr. Moline's statement that there were no other asbestos exposures for Ms. Jackson at least recklessly disregards available information.

### 5.   Valerie Jo Dalis

176.   Plaintiff Valerie Jo Dalis filed a claim against other cosmetic talc defendants alleging that she was exposed to asbestos in their products.

177.   Dr. Moline appeared as an expert in Ms. Dalis's case.

178.   Upon information and belief, Case #4 is a likely match for Ms. Dalis.

|  | Ms. Dalis | Case #4 |
|---|---|---|
| Gender | Female | Female |
| Year of Diagnosis | 2014 | 2014 |
| Age At Diagnosis | 66 | 66 |
| Mesothelioma Site | Peritoneal Epithelial | Peritoneal Epithelial |
| Talcum Powder Brand | Cashmere Bouquet, Mennen | Cashmere Bouquet, Mennen |
| Estimated Years Of Use | 30 | 30 |
| Occupation | Hairdresser | Hairdresser |
| Tissue Digestion | Yes | Yes |
| Asbestos Type in Digestion | Chrysotile | Chrysotile |
| Site Found | Peritoneum | Peritoneum |
| Concentration | 920 | 920 |
| Other Comments | **Moline Expert Report at 10**<br><br>"Ms. Dalis had additional exposure to talcum powder when working as a licensed cosmetologist"<br><br>"She shook the powder onto the necks and wiped the powder off with a brush or blow dryer."<br><br>"She described wearing gloves on a regular basis to apply color, and she had to blow the powder into the gloves." | **Moline Article at 13**<br><br>"Case 4 had additional exposure to talcum powder in the 1960s while working as a licensed cosmetologist"<br><br>"She shook the talcum powder onto the client's neck, and would wipe off the excess with a brush or blow dryer."<br><br>She also used talcum powder inside the gloves that she donned prior to applying hair color." |

179.    The Key confirms that Ms. Dalis is a subject of the Article.

180.    Before Ms. Dalis filed her complaint against another cosmetic talc defendant, she submitted an asbestos bankruptcy trust claim for $450,000 and collected over $28,000 from the Manville Personal Injury Settlement Trust.

181.    The Moline Article states: "Talcum powder exposure histories were reviewed based on sworn testimony by patients and in some cases, family members

47

with first-hand knowledge of the use of talcum powder, such as parents who recalled using talcum powder while diapering the patient." Ex. A, Moline Article at 12.

182. The bankruptcy submissions were discussed at Ms. Dalis's deposition and her husband's deposition.

183. But again, in her Article, Dr. Moline represented that Ms. Dalis had no exposures to asbestos other than talcum powder. Dr. Moline's statement that there were no other asbestos exposures for Ms. Dalis is false.

### 6. Carol Schoeniger

184. Plaintiff Carol Schoeniger filed a claim against other cosmetic talc defendants alleging that she was exposed to asbestos in their products.

185. Dr. Moline served as an expert in Ms. Schoeniger's case.

186. The Key confirms that Ms. Schoeniger is a subject of the Article.

187. Case #28 is a likely match for Ms. Schoeniger.

188. Ms. Schoeniger testified that her husband sanded and applied joint compound in their home in the 1960s.

189. Dr. Moline's *own expert report* stated that "asbestos from joint compound that was applied and sanded in her home in the 1960s" was a "potential exposure" for Ms. Schoeniger.

190. But, in her Article, Dr. Moline represented that Ms. Schoeniger had no exposures to asbestos other than talcum powder.

191. Dr. Moline's statement that there were no other asbestos exposures for Ms. Schoeniger is knowingly false.

### 7. Edward Garcia

192. Plaintiff Edward Garcia filed a claim against Johnson & Johnson and other cosmetic talc defendants alleging that he was exposed to asbestos in their products.

193. Dr. Moline served as an expert in Mr. Garcia's case.

194. The Key confirms that Mr. Garcia is a subject of the Article.

195. Case #14 is a likely match for Mr. Garcia.

196. Mr. Garcia testified that he worked as a press operator at Eastern Molding.

197. In her *own expert report* in Mr. Garcia's case, Dr. Moline stated that exposure to industrial talc there represented a "potential exposure" to asbestos. Industrial talc can be as low as 35% talc.

198. But, in her Article, Dr. Moline represented that Mr. Garcia had no exposures to asbestos other than cosmetic talcum powder.

199. Dr. Moline's statement that there were no other asbestos exposures for Mr. Garcia is false.

### 8.    Sharon Hanson

200.   Plaintiff Sharon Hanson filed a claim against another cosmetic talc defendant alleging that she was exposed to asbestos in their products.

