Kevin H. Marino
John D. Tortorella
Erez J. Davy
MARINO, TORTORELLA & BOYLE, P.C.
437 Southern Boulevard
Chatham, New Jersey 07928-1488
Tel: (973) 824-9300
Fax: (973) 824-8425
*Attorneys for Defendant*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| PECOS RIVER TALC LLC,<br><br>        Plaintiff,<br><br>v.<br><br>DR. JACQUELINE MIRIAM MOLINE,<br><br>        Defendant. | Case 3:23-cv-02990-GC-JTQ<br><br>Hon. Georgette Castner, U.S.D.J. |
| DR. JACQUELINE MIRIAM MOLINE,<br><br>        Counterclaim-Plaintiff,<br><br>v.<br><br>PECOS RIVER TALC LLC; JOHNSON &<br>JOHNSON HOLDCO (NA) INC.; and<br>JOHNSON & JOHNSON,<br><br>        Counterclaim-Defendants. | **ANSWER TO AMENDED<br>COMPLAINT WITH<br>AFFIRMATIVE DEFENSES<br><u>AND COUNTERCLAIM</u>** |

Defendant, Dr. Jacqueline Miriam Moline ("Dr. Moline"), submits this Answer and Counterclaim to the Amended Complaint of Pecos River Talc LLC ("Pecos River"), dated April 29, 2025 (ECF No. 47-4) and re-filed on March 3, 2026 (ECF No. 64). In responding to the Amended Complaint, Dr. Moline responds to the substantive allegations set forth in the enumerated paragraphs and does not respond to the organizational headings used by Pecos River. For the avoidance of doubt, Dr. Moline denies any factual allegation suggested by these headings.

## INTRODUCTION

*Cplt ¶ 1.*    This is an action to recover for the knowing and repeated disparagement of Johnson's Baby Powder and Shower to Shower by Dr. Jacqueline Moline.

1.    Defendant denies the allegations in paragraph 1.

*Cplt ¶ 2.*    In 2019, Dr. Moline published an article claiming that 33 individuals who used talc powder and developed the asbestos-related cancer mesothelioma had no other potential exposures to asbestos—pointing the finger squarely at talc products such as Johnson's Baby Powder. *See* **Exhibit A**, Moline, et. al., *Mesothelioma Associated With the Use of Cosmetic Talc* (2019) (the "Moline Article" or the "Article") (reporting on individuals with pleural or peritoneal mesothelioma).

2.    Defendant admits that an article titled *Mesothelioma Associated with the Use of Cosmetic Talc* was published in the January 2020 edition of the Journal of Occupational and Environmental Medicine ("JOEM") (the "JOEM Article"). Defendant denies the remaining allegations in paragraph 2.

*Cplt ¶ 3.*    Dr. Moline knew that claim was false when she made it, and that individuals she referenced in her Article had admitted to—and indeed had made

2

claims seeking compensation for—exposure to other sources of asbestos, or she recklessly disregarded substantial evidence of these individuals' alternative exposures. Dr. Moline nonetheless reiterated her false claims to the media, in scientific literature, at public conferences, and to Congress, judges and juries.

3. Defendant denies the allegations in paragraph 3.

*Cplt ¶ 4.* Dr. Moline engaged in this widespread deception—not for any laudable public purpose—but for her own personal aggrandizement and gain. She received accolades, speaking opportunities, and acclaim for her self-proclaimed novel and disruptive study. And her disparaging statements provided a foundation for the mass tort asbestos plaintiffs' bar's baseless claims against Pecos River, which richly compensated her with millions of dollars of fees to act as their "expert" and mouthpiece.

4. Defendant denies the allegation in paragraph 4 that she engaged in any deception. Defendant admits that she received recognition and speaking opportunities in connection with the JOEM Article. Defendant admits that she received fees in connection with her service as an expert witness. Defendant denies the remaining allegations in paragraph 4.

*Cplt ¶ 5.* Dr. Moline's deception was laid bare in September 2022 by a federal judge in the District Court for the Middle District of North Carolina who rejected the efforts of certain plaintiffs' law firms for whom Dr. Moline works to keep the evidence of her deceit under seal. *See* **Exhibit B**, *Bell v. Am. Int'l Indus. et al.*, No. 1:17-CV-00111 (M.D.N.C. Sept. 13, 2022), ECF No. 398 at 4, 17, 22 (the "*Bell* Opinion"). The *Bell* Opinion excoriated Dr. Moline because of her "concealment" of information about occupational asbestos exposures of Betty Bell—a plaintiff in cosmetic talc litigation who was also confirmed to be one of the individuals included in Dr. Moline's article. *Id.* at 16-18, 20. The court found that the inclusion of an individual with asbestos exposures apart from allegedly contaminated talc had "direct bearing on the study's credibility" as it contradicted the entire foundation of the Article. The Court also expressed grave concern about the "groundbreaking nature" and "widespread influence" of the Moline Article "on the cosmetic talc litigation nationwide" given that this critical information had been shielded from public disclosure until the *Bell* Opinion was issued. *Id.*

3

5.      Defendant refers to the court's decision in *Bell v. Am. Int'l Indus. et al.*, No. 1:17-CV-00111 (M.D.N.C. Sept. 13, 2022), ECF No. 398, for a full and accurate statement of its contents.  Defendant denies the remaining allegations in paragraph 5.

*Cplt ¶ 6.*      As Dr. Moline intended, her disparaging statements have caused Pecos River significant and ongoing commercial, reputational, and financial harm. In fact, when Pecos River's predecessor announced that it would stop selling talc-based Johnson's Baby Powder in North America, it cited "declining" demand "due in large part to changes in consumer habits" that were "fueled by misinformation around the safety of the product and a constant barrage of litigation advertising." The Moline Article is a central element of that misinformation.

6.      Defendant denies the allegations in paragraph 6.

*Cplt ¶ 7.*      With her malfeasance now unveiled, Dr. Moline should be held accountable for the egregious harm she has caused to Pecos River, and should be required to retract her Article and issue corrective disclosures. Further, the deliberate nature of Dr. Moline's conduct demands a stringent award designed to deter such conduct, which has become a hallmark of the mass tort plaintiffs' bar's business model.

7.      Defendant denies the allegations in paragraph 7.

*Cplt ¶ 8.*      Indeed, the revelation of Dr. Moline's deceit is only further affirmation of a long-running and troubling trend of doctors leveraging their credentials to fabricate false narratives and support "junk science" to bolster the mass tort plaintiffs' bar's claims.[1] These purported experts contrive baseless

---

[1] As just one example, in December 2022, the Southern District of Florida dismissed thousands of product liability claims advanced against pharmaceutical manufacturers, detailing the unfounded, unreliable and unscientific opinions that had been submitted by a roster of plaintiffs' experts—including Dr. Anne McTiernan, who also partnered with Dr. Moline to fabricate a false narrative regarding the very talc products at issue here. *In re Zantac (Ranitidine)*, MDL No. 2924, Doc. No. 6120 (S.D. Fla. Dec. 6, 2022). The long history of manipulating science in asbestos litigation, and now talc litigation, is laid out in more detail in Section VI below.

opinions, which plaintiffs' lawyers then use to confuse juries, secure extreme verdicts, and in turn pay these same experts. This trend is on a steep upward trajectory, with increased litigation financing fueling extensive lawyer advertising that solicits large volumes of claimants regardless of merit. And all the while, the plaintiff firms and experts fight to conceal their duplicity behind protective orders and have fought disclosure of key facts that would illuminate this deceit.

8.      Defendant denies the allegations in paragraph 8, including footnote 1 thereto.

*Cplt ¶ 9.*      This cycle must end. The false narratives contrived by purported experts like Dr. Moline cause harm to the manufacturers whose products they target—and to those individuals who are suffering from harm wrongly attributed to such products. Rather than addressing the actual cause of their harm, these individuals are led astray by contrived claims amplified by the law firms that purport to represent their interests. This is a grave wrong that must be righted.

9.      Defendant denies the allegations in paragraph 9.

## PARTIES

*Cplt ¶ 10.*      Pecos River Talc LLC ("Pecos River") is a Texas limited liability company with its principal place of business in New Jersey.

10.      Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 10.

*Cplt ¶ 11.*      Pecos River has one member: Johnson & Johnson Holdco (NA) Inc. Johnson & Johnson Holdco (NA) Inc. is a citizen of New Jersey. Johnson & Johnson Holdco (NA) Inc. is a corporation incorporated in and with its principal place of business in New Jersey. Pecos River is therefore a citizen of New Jersey.

11.      Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 11.

---

Sadly, the Moline Article is just the latest iteration that has come to light, but its impact—particularly as to Pecos River—has been substantial.

5

*Cplt ¶ 12.*    This case was originally filed by LTL Management LLC, which later changed its name to LLT Management LLC.  In 2024, a restructuring occurred.  LLT Management LLC ceased to exist and three new Texas limited liability companies were created, among which the liabilities and assets which formerly belonged to LLT were allocated.  One of those was Pecos River.

12.    Defendant admits that this case was originally filed by LTL Management LLC.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 12.

*Cplt ¶ 13.*    Pecos River was allocated any direct talc personal injury claim that (i) alleges that the relevant injured or deceased individual was exposed to talc or the product or material containing talc, as applicable, in Canada or resided in Canada at the time such direct talc personal injury claim is filed, or was brought, threatened, or pursued in any court in Canada ("Canadian Talc Personal Injury Claims"); (ii) any talc personal injury claim asserted or assertable by or on behalf of any governmental unit under any federal, state, international or foreign consumer or employee protection rule, statute, or regulation ("Governmental Action Claims"); (iii) any direct talc personal injury claim that alleges that the relevant injured or deceased individual developed Mesothelioma or Lung Cancer (and not ovarian cancer, gynecological cancer, or any other disease) in connection with such individual's use of talc or a product or material containing talc ("Mesothelioma/Lung Cancer Talc Personal Injury Claims"); and (iv) any indirect talc personal injury claims to the extent in respect of any of the foregoing; and specified assets.[2]

13.    Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 13, including footnote 2 thereto.

*Cplt ¶ 14.*    As relevant to this case, Pecos River was allocated both the liabilities and assets of the mesothelioma litigation in which LLT Management LLC (f/k/a LTL Management LLC) was involved, including this case, which asserts

---

[2] Pecos River was not allocated any claims of Imerys Talc America, Inc., Cyprus Mines Corporation or any of their current or former affiliates for contribution, reimbursement, subrogation, or indemnity.

claims of trade libel arising from Defendant Dr. Jacqueline Miriam Moline's false statements about an association between cosmetic talcum powder use and the subsequent development of mesothelioma.

14. Defendant denies that she made false statements about an association between cosmetic talcum powder use and the subsequent development of mesothelioma. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 14.

**Cplt ¶ 15.** Pecos River was substituted for LTL Management LLC in the Third Circuit, and that substitution was uncontested. *See Pecos River Talc LLC v. Moline*, No. 24-235 (3d Cir.), Dkt. No. 19.[3]

15. Defendant admits that Pecos River filed an uncontested substitution motion in the appeal captioned *Pecos River Talc LLC v. Moline*, No. 24-235 (3d Cir.), and that the motion was granted. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 15, including footnote 3 thereto.

**Cplt ¶ 16.** As such, Pecos River now stands in the shoes of LLT Management LLC's (f/k/a LTL Management LLC) as the proper party to pursue this case as plaintiff. This Complaint will use "Pecos River" to refer to both itself and its predecessors.

16. Paragraph 16 consists of a legal conclusion to which no response is required. To the extent a response is required, Defendant denies that Pecos River is the proper party to pursue this case as plaintiff. Given that the Complaint defines

---

[3] Further details regarding the restructuring can be found in Pecos River's substitution motion before the Third Circuit. *See id.*, Dkt. No. 16.

"Pecos River" to include both Pecos River and its predecessors (LLT Management

LLC (f/k/a LTL Management LLC)), Defendant applies the definition throughout

this Answer without waiving her defense that the alleged assignment/allocation of

tort claims to Pecos River is not legally valid.

*Cplt ¶ 17.*    Defendant Dr. Jacqueline Miriam Moline is an Occupational Medicine specialist and Professor of Occupational Medicine, Epidemiology and Prevention and Internal Medicine, and the Chairperson of the Department of Occupational Medicine, Epidemiology and Prevention at the Donald & Barbara Zucker School of Medicine at Hofstra/Northwell, as well as Director of the Northwell Health Queens World Trade Center Health Program, and Director of the New York State funded Occupational and Environmental Medicine of Long Island Clinical Center. Dr. Moline is a citizen of New York.

17.    Defendant admits the allegations in paragraph 17.

*Cplt ¶ 18.*    Dr. Moline has been disclosed as a plaintiff's expert in over 200 cosmetic talc/mesothelioma cases against Pecos River. She has provided deposition testimony in at least 46 talc/mesothelioma cases against Pecos River, as well as trial testimony in 16 of those cases.

18.    Defendant admits that she has been disclosed as a plaintiff's expert in

cosmetic talc/mesothelioma cases against various Johnson & Johnson entities and

provided deposition and trial testimony in many of those cases.  Defendant lacks

knowledge or information sufficient to form a belief as to the truth of the remaining

allegations in paragraph 18.

## JURISDICTION

*Cplt ¶ 19.*    This Court has subject matter jurisdiction pursuant to 28 U.S.C § 1332. The parties are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest, costs and fees. Pecos River is a citizen of New Jersey, and Dr. Moline is a citizen of New York.

19.    Defendant admits that she is a citizen of New York.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations concerning Pecos River's citizenship.  Defendant denies that Pecos River has suffered any cognizable damages.  The remainder of the allegations in paragraph 19 consist of legal conclusions to which no response is required.  To the extent a response is required, Defendant denies the remaining allegations in paragraph 19.

*Cplt ¶ 20.*    Venue is proper under 28 U.S.C. § 1391, which provides for proper venue in the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.

20.    Paragraph 20 consist of legal conclusions to which no response is required.  To the extent a response is required, Defendant denies the allegations in paragraph 20.

## FACTS

### I.    Dr. Moline: Plaintiffs' Paid Expert Witness

*Cplt ¶ 21.*    Dr. Moline has made a career and small fortune testifying on behalf of the mass tort asbestos plaintiffs' bar. She has been testifying as a paid expert in asbestos litigation for over 20 years, always on behalf of plaintiffs. For playing that role, she is paid between approximately $250,000 and $300,000 per year (about 40% of her total income) and, in aggregate, has received over $3 million.

21.    Defendant admits that she has served as an expert witness for plaintiffs in asbestos litigation starting in or about 1996.  Defendant further admits that she has earned more than $3 million over the course of the past thirty (30) years serving as an expert and has earned more than $500,000 in her role as an expert for the past

9

several years.  Defendant further admits that (i) over the past several years, with some variation, approximately 40-50% of her total income has been attributable to her work as an expert; and (ii) the fees she earned for serving as an expert represented approximately 40% of her total income in 2025.   Defendant denies the remaining allegations in paragraph 21.

*Cplt ¶ 22.*   In recent years, Dr. Moline's testimony mainly was in mesothelioma cases against Pecos River (and other manufacturers of talc powder products)—having been disclosed as a plaintiff's expert in over 200 cases, provided deposition testimony in at least 46 cases, and testified in 16 separate trials against Pecos River.

22.   Defendant admits that she has testified as a plaintiff's expert in cosmetic talc/mesothelioma cases against manufacturers of cosmetic talc products for approximately the past sixteen (16) years.  Defendant further admits that Johnson & Johnson was first named as a defendant in cosmetic talc/mesothelioma cases in or about 2015.  Defendant further admits that she is often disclosed as an expert in cosmetic talc/mesothelioma cases but does not always testify in those cases. Defendant further admits that she has provided deposition and trial testimony in cosmetic talc/mesothelioma cases.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 22.

*Cplt ¶ 23.*   Even before the controversy concerning the Article, Dr. Moline's reliability has faced heavy criticism. Notably, multiple appellate courts have excluded her opinions or found them insufficient to establish that, as she posited, the

10

asbestos in the talc products at issue caused mesothelioma.[4]

23.     Defendant denies the allegations in paragraph 23.  Defendant admits that the language quoted in footnote 4 appears in *Matter of New York City Asbestos Litig.*, 148 A.D.3d 233 (1st Dep't 2017), and refers to that decision for a full and accurate statement of its contents.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in footnote 4.

*Cplt ¶ 24.*   In *Lanzo*—a cosmetic talc case against Pecos River—the New Jersey Appellate Division "concluded that the trial court erred by allowing … Moline to provide expert testimony that non-asbestiform minerals can cause mesothelioma." *Lanzo v. Cyprus Amax Mins. Co.*, 467 N.J. Super. 476, 513 (N.J. App. Div. 2021).

24.     Defendant admits that Johnson & Johnson was a defendant in the *Lanzo* case.  Defendant further admits that the language quoted in paragraph 24 appears in *Lanzo v. Cyprus Amax Minerals Co.*, 467 N.J. Super. 476 (App. Div. 2021), and refers to that decision for a full and accurate statement of its contents.  Defendant denies that the *Lanzo* case was against Pecos River.

*Cplt ¶ 25.*   In *Olson*—another cosmetic talc case against Pecos River—the

[4] Dr. Moline's opinions on the cause of mesothelioma also were rejected in cases involving other products. In *Juni*, Dr. Moline testified that asbestos allegedly in Ford Motor Company's friction products caused the plaintiff's mesothelioma. The New York Appellate Division found her opinion "insufficient" to, in fact, establish causation: "The evidence presented by plaintiff here was insufficient because it failed to establish that the decedent's mesothelioma was a result of his exposure to a sufficient quantity of asbestos in friction products sold or distributed by defendant Ford Motor Company." *In re New York City Asbestos Litig. (Juni)*, 148 A.D.3d 233, 236-37, 239 (N.Y. App. Div. 1st Dep't 2017). The New York Court of Appeals affirmed. *Matter of N.Y.C. Asbestos Litig. (Juni)*, 32 N.Y.3d 1116, 1122 (2018).

New York Appellate Division reversed judgment entered in plaintiffs' favor, concluding that Dr. Moline, as plaintiff's medical causation expert, failed "to establish sufficient exposure to a substance to cause the claimed adverse health effect." *Matter of New York City Asbestos Litig. (Olson)*, 207 A.D.3d 415, 416 (N.Y. 1st Dep't 2022).

25.    Defendant admits that Johnson & Johnson was named as a defendant in the *Olson* action.  Defendant further admits that the language quoted in paragraph 25 appears in *Matter of New York City Asbestos Litig.*, 207 A.D.3d 415 (1st Dep't 2022), and refers to that decision for a full and accurate statement of its contents. Defendant denies that the *Olson* case was filed against Pecos River.

**Cplt ¶ 26.**    In *Nemeth*—a cosmetic talc case against another company—the New York Court of Appeals again concluded that Dr. Moline's opinion was insufficient to establish causation. The Court stated: "[T]he studies or scientific literature cited or relied upon by Dr. Moline" did not "provide the necessary support for her conclusion as to proximate causation." *Nemeth v. Brenntag N. Am.*, 38 N.Y.3d 336, 345 (2022).

26.    Defendant admits that the language quoted in paragraph 26 appears in *Nemeth v. Brenntag N. Am.*, 38 N.Y.3d 336 (2022), and refers to that decision for a full and accurate statement of its contents.

**Cplt ¶ 27.**    These appellate courts' determinations of the unscientific and unreliable nature of the testimony Dr. Moline has offered time and again in various courts against Pecos River and others affirms Dr. Moline's proclivity to make knowingly false and disparaging statements published outside of court to the scientific community and general public.

27.    Defendant denies the allegations in paragraph 27.

II.    **Dr. Moline Has Repeatedly Published Disparaging Statements About Johnson's Baby Powder and Shower to Shower in Multiple Forums**

A.    **Dr. Moline Published an "Influential" and "Groundbreaking" Talc Article**

*Cplt ¶ 28.*    Starting in October 2019, Dr. Moline repeatedly and widely published disparaging statements regarding talc powder products, including, in particular, Johnson's Baby Powder and Shower to Shower.

28.    Defendant denies the allegations in paragraph 28.

*Cplt ¶ 29.*    Specifically, Dr. Moline repeatedly asserted that she had conducted the ***first comprehensive*** case study review of individuals whose ***sole exposure to asbestos*** was talc, and determined that the asbestos contamination in those talc products had caused their mesothelioma.

29.    Defendant denies the allegations in paragraph 29.

*Cplt ¶ 30.*    Dr. Moline concocted this "study"—along with another prominent plaintiffs' expert witness in asbestos and talc cases (Ronald E. Gordon, Ph.D.)—after courts began routinely excluding Dr. Moline's testimony regarding causation in other litigation cases, as discussed further below.

30.    Defendant denies the allegations in paragraph 30.

*Cplt ¶ 31.*    That scheme culminated in Dr. Moline and her co-authors' publication of an article in the widely read Journal of Occupational and Environmental Medicine entitled *Mesothelioma Associated With the Use of Cosmetic Talc*. Ex. A, Moline Article. The Article became available online on October 10, 2019.

31.    Defendant denies engaging in any scheme.  Defendant admits that she co-authored the JOEM Article and that it became available in some form online in October 2019.  Defendant lacks knowledge or information sufficient to form a belief as to the precise date when the JOEM Article became available online.  Defendant denies the remaining allegations in paragraph 31.

13

*Cplt ¶ 32.*   As lead author, Dr. Moline asserted that the Article presented "the first large case series to identify cosmetic talcum powder contaminated with asbestos as the cause of malignant mesothelioma in cosmetic talc users." Ex. A, Moline Article at 14.

32.   Defendant admits that the language quoted in paragraph 32 appears in the JOEM Article and refers to the JOEM Article for a full and accurate statement of its contents. Defendant further admits that she was the lead author of the JOEM Article.

*Cplt ¶ 33.*   Dr. Moline "present[s] 33 cases of individuals with malignant mesothelioma who were exposed to commercial talcum powder products." Ex. A, Moline Article at 11.

33.   Defendant admits that the language quoted in paragraph 33 appears in the JOEM Article and refers to the JOEM Article for a full and accurate statement of its contents.

*Cplt ¶ 34.*   These 33 individuals are all plaintiffs in litigation where Dr. Moline serves as an expert witness on behalf of plaintiffs' counsel. Ex. A, Moline Article at 11. Dr. Moline did not do any new investigation for any of the cases that had not already been done in litigation.

34.   Defendant admits that the 33 research subjects were plaintiffs in litigation and that she served as their expert. Defendant denies the remaining allegations in paragraph 34.

*Cplt ¶ 35.*   The Article identifies Johnson's Baby Powder and Shower to Shower as the talc powders most commonly used by the individuals.[5]

---

[5] The Article asserts that the 33 individuals used 22 different brands of talc. Ex. A, Moline Article at 11, 15. Each brand is identified by a letter A through V. The Article contains "Appendix 3" for "type of talcum powder used," and provides a publicly

35.    Defendant admits that the JOEM Article contains a chart with the category "Talcum Powder Brand" in Table 1 and a publicly available link to an "Appendix 3." Defendant further refers to the JOEM Article for a full and accurate statement of its contents. Defendant denies the remaining allegations in paragraph 35 and footnote 5 thereto.

*Cplt ¶ 36.*    Dr. Moline also buttressed the Article by citing to 2017 statistics from the website Statista. Ex. A, Moline Article at 11 n. 26. Statista's 2017 statistics show that Johnson's Baby Powder was the most commonly used brand of talc, accounting for approximately 52% of users. That website also shows that Shower to Shower was the second most popular brand, accounting for approximately 17% of users (for a total of just under 70%).

36.    Defendant admits that footnote 26 of the JOEM Article cites to a source entitled "U.S. Brands of body and baby powder used 2017" and refers to the JOEM Article and the source cited in footnote 26 for a full and accurate statement of their contents. Defendant denies the remaining allegations in the first sentence of paragraph 36. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 36.