201.   Dr. Moline served as an expert in Ms. Hanson's case.

202.   In fact, Dr. Moline's causation opinions were *excluded* in the *Hanson* case. *Hanson v. Colgate-Palmolive Co.*, 353 F. Supp. 3d 1273, 1299 (S.D. Ga. 2018).

203.   Case #75 is a likely match for Sharon Hanson.

204.   The Key confirms that Ms. Hanson is a subject of the Article.

205.   Ms. Hanson's husband, Douglas Hanson, testified that he was potentially exposed to asbestos while working as an engineer for PPG Industries from 1974 to 1985, and again as a manager for LCP Chemicals from 1987 to 1993. One of Mr. Hanson's former coworkers at PPG Industries who worked in the same area during the same timeframe as Mr. Hanson testified that he worked hands on with raw asbestos and other asbestos-containing products. Ms. Hanson testified that during Mr. Hanson's employment at these two companies, she was primarily responsible for household laundry.

206.   Dr. Moline testified that Mr. Hanson's work around others handling asbestos represents a "potential exposure" to Ms. Hanson. But, in her Article, Dr. Moline represented that Ms. Hanson had no exposures to asbestos other than talcum powder.

50

207. Dr. Moline's statement that there were no other asbestos exposures for Ms. Hanson is knowingly false.

### 9. Mary Anne Caine

208. Plaintiff Mary Anne Caine filed a claim against other cosmetic talc defendants alleging that she was exposed to asbestos in their products.

209. Dr. Moline served as an expert in Ms. Caine's case.

210. The Key confirms that Ms. Caine is a subject of the Article.

211. Case #10 is a likely match for Ms. Caine.

212. Ms. Caine alleged in her complaint that for a period of twenty-six years, she "may have been exposed to asbestos which may have been brought home on the clothing of her former husband" from his work for a telephone company.

213. She also included this potential exposure in her fact sheet, listing "Household exposure via former husband, Joseph L. Griggs."

214. But, in her Article, Dr. Moline represented that Ms. Caine had no exposures to asbestos other than talcum powder.

215. Dr. Moline's statement that there were no other asbestos exposures for Ms. Caine is knowingly false.

### 10. Kayla Martinez

216. Plaintiff Kayla Martinez filed a claim against other cosmetic talc defendants alleging that she was exposed to asbestos in their products.

51

217.   Dr. Moline served as an expert in Ms. Martinez's case.

218.   The Key confirms that Ms. Martinez is a subject of the Article.

219.   Case #23 is a likely match for Ms. Martinez.

220.   A medical record for Ms. Martinez states: "Her father worked at a company with known asbestos exposure and held her in his work clothes as a child."

221.   But, in her Article, Dr. Moline represented that Ms. Martinez had no exposures to asbestos other than talcum powder.

222.   Dr. Moline's statement that there were no other asbestos exposures for Ms. Martinez is knowingly false.

### 11.   Barbara Arend

223.   Plaintiff Barbara Arend filed a claim against other cosmetic talc defendants alleging that she was exposed to asbestos in their products.

224.   Dr. Moline served as an expert in Ms. Arend's case.

225.   The Key confirms that Ms. Arend is a subject of the Article.

226.   Upon information and belief, Case #12 is a likely match for Ms. Arend.

227.   A medical record for Ms. Arend stated: "Barbara denies any asbestos exposure *other than the possibility of asbestos presence in the house where she grew up* as a child (apparently this was an old house that might have ha[d] asbestos shingles)."

52

228. But, in her Article, Dr. Moline represented that Ms. Arend had no exposures to asbestos other than talcum powder.

229. Dr. Moline's statement that there were no other asbestos exposures for Ms. Arend is knowingly false.

### 12. Blondia Clemons

230. Plaintiff Blondia Clemons filed a claim against Johnson & Johnson and other cosmetic talc defendants alleging that she was exposed to asbestos in their products.

231. Dr. Moline served as an expert in Ms. Clemons' case.

232. The Key confirms that Ms. Clemons is a subject of the Article.

233. Case #22 is a likely match for Ms. Clemons.

234. Automotive friction products like brakes are a common source of asbestos exposure.

235. Dr. Moline has served as an expert on behalf of plaintiffs who worked with brakes as a shade mechanic—such as Ms. Clemons' father—and she has testified those plaintiffs were exposed to asbestos from that work. It is Dr. Moline's opinion that exposure to abestos from friction products like automobile brakes can cause mesothelioma.

236. Dr. Moline has even testified that merely opening a box with friction parts would result in exposure to respirable asbestos.

53

237. Dr. Moline has also testified that typically there is still exposure to asbestos 10 to 30 feet away from brake work.

238. Ms. Clemons testified that her father was a mechanic and performed two to three brake jobs a day, six days a week, at the family's home during the entire period that Ms. Clemons resided there.

239. Ms. Clemons testified that she would sometimes be on the porch only a few feet away from her father working on cars in the driveway.