*Cplt ¶ 37.*    In the Article, Dr. Moline also relies on litigation testing that specifically names "Johnson & Johnson Baby Powder" and "Shower to Shower."

---

available link to the Appendix: http://links.lww.com/JOM/A651. Ex. A, Moline Article at 12. The Appendix is a key identifying which brand corresponds to each letter. It identifies Johnson's Baby Powder as "D" and Shower to Shower as "I." Ex. A, Moline Article at App'x 3. Of the 33 cases, 19 (over half) used Johnson's Baby Powder (brand "D"). Ex. A, Moline Article at 15. Johnson's Baby Powder was used by more individuals in the Article than any other brand. Ex. A, Moline Article at 15.

15

Ex. A, Moline Article at 14 n. 35.[6]

37.     Defendant admits that footnote 35 of the JOEM Article cites to a source entitled "Longo W, Rigler M. Supplemental Expert Report & Analysis of Johnson & Johnson Baby Powder and Valeant Shower to Shower Talc Products for Amphibole Asbestos; 2018." Defendant further refers to the JOEM Article for a full and accurate statement of its contents. Defendant denies the remaining allegations in paragraph 37. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in footnote 6 to paragraph 37.

*Cplt ¶ 38.*   Notably, however, Dr. Moline *did not disclose* the names of the 33 individuals featured in the Article and has actively *attempted to conceal* the individuals' identities (as discussed further below).

38.     Defendant denies the allegation that she engaged in any improper concealment. Defendant admits that, in accordance with her professional and ethical

---

[6] This testing was conducted by Dr. William Longo, another professional plaintiffs' expert witness and a central figure in talc litigation. Dr. Longo suffers from a similar flaw to Dr. Moline, having falsely testified under oath at least 10 times—including in litigation against Pecos River—that before he was retained in talc cases, his laboratory had never tested cosmetic talc for the presence of asbestos. In reality, he had tested cosmetic talc and not found any asbestos, calling the idea of asbestos contamination an "an urban legend." That all changed when Dr. Longo was hired as a plaintiffs' expert in talc litigation. Suddenly, Dr. Longo began to find "trace" asbestos in virtually every sample of talc that he tested. His new tactic: Call it asbestos even if it's not. At this point, Dr. Longo will even call talc "asbestos" by using an unpublished and self-invented method of detection. Other scientists, including another plaintiff-side expert, have said that what Dr. Longo is calling "chrysotile asbestos" is really nothing more than talc. But juries, judges, and the American public are told time and again that Dr. Longo has found asbestos in talc, including in Johnson's Baby Powder.

16

obligations, she did not disclose the names of the human subjects of the JOEM Article. Defendant denies the remaining allegations in paragraph 38.

*Cplt ¶ 39.* The Article states multiple times that the subjects of the Article had *no other exposure to asbestos* apart from alleged exposure to asbestos from talcum powder:

- "Objective: To describe 33 cases of malignant mesothelioma among individuals with no known asbestos exposure other than cosmetic talcum powder." Ex. A, Moline Article at 11.

- "Results: Asbestos of the type found in talcum powder was found in all six cases evaluated. Talcum powder usage was the only source of asbestos for all 33 cases." Ex. A, Moline Article at 11.

- "For all 33 cases, other potential exposures to asbestos were considered, with no identified source apart from the talcum powder." Ex. A, Moline Article at 11.

- "The table identifies talcum powder as the only asbestos exposure these patients have experienced. No individual identified any asbestos exposure apart from contaminated talcum powder from workplace or household exposures." Ex. A, Moline Article at 14.

- "Like Wagner, we present 33 cases, predominantly of women, who had no known exposure to asbestos other than prolonged use of talcum powder." Ex. A, Moline Article at 14.

39. Defendant refers to the JOEM Article for a full and accurate statement of its contents. Defendant denies the remaining allegations in paragraph 39.

*Cplt ¶ 40.* Dr. Moline did not provide the peer reviewers with any of the underlying materials, so they had no way to vet Dr. Moline's assertion that none of the Article's subjects had alternative asbestos exposures.

17

40.     Defendant admits that she did not make materials available to peer reviewers beyond listing the references cited in the JOEM Article.  Defendant denies the remaining allegations in paragraph 40.

*Cplt ¶ 41.*   Since publishing the Article, Dr. Moline has doubled down on this proposition, testifying that a potential alternative asbestos exposure would have excluded that individual from the Article's case series.

41.     Defendant denies the allegations in paragraph 41.

*Cplt ¶ 42.*   Indeed, as a North Carolina federal court has explained, the premise that all 33 cases did not have other potential exposures to asbestos apart from talcum powder was the "principal factual underpinning of the article." Ex. B, *Bell* Opinion at 22.

42.     Defendant denies the allegations in paragraph 42.

*Cplt ¶ 43.*   Yet, facts have come to light making clear that Dr. Moline's statements that none of the 33 individuals had any other exposure to asbestos is simply not true, as described more fully in Part III below.

43.     Defendant denies the allegations in paragraph 43.

### B.     Dr. Moline Repeatedly Republished Her False and Disparaging Statements

*Cplt ¶ 44.*   Dr. Moline has repeated the false premise of the Article time and time again, in myriad settings and with large and varied audiences.

44.     Defendant denies the allegations in paragraph 44.

#### 1.  Time Magazine Article

*Cplt ¶ 45.*   Shortly after the Moline Article became available online, Time magazine published a story about the Article on October 15, 2019. Exhibit C, A New Study Suggests Tainted Talcum Powder Can Cause a Rare Cancer. Here's How That Could Play Out in the Courtroom (Oct. 15, 2019).[7]

---

[7] https://time.com/5692129/talcum-powder-mesothelioma/.

18

45.     Defendant admits the allegations in paragraph 45.

*Cplt ¶ 46.*   Dr. Moline is quoted in the story saying: "This is the first time that anyone has said, 'Let me look at all these cases, put it all together and identify the ones where [talc] is the sole exposure.'"

46.     Defendant admits that the language quoted in paragraph 46 appears in the article referred to in this paragraph (the "Time Article") and refers to that article for a full and accurate statement of its contents.

*Cplt ¶ 47.*   She also said: "Everything points to cosmetic talc being the cause" of the Article's subjects' mesothelioma.

47.     Defendant admits that the language quoted in paragraph 47 appears in the Time Article and refers to that article for a full and accurate statement of its contents.

## 2. Romper.com Article

*Cplt ¶ 48.*   Dr. Moline similarly gave an interview for an article on Romper.com that was published on October 16, 2019. Exhibit D, Contaminated Baby Powders May Be Linked To Rare Cancer, New Study Suggests (Oct. 16, 2019).[8]

48.     Defendant admits the allegations in paragraph 48.

*Cplt ¶ 49.*   The subject of the Romper piece was the Moline Article: "In a case study of 33 patients, researchers found strong evidence that exposure to asbestos-contaminated talcum powder, such as that's often used in baby powders, can result in malignant mesothelioma."

---

[8]     https://www.romper.com/p/contaminated-baby-powders-may-be-linked-to-rareform-of-cancer-study-suggests-19221063.

49.     Defendant admits that the language quoted in paragraph 49 appears in the article entitled, *Contaminated Baby Powders May Be Linked To Rare Cancer, New Study Suggests* (the "Romper Article"), which appeared online and is available at https://www.romper.com/news/contaminated-baby-powders-may-be-linked-to-rare-form-of-cancer-study-suggests-19221063, and refers to that article for a full and accurate statement of its contents.

***Cplt ¶ 50.***   That article quotes Dr. Moline:

- "All the folks in the study used cosmetic talc, usually for decades, and they all had mesothelioma with no other asbestos source."
- "We couldn't find any other source [of exposure] apart from the cosmetic talc."

50.     Defendant admits that the language quoted in paragraph 50 appears in the Romper Article and refers to that article for a full and accurate statement of its contents.

### 3. Asbestos.com Article

***Cplt ¶ 51.***   Dr. Moline's *Time* magazine quotes were reproduced in an October 18, 2019 article on Asbestos.com, *Case Study Shows Asbestos in Talc Causes Mesothelioma.*

51.     Defendant admits that the language from the Time Article quoted in paragraphs 46 and 47 appear in the Asbestos.com article referred to in paragraph 51 ("Asbestos.com Article") and refers to that article for a full and accurate statement of its contents.  Defendant denies any implication that she was interviewed for the Asbestos.com Article.

*Cplt ¶ 52.*    The Asbestos.com article emphasizes that: "'Everything points to cosmetic talc being the cause,' co-author Dr. Jacqueline Moline told Time Magazine. 'This is the first time that anyone has said, 'Let me look at all these cases, put it together and identify the ones where [talc] is the sole exposure.''" **Exhibit E**, Povtak T, Case Study Shows Asbestos in Talc Causes Mesothelioma (Jan. 5, 2021).[9]

52.    Defendant admits that the language quoted in paragraph 52 appears in the Asbestos.com Article and refers to that article for a full and accurate statement of its contents.

*Cplt ¶ 53.*    Asbestos.com is sponsored by plaintiffs' law firms concentrating in asbestos litigation.

53.    Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 53.

### 4. Congressional Subcommittee Testimony

*Cplt ¶ 54.*    On December 10, 2019, Dr. Moline testified before a House Subcommittee on talc and talc litigation.

54.    Defendant admits that she testified before a House Subcommittee on December 10, 2019, and refers to her testimony for a full and accurate statement of its contents.

*Cplt ¶ 55.*    The day before, CNBC, Reuters, and Yahoo! Finance all covered the upcoming hearing.

55.    Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 55.

*Cplt ¶ 56.*    In her written testimony, Dr. Moline stated: "[M]y colleagues and I reported on 33 individuals with no other identifiable source of exposure apart

---

[9] https://www.asbestos.com/news/2019/10/18/talc-mesothelioma-case-study.

21

from cosmetic talc." **Exhibit F**, Written Testimony of Jacqueline Moline at 2.[10]

56.    Defendant admits that the language quoted in paragraph 56 appears in her written testimony before the United States House of Representatives Committee on Oversight & Reform, Subcommittee on Economic and Consumer Policy (the "House Subcommittee"), dated December 10, 2019 (the "Written Congressional Testimony").  Defendant further refers to the Written Congressional Testimony for a full and accurate statement of its contents.

*Cplt ¶ 57.*    She also repeated in her oral testimony: "This talc exposure was their only exposure to asbestos." **Exhibit G**, Hearing Transcript at 8 (Dec. 10, 2019).[11]

57.    Defendant admits that the language quoted in paragraph 57 appears in the transcript of the House Subcommittee hearing dated December 10, 2019, Serial No. 116-76 (the "Congressional Testimony Transcript"), and refers to the Congressional Testimony Transcript for a full and accurate statement of its contents.

*Cplt ¶ 58.*    In her testimony, she discussed "Ms. D" (*i.e.* Ms. Bell, addressed at length in Part III.B below). Dr. Moline testified that Ms. D "had worked in various industries, including textile and tobacco, and had no exposure to asbestos" in those jobs. *Id.* at 9.

58.    Defendant admits that the language quoted in paragraph 58 appears in the Congressional Testimony Transcript and refers to that transcript for a full and

---

[10]    https://www.congress.gov/116/meeting/house/110311/witnesses/HHRG-116-GO05-Wstate-MolineJ-20191210.pdf.

[11]    https://docs.house.gov/meetings/GO/GO05/20191210/110311/HHRG-116-GO05-Transcript-20191210.pdf.

accurate statement of its contents. Defendant further admits that "Ms. D" referred to Betty Bell.

*Cplt ¶ 59.* The witnesses who testified and the Representatives speaking throughout the session referred many times to Johnson & Johnson brand talcum powder products, even though Johnson & Johnson is a parent company.

59. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 59.

*Cplt ¶ 60.* Indeed, the subcommittee's chairman began the hearing discussing the allegations of asbestos in "Johnson & Johnson's talc-based baby powder." *Id.* at 2.

60. Defendant admits that the language quoted in paragraph 60 appears in the Congressional Testimony Transcript and refers to that transcript for a full and accurate statement of its contents.

*Cplt ¶ 61.* And in his opening statement, he displayed images of Johnson's Baby Powder:



61.    Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 61.

*Cplt ¶ 62.*    The congressional hearing was broadcast on C-SPAN, which also posted the hearing on YouTube.

62.    Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 62.

*Cplt ¶ 63.*    The relevant Congressional Committee put out a press release listing among the "takeaways" from the hearing that "Dr. Jacqueline Moline testified that individuals who have *only* been exposed to asbestos through the use of talc-based Johnson & Johnson Baby Powder have developed mesothelioma."[12]

63.    Defendant admits that, with the exception of the emphasis added by Pecos River, the press release cited in paragraph 63 contains the language quoted in that paragraph and refers to the cited press release for a full and accurate statement of its contents.

*Cplt ¶ 64.*    The websites mesothelioma.com and mesothelioma.net—which are sponsored by plaintiffs' law firms specializing in asbestos litigation—published articles covering the hearing.[13] One story stated that "Dr. Moline "offered insights from 33 mesothelioma patients who were exposed to asbestos from talcum powder" and that "talcum powder was the only instance of asbestos exposure among all 33 patients in the study."

---

[12] https://oversight.house.gov/news/press-releases/oversight-subcommittee-held-second-hearing-on-the-public-health-risks-of.

[13]    https://www.mesothelioma.com/blog/congressional-hearing-examines-asbestos detection-in-talc;  https://mesothelioma.net/mesothelioma-news/congressionalhearings-regarding-asbestos-in-talc-features-mesothelioma-victims-testimony/.

64.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 64.

### 5.  2020 ADAO "Conversation"

*Cplt ¶ 65.*   On May 13, 2020, Dr. Moline participated in an Asbestos Disease Awareness Organization event by Zoom called *ADAO Conversation with Dr. Jacqueline Moline & Robert Sussman Discuss Asbestos, Talc, Prevention, and Policy.*[14]

65.     Defendant admits that, on May 13, 2020, she participated in an event on Zoom sponsored by the Asbestos Disease Awareness Organization (the "ADAO Conversation").

*Cplt ¶ 66.*   During that event, she said of the Article: "What we found in these individuals is that these 33 did not have any other known source of asbestos exposure that we could discern from the information that we were provided."

66.     Defendant admits that the language quoted in paragraph 66 is a substantially accurate rendering of a statement she made during the ADAO Conversation and refers to the recording of the ADAO Conversation, available at https://www.youtube.com/watch?v=PUiFlYuajjQ, for a full and accurate record of its contents.

*Cplt ¶ 67.*   She also said: "[R]eally the whole point of our paper" was "to say that mesothelioma can occur in individuals whose sole exposure is to cosmetic talc."

67.     Defendant admits that the language quoted in paragraph 67 is a substantially accurate rendering of a statement she made during the ADAO

---

[14] https://www.youtube.com/watch?v=PUiFlYuajjQ.

Conversation and refers to the recording of the ADAO Conversation, available at https://www.youtube.com/watch?v=PUiFlYuajjQ, for a full and accurate record of its contents.

### 6.  Statement on EPA's Risk Evaluation of Asbestos

*Cplt ¶ 68.*    On March 30, 2020, the EPA invited public input on its draft risk assessment of asbestos.

68.    Defendant admits the allegations in paragraph 68.

*Cplt ¶ 69.*    Dr. Moline submitted a comment, which was posted on the EPA's website on May 31, 2020. **Exhibit H**, Toxic Substances Control Act (TSCA) Science Advisory Committee on Chemicals Review of Risk Evaluation for Asbestos, Comment submitted by Jacqueline Moline (May 31, 2020).[15]

69.    Defendant admits that she submitted a comment entitled "JACQUELINE MOLINE, MD, MSc STATEMENT ON EPA'S DRAFT RISK EVALUATION OF ASBESTOS" (the "EPA Comment"), which the United States Environmental Protection Agency posted on its website.

*Cplt ¶ 70.*    In her statement, she wrote: "[M]y colleagues and I reported on 33 individuals with mesothelioma with no other identifiable source of exposure apart from cosmetic talc."

70.    Defendant admits that the language quoted in paragraph 70 appears in the EPA Comment and refers to the EPA Comment for a full and accurate statement of its contents.

*Cplt ¶ 71.*    Dr. Moline's statement was also made available on the Asbestos

---

[15] https://www.regulations.gov/docket/EPA-HQ-OPPT-2019-0501/comments?filter=moline.

26

Disease Awareness Organization's website.[16]

71.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 71.

### 7.  2022 ADAO Asbestos Awareness and Prevention Conference

*Cplt ¶ 72.*   On September 17, 2022, Dr. Moline gave a presentation at the *2022 ADAO Asbestos Awareness and Prevention Conference.*[17] That presentation was just four days *after* the federal district court in *Bell* (discussed in Section III) issued its opinion identifying alternative asbestos exposures beyond allegedly contaminated talc for one of the individuals in the Article.

72.   Defendant admits that she gave a presentation at the 2022 ADAO Asbestos Awareness and Prevention Conference on September 17, 2022.  Defendant denies that the federal district court in *Bell* identified "alternative asbestos exposures beyond allegedly contaminated talc for one of the individuals in the [JOEM Article]."

*Cplt ¶ 73.*   Dr. Moline spoke during Session II: Medical Advancements: Diagnosing and Treating Mesothelioma and Other Asbestos-Related Diseases.

73.   Defendant admits the allegations in paragraph 73.

*Cplt ¶ 74.*   During her presentation, she spoke extensively about the Article.

74.   Defendant admits that she spoke about the JOEM Article during Session II: Medical Advancements: Diagnosing and Treating Mesothelioma and

---

[16]   https://www.asbestosdiseaseawareness.org/wpcontent/uploads/2020/05/JACQUELINE-MOLINE-EPA-Statement.pdf.

[17] https://www.youtube.com/watch?v=sqWAzNM9SCA&t=20s.

Other Asbestos-Related Diseases (the "2022 Presentation") and refers to the recording available at https://www.youtube.com/watch?v=sqWAzNM9SCA&t=20s for a full and accurate record of its contents.

*Cplt ¶ 75.*   Although the *Bell* Court had just identified alternative asbestos exposures for Ms. Bell (aka Ms. D from her congressional testimony), and castigated Dr. Moline for stating otherwise in her Article, Dr. Moline made no reference to that alternative asbestos exposure. Instead, Dr. Moline reiterated once again that, with respect to the individuals referenced in her Article, "[w]e were unaware of any other asbestos exposure apart from talc."

75.   Defendant refers to the recording of the 2022 Presentation for a full and accurate record of its contents.   Defendant denies the remaining allegations in paragraph 75.

*Cplt ¶ 76.*   She also presented a slide regarding her Article stating: "Talcum powder as the only asbestos exposure":



28

76.     Defendant admits that the slide excerpted at paragraph 76 was shown during the 2022 Presentation and refers to the presentation for a full and accurate statement of its contents.

### 8.  Dr. Moline Northwell Health Web Bio

*Cplt ¶ 77.*   Dr. Moline has a web bio on Northwell Health's website. **Exhibit I**, Jacqueline Moline, MD, MSc, Feinstein Institutes for Medical Research Northwell Health.[18]

77.     Defendant admits the allegations in paragraph 77.

*Cplt ¶ 78.*   Even after the central premise of the Article was exposed as false by the *Bell* Court, her web bio *to this day* reads: "Dr. Moline published the first case series, identifying cosmetic talc as the asbestos source leading in mesothelioma in 33 individuals."

78.     Defendant admits that Northwell Health, Inc. ("Northwell"), maintains a webpage at https://feinstein.northwell.edu/institutes-researchers/our-researchers/jacqueline-moline-md-msc and that this webpage contains the language quoted in paragraph 78.  Defendant refers to this webpage for a full and accurate statement of its contents.  Defendant denies the remaining allegations in paragraph 78.

### 9.  Dr. Moline and Other Plaintiffs' Experts Cite the Article in Court

*Cplt ¶ 79.*   In addition to publicly and widely disseminating her false statements, Dr. Moline (and other plaintiffs' experts) have routinely referenced the Article in numerous cosmetic talc trials across the country. Ex. B, *Bell* Opinion at 17-18.

---

[18]                  https://feinstein.northwell.edu/institutes-researchers/our-researchers/jacquelinemoline-md-msc.

79.     Defendant admits that the JOEM Article has been referenced in personal-injury cases involving the use of cosmetic talc.  Defendant denies the remaining allegations in paragraph 79.

*Cplt ¶ 80.*   After the online publication of the Article, Dr. Moline was disclosed in at least 58 other cosmetic talc/mesothelioma cases against Pecos River alone, where she began to routinely rely on the Article as the centerpiece of her testimony.

80.     Defendant admits that she was disclosed as an expert in cosmetic talc/mesothelioma cases after publication of the JOEM Article.  Defendant further admits that she has cited the JOEM Article when asked by defendants in these cases whether she published a peer-reviewed paper.  Defendant denies any implication that her opinions in cosmetic talc/mesothelioma cases changed due to the JOEM Article's publication.  Defendant denies the remaining allegations in paragraph 80.

*Cplt ¶ 81.*   In September 2021, a California state court ruled over Pecos River's objection that "Plaintiffs' experts can rely on the Article and state that they relied on it."

81.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 81.

*Cplt ¶ 82.*   Dr. Moline then testified for the first time at a Pecos River talc trial (*Shawn Johnson*) about the Article.

82.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 82.

*Cplt ¶ 83.*   That testimony included a statement that she "picked people [for the Article] who didn't have any other exposure other than cosmetic talc" to "the best of [her] knowledge."

30

83.    Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 83.

*Cplt ¶ 84.*    But during cross examination, Dr. Moline refused to identify any of the subjects of the Article: "I will not disclose the name of the individuals in the paper."

84.    Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 84.

*Cplt ¶ 85.*    Compounding this prejudice, another of plaintiff's experts (Dr. Allan Smith) testified that the Moline Article as a "main source of information that [he is] aware of today" and that he relies upon to testify that talcum powder causes mesothelioma.

85.    Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 85.

*Cplt ¶ 86.*    Shortly thereafter, in another Pecos River talc trial (*Prudencio*), another California court permitted plaintiffs' experts to rely on the Moline Article and summarize it "consistent with the established rules of expert reliance."

86.    Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 86.

*Cplt ¶ 87.*    These two Pecos River trials were not the only cases where an expert has relied on the Moline Article. As the North Carolina federal court explained: "other expert witnesses have begun relying on the article for the basis of their opinions." Ex. B, *Bell* Opinion at 17-18.

87.    Defendant admits that the language quoted in paragraph 87 appears in *Bell v. Am. Int'l Indus.*, 627 F. Supp. 3d 520 (M.D.N.C. 2022) ("*Bell* Opinion") and refers to that opinion for a full and accurate statement of its contents.  Defendant further admits that she has occasionally seen reports by other experts that have

31

included the JOEM Article among the cited reference materials.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 87.

*Cplt ¶ 88.*   In at least 63 other cases against Pecos River, a combined 20 other plaintiffs' experts relied on the Moline Article in either their deposition or court disclosures: Drs. Brody, Castleman, Cohen, Compton, Dodson, Egilman, Emory, Finkelstein, Gordon, Haber, Horn, Kanarek, Kradin, Longo, Maddox, Madigan, Radecki, Rigler, Verschraegen, and Zhang.

88.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 88.

### III.   Dr. Moline Knew Her Statements Were False or Recklessly Ignored Available Information Demonstrating Their Falsity When Made

*Cplt ¶ 89.*   When Dr. Moline published her statements in the public domain, to the scientific community, and in various courts across the country, she knew that the premise of her position—that she conducted a study of 33 mesothelioma patients whose sole exposure to asbestos was through talc powder—was false or recklessly ignored available information demonstrating its falsity.

89.   Defendant denies the allegations in paragraph 89.

*Cplt ¶ 90.*   The truth is that Dr. Moline was intimately familiar with the case histories of the 33 individuals referenced in the Article from her role as a plaintiffs' expert in the underlying tort cases in which those individuals had asserted claims against Pecos River and others.