240. But, in her Article, Dr. Moline represented that Ms. Clemons had no exposures to asbestos other than talcum powder.

241. Dr. Moline's statement that there were no other asbestos exposures for Ms. Clemons is knowingly false.

### 13.   Irma Verdolotti

242. Plaintiff Irma Verdolotti filed a claim against Johnson & Johnson and other cosmetic talc defendants alleging that she was exposed to asbestos in their products.

243. Dr. Moline served as an expert in Ms. Verdolotti's case.

244. The Key confirms that Ms. Verdolotti is a subject of the Article.

245. Case #30 is a likely match for Ms. Verdolotti.

246. Ms. Verdolotti testified that her father worked as a steamfitter for the entire time she lived with him. She recalled him saying he worked with insulation.

54

247.   Ms. Verdolotti also testified that her sister worked in the warehouse of a Providence shipyard during World War II. During that time, Ms. Verdolotti shared a room with her, and her sister wore her work-clothes home.

248.   Shipyard workers have been identified as a group as having an increased incidence of mesothelioma that is been attributed to asbestos exposure, which Dr. Moline knows.

249.   Dr. Moline has testified that working in a shipyard is considered a classical occupational asbestos exposure and that take-home asbestos exposures resulting from family members working on ships or in a shipyard have also been well documented in the literature.

250.   Because shipyard exposures have been associated with asbestos-related disease for decades, Dr. Moline considers an individual to have a "potential exposure" if their family member worked on a shipyard—even without specific information into where precisely on the shipyard the family member worked or for how long.

251.   She also testified that if there was evidence an individual's family member worked in a shipyard, that "potential exposure" would mean the individual would not be in the Article.

252.   But, in her Article, Dr. Moline represented that Ms. Verdolotti had no exposures to asbestos other than talcum powder.

253.   Dr. Moline's statement that there were no other asbestos exposures for Case #30 is knowingly false.

### 14.    Ricardo Rimondi (Moline 2023)

254.   In January 2023, Dr. Moline published another article in response to the *Bell* opinion entitled, "Exposure to cometic talc and mesothelioma" in the Journal of Occupational Medicine and Toxicology ("Moline 2023 Article") (attached as **Exhibit L**).

255.   Dr. Moline presented "166 cases of individuals who have substantial asbestos exposure to cosmetic talc products as well as some who have potential or documented additional exposures to other asbestos-containing products and who subsequently developed mesothelioma." *Id.* at 1.

256.   Like the original article, these 166 individuals were all plaintiffs in litigation where Dr. Moline serves as an expert witness on behalf of plaintiffs' counsel. *Id.* at 2.

257.   According to Dr. Moline, "[i]n 122 cases, the only known exposure to asbestos was from cosmetic talc. For 44 cases, potential or documented alternate exposures in addition to the cosmetic talc were described." *Id.* at 1.

258.   The Moline 2023 Article is based on the same false premise as the original Article. Dr. Moline continues to fail to properly account for alternative exposures.

259.    Dr. Moline states in her new 2023 Article that she intentionally took "[e]fforts to minimize[] identification" of her new subjects such as by "describing age in a range" instead of an exact number.

260.    The Key Pecos River obtained also identifies the individuals in the Moline 2023 Article.

261.    Despite Dr. Moline's attempts to obfuscate, Moline 2023 Article Case #25[26] is a likely match for Ricardo Rimondi, who brought a claim against Pecos River alleging that he was exposed to asbestos through use of Johnson's Baby Powder:

262.

|  | Mr. Rimondi | Case #5 |
|---|---|---|
| Gender | Male | Male |
| Age At Diagnosis | 56 | 51-60 |
| Mesothelioma Site | Pleural Epithelial | Pleural Epithelial |
| Estimated Years Of Use | ~50 | 49 |
| Latency | 55 | 55 |
| Diapering Others | Yes | Yes |
| Occupation | **Moline Expert Report at 7**<br><br>"He then moved to Entenmann's, *a baked goods manufacturer*, where he worked from 1998 until 2010" | **Moline 2023 Article at 5**<br><br>"Baked goods manufacturer" |

_____

[26] Dr. Moline does not number the subjects of her 2023 Article. Case #25 is the third from the top on page 5 with the occupation "baked goods manufacturer."

57

263. The Moline 2023 Article states under "Certainty of Alterative Exposure" for Case #25: "None."

264. The Key confirms that Mr. Rimondi is a subject of the Moline 2023 Article.

265. But Mr. Rimondi had alternative exposures to asbestos from living near the Eternit Plant in Peru (which purchased asbestos cement machine products). Dr. Moline knew about this exposure from her testimony at the trial.