90.   Defendant refers to the JOEM Article for a full and accurate statement of its contents, including the materials Defendant reviewed in connection with that article.  Defendant denies the remaining allegations in paragraph 90.

*Cplt ¶ 91.*   Dr. Moline therefore knew full well that individuals she cited in her Article had admitted to and claimed compensation for exposure to asbestos from

other sources, or she recklessly disregarded substantial evidence of alternative exposure.

91.     Defendant denies the allegations in paragraph 91.

### A.     Dr. Moline's Intimate Knowledge of the True Asbestos Exposures of the 33 Individuals Referenced in the Article

*Cplt ¶ 92.*     To truly understand Dr. Moline's familiarity with the 33 individuals covered in the Article, one must start with the very first cosmetic talc/mesothelioma case to go to trial involving Johnson's Baby Powder—a case called *Herford*, in which Dr. Moline was one of plaintiffs' key experts.

92.     Defendant admits that she was an expert in *Tina Herford v. AT&T Corp.*, et al., No. BC646315 (Cal. Super. Ct.) ("*Herford*").  Defendant denies the remaining allegations in paragraph 92.

*Cplt ¶ 93.*     During the *Herford* trial, Dr. Moline testified: "There are about 41 cases of individuals that I've reviewed records of [or] have in some cases had the opportunity to evaluate." Earlier, she had acknowledged in her deposition that all 41 of those cases involved people who came to her through litigation—in other words, each of them were plaintiffs in mesothelioma cases.

93.     Defendant admits that, during the *Herford* trial, she testified that "There are about 41 cases of individuals that I've reviewed records or have in some cases had the opportunity to evaluate."  Defendant further refers to the transcript of her trial testimony for a full and accurate statement of its contents.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 93.

*Cplt ¶ 94.*     Dr. Moline was examined at trial about her record review and evaluation of the 41 cases. When asked "And would those evaluations include learning about their occupational and environmental history of exposures," Dr. Moline responded: "Yes."

94.    Defendant admits that the language quoted in paragraph 94 appears in the *Herford* trial transcript and refers to that transcript for a full and accurate statement of its contents.

***Cplt ¶ 95.***    On the Northwell website, Dr. Moline is quoted as saying that it is "important to take a comprehensive exposure history when evaluating patients presenting with cancers like mesothelioma."[19]

95.    Defendant admits that Northwell maintains a webpage at https://feinstein.northwell.edu/news/the-latest/talc-powder-exposure-linked-to-mesothelioma and that the language quoted in paragraph 95 appears on that webpage.  Defendant refers to the webpage referred to in paragraph 95 for a full and accurate statement of its contents.  Defendant denies the remaining allegations in paragraph 95.

***Cplt ¶ 96.***    Notably, the *Herford* court precluded Dr. Moline from testifying about her conclusions regarding the 41 individuals because she had evaluated them in "medicolegal matters" not in the "clinical context."

96.    Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 96.

***Cplt ¶ 97.***    For the same reason, other courts thereafter repeatedly barred Dr. Moline from offering testimony on her litigation case review of these various plaintiffs.[20] And so, for a period, Dr. Moline was stymied.

---

[19]    https://feinstein.northwell.edu/news/the-latest/talc-powder-exposure-linked-to-mesothelioma

[20] *Fong et al. v. Johnson & Johnson, et al.*, No. BC675449 (Super. Ct. Ca., L.A. Cnty.); *Hayes v. Colgate-Palmolive Co., et al.*, No. 16-CI-003503 (Jefferson Cir. Ct., Ky.); *Olson et al. v. Brenntag North America, Inc., et al.*, No. 190328/2017 (Supr. Ct. N.Y., N.Y. Cnty.); *Pipes v. Johnson & Johnson, et al.*, No. CJ-2017- 3487

97.     Defendant denies the allegations in paragraph 97.

*Cplt ¶ 98.*    But Dr. Moline ultimately pivoted. To circumvent these piling and adverse rulings, Dr. Moline published the Article to add a veneer of credibility to the other plaintiffs she wanted to testify about, and her claim that their sole source of asbestos exposure was talcum powder.

98.     Defendant denies the allegations in paragraph 98.

*Cplt ¶ 99.*    That veneer was first dispelled by uncovered evidence disclosed in the *Bell* decision that demonstrates, unequivocally, that Ms. Bell's exposure to asbestos reaches well beyond exposure to talc, as Dr. Moline knew full well.

99.     Defendant denies the allegations in paragraph 99.

### B.    The Record Now Shows that Individuals in the Article Claimed Exposures to Asbestos from Sources Other than Talc

*Cplt ¶ 100.*    In September 2022, the *Bell* court unveiled the "concerning" contradiction between (1) Dr. Moline's representations that her study was confined to individuals whose sole exposure to asbestos was talc, and (2) the evidence that she knew they had other exposures.

100.    Defendant denies the allegations in paragraph 100.

*Cplt ¶ 101.*    After years of efforts, Pecos River recently obtained the data that identifies all the individuals in Dr. Moline's Article (the "Key"). (**Exhibit M**). It is now clear why so many fought so hard to try to ensure the Key never came to light. The Key demonstrates that many of the Article's subjects in fact were exposed to asbestos from sources other than cosmetic talc. The extensiveness of the fraudulent nature of the Article demonstrates that Dr. Moline fabricated the data presented in her Article.

---

(Dist. Ct., Okla. Cnty., Okla.); *Lanzo v. Cyprus Amax Minerals Co., et al.*, No. MID-7385-16 AS (Super. Ct. N.J., Middlesex Cnty.); *Weirick v. Brenntag N. Am., Inc.*, No. BC656425 (Super. Ct. Ca., L.A. Cnty.).

101.   Defendant admits that Pecos River obtained data from Northwell that identifies the individuals in the JOEM Article, which the Amended Complaint refers to as the "Key."  Defendant denies the remaining allegations in paragraph 101.

*Cplt ¶ 102.*  Further scrutiny of the record indicates that this concerning contradiction extends beyond the individual who was the plaintiff in the *Bell* case to at least twelve other individuals in the 2020 Article.

102.   Defendant denies the allegations in paragraph 102.

### 1.  Betty Bell

*Cplt ¶ 103.*  The falsity of the Moline Article was first revealed in the context of the *Bell* case.

103.   Defendant denies the allegations in paragraph 103.

*Cplt ¶ 104.*  There, another talc defendant, American International Industries ("AII"), was able to uncover critical evidence regarding Case #9 from the Moline Article: Betty Whitley Bell.

104.   Defendant admits that Case #9 in the JOEM Article is Betty Bell. Defendant denies the remaining allegations in paragraph 104.

*Cplt ¶ 105.*  Ms. Bell is the individual that Dr. Moline referred to as "Ms. D" in her testimony before Congress maligning Pecos River's talc products, *supra* ¶ 52.

105.   Defendant admits that Ms. Bell is the individual referred to as "Ms. D" in Defendant's Congressional testimony.    Defendant denies the remaining allegations in paragraph 105.

*Cplt ¶ 106.*  Ms. Bell worked most of her career as a hairdresser. She alleged using "Clubman" brand talc powder for over thirty years, beginning in the 1970s. She was diagnosed with mesothelioma in July 2015. Ex. B, *Bell* Opinion at 2.

106.   Defendant admits the allegations in paragraph 106.

***Cplt ¶ 107.*** Ms. Bell filed workers' compensation claims with the North Carolina Industrial Commission in September 2015, asserting, under criminal penalty for false statements, that she was exposed to asbestos during prior employment with two textile employers—Hoechst Celanese Corporation and Pillowtex Corporation. Ms. Bell's worker's compensation claims were eventually dismissed without prejudice. Ex. B, *Bell* Opinion at 2.

107. Defendant admits that a worker's compensation claim was filed on Ms. Bell's behalf and avers that it was subsequently withdrawn. Defendant denies any implication that Ms. Bell's worker's compensation claim demonstrates that she was exposed to asbestos other than through her use of cosmetic talc. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 107.

***Cplt ¶ 108.*** Ms. Bell filed a lawsuit[21] in February 2017, arguing that exposure to asbestos in Clubman talc powder—not from her prior employment with textile manufacturers—caused her mesothelioma: *Bell v. Am. Int'l Indus.*, No. 17-cv-111 (M.D.N.C.).[22]

108. Defendant admits that Ms. Bell filed *Bell v. Am. Int'l Indus.*, No. 17-cv-111 (M.D.N.C.). Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 108, including footnotes 21 and 22 thereto.

---

[21] Ms. Bell passed away in June 2017. The executor of her estate, Lloyd Bell, was substituted as Plaintiff in this action after Ms. Bell passed.

[22] Attempting to hide or ignore asbestos trust claims is nothing new in cosmetic talc litigation. In one matter with Pecos River, the plaintiffs' law firm Weitz & Luxenberg (a firm that has retained Dr. Moline 30 times in cosmetic talc cases against Pecos River) failed to turn over asbestos trust claims that they prepared themselves and were legally obligated to provide.

*Cplt ¶ 109.*  Ms. Bell's workers' compensation claims were discussed at her deposition and included on Dr. Moline's list of materials reviewed in her 2016 expert report in Ms. Bell's case. That means Dr. Moline *knew or recklessly ignored available information* at the time she wrote and published the Article. Indeed, the Article itself states: "Data gathered for all 33 patients were gathered from each individual's medical records and sworn testimony (deposition transcripts) of individuals." Ex. A, Moline Article at 11.

109.   Defendant admits that Ms. Bell was asked about her worker's compensation claim during Ms. Bell's deposition.  Defendant further admits that a "Worker's Compensation file" was included under the section "Materials Reviewed" in Defendant's May 5, 2016 report regarding Ms. Bell (the "Bell Report"), and refers to the Bell Report for a full and accurate statement of its contents.  Defendant further admits that the language quoted in paragraph 109 is contained in the JOEM Article and refers to that article for a full and accurate statement of its contents.  Defendant denies any implication that Ms. Bell's worker's compensation claim demonstrates that she was exposed to asbestos other than through her use of cosmetic talc.  Defendant denies the remaining allegations in paragraph 109.

*Cplt ¶ 110.*  Because the facts of Ms. Bell's case paralleled the description of Ms. D in Dr. Moline's congressional testimony, defendant AII—which had purchased the Clubman brand in the late 1980s—suspected that Ms. Bell was one of the 33 anonymous individuals included in the Article. Ex. B, *Bell* Opinion at 4.

110.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 110.

*Cplt ¶ 111.* In a deposition for a different mesothelioma case, AII asked

Dr. Moline for specific information about the 33 individuals from the Article. As she did in the Pecos River cases, Dr. Moline declined to answer, claiming confidentiality concerns. Ex. B, *Bell* Opinion at 4.

111.   Defendant admits that she was deposed in the *Bell* case and that, consistent with her ethical and professional obligations, she did not disclose the identities of the JOEM Article's human subjects.  Defendant denies the remaining allegations in paragraph 111.

*Cplt ¶ 112.* Instead, the plaintiff's counsel advised AII that if it was determined to continue seeking information regarding the 33 individuals, it would have to subpoena Northwell Health (Dr. Moline's employer). When AII did so, plaintiff's counsel moved to quash the subpoena. Ex. B, *Bell* Opinion at 4-5.

112.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 112.

*Cplt ¶ 113.* But AII persisted. And after AII provided Northwell with a HIPAA authorization form signed by the plaintiff, Northwell produced a single five-page document. The document is a spreadsheet containing information on each of the 33 individuals studied in the Article. Importantly, the entire document is redacted except for the row headings and the column listing Ms. Bell's information, which identified her as Case #9. Ex. B, *Bell* Opinion at 5:

 

113.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 113.

*Cplt ¶ 114.*   Upon learning that this document had been disclosed, plaintiff's counsel filed an emergency motion for a protective order to preclude any inquiry into the identities of these individuals. The motion also sought the destruction of all copies of the Northwell document and requested that the document not be disseminated in Ms. Bell's case or any other forum. Ex. B, *Bell* Opinion at 5.

114.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 114.

*Cplt ¶ 115.*   The plaintiff's counsel also reported AII's counsel to the Department of Health & Human Services for supposedly violating Ms. Bell's HIPAA rights. Counsel "requested" that Northwell claw back the document, threatened to also report Northwell's *counsel* to HHS if he did not, and stated that she was "considering reporting [his] violation to the New York bar as this is a staggering breach."

Please provide all correspondence with counsel for AII and a copy of the HIPAA.

I have reported Mr. ▮▮▮▮ to HHS for violating Ms. Bell's HIPAA rights. I again renew my request that you immediately claw back this production or I will have no choice but to report you as well.

We will be filing a motion for a protective order and sanctions against Mr. ▮▮▮▮ in the Bell matter. I am also considering reporting your violation to the New York bar as this is a staggering breach. You had no right to produce any information regarding my client based on the misuse of a HIPAA authorization provided to you not by my client and without any notice to my client while a motion to quash was pending. I am just flabbergasted by your reckless conduct.

115.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 115.

*Cplt ¶ 116.*   The plaintiff's counsel later conceded in court that *none* of the information in the document Northwell provided to AII is HIPAA protected and therefore no HIPAA-protected information was at risk of disclosure. Ex. B, *Bell* Opinion at 36. AII had in any event provided Northwell with a HIPAA authorization form signed by the plaintiff. Ex. B, *Bell* Opinion at 5.

40

116. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 116.

*Cplt ¶ 117.* In ruling on the plaintiff's motion for a protective order, the magistrate judge held that the Northwell document could be used in Ms. Bell's case, but that it, and the information therein confirming that Ms. Bell was one of the 33 individuals the Article studied, was "confidential and limited solely to this case." The magistrate judge explicitly stated that this limited protective order could potentially be reconsidered as the case progressed. Ex. B, *Bell* Opinion at 6.

117. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 117.

*Cplt ¶ 118.* In response, Northwell filed a Motion to Intervene and Extend Protective Order and sought to prevent defense counsel from questioning Dr. Moline about any link between Ms. Bell and the Article. Ex. B, *Bell* Opinion at 6.

118. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 118.

*Cplt ¶ 119.* Before Northwell's motion was adjudicated, the plaintiff essentially withdrew Dr. Moline as an expert by not offering her deposition by the court-ordered deadline. Accordingly, in February 2021, the magistrate judge denied Northwell's intervention motion as procedurally moot and untimely, as well as substantively meritless. Ex. B, *Bell* Opinion at 6.

119. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 119.

*Cplt ¶ 120.* A few months later, AII filed a motion requesting that the court vacate the magistrate judge's protective order so that the information that it had learned could be used in defending other cases. Ex. B, *Bell* Opinion at 6-8.

120. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 120.

41

*Cplt ¶ 121.* The *Bell* court did in fact vacate the earlier protective order—allowing the Northwell document to be used in other cases—and unsealed numerous items on the docket. Ex. B, *Bell* Opinion at 36-40.

121. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 121.

*Cplt ¶ 122.* The court took great lengths to explain why the revelations uncovered in *Bell* should be made publicly available. The court began by observing the impact of the revelations on the Article's credibility: "Ms. Bell's employment history, as well as her belief that she may have been exposed to asbestos during her textile employment, undermines the weight of Dr. Moline's finding that each of the '33 cases ... had no known exposure to asbestos other than prolonged use of talcum powder.'" Ex. B, *Bell* Opinion at 16.[23]

122. Defendant admits that the language quoted in paragraph 122 appears in the September 13, 2022 Opinion in *Bell v. American International Industries*, 627 F. Supp. 3d 520 (M.D.N.C. 2022) (the "*Bell* Opinion") and refers to the *Bell* Opinion for a full and accurate statement of its contents. Defendant further admits that Dr. Ronald Gordon is a co-author of the JOEM Article. Defendants lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations

---

[23] It's telling that one of the co-authors of the Moline Article is pathologist Dr. Ronald Gordon, an individual who has served as a plaintiff's expert witness in asbestos and cosmetic talc litigation. Dr. Gordon was arrested in the early 1990s for conspiracy to commit bank fraud and money laundering, and he admitted to committing those crimes in the course of testifying as a cooperating witness against a co-defendant. Yet Dr. Gordon repeatedly provided false testimony concerning this incident, including falsely testifying that he had never been arrested; never falsified a document; and that he had only ever testified in court as an expert witness.

42

in footnote 23 to paragraph 122. Defendant denies paragraph 122 insofar as it alleges that the *Bell* Opinion was correctly decided.

*Cplt ¶ 123.* The court went on: "The fact is that at least one study participant reported to a state agency that she did have another known asbestos exposure, at least one known to the study participant. Given the groundbreaking nature of the article and its express premise that all individuals studied had no known alternative asbestos exposures, the fact that one of the individuals claimed otherwise has direct bearing on the study's credibility. This court expressed concern about this seeming contradiction before and does so again." Ex. B, *Bell* Opinion at 17.

123. Defendant admits that the language quoted in paragraph 123 appears in the *Bell* Opinion and refers to the *Bell* Opinion for a full and accurate statement of its contents. Defendant denies paragraph 123 insofar as it alleges that the *Bell* Opinion was correctly decided.

*Cplt ¶ 124.* The court stated that its "concern is magnified considering the influence the article has had on cosmetic talc litigation nationwide." Ex. B, *Bell* Opinion at 17.

124. Defendant admits that the language quoted in paragraph 124 appears in the *Bell* Opinion and refers to the *Bell* Opinion for a full and accurate statement of its contents. Defendant denies paragraph 124 insofar as it alleges that the *Bell* Opinion was correctly decided.

*Cplt ¶ 125.* The court pointed to the fact that "Dr. Moline gave testimony discussing her article in a California state court cosmetic talc trial" and that "plaintiff's counsel relied on Dr. Moline's article in his closing argument to connect cosmetic talc exposure to asbestos." Ex. B, *Bell* Opinion at 17.

125. Defendant admits that the language quoted in paragraph 125 appears in the *Bell* Opinion and refers to the *Bell* Opinion for a full and accurate statement of

its contents.   Defendant denies paragraph 125 insofar as it alleges that the *Bell* Opinion was correctly decided.

*Cplt ¶ 126.*  Part of the court's concern included that "other expert witnesses have begun relying on the article for the basis of their opinions." And the court even noted that "[w]hen entering bankruptcy because of cosmetic talc liabilities, one prominent cosmetic talc seller [i.e., Pecos River] specifically discussed the article's integral role in supporting the plaintiffs' claims." Ex. B, *Bell* Opinion at 18.

126.   Defendant admits that the language quoted in paragraph 126, with the exception of the bracketed reference to Pecos River, appears in the *Bell* Opinion and refers to the *Bell* Opinion for a full and accurate statement of its contents.  Defendant denies paragraph 126 insofar as it alleges that the *Bell* Opinion was correctly decided.

*Cplt ¶ 127.* The court concluded: "In this case, a principal factual underpinning of the article is that in all thirty-three cases studied 'no identified source apart from the talcum powder' was identified. The absence of any specific information on the identities of the individuals studied precludes inquiry into the basis of the factual underpinning of no known exposure to asbestos other than talcum powder." Ex. B, Bell Opinion at 22.

127.   Defendant admits that the language quoted in paragraph 127 appears in the *Bell* Opinion and refers to the *Bell* Opinion for a full and accurate statement of its contents.   Defendant denies paragraph 127 insofar as it alleges that the *Bell* Opinion was correctly decided.

*Cplt ¶ 128.* Lest there be any doubt about the brazenness of Dr. Moline's knowing or reckless disregard for the truth, at a public conference on September 17, 2022—just four days after the Bell court issued its decision confirming Ms. Bell's claims for compensation from other sources of asbestos exposure and Dr. Moline's knowledge of the same—Dr. Moline again asserted that, with respect to the cases in

her Article, she was "unaware of any asbestos exposure apart from talc."

128.    Defendants admits that she gave the 2022 Presentation on September 17, 2022, and refers to the recording of that presentation for a true and accurate record of its contents. Defendant further admits that the 2022 Presentation was given four days after issuance of the *Bell* Opinion. Defendant denies the remaining allegations in paragraph 128.

*Cplt ¶ 129.* In other words, even now and despite the *Bell* order, Dr. Moline refuses to acknowledge that the foundational premise of the Article has been proven false.

129.    Defendant admits that, with the exception of an erratum published in May 2023 in Volume 65 of the JOEM (the "Erratum"), she stands by her opinions and conclusions as stated in the JOEM Article. Defendant denies the remaining allegations in paragraph 129.

*Cplt ¶ 130.* What's more, although Ms. Bell's example was uncovered after extensive discovery efforts in North Carolina federal court, she is not the only individual in the Article with other asbestos exposures. After years of further discovery efforts since *Bell,* Pecos River finally obtained the Key that identifies the individuals in Dr. Moline's 2020 Article. **Exhibit M.** The record demonstrates that additional individuals in the Article had alternative sources of asbestos exposures beyond alleged contamination in talc.

130.    Defendant admits that Pecos River obtained data from Northwell that identifies the individuals in the JOEM Article. Defendant denies the remaining allegations in paragraph 130.

*Cplt ¶ 131.* Below are the additional examples uncovered to date where alternative sources of exposure were present that were not cosmetic talc and known to Dr. Moline at the time the Article was written:

45

131.   Defendant denies the allegations in paragraph 131.

## 2.  Helen Kohr

*Cplt ¶ 132.*  Plaintiff Helen Kohr filed a claim against other cosmetic talc defendants alleging that she was exposed to asbestos in their products.

132.   Defendant admits that Helene Kohr was a plaintiff in a personal-injury lawsuit involving the use of cosmetic-talc products.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 132.

*Cplt ¶ 133.*  Dr. Moline appeared as an expert in Ms. Kohr's case.

133.   Defendant admits the allegations in paragraph 133.

*Cplt ¶ 134.*  Case #17 is a likely match for Ms. Kohr:

|  | Ms. Kohr | Case #17 |
|---|---|---|
| Gender | Female | Female |
| Year of Diagnosis | 2015 | 2015 |
| Age At Diagnosis | 80 | 81 |
| Mesothelioma Site | Pleural Epithelial | Pleural Epithelial |
| Talcum Powder Brand | Cashmere Bouquet, Coty Airspun, Helena Rubinstein | Cashmere Bouquet, Coty Airspun, Helena Rubinstein |
| Estimated Years Of Use | 40 | 40 |
| Occupation | Office Worker | Office Worker |

134.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegation in paragraph 134 that Case #17 is a "likely match" for Ms. Kohr.  Defendant admits that the chart in paragraph 134 accurately lists certain details regarding Case #17 other than the subject's age at diagnosis and refers to the JOEM Article for a full and accurate description of Case #17.  Defendant lacks

knowledge or information regarding the provenance of the information summarized in the column "Ms. Kohr" sufficient to admit or deny the allegations.

*Cplt ¶ 135.* The Key confirms that Ms. Kohr is a subject of the Article.

135. Defendant admits the allegations in paragraph 135.

*Cplt ¶ 136.* Dr. Moline's *own expert report* in Ms. Kohr's case from *2017* (well before her Article was published) stated that Ms. Kohr was exposed to asbestos-containing cigarettes known as Kent cigarettes.

136. Defendant admits that her September 22, 2017 expert report in Ms. Kohr's case ("Kohr Report") stated that Ms. Kohr "was exposed to asbestos from Kent Micronite cigarettes, which she smoked from 1952-1956 when crocidolite asbestos was used in the filters," and refers to the Kohr Report for a full and accurate statement of its contents. Defendant further admits that the Kohr Report was prepared before the JOEM Article was published.

*Cplt ¶ 137.* Dr. Moline's report stated: "Ms. Kohr was *exposed to asbestos from Kent Micronite cigarettes*, which she smoked from 1952-1956 when crocidolite asbestos was used in the filters" (emphasis added).