266. One study by Dr. Magnani found that living between 1500 and 2499 meters from an Eternit facility in Italy would have increased the chance that a person developed mesothelioma by **2,000 percent**. *See* Magnani et al., *Increased Risk of Malignant Mesothelioma of the Pleura after Residential or Domestic Exposure to Asbestos: A Case–Control Study in Casale Monferrato, Italy* Environ Health Perspect. 2001 Sep;109(9):915–919. doi: 10.1289/ehp.01109915, available at https://pmc.ncbi.nlm.nih.gov/articles/PMC1240441/.

267. Dr. Magnani was not an expert in the *Rimondi* case.

268. Mr. Rimondi lived 2270 meters away from the Peruvian Eternit Plant from 1960 to 1969, lived 1580 meters away from the plant from 1969-1992, and went to an elementary school located 2120 meters away from the plant.

269. Dr. Moline was aware of where Mr. Rimondi lived in Peru.

270. The website of another plaintiff's expert who testified in that case even discusses the Peruvian Eternit facility which is listed as a purchaser of asbestos cement machine products in 1965.

271. Dr. Moline had been taught to ask about whether someone lived near an asbestos factory because she was aware of a body of literature about environmental exposure to asbestos increasing the risk of mesothelioma. And she was aware that Dr. Magnani had published on asbestos exposure as a result of an Eternit factory in Italy.

272. Moreover, Dr. Moline was cross-examined about Mr. Rimondi's Eternit factory exposure at trial. Mr. Rimondi's case was filed in New Jersey, and Dr. Moline testified at the trial in New Jersey.

273. Mr. Rimondi's case resulted in a full defense verdict.

274. But again, in her 2023 Article, Dr. Moline represented that Case #25's potential for alternative exposures to asbestos was "none."

275. Dr. Moline's statement that there were no other asbestos exposures for Mr. Rimondi false.

### 15. Rafaella Marisco (Moline 2023)

276. Rafaella Marisco is a subject of the 2023 Article according to the Key.

277. Ms. Marisco is likely match for Case # 111.

59

278. For Case #111, Dr. Moline sated: "Certainty of Alternate Exposure: None."

279. Ms. Marisco's complaint and interrogatory responses asserted an exposure to asbestos from phenolic molding compounds at her prior employer, H.H. Fluorescent Parts, Inc.

280. Dr. Moline's statement that no non-talc exposures to asbestos exist for Ms. Marisco is false.

### 16. Santa Rea (Moline 2023)

281. Santa Rea is a subject of the 2023 Article according to the Key.

282. Ms. Rea is likely match for Case # 69.

283. For Case #69, Dr. Moline sated: "Certainty of Alternate Exposure: None."

284. Ms. Rea's medical records state the fire-proof insulation where she lived and exposure to dust and debris in the aftermath of the 9/11 terrorist attacks is believed to be her asbestos exposures.

285. Dr. Moline's statement that no non-talc exposures to asbestos exist for Ms. Rea is false.

### 17. Christina Lopez (Moline 2023)

286. Christina Lopez is a subject of the 2023 Article according to the Key.

287. Ms. Lopez is likely match for Case # 107

60

288.    For Case #107, Dr. Moline sated: "Certainty of Alternate Exposure: None."

289.    Ms. Lopez's medical records stated that she had some asbestos exposure growing up in her home as well as in the canning factory she worked in.

290.    Dr. Moline's statement that no non-talc exposures exist for Ms. Lopez is false.

## IV.    Dr. Moline and Plaintiffs' Counsel Concealed the Falsity of Her Statements

291.    During the time Dr. Moline has been repeating the falsehood that none of the individuals in her Article had alternative exposures to asbestos, she, her employer, and plaintiffs' counsel resisted efforts by others to obtain information about her cases which would uncover the Article's false premise.

292.    On 10 separate occasions, Dr. Moline refused to testify at her deposition in cases against Pecos River regarding the identities of the individuals in her Article. For example:

- **November 2019:** "I will not comment on any further cases that might or might not be included in the paper."

- **February 2020:** "I will not name names in this deposition. That is correct."

- **June 2020:** "I am not willing to discuss any names of any of the individuals in the paper of any of the 33."

- **January 2021:** "I decline to disclose the identi[t]ies or facts apart from what is described in the paper, and my feelings on this have not changed or my position on that has not changed."

61

293.   In one instance, Dr. Moline bizarrely testified at her deposition that she could not identify "Ms. D" from her congressional testimony (i.e., Ms. Bell) because Ms. D was "based on an amalgam of different folks."

294.   But when asked, "So is Ms. D one person?" Dr. Moline responded, "In essence, yes."

295.   She then refused to identify Ms. D: "Ms. D does have a real name. I will not disclose it because it was from one of the individuals in my paper."