> Powder and in more recent fiber release studies of samples of these products. The bulk analysis and fiber release studies done recently by Fitzgerald and others from ore taken from the same source mines as those used in the manufacture of the Cashmere Bouquet and Coty products showed significant amounts of chrysotile, anthophyllite, and tremolite asbestos. Ms. Kohr was exposed to asbestos from Kent Micronite cigarettes, which she smoked from 1952-1956 when crocidolite asbestos was used in the filters. Studies have shown that each filter contained 10 milligrams of crocidolite asbestos and that millions of fibers of asbestos were released into the lungs during smoking. Dr. Steven Compton has personally evaluated Kent Micronite cigarettes and noted crocidolite asbestos fibers present in the Micronite filter. Longo et al tested Kent cigarettes (Cancer Research 1995) and noted crocidolite fibers in both the filters and in the cigarette smoke itself.

47

137.    Defendant admits the allegations in paragraph 137, with the exception of the emphasis added by Pecos River.

*Cplt ¶ 138.* She even stated the Kent cigarettes were a cause of the plaintiff's mesothelioma:

   a. "Her exposures to asbestos-contaminated face powder and asbestos-contaminated body powder **and to Kent cigarettes** were the cause of her mesothelioma" (emphasis added).

   b. "Ms. Kohr had malignant mesothelioma of the pleura as a result of her ***exposure to asbestos from Kent cigarettes*** and cosmetic talc" (emphasis added).

138.    Defendant admits the allegations in paragraph 138, with the exception of the bolding added by Pecos River.

*Cplt ¶ 139.* But, in her Article, Dr. Moline represented that Ms. Kohr had no exposures to asbestos other than talcum powder. Dr. Moline's statement that there were no other asbestos exposures for Ms. Kohr is knowingly false.[24]

139.    Defendant refers to the JOEM Article for a full and accurate statements of its contents.    Defendant denies the remaining allegations in paragraph 139, including footnote 24 thereto.

*Cplt ¶ 140.* In response to a letter to the editor, Dr. Moline stated in May 2023 that she "re-reviewed the cases included in the article" and the associated medical records and "identified one individual with an alternative exposure"—someone who was exposed to "crocidolite asbestos-laden cigarette filters." **Exhibit J**, Response to the Letter to the Editor. She also issued a similar "Erratum" regarding the one case in May 2023. **Exhibit K**, *Mesothelioma Associated With the Use of Cosmetic Talc: Erratum*.

_____

[24] Although this particular case did not involve claims against Pecos River, it serves as a stark example of Dr. Moline's willingness to make statements regarding the lack of exposures that she knew were false.

140.   Defendant admits that she submitted a response to the letter to the editor that appeared in JOEM volume 65, Number 5, May 2023 (the "Response"), and that the Response contained the language quoted in paragraph 140.  Defendant refers to the Response for a full and accurate statement of its contents.  Defendant further admits that the Erratum contained language similar to that quoted in paragraph 140 and refers to the Erratum for a full and accurate statement of its contents.

*Cplt ¶ 141.*  Dr. Moline did not acknowledge that any other individuals in her Article had potential alternative exposures to asbestos. In fact, she stated "This error does not negate the other 32 cases, in which no other source of asbestos was present apart from cosmetic talcum powder." Exs. J-K.

141.   Defendant admits that the language quoted in paragraph 141 appears in the Erratum and refers to the Erratum for a full and accurate statement of its contents. Defendant further admits that she did not issue a similar erratum for any subject of the JOEM Article other than Ms. Kohr.  Defendant denies the remaining allegations in paragraph 141.

### 3. Stephen Lanzo

*Cplt ¶ 142.* The falsity of the Moline Article is also evident given the information uncovered in the *Lanzo* case.

142.   Defendant denies the allegations in paragraph 142.

*Cplt ¶ 143.* In 2016, Stephen Lanzo brought a claim against Pecos River alleging that he was exposed to asbestos through use of Johnson's Baby Powder.

143.   Defendant denies the allegations in paragraph 143.

*Cplt ¶ 144.* Dr. Moline served as an expert witness in Mr. Lanzo's case against Pecos River—she served an expert report, sat for deposition, and testified at

trial.

144.   Defendant denies that Mr. Lanzo's case was brought against Pecos River.  Defendant admits the remaining allegations in paragraph 144.

*Cplt ¶ 145.*  Mr. Lanzo is a New Jersey resident, his case was filed in New Jersey, and Dr. Moline testified at trial in New Jersey.

145.   Defendant admits that Mr. Lanzo's case was filed in New Jersey and that she testified at Mr. Lanzo's trial.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 145.

*Cplt ¶ 146.*  During the course of that case, alternative sources of asbestos exposure beyond alleged contamination in talc were identified. Additionally, evidence of the presence of commercial asbestos—not a type of "asbestos" allegedly present in Johnson's Baby Powder—was found in plaintiff's tissue.

146.   Defendant denies any implication that there was an undisputed finding in the *Lanzo* case that commercial asbestos fibers were found in Mr. Lanzo's tissue. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 146.

*Cplt ¶ 147.*  Despite this, Dr. Moline included Mr. Lanzo in her Article as Case #6:

|  | Mr. Lanzo | Case #6 |
|---|---|---|
| **Gender** | Male | Male |
| **Year of Diagnosis** | 2016 | 2016 |
| **Age At Diagnosis** | 43 | 43 |
| **Mesothelioma Site** | Pleural | Pleural |
| **Talcum Powder Brand** | Johnson's Baby Powder | D (Johnson's Baby Powder) |
| **Estimated Yrs Of Use** | 40 | 40 |
| **Occupation** | Finance | Finance |
| **Other Details** | **Moline Expert Report at 5, 14**<br><br>"developed chest pain after playing hockey in 2012"<br>"Mr. Lanzo recalled using the talcum powder in the bathroom or his room, and that there would be powder on the floor."<br><br>"He applied the talcum powder to his torso, groin, legs and back, often twice a day after showering."<br><br>"He recalled getting mouthfuls of powder during the application." | **Moline Article at 13-14**<br><br>"developed chest pain after playing hockey in 2012"<br><br>"Case 6 recalled using the powder in the bathroom and in his room, and that there would be powder on his floor."<br><br>"He applied the talcum powder directly to his torso, groin, legs, and back, often twice a day after showering."<br><br>"He recalled getting mouthfuls of powder during the application." |

147.    Defendant admits that Mr. Lanzo is Case #6 in the JOEM Article and denies the allegation that he was improperly included in the article.  Defendant admits that the chart in paragraph 147 accurately quotes from and lists certain details from the JOEM Article regarding Mr. Lanzo other than the talcum powder brand, which is referred to in the referenced appendix as "Johnson's," and refers to the JOEM Article for a full and accurate description of Case #6.  Defendant further admits that the chart in paragraph 147 accurately quotes from and lists certain details from Dr. Moline's April 14, 2017 report in Mr. Lanzo's case ("Lanzo Report"), other

51

than Mr. Lanzo's occupation and estimated years of use, and refers to the Lanzo Report for a full and accurate statement of its contents.

> *Cplt ¶ 148.* The Key confirms that Mr. Lanzo is a subject of the Article.

148.    Defendant admits the allegations in paragraph 148.

> *Cplt ¶ 149.* As further background, Dr. Moline states in her Article that "crocidolite" asbestos fibers "are encountered in cases of industrial and occupational exposure, *not cosmetic talcum powder*." Ex. A, Moline Article at 14 (emphasis added).

149.    Defendant admits that the language quoted in paragraph 149 appears, without the added emphasis, in the JOEM Article and refers to the JOEM Article for a full and accurate statement of its contents.    Defendant denies the remaining allegations in paragraph 149.

> *Cplt ¶ 150.* Dr. Moline knowingly made false statements or recklessly ignored available information demonstrating their falsity when she stated in her Article that crocidolite asbestos was not found in the tissue of Case #6.

150.    Defendant denies the allegations in paragraph 150.

> *Cplt ¶ 151.* Specifically, she states that "tissue samples from six patients were analyzed" (including Case #6) and that "[a]mosite and *crocidolite*, asbestos fibers . . . *were not found* in any of these cases." Ex. A, Moline Article at 14 (emphasis added). That tissue analysis was done in connection with Mr. Lanzo's New Jersey case. *Id.* at 11.

151.    Defendant admits that the language quoted in paragraph 151, with the exception of the added emphasis, is contained in the JOEM Article and refers to the JOEM Article for a full and accurate statement of its contents.    Defendant further admits that the JOEM Article stated that tissue digestions were performed by Dr.

Ronald Gordon "as part of tort litigation" and refers to the JOEM Article for a full and accurate statement of its contents. Defendant denies the remaining allegations in paragraph 151.

*Cplt ¶ 152.* But in fact, crocidolite asbestos was found in the tissue of that Case #6—Mr. Lanzo.

152. Defendant denies the allegations in paragraph 152.

*Cplt ¶ 153.* In the *Lanzo* case, *Plaintiff's expert* Mr. Lee Poye analyzed Mr. Lanzo's tissue and found crocidolite asbestos:



153. Defendant denies the allegations in paragraph 153.

*Cplt ¶ 154.* Defense expert, Dr. Matthew Sanchez, also found crocidolite in Mr. Lanzo's tissue:



154.    Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 154.

*Cplt ¶ 155.* The statement in the Moline Article that no crocidolite was found in the tissue for Case #6 is false.[25]

---

[25] Ignoring or concealing tissue analyses is also not a new tactic. In one case against Pecos River, plaintiffs' law firm Kazan, McClain, Satterley & Greenwood (another firm that has retained Dr. Moline as an expert witness in cases against Pecos River) hid its expert's tissue analysis because he found no asbestos. The firm never produced the expert's voluminous analysis even though it was required to be disclosed under both the relevant California rules of evidence and a case-specific deposition notice. And while the expert testified under oath that he did not know whether he ever tested the specific plaintiff's tissue, emails later leave no question that he did and knew that he did at the time of the false testimony.

155.    Defendant denies the allegations in paragraph 155.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in footnote 25 to paragraph 155.

*Cplt ¶ 156.*  Dr. Moline also stated in her Article that the exposure data she obtained included "known abatement of asbestos while the patient was in school, home renovations that might have used asbestos containing materials, and any other potential sources of asbestos exposure." Ex. A, Moline Article at 11.

156.    Defendant denies the allegations in paragraph 156.

*Cplt ¶ 157.*  But she testified at Mr. Lanzo's trial in 2018 (before her Article was published) that 60 linear feet of exposed asbestos pipe were removed from Mr. Lanzo's basement. She had reviewed the asbestos record of abatement.

157.    Defendant admits that she testified at Mr. Lanzo's trial before the JOEM Article was published.  Defendant further admits that Mr. Lanzo's abatement records were discussed during his trial.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 157.

*Cplt ¶ 158.*  Dr. Moline also testified that she understood that the basement was a family room with a TV and couches, and that Mr. Lanzo spent time in the basement.

158.    Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 158.

*Cplt ¶ 159.*  Case #6 is one of the cases Dr. Moline discusses in detail in her Article. Yet she does not mention the asbestos pipe in the basement as a potential source of exposure. She instead says that other potential exposures to asbestos were considered, with no identified source apart from the talcum powder.

159.    Defendant admits that Case #6 is discussed in the JOEM Article and refers to the JOEM Article for a full and accurate statement of its contents. Defendant further admits that the JOEM Article does not mention asbestos pipe in the basement as a potential source of exposure for Case #6.  Defendant denies any implication that Mr. Lanzo had an asbestos exposure based on any asbestos-containing pipe in Mr. Lanzo's basement.    Defendant denies the remaining allegations in paragraph 159.

*Cplt ¶ 160.*  Mr. Lanzo also had potential exposures from his schools.

160.    Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 160.

*Cplt ¶ 161.*  In his elementary school, damage to the asbestos pipe insulation was found in multiple locations, including hallways, classrooms, the lunchroom, and the boys' locker room.

161.    Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 161.

*Cplt ¶ 162.*  In the school he attended from grades 1-4, the school district found what amounted to 64 bags of friable asbestos-containing material which would have been present while he attended (and removed after he left).

162.    Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 162.

*Cplt ¶ 163.*  In the school he attended for grade 5, large amounts of friable asbestos were found and removed from the boys' bathroom and classrooms in the years after his attendance.

163.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 163.

*Cplt ¶ 164.* In his middle school, abatement records show that asbestos-containing material was removed from classrooms after Mr. Lanzo was a student at the school. At one point, 67 bags of friable waste was removed from the school. All this asbestos would have been present when Mr. Lanzo was there.

164.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 164.

*Cplt ¶ 165.* In his high school, hundreds of bags of friable asbestos were removed. The school district removed 200 square-feet of friable asbestos from the ground-floor lobby from 1989-1992—meaning some of the asbestos was removed during Mr. Lanzo's junior and senior year.

165.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 165.

*Cplt ¶ 166.* Dr. Moline stated in her Article that she considered "known abatement of asbestos while the patient was in school." Ex. A, Moline Article at 11. But she did not mention any of the abatement in Mr. Lanzo's schools in her Article.

166.   Defendant admits that the JOEM Article does not mention abatement in Mr. Lanzo's schools.    Defendant denies the remaining allegations in paragraph 166.

*Cplt ¶ 167.* Dr. Moline's statement that there were no other asbestos exposures for Mr. Lanzo is false.

167.   Defendant denies the allegations in paragraph 167.

### 4.  Doris Jackson

*Cplt ¶ 168.* Plaintiff Doris Jackson filed a claim against other cosmetic talc defendants alleging that she was exposed to asbestos in their products.

168.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 168.

*Cplt ¶ 169.*  Dr. Moline appeared as an expert in Ms. Jackson's case.

169.   Defendant admits the allegations in paragraph 169.

*Cplt ¶ 170.*  Upon information and belief, Case #3 is a likely match for Doris Jackson.

|  | Ms. Jackson | Case #3 |
|---|---|---|
| **Gender** | Female | Female |
| **Year of Diagnosis** | 2014 | 2014 |
| **Age At Diagnosis** | 84 | 84 |
| **Mesothelioma Site** | Pleural Biphasic | Pleural Biphasic |
| **Talcum Powder Brand** | Cashmere Bouquet | Cashmere Bouquet |
| **Estimated Years Of Use** | 70 | 70 |
| **Occupation** | Elementary School Teacher | Elementary School Teacher |
| **Tissue Digestion** | Yes | Yes |
| **Digestion Asb. Type** | Tremolite | Tremolite |
| **Site Found** | Lung, Lymph Node | Lung, Lymph Node |
| **Concentration** | 0; 9,409 | 0; 9,409 |
| **Other Details** | **Moline Expert Report at 3-4**<br><br>"developed shortness of breath with exertion in September 2014, along with a cough and chest tightness. . ."<br><br>"a chest x-ray showed a very large left pleural effusion." | **Moline Article at 12**<br><br>"In September 2014, Case 3 . . . developed shortness of breath, a cough, and chest tightness."<br><br>"A chest x-ray in November 2014 showed a large left pleural effusion" |

170.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegation in paragraph 170 that Case #3 is a "likely match" for Doris Jackson.  Defendant admits that the chart in paragraph 170 accurately quotes and lists certain details regarding Case #3 from the JOEM Article (other than the age of diagnosis) and refers to the JOEM Article for a full and accurate description of

Case #3.  Defendant admits that the chart in paragraph 170 accurately quotes from and lists certain details regarding Ms. Jackson reported in Dr. Moline's May 3, 2016 report in Ms. Jackson's case (the "Jackson Report") (other than the age of diagnosis, estimated years of use, tissue digestion, site found, and concentration) and refers to the report for a full and accurate statement of its contents.

*Cplt ¶ 171.*  The Key confirms that Ms. Jackson is a subject of the Article.

171.  Defendant admits the allegations in paragraph 171.

*Cplt ¶ 172.*  A medical record history form from Ms. Jackson's examination with Dr. Robert Cameron included a handwritten statement that she had been exposed to "[c]eiling pipes with degrading insulation" during her more than 30-year career as a public school teacher.

172.  Defendant admits that a form in Ms. Jackson's medical records entitled "Initial Medical History and Physical Examination" contains a handwritten notation, "ceiling pipes with degrading insulation," in a section regarding asbestos exposure and refers to that form for a full and accurate statement of its contents.  Defendant denies any implication that this form demonstrates that Ms. Jackson was exposed to asbestos other than through her use of cosmetic talc.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 172.

*Cplt ¶ 173.*  Dr. Moline noted the evidence of alternative exposure in her expert report for the *Jackson* case:

59

> Dr. Robert Cameron, a thoracic surgeon, saw Ms. Jackson on February 4, 2015. In her intake form, she noted that she was exposed for over thirty years to ceiling pipes with degrading insulation while working as a teacher in the DC Public Schools. An MRI of the

173.    Defendant admits that the passage excerpted in paragraph 173, with the exception of the emphasis, is contained in the Jackson Report and refers to the report for a full and accurate statement of its contents.

*Cplt ¶ 174.* But, in her Article, Dr. Moline represented that Case #3 had no  exposures to asbestos other than talcum powder.

174.    Defendant refers to the JOEM Article for a full and accurate statement of its contents.  Defendant denies the remaining allegations in paragraph 174.

*Cplt ¶ 175.* Dr. Moline's statement that there were no other asbestos exposures for Ms. Jackson at least recklessly disregards available information.

175.    Defendant denies the allegations in paragraph 175.

### 5.  Valerie Jo Dalis

*Cplt ¶ 176.* Plaintiff Valerie Jo Dalis filed a claim against other cosmetic talc defendants alleging that she was exposed to asbestos in their products.

176.    Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 176.

*Cplt ¶ 177.* Dr. Moline appeared as an expert in Ms. Dalis's case.

177.    Defendant admits the allegations in paragraph 177.

*Cplt ¶ 178.* Upon information and belief, Case #4 is a likely match for Ms. Dalis.

60

|  | Ms. Dalis | Case #4 |
| --- | --- | --- |
| Gender | Female | Female |
| Year of Diagnosis | 2014 | 2014 |
| Age At Diagnosis | 66 | 66 |
| Mesothelioma Site | Peritoneal Epithelial | Peritoneal Epithelial |
| Talcum Powder Brand | Cashmere Bouquet, Mennen | Cashmere Bouquet, Mennen |
| Estimated Years Of Use | 30 | 30 |
| Occupation | Hairdresser | Hairdresser |
| Tissue Digestion | Yes | Yes |
| Asbestos Type in Digestion | Chrysotile | Chrysotile |
| Site Found | Peritoneum | Peritoneum |
| Concentration | 920 | 920 |
| Other Comments | **Moline Expert Report at 10**<br><br>"Ms. Dalis had additional exposure to talcum powder when working as a licensed cosmetologist"<br><br>"She shook the powder onto the necks and wiped the powder off with a brush or blow dryer."<br><br>"She described wearing gloves on a regular basis to apply color, and she had to blow the powder into the gloves." | **Moline Article at 13**<br><br>"Case 4 had additional exposure to talcum powder in the 1960s while working as a licensed cosmetologist"<br><br>"She shook the talcum powder onto the client's neck, and would wipe off the excess with a brush or blow dryer."<br><br>She also used talcum powder inside the gloves that she donned prior to applying hair color." |

178.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegation in paragraph 178 that Case #4 is a "likely match" for Ms. Dalis.  Defendant admits that the chart in paragraph 178 accurately quotes and lists certain details regarding Case #4 from the JOEM Article and refers to the JOEM Article for a full and accurate description of Case#4.  Defendant admits that the chart in paragraph 178 accurately quotes from and lists certain details regarding Ms. Dalis reported in Dr. Moline's March 4, 2016 report in Ms. Dalis's case (the "Dalis

61

Report") (other than tissue digestion, asbestos type in digestion, site found, and concentration) and refers to the report for a full and accurate statement of its contents.

*Cplt ¶ 179.* The Key confirms that Ms. Dalis is a subject of the Article.

179.   Defendant admits the allegations in paragraph 179.

*Cplt ¶ 180.* Before Ms. Dalis filed her complaint against another cosmetic talc defendant, she submitted an asbestos bankruptcy trust claim for $450,000 and collected over $28,000 from the Manville Personal Injury Settlement Trust.

180.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 180.

*Cplt ¶ 181.* The Moline Article states: "Talcum powder exposure histories were reviewed based on sworn testimony by patients and in some cases, family members with first-hand knowledge of the use of talcum powder, such as parents who recalled using talcum powder while diapering the patient." Ex. A, Moline Article at 12.

181.   Defendant admits that the language quoted in paragraph 181 appears in the JOEM Article and refers to the JOEM Article for a full and accurate statement of its contents.

*Cplt ¶ 182.* The bankruptcy submissions were discussed at Ms. Dalis's deposition and her husband's deposition.

182.   Defendant admits that Ms. Dalis's Claim Information Report for the Manville Personal Injury Settlement Trust was discussed during Ms. Dalis's deposition.  Defendant denies any implication that Ms. Dalis's Claim Information Report demonstrates that she was exposed to asbestos other than through her use of

62

cosmetic talc.  Defendant lacks knowledge or information sufficient to form a belief

as to the truth of the remaining allegations in paragraph 182.

*Cplt ¶ 183.*  But again, in her Article, Dr. Moline represented that Ms. Dalis had no exposures to asbestos other than talcum powder. Dr. Moline's statement that there were no other asbestos exposures for Ms. Dalis is false.

183.   Defendant denies the allegations in paragraph 183.

### 6.  Carol Schoeniger

*Cplt ¶ 184.*  Plaintiff Carol Schoeniger filed a claim against other cosmetic talc defendants alleging that she was exposed to asbestos in their products.

184.   Defendant lacks knowledge or information sufficient to form a belief

as to the truth of the allegations in paragraph 184.

*Cplt ¶ 185.*  Dr. Moline served as an expert in Ms. Schoeniger's case.

185.   Defendant admits the allegation in paragraph 185.

*Cplt ¶ 186.*  The Key confirms that Ms. Schoeniger is a subject of the Article.

186.   Defendant admits the allegations in paragraph 186.

*Cplt ¶ 187.*  Case #28 is a likely match for Ms. Schoeniger.

187.   Defendant lacks knowledge or information sufficient to form a belief

as to the truth of the allegations in paragraph 187.

*Cplt ¶ 188.*  Ms. Schoeniger testified that her husband sanded and applied joint compound in their home in the 1960s.

188.   Defendant admits that Ms. Schoeniger testified at her deposition that

her husband had sanded joint compound or spackle shortly after moving into their

home in the 1960s.  Defendant denies the remaining allegations in paragraph 188,

including any implication that Ms. Schoeniger's deposition testimony demonstrates that she was exposed to asbestos other than through her use of cosmetic talc.

*Cplt ¶ 189.* Dr. Moline's *own expert report* stated that "asbestos from joint compound that was applied and sanded in her home in the 1960s" was a "potential exposure" for Ms. Schoeniger.

189. Defendant admits that the language quoted in paragraph 189 appears in her March 2, 2017 report in Ms. Schoeniger's case (the "Schoeniger Report") and refers to the Schoeniger Report for a full and accurate statement of its contents.

*Cplt ¶ 190.* But, in her Article, Dr. Moline represented that Ms. Schoeniger had no exposures to asbestos other than talcum powder.

190. Defendant denies the allegations in paragraph 190.

*Cplt ¶ 191.* Dr. Moline's statement that there were no other asbestos exposures for Ms. Schoeniger is knowingly false.

191. Defendant denies the allegations in paragraph 191.

### 7.  Edward Garcia

*Cplt ¶ 192.* Plaintiff Edward Garcia filed a claim against Johnson & Johnson and other cosmetic talc defendants alleging that he was exposed to asbestos in their products.

192. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 192.

*Cplt ¶ 193.* Dr. Moline served as an expert in Mr. Garcia's case.

193. Defendant admits the allegations in paragraph 193.

*Cplt ¶ 194.* The Key confirms that Mr. Garcia is a subject of the Article.