296.   She would not even answer the basic question: "Were there any documents that you saw that alleged exposure to asbestos other than from talc?"

297.   She then refused to answer any questions regarding Ms. Bell's case.

298.   A defendant moved to compel Dr. Moline's testimony identifying the individuals in her article. Dr. Moline, her employer (Northwell Health), and the plaintiff all opposed the motion.

299.   As noted, Ms. Bell's example was only uncovered after extensive discovery efforts in North Carolina federal court.

300.   And Pecos River only obtained the key after even further extensive efforts in multiple courts.

## V.    Dr. Moline Was Motivated by Fame and Fortune

301.   Dr. Moline disparaged Johnson's Baby Powder and Shower to Shower for her own professional aggrandizement and financial gain.

302.    The Article in part represented an attempt to gain publicity and enhance her own stature within the scientific community.

303.    In the Article, Dr. Moline attempts to explicitly align herself with one of the two most preeminent scientists in the asbestos space: Dr. J. Christopher Wagner. As the Article describes, Dr. Wagner published a famous and groundbreaking article in 1960 concerning 33 mesothelioma cases, which was the first epidemiology study linking asbestos exposure with the development of mesothelioma. Ex. A, Moline Article at 11. Not coincidentally, Dr. Moline chose 33 cases for *her study*, and was quick to make the connection: "Like Wagner, we present 33 cases. . . ." Ex. A, Moline Article at 11.

304.    Dr. Moline also tirelessly promoted herself by using the Article, discussing it publicly at speaking engagements, before Congress, and to the media, as discussed above.

305.    Her employer, Northwell Health, also used the Article to promote Dr. Moline. It ran a prominent story concerning the Article on its website, saying: "For the first time, Jacqueline Moline, MD, MSc, professor in the Institute of Health Innovations and Outcomes Research at The Feinstein Institutes for Medical Research, and her colleagues have identified household talcum powder contaminated with asbestos as the root cause of malignant mesothelioma in 33 long-

63

term users, as published in the Journal of Occupational and Environmental Medicine."[27]

306.    The web story repeated the false premise of the Article: "The patients had no other known exposure to asbestos, and in the six detailed, the tissue analysis revealed the presence of asbestos commonly found in talc and not that found in other commercial products, such as automobile brakes or home insulation materials. It was determined that the 27 other individuals in the study were also linked to contaminated talcum powder, as they had no additional exposure to asbestos."

307.    Beyond just the recognition the Article brought Dr. Moline, the asbestos plaintiffs' bar pays Dr. Moline hundreds of thousands of dollars a year to serve as an expert witness to help them win jury verdicts. This litigation work represents nearly half her income.

308.    Those verdicts then help fund plaintiffs' law firms, who typically receive a large percentage of the verdict amount (often in the millions of dollars). That money is then used, in part, to hire Dr. Moline for the next case.

309.    To keep this cycle in motion and the money flowing, Dr. Moline has every incentive to try to help the plaintiffs' bar as much as possible, both by trying to sway public opinion and by manufacturing support for what she is saying in court.

---

[27] https://feinstein.northwell.edu/news/the-latest/talc-powder-exposure-linked-to-mesothelioma

64

310. The Article stated that one of its purposes was "underlin[ing] the importance of collecting detailed exposure histories . . . in patients presenting with mesothelioma." Ex. A, Article at 6–7. But Dr. Moline's stated purpose for her Article is not true but rather a pretext.

311. To be clear, Dr. Moline did not publish the Article or make the challenged public statements to advance academic or scientific discourse. Nor did she do so with the intent to advance the interests of any particular talc plaintiff. Rather, Dr. Moline acted to further her own interest, gain fame, and gain fortune for herself.

312. By helping the plaintiffs' lawyers, she ultimately was helping herself.

## VI.    Dr. Moline's Statements Perpetuated a Decades-Long Fraud in Asbestos Litigation

313. The circumstances surrounding the Moline Article, including her knowing or reckless misrepresentations and subsequent efforts to conceal pertinent facts, may at first blush appear difficult to believe. But, sadly, Dr. Moline's actions fit a pattern of fraud both in the cosmetic talc litigation specifically and asbestos litigation writ-large.

314. One of the most egregious problems—central to the asbestos plaintiffs' bar's business model—is submitting claims against multiple defendants, without disclosing to each successive defendant the prior assertions predicated on alternative

65

uses. Then the sheer volume of claims is used to coerce portfolio settlements that don't reflect the merits of each individual claim.

315.    The *Garlock* proceedings are a famous example of fraud by hiding alternative exposures.

316.    A North Carolina bankruptcy court found evidence of "wide-ranging, systematic, and well-concealed fraud designed to suppress evidence and inflate settlement values for mesothelioma claims." *Garlock Sealing Techs., LLC v. Shein*, No. 3:13-cv-137, 2015 WL 5155362, at *2 (W.D.N.C. Sept. 2, 2015) (citing *In re Garlock Sealing Techs.*, LLC, 504 B.R. 71, 85 (Bankr. W.D.N.C. 2014)).