194. Defendant admits the allegations in paragraph 194.

*Cplt ¶ 195.* Case #14 is a likely match for Mr. Garcia.

195.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 195.

*Cplt ¶ 196.* Mr. Garcia testified that he worked as a press operator at Eastern Molding.

196.   Defendant admits the allegations in paragraph 196.

*Cplt ¶ 197.* In her *own expert report* in Mr. Garcia's case, Dr. Moline stated that exposure to industrial talc there represented a "potential exposure" to asbestos. Industrial talc can be as low as 35% talc.

197.   Defendant admits that her October 12, 2017 report in Mr. Garcia's case (the "Garcia Report") stated that "Mr. Garcia has no known other asbestos exposure, although there is a question of whether he had bystander exposure to industrial talc used at Eastern Molding in a room adjacent to him. This potential exposure, is the only other potential source for asbestos exposure, and apart from this, he has no other competing explanations (#4) for the development of his mesothelioma." Defendant further refers to the Garcia Report for a full and accurate statement of its contents. Defendant admits that industrial talc can contain as little as 35% talc, but lacks knowledge or information sufficient to form a belief as to the truth of any implication that she knew this at the time she prepared the Garcia Report. Defendant further denies any implication that Mr. Garcia was improperly included in the JOEM Article based on the contents of the Garcia Report.

*Cplt ¶ 198.* But, in her Article, Dr. Moline represented that Mr. Garcia had no exposures to asbestos other than cosmetic talcum powder.

65

198.  Defendant denies the allegations in paragraph 198.

*Cplt ¶ 199.* Dr. Moline's statement that there were no other asbestos exposures for Mr. Garcia is false.

199.  Defendant denies the allegations in paragraph 199.

### 8.  Sharon Hanson

*Cplt ¶ 200.* Plaintiff Sharon Hanson filed a claim against another cosmetic talc defendant alleging that she was exposed to asbestos in their products.

200.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 200.

*Cplt ¶ 201.* Dr. Moline served as an expert in Ms. Hanson's case.

201.  Defendant admits the allegations in paragraph 201.

*Cplt ¶ 202.* In fact, Dr. Moline's causation opinions were *excluded* in the *Hanson* case. *Hanson v. Colgate-Palmolive Co.*, 353 F. Supp. 3d 1273, 1299 (S.D. Ga. 2018).

202.  Defendant admits that her causation opinions were excluded in *Hanson v. Colgate-Palmolive Co.*, 353 F. Supp. 3d 1273 (S.D. Ga. 2018), and refers to that opinion for a full and accurate statement of its contents.

*Cplt ¶ 203.* Case #75 is a likely match for Sharon Hanson.

203.  Defendant denies the allegations in paragraph 203.

*Cplt ¶ 204.* The Key confirms that Ms. Hanson is a subject of the Article.

204.  Defendant admits the allegations in paragraph 204.

*Cplt ¶ 205.* Ms. Hanson's husband, Douglas Hanson, testified that he was potentially exposed to asbestos while working as an engineer for PPG Industries from 1974 to 1985, and again as a manager for LCP Chemicals from 1987 to 1993. One of Mr. Hanson's former coworkers at PPG Industries who worked in the same

66

area during the same timeframe as Mr. Hanson testified that he worked hands on with raw asbestos and other asbestos-containing products. Ms. Hanson testified that during Mr. Hanson's employment at these two companies, she was primarily responsible for household laundry.

205.   Defendant denies the allegation in the first sentence of paragraph 205. Defendant admits that Ms. Hanson testified at her deposition that she did Mr. Hanson's laundry when she was married to him, and refers to the transcript of that deposition for a full and accurate statement of its contents.  Defendant denies any implication that Ms. Hanson's deposition testimony demonstrates that she was exposed to asbestos other than through her use of cosmetic talc.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 205.

*Cplt ¶ 206.* Dr. Moline testified that Mr. Hanson's work around others handling asbestos represents a "potential exposure" to Ms. Hanson. But, in her Article, Dr. Moline represented that Ms. Hanson had no exposures to asbestos other than talcum powder.

206.   Defendant denies the allegations in paragraph 206.

*Cplt ¶ 207.* Dr. Moline's statement that there were no other asbestos exposures for Ms. Hanson is knowingly false.

207.   Defendant denies the allegations in paragraph 207.

### 9.  Mary Anne Caine

*Cplt ¶ 208.*  Plaintiff Mary Anne Caine filed a claim against other cosmetic talc defendants alleging that she was exposed to asbestos in their products.

208.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 208.

67

*Cplt ¶ 209.* Dr. Moline served as an expert in Ms. Caine's case.

209. Defendant admits the allegations in paragraph 209.

*Cplt ¶ 210.* The Key confirms that Ms. Caine is a subject of the Article.

210. Defendant admits the allegations in paragraph 210.

*Cplt ¶ 211.* Case #10 is a likely match for Ms. Caine.

211. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 211.

*Cplt ¶ 212.* Ms. Caine alleged in her complaint that for a period of twenty-six years, she "may have been exposed to asbestos which may have been brought home on the clothing of her former husband" from his work for a telephone company.

212. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 212.

*Cplt ¶ 213.* She also included this potential exposure in her fact sheet, listing "Household exposure via former husband, Joseph L. Griggs."

213. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 213.

*Cplt ¶ 214.* But, in her Article, Dr. Moline represented that Ms. Caine had no exposures to asbestos other than talcum powder.

214. Defendant denies the allegations in paragraph 214.

*Cplt ¶ 215.* Dr. Moline's statement that there were no other asbestos exposures for Ms. Caine is knowingly false.

215. Defendant denies the allegations in paragraph 215.

### 10. Kayla Martinez

*Cplt ¶ 216.* Plaintiff Kayla Martinez filed a claim against other cosmetic talc

68

defendants alleging that she was exposed to asbestos in their products.

216.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 216.

*Cplt ¶ 217.*   Dr. Moline served as an expert in Ms. Martinez's case.

217.   Defendant admits the allegations in paragraph 217.

*Cplt ¶ 218.*   The Key confirms that Ms. Martinez is a subject of the Article.

218.   Defendant admits the allegations in paragraph 218.

*Cplt ¶ 219.*   Case #23 is a likely match for Ms. Martinez.

219.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 219.

*Cplt ¶ 220.*   A medical record for Ms. Martinez states: "Her father worked at a company with known asbestos exposure and held her in his work clothes as a child."

220.   Defendant admits that the language quoted in paragraph 220 appears in a document entitled, MD Anderson Cancer Center Main Building Facesheet, for Ms. Martinez generated on May 16, 2018, and refers to that document for a full and accurate statement of its contents.   Defendant denies any implication that this document demonstrates that Ms. Martinez was exposed to asbestos other than through her use of cosmetic talc.

*Cplt ¶ 221.*   But, in her Article, Dr. Moline represented that Ms. Martinez had no exposures to asbestos other than talcum powder.

221.   Defendant denies the allegations in paragraph 221.

*Cplt ¶ 222.* Dr. Moline's statement that there were no other asbestos exposures for Ms. Martinez is knowingly false.

222.   Defendant denies the allegations in paragraph 222.

### 11. Barbara Arend

*Cplt ¶ 223.* Plaintiff Barbara Arend filed a claim against other cosmetic talc defendants alleging that she was exposed to asbestos in their products.

223.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 223.

*Cplt ¶ 224.* Dr. Moline served as an expert in Ms. Arend's case.

224.   Defendant admits the allegations in paragraph 224.

*Cplt ¶ 225.* The Key confirms that Ms. Arend is a subject of the Article.

225.   Defendant admits the allegations in paragraph 225.

*Cplt ¶ 226.* Upon information and belief, Case #12 is a likely match for Ms. Arend.

226.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 226.

*Cplt ¶ 227.* A medical record for Ms. Arend stated: "Barbara denies any asbestos exposure *other than the possibility of asbestos presence in the house where she grew up* as a child (apparently this was an old house that might have ha[d] asbestos shingles)."

227.   Defendant admits that the language quoted in paragraph 227, other than the emphasis and brackets added by Pecos River, appears in a document entitled, Patient Record UT Southwestern Medical Center, and refers to that record for a full and accurate statement of its contents.  Defendant denies any implication that Ms.

70

Arend's medical records demonstrate that she was exposed to asbestos other than through her use of cosmetic talc.

*Cplt ¶ 228.* But, in her Article, Dr. Moline represented that Ms. Arend had no exposures to asbestos other than talcum powder.

228.   Defendant denies the allegations in paragraph 228.

*Cplt ¶ 229.* Dr. Moline's statement that there were no other asbestos exposures for Ms. Arend is knowingly false.

229.   Defendant denies the allegations in paragraph 229.

### 12. Blondia Clemons

*Cplt ¶ 230.* Plaintiff Blondia Clemons filed a claim against Johnson & Johnson and other cosmetic talc defendants alleging that she was exposed to asbestos in their products.

230.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 230.

*Cplt ¶ 231.* Dr. Moline served as an expert in Ms. Clemons' case.

231.   Defendant admits the allegations in paragraph 231.

*Cplt ¶ 232.* The Key confirms that Ms. Clemons is a subject of the Article.

232.   Defendant admits the allegations in paragraph 232.

*Cplt ¶ 233.* Case #22 is a likely match for Ms. Clemons.

233.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 233.

*Cplt ¶ 234.* Automotive friction products like brakes are a common source of asbestos exposure.

234.   Defendant denies the allegations in paragraph 234.

*Cplt ¶ 235.* Dr. Moline has served as an expert on behalf of plaintiffs who worked with brakes as a shade mechanic—such as Ms. Clemons' father—and she has testified those plaintiffs were exposed to asbestos from that work. It is Dr. Moline's opinion that exposure to asbestos from friction products like automobile brakes can cause mesothelioma.

235.   Defendant admits that she has served as an expert on behalf of plaintiffs who worked with brakes as a shade-tree mechanic and she has testified those plaintiffs were exposed to asbestos from that work.  Defendant further admits that exposure to asbestos from friction products like automobile brakes can cause mesothelioma.  Defendant denies any implication that Ms. Clemons was exposed to asbestos due to her father's work as a shade-tree mechanic.

*Cplt ¶ 236.* Dr. Moline has even testified that merely opening a box with friction parts would result in exposure to respirable asbestos.

236.   Defendant denies the allegations in paragraph 236.

*Cplt ¶ 237.* Dr. Moline has also testified that typically there is still exposure to asbestos 10 to 30 feet away from brake work.

237.   Defendant denies the allegations in paragraph 237.

*Cplt ¶ 238.* Ms. Clemons testified that her father was a mechanic and performed two to three brake jobs a day, six days a week, at the family's home during the entire period that Ms. Clemons resided there.

238.   Defendant admits the allegations in paragraph 238.

*Cplt ¶ 239.* Ms. Clemons testified that she would sometimes be on the porch only a few feet away from her father working on cars in the driveway.

239.   Defendant admits that Ms. Clemons stated in her deposition testimony that she would sometimes be on the porch when her father was working in the driveway.  Defendant denies the remaining allegations in paragraph 239.

*Cplt ¶ 240.*  But, in her Article, Dr. Moline represented that Ms. Clemons had no exposures to asbestos other than talcum powder.

240.   Defendant denies the allegations in paragraph 240.

*Cplt ¶ 241.*  Dr. Moline's statement that there were no other asbestos exposures for Ms. Clemons is knowingly false.

241.   Defendant denies the allegations in paragraph 241.

### 13. Irma Verdolotti

*Cplt ¶ 242.*  Plaintiff Irma Verdolotti filed a claim against Johnson & Johnson and other cosmetic talc defendants alleging that she was exposed to asbestos in their products.

242.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 242.

*Cplt ¶ 243.*  Dr. Moline served as an expert in Ms. Verdolotti's case.

243.   Defendant admits the allegations in paragraph 243.

*Cplt ¶ 244.*  The Key confirms that Ms. Verdolotti is a subject of the Article.

244.   Defendant admits the allegations in paragraph 244.

*Cplt ¶ 245.*  Case #30 is a likely match for Ms. Verdolotti.

245.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 245.

*Cplt ¶ 246.*  Ms. Verdolotti testified that her father worked as a steamfitter for the entire time she lived with him. She recalled him saying he worked with

73

insulation.

246.    Defendant admits that Ms. Verdolotti testified during her deposition that her father worked as a steamfitter when she lived with him.  Defendant refers to Ms. Verdolotti's deposition testimony for a full and accurate statement of its contents.  Defendant denies any implication that Ms. Verdolotti was exposed to asbestos from her father's work as a steamfitter.  Defendant denies the remaining allegations in paragraph 246.

*Cplt ¶ 247.* Ms. Verdolotti also testified that her sister worked in the warehouse of a Providence shipyard during World War II. During that time, Ms. Verdolotti shared a room with her, and her sister wore her work-clothes home.

247.    Defendant admits that Ms. Verdolotti testified during her deposition that her sister worked in a warehouse at the Providence shipyard during World War II and that she shared a room with her sister.  Defendant refers to Ms. Verdolotti's deposition transcript for a full and accurate statement of its contents.  Defendant denies the remaining allegations in paragraph 247.

*Cplt ¶ 248.* Shipyard workers have been identified as a group as having an increased incidence of mesothelioma that is [*sic*] been attributed to asbestos exposure, which Dr. Moline knows.

248.    Defendant denies the allegations in paragraph 248.

*Cplt ¶ 249.* Dr. Moline has testified that working in a shipyard is considered a classical occupational asbestos exposure and that take-home asbestos exposures resulting from family members working on ships or in a shipyard have also been well documented in the literature.

249.    Defendant denies the allegations in paragraph 249.

*Cplt ¶ 250.* Because shipyard exposures have been associated with asbestos-related disease for decades, Dr. Moline considers an individual to have a "potential exposure" if their family member worked on a shipyard—even without specific information into where precisely on the shipyard the family member worked or for how long.

250. Defendant admits that, depending on the circumstances, an individual who worked in certain areas of a shipyard that used asbestos could have been exposed to asbestos. Defendant denies the remaining allegations in paragraph 250.

*Cplt ¶ 251.* She also testified that if there was evidence an individual's family member worked in a shipyard, that "potential exposure" would mean the individual would not be in the Article.

251. Defendant denies the allegations in paragraph 251.

*Cplt ¶ 252.* But, in her Article, Dr. Moline represented that Ms. Verdolotti had no exposures to asbestos other than talcum powder.

252. Defendant denies the allegations in paragraph 252.

*Cplt ¶ 253.* Dr. Moline's statement that there were no other asbestos exposures for Case #30 is knowingly false.

253. Defendant denies the allegations in paragraph 253.

### 14. Ricardo Rimondi (Moline 2023)

*Cplt ¶ 254.* In January 2023, Dr. Moline published another article in response to the *Bell* opinion entitled, "Exposure to cometic talc and mesothelioma" in the Journal of Occupational Medicine and Toxicology ("Moline 2023 Article") (attached as **Exhibit L**).

254. Defendant admits that the Journal of Occupational Medicine and Toxicology ("JOMT") published an article entitled, *Exposure to cosmetic talc and*

*mesothelioma* (the "JOMT Article"), in a January 2023 volume of that journal.

Defendant denies the remaining allegations in paragraph 254.

**Cplt ¶ 255.** Dr. Moline presented "166 cases of individuals who have substantial asbestos exposure to cosmetic talc products as well as some who have potential or documented additional exposures to other asbestos-containing products and who subsequently developed mesothelioma." *Id.* at 1.

255. Defendant denies that paragraph 255 quotes the JOMT Article accurately. Defendant admits that the JOMT Article states that it presents "166 cases of individuals who had substantial asbestos exposure to cosmetic talc products as well as some who had potential or documented additional exposures to other asbestos-containing products and who subsequently developed mesothelioma." Defendant refers to the JOMT Article for a full and accurate statement of its contents.

**Cplt ¶ 256.** Like the original article, these 166 individuals were all plaintiffs in litigation where Dr. Moline serves as an expert witness on behalf of plaintiffs' counsel. *Id.* at 2.

256. Defendant admits the allegations in paragraph 256.

**Cplt ¶ 257.** According to Dr. Moline, "[i]n 122 cases, the only known exposure to asbestos was from cosmetic talc. For 44 cases, potential or documented alternate exposures in addition to the cosmetic talc were described." *Id.* at 1.

257. Defendant admits that the language quoted in paragraph 257 appears in the JOMT Article and refers to that article for a full and accurate statement of its contents.

**Cplt ¶ 258.** The Moline 2023 Article is based on the same false premise as the original Article. Dr. Moline continues to fail to properly account for alternative exposures.

76

258.    Defendant denies the allegations in paragraph 258.

*Cplt ¶ 259.*    Dr. Moline states in her new 2023 Article that she intentionally took "[e]fforts to minimize[] identification" of her new subjects such as by "describing age in a range" instead of an exact number.

259.    Defendant admits that the language quoted in paragraph 259 appears in the JOMT Article and refers to that article for a full and accurate statement of its contents.

*Cplt ¶ 260.*    The Key Pecos River obtained also identifies the individuals in the Moline 2023 Article.

260.    Defendant admits the allegations in paragraph 260.

*Cplt ¶ 261.*    Despite Dr. Moline's attempts to obfuscate, Moline 2023 Article Case #25[26] is a likely match for Ricardo Rimondi, who brought a claim against Pecos River alleging that he was exposed to asbestos through use of Johnson's Baby Powder:

261.    Defendant denies that she engaged in any attempts to obfuscate. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 261.

---

[26] Dr. Moline does not number the subjects of her 2023 Article. Case #25 is the third from the top on page 5 with the occupation "baked goods manufacturer."

*Cplt ¶ 262.*

|  | **Mr. Rimondi** | **Case #5** |
|---|---|---|
| **Gender** | Male | Male |
| **Age At Diagnosis** | 56 | 51-60 |
| **Mesothelioma Site** | Pleural Epithelial | Pleural Epithelial |
| **Estimated Years Of Use** | ~50 | 49 |
| **Latency** | 55 | 55 |
| **Diapering Others** | Yes | Yes |
| **Occupation** | **Moline Expert Report at 7**<br><br>"He then moved to Entenmann's, *a baked goods manufacturer*, where he worked from 1998 until 2010" | **Moline 2023 Article at 5**<br><br>"Baked goods manufacturer" |

262.    Defendant admits that the chart in paragraph 262 accurately lists certain details regarding Case #25 and refers to the JOMT Article for a full and accurate description of Case #25.  Defendant denies that the chart in paragraph 262 accurately lists details of Case #5.  Defendant admits that the chart in paragraph 262 accurately quotes from and lists certain details regarding Mr. Rimondi reported in Dr. Moline's February 8, 2018 report in Mr. Rimondi's case (the "Rimondi Report") (other than the bolded language added by Pecos River, estimated years of use, and latency) and refers to the report for a full and accurate statement of its contents.

*Cplt ¶ 263.* The Moline 2023 Article states under "Certainty of Alterative Exposure" for Case #25: "None."

263.    Defendant admits that Case #25, which refers to a male with a listed occupation as "Baked goods manufacturer," categorizes the "Certainty of Alternate

Exposure" as "None." Defendant further refers to the JOMT Article for a full and accurate statement of its contents.

*Cplt ¶ 264.* The Key confirms that Mr. Rimondi is a subject of the Moline 2023 Article.

264. Defendant admits the allegations in paragraph 264.

*Cplt ¶ 265.* But Mr. Rimondi had alternative exposures to asbestos from living near the Eternit Plant in Peru (which purchased asbestos cement machine products). Dr. Moline knew about this exposure from her testimony at the trial.

265. Defendant denies the allegations in paragraph 265.

*Cplt ¶ 266.* One study by Dr. Magnani found that living between 1500 and 2499 meters from an Eternit facility in Italy would have increased the chance that a person developed mesothelioma by **2,000 percent**. *See* Magnani et al., *Increased Risk of Malignant Mesothelioma of the Pleura after Residential or Domestic Exposure to Asbestos: A Case–Control Study in Casale Monferrato, Italy* Environ Health Perspect. 2001 Sep;109(9):915–919. doi: 10.1289/ehp.01109915, available at https://pmc.ncbi.nlm.nih.gov/articles/PMC1240441/.

266. Defendant admits that Dr. Corrado Magnani and others authored an article entitled, *Increased Risk of Malignant Mesothelioma of the Pleura after Residential or Domestic Exposure to Asbestos: A Case-Control Study in Casale Monferrato, Italy*, and refers to that article for a full and accurate statement of its contents. Defendant denies the remaining allegations in paragraph 266.

*Cplt ¶ 267.* Dr. Magnani was not an expert in the *Rimondi* case.

267. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 267.

*Cplt ¶ 268.* Mr. Rimondi lived 2270 meters away from the Peruvian Eternit Plant from 1960 to 1969, lived 1580 meters away from the plant from 1969-1992,

79

and went to an elementary school located 2120 meters away from the plant.

268.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 268.

*Cplt ¶ 269.*   Dr. Moline was aware of where Mr. Rimondi lived in Peru.

269.   Defendant denies the allegations in paragraph 269.

*Cplt ¶ 270.*   The website of another plaintiff's expert who testified in that case even discusses the Peruvian Eternit facility which is listed as a purchaser of asbestos cement machine products in 1965.

270.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 270.

*Cplt ¶ 271.*   Dr. Moline had been taught to ask about whether someone lived near an asbestos factory because she was aware of a body of literature about environmental exposure to asbestos increasing the risk of mesothelioma. And she was aware that Dr. Magnani had published on asbestos exposure as a result of an Eternit factory in Italy.

271.   Defendant admits that she was aware that Dr. Magnani published an article regarding an Eternit factory located in a valley in Italy with unique geographic properties, meaning that Dr. Magnani's findings might not apply to other regions. Defendant denies the remaining allegations in paragraph 271.

*Cplt ¶ 272.*   Moreover, Dr. Moline was cross-examined about Mr. Rimondi's Eternit factory exposure at trial. Mr. Rimondi's case was filed in New Jersey, and Dr. Moline testified at the trial in New Jersey.

272.   Defendant admits the allegations in paragraph 272.

*Cplt ¶ 273.*   Mr. Rimondi's case resulted in a full defense verdict.

80

273.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 273.

*Cplt ¶ 274.* But again, in her 2023 Article, Dr. Moline represented that Case #25's potential for alternative exposures to asbestos was "none."

274.   Defendant admits that Case #25, which refers to a male with a listed occupation as "Baked goods manufacturer," categorizes the "Certainty of Alternate Exposure" as "None."   Defendant further refers to the JOMT Article for a full and accurate statement of its contents.   Defendant denies the remaining allegations in paragraph 274.

*Cplt ¶ 275.* Dr. Moline's statement that there were no other asbestos exposures for Mr. Rimondi false.

275.   Defendant denies the allegations in paragraph 275.

### 15. Rafaella Marisco (Moline 2023)

*Cplt ¶ 276.* Rafaella Marisco is a subject of the 2023 Article according to the Key.

276.   Defendant admits the allegations in paragraph 276.

*Cplt ¶ 277.* Ms. Marisco is likely match for Case # 111.

277.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 277.

*Cplt ¶ 278.* For Case #111, Dr. Moline s[t]ated: "Certainty of Alternate Exposure: None."

278.   Defendant admits that Case #111, which refers to a female with a listed occupation as "X-ray technician," categorizes the "Certainty of Alternate Exposure"

as "None." Defendant further refers to the JOMT Article for a full and accurate statement of its contents. Defendant denies the remaining allegations in paragraph 278.

*Cplt ¶ 279.* Ms. Marisco's complaint and interrogatory responses asserted an exposure to asbestos from phenolic molding compounds at her prior employer, H.H. Fluorescent Parts, Inc.

279. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 279.

*Cplt ¶ 280.* Dr. Moline's statement that no non-talc exposures to asbestos exist for Ms. Marisco is false.