317.    More specifically, the *Garlock* court found that evidence of exposure to large, now-bankrupt asbestos manufacturing companies "disappeared" as a result of "the effort by some plaintiffs and their lawyers to withhold evidence of exposure to other asbestos products and to delay filing claims against bankrupt defendants' asbestos trusts until after obtaining recoveries" in the tort system. *In re: Garlock*, 504 B.R. at 84. The court found that these "demonstrable misrepresentation(s)" were "sufficiently widespread" in the asbestos tort system "to have a significant impact" on settlement practices and results. *Id.* at 85.

318.    Notably, the day before the bankruptcy court issued that holding, Garlock sued five plaintiffs' firms for the litigation conduct discussed by the court under the Racketeer Influenced and Corrupt Organizations Act, better known as

66

RICO.[28] Upon information and belief, those lawsuits were instrumental in and resolved in connection with the final plan of reorganization in the *Garlock* case.

319.   One of the firms sued was Simon Greenstone Panatier Bartlett, P.C, a firm that has paid Dr. Moline to testify 20 times in one three-year span. And it is the very same firm that sought to keep her data sealed and hidden in the *Bell* matter.

320.   Since *Garlock*, other recent bankruptcy proceedings have uncovered further examples of fraud.

321.   ***Bestwall Bankruptcy***. In a particularly damning twist, it appears that Dr. Moline is not the only plaintiff-expert-turned-author whose litigation-influencing misstatements are coming to light in bankruptcy courts right now. The North Carolina debtor Bestwall is faced with a conundrum much like the Moline Article, which it is presently conducting discovery on while the asbestos plaintiffs' bar fights tooth and nail to keep relevant information hidden.[29] Similar to Dr. Moline, Plaintiffs' expert James Dahlgren published a 2012 article claiming to identify three cases of mesothelioma in which the only known exposure to asbestos

---

[28] *See Garlock Sealing Techs., LLC v. Simon Greenstone Panatier Bartlett, P.C.*, No. 3:14-cv-116 (W.D.N.C.); *Garlock Sealing Techs., LLC v. Belluck & Fox, LLP*, No. 3:14-cv-118 (W.D.N.C.); *Garlock Sealing Techs., LLC v. Waters & Kraus.*, No. 3:14-cv-130 (W.D.N.C.) (Stanley-Iola, LLP also named a defendant); and *Garlock Sealing Techs., LLC v. Shein Law Center, Ltd.*, No. 3:14-cv-137 (W.D.N.C.).

[29] *In re Bestwall LLC*, No. 17-BK-31795 (LTB) (W.D.N.C. Bankr.).

was from joint compound manufactured by Old Georgia Pacific (predecessor to Bestwall). Although the company settled all three of the cases covered in the article, it now has uncovered that these individuals submitted claims to various asbestos trusts claiming exposure to other sources of asbestos after the cases were settled.

322. ***Imerys Bankruptcy***. Fraud has even been uncovered in a recent cosmetic talc bankruptcy filed by the talc supplier for Johnson's Baby Powder. In the Imerys bankruptcy pending in New Jersey, one plaintiffs' lawyer was forced to concede under oath that he took a list of individuals diagnosed with ovarian cancer or mesothelioma and asserted claims against the debtor without even assessing whether the claimant had ever used Johnson's Baby Powder. What's more, in some instances, the claimant previously alleged and recovered on a theory that his/her disease was exclusively attributable to another company's products.

**VII.    Pecos River Was Gravely Harmed by Dr. Moline's False Statements**

323.    Dr. Moline's disparagement of Johnson's Baby Powder and Shower to Shower talc products for her own aggrandizement harmed Pecos River.

324.    Dr. Moline knew that Pecos River's principal place of business was in New Jersey. She targeted New Jersey with her false statements, and New Jersey is the focal point of her false statements.

325. As discussed above, Dr. Moline repeated her false statements multiple times over the years, ensuring they would reach the public, particularly through the press such as *Time* Magazine.

326. Her Article became available online on October 10, 2019. In October 2019, the call center handling the Consumer business of Johnson & Johnson saw a significant increase in contacts.

327. The sales volume and profits from Johnson's Baby Powder declined in 2019 and again in 2020. And an ever-increasing percentage of Johnson's Baby Powder sales was the corn starch-based version compared to the talc-based version. Dr. Moline's statements and the resulting publicity were a substantial cause of this sales decline.