280. Defendant denies the allegations in paragraph 280.

### 16. Santa Rea (Moline 2023)

*Cplt ¶ 281.* Santa Rea is a subject of the 2023 Article according to the Key.

281. Defendant admits the allegations in paragraph 281.

*Cplt ¶ 282.* Ms. Rea is likely match for Case # 69.

282. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 282.

*Cplt ¶ 283.* For Case #69, Dr. Moline s[t]ated: "Certainty of Alternate Exposure: None."

283. Defendant admits that Case #69, which refers to a female with a listed occupation as "Hospitality," categorizes the "Certainty of Alternate Exposure" as "None." Defendant further refers to the JOMT Article for a full and accurate

82

statement of its contents.  Defendant denies the remaining allegations in paragraph 283.

*Cplt ¶ 284.*  Ms. Rea's medical records state the fire-proof insulation where she lived and exposure to dust and debris in the aftermath of the 9/11 terrorist attacks is believed to be her asbestos exposures.

284.  Defendant admits that medical records entitled, Discharge Summary CFHP by Adam Holers and Consultation dictated by Dr. Prafulla Kirtane, speculate that Ms. Rea may have been exposed to asbestos from the 9/11 attacks on the World Trade Center and refer to those records for a full and accurate statement of their contents.  Defendant denies the remaining allegations in paragraph 284, including any implication that Ms. Rea's medical records demonstrate that she was exposed to asbestos other than through her use of cosmetic talc.

*Cplt ¶ 285.*  Dr. Moline's statement that no non-talc exposures to asbestos exist for Ms. Rea is false.

285.  Defendant denies the allegations in paragraph 285.

### 17. Christina Lopez (Moline 2023)

*Cplt ¶ 286.*  Christina Lopez is a subject of the 2023 Article according to the Key.

286.  Defendant admits the allegations in paragraph 286.

*Cplt ¶ 287.*  Ms. Lopez is likely match for Case # 107

287.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 287.

*Cplt ¶ 288.*  For Case #107, Dr. Moline sated: "Certainty of Alternate

Exposure: None.”

288.   Defendant admits that Case #107, which refers to a female with a listed occupation as “Chicken farming, medical assistant,” categorizes the “Certainty of Alternate Exposure” as “None.”  Defendant further refers to the JOMT Article for a full and accurate statement of its contents.  Defendant denies the remaining allegations in paragraph 288.

**Cplt ¶ 289.**  Ms. Lopez’s medical records stated that she had some asbestos exposure growing up in her home as well as in the canning factory she worked in.

289.   Defendant admits that a medical record entitled, Amb Encounter Report from M.D. Anderson Cancer Center, states that Ms. Lopez “had some asbestos exposure growing up in her home as well as in the canning factory she worked in” and refers to that record for a full and accurate statement of its contents.  Defendant denies any implication that Ms. Lopez’s medical records demonstrate that she was exposed to asbestos other than through her use of cosmetic talc.

**Cplt ¶ 290.**  Dr. Moline’s statement that no non-talc exposures exist for Ms. Lopez is false.

290.   Defendant denies the allegations in paragraph 290.

## IV.    Dr. Moline and Plaintiffs’ Counsel Concealed the Falsity of Her Statements

**Cplt ¶ 291.**  During the time Dr. Moline has been repeating the falsehood that none of the individuals in her Article had alternative exposures to asbestos, she, her employer, and plaintiffs’ counsel resisted efforts by others to obtain information about her cases which would uncover the Article’s false premise.

291.    Defendant denies the allegations in paragraph 291.

*Cplt ¶ 292.* On 10 separate occasions, Dr. Moline refused to testify at her deposition in cases against Pecos River regarding the identities of the individuals in her Article. For example:

- **November 2019:** "I will not comment on any further cases that might or might not be included in the paper."
- **February 2020:** "I will not name names in this deposition. That is correct."
- **June 2020:** "I am not willing to discuss any names of any of the individuals in the paper of any of the 33."
- **January 2021:** "I decline to disclose the identi[t]ies or facts apart from what is described in the paper, and my feelings on this have not changed or my position on that has not changed."

292.    Defendant admits that, consistent with her ethical and professional obligations, including her obligations to Northwell, she did not disclose the names of the research subjects in the JOEM and JOMT Articles until after the New York Appellate Division's decision in *Matter of Johnson & Johnson v. Northwell Health Inc.*, 231 A.D.3d 481 (1st Dep't 2024). Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 292.

*Cplt ¶ 293.* In one instance, Dr. Moline bizarrely testified at her deposition that she could not identify "Ms. D" from her congressional testimony (i.e., Ms. Bell) because Ms. D was "based on an amalgam of different folks."

293.    Defendant denies that she "bizarrely testified at her deposition" and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 293.

*Cplt ¶ 294.* But when asked, "So is Ms. D one person?" Dr. Moline

85

responded, "In essence, yes."

294.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 294.

*Cplt ¶ 295.* She then refused to identify Ms. D: "Ms. D does have a real name. I will not disclose it because it was from one of the individuals in my paper."

295.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 295.

*Cplt ¶ 296.* She would not even answer the basic question: "Were there any documents that you saw that alleged exposure to asbestos other than from talc?"

296.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 296.

*Cplt ¶ 297.* She then refused to answer any questions regarding Ms. Bell's case.

297.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 297.

*Cplt ¶ 298.* A defendant moved to compel Dr. Moline's testimony identifying the individuals in her article. Dr. Moline, her employer (Northwell Health), and the plaintiff all opposed the motion.

298.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 298.

*Cplt ¶ 299.* As noted, Ms. Bell's example was only uncovered after extensive discovery efforts in North Carolina federal court.

299.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 299.

*Cplt ¶ 300.* And Pecos River only obtained the key after even further extensive efforts in multiple courts.

300.    Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 300.

## V.    Dr. Moline Was Motivated by Fame and Fortune

*Cplt ¶ 301.* Dr. Moline disparaged Johnson's Baby Powder and Shower to Shower for her own professional aggrandizement and financial gain.

301.    Defendant denies the allegations in paragraph 301.

*Cplt ¶ 302.* The Article in part represented an attempt to gain publicity and enhance her own stature within the scientific community.

302.    Defendant denies the allegations in paragraph 302.

*Cplt ¶ 303.* In the Article, Dr. Moline attempts to explicitly align herself with one of the two most preeminent scientists in the asbestos space: Dr. J. Christopher Wagner. As the Article describes, Dr. Wagner published a famous and groundbreaking article in 1960 concerning 33 mesothelioma cases, which was the first epidemiology study linking asbestos exposure with the development of mesothelioma. Ex. A, Moline Article at 11. Not coincidentally, Dr. Moline chose 33 cases for *her study*, and was quick to make the connection: "Like Wagner, we present 33 cases.  .  .  . " Ex. A, Moline Article at 11.

303.    Defendant admits that the JOEM Article cited an article by Dr. J. Christopher Wagner and refers to that article for a full and accurate description of its contents.  Defendant denies the remaining allegations in paragraph 303.

*Cplt ¶ 304.* Dr. Moline also tirelessly promoted herself by using the Article, discussing it publicly at speaking engagements, before Congress, and to the media, as discussed above.

304.    Defendant denies the allegations in paragraph 304.

*Cplt ¶ 305.* Her employer, Northwell Health, also used the Article to

87

promote Dr. Moline. It ran a prominent story concerning the Article on its website, saying: "For the first time, Jacqueline Moline, MD, MSc, professor in the Institute of Health Innovations and Outcomes Research at The Feinstein Institutes for Medical Research, and her colleagues have identified household talcum powder contaminated with asbestos as the root cause of malignant mesothelioma in 33 long-term users, as published in the Journal of Occupational and Environmental Medicine."[27]

305.    Defendant admits that the webpage referred to in paragraph 305 appears at the listed website and contains the language quoted in this paragraph. Defendant refers to the webpage for a full and accurate statement of its contents. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 305.

*Cplt ¶ 306.*    The web story repeated the false premise of the Article: "The patients had no other known exposure to asbestos, and in the six detailed, the tissue analysis revealed the presence of asbestos commonly found in talc and not that found in other commercial products, such as automobile brakes or home insulation materials. It was determined that the 27 other individuals in the study were also linked to contaminated talcum powder, as they had no additional exposure to asbestos."

306.    Defendant admits that the language quoted in paragraph 306 appears in the webpage referred to in this paragraph and refers to that webpage for a full and accurate statement of its contents. Defendant denies the remaining allegations in paragraph 306.

*Cplt ¶ 307.*    Beyond just the recognition the Article brought Dr. Moline, the asbestos plaintiffs' bar pays Dr. Moline hundreds of thousands of dollars a year to serve as an expert witness to help them win jury verdicts. This litigation work

---

[27]    https://feinstein.northwell.edu/news/the-latest/talc-powder-exposure-linked-to-mesothelioma

represents nearly half her income.

307. Defendant admits that she has been retained to serve as an expert by law firms whose clients include plaintiffs in cosmetic talc/mesothelioma cases. Defendant further admits that, as part of her retention, she has been asked to render opinions relating to asbestos exposures and the health effects of such exposures. Defendant further admits that she is compensated for her time working as an expert, and refers to her answer in paragraph 21 regarding the details of her compensation. Defendant denies the remaining allegations in paragraph 307.

*Cplt ¶ 308.* Those verdicts then help fund plaintiffs' law firms, who typically receive a large percentage of the verdict amount (often in the millions of dollars). That money is then used, in part, to hire Dr. Moline for the next case.

308. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 308.

*Cplt ¶ 309.* To keep this cycle in motion and the money flowing, Dr. Moline has every incentive to try to help the plaintiffs' bar as much as possible, both by trying to sway public opinion and by manufacturing support for what she is saying in court.

309. Defendant denies the allegations in paragraph 309.

*Cplt ¶ 310.* The Article stated that one of its purposes was "underlin[ing] the importance of collecting detailed exposure histories . . . in patients presenting with mesothelioma." Ex. A, Article at 6–7. But Dr. Moline's stated purpose for her Article is not true but rather a pretext.

310. Defendant admits that the language quoted in paragraph 310 appears in the JOEM Article and refers to that article for a full and accurate statement of its contents. Defendant denies the remaining allegations in paragraph 310.

89

*Cplt ¶ 311.*  To be clear, Dr. Moline did not publish the Article or make the challenged public statements to advance academic or scientific discourse. Nor did she do so with the intent to advance the interests of any particular talc plaintiff. Rather, Dr. Moline acted to further her own interest, gain fame, and gain fortune for herself.

311.   Defendant denies the allegations in paragraph 311.

*Cplt ¶ 312.*  By helping the plaintiffs' lawyers, she ultimately was helping herself.

312.   Defendant denies the allegations in paragraph 312.

## VI.   Dr. Moline's Statements Perpetuated a Decades-Long Fraud in Asbestos Litigation

*Cplt ¶ 313.*  The circumstances surrounding the Moline Article, including her knowing or reckless misrepresentations and subsequent efforts to conceal pertinent facts, may at first blush appear difficult to believe. But, sadly, Dr. Moline's actions fit a pattern of fraud both in the cosmetic talc litigation specifically and asbestos litigation writ-large.

313.   Defendant denies that she made any knowing or reckless misrepresentations or concealed any facts.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 313.

*Cplt ¶ 314.*  One of the most egregious problems—central to the asbestos plaintiffs' bar's business model—is submitting claims against multiple defendants, without disclosing to each successive defendant the prior assertions predicated on alternative uses. Then the sheer volume of claims is used to coerce portfolio settlements that don't reflect the merits of each individual claim.

314.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 314.

*Cplt ¶ 315.*  The *Garlock* proceedings are a famous example of fraud by

hiding alternative exposures.

315.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 315.

*Cplt ¶ 316.* A North Carolina bankruptcy court found evidence of "wide-ranging, systematic, and well-concealed fraud designed to suppress evidence and inflate settlement values for mesothelioma claims." *Garlock Sealing Techs., LLC v. Shein*, No. 3:13-cv-137, 2015 WL 5155362, at *2 (W.D.N.C. Sept. 2, 2015) (citing *In re Garlock Sealing Techs.*, LLC, 504 B.R. 71, 85 (Bankr. W.D.N.C. 2014)).

316.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 316.

*Cplt ¶ 317.* More specifically, the *Garlock* court found that evidence of exposure to large, now-bankrupt asbestos manufacturing companies "disappeared" as a result of "the effort by some plaintiffs and their lawyers to withhold evidence of exposure to other asbestos products and to delay filing claims against bankrupt defendants' asbestos trusts until after obtaining recoveries" in the tort system. *In re: Garlock*, 504 B.R. at 84. The court found that these "demonstrable misrepresentation(s)" were "sufficiently widespread" in the asbestos tort system "to have a significant impact" on settlement practices and results. *Id.* at 85.

317.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 317.

*Cplt ¶ 318.* Notably, the day before the bankruptcy court issued that holding, Garlock sued five plaintiffs' firms for the litigation conduct discussed by the court under the Racketeer Influenced and Corrupt Organizations Act, better known as RICO.[28] Upon information and belief, those lawsuits were instrumental in and resolved in connection with the final plan of reorganization in the *Garlock* case.

---

[28] See Garlock Sealing Techs., LLC v. Simon Greenstone Panatier Bartlett, P.C., No. 3:14-cv-116 (W.D.N.C.); Garlock Sealing Techs., LLC v. Belluck & Fox, LLP, No. 3:14-cv-118 (W.D.N.C.); Garlock Sealing Techs., LLC v. Waters & Kraus., No. 3:14-cv-130 (W.D.N.C.) (Stanley-Iola, LLP also named a defendant); and Garlock Sealing Techs., LLC v. Shein Law Center, Ltd., No. 3:14-cv-137 (W.D.N.C.).

318.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 318.

*Cplt ¶ 319.*   One of the firms sued was Simon Greenstone Panatier Bartlett, P.C, a firm that has paid Dr. Moline to testify 20 times in one three-year span. And it is the very same firm that sought to keep her data sealed and hidden in the *Bell* matter.

319.   Defendant admits that she has been hired on multiple occasions by Simon Greenstone Panatier, P.C. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 319.

*Cplt ¶ 320.*   Since *Garlock*, other recent bankruptcy proceedings have uncovered further examples of fraud.

320.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 320.

*Cplt ¶ 321.  Bestwall Bankruptcy*. In a particularly damning twist, it appears that Dr. Moline is not the only plaintiff-expert-turned-author whose litigation-influencing misstatements are coming to light in bankruptcy courts right now. The North Carolina debtor Bestwall is faced with a conundrum much like the Moline Article, which it is presently conducting discovery on while the asbestos plaintiffs' bar fights tooth and nail to keep relevant information hidden.[29] Similar to Dr. Moline, Plaintiffs' expert James Dahlgren published a 2012 article claiming to identify three cases of mesothelioma in which the only known exposure to asbestos was from joint compound manufactured by Old Georgia Pacific (predecessor to Bestwall). Although the company settled all three of the cases covered in the article, it now has uncovered that these individuals submitted claims to various asbestos trusts claiming exposure to other sources of asbestos after the cases were settled.

---

[29] *In re Bestwall LLC,* No. 17-BK-31795 (LTB) (W.D.N.C. Bankr.).

321.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 321.

*Cplt ¶ 322.  **Imerys Bankruptcy**.* Fraud has even been uncovered in a recent cosmetic talc bankruptcy filed by the talc supplier for Johnson's Baby Powder. In the Imerys bankruptcy pending in New Jersey, one plaintiffs' lawyer was forced to concede under oath that he took a list of individuals diagnosed with ovarian cancer or mesothelioma and asserted claims against the debtor without even assessing whether the claimant had ever used Johnson's Baby Powder. What's more, in some instances, the claimant previously alleged and recovered on a theory that his/her disease was exclusively attributable to another company's products.

322.   Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 322.

## VII.   Pecos River Was Gravely Harmed by Dr. Moline's False Statements

*Cplt ¶ 323.*  Dr. Moline's disparagement of Johnson's Baby Powder and Shower to Shower talc products for her own aggrandizement harmed Pecos River.

323.   Defendant denies the allegations in paragraph 323.

*Cplt ¶ 324.*  Dr. Moline knew that Pecos River's principal place of business was in New Jersey. She targeted New Jersey with her false statements, and New Jersey is the focal point of her false statements.

324.   Defendant denies the allegations in paragraph 324.

*Cplt ¶ 325.*  As discussed above, Dr. Moline repeated her false statements multiple times over the years, ensuring they would reach the public, particularly through the press such as *Time* Magazine.

325.   Defendant denies the allegations in paragraph 325.

*Cplt ¶ 326.*  Her Article became available online on October 10, 2019. In October 2019, the call center handling the Consumer business of Johnson & Johnson saw a significant increase in contacts.

93

326.   Defendant admits that the JOEM Article became available in some form online in October 2019.  Defendant lacks knowledge or information sufficient to form a belief as to the precise date when the JOEM Article became available online.  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 326.

*Cplt ¶ 327.* The sales volume and profits from Johnson's Baby Powder declined in 2019 and again in 2020. And an ever-increasing percentage of Johnson's Baby Powder sales was the corn starch-based version compared to the talc-based version. Dr. Moline's statements and the resulting publicity were a substantial cause of this sales decline.

327.   Defendant denies the allegations in the last sentence of paragraph 327. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 327.

*Cplt ¶ 328.* Johnson & Johnson announced in May 2020 the discontinuation of talc-based Johnson's Baby Powder in the United States and Canada. As the press release at the time explained: "Demand for talc-based Johnson's Baby Powder in North America ha[d] been declining due in large part to changes in consumer habits and fueled by misinformation around the safety of the product and a constant barrage of litigation advertising." The Moline Article is a central element of that misinformation.

328.   Defendant denies the allegations in the last sentence of paragraph 328. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 328.

*Cplt ¶ 329.* Pecos River also incurred substantial costs as a direct result of Dr. Moline's false statements. Among other costs, Pecos River spent millions of dollars in fees paid to attorneys, expert witnesses, and other professionals to investigate, respond to, defend against, and otherwise counteract Dr. Moline's false

94

statements. That included deposing Dr. Moline multiple times regarding her Article.

329.   Defendant denies the allegations in paragraph 329.

*Cplt ¶ 330.*   Indeed, Dr. Moline's false statements have forced Pecos River to file this lawsuit to correct the record.

330.   Defendant denies the allegations in paragraph 330.

## CAUSES OF ACTION

### Count I: Injurious Falsehood / Product Disparagement

*Cplt ¶ 331.*   Pecos River hereby incorporates each preceding paragraph as though fully set forth herein.

331.   Defendant incorporates by reference her answers to each preceding paragraph as though fully set forth herein.

*Cplt ¶ 332.*   Dr. Moline has made statements that contain false and untrue assertions of fact, including the false statements referenced above, which include, but are not limited to (emphasis added):

  a. Multiple factual assertions in the Article, including:

    i.   "Talcum powder usage was the only source of asbestos for all 33 cases."

    ii.  "*For all 33 cases*, other potential exposures to asbestos were considered, with *no identified source apart from the talcum powder*."

    iii. "[W]e present 33 cases, predominantly of women, who had *no known exposure to asbestos* other than prolonged use of talcum powder."

    iv.  "Amosite and crocidolite, asbestos fibers … *were not found in any*" of the six subjects whose tissue samples were tested.

  b. Dr. Moline's statement to *Time* Magazine, published on October 15, 2019, that "[t]his is the first time that anyone has said, 'Let me look at all these cases, put it all together and identify the ones where *[talc] is the sole exposure*.'"

c. Dr. Moline's statements to Romper.com, published on October 16, 2019, that "[a]ll the folks in the study used cosmetic talc, usually for decades, and they *all had mesothelioma with no other asbestos source*" and "[w]e couldn't find *any other source* apart from the cosmetic talc."

d. Dr. Moline's statement in her written Congressional testimony that "my colleagues and I reported on 33 individuals with *no other identifiable source of exposure* apart from cosmetic talc," and her assertion that "Ms. D" had "no known exposure to asbestos" in her work in the textile industry.

e. Dr. Moline's statement in her oral Congressional testimony that she and her colleagues "reported on 33 individuals *whose only source of asbestos exposure was cosmetic talc*."

f. Dr. Moline's statement at a May 13, 2020, event organized by the Asbestos Disease Awareness Organization that "[w]hat we found in these individuals is that *these 33 did not have any other known source of asbestos exposure* that we could discern from the information that we were provided."

g. Dr. Moline's comment to EPA, posted on its website on June 1, 2020, that "[m]y colleagues and I reported on 33 individuals with mesothelioma with no other identifiable source of exposure apart from cosmetic talc."

h. Dr. Moline's statement, in discussing the article at a September 17, 2022, *ADAO Asbestos Awareness and Prevention Conference*, that "[w]e were unaware of any asbestos exposure apart from talc." A slide describing the Article falsely stated: "Talcum powder as the only asbestos exposure."

332. Defendant denies the allegations in paragraph 332.

*Cplt ¶ 333.* Dr. Moline published the false statements alleged herein to others, including through electronic and hard-copy publication of the Article, written and oral testimony to Congress, at least one national magazine, and multiple conferences. Dr. Moline's false statements were read and otherwise received by the public at large, consumers and manufacturers of cosmetic talc products, Congressional and government officials, scientists, and attorneys and expert witnesses involved in talcum powder litigation, among others.

333. Defendant denies the allegations in paragraph 333.

96

*Cplt ¶ 334.* Dr. Moline's false, influential, and groundbreaking Article has been republished by numerous sources, including multiple plaintiffs' firms and advocacy groups soliciting talc-related personal injury claims relied upon by plaintiffs' multiple expert witnesses in talc litigation; and considered by judges and juries throughout the country adjudicating cosmetic talc claims.

334. Defendant denies the allegations in paragraph 334.

*Cplt ¶ 335.* Dr. Moline intended and/or reasonably anticipated that the publication of her false statements would disparage the safety of the Johnson's Baby Powder and Shower to Shower products and harm Pecos River's interests. Dr. Moline's false statements did disparage the safety of those products.

335. Defendant denies the allegations in paragraph 335.

*Cplt ¶ 336.* Dr. Moline acted with actual malice because her false statements were made with the knowledge that they were false and/or with reckless disregard as to their truth or falsity. Moreover, as described herein, Dr. Moline has repeatedly sought to conceal evidence betraying the falsity of her statements and demonstrating that her statements were made with knowledge that they were false and/or with reckless disregard as to their truth or falsity. Dr. Moline's acts of concealment include statements reaffirming the false statements in the Article and refusing to disclose the identity of the 33 subjects of the Article or answer questions about the information she reviewed prior to the Article's publication.

336. Defendant denies the allegations in paragraph 336.

*Cplt ¶ 337.* Dr. Moline acted without any privilege, authorization, or immunity in making her false statements. The statements alleged herein are not protected statements of scientific opinion but, rather, economically-motivated, false, and inaccurate statements concerning the data underlying her Article.

337. Defendant denies the allegations in paragraph 337.

*Cplt ¶ 338.* Dr. Moline's false statements were made of and concerning Pecos River's products. Dr. Moline's false statements impugned the safety of all cosmetic talc products, including Johnson's Baby Powder and Shower to Shower. Johnson's Baby Powder and Shower to Shower products were well-recognized, the leading brands among a discrete and limited number of cosmetic talc products in the market. The Article identifies Johnson's Baby Powder (product "D") and Shower to Shower (product "I") as two of the 22 brands of cosmetic talc allegedly used by the

97

Article's 33 subjects. According to the Article, 19 of the 33 subjects allegedly used Johnson's Baby Powder—more than any other brand.

338.    Defendant denies the allegations in paragraph 338.

*Cplt ¶ 339.*  Dr. Moline's false statements were published contemporaneously with statements referring to Johnson's Baby Powder, including through Congressional testimony, advocacy events, plaintiff attorney websites, and various media outlets. For example, the subcommittee chairman began the hearing featuring Dr. Moline's Congressional testimony by referencing allegations of asbestos in "Johnson and Johnson's talc-based baby powder" and by displaying images of Johnson's Baby Powder.