328. Johnson & Johnson announced in May 2020 the discontinuation of talc-based Johnson's Baby Powder in the United States and Canada. As the press release at the time explained: "Demand for talc-based Johnson's Baby Powder in North America ha[d] been declining due in large part to changes in consumer habits and fueled by misinformation around the safety of the product and a constant barrage of litigation advertising." The Moline Article is a central element of that misinformation.

329. Pecos River also incurred substantial costs as a direct result of Dr. Moline's false statements. Among other costs, Pecos River spent millions of dollars

69

in fees paid to attorneys, expert witnesses, and other professionals to investigate, respond to, defend against, and otherwise counteract Dr. Moline's false statements. That included deposing Dr. Moline multiple times regarding her Article.

330. Indeed, Dr. Moline's false statements have forced Pecos River to file this lawsuit to correct the record.

## CAUSES OF ACTION

### Count I: Injurious Falsehood / Product Disparagement

331. Pecos River hereby incorporates each preceding paragraph as though fully set forth herein.

332. Dr. Moline has made statements that contain false and untrue assertions of fact, including the false statements referenced above, which include, but are not limited to (emphasis added):

    a. Multiple factual assertions in the Article, including:

        i. "Talcum powder usage *was the only source of asbestos for all 33 cases*."

        ii. "*For all 33 cases*, other potential exposures to asbestos were considered, with *no identified source apart from the talcum powder*."

70

iii. "[W]e present 33 cases, predominantly of women, who had *no known exposure to asbestos* other than prolonged use of talcum powder."

iv. "Amosite and crocidolite, asbestos fibers … *were not found in any*" of the six subjects whose tissue samples were tested.

b.      Dr. Moline's statement to *Time* Magazine, published on October 15, 2019, that "[t]his is the first time that anyone has said, 'Let me look at all these cases, put it all together and identify the ones where *[talc] is the sole exposure*.'"

c.      Dr. Moline's statements to Romper.com, published on October 16, 2019, that "[a]ll the folks in the study used cosmetic talc, usually for decades, and they *all had mesothelioma with no other asbestos source*" and "[w]e couldn't find *any other source* apart from the cosmetic talc."

d.      Dr. Moline's statement in her written Congressional testimony that "my colleagues and I reported on 33 individuals with *no other identifiable source of exposure* apart from cosmetic talc," and her assertion that "Ms. D" had "no known exposure to asbestos" in her work in the textile industry.

71

e.     Dr. Moline's statement in her oral Congressional testimony that she and her colleagues "reported on 33 individuals *whose only source of asbestos exposure was cosmetic talc*."

f.     Dr. Moline's statement at a May 13, 2020, event organized by the Asbestos Disease Awareness Organization that "[w]hat we found in these individuals is that *these 33 did not have any other known source of asbestos exposure* that we could discern from the information that we were provided."

g.     Dr. Moline's comment to EPA, posted on its website on June 1, 2020, that "[m]y colleagues and I reported on 33 individuals with mesothelioma with no other identifiable source of exposure apart from cosmetic talc."

h.     Dr. Moline's statement, in discussing the article at a September 17, 2022, *ADAO Asbestos Awareness and Prevention Conference*, that "[w]e were unaware of any asbestos exposure apart from talc." A slide describing the Article falsely stated: "Talcum powder as the only asbestos exposure."

333.   Dr. Moline published the false statements alleged herein to others, including through electronic and hard-copy publication of the Article, written and oral testimony to Congress, at least one national magazine, and multiple conferences. Dr. Moline's false statements were read and otherwise received by the public at

72

large, consumers and manufacturers of cosmetic talc products, Congressional and government officials, scientists, and attorneys and expert witnesses involved in talcum powder litigation, among others.

334. Dr. Moline's false, influential, and groundbreaking Article has been republished by numerous sources, including multiple plaintiffs' firms and advocacy groups soliciting talc-related personal injury claims relied upon by plaintiffs' multiple expert witnesses in talc litigation; and considered by judges and juries throughout the country adjudicating cosmetic talc claims.

335. Dr. Moline intended and/or reasonably anticipated that the publication of her false statements would disparage the safety of the Johnson's Baby Powder and Shower to Shower products and harm Pecos River's interests. Dr. Moline's false statements did disparage the safety of those products.

336. Dr. Moline acted with actual malice because her false statements were made with the knowledge that they were false and/or with reckless disregard as to their truth or falsity. Moreover, as described herein, Dr. Moline has repeatedly sought to conceal evidence betraying the falsity of her statements and demonstrating that her statements were made with knowledge that they were false and/or with reckless disregard as to their truth or falsity. Dr. Moline's acts of concealment include statements reaffirming the false statements in the Article and refusing to

disclose the identity of the 33 subjects of the Article or answer questions about the information she reviewed prior to the Article's publication.