339.    Defendant denies the allegations in paragraph 339.

*Cplt ¶ 340.*  Anyone reading, hearing, or otherwise receiving Dr. Moline's false statements would have associated those statements with the Johnson's Baby Powder and Shower to Shower products. Indeed, on repeated occasions, Johnson & Johnson and Pecos River were asked to comment on Dr. Moline's Article and false statements, thereby demonstrating that readers of the statements in fact associated them with Pecos River's products.

340.    Defendant denies the allegations in paragraph 340.

*Cplt ¶ 341.*  After the online publication of the Article, Dr. Moline has been disclosed in at least 58 cosmetic talc/mesothelioma cases against Pecos River, many of which [*sic*] in New Jersey. Dr. Moline routinely relies on her Article in these cases. Moreover, in at least 63 cosmetic talc/mesothelioma cases against Pecos River, a combined 20 other plaintiff experts have relied on the Article in either their deposition or court disclosures.

341.    Defendant lacks knowledge or information sufficient to form a belief

as to the truth of the allegations in paragraph 341.

*Cplt ¶ 342.*  As a direct and proximate cause of Dr. Moline's false statements, Pecos River has suffered, and continues to suffer, actual and special damages, including, without limitation, lost profits on the sale of Johnson's Baby Powder and Shower to Shower caused by the widespread dissemination of the Article; increased fees to defend (including substantial fees paid to attorneys, expert witnesses, and other professionals to investigate, respond to, and defend against Dr. Moline's

98

assertions) and resolve Talc Claims; and other expenses incurred to counteract and prevent Dr. Moline's false statements from causing further harm (including the costs of this litigation). Pecos River felt the brunt of this harm in New Jersey, where its principal place of business is located.

342.    Defendant denies the allegations in paragraph 342.

*Cplt ¶ 343.*    Dr. Moline knew or reasonably should have anticipated that her false statements and subsequent acts of concealment would cause the aforementioned actual and special damages to Pecos River.

343.    Defendant denies the allegations in paragraph 343.

## AFFIRMATIVE DEFENSES

Defendant asserts the following Affirmative Defenses based on information presently known to her.  Defendant reserves the right to amend or supplement these Affirmative Defenses as additional information becomes available.

## FIRST AFFIRMATIVE DEFENSE

The Amended Complaint fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

Pecos River's trade-libel claim is barred because it targets speech protected by the First Amendment to the United States Constitution.

## THIRD AFFIRMATIVE DEFENSE

Pecos River's trade-libel claim is barred because it targets speech protected by the New York State and New Jersey State Constitutions.

## FOURTH AFFIRMATIVE DEFENSE

Pecos River's trade-libel claim is barred because Dr. Moline was privileged

to make the statements it challenges.

## FIFTH AFFIRMATIVE DEFENSE

Pecos River's trade-libel claim is barred by res judicata, collateral estoppel, judicial estoppel, and/or any other applicable principle of preclusion to the extent it seeks to challenge any statement beyond those identified in the Court's February 27, 2026 Opinion and Order (ECF Nos. 60-61) granting Pecos River's motion to reopen.

## SIXTH AFFIRMATIVE DEFENSE

Pecos River's trade-libel claim is barred because the statements it challenges are true or substantially true.

## SEVENTH AFFIRMATIVE DEFENSE

Pecos River's trade-libel claim is barred in whole or in part pursuant to New York Civil Rights Law § 76-a(2), which prohibits the recovery of any damages unless the plaintiff, "in addition to all other necessary elements, shall have established by clear and convincing evidence that any communication which gives rise to the action was made with knowledge of its falsity or with reckless disregard of whether it was false, where the truth or falsity of such communication is material to the cause of action at issue."

## EIGHTH AFFIRMATIVE DEFENSE

The trade-libel claim is barred because Pecos River lacks standing to assert the claim, including because it was not assigned the right to bring the trade-libel claim and is unable to assert cognizable damages traceable to the challenged

100

statements.

## NINTH AFFIRMATIVE DEFENSE

The trade-libel claim is barred, in whole or in part, because the Johnson & Johnson entity or entities allegedly injured by the challenged statements failed to mitigate damages.

## TENTH AFFIRMATIVE DEFENSE

Pecos River is barred from asserting the trade-libel claim because it is a tort claim that is not assignable as a matter of law.

## COUNTERCLAIM

Defendant, Dr. Jacqueline Miriam Moline ("Dr. Moline"), brings this Counterclaim against Pecos River Talc LLC ("Pecos River") and Counterclaim-Defendants Johnson & Johnson Holdco (NA) Inc. ("J&J Holdco") and Johnson & Johnson ("J&J Parent").    Pursuant to Local Civil Rule 10.1(a), the names and addresses of the parties to this action and Counterclaim are as follows:

- The address of Defendant/Counterclaim-Plaintiff Dr. Jacqueline Miriam Moline is 223 W. 19th Street, Apt. 5, New York, NY 10011.

- The principal place of business of Plaintiff/Counterclaim-Defendant Pecos River Talc LLC is One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.

- The principal place of business of Counterclaim-Defendant Johnson & Johnson Holdco (NA) Inc. is One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.

- The principal place of business of Counterclaim-Defendant Johnson & Johnson is One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.

## NATURE OF THE COUNTERCLAIM

1.    This Counterclaim is brought pursuant to New York Civil Rights Law § 70-a, which is part of a group of statutes designed to protect New York citizens from lawsuits commonly referred to by the acronym "SLAPP," or Strategic Lawsuits Against Public Participation.  New York's anti-SLAPP laws empower defendants sued for exercising their free-speech and petition rights on matters of public interest

to bring a counterclaim to recover legal fees incurred defending a lawsuit commenced or continued without a substantial basis in fact and law. These laws further entitle a defendant to additional damages when the action has been brought to harass, intimidate, or otherwise maliciously inhibit the defendant's rights to free speech or petition.

2.     Dr. Moline is a New York citizen and highly accomplished physician and researcher who specializes in occupational medicine. Dr. Moline conducted two research studies under the auspices of her employer, Northwell Health, Inc. ("Northwell"), New York's largest healthcare provider. Those studies concluded that exposure to asbestos particles in talc-based cosmetic products ("cosmetic talc") could cause mesothelioma, and recommended that clinicians question mesothelioma patients about their use of cosmetic talc when evaluating their exposure to asbestos. This research was published in prestigious medical journals and concerned a matter of vital interest to the medical community and society at large.

3.     J&J Parent and its corporate predecessors and subsidiaries (together, "J&J") is a company that has developed some of the most recognizable healthcare products, including Johnson's Baby Powder ("Baby Powder"). For decades, J&J manufactured Baby Powder using talc, a mineral that is found naturally alongside asbestos. J&J knew that its talc was contaminated with asbestos but hid that danger from the public and regulators.

103

4.     Over the past decade, J&J has had to defend numerous lawsuits by plaintiffs who allege that their mesothelioma and ovarian cancers have been caused by their use of J&J's talc-based products.   J&J formed Pecos River and its predecessors, LTL Management LLC and LLT Management LLC (together, "LTL"), to shield itself from these lawsuits by purporting to assign them certain liabilities arising from these personal-injury cases.  J&J has also used LTL and Pecos River affirmatively, to bring strategic lawsuits against doctors and researchers who have opined that talc-based products can cause mesothelioma.

5.     J&J's action against Dr. Moline through LTL and Pecos River is a classic SLAPP lawsuit.   The common-law claims originally brought by LTL challenged scientific opinions protected by the First Amendment and Dr. Moline's right to petition Congress and a federal agency about the dangers of asbestos and cosmetic talc.  They further depended on the implausible allegation that J&J was deceived by Dr. Moline's statements.  Those claims were rightfully dismissed, confirming that they lacked any basis in law and fact and were brought solely to harass and intimidate Dr. Moline and chill her constitutional rights to free speech and petition.

6.     Pecos River's claim in the Amended Complaint for trade libel, as recently narrowed by this Court, is also baseless.  The claim depends on the allegation that Dr. Moline fabricated data in her research articles to conclude that

104

certain of her research subjects had no known exposure to asbestos other than through their use of cosmetic talc. Pecos River's claim further depends on the allegations that Dr. Moline's articles falsely concluded that J&J's talc-based products contained asbestos and damaged J&J by causing consumers to stop buying those products.

7.      Pecos River's claim has no basis in fact and law and, like LTL's original common-law claims, has been brought solely to intimidate Dr. Moline and send a chilling message to other doctors and researchers who publish findings that challenge the safety of J&J's talc-based products. Pecos River has no evidence that Dr. Moline fabricated any data in her research articles. Indeed, the journal that published Dr. Moline's lead article expressly rejected Pecos River's bald fabrication allegations and refused to withdraw that article or modify it in any way.

8.      Pecos River cannot prove that any statement in Dr. Moline's research articles (i) falsely implied that J&J's products contained asbestos or (ii) caused J&J any losses. That J&J's talc-based products were contaminated with asbestos is true. This fact, moreover, was known to the public well before publication of the research articles at issue, meaning that Dr. Moline's research articles could not have caused J&J any damages.

9.      J&J's efforts to intimidate Dr. Moline and other doctors for publishing research vital to public health is shameful and wrong. This Counterclaim is brought

105

to hold J&J accountable for its misconduct and ensure that it cannot chill valuable medical research through its intimidation tactics.

## THE PARTIES

10. Dr. Moline is a resident of the State of New York.

11. Pecos River is, on information and belief, a Texas limited liability company with its principal place of business in New Jersey.

12. J&J Holdco is a New Jersey corporation that has its principal place of business in New Jersey. J&J Holdco is, on information and belief, Pecos River's sole member and served as LTL's sole member before LTL was extinguished in a corporate restructuring.

13. J&J Parent is a New Jersey corporation with its principal place of business in New Jersey. J&J Parent is, on information and belief, a holding company that is the ultimate parent of both J&J Holdco and Pecos River and was the ultimate parent of LTL before it was extinguished in a corporate restructuring.

14. J&J Parent and J&J Holdco caused Pecos River to be formed to shield J&J from liabilities for personal injuries arising from J&J's talc-based products. On information and belief, Pecos River does not sell any products or earn any revenues. Rather, Pecos River's funding is provided through an Amended and Restated Funding Agreement, dated August 19, 2024 ("Funding Agreement"), through which J&J Holdco is obligated to satisfy certain "Funding Requests" from Pecos River for

a "Permitted Funding Use" as those terms are defined in the Funding Agreement. A "Permitted Funding Use" does not expressly include liabilities incurred by Pecos River in commencing and continuing an action in violation of New York's anti-SLAPP statutes. Pecos River will therefore likely claim that it is not liable for any judgment that Dr. Moline obtains against it under these statutes, meaning it is a grossly undercapitalized entity for purposes of this Counterclaim.

15.    Pecos River is dominated and controlled by J&J Parent and J&J Holdco and serves as a mere instrumentality or alter ego of these entities. This domination and control is evidenced by, among other things, numerous statements by J&J Parent's Worldwide Vice President of Litigation concerning the action it caused to be filed against Dr. Moline, demonstrating that J&J Parent directed and controlled LTL and directs and controls Pecos River for purposes of this action. This domination and control is further evidenced by the facts that J&J Holdco serves as Pecos River's sole member and is the sole funding source (*i.e.*, the "Payor") for Pecos River under the Funding Agreement. J&J Parent, J&J Holdco, and Pecos River also all have the same principal place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933, further underscoring J&J Parent and J&J Holdco's domination and control over Pecos River.

16.    Under these circumstances, adhering to the fiction that Pecos River is a separate entity from J&J Parent and J&J Holdco would perpetrate a fraud and

107

injustice on Dr. Moline and circumvent the purpose of New York's anti-SLAPP statutes, which is to deter precisely the type of SLAPP lawsuit at issue in the Counterclaim.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this Counterclaim pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the Counterclaim exceeds the sum or value of $75,000, exclusive of interest, costs, and fees.  This Court also has supplemental jurisdiction over the Counterclaim pursuant to 28 U.S.C. § 1367 because it is related to the trade-libel claim Pecos River has asserted in this action.

18.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the Counterclaim occurred in this judicial district.

## FACTUAL ALLEGATIONS

**A.     J&J Has Known For Decades That Its Talc Was Contaminated With Asbestos.**

19.     J&J is a company initially founded in 1886 that, over time, has developed some of the most recognizable healthcare products used by consumers.

20.     One such product is Johnson's Baby Powder.

21.     Before switching to corn starch in 2020, J&J manufactured Baby Powder by using talcum powder.

108

22.    Talcum powder is made from talc, a mineral made up mainly of magnesium, silicon, and oxygen, that is mined from the earth. *See* American Cancer Society, *Talcum Powder and Cancer*.[1]

23.    Asbestos is a mineral that is a known carcinogen.

24.    Exposure to asbestos can cause a variety of diseases, including mesothelioma, which is a signature injury of asbestos exposure. These diseases have a long latency period, meaning that a disease caused by asbestos can manifest decades after exposure.

25.    There is no safe level of exposure to asbestos. Thus, even a small exposure can cause mesothelioma and other diseases. *See, e.g.*, Occupational Safety and Health Administration, *Asbestos*.[2]

26.    Talc and asbestos are so chemically, geologically, and structurally similar that veins of one are often sandwiched between or ribboned with the other. *See* Gardiner Harris, NO MORE TEARS: THE DARK SECRETS OF JOHNSON & JOHNSON (Random House 2025) 26.

27.    Once intermingled, talc and asbestos are impossible to completely separate. *See* NO MORE TEARS 26. Indeed, J&J's own scientist wrote to the FDA in

---

[1]  *Available at* https://www.cancer.org/cancer/risk-prevention/chemicals/talcum-powder-and-cancer.html.

[2]  *Available at* https://www.osha.gov/asbestos.

the 1970s to advise it that it was impossible to completely remove asbestos from talcum powder. *See id.* 32.

28.    By no later than 1958, J&J knew that the talc it used was contaminated with asbestos. *See* NO MORE TEARS 26. In that year, a private lab reported that J&J's talc contained impurities ranging from less than one percent to three percent, with most of these impurities consisting of asbestos. *See id.*

29.    In 1964, J&J purchased a set of talc mines in Vermont. One of those mines, in Johnson, Vermont, was located just a few hundred yards from an asbestos mine. *See* NO MORE TEARS 26. Not surprisingly, J&J's tests found asbestos in the Vermont talc that it used. *See id.* at 26-27.

30.    In 1971, a mineralogist at Mount Sinai Medical Hospital found asbestos in J&J's Baby Powder. *See* NO MORE TEARS 28-29. That same year, J&J scientists acknowledged to the FDA that J&J's talc contained minor amounts of asbestos fibers. *Id.* at 29.

31.    From 1971 to the early 2000s, J&J's raw talc and finished powders continued to periodically test positive for small amounts of asbestos. *See* Lisa Girion, REUTERS, *Johnson & Johnson knew for decades that asbestos lurked in its Baby Powder*, Dec. 14, 2018.[3]

---

[3]    *Available at* https://www.reuters.com/investigates/special-report/johnsonandjohnson-cancer/.

32.     J&J, however, waged a successful campaign to hide these facts from the public. Those efforts included falsely reporting results to the FDA and adopting testing procedures designed to fail to detect or to underestimate the degree to which talc was contaminated by asbestos. *See* Girion, *Johnson & Johnson*; NO MORE TEARS 33, 41-42.

33.     These efforts also included destroying or fabricating evidence to hide J&J's knowledge that its talc was contaminated with asbestos. For example, after a 1983 deposition revealed that a Vermont mine J&J owned was contaminated with asbestos, J&J collaborated with the company that purchased the mine to destroy records and create false affidavits swearing that no asbestos had ever been found in that mine. *See* NO MORE TEARS 59-61.

34.     As particularly relevant to this action, J&J's efforts also included manipulating the scientific literature to falsely report that cosmetic talc was safe.

35.     J&J's strategy consisted of a two-pronged approach to promote its false narrative that cosmetic talc was safe while attacking and discrediting researchers who found otherwise. *See* Girion, *Johnson & Johnson*; NO MORE TEARS 34-35, 43-50, 54-55.

36.     To promote its false narrative, J&J commissioned and paid for studies, told the researchers the results it wanted, and hired ghostwriters to redraft articles for presentations in journals. *See* Girion, *Johnson & Johnson*.

37.     J&J's shameful efforts polluted the scientific literature, helping stave off regulations and misinforming the medical community and the public about the risks of its talc-based products.  *See* David Rosner & Gerald Markowitz, Correspondence, *Asbestos, talc, and The Lancet's 1977 publication*, THE LANCET, Mar. 25, 2026.[4]

38.     These efforts are still being uncovered and rectified.  On December 8, 2025, two accomplished professors informed The Lancet—one of the most prestigious medical journals—that an unsigned commentary it published in 1977 was written by a paid J&J consultant without disclosing the consultant's identity or his conflicts of interest.  *See* Rosner, *Asbestos, talc, and The Lancet's 1977 publication*; Editors of The Lancet, *Asbestos, talc, and The Lancet's 1977 publication – Editors' reply*, THE LANCET, Mar. 25, 2026.[5]

39.     On March 25, 2026, the Lancet retracted the 1977 unsigned commentary, finding that the consultant's "conflict of interest with Johnson & Johnson was a clear breach of publishing ethics."  *See Asbestos, talc, and The Lancet's 1977 publication – Editors' reply*.

---

[4]   *Available at* https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(26)00558-1/fulltext.

[5]   *Available at* https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(26)00559-3/fulltext

40.    The Lancet's historic retraction last month of a 49-year-old unsigned commentary was significant, given that J&J misused the article for decades to substantiate its false claim that talc-based products were safe. *See The Lancet retracts half-century-old unsigned commentary on talc for undisclosed industry ties*, Retraction Watch.[6]

**B.    J&J's Misconduct Was Revealed Through Litigation, Media Reports, And The FDA's Sampling Of Johnson's Baby Powder.**

41.    J&J's misconduct began to be revealed more than a decade ago through litigation, media reports, and J&J's decision to recall and ultimately discontinue its talc-based products.

42.    These revelations first became publicized in trials in 2013 and 2016, which resulted in jury verdicts for plaintiffs alleging that J&J's talc-based products caused ovarian cancer. *See In re LTL Mgmt., LLC*, 64 F.4th 84, 94 (3d Cir. 2023). These trials ushered in a wave of lawsuits alleging that Baby Powder and J&J's Shower to Shower product caused ovarian cancer and mesothelioma. *See id.* & n.1.

43.    In July 2018, a St. Louis jury awarded 22 women and their families $550 million in compensatory and $4.14 billion in punitive damages against J&J, finding that asbestos in J&J's Baby Powder and Shower to Shower products caused

---

[6]    *Available    at*    https://retractionwatch.com/2026/03/25/lancet-retraction-commentary-talc-powder-johnson-johnson-industry-consultant/

their ovarian cancers.  *See* Girion, *Johnson & Johnson.  See also Ingham v. Johnson & Johnson*, 608 S.W.3d 663, 678-80 (Mo. Ct. App. 2020).

44.    The July 2018 verdict against J&J was widely reported by the press at the time.  *See, e.g.*, Tiffany Hsu, N.Y. TIMES, *Johnson & Johnson Told to Pay $4.7 Billion in Baby Powder Lawsuit*, July 12, 2018[7]; Scott Neuman, NPR, *Jury Awards $4.7 Billion To Women In Johnson & Johnson Talcum Powder Suit*, July 13, 2018[8]; Tim Bross, et al., TIME, *Women Claimed Johnson & Johson's Talc Powder Gave Them Cancer.  They Just Won $4.7 Billion in Damages*, July 12, 2018[9]; BBC, *Johnson & Johnson to pay $4.7bn damages in talc cancer case*[10]; Tina Bellon, REUTERS, *Jury orders J&J to pay $4.7 billion in Missouri asbestos cancer case*, July 12, 2018[11]; Jen Christensen, CNN, *$4.69 billion verdict against Johnson & Johnson's talcum powder*, July 13, 2018[12]; Max Mitchell, Law.com, *St. Louis Jury*

---

[7]  *Available at* https://www.nytimes.com/2018/07/12/business/johnson-johnson-talcum-powder.html

[8]  *Available at* https://www.npr.org/2018/07/13/628684038/jury-awards-4-7-billion-to-women-in-johnson-johnson-talcum-powder-suit

[9]  *Available at* https://time.com/5337841/johnson-johnson-damages-talc-powder-cancer/

[10]  *Available at* https://www.bbc.com/news/business-44816805

[11]  *Available at* https://www.reuters.com/article/business/jury-orders-jj-to-pay-47-billion-in-missouri-asbestos-cancer-case-idUSKBN1K234U/

[12]  *Available at* https://www.cnn.com/2018/07/13/health/4-69-billion-verdict-johnson--johnson-talcum-powder

*Issues $4.7 Billion Verdict After Trial Linking Talc to 22 Cancer Cases*, July 13, 2018.[13]

45.   A few months after that trial, two news outlets published extensive and lengthy exposés about the presence of asbestos in J&J's talc-based products.

46.   On December 14, 2018, Reuters published the results of an extensive investigation demonstrating that J&J knew that its talc products were contaminated with asbestos and intentionally concealed that fact and the resulting risks from regulators and the public. *See* Girion, *Johnson & Johnson*.

47.   Shares of J&J dropped ten percent on the day Reuters published its report. *See* Roni Rabin and Tiffany Hsu, *Johnson & Johnson Feared Baby Powder's Possible Asbestos Link for Years*, N.Y. TIMES, Dec. 14, 2018.[14]

48.   Also on December 14, 2018, The New York Times published a lengthy article that echoed the findings in the Reuters piece. *See* Rabin, *Johnson & Johnson Feared Baby Powder's Possible Asbestos Link for Years*.

49.   Thus, by no later than December 14, 2018, the public was well aware that J&J's talc-based products were contaminated with asbestos and that J&J knew that to be the case.

---

[13] *Available at* https://www.law.com/nationallawjournal/2018/07/13/st-louis-jury-issues-4-7-billion-verdict-after-trial-linking-talc-to-22-cancer-case/?slreturn=20260319101746

[14] *Available at* https://www.nytimes.com/2018/12/14/business/baby-powder-asbestos-johnson-johnson.html

50.     By that date, there was also incontrovertible evidence that (i) asbestos is a carcinogen associated with the development of mesothelioma; (ii) there is no safe level of exposure to asbestos; and (iii) talc could contain asbestos.

51.     The documents revealed through the Missouri trial prompted the FDA to sponsor its own tests of Johnson's Baby Powder and other talc-based cosmetic products.  *See* NO MORE TEARS 82-83.

52.     On October 18, 2019, the FDA advised consumers to stop using a specific lot of Baby Powder after a sample tested positive for asbestos.  *See* FDA, *FDA Advises Consumers to Stop Using Certain Cosmetic Products*, Oct. 18, 2019.[15]

53.     That same day, J&J voluntarily recalled its Baby Powder from the affected lot.  *See* FDA, *Baby Powder Manufacturer Voluntarily Recalls Product for Asbestos*, Oct. 18, 2019.[16]

54.     On June 23, 2020, the Missouri Court of Appeals issued a scathing decision confirming J&J's longstanding knowledge that its products contained asbestos.

55.     On appeal from the judgment in the St. Louis action described above, the Missouri Court of Appeals held that plaintiffs established their entitlement to

---

[15]     *Available    at*    https://www.fda.gov/cosmetics/cosmetics-compliance-enforcement/fda-advises-consumers-stop-using-certain-cosmetic-products

[16]     *Available at*   https://www.fda.gov/food/hfp-constituent-updates/baby-powder-manufacturer-voluntarily-recalls-product-asbestos

116

punitive damages "with convincing clarity that Defendants engaged in outrageous conduct because of an evil motive or reckless indifference." *Ingham*, 608 S.W.3d at 715. The Court only reduced those damages from $4.14 billion to approximately $1.6 billion by finding that the court improperly exercised jurisdiction over certain claims. *See id.* at 721-22.