337.  Dr. Moline acted without any privilege, authorization, or immunity in making her false statements. The statements alleged herein are not protected statements of scientific opinion but, rather, economically-motivated, false, and inaccurate statements concerning the data underlying her Article.

338.  Dr. Moline's false statements were made of and concerning Pecos River's products. Dr. Moline's false statements impugned the safety of all cosmetic talc products, including Johnson's Baby Powder and Shower to Shower. Johnson's Baby Powder and Shower to Shower products were well-recognized, the leading brands among a discrete and limited number of cosmetic talc products in the market. The Article identifies Johnson's Baby Powder (product "D") and Shower to Shower (product "I") as two of the 22 brands of cosmetic talc allegedly used by the Article's 33 subjects. According to the Article, 19 of the 33 subjects allegedly used Johnson's Baby Powder—more than any other brand.

339.  Dr. Moline's false statements were published contemporaneously with statements referring to Johnson's Baby Powder, including through Congressional testimony, advocacy events, plaintiff attorney websites, and various media outlets. For example, the subcommittee chairman began the hearing featuring Dr. Moline's Congressional testimony by referencing allegations of asbestos in "Johnson and

74

Johnson's talc-based baby powder" and by displaying images of Johnson's Baby Powder.

340. Anyone reading, hearing, or otherwise receiving Dr. Moline's false statements would have associated those statements with the Johnson's Baby Powder and Shower to Shower products. Indeed, on repeated occasions, Johnson & Johnson and Pecos River were asked to comment on Dr. Moline's Article and false statements, thereby demonstrating that readers of the statements in fact associated them with Pecos River's products.

341. After the online publication of the Article, Dr. Moline has been disclosed in at least 58 cosmetic talc/mesothelioma cases against Pecos River, many of which in New Jersey. Dr. Moline routinely relies on her Article in these cases. Moreover, in at least 63 cosmetic talc/mesothelioma cases against Pecos River, a combined 20 other plaintiff experts have relied on the Article in either their deposition or court disclosures.

342. As a direct and proximate cause of Dr. Moline's false statements, Pecos River has suffered, and continues to suffer, actual and special damages, including, without limitation, lost profits on the sale of Johnson's Baby Powder and Shower to Shower caused by the widespread dissemination of the Article; increased fees to defend (including substantial fees paid to attorneys, expert witnesses, and other professionals to investigate, respond to, and defend against Dr. Moline's assertions)

75

and resolve Talc Claims; and other expenses incurred to counteract and prevent Dr. Moline's false statements from causing further harm (including the costs of this litigation). Pecos River felt the brunt of this harm in New Jersey, where its principal place of business is located.

343.   Dr. Moline knew or reasonably should have anticipated that her false statements and subsequent acts of concealment would cause the aforementioned actual and special damages to Pecos River.

## PRAYER FOR RELIEF

WHEREFORE, Pecos River respectfully requests judgment or relief against Dr. Moline as follows:

1)   Awarding special, compensatory, and punitive money damages to Pecos River against Dr. Moline for injurious falsehood and product disparagement;

2)   Enjoining Dr. Moline from continuing to make false statements of the type alleged herein;

3)   Enjoining Dr. Moline to answer questions regarding her Article that she has to date refused to answer;

4)   Enjoining Dr. Moline to retract and/or issue a correction of her Article;

5)      Enjoining Dr. Moline to produce unsealed records identifying the individuals in the Article;

6)      Awarding Pecos River the costs of this action, including attorneys' fees, together with pre- and post-judgment interest; and

7)      Awarding Pecos River such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pecos River respectfully requests a trial by jury on all triable issues in accordance with Fed. R. Civ. P. 38.

Dated: April 29, 2025                          Respectfully submitted,

**KIRKLAND & ELLIS LLP**                        **PATTERSON BELKNAP WEBB & TYLER LLP**

                                                */s/ Peter C. Harvey*

Allison M. Brown                                Peter C. Harvey
601 Lexington Avenue                            Thomas P. Kurland (pro hac vice)
New York, NY 10022                              1133 Avenue of the Americas
Telephone: (212) 446-4800                       New York, NY 10036-6710
Facsimile: (212) 446-4900                       Telephone: (212) 336-2000
alli.brown@kirkland.com                         Fax: (212) 336-2222
                                                pcharvey@pbwt.com
                                                tkurland@pbwt.com

                                                **KING & SPALDING, LLP**

                                                Kristen Fournier (pro hac vice)
                                                Matthew Bush (pro hac vice)
                                                1185 Avenue of the Americas
                                                34th Floor
                                                New York, NY 10036
                                                Telephone: (212) 556-2100
                                                Facsimile: (212) 556-2222
                                                kfournier@kslaw.com
                                                mbush@kslaw.com

*Counsel for Plaintiff Pecos River Talc LLC*

78