56. In explaining its reasoning, the Missouri Court of Appeals found that plaintiffs showed that J&J knew its talc-based products contained asbestos since at least the late 1960s and continuing well into the 2000s:

> According to Plaintiffs' evidence, Defendants knew the Products, which they referred to internally as their "company trust-mark," "golden egg," and "sacred cow," contained asbestos. In a 1969 memorandum, Defendants acknowledged their Products contained tremolite asbestos and asbestos could be dangerous. . . . Memoranda from the 1970s also reveal Defendants knew the Products contained tremolite asbestos. . . . After Dr. Seymour Lewin, "Consultant to the FDA," reported asbestos in samples of Defendants' Products in 1972, Defendants hired Walter C. McCrone Associates, Inc. ("McCrone") to examine the samples. McCrone confirmed the samples contained tremolite. In 1975, McCrone tested more samples of Defendant's Products for asbestiform minerals and found some contained "rather high" levels of amphibole asbestiform fibers. . . .
>
> According to Plaintiffs' evidence, Defendants' knowledge of asbestos in the Products continued into the 1980s, 1990s, and well into the 2000s. . . .

*Ingham*, 608 S.W.3d at 715.

57.   The Missouri Court of Appeals further found that J&J had "worked tirelessly to ensure the industry adopted testing protocols not sensitive enough to detect asbestos in every talc sample" and "published articles downplaying the safety hazards associated with talc through deception without revealing their funding." *Ingham*, 608 S.W.3d at 716-17.

58.   The Missouri Court of Appeals accordingly upheld the jury's determination that J&J, motivated by profits, "disregarded the safety of consumers" despite its knowledge that the talc in its products caused ovarian cancer. *Ingham*, 608 S.W.3d at 718.

59.   In 2020, J&J discontinued using talc in its Baby Powder in North America, switching instead to corn starch. *See* Tiffany Hsu & Roni Rabin, *Johnson & Johnson Will Discontinue Talc-Based Baby Powder Globally in 2023*, N.Y. TIMES, Aug. 11, 2022.[17]

60.   In August 2022, J&J announced that it would stop selling its talc-based Baby Powder globally. *See* Hsu, *Johnson & Johnson Will Discontinue Talc-Based Baby Powder.*

61.   A similar fate followed for Shower to Shower, though on an earlier time frame.

---

[17]   *Available at* https://www.nytimes.com/2022/08/11/business/johnson-and-johnson-talc-corn-starch.html

62.    J&J sold its Shower to Shower product to Bausch Health Cos. Inc. ("Bausch") in 2012. *See* Emily Field, *J&J, Bausch Reach Talc Litigation Deal*, LAW360, Apr. 23, 2019.[18]

63.    In 2018, Bausch began phasing out its use of talc in that product, replacing that product entirely with a cornstarch-based product as of early 2019. *See* Riley Griffin & Jef Feeley, *Johnson & Johnson Ending Sale of Talcum Powder Products in U.S.,* TIME, May 20, 2020[19]; Jef Feeley, *Bausch Yanked Talc From Its Body Powder Months Before J&J Recall*, Bloomberg, Nov. 6, 2019.[20]

64.    J&J's misconduct is still being revealed and the damage it has caused the public is slowly being rectified, including through The Lancet's recent and historic retraction of the 1977 unsigned commentary discussed above.

**C.    Dr. Moline's Research Conducted With The Permission And Support Of Northwell.**

65.    Dr. Moline is a highly experienced and respected physician specializing in occupational medicine.

66.    Dr. Moline is employed by Northwell, New York's largest healthcare provider, and works in New York.

---

[18]  *Available at* https://www.law360.com/articles/1152678/j-j-bausch-reach-talc-litigation-deal.

[19]  *Available at* https://time.com/5839391/johnson-johnson-ends-talcum-baby-powder/

[20]  *Available at* https://www.bloomberg.com/news/articles/2019-11-06/bausch-yanked-talc-from-its-body-powder-months-before-j-j-recall

67.    Dr. Moline performed the research for the two articles at issue with the approval and under the supervision of Northwell.

68.    Dr. Moline performed her research and wrote her articles in her home State of New York with the reasonable expectation that New York law would protect her research and publications from the type of SLAPP suit at issue in this Counterclaim.  Northwell shared this same expectation.

69.    Dr. Moline's first research study ultimately led to the publication of the article entitled, *Mesothelioma Associated With the Use of Cosmetic Talc* ("JOEM Article"), in the January 2020 edition of the Journal of Occupational and Environmental Medicine ("JOEM").  In the JOEM Article, Dr. Moline concluded that exposure to asbestos-contaminated talc powders could cause mesothelioma and made the salutary recommendation that clinicians elicit a history of talcum powder usage in all patients presenting with that disease.

70.    Dr. Moline's research was a matter of vital public and medical interest. This was particularly so because, prior to her publication, it was not well known in the medical community that exposure to talc-based products could cause mesothelioma.  As a result, clinicians were not properly trained to ask patients about their use of talc-based products when obtaining an exposure history of asbestos.

71.    In January 2023, Dr. Moline and her co-authors published an article entitled, *Exposure to cosmetic talc and mesothelioma*, in the Journal of Occupational

Medicine and Toxicology ("JOMT Article") that confirmed the conclusions reached in her earlier research.

72.     Both articles therefore reported on important matters of public interest.

73.     Because Dr. Moline lives and works in New York and wrote her articles there, and because Northwell is based in that State, New York has a significant interest in protecting its citizens and healthcare institutions from claims designed to chill the valuable medical research represented by the JOEM and JOMT Articles.

**D.     J&J Causes LTL And Pecos River To Assert Common-Law Claims Against Dr. Moline Without A Substantial Basis In Fact And Law.**

74.     On May 31, 2023, J&J caused LTL to commence this action by filing a three-count Complaint against Dr. Moline alleging trade libel, fraud, and violation of the Lanham Act, thereby challenging the reasonable conclusions reached in the JOEM and JOMT Articles and repeated in other forums.

75.     The original Complaint's claims for trade libel and fraud were brought without a substantial basis in law and fact within the meaning of New York's anti-SLAPP laws.

76.     The Complaint centered on challenging scientific opinions in Dr. Moline's journal articles that were protected under the First Amendment to the United States Constitution.

77.     The Complaint further challenged Dr. Moline's constitutional right to petition Congress regarding the dangers posed by talc-based products, targeting Dr. Moline's testimony before a Congressional committee.

78.     Similarly, the Complaint challenged Dr. Moline's constitutional right to petition a federal agency (the Environmental Protection Agency) concerning its evaluation of the risks posed by asbestos.

79.     Beyond the facial invalidity of these allegations, the Complaint's fraud claim was based on the implausible allegation that J&J relied on Dr. Moline's scientific conclusions when, to the contrary, it waged a relentless campaign to challenge them.

80.     On June 28, 2024, this Court dismissed these claims, holding that they challenged scientific opinions that were non-actionable as a matter of law.

81.     The Court further held that the Complaint could not challenge Dr. Moline's statements in other forums because those statements repeated her protected scientific opinions.  The Court additionally found that Dr. Moline's statements to a Congressional Subcommittee were protected by the absolute privilege afforded such statements.

82.     As for LTL's fraud claim, the Court held that the Complaint's reliance allegations were implausible, self-contradictory, and defeated by the documents attached to the Complaint.

83.    But J&J persisted.  In April 2025, it obtained from Northwell a list identifying the research subjects of the JOEM and JOMT Articles, which Dr. Moline had anonymized in accordance with her ethical and professional obligations.

84.    On April 29, 2025, J&J caused Pecos River to file a motion to reopen this Court's judgment by claiming that the list produced by Northwell consisted of material new evidence that justified that relief.  Lacking any basis to claim that the list changed the protected nature of the opinions in the JOEM and JOMT Articles, Pecos River instead reframed its allegations to accuse Dr. Moline of fabricating the underlying data used in those articles.

85.    More specifically, in paragraph 101 of the Amended Complaint, Pecos River alleged that "[t]he extensiveness of the fraudulent nature of the Article demonstrates that Dr. Moline fabricated the data presented in her Article." (Amended Cplt. ¶ 101.)

86.    In moving to reopen the case against Dr. Moline, J&J caused Pecos River to abandon LTL's fraud claim entirely and did not seek permission to challenge any statement by Dr. Moline other than the conclusions in the JOEM and JOMT Articles that certain research subjects had no known exposures to asbestos other than through their use of cosmetic talc.  In doing so, J&J confirmed that its fraud claim and its trade-libel claim as originally alleged were without any basis in law or in fact.

87.    On February 27, 2026, this Court granted Pecos River's motion to reopen the case solely on the basis that its new "fabrication" allegations could survive a motion to dismiss:

> Pecos River alleges for the first time that "Dr. Moline fabricated the data presented in her Article." (ECF No. 47-5 ¶ 101.)  And Pecos River argues that it now "has a good-faith basis" to make this allegation following the production of the Key.  (ECF No. 47-1 at 28.)  The Court finds that Pecos River's new allegations concerning the fabrication of data are sufficient to survive a motion to dismiss.

*Pecos River Talc LLC v. Moline*, No. 23-02990, 2026 U.S. Dist. LEXIS 40697, at *43 (D.N.J. Feb. 27, 2026).

88.    J&J caused Pecos River to pursue these "fabrication" allegations while knowing it had no basis to make them.  Shortly after it filed its motion to reopen the case, J&J's counsel wrote to the JOEM demanding that it withdraw the JOEM Article by claiming that a "vast number of individuals" had potential exposures to asbestos other than through talc.  (*See* Letter from Kristen Renee Fournier, Esq., to Dr. Paul W. Brandt-Rauf and Dr. Stacieann Yuhasz, dated May 5, 2025 (attached as Exhibit to F to ECF No. 48-1), at 4.)  J&J's lawyers even threatened to sue the JOEM unless it withdrew the article.  (*Id.*)

89.    On May 15, 2025, counsel for Dr. Moline wrote a responding letter to the JOEM demonstrating that none of the criticisms lodged by J&J were valid.  (*See*

124

Letter from Kevin H. Marino, Esq., to Dr. Paul W. Brandt-Rauf and Dr. Stacieann Yuhasz, dated May 15, 2025 (attached as Exhibit G to ECF No. 48-1).)

90.     On June 3, 2025, the JOEM's editors advised J&J's lawyers that Dr. Moline had satisfactorily responded to J&J's allegation of data fabrication.  (*See* Letter from Dr. Stacieann Yuhasz and Dr. Paul W. Brandt-Rauf to Kristen Renee Fournier, Esq., dated June 3, 2025 (attached as Exhibit 1 to ECF No. 52-1).)  The JOEM's editors accordingly decided that the JOEM article "will not be altered or changed" and that "the publication will stand."  (*Id.*)

91.     The JOEM's rejection of J&J's retraction demand confirms that Pecos River had no basis to allege that Dr. Moline fabricated the evidence underlying her articles.

92.     Beyond that fatal flaw, Pecos River lacks a basis in law and fact to allege that the JOEM and JOMT Articles affected the sales of J&J's Baby Powder and Shower to Shower Products in any way.

93.     A trade-libel claim must be premised on a false allegation concerning a company's product.  But as shown above, no statement in the JOEM and JOMT Articles could be interpreted to falsely accuse J&J of selling talc-based products contaminated with asbestos.  That is because those products *did* contain asbestos, as J&J well knew.

94. A plaintiff that brings a trade-libel claim must prove that it suffered special damages as a result of a false statement. But as shown above, the public was well aware that J&J's talc-based products contained asbestos—and that J&J knew that they contained asbestos—before the JOEM and JOMT Articles were published. Moreover, J&J itself issued a recall of its Baby Powder in October 2019, at or about the time Pecos River alleges that the JOEM Article appeared online, dispelling any notion that the JOEM Article somehow caused J&J's customers to stop using that product.

95. Thus, there is no causal link between Pecos River's frivolous fabrication allegations and the cause of J&J's alleged harm—*i.e.*, the public's awareness that J&J's talc-based products contained asbestos.

96. The timeline of Pecos River's allegation with respect to Shower to Shower and the JOMT Article also makes no sense. J&J sold Shower to Shower to Bausch in 2012 and the JOMT Article was published in 2023, after J&J had already decided to discontinue its talc-based Baby Powder.

97. Pecos River's trade-libel claim lacks any basis in law and fact for many reasons, including but not limited to those set forth above.

126

**E.  J&J Caused LTL And Pecos River To Assert Common-Law Claims Against Dr. Moline To Harass And Intimidate Her And Chill Medically Valuable Research.**

98.  J&J caused LTL to sue Dr. Moline solely to harass and intimidate her and thereby chill research that questions the safety of J&J's talc-based products.

99.  J&J has further caused Pecos River to continue this action solely to perpetuate this pattern of harassment and intimidation and thereby chill socially valuable medical research.

100.  J&J's true objective is not to correct any actual misstatement in the medical literature, but rather to gain an advantage in pending cosmetic-talc lawsuits by discrediting Dr. Moline and her research.  That objective is evidenced by multiple statements made by Erik Haas, J&J Parent's Worldwide Vice President of Litigation, who has repeatedly used LTL's and Pecos River's lawsuit as a vehicle to disparage Dr. Moline personally and discredit her work.  For example:

> a. On or about May 1, 2025, Erik Haas falsely stated that (i) the JOEM Article was "central to the plaintiffs' bar's efforts to wrongly associate talcum powder with cancer-related lawsuits and to malign Johnson's baby powder" and (ii) Dr. Moline's "mission was to promote a fraudulent article to the American public, the judiciary and even Congress, all in an attempt to fuel baseless litigation and enrich the plaintiffs' lawyers who hired her."  George Woolston, *J&J Unit Says New Doc 'Key' To Talc Study Libel Suit*, LAW360, May 1, 2025.[21]

---

[21] *Available at* https://www.law360.com/articles/2333074/j-j-talc-unit-says-new-doc-key-to-talc-study-libel-suit

b. On or about November 21, 2025, Erik Haas falsely stated that Dr. Moline's mission was to promote a "fraudulent article" in a bid to "fuel baseless litigation and enrich the plaintiffs' lawyers who hired her." George Woolston, *'No Evidence' New Info Backs J&J Unit's Libel Suit, Court Told*, LAW360, Nov. 21, 2025.[22]

c. On or about January 6, 2026, Erik Haas stated that, once this case was reopened, J&J would be "entitled to pursue its claims against plaintiffs' expert who fomented junk science with false claims regarding the company's talc powder products." *See* Emily Lever, *NJ Judge Signals Green Light To Revive J&J Unit's Libel Suit*, LAW360, Jan. 6, 2026.[23]

d. On or about February 6, 2026, Erik Haas falsely stated that the record in this case shows that Dr. Moline "blatantly lied" about the facts on which she based her scientific opinions. *See* George Woolston, *3d Circ. Remands J&J Unit's Libel Suit Over Talc Study*, LAW360, Feb. 6, 2026.[24]

101. By causing LTL and Pecos River to aggressively and publicly pursue its nefarious trade-libel claim against Dr. Moline, J&J has caused her to suffer substantial and continuing damages, including but not limited to harm to her professional reputation and her ability to be retained as an expert.

102. Dr. Moline is not the only researcher who has been targeted in this way.

---

[22] *Available at* https://www.law360.com/articles/2414280/-no-evidence-new-info-backs-j-j-unit-s-libel-suit-court-told

[23] *Available at* https://www.law360.com/articles/2426781/nj-judge-signals-green-light-to-revive-j-j-unit-s-libel-suit

[24] *Available at* https://www.law360.com/articles/2438937/3rd-circ-remands-j-j-unit-s-libel-suit-over-talc-study

103.   On May 9, 2024, J&J caused Pecos River's predecessor-in-interest to file an action in the Eastern District of Virginia against Dr. Theresa Emory, Dr. Richard Kradin, and Dr. John Maddox for publishing an article similar to the JOEM and JOMT Articles concluding that exposure to cosmetic talc could cause mesothelioma.

104.   As it did with respect to Dr. Moline's articles, Pecos River alleged that Dr. Emory's article contained "misinformation" that caused J&J's sales of Baby Powder to decline and ultimately caused the company to discontinue its talc-based Baby Powder.  *See* Cplt. ¶¶ 145-46, *LLT Management LLC v. Dr. Theresa Emory, et al.*, No. 4:24-cv-75 (E.D. Va.).

105.   Through this conduct, J&J has engaged in a pattern of filing lawsuits strategically aimed to silence doctors and researchers who have found a connection between the use of talc-based products and mesothelioma.  In doing so, J&J hopes to chill medically valuable research for its advantage in pending lawsuits.

106.   This Counterclaim seeks to hold J&J accountable for such misconduct by causing it to pay Dr. Moline compensatory and punitive damages and attorneys' fees pursuant to New York's anti-SLAPP statutes.

129

## COUNT ONE

### (Damages Pursuant New York State's Anti-SLAPP Statutes)

107.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 106 of this Counterclaim as though fully set forth herein.

108.    New York Civil Rights Law § 70-a(1) authorizes a defendant sued in an "action involving public petition and participation" (the "Covered Action") to assert a counterclaim to recover damages, including costs and attorneys' fees, from any person who commenced or continued such action under specified circumstances.

109.    All three Counterclaim-Defendants are "person[s] who commenced or continued" this Covered Action within the meaning of New York Civil Rights Law § 70-a(1).

    a.    ***Pecos River.***  Pecos River is the nominal plaintiff that is continuing to pursue this action.  Pecos River also alleges in the Amended Complaint that it stands in the shoes of LTL, the entity that commenced this action.  Pecos River is thus a "person" that has "commenced or continued" this action.

    b.    ***J&J Holdco.***  J&J Holdco serves as Pecos River's single member. J&J Holdco also served as LTL's single member before LTL was extinguished through a corporate restructuring that created Pecos River.  As the single member of both companies, J&J Holdo caused LTL and Pecos River to initiate and continue this action against Dr. Moline.  J&J Holdco also dominates and controls Pecos River to the point that Pecos River serves as its mere alter ego or instrumentality. Moreover, adhering to the fiction that Pecos River is a separate corporate entity would perpetrate a fraud or injustice on Dr. Moline and circumvent the purpose of New York's anti-SLAPP statutes. J&J Holdco is thus a "person" that has "commenced or continued" this action.

130

    c. ***J&J Parent.*** J&J Parent is the ultimate parent of J&J Holdco and Pecos River. It also was the ultimate parent of LTL. In that capacity, J&J Parent oversaw and directed the actions of both LTL and Pecos River. Indeed, Erik Haas, J&J Parent's Worldwide Vice President of Litigation, has frequently commented and continues to comment on LTL's and Pecos River's action against Dr. Moline, confirming that J&J Parent caused LTL and Pecos River to initiate and continue this action against Dr. Moline. J&J Parent also dominates and controls Pecos River to the point that Pecos River serves as its mere alter ego or instrumentality. Moreover, adhering to the fiction that Pecos River is a separate corporate entity would perpetrate a fraud or injustice on Dr. Moline and circumvent the purpose of New York's anti-SLAPP statutes. J&J Parent is thus a "person" that has "commenced or continued" this action.

110. New York Civil Rights Law § 76-a(a) defines an "action involving public petition and participation" as a claim based upon "(1) any communication in a place open to the public or a public forum in connection with an issue of public interest; or (2) any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest, or in furtherance of the exercise of the constitutional right of petition."

111. New York Civil Rights Law § 76-a(d) directs courts to construe the phrase "public interest" broadly to mean "any subject other than a purely private matter."

112. Subdivision (a) of New York Civil Rights Law § 70-a(1) authorizes a defendant in a Covered Action to recover costs and attorneys' fees upon a demonstration that "the action involving public petition and participation was

131

commenced or continued without a substantial basis in fact and law and could not be supported by a substantial argument for the extension, modification or reversal of existing law."

113.   Subdivision (b) of New York Civil Rights Law § 70-a(1) authorizes a defendant in a Covered Action to recover compensatory damages "upon an additional demonstration that the action involving public petition and participation was commenced or continued for the purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting the free exercise of speech, petition or association rights."

114.   Subdivision (c) of New York Civil Rights Law § 70-a(1) authorizes a defendant in a Covered Action to recover punitive damages "upon an additional demonstration that the action involving public petition and participation was commenced or continued for the sole purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting the free exercise of speech, petition or association rights."

115.   The case filed against Dr. Moline—by nominal plaintiffs LTL and Pecos River (together, the "J&J Action")—is an "action involving public petition and participation" within the meaning of New York Civil Rights Laws §§ 70-a(1) and 76-a.  Both the JOEM and JOMT Articles are communications made in a public forum in connection with an issue of public interest.  Both articles also constitute

lawful conduct in furtherance of Dr. Moline's exercise of her constitutional rights to free speech and petition in connection with an issue of public interest.

116.    The J&J Action further targeted Dr. Moline's repetition of the protected scientific conclusions in the JOEM and JOMT Articles in multiple forums.  These forums included a Congressional Committee and the EPA, governmental entities that Dr. Moline has a constitutional right to petition.  Dr. Moline's repetition of her scientific conclusions in the forums identified in the Complaint and Amended Complaint were communications made in a public forum in connection with an issue of public interest.  Those challenged statements also consist of lawful conduct in furtherance of Dr. Moline's exercise of her constitutional rights to free speech and petition in connection with an issue of public interest.

117.    The JOEM and JOMT Articles and Dr. Moline's repetition of their protected scientific conclusions concerned matters of "public interest" within the meaning of New York Civil Rights Law § 76-a(1)(d).  Indeed, whether exposure to cosmetic talc can cause mesothelioma, and whether clinicians should question patients presenting with mesothelioma about their use of cosmetic talc, are matters of grave concern to the public, researchers, and the medical community.

118.    LTL's trade-libel and fraud claims as alleged in the Complaint lacked a substantial basis in law and fact.

133

119.   Pecos River's trade-libel claim as alleged in the Amended Complaint lacks a substantial basis in law and fact.

120.   Dr. Moline has incurred substantial attorneys' fees and costs to defend against LTL's and Pecos River's claims.

121.   The J&J Action was commenced and continued for the purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting Dr. Moline's free exercise of her rights to free speech, petition, or association.

122.   The J&J Action caused Dr. Moline to suffer compensatory damages, including but not limited to damage to her professional reputation and her ability to be retained as an expert.

123.   The J&J Action was commenced and continued for the sole purpose of harassing, intimidating, punishing or otherwise maliciously inhibiting Dr. Moline's free exercise of her rights to free speech, petition, or association, making an award of punitive damages appropriate.

WHEREFORE, Dr. Moline respectfully requests that the Court enter judgment in her favor and against Pecos River, J&J Holdco, and J&J Parent:

   (a)   awarding Dr. Moline damages, in accordance with New York Civil Rights Law § 70-a(1)(a), consisting of attorneys' fees and costs incurred in this action;

(b)    awarding Dr. Moline compensatory damages in accordance with New York Civil Rights Law § 70-a(1)(b);

(c)    awarding Dr. Moline punitive damages in accordance with New York Civil Rights Law § 70-a(1)(c); and

(d)    awarding Dr. Moline such other and further relief that this Court finds just and equitable.

## DEMAND FOR JURY TRIAL

Dr. Moline respectfully requests a trial by jury on all triable issues on her Counterclaim in accordance with Federal Rule of Civil Procedure 38.

**MARINO, TORTORELLA & BOYLE, P.C.**

Dated:    April 10, 2026    By: _____

Kevin H. Marino
John D. Tortorella
Erez J. Davy
437 Southern Boulevard
Chatham, New Jersey 07928-1488
(973) 824-9300
*Attorneys for Defendant/Counterclaim-Plaintiff Dr. Jacqueline Moline*

135